```
1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3   SAGE HUMPHRIES, GINA MENICHINO,)  Case No. 2:21-cv-01412-ART-EJY
    ROSEMARIE DEANGELO, DANIELLE    )
4   GUITIERREZ, JANE DOE 1 AND      )  Las Vegas, Nevada
    JANE DOE 2,                     )  Wednesday, April 5, 2023
5                                   )  10:06 a.m. - 12:19 p.m.
                   Plaintiffs,      )
6                                   )  Courtroom 3A
             v.                     )  MOTION HEARING
7                                   )
    MITCHELL TAYLOR BUTTON AND      )
8   DUSTY BUTTON,                   )
                                    )
9                  Defendants.      )  C E R T I F I E D   C O P Y
    _____)

10

11

12              REPORTER'S TRANSCRIPT OF PROCEEDINGS

13          THE HONORABLE ELAYNA J. YOUCHAH
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

14

15
    APPEARANCES:  (See next page.)
16

17  REPORTED BY:  PAIGE M. CHRISTIAN, RPR, CRR, CCR #955
                  United States District Court
18                333 South Las Vegas Boulevard
                  Las Vegas, Nevada  89101
19

20

21

22

23

24  Proceedings reported by machine shorthand.
    Transcript produced by computer-aided transcription.
25
```

1   **APPEARANCES:**

2

3   For Plaintiffs:

4           **LINDSEY RUFF, ESQ.   (*Pro Hac Vice*)**
            *BOIES SCHILLER FLEXNER*
5           55 Hudson Yards
            New York, NY 10001
6           (212) 754-4372
            E-mail: lruff@bsfllp.com

7      --AND--

8
            **RICHARD J. POCKER, ESQ.**
9           *BOIES SCHILLER FLEXNER LLP*
            300 South Fourth Street
10          Suite 800
            Las Vegas, NV 89101
11          (702) 382-7300
            E-mail: rpocker@bsfllp.com

12     --*AND*--

13
            **SIGRID McCAWLEY, ESQ.**
14          *BOIES SCHILLER FLEXNER*
            401 East Las Olas Boulevard
15          Fort Lauderdale, FL 33301
            (954) 356-0011
16          E-mail: smccawley@bsfllp.com

17     --*AND*--

18          **SABINA MARIELLA, ESQ.**
            *BOIES SCHILLER FLEXNER*
19          55 Hudson Yards
            New York, NY 10001
20          (212) 754-4541
            E-mail: smariella@bsfllp.com

21

22   For Defendant Dusty Button:

23          **DUSTY BUTTON, PRO SE**
            5664 Deer Creek Falls Court
24          Las Vegas, NV 89118
            E-mail: worldofdusty@gmail.com

25

 1    For Defendant Mitchell Taylor Button:

 2          **MITCHELL TAYLOR BUTTON, PRO SE**
            5664 Deer Creek Falls Court
 3          Las Vegas, NV 89118
            E-mail: desmodynamica@gmail.com

 4

 5    For Movant Randazza Legal Group:

 6          **TREY ALAN ROTHELL, ESQ.**
            *RANDAZZA LEGAL GROUP, PLLC*
 7          4974 S. Rainbow Boulevard
            Suite 100
 8          Las Vegas, NV 89118
            (702) 420-2001
 9          E-mail: tar@randazza.com

10      *--AND--*

11          **RONALD D. GREEN, JR., ESQ.**
            *RANDAZZA LEGAL GROUP*
12          4974 S. Rainbow Boulevard
            Suite 100
13          Las Vegas, NV 89118
            (702) 420-2001
14          E-mail: rdg@randazza.com

15

16

17    ALSO PRESENT:  Dennis Kennedy, Esq.;
                     Shilah Wisniewski, Legal Assistant
18

19

20

21

22

23

24

25

```
 1          LAS VEGAS, NEVADA; WEDNESDAY, APRIL 5, 2023; 10:06 A.M.

 2                              --o0o--

 3                    P R O C E E D I N G S

 4              COURTROOM ADMINISTRATOR:  All rise.

 5              THE COURT:  Good morning, everyone.  Please be

 6   seated.

 7              COURTROOM ADMINISTRATOR:  This is the time set in the

 8   case of 2:21-cv-01412-ART-EJY, Sage Humphries vs. Dusty Button.

 9              Plaintiffs' counsel, please enter your appearance for

10   the record.

11              MS. McCAWLEY:  Good morning, Your Honor.  Sigrid

12   McCawley from Boies Schiller Flexner on behalf of the plaintiffs.

13   In this case, there are a number of plaintiffs.  I have with me

14   my colleagues, Sabina Mariella and Lindsey Ruff as well as my

15   partner, Rick Pocker.

16              THE COURT:  And the other individuals in the

17   courtroom?

18              MS. McCAWLEY:  I'm sorry.  And Dennis Kennedy, who is

19   our Bar counsel.

20              THE COURT:  Okay.  Thank you.  And that's just an

21   observer --

22              MS. McCAWLEY:  Shilah is from our office.  Thank you.

23              THE COURT:  Thank you.

24              And gentlemen.

25              MR. ROTHELL:  My name is Trey Rothell.  I'm appearing
```

2:21-cv-01412-ART-EJY - Wednesday, April 5, 2023    5

```
 1   for nonparty Randazza Legal Group --

 2              THE COURT:  Okay.

 3              MR. ROTHELL:  With me is Ron Green.

 4              THE COURT:  Why don't you come sit at the table since

 5   you have a motion that's pending and you will be arguing.

 6              MR. ROTHELL:  Thank you.

 7              THE COURT:  Go ahead.

 8              COURTROOM ADMINISTRATOR:  And defendants, please

 9   enter your appearance into the record.

10              MS. BUTTON:  Dusty Button.

11              MR. BUTTON:  Mitchell Button.

12              THE COURT:  Thank you.

13              All right.  Just in case there's any question at any

14   point for the Buttons, the camera is in the back of the room.  So

15   when I turn to look at you, it looks like I -- sometimes it looks

16   like I'm looking away from you, like I'm staring at a screen.

17   You are, in fact, on the screen that is in front of me.  So when

18   I look like this (indicating), I can't see you, so that's why it

19   may look like I'm not looking straight at you.

20              All right.  Also, I want to make everybody aware that

21   I received through my courtroom deputy three e-mails this morning

22   from the Buttons with a variety of exhibits attached.  Because of

23   the volume of the exhibits, I could not review them all and have

24   not reviewed them all.

25              I don't know that they are pertinent.  I know that
```

1  the parties were copied, the plaintiffs were copied on them this
2  morning, as well.

3          I will also advise that prior to receiving these
4  e-mails, my courtroom deputy did receive an e-mail from the
5  Buttons, who are pro se.  They did not copy opposing counsel or
6  opposing parties.  There was nothing attached to them.  I
7  instructed her to simply write the Buttons back and explain that
8  we don't respond ex parte and that they needed to copy everyone,
9  whether -- nothing else was communicated to them.  And because,
10 obviously, of the volume of the exhibits, it took them awhile,
11 undoubtedly, to scan and e-mail everything.  Unfortunately, the
12 late delivery of them makes it a little difficult to consider
13 them if they are relevant at all.

14          Also, let me just make for the record what is before
15 me and what I will be deciding, presumably, from the bench today.
16 Plaintiffs -- and not in this order:  Plaintiffs' motion for
17 sanctions, which is ECF No. 120; defendants' motion to strike the
18 motion for sanctions, ECF No. 123; plaintiffs' motion for
19 protective order, ECF No. 138.  I also have reviewed the
20 supplement to that, which I ordered to be filed, which is at ECF
21 No. 141; defendant's counter-motion to ECF No. 134, that is,
22 plaintiff's motion for protective order, and their counter-motion
23 is ECF No. 138; defendant's motion to strike the statements in
24 Juliet Doherty's dismissal, ECF No. 140; defendant's motion to
25 quash subpoenas at ECF No. 143; and third-party Randazza Law

1    Group's motion to quash subpoenas at 148.

2              I have a particular order I'm going to take these in.

3    Because of the number of documents that have been filed and that

4    will be considered and the substantial amount of time the Court

5    has spent reviewing not only the motions and responses but

6    numerous exhibits and information that is on the web that is

7    linked in the exhibits and the consideration of the legal issues,

8    I am telling everybody keep your arguments brief.  If you don't

9    have something to tell me in addition to what's in the written

10   documents, you can say, I have nothing in addition to

11   what's -- what's been submitted.  That's fine.

12             Please do not repeat what is in the motions and

13   responses, and that goes both for the Buttons and for counsel,

14   because I don't need that.  I could probably recite some of these

15   verbatim given the number of times I've reviewed them to ensure I

16   understand all of the issues that are presented.

17             I am also going to start with two motions that I'm

18   going to decide without argument because they can -- they are

19   appropriately decided in that manner.  Those are ECF No. 123 and

20   ECF No. 140.

21             ECF No. 123 is a motion to strike the motion for

22   sanctions.

23             Mr. and Mrs. Button, motions to strike are rarely

24   granted by the Court.  They are rare.  They are an extreme result

25   for the Court to reach, and they are -- they are granted almost

1    only when we are talking about pleadings.  Pleadings as opposed

2    to motions are complaints, answers, amended complaints, amended

3    answers.  Motions to strike do not typically apply to motion

4    practice.  And you can find that law in a variety of places, but

5    I will refer you to 922 F.Supp. 1450 at 1478, a Central District

6    of California case.  Rule 12(f) motions are generally disfavored

7    because they are often used as a delay tactic.  And because of

8    their importance, they are limited to pleadings in federal

9    courts.  That's my paraphrase.

10           Also, 12(f) motions have to demonstrate that the

11   materials that are sought to be struck are redundant, immaterial,

12   impertinent, or scandalous.  A matter is immaterial if it has no

13   bearing on a controversy before the Court.  Allegations are

14   impertinent if they are not responsive to the issues that arise

15   in an action and are inadmissible in evidence.  And scandalous

16   matters are those matters that are cruelly derogatory.

17           The Court's review of the motion for sanctions, while

18   I understand has -- is -- has some strong presentation of

19   information in it, the Court finds it is not immaterial; the

20   information is not impertinent; it is not scandalous; and it is

21   not redundant.  And for that reason, the motion is denied.

22           This is not to suggest that the Court agrees with or

23   is finding in favor of anything that is said in the motion

24   to -- for sanctions at this juncture.  That will be decided later

25   in the hearing.  It's merely denying the motion to strike it.

1          ECF No. 140 also seeks to strike language this time

2    from the dismissal in Juliet Doherty's dismissal.  And the same

3    standards apply to that -- to that dismissal, as I've just

4    described.  And while there is language in the dismissal that, I

5    understand, the Buttons object to or find offensive and I don't

6    take issue with their feelings or their concerns about it, it is

7    not appropriate under the law to strike that.  So ECF No. 140 and

8    123 are denied.

9          I'm going to take Randazza's motion last because they

10   are no longer representing a party.  They are here on behalf of a

11   law firm that was subpoenaed.  And I will hear argument from the

12   Randazza Law Group (sic) and defendants.

13         This plaintiffs -- excuse me.

14         Plaintiffs, I will -- I will also -- as it bleeds

15   over to the motion to quash that is filed by the Buttons, I will

16   hear from the Buttons, as well.

17         Oh, let me just make clear that I understand Randazza

18   group argues three basic issues with respect to their motion to

19   quash the documents that were sought from them:  Undue burden,

20   the documents are more easily obtained from defendants, and that

21   Randazza group is not in a position to waive privilege for the

22   Buttons.

23         With the third proposition, I agree.  The Randazza

24   group is not in a position to waive the privilege for the

25   Buttons.  Only the Buttons can do that.  And whether they have

1    done that is a separate question, and I will address that

2    separately.

3              But with respect to the first two, I don't find undue

4    burden or more easily obtained from the defendants in this case

5    because they are not represented.  These are persuasive

6    arguments.

7              But setting that aside, I note that the firm -- the

8    RLG clearly states there are no communications with anyone

9    regarding the web site just- -- justiceforthebuttons.com or the

10   YouTube channel @fletcherreid and that they argue this disposes

11   of Topics 3 through 8 on the subpoena.

12             It is their motion.

13             Counsel, if you want to add anything to what I've

14   said, I'm happy to hear, but I was going to turn it over to

15   plaintiffs' counsel to tell me why I should not find or -- or

16   quash the subpoena with respect to 3 through 8 since you have no

17   responsive documents.

18             **MR. ROTHELL:**  I think --

19             **THE COURT:**  Please stand, just for --

20             **MR. ROTHELL:**  Sorry.

21             **THE COURT:**  That's okay.  Thank you.

22             **MR. ROTHELL:**  I think we are fine with what's written

23   in the papers.  That representation is accurate.

24             **THE COURT:**  Okay.  Thank you.  All right.

25             So do you wish to be heard?  And if you want to speak

 1    among yourselves for a minute, that's fine.

 2            **MS. McCAWLEY:**  We do, Your Honor.  I'm going to, with

 3    the court's permission, allow Sabina Mariella to argue this

 4    portion.

 5            **THE COURT:**  Certainly.  Not the motion.  Just

 6    Requests 3 through 8.  That's it.

 7            **MS. MARIELLA:**  Understood, Your Honor.

 8            Where -- the Randazza Law Group has already informed

 9    us through their briefing that they have no responsive documents,

10    so we don't see that as a basis to quash the subpoena.  We would

11    ask that they just simply include in their response to the

12    subpoena that they have performed a diligent search and have no

13    responsive documents.  I'm not sure why that justifies quashing

14    it in its entirety.

15            **THE COURT:**  Well, I'm not quashing the subpoena in

16    its entirety.  It was only 3 through 8 --

17            **MS. MARIELLA:**  Understood.

18            **THE COURT:**  -- that they were talking about.

19            **MS. MARIELLA:**  Understood.

20            **THE COURT:**  All right.  Is there anything else?

21            **MS. MARIELLA:**  Not on those.

22            **THE COURT:**  Okay.  Thank you.

23            With Request No. 9, the Randazza Law Group

24    communication with third parties concerning this lawsuit, the

25    Court finds that request, as worded, overbroad.  It could include

1  many things that would not be appropriately produced, for

2  example, the search for an expert, which would not necessarily be

3  appropriate to produce, or a simple question about gathering

4  information about the Massachusetts case communication with a

5  third party in -- in that matter or a response to an unsolicited

6  e-mail.  There are many things that would not be responsive, in

7  my opinion, or appropriately produced.  And the way it is worded,

8  because it uses the word "all communications," it is overbroad

9  and burdensome.

10        I -- with respect to a limited number of

11  communications with the Buttons, which is Request No. 2, I will

12  be finding to the contrary, but that is a separate issue.

13        Is there a reason that all communications with the

14  Randazza Law Group are appropriately produced in response to the

15  subpoena?

16        **MS. MARIELLA:**  No, Your Honor.  I think -- so

17  we -- when we conferred with the counsel for the Randazza Legal

18  Group, we offered to work with them to narrow that request.  So

19  we think that the motion on that request is premature because

20  we're still willing to confer about a more narrowed request --

21        **THE COURT:**  No.  You're going to tell me now.  I'm

22  not leaving this to another day.

23        What is the issue?  How have you offered to -- to

24  narrow it?

25        And then I'll hear from the Randazza group.

1          **MS. MARIELLA:**  Yes, Your Honor.

2          So what we're primarily concerned with are any -- as

3 you'll hear from Ms. Ruff, we're primarily concerned with these

4 harassing online platforms that we believe the defendants are

5 posting discovery materials to and communications to.  And part

6 of what they've posted are communications with the Randazza firm.

7 So the defendants have disclaimed any connection to those web

8 sites --

9          **THE COURT:**  I don't want to hear argument on that.

10 That's one issue.

11          What else do you want to -- what other topics?

12          **MS. MARIELLA:**  So the -- the purpose of Request 9 was

13 primarily to understand how these materials got on these web

14 sites if it wasn't the defendants, because we believe if it

15 wasn't the defendants -- it either has to be the defendants or

16 Randazza Legal Group since the communications between them are on

17 these videos.

18          **THE COURT:**  I'm not -- I'm sure you're not saying

19 that Randazza Law Group would have violated the attorney-client

20 privilege with their clients without their permission, correct?

21          **MS. MARIELLA:**  We have no reason to believe that they

22 did that.

23          **THE COURT:**  All right.  Thank you.

24          Do you wish to be heard on this discrete issue, sir?

25          **MR. ROTHELL:**  Yes, Your Honor.  As to Request No. 9,

1   again, it's overbroad --

2            **THE COURT:**  No.  Just to the extent that they have

3   offered to narrow it, please.

4            **MR. ROTHELL:**  Okay.  Yes, Your Honor.

5            I believe that's subsumed in Requests 3 through 8.

6   And on that topic, as to the web site, we still maintain we don't

7   have any documents or communications regarding the web site

8   justiceforthebuttons.com and the @fletcherreid YouTube account

9   that would be responsive.

10           **THE COURT:**  All right.  All right.  With Request

11  No. 1, the Court reviewed the content of the YouTube channel.  I

12  think it's *Cat's Out of the Bag* (phonetic), specifically.  That

13  is the video that we are talking about here at time marker

14  54 seconds, five minutes and 45 seconds, 5 minutes and

15  48 seconds, as well as portions of the video that immediately

16  preceded it and came after that.  In fact, the Court has looked

17  at that video in its entirety more than once to make decisions

18  regarding the video itself.

19           My preliminarily review leads me to conclude that the

20  screen at 54 seconds does not contain any information waiving the

21  privilege or that requires further investigation.  This is -- and

22  I have the screens with me so that I didn't have to pull them up

23  on the computer if I did not have to.

24           And screen 50 -- at 54 seconds -- that's the wrong

25  screen.  Excuse me.

1          The screen at 54 seconds says, We have to file an

2    opposition, and we need comments from you.  Obviously, the

3    Buttons.

4          And -- and response is, Actually, Marc, I responded

5    to everything two days ago.  I also called Trey.

6          That is simply an exchange about filing the motion

7    -- filing an opposition to the motion to sanction -- for

8    sanctions.  It does not ask for or provide any legal advice.  It

9    provides a set of facts.

10          There is some language in there that I'm sure that

11   the parties never expected, or certainly, the Randazza group

12   never expected, to be disclosed, but I set that aside.  I don't

13   see that as -- as waiving or requiring further investigation,

14   especially because the opposition was filed.

15          With respect to the screens at 5:45, 5 minutes

16   45 seconds, and 5 minutes 48 seconds, those are going to be

17   discussed when I consider Request No. 2, which is whether the

18   attorney-client privilege has been waived and to what extent it

19   has been waived.  So I'm only interested in hearing about if

20   anybody has further argument they want to make at the -- with

21   respect to the disclosure that is at screen 50 -- at 54 seconds.

22          And if you do not have it, I can provide it to you

23   through my court reporter because I -- my court -- sorry, my

24   courtroom deputy because I printed it out.  It's a discrete, very

25   discrete, screen.

1            Do you have anything further you want to add, sir?

2            **MR. ROTHELL:**  No, Your Honor.

3            **THE COURT:**  Thank you.

4            And from plaintiffs?

5            **MS. MARIELLA:**  No, Your Honor.

6            **THE COURT:**  Okay.  Very good.

7            All right.  Then, we are moving to Request No. 2,

8  which I think is the heart of the subpoena and the real concern

9  here, which is -- and this -- which is whether the

10 attorney-client privilege has been waived.

11            And this implicates the Buttons' motion, as well, and

12 when I hear argument about this, I will hear from the Buttons, as

13 well.  That motion is at ECF No. 143.

14            The Court first looked to Federal Rule of Evidence at

15 502.  502 is the rule of evidence that pertains to the

16 inadvertent disclosure of attorney-client privilege.  And in

17 that, when -- when a Court considers whether there's been an

18 inadvertent disclosure, there are five factors typically

19 considered:  Reasonableness of the precautions taken against

20 disclosure; the time -- the time taken to rectify the error; the

21 scope of the discovery; and the extent of the disclosure, as well

22 as overriding issues of fairness.

23            This is found in 144 F.R.D. 11 -- 111 at 115.  It's a

24 District of Oregon case at 1991.  It is citing a Ninth Circuit

25 case.

1            And there is a Ninth Circuit case that expressly says

2    that the inadvertent disclosure of attorney-client information

3    does not constitute waiver.  That's at 829 F.2d 909.  It's a 1987

4    Ninth Circuit case, but I did ensure that this was still good law

5    before I provide that to you for citation purposes.

6            The Court considered these factors and finds that

7    greater precaution clearly could have been taken and should have

8    been taken to protect the information that is disclosed that

9    is -- appears to be attorney-client privileged communications to

10    the Court.  But I also find, or am predisposed to find, that the

11    disclosure was very narrow.  And while there's been no effort to

12    rectify the error, I think there are complicated reasons for

13    that, not the least of which who has control over the video in

14    which these materials appear, which is clearly disputed.

15            The Court has focused on two considerations:

16    Defendants' pro se status, which does not waive or excuse a

17    waiver of -- of privilege, by any means, but it is part of the

18    overall consideration for purposes of fairness, and the scope of

19    what was disclosed.

20            As I said, I don't find the disclosure at screen 54

21    having -- or the screen at 54 having disclosed or waived the

22    privilege, but I cannot say the same for what is at 1 -- at

23    5 minutes and 44 seconds, 5 minutes and 45 seconds, both of which

24    respond to and was not noted in the motion practice, an e-mail

25    that is set -- that is shown or a text message that is shown at

1    5 minutes and 41 seconds.

2            That -- whether those screens have waived a privilege

3    is another issue and one on which I am willing to hear -- hear

4    argument.  I will hear argument.

5            It is -- it is the Court's, at least,

6    initial appearance -- initial decision that there is a waiver.

7    It is a narrow waiver.  And there is plenty of Ninth Circuit case

8    law that talks about whether a narrow subject matter waiver

9    waives the privilege in the entirety, and it does not, or it does

10   not necessarily.  And in this case, having looked at these

11   video -- at the video and all of the screens very carefully, it's

12   my -- my initial feeling that the waiver here is a narrow one.

13           The -- the exchange of information is for purposes of

14   obtaining or giving attorney-client advice and -- but it is about

15   a -- the use and disclosure of information from Sage Humphries'

16   phone.

17           It doesn't implicate specifically whether there is

18   retention of that phone and its contents by the Buttons, but

19   there are certainly statements in these screenshots that suggest

20   they do have the contents and continue to have the

21   contents -- did have the contents and continue to have the

22   contents.

23           So at -- at screens 44 and 45 and five minutes, after

24   counsel says it's not terribly shocking that the plaintiffs have

25   filed the motion over the use of information from Ms. Humphries'

1  phone, a statement, in and of itself, that the Court finds

2  surprising, the defendants respond, in part, We have used nothing

3  from her phone.

4          That phrase suggests you have the phone.  You

5  couldn't use something from a phone that you do not have -- a

6  copy of the phone -- copy of the download of the phone.  You

7  can't use something you do not have a copy of, you do not have

8  access to.  It doesn't say, We don't have the phone.  It says, We

9  have used nothing from her phone, exactly what it says.

10         Then the text message goes on to say and admit that

11 only -- and the word "only" is in capitals.  That was backed

12 up -- the only thing that was backed up is data to our hard

13 drive.  And that included texts with Daryl Katz.  Those are the

14 words of the Buttons, never anything else.

15         I note that the Buttons now talk about the camera

16 roll only.  This has not been lost on the Court.

17         So my reading of this is that there is a clear

18 exchange between counsel and -- and defendants about use of

19 information on Ms. Humphries' phone that was at one time backed

20 up to a computer or external hard drive that belonged to, or was

21 controlled by, the Buttons and that they retained it at least at

22 the time that these text messages went back and forth and that

23 this waived the privilege with respect to the possession of -- of

24 a copy of Ms. Humphries' phone, the continued retention of that

25 copy, and the use of information of that and what that

```
 1   information comprised.  Clearly, at one time, it comprised texts.
 2   Only Katz's texts came from the folder uploaded to our drive.
 3   Clearly, those were on a hard drive or an external drive at one
 4   time that was in the defendants' possession, not just the camera
 5   roll.
 6            All right.  So with all of that and the narrow topic
 7   that I find the waiver pertaining to -- the possession, the
 8   continued possession, the content, and the use of information
 9   from Sage Humphries' phone -- I'm willing to hear argument about
10   how more -- a broader waiver occurred and/or anything else that
11   you want to address with respect to Request No. 2 and all
12   communications between counsel and the Buttons.
13            Do you wish to be heard?
14            MR. ROTHELL:  Yes, Your Honor.
15            THE COURT:  Please.
16            MR. ROTHELL:  Thank you.
17            I'm mindful of the fact that Your Honor advised us
18   not to repeat arguments in our briefing.  I would just emphasize
19   that all of these communications are in the possession of the
20   Buttons, necessarily, because they are made between counsel and
21   the Buttons.
22            There's not been, to my knowledge, a motion to compel
23   on that subject.  They represented that they had previously
24   requested those documents from the Buttons, and they had not been
25   produced --
```

1            **THE COURT:**  Well, no, no, no.  Sir, these would be
2  communications between your firm and the Buttons, so you would
3  also be in possession of those, correct?
4            **MR. ROTHELL:**  Yes, Your Honor.
5            **THE COURT:**  Okay.
6            **MR. ROTHELL:**  And that goes to the unduly
7  burdensome nature of the --
8            **THE COURT:**  On the limited topic that I've given you?
9            **MR. ROTHELL:**  Yes.  They would be in possession of
10  all of those communications.
11            **THE COURT:**  Okay.
12            **MR. ROTHELL:**  Thank you.
13            **THE COURT:**  Thank you.
14            Counsel.
15            **MS. MARIELLA:**  I won't repeat what's in our papers on
16  this point.  I agree with the scope of the waiver that Your Honor
17  has set out, and I think it's important and relevant to our case,
18  those communications.
19            We have requested them from the defendants.  They
20  have not been produced, and they've refused to produce them.
21            We didn't file a motion to compel because Your Honor
22  ordered us not to file anything else.
23            **THE COURT:**  That's right.
24            **MS. MARIELLA:**  We think, either way, we are entitled
25  to them.  We don't necessarily care who produces them to us, but

1    we just want to make sure that we get all of the communications

2    within the scope of the waiver.

3            **THE COURT:**  Thank you.  All right.

4            I don't know who's speaking for the Buttons, but I'll

5    hear from you now, please.

6            **MR. BUTTON:**  Are we allowed to both speak, both of

7    us?

8            **THE COURT:**  Yes.  But generally, on one topic, one

9    person would take the lead.  But go ahead.

10           **MR. BUTTON:**  Okay.

11           **THE COURT:**  Thank you.

12           **MR. BUTTON:**  So --

13           **MS. BUTTON:**  I can only reference one exhibit that is

14   pertinent based on week ago, an order from the --

15           *(Whereupon, the reporter interrupts to preserve the*

16           *record.)*

17           **THE COURT:**  Ms. Button, hold on a second.

18           **MS. BUTTON:**  Okay.

19           **THE COURT:**  The court reporter who's in the room did

20   not hear all of what you said.

21           **MS. BUTTON:**  Oh.

22           **THE COURT:**  What is it that you didn't hear?

23           Hold on a second.  Before you say anything else, let

24   the court reporter tell us what she did not hear.  Okay?  Hold

25   on.

 1              **MS. BUTTON:**  Okay.

 2              **THE COURT:**  Yes.  Go ahead.

 3         *(Record read.)*

 4              **THE COURT:**  Massachusetts court.

 5              Okay.  She was missing what state.  So I heard what

 6    you said, Ms. Button --

 7              **MS. BUTTON:**  Okay.

 8              **THE COURT:**  -- so please go ahead.

 9              So there was an order from the Massachusetts court

10    that vacated the no contact order?

11              **MS. BUTTON:**  That is still pending currently --

12              **THE COURT:**  Okay.

13              MS. BUTTON:  -- But there was another order that was

14    already issued on March 10th from Judge Lyons at the Boston

15    Municipal Court that actually clarifies that there was no

16    violation whatsoever in regards to the abuse prevention order.

17    And it actually verifies that that was our property; that we were

18    not in contempt of any order; that Sage did willingly upload this

19    onto our property; and most importantly, that it was never to be

20    destroyed, as McCawley stated in a letter to us on August 12th

21    saying we were directed to destroy this information.  That is

22    false information, and we are actually not held in contempt.  And

23    they found there was no violation to this, whatsoever.  And the

24    judge actually said, in any case, which it's not, if the web site

25    had been produced by us and the videos produced by us that

 1  nothing from those videos or the web site contained any

 2  information from Sage Humphries' camera roll backup that she

 3  herself has now admitted in her admission that she uploaded onto

 4  our hard drive while she was living with us.  And in fact, her

 5  Boston attorney --

 6            THE COURT:  Mrs. Button --

 7            MS. BUTTON:  -- lied to the court --

 8            THE COURT:  -- Mrs. Button --

 9            MS. BUTTON:  Yes.

10            THE COURT:  -- hold on.

11            MS. BUTTON:  Okay.

12            THE COURT:  You're not in Massachusetts.  You're in

13  Nevada --

14            MS. BUTTON:  Correct.

15            THE COURT:  -- this is a federal court --

16            MS. BUTTON:  Correct.

17            THE COURT:  -- okay?

18            MS. BUTTON:  I understand.

19            THE COURT:  I am interested in what the Massachusetts

20  court said, but I know --

21            MS. BUTTON:  Okay.

22            THE COURT:  -- that that March 10th order did not say

23  that you have free use of information downloaded from Sage

24  Humphries' phone onto your hard drive or your computer.  That's

25  not what the order said.

1              It may not have found you in contempt, I understand

2    that, because there was insufficient evidence to determine that

3    you or Mr. Button had uploaded -- created and uploaded, owned, or

4    controlled the various videos at issue, not just the one video

5    that we're talking about now.  So I understand all that.

6              What that doesn't respond to and the issue that's

7    being considered right now, because those issues will be

8    discussed in a little bit, is the waiver of the attorney-client

9    privilege.  I want to make sure you understand what's being

10   talked about now is --

11             **MS. BUTTON:**  I do.

12             **THE COURT:**  -- whether -- whether these texts that

13   went back and forth between you and the Randazza Law Group waived

14   a privilege as to a very limited amount of information; that is,

15   any communications between the two of you that pertain to the

16   owner- -- the download of Mrs. -- of Ms. Humphries' phone, the

17   content of the phone, the use of the phone, and the continued

18   possession of the phone download, the download, not the phone

19   itself.  That is what the Court is asking about only.

20             So I'd like you to --

21             **MR. BUTTON:**  Okay.

22             **THE COURT:**  -- confine these particular comments --

23   not that what you're saying may not be relevant to another issue

24   before the Court.  This issue is attorney-client privilege.

25             Do you have anything you want to tell me about that?

 1                MR. BUTTON:  Yes.

 2                MS. BUTTON:  I will let him.

 3                THE COURT:  Okay.

 4                MR. BUTTON:  Yes.

 5                THE COURT:  Go ahead.

 6                MR. BUTTON:  I'd like to say, we've never -- you

 7    know, I know you mentioned how we can be cautious with this data.

 8    We never shared anything that we've said between our counsel and

 9    ourselves with anyone in any way, shape, or form.  We actually

10    believe that Anthony Pellicano, who was the result of McCawley

11    and Daryl Katz' coercion together with all of this stole this

12    data and broke into our home, broke into our telecommunications

13    box to tap our phone lines, which is what he was released from

14    prison after 17 years for.  So we haven't -- we haven't shared

15    any of this data.  We've certainly never disclosed it to anyone

16    or released our privilege.

17                But in regards to the data discussed, yes, we did

18    have a copy at the time of this backup, as allowed by the Boston

19    court, because that was not a stipulation.  When Ms. McCawley

20    e-mailed our attorney as stated in this e-mail that we were to

21    destroy all data, she is misinterpreting the Boston order, and

22    she manipulated the Nevada court to force us to destroy that

23    data the Boston --

24                THE COURT:  Mr. Button, Ms. McCawley backed off the

25    comment about destruction.  I've read that.  I know that.  And

1    this Court has never ordered the destruction of the data, simply

2    the turnover of all of it to be retained by plaintiffs' counsel.

3    And you may seek copies back, which you have done.

4              So there's never been --

5              **MS. BUTTON:**  But they refused to give it to us.

6              **THE COURT:**  One -- that will come up later.  That's

7    not what this subject matter is about.

8              And I know you're not attorneys, so I'm trying to

9    keep you focused.

10             And I understand, Mr. Button, what you are saying is

11   that you did not disclose these text messages.  You have not

12   waived the privilege.  That's what you're --

13             MR. BUTTON:  Never.

14             THE COURT:  -- saying --

15             MR. BUTTON:  Yes.

16             THE COURT:  -- it is Mr. -- whatever his last name

17   is, the guy who's associated with Daryl Katz who allegedly broke

18   into your home, stole your data, tapped your phone lines, and

19   obtained this and then posted it on the internet in a video that

20   is very derogatory about Mr. Katz; is that correct?

21             **MR. BUTTON:**  No, that's -- sorry.  That's not

22   correct.

23             We do believe that he broke into our home, that he

24   attempted to tap our phone lines, but we don't have landlines.

25   We use cell phones, so that's impossible.

1          But considering this all happened as soon as he was

2    hired and admitted to being hired by Daryl Katz to silence us and

3    suppress this data, yes, we believe that it came from him, or we

4    believe that he gained access illegally through our private data.

5    But we have certainly in no way, shape, or form ever shared it to

6    anyone in any way, shape, or form.

7          **THE COURT:**  All right.  Thank you.  I understand.

8    All right.  Narrow issue.

9          Do you wish to be heard again, Counsel?

10         **MS. MARIELLA:**  I'll just respond very, very briefly

11    to one or two things they said.  One is that Your Honor just made

12    a ruling about inadvertent disclosure --

13         **THE COURT:**  I just said that's what I looked at, but

14    yes.  Go ahead.

15         **MS. MARIELLA:**  And I don't think anything the

16    defendants said responded to the factors applicable to

17    inadvertent disclosure --

18         **THE COURT:**  No.  They said their -- the data was

19    stolen, so it wouldn't be inadvertent.  It would be an unlawful

20    disclosure --

21         **MS. MARIELLA:**  Right.

22         **THE COURT:**  -- I understand.

23         **MS. MARIELLA:**  And I'll just emphasize, which we

24    explain in our papers, that, you know, the defendants have the

25    burden of proving all of the elements of privilege and nonwaiver

1   here.  And we believe that just saying that someone hacked into

2   their systems and whatnot with no proof is not sufficient to

3   demonstrate nonwaiver.

4            **THE COURT:**  Thank you.  All right.

5            Counsel for Randazza Law Group, do you wish to be

6   heard further?

7            **MR. ROTHELL:**  As to the -- the issue of waiver of

8   privilege, I mean, we can only argue to the extent that the

9   Buttons assert that privilege, and I believe it's their argument.

10           **THE COURT:**  I agree.

11           **MR. ROTHELL:**  Thank you.

12           **THE COURT:**  Thank you.  All right.

13           The Court finds that there has been a limited waiver

14   of the attorney-client privilege between Mr. and Mrs. Button and

15   the Randazza Law Group, as stated.  The elements of waiver have

16   been met; that is, that there is a -- a communication between

17   parties and their counsel about attorney-client privilege

18   information that has gone out to the public and remains on the

19   public domain and has remained on the public domain for a long

20   time.  It pertains to, as I said, the download of the Sage

21   Humphries' telephone -- or iPhone, I should say, whatever it was,

22   iPhone like -- the content and retention and use of that -- of

23   that information.

24           Randazza Law Group is ordered to search for any

25   communications pertaining to that -- to that narrow scope of

1  waiver and produce any documents to plaintiffs' counsel.  I will

2  allow you, if you prefer and if plaintiffs' counsel wants to pay

3  for it, to obtain third party to do the search with queries and

4  word searches that you choose and then production, allowing

5  Randazza Law Group to first review the materials to ensure that

6  there is nothing outside of what I have found waived contained in

7  the information.  If there is, it can be redacted and placed on a

8  privilege log, or Randazza Law Group can do it themselves and

9  produce the information and a privilege log if they believe

10  there's any portion.

11          So one could imagine an e-mail or a text message that

12  would include more than one subject matter and that the redaction

13  would occur for the portion that is not waived.  You can do that

14  yourselves.  But you are to produce that with -- this needs to be

15  done within the next 30 days.

16          So I think that there's no difficulty between

17  Randazza Law Group and plaintiffs communicating and figuring out

18  how to get this done, so I'm not going to make a specific order

19  to that effect.  I'm giving you options.

20          And if there is a problem with how to get this done,

21  you hit a stalemate, you hit a wall, whatever you want to call

22  it, and you bring it back to me, simply either submit a, you

23  know, status report and ask for a hearing, or call my chambers

24  and ask for a hearing.  I don't need, you know, full briefing on

25  it.  We can just work through what the difficulties are, I think.

1    And, of course, we will make sure that the Buttons get a notice

2    of any hearing that is held.

3              That leads to the order with respect to ECF No. 148,

4    which is the motion to quash.  Given plaintiffs' comments about 3

5    through 8, I won't quash 3 through 8.  I will require simply that

6    Randazza Law Group respond that there are no responsive

7    documents.  And I accept that in good faith.  I have absolutely

8    no reason to doubt that.  These are officers of the court who

9    appear in federal and state court in Nevada frequently, and if

10   there were some concern with their honesty before the court, I

11   would probably be aware of that, and there is no such concern.

12             With respect to Request No. 9 and all communications,

13   that is -- that is quashed, except as far as No. 2 has found the

14   production of a limited amount of communications is required.

15             Request No. 1 is quashed with respect to any

16   additional documents or information as it pertains to the screen

17   that is at time marker 54 on the *Cat's Out of the Bag* video with

18   the screens that are at 4 -- 5 minutes and 45 seconds and

19   5 minutes and 48 seconds.  The motion to quash is denied, as

20   stated, with respect to Request No. 2, which is granted, as

21   already stated on the record.  Unless there is some question,

22   that is the order so that the motion to quash at ECF No. 148 is

23   granted in part and denied in part, as stated on the record.  And

24   ECF No. 140 -- I'm sorry, 148.

25             143 is granted in part and denied in part as far as

1    it goes -- as far as it pertains to attorney-client privilege.

2                As it pertains to Google, domain by proxy, YouTube,

3    and the other issues, that will be discussed separately.

4                Are there any questions about 148 from Randazza Law

5    Group, from plaintiffs, from the defendants?  Any questions about

6    the Court's order?

7                **MS. BUTTON:**  I don't think we're allowed to ask any

8    more question, so I -- yeah.  I feel like we don't quite

9    understand, like, if it's offensive to ask a question.  But the

10   fact that we haven't produced these videos -- and it's been ruled

11   on that we -- there's no evidence we produced this video.  It

12   feels unfair that these motions are being granted based on

13   beliefs and not hard evidence, which we can produce in every

14   other instance.

15               So I understand what you're saying, and I do get it.

16   I'm focused and I understand your point.  But it does feel a bit

17   strange that we can sit in a courtroom based on beliefs when it

18   should be based on evidence.

19               **THE COURT:**  The obligation to prove a -- that there

20   was no waiver by this is yours, and I have no proof of that.

21   What I have is a series of videos, not just one, and this is

22   getting ahead of -- of myself -- that include a tremendous amount

23   of information that could only have come from information that at

24   one time, you possessed.  There is no allegation.  There is no

25   evidence that Ms. Humphries or anyone else ever posted these

1    videos, and the Court would find such an allegation fantastic and

2    not believable based on everything that I have read and seen,

3    including all of the videos, all of the exhibits that were

4    produced, and there were many, and having watched and looked at

5    things exceptionally carefully more than once.

6            So while I appreciate the denial and I -- this goes

7    to the issues in 143, which is your motion to quash.  And the

8    subpoenas to Google, YouTube, godaddy.com, Domains By Proxy,

9    which the plaintiffs seek in order to help demonstrate what they

10   believe and what is most supported based on all of the evidence

11   before the Court at this time is that these videos were created

12   and -- and posted online by -- by you, the Buttons, one or both

13   of you.  I don't know.

14           I want to hear from you now about why I should quash

15   the Google, YouTube, GoDaddy, and Domains By Proxy subpoenas if,

16   in fact, as you say so emphatically, that these videos were not

17   posted by you, then these subpoenas and responses would be

18   helpful to you, it seems to me.  That's one problem -- or one

19   issue that I see for you with your objection to these subpoenas.

20           The other is a legal proposition, which is that when

21   a third party does not have a protected interest in the

22   information that is sought, that party can't object to the

23   subpoena.

24           So if Jane Smith goes out and subpoenas information

25   from the Bank of America because she's in a suit with John Doe,

1    and John Doe has no interest, no protected interest, in the

2    information sought from Bank of America, John Doe can't object as

3    a matter of law.  He cannot object to that subpoena.  He does not

4    have standing.

5            You, the Buttons, have said emphatically that

6    these -- these videos and postings, not just the videos but

7    the -- there's also the formerly known as Dusty Button postings

8    are not yours.  You did not do them.  They did not come from you.

9    You did not create them.  You do not own them.  You do not

10   control them.  Then I don't see how you can have standing to

11   object to the subpoenas since you'd have no interest in the

12   response.

13           So you have two problems.  One is, I think, it helps

14   you.  Second, if you have no relationship whatsoever to the

15   postings, then you have no standing.

16           So tell me how -- tell me how that -- how you wish to

17   respond to that.  Go ahead.

18           **MR. BUTTON:**  Okay.  So when we left Nevada from the

19   previous hearing, as we exited the courthouse, we were served

20   with a summons for Boston.  And I know we're here to talk about

21   Nevada and not -- my scope is the Nevada hearing.

22           There's no reason to oppose these subpoenas.  It is

23   because they weren't filed on behalf of Nevada.  They were filed

24   on behalf of Boston following -- and the hours following the

25   hearing that we won were the same claims that we're here to

 1   discuss today were defeated in Boston and verified to be no

 2   violation of any sort for this order.

 3            So our main complaint of why these should be quashed

 4   is because they were filed indirectly for another court because

 5   that court wasn't filing them themselves, which is why now the

 6   people sitting in that room are now representing Sage and Boston

 7   as well, which is ironic because they just -- claims in Boston is

 8   that she was in a consensual relationship that she only ended

 9   because of (indiscernible.)  And now she claims rape in Nevada,

10   which is somehow never discussed in court.

11            And the only thing we ever discuss is Daryl Katz.

12   And the irony behind all of is very clear that her target is to

13   distract from the main point.  And the main point is that they

14   don't possess any evidence to meet their burden of proof in this

15   frivolous lawsuit.  They've had two years to do so.  And

16   everything they do along the way is a distraction to take away

17   from the fact that they're never going to be able to enter the

18   courtroom, provide evidence that will prove any of the claims

19   that they've brought against us.

20            We've provided thousands of documents, and in doing

21   so, they've objected to all of them.  And some of these

22   objections are relevant to this subpoena to YouTube.  They state

23   that the objections are --

24            *(Whereupon, the reporter interrupts to preserve the*

25            *record.)*

1        **THE COURT:**  Mr. Button, Mr. Button, the court

2    reporter isn't catching everything, so just, if you would, talk a

3    little slower, please.  Go ahead --

4        **MR. BUTTON:**  Okay.  I'm sorry.

5        **THE COURT:**  No.  That's okay.  Keep going.  Just talk

6    a little slower.

7        **MR. BUTTON:**  So in our admission request and in our

8    request for documents, the other day, we requested 228 documents

9    -- or, I'm sorry, admission requests.  227 of them were objected

10   to, and majority of those objections are because they seek

11   documents that took place after the filing of this lawsuit.

12   These web sites took place after the filing of this lawsuit.  So

13   if everything that we're requesting through the proper channels

14   of litigation and discovery are objected to because they took

15   place after the filing of the lawsuit, then this web site, this

16   YouTube, should have no relevance here.

17        But Boston itself, the people who wrote the order,

18   and why we're here today, these -- these sanctions, everything

19   that we're discussing are based on violations to a restraining

20   order.  But the Court that wrote that order verified there were

21   no violations.

22        So aside from the sanctions being granted, we're

23   talking about subpoenas that are relevant to that restraining

24   order and violations that the Court did state.  And we can read

25   the order in a bit, I know, but on the transcript, they stated

 1    that if we had created these videos, it would still not be in any

 2    violation of the order.  So I understand that we have the order

 3    and we can review it later, but we've -- we've opposed this

 4    because it's merely a distraction.

 5              We asked for this counsel to just state the month

 6    that Jane Doe 1, who we've never met or heard of in our entire

 7    lives, claims that she was raped.  They say it's burdensome.

 8    It's harassment to ask her to admit the month that she

 9    was -- that she claims this happened in.

10              So it seems that anything we ask in discovery,

11    including asking for the data that we were told to turn over to

12    them and to destroy our own copy will be objected to.  They have

13    no intention of respecting their oath.  Every affidavit Sage

14    Humphries has ever provided to the court has been a lie.  Rather

15    than standing here defending ourselves for payments to them for

16    manipulating courts, we should be standing here discussing

17    penalties for those manipulations or for the perjury that she

18    continues to -- to do over and over and over again.  Every time

19    she stood in a court, she perjures herself --

20              **THE COURT:**  Mr. Button, you're getting off topic.  I

21    understand your frustration.

22              **MR. BUTTON:**  Sorry.

23              **THE COURT:**  Don't apologize.  You're fine.  You're

24    getting off topic.

25              I understand your point with respect to the motions

 1    to quash.  I'm going to hear from opposing counsel.  I'll let you

 2    respond briefly.  I would highly recommend that if you can, you

 3    get counsel in this matter.  It's a serious matter.  I understand

 4    that.  There are --

 5             **MS. BUTTON:**  We have no money, so we can't.  We

 6    literally have no money, so we can't hire counsel, which is why

 7    we --

 8             **THE COURT:**  So I say that there are -- that you need

 9    to review the Rules of Civil Procedure and remedies that you have

10    available.  When you believe that discovery is not responded to

11    appropriately, you meet and confer with the other side --

12             **MS. BUTTON:**  We have --

13             **THE COURT:**  Just let me finish, Mrs. Button, and then

14    you can talk.  Okay?

15             You can meet and confer with the other side, which

16    requires a telephone or Zoom.  It cannot be done only in writing.

17    And then you're allowed to file what's called a motion to compel

18    if you believe that you are entitled to discovery you haven't

19    gotten.

20             That is not before me today.  I am not ruling on

21    that.  I have no idea what you're -- you know, I have nothing

22    before me.  Do not take this as a suggestion that you would

23    prevail or not prevail.  I am simply giving you a little bit of

24    instruction on how these things work.

25             Now, from opposing counsel, with respect to the

1    objection that these subpoenas are really seeking information in

2    order to respond to a Massachusetts court proceeding, would you

3    please give me your argument.

4         **MS. MARIELLA:**  Yes, Your Honor.  Thank you.

5              I think, as Your Honor has recognized, these

6    subpoenas seek information relevant to the case, and the fact

7    that there is some overlap in this case and the Boston case does

8    not negate the fact that they are highly relevant to this case.

9    It does not negate the fact that the defendants in this case have

10   denied ownership of the web sites that we contend are harassing

11   plaintiffs and third-party witnesses in this case.  And we don't

12   think the fact that there is overlapping relevance in the Boston

13   case, which is based on many of the same facts as Ms. Humphries

14   claims in this case, is a valid objection to a third-party

15   subpoena on behalf of a party.

16             And I just -- I know Your Honor understands this, but

17   I just want to clarify.  The reason we're seeking this

18   information from third parties in this case is not to prove a

19   violation of the Boston abuse prevention orders.  This is not

20   about violation of those orders.

21             This is about, again, their harassment that we allege

22   of the plaintiffs and third-party witnesses in this case, which

23   is totally separate from whether there's contempt of the abuse

24   prevention orders, whether there's any violations of them.

25             And I know, again, Your Honor understands this, but

 1  Judge Lyons, she was ruling on a contempt motion, which has a

 2  very different standard than a sanctions motion in this court.

 3  We had the burden of proving something by clear and convincing

 4  evidence, and it was -- it was just a different motion with a

 5  different standard in a different matter.

 6          So, again, the fact that there is -- there are

 7  overlapping facts and circumstances in the two cases is not a

 8  basis to quash these subpoenas to the third parties.  It's not a

 9  basis for the defendants who are parties to move to quash

10  subpoenas that, really, they have no interest in.  They're not

11  alleging privilege or privacy concerns or anything like that.

12          **THE COURT:**  Understood.  All right.

13          Did you hear the response, Mr. Button?

14          **MR. BUTTON:**  Yes, ma'am, I did.

15          **THE COURT:**  All right.  Do you wish to tell the Court

16  anything else in -- as -- in response to what opposing counsel

17  said?

18          **MR. BUTTON:**  Yeah.  I'm a little confused on -- she

19  said that they're not -- it's not relevant to the Boston order,

20  but these sanctions were granted based on violations to the

21  Boston order, so I'm a little confused on that statement.

22          And I'm confused on what the relevance of this web

23  site is and how it's relevant to the original claims brought

24  forth in this lawsuit.

25          **THE COURT:**  So the -- what the Court finds is that

1   there is sufficient information before it that the videos at

2   issue and the postings on the formerly known as Dusty Button

3   Instagram or whatever -- I'm not a social media person.  I've

4   never had an account, so I don't know what kind of an account it

5   is, whether it's Facebook or Instagram or Snapchat or whatever it

6   is -- that those postings are harassing witnesses and plaintiffs

7   in litigation before this court, the District of Nevada.

8            The Court agrees that those postings and the contents

9   of the postings and some of the contents of the videos are

10  clearly harassing to plaintiffs and potentially to witnesses.

11  And because the ownership of that material is disavowed strongly

12  by the Buttons, the plaintiffs wish to find out who does own them

13  so that they may be able to take appropriate action.

14           If it's not the Buttons, if it's found to be someone

15  else, there can be action against those individuals.  If it is

16  you, the Buttons, then they can come back to the court and bring

17  that information to me.

18           Your contention that this only pertains to Boston is

19  rejected by the Court.  It does pertain to the Boston proceeding.

20  I understand why you say that, because the Court in Boston said

21  it had insufficient information to determine ownership and

22  control, and therefore, ownership and control needed to be

23  demonstrated before the Court would issue a contempt order.

24           But it is separate from that in this case with

25  respect to witnesses that might appear in this case and

1   plaintiffs in this case that the -- that the plaintiffs contend
2   these are harassing and intimidating and in violation of the law.
3   And the Court agrees that there is sufficient information to
4   support that.
5          The Buttons disavow any ownership of the -- of
6   that -- of those web sites and/or YouTube sites, channels,
7   whatever the right word is, and the -- or channels, if it's more
8   than one, and the posting, I presume, is also disavowed as coming
9   from them.  And because of that, they lack standing to object to
10  the subpoenas.
11         ECF No. 143 is denied.
12         We're moving on to ECF No. 134.  ECF No. 134 is
13  plaintiffs' motion for protective order.  ECF No. 138 is a
14  response and counter-motion for a protective order.
15         The Court previously ruled on defendants' request to
16  take more than ten depositions and denied that.  Not only were
17  ten depositions not yet taken, but there had been appropriate
18  meet and confer that occurred at that time.  That motion -- that
19  portion of the motion was denied.
20         What we are here to discuss today are the depositions
21  of the plaintiffs, the circumstances surrounding those
22  depositions, the request for admissions that are currently
23  pending that were propounded served by defendants on the
24  plaintiffs, the requests for production that were propounded by
25  the defendants and served on the plaintiffs, the subpoenas issued

 1  by the defendants to third parties, and the Rule 26 disclosure of

 2  approximately 209 witnesses.  That is what I am here to talk

 3  about.  And I will give you a little bit of background.

 4          I just want to say, if the Randazza group wants to

 5  leave, you are free to go.

 6          **MR. ROTHELL:**  Thank you, Your Honor.

 7          **THE COURT:**  You're welcome.  And I should have said

 8  that awhile ago.  That's why I took you out of order.  I'm sorry.

 9          **MR. ROTHELL:**  Thank you.

10          *(Whereupon, Mr. Rothell and Mr. Green leave the*

11          *proceedings.)*

12          **THE COURT:**  All right.  With respect to the

13  depositions of the plaintiffs, current plaintiffs, and former

14  plaintiff Juliet Doherty, the Court is inclined to require these

15  depositions occur only by Zoom, not written question -- we have

16  unrepresented parties.  That would be highly ineffective.  It

17  would be a waste of everybody's time -- such that the parties are

18  in separate rooms, separate locations, and that the Zoom

19  depositions of the plaintiffs and Ms. Doherty may be observed by

20  a third party.  That third party must be paid for solely by

21  plaintiff if they -- plaintiffs if they choose to do so, and the

22  person must come from the Judicial Arbitration and Mediation

23  Services.  It's called JAMS.

24          JAMS is an entity that contracts with retired federal

25  and state court judges who assist in civil litigation in a

 1   variety of ways.

 2           And it has to come from somebody who's associated

 3   with JAMS in this district, and because the case is in this

 4   district, the law of the District of Nevada and the Ninth Circuit

 5   would apply.  And I am limiting you to two selected -- two

 6   individuals who are retired magistrate judges who dealt with

 7   discovery their entire careers -- Judge Leen, Peggy Leen, and

 8   Judge Hoffman.

 9           They are both retired.  They've been retired for a

10   number of years, four to five years.  Ms. -- Judge Leen has been

11   retired for five years.  Judge Hoffman has been retired for four

12   years.  But they are still very current in the practice of law.

13           So that is how the depositions will -- will occur,

14   from my perspective.  I want to know if anybody has an objection

15   to that process.

16           It is your motion, so I will start with the

17   plaintiffs.

18           **MS. McCAWLEY:**  Thank you, Your Honor.  I'm going to

19   handle this motion.

20           We're very comfortable with the terms that you've

21   outlined.  I would -- and this may not be the time to address it.

22           There is one other issue with respect to the

23   depositions that we raised in our papers, and that's with respect

24   to Rule 412 and Rule 26 --

25           **THE COURT:**  Yes.  I'll get to that --

1          **MS. McCAWLEY:**  -- later?

2          **THE COURT:**  Yes.

3          **MS. McCAWLEY:**  Okay.  Great.  So we're comfortable

4  with this.

5          The only thing I wanted to clarify for purposes --

6  and you may have said this, and I may not have heard it.  But we

7  have some third parties that may be deposed who were also minor

8  children at the time that we allege of the abuse.

9          Are we in the same position to be able to have a

10  magistrate present for that, for those depositions, as well, as

11  long as we pay for it?

12          **THE COURT:**  As long as you pay for it, you may have a

13  third-party observer --

14          **MS. McCAWLEY:**  Okay.

15          **THE COURT:**  -- yes.

16          **MS. McCAWLEY:**  Thank you, Your Honor.

17          **THE COURT:**  All right.  So Mr. and Mrs. Button, this

18  is only about the circumstances about how you would take the

19  depositions of the plaintiffs, Juliet Doherty, and any minor, any

20  person who's an alleged victim who was a minor at the time,

21  alleged.  Please understand they use the word "alleged."  I have

22  made no finding in that regard.

23          And the order is that it will occur by Zoom, this

24  process, and that the plaintiffs may pay for a third-party

25  observer who is a retired magistrate judge.  And that is the only

1  thing that I am talking about right now.

2          Do you have any objection to that process?

3          **MR. BUTTON:**  Prior to any objection, can we just

4  verify, does that mean that we are not to be in the room with any

5  of these plaintiffs during -- this is Zoom for everyone,

6  including Sage and the one we never met, Jane Doe 1?

7          **THE COURT:**  That's correct.  Any plaintiff.  You

8  would not be in the room with them, but you are able to see them.

9  You see them at all times.  They are on the screen, and you

10  should be able to see the plaintiff's counsel who's present and

11  the third party who is present.  But really, you're focused on

12  the plaintiff.  And you are able to see her, and she is able to

13  see you, a plaintiff or witness.  Whoever the witness is, you

14  will be able to see them.  They will not be disguised.  They will

15  not be behind a screen.  They will be present, just as I am now,

16  facing you.

17          **MR. BUTTON:**  The only -- the only objection that we

18  would have -- and I'm not even sure if it would be a relevant one

19  -- is that for two years, Jane Doe 1, who we've never met, has

20  destroyed our lives.  And we feel it would be unfair for her to

21  not have the opportunity to be in the same room with the people

22  who she's destroyed and meet them for the first time.

23          And it just seems -- I can't understand how someone

24  who we've never met or heard of before this can destroy our lives

25  and then not be held accountable and stand to face the people

 1   she's accused in the same room.  That's the only objection I

 2   would have to it.

 3        **THE COURT:**  And I understand your concern.  The

 4   problem is that Jane Doe, of course, says something contrary to

 5   what you say.  And the Court today is not prepared to nor would

 6   it nor would it be appropriate for me to rule on whether Jane Doe

 7   ever met you or didn't meet you.  You emphatically say you never

 8   met her.  I understand that.  She says the contrary.  I

 9   understand that.  I have no way to judge that.

10        You will meet her.  She will see you face to face.

11   It will be by Zoom.  So much is done by Zoom these days.  I

12   understand your desire to be in the room with her, but at this

13   juncture, I am not going to allow that.  I can't say that there

14   would never be a circumstance where that would occur.  It might

15   occur at trial if not before, but it won't occur for purposes of

16   the deposition.  That's all I'm talking about now.

17        And let me -- so do you have any other objection to

18   the process for the depositions?

19        **MS. BUTTON:**  No.  I don't think --

20        **MR. BUTTON:**  I have a question, but we don't have any

21   other objections, to clarify something --

22        **THE COURT:**  What's your question?

23        **MR. BUTTON:**  -- may I ask a question of you?

24        **THE COURT:**  Yes.  Go ahead.

25        **MR. BUTTON:**  When we -- when we do ask these

1    questions, by law, they are required to answer them.

2                Am I right to think that?

3                **THE COURT:**  So I was going to get into that and give

4    a little instruction about depositions.  And I -- even if

5    you -- this is why I, again, I wish you had counsel, because

6    there is a -- there are rules that pertain to depositions.

7                First, let me give you just some basic rules that

8    apply to everybody.  They are limited to seven hours.  You cannot

9    take them for -- that applies universally, unless the Court rules

10   otherwise.

11               So if plaintiffs take your depositions, each one of

12   them, you are -- they are limited to seven hours.  You are

13   limited to asking questions for seven hours, first.

14               Second, you can't ask questions that ask the parties

15   to tell you what they talked about with their client -- with

16   their counsel.  That's attorney-client privilege.  If there's an

17   objection based on attorney-client privilege, the -- the

18   deponent, the person you are asking the question, does not have

19   to answer that question.  Okay?

20               If there is -- if there are other objections, which

21   are allowed -- they're allowed to say lack of foundation,

22   speculation, calls for hearsay, calls for a -- you know, a

23   disclosure of an attorney-client privilege.  There are others,

24   but those are the ones that are coming to mind at the moment to

25   me.  Generally speaking, unless it is a privilege, after the

2:21-cv-01412-ART-EJY - Wednesday, April 5, 2023    49

1    objection is made, the witness must answer the question.

2            Now, sometimes counsel will instruct a witness not to

3    answer, and if they do, then the witness says, On the basis of

4    counsel's advice, I'm not going to answer the question.

5            If you want that question answered, if you believe it

6    must be answered, that's when you have to first meet and confer

7    with the opposing party, say, I think you're wrong.  They should

8    have to answer.  Or you can bring that to court in a motion to

9    compel the plaintiff or the party, the person who's being

10   deposed, to answer the question.

11           There are some things that you can't do.  You can't

12   generally ask people questions about what other people thought,

13   right, because that -- how do they know, right?

14           You ask that question, the party's going to -- the

15   person being deposed is going to say, I don't know.  I don't know

16   what Jane Smith thought.  I don't know.

17           Now, you can ask what somebody told them, but not

18   what they think, okay, not how they felt.  I'm giving you just

19   some broad advice here on how to ask questions, advice,

20   instruction, on how to ask questions.

21           Also, under Rule 412(a) of the Federal Rules of

22   Evidence, generally, evidence regarding a victim's sexual

23   relationships with other people, sexual behavior, sexual

24   predisposition is inadmissible, meaning it cannot be admissible

25   in a civil proceeding.  The exception to that -- and it's

1    narrow -- is that if the party places their sexual history at

2    issue or their -- their relationship with other people at issue,

3    then you can ask questions.

4              Here, there was a claim against Daryl Katz.  That has

5    been dismissed.  No questions regarding Daryl -- the sexual

6    relationship, if any, between any plaintiff -- I know it's most

7    probably alleged to be Sage Humphries -- and Mr. Katz may not be

8    inquired into.  That case is gone.  It is not relevant to, it has

9    no potential relevance to, whether or not the allegations

10   Ms. Sage makes -- Ms. Humphries makes against the defendants are

11   true or false.  So that may not be inquired into nor can any

12   other sexual relationship between any of the plaintiffs and any

13   other parties.  Those are off limits for now.  The defendants

14   have not demonstrated a basis for asking those type of questions.

15             And, of course, as always, harassment, abuse, those

16   kind of things are precluded as a matter of law under the rules

17   of civil procedure.  I don't -- I wouldn't ordinarily have to say

18   that were you represented by counsel, but I do need to just

19   remind you.

20             I'll tell you one other thing.  The more complex, the

21   longer the questions, the more complicated the questions, the

22   more objections you're going to draw, and the harder it is for

23   the plaintiff to answer.  And you only get seven hours to do

24   this.

25             So, generally speaking, discrete, short questions are

 1    the best way to get information in a deposition.

 2              Now, Mr. Button, you want to tell me something else.

 3    I heard you.

 4              **MR. BUTTON:**  I just had a question because Daryl Katz

 5    was only ever released as a third-party defendant following

 6    extreme threats, death threats and legal threats from his

 7    counsel, Anthony Pellicano.  We actually requested that he not be

 8    released.

 9              But now that we don't have counsel and there is a

10    tolling agreement in place, he will be brought back into this.

11    So when he is, this -- this is a fair conversation, and we're

12    allowed to ask questions regarding him because he will be a

13    third-party defendant again.

14              Am I right to think that?

15              **THE COURT:**  If -- if he were brought back into this

16    case or there were another lawsuit against him, for some reason,

17    and any plaintiff in this case were a witness, had

18    percipient -- what's called a percipient fact witness, had facts,

19    material facts, that would help prove or disprove that separate

20    case or if he came back into this case, then you can ask the

21    Court.  You can come back and say, Can we take a second

22    deposition and ask questions about Daryl Katz?  And if --

23              **MR. BUTTON:**  Okay.

24              **THE COURT:**  -- it's in a separate case, you'll deal

25    with that in the separate case.  But for right now in this case,

1    he's gone.  Whatever the reason is, he's gone.  The motion to

2    dismiss that third-party complaint was granted.  I did not play a

3    role in that.  And I'm not taking issue with it.  I'm simply

4    saying it happened.  It's done.

5           So that is -- those are the rules as it pertains to

6    depositions.

7           Do you wish to -- I know it's your motion, but do you

8    wish to be -- plaintiffs' (sic) motion.

9           Do you wish to be heard any further about the

10   depositions at this time?

11          If not, I will hear from plaintiffs, and then I'll

12   give you another chance if you have questions about anything

13   plaintiff says.

14          Are you good?

15          **MR. BUTTON:**  No.  I don't --

16          **THE COURT:**  Okay.  All right.

17          Go ahead.

18          **MS. McCAWLEY:**  Your Honor, that covers my concern

19   with respect to scope and nature of the questioning.  Thank you

20   very much.

21          **THE COURT:**  Okay.  So they have nothing further.

22          So then we move on to the rule -- the requests for

23   admissions and requests for production of documents.

24          The Court recognizes that there are no preset limits

25   to requests for admissions or requests for production.  But when

 1  requests are duplicative or ask for information that is

 2  immaterial, having absolutely no relevance to the case or

 3  potential relevance, disproportionate to the needs of the case,

 4  or create undue burden or are harassing, then the Court clearly

 5  has power, not only under Federal Rule of Civil Procedure

 6  26(b)(2)(A), but also its inherent power to limit discovery.

 7  Magistrate judges have very broad -- "discretion" is the word, to

 8  control discovery in a case.  And I will issue some orders with

 9  respect to the RFAs, request for admissions, and RFPs, requests

10  for production.

11          First, let me give you what the -- what the purpose

12  of Rule 36 request for admission is because it will help

13  understand some of my -- my rulings on this issue.

14          Rule 36(a), requests for admissions, is intended to

15  expedite a trial by setting aside, obtaining admissions or

16  denials to specific material facts at issue so that the issues

17  for trial are narrowed.  That is generally what a request for

18  admission is intended to do.

19          They are not treated as substitutes for discovery to

20  uncover evidence.  You can find these at -- these rules, these

21  pronouncements, a Ninth Circuit 1981 case at 669 F.2d 1242, at

22  1245, or at 19 F.R.D. 436, case, *In Re: Jules Fribourg*.

23          A party or any person to whom discovery is sought may

24  move for a protective order -- that's allowed -- based on any one

25  of the reasons I described, and for good cause, the Court can

1    grant such an order.  That power comes from Federal Rule of Civil

2    Procedure 26(c)(1).

3                Here, to Ms. Humphries, we have 288 requests for

4    admissions.  That number, in and of itself, is unduly burdensome.

5    There are certainly requests that can be made, but 288 is unduly

6    burdensome.

7                The Court read all 288 of those requests, every

8    single one, and found 97 that could be struck for reasons other

9    than reasons of burdensomeness.  That still leaves 191 requests

10   for admissions.  And I can tell you, because I brought my list of

11   every request for admission that I would strike.  I

12   don't -- wasn't going to do that, but if somebody wants me to, I

13   can do that.

14               There are duplicates in the requests.  They are

15   cumulative.  And those -- those requests are unduly burdensome.

16   But there are requests that seek information that has no

17   relevance or potential relevance to this case, all of the issues,

18   and therefore, they are disproportionate to the needs of the

19   case.

20               Keep in mind that you are trying with an RFA, request

21   for admission, to establish a discrete fact.  On June 10, 2022,

22   you were on the corner of 23rd Street and 1st Avenue -- I grew up

23   in Manhattan, so I admit that's why I picked that -- and you saw

24   the blue car run the red light.  That's a discrete fact.  It's

25   not a fact that has any relevance to this case, but I'm just

 1    using it as an example.

 2              Asking someone to admit they have no evidence that

 3    they committed a civil wrong or a criminal act is not the purpose

 4    of an RFA.  RFAs are not used to get someone to admit they

 5    committed perjury or defamed someone.  They are not properly used

 6    to get an opponent to say they have no evidence for something.

 7    That's not a discrete fact.  They are not properly used to ask

 8    background questions about another party such as the

 9    circumstances surrounding somebody's childhood.  Those are not

10    appropriate RFAs, requests for admissions.

11              My intent is to limit defendants to repropounding

12    these requests for admissions to 60 requests for admissions to

13    each plaintiff, 6-0.

14              If, after you receive all of the discovery and

15    responses to those 60 RFAs to each plaintiff, if you feel you

16    aren't -- you must ask more, they are absolutely necessary, then

17    you can meet and confer with opposing counsel.  If they do not

18    agree, you can bring that issue to the Court and tell me what you

19    want to ask and why you need to ask those RFAs.

20              Now, with that provision -- with that decision,

21    rather, not provision, decision, do plaintiffs wish to be heard

22    more -- further? because this is your motion.

23              **MS. McCAWLEY:**  Yes --

24              **THE COURT:**  Okay.

25              **MS. McCAWLEY:**  -- just on that issue, Your Honor.  So

1    to date, they have served on all of the parties in our case

2    1,332 RFAs, and we have -- we couldn't confer on an extension, so

3    we have answered those.  So we have now responded to every single

4    RFA that they've issued in this --

5            **THE COURT:**  And have you, as they suggest, objected

6    to most of them?

7            **MS. McCAWLEY:**  Some of them, for a legal conclusion,

8    but the bulk of them, my wonderful associates can say we

9    responded in some manner.

10           **MS. RUFF:**  Yeah.  We do include objections, Your

11    Honor, but then also admit or deny at the end.  There's a handful

12    where we don't include an admission or denial because they're

13    specifically calling for a legal conclusion, but the overwhelming

14    majority include admission or denial --

15           **THE COURT:**  So you would, I assume, tell the Court

16    that you have responded substantively with an admission or denial

17    to at least 60 requests for admissions for each plaintiff?

18           **MS. McCAWLEY:**  Correct, Your Honor.  And we prefer

19    not to do another 60 if we don't have to.

20           **THE COURT:**  Okay.

21           **MS. BUTTON:**  She's lying --

22           **THE COURT:**  My -- well, I -- I truly doubt that a

23    lawyer from Boies Schiller would stand up in this court and lie

24    to me, Ms. Button.  I -- I'd be careful about what you say --

25           **MS. BUTTON:**  I mean, perfect.  Okay --

1          **THE COURT:**  No need to respond to that.  Thank you.

2          So the question is -- so I want to make sure you

3   understand.  If there is an objection to a request for

4   admission -- oh, the only response to requests for admissions are

5   typically admit or -- or deny.  So the word would say

6   admit/denied.  That's it.  That's all you get in response.

7          That may come after an objection.  So, objection;

8   calls for a legal conclusion; is vague based on the use of this

9   word; is unduly burdensome for this reason; call -- lack of

10  foundation; whatever objections are there.  And then,

11  notwithstanding the objections, plaintiff admits/plaintiff

12  denies.  That is the response.  That's all you're entitled to.

13         They are contending you got 60 such responses

14  already.

15         Are you telling me you did not?

16         **MR. BUTTON:**  We would have to review the exact

17  number, but, I mean, just a few notes that we've made here, we've

18  got 87 requests for documents, and they've produced none --

19         **THE COURT:**  These are not the documents, sir.  Just

20  make sure you understand --

21         **MR. BUTTON:**  I know.  I'm not --

22         **THE COURT:**  -- I'm going to deal with the requests

23  for production separately.

24         **MR. BUTTON:**  Right --

25         **THE COURT:**  I'm talking --

1              **MR. BUTTON:**  -- right.

2              **THE COURT:**  -- about the requests for admissions.

3              **MR. BUTTON:**  That was my next statement.  Sorry --

4              **THE COURT:**  Okay.

5              **MR. BUTTON:**  So --

6              **THE COURT:**  That's okay.

7              **MR. BUTTON:**  No.  I mean, I'd have to go review to be

8    certain, but we don't believe so.  And any -- any responses we

9    did get for admissions, I mean, I can quote you all of the lies

10   here that we provided the Court with evidence that were -- that

11   were lies.

12             And I'm not sure how that works, but it sounds like

13   we're just supposed to accept what they've given us --

14             **THE COURT:**  No, no.

15             **MR. BUTTON:**  -- and even though half of it's a lie,

16   we -- there's no penalty for that, and we just carry on.  I'm not

17   sure how to -- how to --

18             **THE COURT:**  So this is, again, why counsel would be

19   helpful.  So you get the request for admission and the person

20   says denied and you believe that's not true.  At deposition, you

21   can present evidence to that person about that request for

22   admission.  I'll use my 23rd Street and 1st Avenue example.

23   Okay?

24             I say to you, You were at 23rd Street and 1st Avenue,

25   and you saw the blue car go through the red light.  And you deny

1  it --

2          **MR. BUTTON:**  Right.

3          **THE COURT:**  -- and I have a picture of you standing

4  at --

5          **MR. BUTTON:**  Right.

6          **THE COURT:**  -- 23rd Street and 1st Avenue on the day

7  and -- with the -- with the car running through the red light,

8  and I show that to you.  And I say to you, In your request for

9  admission, you denied this.

10         Does this reflect your recollection?  You were there,

11 weren't you?

12         Yes.

13         So now the person has admitted to you that what they

14 said previously was wrong.  That's how you do it.  You

15 don't -- there's no recourse to the request for admission that

16 you disagree with the answer of -- boy, that was bad grammar --

17 the answer with which you disagree.

18         So --

19         **MR. BUTTON:**  Right.

20         **THE COURT:**  -- you cannot -- you can't -- you know,

21 you can't go back and say, Are you sure?  Do you want to change

22 this?

23         You could call plaintiffs' counsel if you have

24 specific evidence and suggest to them that they look at specific

25 evidence and see if they want to revisit a request for admission

1  and amend their answer.  But you can't force them into answering

2  differently once they've answered.

3              So what I'm going to say --

4         **MR. BUTTON:**  Right.

5         **THE COURT:**  -- here with respect to the requests for

6  admissions is that if 60 have been responded to, no more may be

7  asked, unless the Buttons bring to me specific requests for

8  admissions that they believe they must get responses to, in which

9  case the Court would consider those.

10             Then with respect to the requests for production,

11 here, they are -- there are fewer.  I understand that.  But there

12 are many duplicates.  So as I read through these -- and again, I

13 read them to make sure I understood that -- that there are many

14 duplicates where you ask the same thing multiple times.  That's

15 unduly burdensome.  It's work for counsel and for their -- for

16 their clients.  It's not appropriate to ask the same question

17 over and over.

18             Also, my concern is that some of the requests require

19 the disclosure of information that must be subject to what's

20 called either a protective order or a confidentiality order,

21 which I will explain in a minute.

22             I will tell you, Mr. and Mrs. Button, that there is

23 no burden to prove anything in this case beyond a reasonable

24 doubt.  The burden, not one that I created, not one that this

25 Court created -- this has been a -- this is the standard that has

 1    been applied for many, many, many years to civil cases.  The

 2    burden is called preponderance, which just --

 3            **MR. BUTTON:**  Uh-huh.

 4            **THE COURT:**  -- means, if you weigh the evidence, more

 5    is in favor of one party than the other.  And to put it really

 6    simply, if there are a hundred pieces of evidence and 51 pieces

 7    are on one side and 49 are on the other, the party with 51 pieces

 8    wins.  That's the preponderance of the evidence.  It is a light

 9    burden.

10            They do not have to prove things beyond a reasonable

11    doubt.  They do not have to prove things by clear and convincing

12    evidence.  It is preponderance of the evidence.

13            Go read about it.  I am sure there is plenty of it

14    just on the web that you could read.  You are intelligent people.

15    You can inform yourselves about what that means.

16            So with respect to a -- the medical records that were

17    requested, emotional distress records, tax returns, any financial

18    documents, I want a protective order in place.  And because the

19    defendants are not lawyers and not represented, I am going to

20    require -- this is before I get to the number.

21            I'm going to require defendants to -- plaintiffs'

22    counsel to draft a relatively simple, straightforward protective

23    order that is very clear that says that the materials disclosed

24    may not be used for any purpose, whatsoever, no purpose other

25    than this litigation, meaning the litigation in the District of

1    Nevada, or for purposes of any other court proceeding in

2    Massachusetts.

3           But those documents may only be submitted to the

4    court under seal.  And there is a process for getting those

5    documents sealed, but I am going to preorder that all medical

6    records, all financial records, all personal records that

7    describe income or finances or money or payment of bills or fees

8    of any kind, anything that deals with money or anything that

9    deals with damages, whether it's physical or emotional, must be

10   filed under seal.

11          And Mr. and Mrs. Button, when you file something

12   under seal, when you go to CM/ECF, because you are doing this,

13   you are filing things, there is a box that you can check to file

14   under seal.  If you are unsure how to do that, you may call my

15   courtroom deputy, and she will walk you through how to file

16   something under seal.

17          She's the person you e-mailed, Elvia Garcia, and her

18   telephone number is the bottom of the e-mail she sent back.  Not

19   a conversation about the content of what you're filing, not a

20   conversation about the case, but how to file those documents

21   under seal, and she will tell you how to do it, because I

22   understand you may not know how to do it.

23          Once you draft the confidentiality protective order,

24   you send it to the Buttons.

25          Mr. and Mrs. Button, you may make -- you may make

1  changes to that.  You know how.  I presume you do how to red line

2  something in Word, in Microsoft Word.  If you want to make

3  changes, you must do it in red line in Microsoft Word -- they're

4  nodding their heads yes for the record -- and send it back to

5  plaintiffs for review.

6          If the parties cannot agree on the content of a

7  protective order, you may each submit to the court your own

8  proposed protective order.  The way you do that, it would simply

9  say plaintiffs' proposed protective order or defendants' proposed

10 protective order.  I will look at both, and I will issue the

11 protective order.

12         I want this done within the next two weeks so that

13 when documents start to roll, the protective order is in place.

14         And Mr. and Mrs. Button, this means nothing can be

15 posted on any social media of any kind --

16         **MS. BUTTON:**  We haven't posted --

17         **THE COURT:**  Okay --

18         **MS. BUTTON:**  -- but yes.  We understand --

19         **THE COURT:**  -- any -- I'm not saying you have.  I'm

20 just explaining what it means; that nothing can be posted on any

21 form of social media -- YouTube, TikTok.  I don't know all the

22 apps that are out there.  It cannot be used.  It cannot be

23 disclosed to third parties, unless it is a -- an attorney that

24 you are retaining or an expert that you are retaining, no

25 parents, no sisters, no brothers, no friends, no acquaintances.

1    And the plaintiffs are equally bound.  They can -- their

2    attorneys can look at them.  Their attorney offices can look at

3    them.  Their experts can look at them.  Plaintiffs can look at

4    them.  But nobody else.  So it's equal on both sides.

5              Now, with respect to the number of RFPs, before I go

6    further, have these also been responded to, Counsel?

7              **MS. RUFF:**  Yes, Your Honor.

8              **THE COURT:**  And have documents been produced?

9              **MS. RUFF:**  A handful have been produced.  The

10   specific requests for specific images that were from Sage's

11   iPhone, some were objected to, but the ones that we didn't object

12   to, we have produced.  We're in the process of running searches

13   for other documents.

14             But when defendants were represented by prior

15   counsel, they also served RFPs on us, and documents have been

16   produced in response to those --

17             **THE COURT:**  I'm talking about plaintiffs' RFPs now.

18             **MS. RUFF:**  Understood.

19             **THE COURT:**  All right.  So with respect to the

20   images, what is it that -- and I had concerns.  The images are

21   also -- are protected under this protective order, which is

22   effective today even though not on the record yet.  I'm telling

23   you, with respect to those images, they may not be used for any

24   other purpose, whatsoever, disclosed in any form on any platform

25   no matter what it's called, whether it hasn't even been invented

1    yet and it comes up tomorrow.  I do not want to hear that these

2    images have ended up on the internet in any fashion or used in

3    communications that flow through the internet, such as e-mail,

4    text messages -- I'm not sure that flows through the internet.

5    Text messages are included here, Snapchat, Instagram, What's App.

6    I don't no what's out there.  None of it is to be on any of those

7    platforms by plaintiffs or by defendants.

8            Now, with respect to the images that you have

9    objected to, what -- can you give me an idea of the type of image

10   that has been objected to and why?

11           I realize I'm asking you something you may not have

12   been prepared for today.

13           **MS. RUFF:**  Yes.  We've generally speaking, we've

14   agreed to produce images of plaintiff with defendants or

15   communications between plaintiff and defendants.  We've objected

16   to communications between plaintiff and third parties, for

17   example, Daryl Katz; images of plaintiff with third parties, for

18   example, Daryl Katz.

19           And to the extent helpful to you, we do have a binder

20   of our responses and objections to all these requests.  I'm sure

21   you don't want to do more reading, but if you'd like them, we do

22   have it for you.

23           **THE COURT:**  Well, there's no way I could go through

24   them today.  I agree that images between plaintiff and Daryl

25   Katz, as I've already said, because he has been dismissed, are

1  not to be disclosed in this case or used in this case for

2  any -- for purposes of deposition.

3          And when it comes to trial, if it gets that far, the

4  district judge will rule on that issue.  That will be Judge

5  Traum.

6          But if they are images with -- you know, if they are

7  her -- I don't know.  She's at the shopping mall with her best

8  friend.  I understand why that may not have been produced.

9          But anything that pertains to this case and the

10  allegations in this case, you are telling me, have been produced;

11  is that correct?

12          **MS. RUFF:**  With respect to the specific request for

13  discrete images, yes, Your Honor.

14          **THE COURT:**  Okay.  All right.  If -- Mr. and

15  Mrs. Button, if you believe that's not true, you can call

16  plaintiffs' counsel, tell them what images you think you did not

17  receive, because you know the names and the titles of the images,

18  which means you must have had them at some point in time to be

19  able to say that.  You can call them and tell them why you

20  believe that image should be produced.  If they don't agree, then

21  you can bring that to the court and tell me why you think you are

22  entitled to that image.  That's how it works.

23          But as of right now, they have responded, so I -- I

24  don't think there's anything for me to really do with this.  I

25  was going to limit the number.

1          I'm going to tell you that before you issue any

2   additional requests for admission or requests for production, you

3   must first speak to plaintiffs' counsel.  If they disagree, then

4   you can bring it to the court, because there have been an

5   extraordinary number already propounded, both while you were

6   represented and now subsequently.  So no more RFAs or RFPs.

7          So that is that subject matter, unless, Mr. Button or

8   Mrs. Button, you wish to be heard further on this subject matter

9   -- RFAs, RFPs.

10          **MR. BUTTON:**  Yes.  I'll make it very brief.  We have

11   requested a lot of things, and they claim they have provided

12   files.  But what they have provided are irrelevant files that we

13   did not request of them so that they could stand there today and

14   say that they've provided files.

15          The things that they've provided are hearsay

16   conversations between third parties.  We want nothing to do with

17   that.  The things that we were requested were not granted.  They

18   were not returned.  And granted, I understand we need to discuss

19   the Daryl Katz request.  That's why we plan to confer with them.

20          We actually begged our previous counsel to file a

21   motion to compel prior to their withdrawal from this lawsuit but

22   missed the deadline to do so.  So our first attempt to try to

23   gain the files that we need were through this.  They haven't

24   provided them.  What they did provide is whatever they believe

25   will convince the Court that they've provided --

 1                **THE COURT:**  Can you give me an example?  I'm sorry --

 2                **MR. BUTTON:**  -- they've given nothing that we asked

 3    for.

 4                **THE COURT:**  Give me just -- Mr. -- Mr. Button, what

 5    I'm saying is, can you give me an example?

 6                If you don't have one right now, I understand.  But

 7    if you do, I would be interested in hearing the example.

 8                **MR. BUTTON:**  Yeah.  I guess, one example would be

 9    communications between plaintiffs amongst themselves prior to the

10    onset of this lawsuit or communications with the *New York Times*,

11    where they published this lawsuit prior to us ever even knowing

12    that this lawsuit was going to take place.  So all of these

13    communications that showcase that their angle and this from the

14    entire onset of this lawsuit was a media campaign to destroy

15    us --

16          *(Whereupon, the reporter interrupts to preserve the*

17          *record.)*

18                **THE COURT:**  You have to slow down again.  I'm sorry.

19    She's not -- what is it that you don't hear him? because I am

20    hearing him clearly.  I'm sorry.

21          *(The Court and court reporter conferring.)*

22                **THE COURT:**  So you're talking a little too fast for

23    the court reporter.  So if --

24                **MR. BUTTON:**  Okay.

25                **THE COURT:**  -- you'll just slow down a little bit,

1    please.

2          I understood it's between plaintiffs -- before the

3    lawsuit between plaintiffs, subsequent to the lawsuit, and

4    also -- I'm sorry.

5          What was the other subject matter you said?

6          And I was writing it down --

7          **MR. BUTTON:**  Communications between plaintiffs and

8    their interviews that they did with every --

9          **THE COURT:**  Oh, right.

10          **MR. BUTTON:**  -- media outlet on the planet prior to

11    us ever being served with this lawsuit about the lawsuit that we

12    were unaware of.

13          **THE COURT:**  All right.

14          **MR. BUTTON:**  There are various other ones that have

15    to do with, for example, Jane Doe 1, who I know we stated and we

16    can't rule on today.  We've never met before.  She was an

17    employee at Sage Humphries' salon that she modelled for, and they

18    do have a connected circle.  We seek communications between her,

19    the first person Sage Humphries told that she was in love with us

20    and Sage Humphries, because the onset of this lawsuit coming

21    from -- especially including somewhere that we never met, there

22    has to be communications present.

23          One of the plaintiffs visited Sage Humphries' house

24    prior to ever joining this lawsuit, prior to this lawsuit ever

25    existing, and they provided none of those communications.  They

1  essentially only provided third-party gossip and hearsay about

2  the *New York Times* and about the claims made in the media, but

3  they've provided nothing that we've actually asked for.  So --

4  and some of the files, for Jane Doe 1, for example, we've asked

5  her to provide --

6         **THE COURT:**  Just slow down.  Mr. Button, just slow

7  down again.  Slow down.  Go ahead.

8         **MR. BUTTON:**  Okay.  So we asked for Jane Doe 1 to

9  provide any documentation of any kind that would verify that

10  she's ever met us before, verify that she's ever been in our

11  presence, or verify that she's ever been in the same vicinity or

12  same building as us.

13        She provided blank applications from web sites that

14  are irrelevant to all of this and a resume.  And the only reason

15  we know she worked at the salon Sage Humphries modelled for, when

16  she -- prior to her plagiarizing Sage Humphries' affidavit is

17  because she provided that --

18        **MS. BUTTON:**  The resume.

19        **MR. BUTTON:**  -- the resume.

20        But, but she has provided absolutely no

21  communications with anyone.  She's provided absolutely nothing,

22  in other words.  I mean, blank forms from our web site that have

23  no -- there's nothing filled out.  There's no signature.  It's

24  just a blank form that she printed online --

25        **MS. BUTTON:**  But there's duplicates --

 1           **MR. BUTTON:**  Yeah.

 2           **MS. BUTTON:**  -- and I know that -- I know that this

 3  isn't entirely relevant, but the problem is she's the worst

 4  claim.  Even though we had a relationship with Sage, Jane Doe 1

 5  literally made thousands of people think that we raped children

 6  at gunpoint.  And she can't provide anything to even prove she's

 7  ever met us?  Sorry.  It destroyed our lives.  And she can't

 8  provide anything.

 9           **THE COURT:**  So if she doesn't have anything, she

10  can't provide what she doesn't have, of course.  And if she

11  doesn't have a document, then she -- there's nothing to produce.

12  I don't know what they've said.

13           But this is where their -- they have the burden to

14  prove this.  Her testimony and your counter-testimony and witness

15  testimony around these subject matters is evidence.  But people

16  don't always have documents.  It just is true.  So I -- I don't

17  know whether Jane Doe has documents or doesn't.

18           Let me ask the plaintiffs' counsel a couple of

19  questions.  Okay?

20           Just hold on a second here.

21           With respect to communications that would pertain to

22  this lawsuit even before it occurred between the plaintiffs,

23  before they're represented, before there's any attorney-client

24  privilege that be claimed, have those been searched for?

25           **MS. RUFF:**  We agreed to search for and produce

 1  communications between plaintiffs to the extent they relate to

 2  defendants or this lawsuit.  Some of these plaintiffs are

 3  childhood friends, have voluminous communications.

 4           THE COURT:  Right.  I understand.  If they're talking

 5  about what they did when they were 12 at somebody's summerhouse

 6  one day, that's not going to be produced.

 7           MS. RUFF:  Right.

 8           THE COURT:  So you are searching for those and will

 9  produce them, or you've searched for them and have produced them?

10           MS. RUFF:  We search for them and will produce them

11  to the extent they're not covered by the joint defense privilege.

12           THE COURT:  Okay.  So right.  But the joint defense

13  privilege would have to be that it pertain to attorney-client

14  communications, requests.  I mean, if -- I'll use different words

15  -- Sam Jones 1 and Sam Jones 2 decide to go out to the bar and

16  start texting back and forth about this and it's not something

17  you've requested or you've sought for them to try to figure out

18  for you at your direction broadly whether it's you and

19  particularly somebody from the firm, a paralegal, an expert,

20  whatever it is, that's not -- that's not joint defense.

21           MS. RUFF:  Well, for instance, certain plaintiffs

22  filed police reports against Mr. Button years before this lawsuit

23  was filed --

24           THE COURT:  I understand that.

25           MS. RUFF:  -- so we weren't their attorneys.  But to

 1  the extent they have communications with each other related to

 2  those separate proceedings, we would argue that there may be

 3  issues of privilege there.

 4          **THE COURT:**  Okay.  All right.  So what I am hearing

 5  is that they are going to search for and are searching for and

 6  are going to produce documents that include communications

 7  between the plaintiffs that they do not claim a privilege over.

 8          If there is a privilege, you need to produce a

 9  privilege log.

10          **MS. RUFF:**  Yes.

11          **THE COURT:**  A privilege log says, We aren't producing

12  Document X that is between Y and Z.  It pertains to this, and

13  here's the privilege we are claiming.  That's how it works.

14  That's how it works in all litigation.

15          Then, if you disagree, you have to either write

16  plaintiffs' counsel a letter or call them and say, We disagree.

17  Explain why.  If you can't agree and you think you are entitled

18  to the documents, that's when you come to court.  That's how it

19  works.

20          Now, with respect to communications with a media

21  outlet, have those been searched for?  Are you claiming

22  privilege?  What is the status of those?

23          **MS. RUFF:**  Well, as we assert in our responses and

24  objections, we've been using the date the initial complaint was

25  filed as the cutoff date for our search parameters.  To the

 1  extent defendants have an issue with that cutoff date, we're

 2  happy to meet and confer with them about it --

 3              **THE COURT:**  Well, but didn't -- didn't some of these

 4  that I've seen occur before the lawsuit was filed?

 5              **MS. RUFF:**  Yes, Your Honor.  Certain communications

 6  between plaintiffs and media outlets were not written.  To the

 7  extent there are written communications, we can search and

 8  produce those to the extent they predate the date the initial

 9  complaint was filed.

10              **THE COURT:**  And there's no privilege there.  It's not

11  irrelevant.  I'm not sure.  It could be disproportionate if there

12  were thousands of them, but I suspect there are not.

13              **MS. RUFF:**  Understood, Your Honor.  We can search for

14  and produce those that predate the date of the initial complaint.

15              **THE COURT:**  All right.  So they are going to search

16  for and produce communications -- remember, if it's telephone

17  call, there's not going to be a written document.  But if there

18  are written communications between the plaintiffs and news media

19  or media outlets, not just news, not just *New York Times*, Cosmo.

20  *Cosmopolitan* isn't a news outlet, in my opinion.  So, you know,

21  if they are there, they will produce them.  So I -- those two

22  things have been addressed.

23              Let me move on to the subpoenas.  The subpoenas are

24  to third parties.  Just as the Buttons didn't have standing to

25  object, I don't understand how plaintiffs have standing to object

1    to the third-party subpoenas.  To the extent they are to

2    plaintiffs, those are inappropriate, and I will explain that to

3    the Buttons.  But to the third parties, I understand there are

4    many of them.  But those parties, if they haven't been properly

5    served, they're not going to response.  If they claim they

6    were -- they weren't served, they were improperly served, or they

7    object, they all have freedom to do that.

8              **MS. McCAWLEY:**  Your Honor, I -- maybe we put

9    something in our papers that was not entirely clear.  But with

10   respect to the subpoenas, we're simply asking the Buttons -- they

11   served 56 subpoenas.  We're just asking them -- their obligation

12   is to give us copies of anything they received, and we haven't

13   received a single document.

14             So to the extent that third parties are providing

15   them discovery, that was our request with respect to the

16   subpoenas --

17             **THE COURT:**  Okay.  So if you get responses to any of

18   the subpoenas you have served, you must produce the documents

19   without any alteration to the plaintiffs.

20             **MR. BUTTON:**  Yes, ma'am.

21             **THE COURT:**  Okay.

22             **MS. BUTTON:**  Absolutely.

23             **THE COURT:**  That's it.

24             And the only other thing I'll tell you is that you

25   don't subpoena parties, so the subpoenas to Ms. Humphries,

 1    Ms. DeAngelo --

 2                  **MR. BUTTON:**  Right.

 3                  **THE COURT:**  -- Menichino, Jane Doe 1, and Jane Doe 2

 4    are not appropriate.  They get requests for production.  And

 5    you've done that --

 6                  **MR. BUTTON:**  That's correct.

 7                  **THE COURT:**  -- and we're getting additional

 8    documents, as discussed here in court today.

 9                  The last subject matter is the Rule 26 disclosure.

10    And what Rule 26 requires is a list of persons with knowledge.

11    And you have to list the person's name, the last known address,

12    unless there's some reason to keep it confidential, and telephone

13    number, unless there's a reason to keep it confidential, and the

14    subject matter that that individual is going -- has knowledge

15    about -- oh, grammar -- that -- the knowledge that that person is

16    going to allegedly be able to share in the course of the lawsuit

17    that is relevant to the lawsuit.

18                  You have listed 209 people.  There are no addresses.

19    There are no phone numbers.  But most importantly, there are no

20    descriptions of the testimony or the -- not testimony -- the

21    information that they have that is pertinent to this lawsuit,

22    whether it is in your favor or in the plaintiffs' favor or

23    somehow detrimental to the plaintiffs or detrimental to you.  You

24    must list that.  That is the idea.

25                  Plus, 209 witnesses are fairly -- that's pretty

 1  burdensome.  No Court's ever going to let you bring 209 witnesses

 2  to court.  It's not going to happen.  I can tell you that.  It

 3  doesn't happen in much bigger lawsuits than this.  A 209 witness

 4  litigation would take months, and the court will not give you

 5  months to try this case.

 6              So you are going to need to pare that number down to

 7  the witnesses that you believe -- the people who have the most

 8  important information that you believe, not that you are certain,

 9  that you believe may be called as witnesses in this case.  And

10  you must list their addresses.  If you don't know their address,

11  you say address unknown.  List their phone number.  If you don't

12  know their phone number, you can say phone number unknown.  And

13  you must give a brief two-sentence, three-sentence description of

14  what they know.  Witness to events on such and such a date.

15  Witness to events in Florida at the dance studio.  Whatever it is

16  that you believe they know that is pertinent, you must include.

17              And I'm going to limit you to 75.  I 'm asking you to

18  pare this down to 75 people.  And I'm going to give you -- how

19  much time do you need to update this list?  Is two weeks enough

20  time?

21              **MR. BUTTON:**  That's plenty of time, and I just -- I

22  wanted to say, too, we -- we were a little ignorant to what that

23  was --

24              **THE COURT:**  Okay.

25              **MR. BUTTON:**  -- so when we made that list, we were

 1   assuming that these were people that we, basically, were telling

 2   the Court that we will seek information from.  We weren't aware

 3   that when we made this list, these were people we were stating

 4   that we're calling for witnesses.  We thought we just needed to

 5   ask the Court for permission just so they know, hey, all of these

 6   people may have something relevant, and we may speak to them.

 7   So --

 8                 **THE COURT:**  You --

 9                 **MR. BUTTON:**  -- we misunderstood what that was.

10                 **THE COURT:**  Right.  You can speak to people who are

11   not on that list.  If you intend later, after you talk to

12   somebody, to call that person as a witness, you need to add that

13   person to the list.  Okay?

14                 **MR. BUTTON:**  Right.

15                 **THE COURT:**  So you start off with 75 people, then you

16   talk to ten more, and out of those ten more, there's an

17   additional person.  You would do a supplement, and you would

18   include that new person on your list, because you may --

19                 **MR. BUTTON:**  Okay.

20                 **THE COURT:**  -- call them as a witness, because if the

21   person is not on that list and you get to trial, you may be

22   precluded from calling that person as a witness.

23                 So anybody who you're sure is going to be a witness,

24   you want to put on that list.  Anybody --

25                 **MR. BUTTON:**  I see.

 1          THE COURT:  -- you're not sure but you think may be,

 2  you put on that list.  Go talk to them.  You can always update

 3  the list.  You can take people off.  You can put people on.  But

 4  the number's got to be down to 75.

 5          MR. BUTTON:  Yes.  That's not a problem.  And we

 6  did -- we did tell their counsel that we were planning to add all

 7  the addresses.  We didn't understand that that needed to

 8  be there --

 9          THE COURT:  Okay.

10          MR. BUTTON:  -- so we will work that down.  Two weeks

11  is not a problem.  We'll get that done.

12          THE COURT:  Okay.  So that updated list is

13  due -- what month this was -- April 19th, and the production of

14  the additional documents due to the plaintiffs on

15  April 19th -- defendants, excuse me.  Due to the defendants on

16  April 19th.

17          And the protective order that I described orally is

18  in place.  It will go into order in writing once plaintiffs have

19  a chance to draft it, defendants have a chance to look at it,

20  there's an agreement or disagreement.  The Court will enter

21  ultimately the written version of this order, but the protective

22  order is in place now.

23          All right.  So ECF No. 134 is granted in part and

24  denied in part, as stated on the record.

25          ECF No. 138 is granted to the extent the Court

```
 1   ordered specific third-party observer at the depositions.

 2   Otherwise, the motion is denied.

 3              This leaves the last motion, which is the motion for

 4   sanctions, and this is plaintiffs' motion.

 5              Yes?

 6        MS. McCAWLEY:  Your Honor, I'm so sorry.  There was

 7   one part of this that I did not address.  I'm sorry --

 8        THE COURT:  Go ahead.

 9        MS. McCAWLEY:  -- it's my fault.  I should have done

10   it in the course of it.

11              It is -- we mentioned it in the papers, but it's come

12   up a number of times, and I just want some direction for the

13   Court -- from the Court, please.  And this is with respect to the

14   threats of reporting to the Bar and Bar violations.

15              There's been at least six instances in writing.  I

16   had my associates on a meet and confer the other day where that

17   came up again and they were threatened.  And, you know, if this

18   was a lawyer on the other side, they obviously would know there's

19   an ethical obligation not to threaten Bar obligations.  We had to

20   retain Bar counsel as a result.

21              I just want to make sure that we can get a statement

22   on the record that that doesn't happen going forward.

23        THE COURT:  Thank you.

24        MS. McCAWLEY:  Thank you.

25        THE COURT:  All right.  So -- and I understand you
```

 1  may not know this, but it is unethical to threaten somebody with

 2  a Bar violation if you don't intend to file that Bar violation.

 3              **MR. BUTTON:**  Absolutely.  We intend to --

 4              **MS. BUTTON:**  We intend to.

 5              **THE COURT:**  And I will tell you that while I know

 6  that you may find this process -- I'm sure you do -- very

 7  frustrating and overwhelming, my experience of 30 years -- and

 8  some people have more, but 30 is a lot -- tells me that it is

 9  very, very rare, very rare that an attorney will commit a

10  violation of their professional obligations.

11              Why?

12              Because it threatens their license, which is -- means

13  they could not practice law if they violate the rules of

14  professional conduct.

15              And I would be extremely surprised and, based on

16  everything I've read, can say without exception that I see

17  absolutely no basis for a Bar violation.  When parties disagree,

18  even strenuously, even emphatically, even with assurance, that

19  isn't a Bar violation.

20              Just because plaintiffs' counsel believe all

21  plaintiffs and believe what they have told them isn't a Bar

22  violation and that they --

23              **MR. BUTTON:**  Uh-huh.

24              **MS. BUTTON:**  Right.

25              **THE COURT:**  -- pursue the case on that basis is not a

 1  Bar violation --

 2          MR. BUTTON:  Uh-huh.

 3          THE COURT:  -- and that they see information about

 4  the case from their perspective is not a Bar violation --

 5          MR. BUTTON:  No.

 6          THE COURT:  -- just as your emphatic denials don't

 7  violate any rules.  You are allowed to deny, and you believe your

 8  denials, and you are certain of your denials.  That is not a

 9  violation of any obligation you have to plaintiffs.

10          So you must be candid with each other, but you are

11  allowed to have strong views.  And I recommend you hold back any

12  further threats until you're absolutely certain after you've

13  reviewed the rules of professional conduct that you're going to

14  file a Bar violation with the Nevada Bar.  Otherwise, you need to

15  cease --

16          MR. BUTTON:  Ma'am, we have -- we have reviewed the

17  rules.  We're not -- it's not a threat.  I wanted to be clear.

18  That was our attempt to confer, by recommendation of the Bar

19  Association.  We're required to communicate this with them prior

20  to filing the complaint, which we attempted to do multiple times,

21  and the last time we did, they laughed at us.

22          So there is -- I understand that there is

23  nothing clear in the --

24          THE COURT:  But you haven't filed one, Mr. Buttons,

25  right?  So the threats are not real.  So don't --

1          **MR. BUTTON:**  No, no.  It's -- we haven't, but we're

2     working on it.  Unfortunately, we're on the computer

3     18 days -- 18 hours a day trying to keep up with their massive

4     legal team.  So we haven't had time to finish complaints.  But

5     it's not a threat.  It's an assurance.

6          And, again, we only told them because the Bar

7     Association required it.  So this wasn't a threat to anyone --

8          **MS. BUTTON:**  And I understand --

9          **MR. BUTTON:**  -- this is just a -- it's a courtesy

10    more than it is anything else.

11          **MS. BUTTON:**  And I understand you hear most he

12    said/she said situations, but we have proof, one, to every

13    allegation that they've ever made; and two, proof that they

14    actually have committed these professional misconducts, because

15    we have -- I understand we are not as intelligent as any of you

16    are in regards to law, but we are making an effort to read all of

17    these rules.  And we have read the rules, which is why we called

18    the Bar Association and didn't mention names.

19          We just asked what is the procedure if we want to

20    file something.  They told us we had to confer, which is why

21    she's mentioning the six instances which we have conferred, five

22    of which went unnoticed.  And I might be wrong.  It may be four.

23          But yes.  The last phone call we received and we

24    spoke to them, they did laugh and said, Threatening us isn't

25    going to help you.  And we're not threatening.  We're conferring.

1          So that's the response we get every time.  And we

2    have conferred, and we did confer prior to the last filing where

3    they said, We'll let the judge know that somehow it was mistaken

4    that you did confer with us, and we'll -- we'll let her know that

5    you did confer.  And then they filed and said that they didn't.

6          So there's -- there's been multiple instances and

7    they will always get away with it, just as they did in the

8    *Weinstein* case and the (indiscernible) case, which I know we're

9    not here for.  But regardless, yes.  We will -- we will be doing

10   that.

11         **MR. BUTTON:**  Well, I apologize, but I have to ask.  I

12   know that we're not allowed to question their integrity.  Is that

13   -- is that the way it is in the courtroom?  Like, we can't?

14         **THE COURT:**  You know, generally, no.  You know,

15   generally, the answer is no.  The people are --

16         **MS. BUTTON:**  Okay.

17         **THE COURT:**  -- as you take them.  They don't -- you

18   know, they don't believe your denials.  You don't believe

19   their -- you are emphatic their clients are not telling the

20   truth.  But the fact that counsel believes their clients is not a

21   Bar violation.

22         **MS. BUTTON:**  No, it's not --

23         **MR. BUTTON:**  No, no.

24         **MS. BUTTON:**  -- that's not what --

25         **THE COURT:**  And the fact --

```
 1              MS. BUTTON:  -- Right.
 2              THE COURT:  -- that they pursue the claims are not a
 3   Bar violation and that they pursue --
 4              MR. BUTTON:  That's not why we're filing.
 5              THE COURT:  -- that they pursue the claims
 6   aggressively is not a Bar violation --
 7              MR. BUTTON:  No.
 8              THE COURT:  -- and that they advise you about what
 9   the Bar -- you know, what a Bar violation is and they tell you
10   that you don't have a Bar violation is not a Bar violation --
11              MR. BUTTON:  No.
12              THE COURT:  -- and I will tell you --
13              MS. BUTTON:  We agree.
14              THE COURT:  -- in 30 years, I never filed a Bar
15   violation against anybody.  And the only time one was ever filed
16   against me, it was a pro se plaintiff who didn't understand, and
17   it was thrown out.
18              And if it has no factual basis, it can be defamation.
19   So you want to --
20              MR. BUTTON:  Okay.
21              THE COURT:  -- think carefully about what you're
22   doing.  I'm not telling you not to do it.  I'm not --
23              MR. BUTTON:  Right.
24              THE COURT:  -- telling you I know what the facts are.
25   I'm telling you to be careful and maybe confer with a lawyer,
```

```
 1   even if you can't retain one for all purposes, before you make

 2   statements that counsel is lying to the Court.  That's a very

 3   serious allegation.  It's a very serious allegation --

 4             MS. BUTTON:  It is --

 5             MR. BUTTON:  Can I -- can I quote one of those lies

 6   on paper --

 7             THE COURT:  No.

 8             MR. BUTTON:  -- can I insert that into the court?

 9   because we have the proof here.

10             THE COURT:  No, because I'm not ruling on it today.

11   No --

12             MR. BUTTON:  Okay.  All right.  Well --

13             THE COURT:  -- I don't have your papers or their

14   papers before me.  It wouldn't be appropriate.  This goes to Bar.

15   You go ahead, but I'm --

16             MR. BUTTON:  Yes.

17             THE COURT:  -- I've said what I'm going to say on the

18   subject matter.  I'm not going to say anything else, Mr. and

19   Mrs. Button --

20             MR. BUTTON:  All right.

21             THE COURT:  -- you'll do what you think is right.

22   You'll do --

23             MR. BUTTON:  Yes.

24             THE COURT:  -- what you think is best, and I can't

25   control what those things are.
```

1              All right --

2         **MS. BUTTON:**  That's true.

3         **THE COURT:**  -- ECF -- ECF No. 120, plaintiffs' motion

4    for sanctions.  This is the last motion to be considered, and it

5    is -- the Court must -- I'll just give you some basic lay of the

6    land that I have, as do all federal judges, inherent power to

7    levy sanctions, including attorneys' fees and other sanctions

8    such as striking an answer or imposing a -- what's called an

9    inference of fact or even requiring a specific jury instruction

10   to be given.  I have very broad, very broad discretion to do

11   that.

12             And I am concerned today about the Boston order, the

13   subsequent hearing, and what happened at that.  I understand what

14   the Buttons have told me.  I'm going to ask if -- if plaintiffs

15   have a copy and can read from any of the order, and -- but I am

16   also concerned about this Court's order, not the Boston order,

17   with respect to any disclosure of information from Sage

18   Humphries' home which, Mr. and Mrs. Humphries, you say

19   emphatically in your opposition to this motion is the camera

20   roll.  But you say elsewhere that you clearly had text messages

21   between Ms. Humphries and Daryl Katz and Ms. Humphries and her

22   mother.  So it's not --

23         **MR. BUTTON:**  Sorry.  No.  That's -- I apologize.

24   That's not right --

25         **MS. BUTTON:**  That's not correct --

1          **THE COURT:**  Let me finish.  I am not asking to hear

2    from you at the moment.

3          **MS. BUTTON:**  We can't hear you because of Zoom, so I

4    apologize --

5          **THE COURT:**  You can't --

6          **MS. BUTTON:**  -- We can't hear you.  You're -- you're

7    very broken up.  So it sounds like you're finished some of the

8    time.

9          **THE COURT:**  Understood.  All right.  I haven't

10   finished.  Thank you.

11          You say emphatically in your opposition camera roll,

12   camera roll, camera roll, how plaintiffs don't understand it, how

13   plaintiffs' counsel doesn't understand it, how the Court doesn't

14   understand it.

15          The Court understands what a camera roll is just

16   fine.  And if you look on the web, common knowledge will say the

17   camera roll are the photo app.

18          In any event, whether it's more than the camera roll

19   or less than the camera roll, you clearly admit to, at one time,

20   having texts from her phone, not your --

21          **MS. BUTTON:**  -- that's incorrect.

22          **THE COURT:**  -- her texts between Mr. Katz and her and

23   between Ms. Humphries and her mother.

24          **MS. BUTTON:**  That's impossible.

25          **MR. BUTTON:**  No.

1                THE COURT:  That's what you say, so it's not

2   impossible --

3                MR. BUTTON:  They're screenshots.  Screenshots.

4                MS. BUTTON:  Screenshots of text messages --

5                THE COURT:  Right.

6                MR. BUTTON:  A photo in a camera roll, a screenshot,

7   not a text message, a screenshot of it --

8                MS. BUTTON:  Like if I --

9                MR. BUTTON:  -- like if I screenshot this photo right

10  now, we have a photo.

11               THE COURT:  Thank you.  That's not what you say when

12  you're communicating.  We have --

13               MR. BUTTON:  Can you reference where?

14               THE COURT:  -- I had the download of her texts.  The

15  folder has the download of the texts between Ms. Humphries and

16  Mr. Katz.  I don't think --

17               MS. BUTTON:  The camera roll has photos of her text

18  messages between Mr. Katz -- there's no way -- if you actually

19  search this, there's no way for someone to have a text message

20  from someone else's phone.  It's a screenshot because she

21  uploaded her camera roll, which she admits in her admissions just

22  last Friday that she only --

23               THE COURT:  I'm done -- I'm done hearing this right

24  now, Mr. and Mrs. Button, so thank you.

25               Publication of materials that could only have come

1    from plaintiff Humphries' iPhone, on YouTube, and the web is a

2    violation of this Court's order, period, the end.  Whether it's a

3    violation of the Massachusetts' order is not at issue here.

4              It is at issue for my court, my order.  No

5    publication of any materials that could only have come from

6    plaintiffs' iPhone, whether it is a screenshot or an actual text

7    or anything else.  It is not to be used outside of this

8    litigation by you and plaintiffs, attorneys, and experts.  The

9    end.  No exception.  Nothing.  No other use, no other use.

10   That's it.  There's nothing else to discuss about it.

11             And, you know, your -- your texts said that you were

12   willing to give plaintiffs access to the folder Sage backed up on

13   your drive.  Your actual quote says, The folder Sage backed up on

14   their drive.  Okay --

15             **MR. BUTTON:**  Uh-huh.

16             **THE COURT:**  -- so are you still willing to do that?

17             **MR. BUTTON:**  They have it and we destroyed it.  We

18   were ordered to return it.  They have all of it, and we destroyed

19   all --

20             **THE COURT:**  You were never ordered to destroy it by

21   this court or the Massachusetts court --

22             **MR. BUTTON:**  Yes, we were -- no.  We were ordered by

23   Nevada --

24             **THE COURT:**  You were ordered to retain no copies.

25             So you have no copies?

1                MR. BUTTON:  How can we not -- how can we retain no

2  copies and not destroy the copy?

3                MS. BUTTON:  We destroyed the copy --

4                THE COURT:  You can give the copy to the other side.

5  You give it --

6                MS. BUTTON:  They have the whole --

7                MR. BUTTON:  They have all of it.

8                MS. BUTTON:  December 31st, they received it --

9           *(Whereupon, the reporter interrupts to preserve the*

10          *record.)*

11                THE COURT:  You'll just have to take down what you

12  can.  Okay?

13                MS. BUTTON:  We can't take anything down --

14                MR. BUTTON:  No.  She's talking to the --

15                MS. BUTTON:  Oh.

16                THE COURT:  I'm talking to the court reporter --

17                MR. BUTTON:  We have them everything.  They have all

18  of it.

19                THE COURT:  Okay.

20                MS. BUTTON:  They've had everything since December

21  31st because we followed your instructions.

22                MR. BUTTON:  Yes.

23                MS. BUTTON:  They've had everything since then --

24                THE COURT:  Mr. and Mrs. -- Mr. and Mrs. Buttons,

25  candidly, I don't know that that's true because subsequent to

1    that --

2            **MS. BUTTON:**  We filmed a 25-minute-long video to

3    prove to you it's true because they knew -- we knew that they

4    would do this.  We knew they would say they don't have it, which

5    is why we filmed a 25-minute-long video destroying it, the

6    evidence -- the copies that we had and sent everything back to

7    her.  So if you want the 25-minute-long video, we're happy to

8    send that to you.

9            **THE COURT:**  On January 15, 2023, a video was posted

10   to the YouTube channel that includes screenshots of text messages

11   between Mrs. -- Ms. Humphries and Daryl Katz that coincide with

12   the defendants' statements and declarations that they discovered

13   text messages between these two individuals on their external

14   drive or hard drive, whichever it was.  And they have -- there

15   are also a variety of other videos that have been posted with

16   your pictures, so I guess somebody else, you're saying, has

17   done -- created all of these videos.

18            Let me tell you now that if, in response to the

19   subpoenas that are going out to the various social media and web

20   sites, there is discovery that you posted, controlled, or owned

21   these web sites, there will be serious sanctions entered by the

22   Court.  And in the -- in the event -- in the event that you, in

23   fact, control -- and I'm not saying you do -- control the video

24   about Jane Doe, the video about Juliet Doherty, the two videos

25   about Ms. Humphries, which I have watched all four of them, or

1  the video about Daryl Katz, if, in fact, you do control them, I

2  would -- I can't order you to take them down because I don't know

3  that you own them.  But if you do control them or you do have

4  control over them or if you did post them, whether directly or

5  indirectly, and they don't come down and I discover that you did

6  have control, that you did have ownership, that you did direct

7  the posting of these, whether directly or indirectly, there will

8  be serious sanctions entered by the Court.

9        I am not finding that now because I am waiting for

10  the outcome of the subpoenas that have been issued.  And I am not

11  going to issue sanctions today until I have a certainty, more

12  certainty, that these are, in fact, posted or controlled in some

13  fashion by one or both of you.

14        But if that should happen, there will be serious

15  sanctions.  Those videos, the ones about Ms. Humphries and

16  Ms. Doherty and Jane Doe 1 are particularly offensive.  They are

17  certainly harassing.  They could certainly be intimidating.

18        You are able to use your evidence.  You are able to

19  use the evidence that you have that refutes what Ms. Humphries

20  says or what Ms. Doherty says or what any of the other plaintiffs

21  say.  But you cannot post this interrogatory offensive videos on

22  the web in any fashion.  That's just -- that's the ruling of the

23  Court, and that -- it does not stop --

24        **MR. BUTTON:**  How can we use -- how can we use it, our

25  evidence?

1          **THE COURT:** You can use it in deposition.  You can

2  use it when you submit something to the Court.  You can attach an

3  exhibit and file it under seal and say, This refutes --

4          **MR. BUTTON:** Okay.

5          **THE COURT:** -- what plaintiff says.  You can use it

6  at trial.  You can use --

7          **MR. BUTTON:** Okay.  So the exhibit -- the exhibit

8  today, we can use that, that evidence, and we can ask the Court

9  to take it all as an exhibit?

10         **THE COURT:** Well, it has to be in relation to

11 something.  I don't -- you don't file exhibits separate from a

12 motion.  You file exhibits to support a motion or to support a

13 response to a motion.  You -- and you must file those things

14 under seal if you are asking the Court to review them.

15         And if it is -- if it is a CD-ROM or a flash drive,

16 you send it to the clerk's office for manual filing under seal.

17 You have to mail it to them because you don't live here.  So you

18 have to mail it to the clerk's office for manual filing under

19 seal.

20         And you would put that in a motion format, just like

21 you have done other things.  You clearly know how to do this.

22 That's how you file things under -- to get before the Court.

23         I did not have a chance to look at what you sent me

24 today.  I am not ruling based on what you sent me today.  I am

25 not ruling today that any video that was posted, whether it's

 1  Jane Doe Part 1 of 2 or 1 of 1 and Part 2 of 2 -- I'm sorry.

 2  That's -- that's Sage Humphries -- Sage Humphries 1 of 2 and 2 of

 3  2, Jane Doe's video, or Juliet Doherty's video.  I am not finding

 4  that those are yours or that the Cat's video is yours.  I'm

 5  saying if it's discovered that it's yours, that you controlled

 6  it, posted it, had a role in it, whatever, and they haven't come

 7  down, there will be sanctions.  That's what I'm telling you.  I

 8  am obligated to warn you of serious sanctions, and that's what I

 9  am doing.

10          With respect to the -- the web -- or what is

11  -- Snapchat, whatever it is, the formerly known as Dusty Button

12  account, I'll call it, again, any further threats -- and there

13  were threats in those postings -- that are made to any witness,

14  if they are controlled by you, done on your behalf by somebody

15  else and it is demonstrated successfully to the Court or that you

16  did them, there will be serious sanctions entered by the Court.

17          If you have, or know of, anybody who is making

18  threats to the woman at the Dallas Conservatory or who is posting

19  things about the Button -- excuse me, about Ms. Humphries or any

20  of the other plaintiffs, I highly recommend you tell them to

21  stop.  I can't order them to do that at this time, but if

22  plaintiffs find out that they -- who it is, they may bring them

23  into court, and I can issue orders directly as to those

24  individuals.

25          I just am highly offended as a lawyer and as a judge

1  by the content of those videos --

2          **MS. BUTTON:**  Wow --

3          **THE COURT:**  -- Mr. Katz could move about his own

4  video, but -- I don't answer questions, Ms. Buttons.  I don't

5  have to tell you why.  But, it is --

6          **MS. BUTTON:**  I didn't ask you why.

7          **THE COURT:**  -- it is abundantly clear that they are

8  intended to intimidate and embarrass and harass the people who

9  are on those videos, including Mr. Katz, although that's up to

10  him what he does with it --

11          **MR. BUTTON:**  Ironic, very impressive --

12          **THE COURT:**  -- but it is what it is.

13          So I am not going to issue sanctions today.  I am

14  leaving that issue open.  The motion is denied without prejudice.

15          And that -- as such time as the responses to

16  subpoenas are received or any other investigatory work that you

17  do -- I'm speaking to plaintiffs -- to determine the ownership,

18  control, or direction resulting in the posting of any of these

19  five videos -- it is indeed five -- or any messages to any third

20  party who's a witness that is done by the Buttons or by somebody

21  else, I am open to any further motion practice with respect to

22  that.

23          And I can't say strongly enough how concerned I am

24  about what -- about these videos and how harassing and oppressive

25  and inappropriate they are.  We don't litigate, despite what may

 1  be going on sometimes in the United States, in the press,

 2  typically.  We don't embarrass people in the press.  We don't

 3  threaten people in the press.  We don't threaten people --

 4          **MS. BUTTON:**  What about us.

 5          **THE COURT:**  -- in the press.  We don't -- that's not

 6  how our legal system works, so I'm suggesting --

 7          **MS. BUTTON:**  That is how it works.  Look at -- look

 8  at what they've done to us --

 9          **MR. BUTTON:**  Can we -- can we speak?

10          I have a question.

11          **THE COURT:**  You can --

12          **MR. BUTTON:**  Okay.

13          **THE COURT:**  -- you can make whatever statement you'd

14  like.  Please go ahead.

15          **MR. BUTTON:**  Do we litigate through the *New York*

16  *Times*, through *The Boston Globe*, through the *Tribune*?  Do we

17  litigate through every news company on the planet prior to

18  serving defendants?  Do we litigate through hiring a hitman who

19  went to jail for 17 years for intimidating, shooting bullet holes

20  through windows at journalists and silencing oppressing stories?

21  Is that how we litigate in this country? because that's what's

22  happening to us.

23          And you guys are so concerned about a YouTube video

24  while we had our home broken into, while the man admitted to

25  being hired for $75,000, his retainer, to silence and suppress

1    us, to threaten our attorneys, and to threaten our lives.

2            And the Court is more concerned about a YouTube video

3    than it is about us being broken into and being physically

4    threatened and having our lives threatened by a hitman, by a man

5    that just got out of prison after 17 years for doing exactly

6    these things?

7            **MS. BUTTON:**  Unreal --

8            **MR. BUTTON:**  And the *New York Times*.  We were served

9    in the *New York Times*.  We weren't served by a process server.

10   We were -- we were served by the *New York Times,* and we're

11   talking about press and media.  I can't believe that this is so

12   biassed.

13           **THE COURT:**  Mr. Pellicano was apparently an associate

14   of Mr. Katz.  What he did or didn't do is not before me.  I do

15   not have evidence of it before me.

16           He is not a party.  There's no motion against him

17   filed here in this court.  I can't rule absent a motion.  I don't

18   rule just because I feel like something is unfair.  That's not

19   how it works.

20           So I am not doubting or finding, one way or the

21   other, about what Mr. Pellicano said or did.

22           But there is nothing before me, Mr. and Mrs. Button.

23   You haven't filed a motion seeking sanctions against

24   Mr. Pellicano, which I couldn't grant, anyway, because he's not a

25   party to this case.  The Court's power is limited to the parties

1  to this case.  Those parties are the two of you and the

2  plaintiffs.  I am talking --

3              MR. BUTTON:  So the *New York Times?*

4              THE COURT:  The *New York Times* is not a party to this

5  case --

6              MR. BUTTON:  No.  But they're the press.  We're

7  arguing press and litigating in the press, and that's exactly

8  what they've done.

9              MS. BUTTON:  We found out from Juliet Jacobs that we

10 were even being sued.  We didn't even know we were being sued

11 until Sage already did her interview in the *New York Times*.  If

12 they're not trying to play this in the media, I don't know who

13 is.  It's completely unjust.  And no one will listen to the

14 evidence that we have, which we can prove.  We've provided them

15 over a hundred thousand files nearly of data that proves that we

16 have never done anything that they have ever said we've done, and

17 no one wants to listen.  And that is what the court is for.  And

18 it's always that's not what we're here for, and I understand

19 that, because I understand everyone has a duty.  But the fact

20 that two people have -- lives have been destroyed -- and I would

21 not be here today, physically, if it wasn't for my husband.  I

22 would not be here because of the allegations that have been

23 brought forth that we can prove we've never done, and the burden

24 does not even lie upon us.

25                  This entire lawsuit for two years -- and they have

1  brought forth nothing, and we can explain everything.  And I

2  understand.  You don't want to hear that today, but I please hope

3  that you understand that our lives were at stake because of all

4  of this.

5          **MR. BUTTON:**  If we -- if we can't discuss Pellicano,

6  why are we discussing that video on that web site, Cat's Out of

7  the Bag?  That's a Pellicano video, so I don't understand why we

8  can't discuss him, himself.

9          **THE COURT:**  I didn't say you couldn't discuss

10  Mr. Katz.  I said you can't discuss Ms. Humphries, and Ms.

11  Humphries plays a big part of -- portion of that video.

12          I'm not striking anything today, and I'm not issuing

13  sanctions.  I'm telling you, if you posted those videos, there

14  will be problems.  So my duty is to tell you that ahead of time,

15  that there will be serious sanctions.

16          With respect to whether anybody wants to listen, I've

17  spent a lot of time listening today.  And I think there is

18  evidence here that you have and can use to defend yourselves.

19  But I am not here to make a ruling today on whether the

20  allegations are true or untrue.  I'm here to rule specifically on

21  the motions that were filed, and that's what I am ruling on.

22          If you want to bring a motion that says they can't

23  talk to the court -- to the press anymore, file the motion.  Get

24  some authority and tell me why I should issue a gag order.  It's

25  pretty hard to do.  The court didn't do it --

1          MR. BUTTON:  Sure it is.

2          THE COURT:  -- just two days ago, right, in a far

3    more fantastic case --

4          MS. BUTTON:  Oh, yeah.  The *Trump* case.  Yes.  We

5    understand.

6          THE COURT:  -- so issuing gag orders are very hard.

7          I'm not issuing a gag order.  I'm not telling you,

8    you can't talk to the press.  I'm telling you, you can't -- not

9    you, but whoever is -- post videos that are threatening or

10   harassing or embarrassing about the plaintiffs.  That's what I'm

11   saying.  That's different than talking to the press and -- and

12   denying the allegations and saying they're untrue and offering

13   somebody from the press a piece of evidence that you think you

14   have.

15         I didn't say you couldn't do that.  I'm not

16   suggesting you do, but I didn't say you couldn't do that.  And

17   all of the publications and this were done long before I was

18   involved in this case, and I have no motion to cease

19   communication with the press before me.

20         I'm talking about the internet.  *New York Times* may

21   have its service on the internet, but they are not the internet.

22   YouTube, Snapchat, whatever it is, What's App, TikTok, whatever

23   it is, that's what I am talking about.

24         No more videos.  No more derogatory, threatening

25   statements to witnesses or about witnesses or about plaintiffs or

1    to plaintiffs.

2             And the same goes for defense counsel if they're

3    putting it on the internet -- plaintiffs' counsel if they're

4    putting it on the internet about you.  I haven't seen anything to

5    that effect.  I don't believe it exists because I would think I

6    would have it if it did, but I don't.

7             With that, rule -- the Court rules that ECF No. 120

8    is denied without prejudice and to -- to allow the refiling of

9    the motion should it be discovered that there's evidence to

10   support the -- the allegations of the posting by the defendants

11   or at their control or direction.  And the Court will entertain

12   that.

13            If there's something further that the plaintiffs

14   -- defendants want to file with the court with respect to conduct

15   about postings by the plaintiffs that you want me to consider,

16   you can certainly bring that or any other motion that you want,

17   as I've described throughout this very long hearing.

18            With that, the transcript of this proceeding is the

19   order of the Court, and this matter is adjourned.  Thank you.

20                 (*Proceedings adjourned at 12:19 p.m.*)

21                              --o0o--

22

23

24

25

1              COURT REPORTER'S CERTIFICATE

2        I, Paige M. Christian, Official Court Reporter, United

3   States District Court, District of Nevada, Las Vegas, Nevada, do

4   certify that pursuant to 28 U.S.C. § 753, the foregoing is a

5   true, complete, and correct transcript of the proceedings had in

6   connection with the above-entitled matter.

7

8   DATED:  April 5, 2023

9

10                          /s/ Paige M. Christian_____
                            Paige M. Christian, RPR, CRR, CCR #955
11                          Official Court Reporter
                            United States District Court
12                          District of Nevada

13

14

15

16

17

18

19

20

21

22

23

24

25