```
 1

 2                  IN THE UNITED STATES DISTRICT COURT

 3                      FOR THE DISTRICT OF NEVADA

 4

 5   SAGE HUMPHRIES, GINA          )
     MENICHINO, ROSEMARIE          )
 6   DeANGELO, DANIELLE GUTIERREZ, )  Civil Case No.
     JANE DOE 1, and JANE DOE 2,   )  2:21-cv-01412-CRT-EJY
 7   et al,                        )
                                   )
 8                  Plaintiffs,    )  Tuesday, August 1, 2023
                                   )
 9   vs.                           )
                                   )
10   MITCHELL TAYLOR BUTTON and    )
     DUSTY BUTTON, et al,          )
11                                 )
                    Defendants.    )
12   _____

13

14                 TRANSCRIPT OF MOTION HEARING
                HONORABLE ELAYNA J. YOUCHAH PRESIDING
15                   UNITED STATES DISTRICT COURT

16

17                      A P P E A R A N C E S

18   For the Plaintiff:      Lindsey Ruff
                             Boies Schiller Flexner
19                           55 Hudson Yards
                             New York, NY 10001
20
                             Richard J. Pocker
21                           Boies Schiller Flexner LLP
                             300 South Fourth Street, Suite 800
22                           Las Vegas, NV 89101

23                           Sigrid McCawley
                             Boies Schiller Flexner
24                           401 East Las Olas Boulevard
                             Fort Lauderdale, FL 33301
25
     Proceedings recorded by Liberty Recorder; Proceedings
     transcribed using Computer-Assisted Translation
```

1                          A P P E A R A N C E S

2    For the Plaintiff:        Sabina Mariella
                               Boies Schiller Flexner
3                              55 Hudson Yards
                               New York, NY 10001
4
     For the Defendant:        Mitchell Taylor Button, Pro Se
5                              5664 Deer Creek Falls Ct.
                               Las Vegas, NV 89118
6

7

8

9

10

11

12

13

14

15                                  -oOo-

16

17

18

19

20

21

22

23

24

25

 1          (Recording commenced at 10:09 a.m.)

 2          THE CLERK:  This is the time set in the case of

 3     2:21-cv-1412-ART-EJY, Sage Humphries, et al, versus Buttons,

 4     et al.

 5          Plaintiffs' counsel, please enter your appearance

 6     for the record.

 7          MS. MCCAWLEY:  Good morning, Your Honor.  Sigrid

 8     McCawley from Boies Schiller Flexner on behalf of the group of

 9     plaintiffs in this case.  I have with me my colleagues Sabina

10     Mariella and Lindsey Ruff, both of whom are working on this

11     case, along with my partner Rick Pocker, and two of our summer

12     associates, Namoi Hardin and Carolyn Drell.

13          THE COURT:  All right.  Very good.  Thank you.

14          THE CLERK:  Defendants, please enter your appearance

15     for the record.

16          MR. BUTTON:  I'm sorry, for some reason it's

17     difficult to hear.

18          THE COURT:  Hold on one second.

19          MR. BUTTON:  Yeah.

20          THE COURT:  Hold on one second, Mr. Button.

21          Is our equipment working properly?

22          Go ahead.

23          THE CLERK:  Mr. Button, can you hear me?

24          MR. BUTTON:  Yes.  There we go.

25          THE CLERK:  Can you enter your appearance for the

1    record, please.  Just state your name for the record.

2            MR. BUTTON:  Oh, my name -- yes, Taylor Button.

3            THE COURT:  And with you?

4            MRS. BUTTON:  Dusty Button.

5            THE COURT:  Thank you.  All right.  Very good.

6            All right.  We're here today on nine, possibly ten

7    motions that are pending before me only, and they include ECF

8    Number 168, the plaintiffs' third motion for sanctions; ECF

9    Number 185 and 192, which is defendants' motion for Rule 11

10   sanctions, that motion is filed once unsealed and once sealed;

11   ECF Number 187, the motion to remove pseudonym for Jane Doe 1

12   filed by the defendants; ECF Number 188, motion to amend the

13   amended complaint filed by the plaintiffs; ECF Number 191,

14   which is filed sealed, a motion for protective order by the

15   defendants; ECF Number 213, a motion to supplement by

16   defendants; and ECF Number 215, motion for alternative service

17   by plaintiffs; and finally, 217, which is a motion to quash a

18   non-party subpoena filed by defendants.

19           Before I hear argument on anything, I'm going to

20   rule on some of these motions because they are easy for me to

21   do so, relatively straightforward, and appropriate for me to

22   do so from the bench.

23           First, ECF Number 213, which is defendants' motion

24   to supplement, seeks only to add certain evidence to their

25   motion for Rule 11 sanctions.  I reviewed the evidence.  I

1  understand what it is, and I am granting the motion to

2  supplement.  That's all that is granted here.  Not the Rule 11

3  motion, but the motion to sanction -- to supplement at ECF

4  Number 213.

5          I'm also granting ECF Number 188, which is

6  plaintiffs' motion to amend the complaint.  I read the

7  opposition in its entirety.  I understand defendants contend,

8  as they are entitled to do, that the allegations in the third

9  amended complaint are untrue.  But the standard for granting

10  or denying a motion to amend is not based on deciding whether

11  the party filing the motion to amend and the amended complaint

12  has stated facts sufficient to win a case, it is just a matter

13  of the Court weighing the elements that the Ninth Circuit has

14  set out to determine whether a motion to amend is appropriate.

15  And the Court has done that.

16          It's the Court's job to decide whether there's good

17  cause to amend and whether there are any factors to consider

18  when presented with the motion to amend that would lead to

19  denying the motion to amend.

20          Here, without expressing any opinion about the truth

21  or the falsity of what is in the third amended complaint and

22  understanding defendants' argument regarding their ability to

23  refute the allegations, specifically about Jane Doe 1, the

24  Court finds the amended complaint is appropriate as it removes

25  obsolete allegations and corrects others.  No new action is

1  added, and no new cause of action is added, and no wholly new

2  factual allegations are averred.

3          Defendants' argument that the allegations are untrue

4  is not a basis to deny a motion to amend.  Discovery which

5  defendants have been engaged in, as have plaintiffs, for a

6  great deal of time is the process through which evidence is

7  gathered and plaintiffs and defendants can attempt to gather

8  evidence that supports or refutes the other side's position.

9  But that is how discovery works, and it is not the basis for

10 denying a motion to amend.

11         I am going to explain a little bit about how things

12 work at the close of discovery for the defendants' benefit,

13 primarily, because they are unrepresented.

14         After discovery closes, or even before if a party

15 wants to, a party can file what's called a motion for summary

16 judgment.  A motion for summary judgment is a motion that's

17 made under Federal Rule of Civil Procedure 56.  And in that

18 motion is where a party typically argues based on all of the

19 evidence and facts alleged by the other side that their facts

20 and their evidence, the party bringing the motion, when

21 applied to the law results in the court saying I don't need to

22 go to trial, all questions of fact are eliminated, and the

23 party bringing the motion has demonstrated that they are

24 entitled to a judgment by the court.  It is a very high

25 standard to meet.  But it is in that type of motion that

1    defendants would appropriately argue all the evidence that

2    they have attempted to bring into other motions as showing

3    that plaintiffs' claims are not worthy of going to trial, that

4    the evidence eliminates all questions of fact as alleged, and

5    all facts as alleged by plaintiff to the degree that defendant

6    should win.

7         And I would recommend to the plaintiff -- to the

8    defendants that they read about motions for summary judgment

9    because that is what many of the motions that they have filed

10   really is seeking -- are seeking.  And the arguments as

11   presented in the motions as they are styled is not

12   appropriate.

13        So, the other thing I'll warn you, and I don't know

14   that this is true for Judge Traum, she's been on the bench for

15   about 15 months now, but I don't -- and so some judges, we get

16   an idea of how they like to proceed.  I don't know Judge Traum

17   well enough to tell you, but some judges only want one motion

18   per summary judgment.  They don't want a series.  So you may

19   want to wait until the close of discovery to file a motion for

20   summary judgment arguing each of the claims that you think

21   should be dismissed and granted in your favor using evidence

22   to support that.

23        The third amended complaint is to be filed by the

24   close of business on Wednesday, August 2nd.  And the

25   defendants must answer or file whatever other motion they

```
 1    want, a motion to dismiss if they choose to do so, no later
 2    than April 16th, 2023.
 3            If you file -- Mr. and Mrs. Button, if you file an
 4    answer to the complaint, remember, you're answering a brand
 5    new complaint.  So everything that you have previously wanted
 6    to present in an answer and counterclaim must be reasserted in
 7    response to the new third amended complaint.  You can't rely
 8    on what was previously filed.
 9            All right.  That's the resolution of 188.
10            187, defendants' motion to remove the pseudonym
11    proceeding by Jane Doe 1.  I looked at this very carefully.  I
12    read all of the evidence that was presented to me.  I looked
13    at the deposition testimony.  I understand and am not
14    unsympathetic to why defendants want Jane Doe to proceed in
15    her true legal name, but that is not the standard that the
16    Court applies.  So after looking at this --
17            Oh, I also want to address that with respect to
18    timeliness of the motion, the Court has treated defendants'
19    motion to remove the pseudonym proceeding as a motion to
20    reconsider the Court's prior order.  And that is not untimely
21    because the defendants present new evidence in the form of
22    deposition testimony that was not available that they asked
23    the Court to review in determining whether the pseudonym
24    proceeding should be removed.  And while I understand why the
25    argument is made, I do not believe those facts are sufficient
```

1    to overcome the standard that is applied to synonymous

2    proceedings, and I am going to allow Jane Doe to continue to

3    proceed synonymously.  ECF 187 is denied.

4            ECF 191, defendants' motion for a protective order.

5    This is seeking an order requiring a third party to take their

6    depositions, or, to have their depositions taken by written

7    questions.  That's by defendants when I say "they".

8            The proceeding by written questions is a very rare

9    occurrence in civil practice.  It mainly occurs when someone

10   is infirm to the point that they cannot get out of bed, that

11   they must proceed in a particular setting for their health, or

12   other reasons that aren't really present here.  There's no --

13   it's also limited, let me say, generally, when there's a very

14   discrete set of facts that need to be inquired about.  And

15   that's not the case here.  It's just this is a far too

16   complicated case and too complex with respect to the evidence

17   to proceed by written question.

18           With respect to a third party, I denied certain

19   requests by plaintiffs with respect to taking the plaintiffs'

20   motions.  And here again, I do not see it appropriate that

21   some unknown third party take the depositions of Mr. and

22   Mrs. Button.  Again, the evidence is far too complex.  The

23   long history is too much for an individual who is unfamiliar

24   with this case to be able to effectively depose either Mr. or

25   Mrs. Button.  And for that reason, the motion is denied.

1          However, if the defendants want, if they can choose

2     to pay for a neutral third party to be present at their

3     depositions to ensure, in the same way that I allowed a third

4     party to be present at plaintiffs' depositions, that there is

5     not any tactics or questioning that is outside of the bounds

6     of what is appropriate in a deposition.  If the Buttons choose

7     to select a third party, and I will not limit that to Judge

8     Leen, but I do limit it to somebody who is an attorney and who

9     is licensed to practice in the state of Nevada.

10          You, the Buttons, must alert the plaintiffs' counsel

11    to whom you have selected and who you intend to have present

12    at least seven days before the deposition date so if

13    plaintiffs want to object, they have an opportunity to do so.

14          I have a separate recommendation, however, which is

15    that you set the depositions for a date that I am available

16    here in the courthouse so that the parties can call the Court

17    to address any concerns that arise during the depositions

18    about questions that are asked or the way questions are being

19    answered.  Either side.  I do it all the time.  I've taken

20    more depositions than I could possibly count.  I am extremely

21    familiar with the rules, and I am available to do that.  I

22    will make myself available to do that.

23          And if before we end today you want to talk about

24    deposition dates and my availability, I have my -- I brought

25    up my calendar, and I can do that with you before we sign off

1  today.

2          I also want to alert the Buttons to certain subject

3  matters they may not think are appropriate, but because of

4  other motion practice here today, I think may reasonably be

5  raised.  In a deposition of defendants, a plaintiff, no matter

6  who the defendant is, the plaintiff may make inquiries about

7  the defendants' ability to satisfy a judgment, which

8  essentially means to pay a judgment that is a money judgment.

9  Somebody's awarded $50 or $50 million, the plaintiffs are

10  entitled to ask the defendants about their ability to pay a

11  money judgment.  And that could mean asking about where you

12  work, where you have worked, what money you have earned, what

13  property you own, whether there's real estate property or

14  personal property such as cars, and you must answer those

15  questions to the best of your ability to do so.

16          I also note, just to remind everybody, that you must

17  answer a question, even if you object to it.  And having read

18  defendants' deposition of Jane Doe 1, I understand this was

19  discussed many times.  But even if the other side -- even if

20  you object to a question that's been asked, you must answer

21  it.  You're preserving your objection for it to be ruled on at

22  a later date by the Court.  That's how it works.  So you must

23  answer.

24          The exceptions to that are privilege.

25  Attorney-client privilege you would only have if they were

1    inquiring into subject matters that involved the Randazza

2    firm, and there's one small area where I said the privilege

3    was waived.  So that one small area may be inquired into.

4    But, otherwise, conversations between you and the Randazza

5    firm would be off limits.  Or, if there is another privilege

6    that arises, you may want to look up what those privileges

7    are, accounting privilege, for example, but there are others,

8    where the question is so harassing because, for example, it's

9    been asked or answered multiple times that you do not have to

10   answer.

11          But if you choose not to answer, just so you

12   understand, the plaintiffs can come to court and make a motion

13   to compel, file a motion to compel asking me to compel you to

14   answer questions.  You could do the same to the people that

15   you depose.  But that's how it works.  And I just offer that

16   just as a little bit of insight into how depositions work.

17          It's not atypical.  I always told my young

18   associates this, for somebody to ask a question twice in

19   slightly different ways because it's not always clear that

20   somebody understood the answer or that -- the question rather,

21   somebody understood the question or that the answer was clear.

22   So somebody can say let me rephrase that slightly and ask the

23   same question in a slightly different way.  Two times is not

24   abusive.  Five, six, seven times, that's abusive.

25          So, you know, just because somebody asks the same

1   question twice doesn't make it abusive or harassing, just

2   another standard I would offer to you.

3           Okay.  ECF number -- in case I wasn't clear, let me

4   just state for the record, 191 is denied.

5           ECF Number 215, plaintiffs' motion for alternative

6   service, and ECF Number 217, defendants' motion to quash.  The

7   Court is treating the motion to quash filed by defendants as

8   both an opposition to the motion for alternative service and a

9   motion to quash.  I've read them both.  I've read all of the

10  exhibits.  I've looked at a tremendous number of exhibits.

11  And I have -- and so I have a full understanding of what is

12  happening here.

13          I have one question that I want a simple answer to

14  before I go further.  I did not see the notice required by

15  Rule 45 as provided before the subpoena was issued to Laura

16  Button.  Was there such a notice?

17          MS. RUFF:  We e-mailed defendants letting them know

18  that we intended to serve Laura Button and asking if they

19  would accept service on her behalf.

20          THE COURT:  But that was only after you had

21  attempted service, so that doesn't count.

22          MS. RUFF:  Understood.

23          THE COURT:  Before -- and it's fine if you didn't do

24  it, everybody makes mistakes.  I'm just confirming that there

25  was no notice under Rule 45 as typically required and filed

1    typically on the docket.  And that didn't happen, did it?

2            MS. RUFF:  Correct.  I made a mistake.

3            THE COURT:  That's fine.  Okay.  Very good.  I just

4    want to confirm that.

5            But, in essence, because of the exchanges that have

6    occurred here, notice was eventually effectively given, but

7    that doesn't end the issue here for the Court.  The question

8    is whether the service was effective and whether there's any

9    basis for quashing.  And I'm just going to explain a couple of

10   other things that I think I talked about before with the

11   Buttons, but I'm going to go over again in the hopes of

12   helping, what the obligations are under Rule 26 and how

13   service works under Rule 45.

14           So Rule 26, that list of witnesses that both sides

15   have to give and has occurred here, are generally supposed to

16   provide the addresses and phone numbers for witnesses.  The

17   only exception to that comes when somebody is represented by

18   counsel or if somebody is -- if somebody's address and

19   telephone number isn't known, then you don't list it.  But,

20   otherwise, generally, even when somebody is looking -- is

21   seeking privacy, which I understand third parties generally

22   don't want to be dragged into litigation, you still have to

23   provide witness address and phone numbers.  Because the other

24   side has the right, just as you would, to subpoena those

25   witnesses appropriately and sometimes contact them, depending

```
 1    on the circumstances of the case.

 2            So I say that just for edification, just to give you

 3    a little background.  And let me explain Rule 45 service,

 4    because I think that was a little misunderstood, and I

 5    completely -- I completely understand why.  When the rule

 6    talks about a person, a party not being able to serve a Rule

 7    45 subpoena, what they mean is that the party cannot literally

 8    do the service.  If I am suing somebody, I can't go up to

 9    their door, knock and serve the subpoena because I am a party.

10    You could not serve a subpoena.  The plaintiffs could not come

11    and serve you with a subpoena.  But either side can hire a

12    process server or find another third party who's appropriate

13    to serve a subpoena.  So the way the subpoena was attempted to

14    be served was not a violation of the law, except for the

15    failure to notice.

16            So that -- that is traditional.  And you must

17    attempt personal service, either side, any party must attempt

18    personal service, meaning, getting to the individual before

19    you can attempt any alternative service such as e-mail or

20    mail.  And before you can do those kinds of service, you have

21    to prove to the Court that you attempted personal service, you

22    failed, and I should be allowed alternative service, which is

23    what plaintiffs have done here.  They attempted personal

24    service.  They didn't obtain personal service.  They did

25    e-mail Laura Button.  She, obviously, now has a copy of the
```

1  subpoena.  But they were looking for confirmation from the

2  Court that that service was effective, meaning it was service

3  on Mrs. Button, Laura Button.  And the Court finds it was.

4       Now, let me tell you, if somebody avoids service

5  repeatedly, besides e-mail and mail, the Court can order

6  service by publication, which means the Court can order that

7  the plaintiff, or if it were you the defendants trying to

8  serve someone, can put an add, essentially, in a newspaper in

9  the locality where the person lives and says this is to

10  provide you notice that a subpoena has been issued, and

11  there's other language that goes in there.  But I would try to

12  avoid publication as a means of service because that's

13  embarrassing, lots of people could see it.  And I think, given

14  that the address for Ms. Button, Laura Button, is known, that

15  there would be no reason for service by publication.

16       But I'm granting the motion for alternative service

17  to the extent that e-mail service occurred here, primarily

18  because Ms. Button, Laura Button, has responded by e-mail

19  saying she received that subpoena.  So I think that's

20  effective service for purposes of Rule 45.

21       But I'm ordering that that service was effective as

22  of today.  Because before today there was no order from the

23  Court.  So that service was effective today, August 1, 2023.

24       Now, but the question remains whether any portion of

25  the subpoena should be quashed.  Defendants, Mr. and

```
 1    Mrs. Button, as I've explained I think in my prior hearing, I

 2    looked at that transcript, that there are limited bases, even

 3    though you are the parties who are being sued, there are

 4    limited bases on which you can move to quash a subpoena.  It's

 5    not just applicable to you, it would be applicable to

 6    plaintiffs.  If you were trying to serve a third party on

 7    their side, they would also have limited bases on which they

 8    could object to the subpoena, move to quash.  Those two bases

 9    are that either they are trying to invade a privilege, or that

10    you have some other privacy right that is being invaded.

11    Typically that arises when people seek bank records or other

12    financial records that they don't believe should be disclosed

13    in a case.  Even though that subpoena would go to Bank of

14    America, or Morgan Stanley, or pick your company, it doesn't

15    matter, even though it wouldn't go to another individual, you,

16    the Buttons, if it was about your financial information, if

17    you felt you had a basis to object, you would have a right to

18    object based on your interest, your specific interest in that

19    information.  But short of a violation of your privacy right

20    or some other personal interest you hold in the information,

21    you don't have what's called standing to object to the

22    subpoena, just as plaintiffs would not have standing to object

23    to a subpoena you served on a third party in which they did

24    not have a privacy right to object.  But because I am going to

25    attempt -- given how much time and energy goes into this case,
```

1  which is a different subject matter which I will address

2  shortly, I am going to talk about the subject matter in the

3  subpoena in an effort to avoid future motion practice.

4        I looked at each subject and looked at whether it

5  was relevant and proportionate to the needs of the case.

6  Those are the standards that are applied to discovery.

7  They're stated in Rule 26, and the law says Rule 26 applies to

8  Rule 45, meaning, information you're seeking from a party,

9  which is -- I get it, that's Rule 26 applies equally when

10  you're looking for information from a non-party, a third

11  party.  Relevance and proportionality.  I also look at things

12  like privacy, burden, all the other things that can be

13  considered that Miss Laura Button might be able to assert

14  where the Buttons, Mr. and Mrs. Button, you cannot.

15        So looking at Topic 1, which is seeking information

16  about vehicles that are currently or previously registered to

17  either Mr. or Mrs. Button, that is a relevant and proportional

18  request.  It is just five, six, seven, eight -- I think it's

19  just eight vehicles -- or seven vehicles and one trailer.  And

20  it's a discrete list.  They are adequately defined.  However,

21  I think that the way it's worded, even though the word

22  "concerning" is defined in the subpoena, when we are talking

23  about lay people without experience, that doesn't have the

24  same meaning that it seems to have to lawyers.  To us, it's

25  clear, hopefully.  Not to every lawyer, but hopefully to most

 1   lawyers; right?  But to the Buttons, I don't think it's clear.

 2   I don't think you're looking for gas receipts, for example, if

 3   they drove the car.  Or if they needed new tires, or if the

 4   brakes had to be replaced.  You're looking for ownership and

 5   transfer of ownership information, things that would

 6   demonstrate that the vehicles and the trailer at one time

 7   belonged to either both the Buttons, Mr. and Mrs. Button, or

 8   one of them, and was subsequently transferred to Mrs.

 9   Button -- to Ms. Button, Dusty button's mother.  And that is

10   appropriate.  And anything that relates to the transfer would

11   be appropriate.  But the way it's worded, I think, would

12   yield, from a layperson's perspective, anything concerning the

13   car.  Could mean if I had an old-fashioned lighter in the car

14   and it broke and I got it fixed, it would include that.

15   Right?  And I know you're not looking for that.  So I think

16   that Topic Number 1 is relevant to proportionate, but it needs

17   to be reworded to be more specific.

18            Topics 2, 3, 4, and 5 all use the same word

19   "concerning".  Concerning justiceforthebuttons.com, concerning

20   YouTube channel of Fletcher Reede, concerning Instagram

21   formerly known as Dusty Button, and Instagram concerning

22   formerly known as Button Build.  Again, I think that the way

23   it's worded is too broad.  I think what you are looking for is

24   not if something was posted, for example, about if I was a,

25   you know, influencer, and I said, I really like this brand of

1    cereal.  You don't care, right?  And this is not my area of

2    expertise.  I have absolutely no social media.  I never have.

3    I don't look at it.  Never been on TikTok.  I don't even know

4    what you find on TikTok.  I have been on Google and things

5    like that, but generally because I am a nerd.  I'm looking up

6    something esoteric that you wouldn't be interested in -- or

7    some of you might.  But anyway, it has nothing to do with the

8    kind of information you're looking for.

9           So, while I understand, I think I know what you're

10   looking for, again, I think these need to be reworded so that

11   the Buttons have a better idea.  And Mrs. Button, Mrs. Laura

12   Button, understands what it is you're seeking so that she can

13   search for those documents legitimately, which she must do,

14   and produce.

15          Okay.  With respect to Topics -- I want to make sure

16   I have my topics right.  Okay.  6, 7, 8, and 9.  I thought

17   that's what it was.  They're relevant.  They're all

18   proportionate.  I think they're clear.  They do not need to be

19   reworded.  But if you're reissuing the subpoena, which I'll

20   get to in a minute, you can include them as stated.

21          10 and 11 are overbroad.  And I -- you know, I

22   don't, again, it's the word "concerning" for me that I think

23   doesn't have sufficient meaning.  Looking at 11, in

24   particular, if Mrs. Button has printed off or has copies of

25   the pleadings in this case, do you want those?  I don't know

```
 1    why you would.  She's entitled to have them.  It doesn't mean
 2    anything.  However, so that would be anything concerning the
 3    lawsuit captioned.  I think you are looking for something
 4    else.  If I'm wrong, you can include that.  But I think you
 5    need to provide examples, sufficient information in 10 and 11
 6    so that she knows what you're looking for so that we can, if
 7    necessary, come back and talk about whether the search for the
 8    specific document or the type of document has been located.
 9    And it's -- you know, at that point, to hear I didn't
10    understand would be just another round of litigation and
11    motion practice, potentially, and that's what I'm trying to
12    avoid.
13            So, with all of that, as I said, the motion for
14    alternative service is granted.
15            The motion to quash is denied without prejudice
16    because it is Mrs. Laura Button who can bring such a motion.
17    But she doesn't need to do that now because I'm ordering the
18    plaintiffs to redraft the subpoena and serve it again.
19            Now, with respect to the service a second time, I'm
20    going to ask or I'm ordering Mr. and Mrs. Button, the
21    defendants, to let Ms. Button, Laura Button, know that she has
22    a choice:  She can either accept service by e-mail or she can
23    contact plaintiffs' counsel and state a date and a time and a
24    place where she will be personally served.  Either one; her
25    choice.  She needs to let them know no later than 5:00
```

 1    Wednesday -- Thursday.  Today is Tuesday.  It's not that big a

 2    decision.  She should make that decision.  And then

 3    defendants -- I'm sorry, plaintiffs must serve the revised

 4    subpoena, so that makes the third -- 5:00 the third of August,

 5    she must let them know.  So she has to send an e-mail -- and

 6    she's already sent an e-mail, so we know she can send them an

 7    e-mail, that says please serve me by e-mail, or serve me at

 8    XYZ in ABC city and state on this date at this time.  But that

 9    service date must be by the tenth.  So if she wants personal

10    service, she has to find a date and a time and a place that

11    she will be for certain by the tenth, including the tenth,

12    that she can be personally served.

13            And then her response to the subpoena will be due

14    the 24th of August.  And the documents that she finds, and

15    I'll explain that in a second, should be produced to the law

16    firm, which will be on the subpoena, that law firm in Myrtle

17    Beach, South Carolina.  That's where she can take them.  Or if

18    she wants to mail them, she has to mail them three days ahead

19    of time.  Three-day mail rule is generally agreed in the law

20    that it takes three days for mail to get from one place to the

21    other.  That's not true anymore, but if you're mailing in

22    Myrtle Beach and you're sending to Myrtle Beach, it shouldn't

23    take more than three days.  So she has to mail it three days

24    ahead of time.  So by the 24th she can drop it off or she can

25    mail it no later than the 21st.  That's her choice.

1          Okay.  Now, that -- so that means -- I'm sorry, I

2     lost my train of thought for a second.

3          With respect to the second subpoena that's going to

4     be served, because this first subpoena is gone, in essence;

5     right?  If Mrs. Button, Laura Button, wants to file a motion

6     to quash any part of it -- so she could say I'm going to

7     answer 2, 4, and 6, but I think 7, 8 -- you know, the other

8     ones, 1, 3, and 5 are overbroad -- she must file that motion

9     based on overbreadth or burdensomeness.  That is her

10    prerogative.  That's -- you don't have, no party has the right

11    to -- has the standing to assert burden or overbreadth as an

12    objection to a third party.  It's not specific to you.  That's

13    just the rules.  So she can do it, and she must file it.  You

14    can't -- it can't be you; she has to sign it.  You know, she

15    can file it by mailing it to the court.

16         Do plaintiffs' counsel have an objection to allowing

17    the Buttons to physically file it through their PACER account

18    so she doesn't have to establish one if she files a motion to

19    quash?

20         MS. MCCAWLEY:  No objection, Your Honor.

21         THE COURT:  Okay.  So if Ms. Laura Button writes out

22    a motion to quash, she can -- she must, she must draft it, she

23    must sign it, but you can file it for her in your -- through

24    your PACER account.  Okay?  Because that way plaintiffs'

25    counsel gets notice, and everybody can go back and forth.  I'm

```
 1    hoping that with the way I've asked plaintiffs to explain

 2    their request that that won't be necessary.  That was my goal

 3    here.  But who knows?

 4            All right.

 5            MR. BUTTON:  May I ask two questions about that

 6    really quick?

 7            THE COURT:  Yes.

 8            MR. BUTTON:  Just --

 9            THE COURT:  Yep.

10            MR. BUTTON:  One of them was -- so in regards to our

11    privileged communications with our previous counsel, when this

12    litigation got kicked off, we immediately stopped working.

13    Over time we have a ton of communications with him.  Actually,

14    the majority of our communications was about all of the things

15    that we were selling at the time to pay his fees.  So those

16    communications, we can't -- if we provide those to the court,

17    that kills our privilege.  Is that how that works?

18            THE COURT:  That's how it works.

19            MR. BUTTON:  So then I -- my question is in regards

20    to her subpoena, she can't necessarily provide any of those

21    because they're only our communications with our attorney.

22    She has no history of our vehicles being sold.

23            THE COURT:  If --

24            MR. BUTTON:  I'm just -- yeah, I'm confused.

25            THE COURT:  Okay.  If you -- so when you're in law
```

```
 1    school, they teach you that privilege is like a balloon.  And
 2    once it's popped, it's gone.  Right?
 3              MR. BUTTON:  Right.
 4              THE COURT:  So if you -- if either one of you chose
 5    to give Laura Button information from -- that was
 6    communication that would be privileged between you and the
 7    Randazza firm, that would have destroyed the privilege, and
 8    she --
 9              MR. BUTTON:  Right.
10              THE COURT:  -- would then produce it.  But if you
11    did not give it to her, she cannot provide it.  If she doesn't
12    have documents that are responsive, she searches and she says
13    I don't have anything, she needs to say that in a cover letter
14    that she provides with the response.  I searched for documents
15    under Number 1.  I don't have anything.
16              But make sure it's the truth, because truth matters.
17              MR. BUTTON:  Yes.
18              THE COURT:  Right?  Ultimately, truth matters.  I
19    know there's a lot of issue around truth in this case, but
20    truth matters.  So, but if she doesn't have documents, she
21    doesn't have to -- she says I don't have anything responsive.
22    The general language is I have no documents responsive to the
23    request.  That's what she should say.
24              MR. BUTTON:  Right.
25              THE COURT:  Privilege, yes.  So she can't waive your
```

1    privilege.  But if you've given her information, then you have

2    waived the privilege.

3         Go ahead.

4         MR. BUTTON:  Okay.  And then my other question was

5    the guy that dropped the subpoena on the porch when she was

6    out of town, the man, the process server that came in, on that

7    subpoena it gave her I believe three or four days to produce

8    everything that they had requested if it had been served to

9    her.  She travels out of town on Thursdays, usually.  She's

10   back in town on Monday, and she works Tuesday and Wednesday.

11   And when she is out of town, she works 14, 15-hour days.  So

12   is that -- is that an appropriate amount of time to provide

13   somebody to produce those documents?

14        THE COURT:  The standard is reasonable.  And it

15   depends on the case.  Ordinarily, two or three days wouldn't

16   be enough time.  However, they had been trying to serve the

17   subpoena for some period of time before that.  And so when the

18   process server chose to drop the subpoena on her porch, he

19   doesn't really -- he or she, whoever the process server, has

20   only one job:  Get the subpoena to the person.  They play no

21   other role in it.  But if Mrs. Button, Miss Laura Button,

22   picked it up that night, she could have e-mailed plaintiffs'

23   counsel and said I just got this.  I've been out of town.  Do

24   you agree to give me another ten days to respond?  That's how

25   it generally works.

1          And I am fairly confident plaintiffs' counsel would

2    have said yes.

3          So it's not atypical for there to be -- you know,

4    you start with one date, but by the time the subpoena gets

5    served it's a shortened date, and then for the parties, the

6    person who is subpoenaed and the party who is subpoenaing the

7    information to talk about a new due date.  But I am setting

8    dates.  She must be served by the tenth.

9          MR. BUTTON:  Yeah.

10          THE COURT:  And she has until the 14th -- 24th,

11    excuse me.

12          If she needs a couple of more days, she should

13    e-mail plaintiffs' counsel and say can I have until the 28th

14    or the 29th?  Not can I have until September 30th.  But if she

15    needs a few more days --

16          MR. BUTTON:  Right.

17          THE COURT:  -- that's fine.  Just let them know.

18    Give a specific date.  And they'll respond to you.  I am sure

19    they will respond.

20          MR. BUTTON:  Okay.  And on the date that they

21    e-mailed us that they planned to serve this, which was less

22    than 24 hours before they attempted service, that subpoena

23    gave five days from the date that we received it before it was

24    ever attempted.  So I'm just -- for her, five days when she

25    works 12 hours a day would give her absolutely no time to

 1    respond to a subpoena.  I believe that's when discovery was

 2    ending.

 3           THE COURT:  Yeah, but that is because -- but that's

 4    not so unreasonable if you're in the same town and, you know,

 5    you give somebody five days.  But it's not atypical for

 6    someone to pick up the phone, my old-fashioned way, or e-mail

 7    and say I need extra time.  And that's all she needed to do.

 8           MR. BUTTON:  Okay.

 9           THE COURT:  Okay.  And that's all she needs to do

10    now as well.

11           MR. BUTTON:  Okay.

12           MRS. BUTTON:  Okay.

13           THE COURT:  All right.  Now, we're at ECF Number 185

14    and 192.  So that was -- just for the record, 217 -- I'm

15    sorry, 215 was granted.

16           217 was denied as moot because a new subpoena is

17    going to issue.

18           All right.  So now we are at ECF Number 185 and 192.

19    This is defendants' motion for Rule 11 sanctions.

20           Mr. and Mrs. Button, I have to tell you, Rule 11

21    sanctions in our federal court are so rare that I can't even

22    think of an occasion when they have been granted.  It is a --

23    it requires a level typically of egregiousness that isn't

24    present here, certainly.  It requires generally there to have

25    been some, some objectively non-debatable set of facts, or

1    events, or whatever you want to call them, that really is

2    beyond debate and the other side has ignored, and then you can

3    bring a Rule 11 sanction.  But it is extremely rare.  And in

4    31 years now of practice in this district, I do not -- I

5    personally do not know of a Rule 11 sanction ever being

6    granted by the federal court.  And this is where I primarily

7    practiced before I took the bench.  So I tell you that because

8    I'm going to deny the motion.  And I'm denying the motion -- I

9    read it, I read the opposition, I read the reply, I spent days

10   reading the exhibits, I've looked at it all, but you don't

11   demonstrate the level of egregiousness, you don't demonstrate,

12   in essence, any of the elements of Rule 11 that would result

13   in a granting of the sanction.

14          Disagreement, even vehement, heartfelt, intense

15   disagreement with the other side's presentation of facts is

16   not a basis for Rule 11 sanctions.  This happens all the time

17   in litigation.  Big corporations sue each other spending

18   millions and millions and millions of dollars because they

19   vehemently disagree about facts.  And ultimately, it is either

20   the judge or the jury who decides whose set of facts are

21   right.  But before that, the disagreement, no matter how

22   intense, no matter how vehement, is not sufficient to warrant

23   Rule 11 sanctions.

24          A party, a lawyer, is entitled to believe their

25   client, if they do, even if you think there's no basis for

1    them to do so.  It's just the way the law works.  It's why

2    people litigate.  It's why we're in court, because there is

3    such vehement disagreement.  If there was agreement, even on

4    basic facts in this case, I think we would be in a different

5    place.  But there is such total disagreement about the facts

6    that, ultimately, in my opinion, this case is going to go to a

7    jury, at least on a great deal of questions.  And I think

8    that's a sad outcome, because jury trials are rarely

9    satisfactory proceedings, even though they are the best in the

10   world, in my opinion.

11          It appears to me that there are substantial

12   questions of fact regarding Jane Doe's allegations.  You have

13   raised those.  I understand it.  But that doesn't mean you win

14   or that Jane Doe wins.  It means it goes to a jury to decide.

15   That's my -- I think what's going to happen.  I'm not telling

16   you it's definite, because that will be Judge Traum's ultimate

17   decision if motions for summary judgment are filed.

18          And, again, I refer you, because so much of what you

19   argued in your motion would be more appropriately argued in

20   the motion for summary judgment under Rule 56.  So try to

21   focus your energy, if you will, on bringing that kind of

22   motion, if you choose to, at the close of discovery that

23   explains to the Court succinctly, even though it's long, you

24   want to make each fact succinct in your evidence that supports

25   your rendition easy for the Court to follow.  Because when it

 1    gets too complicated, the Court will say, as we are famous for
 2    doing, we are not pigs hunting for truffles in the forest.
 3    All right.  It has to be set out sufficiently clearly for us
 4    to understand what you're saying.  "Us" meaning the judges.
 5         But your motion is more a motion for summary
 6    judgment which wouldn't come before me, that will go to
 7    Judge Traum, and it needs to have exhibits attached in an
 8    orderly fashion that she can follow.  And then plaintiffs can
 9    oppose.  And plaintiffs can bring motions for summary
10    judgment.  But because what the basis for what you seek is not
11    a basis for Rule 11 sanctions, I am denying ECF Number 185.
12    And that is also 192, which is the sealed version.
13         All right.  Now we get to -- these are all the
14    exhibits I looked at and read.  All right.  Plaintiffs third
15    motion for sanctions, and I will hear some argument on this.
16         With respect to this motion, the first thing that
17    occurs to me, and this is ECF Number 168, is that the website
18    justiceforbuttons.com no longer has on it anything other than
19    a attachment which is a Daily Mail United Kingdom publication
20    article.  The entirety of what is on that website now is an
21    article that is -- was published by the Daily Mail.  And while
22    you might not like the content, Buttons didn't like the
23    content of things that were published by other news outlets, I
24    think that's the way it goes.  I don't see -- I don't know
25    when the other information was removed.  If there's a way to

```
1   find that out, I certainly don't know.  And so, but they have
2   removed everything else from that website.  And unless the
3   parties want to agree that neither party is going to talk to
4   the press, I have no basis for issuing such an order.  A gag
5   order in a case like this would be extraordinary and certainly
6   not one I am going to enter.  That would have to go before
7   Judge Traum because there are First Amendment implications.
8   And given that there was press, there's now been press on both
9   sides, it seems to me the best course of action was for
10  everybody to agree not to speak to the press.  But that would
11  be between the parties, and then I could enter an order to
12  that effect if you agree.
13          The second site, however, Fletcher Reede, and I did
14  note the documentation you found with respect to ownership.
15  I'm not going to go through that.  It's obviously clear that
16  there was a relationship between Mr. Button, Laura Button, and
17  that website.  That is clear.  But what's the status of the
18  Fletcher -- of the YouTube subpoena?  That I am interested in.
19  And I will give the Buttons, if I ask any questions, I will
20  give you an opportunity to respond.
21          Please, go ahead.
22          MS. MARIELLA:  So we did receive a brief response
23  from YouTube and Google on the Fletcher Reede channel, and all
24  we got was information showing that a proton.me e-mail address
25  called -- I think it was mrfletcherreede@proton.me was used to
```

```
 1    create the channel and what we believe is a VPN IP address
 2    that we weren't able to track to the defendants, because the
 3    purpose of a VPN is to disguise who it belongs to.
 4            So the Google and YouTube subpoenas did not give us
 5    anything fruitful that we thought we should present to the
 6    Court.  We, of course, stand by our prior motion where we
 7    listed all of the extremely strong circumstantial evidence
 8    that led to no other conclusion than that other than the
 9    defendants being behind these videos.  And the videos are
10    still up, last time I checked, just a couple of days ago.
11    Some of them have almost a thousand views.  They are
12    continuing to cause harm.  So we do request that the Court
13    sanction --
14            THE COURT:  Isn't there some connection with proton,
15    whatever that whole e-mail is, on the records from the --
16            MS. MARIELLA:  GoDaddy.
17            THE COURT:  -- justiceforbuttons.com subpoena
18    response?
19            MS. MARIELLA:  That's correct.  So the response we
20    received from GoDaddy showed --
21            THE COURT:  GoDaddy.
22            MS. MARIELLA:  -- a couple of things, one of which
23    is the billing information for Mr. Button had a proton.me
24    e-mail address linked to it.  And that is the e-mail address
25    that, at least as recent as our production goes, is still
```

1    linked to the justiceforthebuttons.com domain name.  There's a

2    different e-mail address, but same e-mail server provider.

3                THE COURT:  And that is on the response from

4    YouTube?

5                MS. MARIELLA:  Correct.

6                THE COURT:  Is there anything else?  I mean, did

7    YouTube tell you this is everything we have?  I have -- you

8    know, the only time I'm on YouTube is for work.  So I don't

9    look at YouTube videos either, so I don't know what they

10   typically have.  I know there's a lot more information out

11   there than people think there is going to be, because I see it

12   from the criminal side, but is that -- they're telling you

13   they have nothing else?

14               MS. MARIELLA:  That's correct.  And in our prior

15   experience, the subpoenas to YouTube and Google, it is often

16   very difficult to get ownership information as to YouTube

17   channels.  We also did ask an investigator to look at the IP

18   address and to see if that could be connected to anyone.  And

19   they weren't able to find anything either.  So it was pretty

20   well concealed.

21               THE COURT:  Is there anything the Court could do

22   that would incentivize, if you will, or require, better word,

23   YouTube to provide additional information, or is their

24   position that there is no additional information?

25               MS. MARIELLA:  It certainly couldn't hurt.  Their

1   position was this is what we have.  We didn't, candidly, press

2   too hard because in our prior experience we usually don't get

3   much more than that.  So we have no reason to believe that

4   they are not producing everything.  But, of course, there is

5   that possibility that there is more registration information

6   for that channel or that we can get more information about

7   potentially, like, visitors or places where the videos have

8   been shared that could shed light on some connection, so that

9   is something we could explore and submit a proposed order to

10  the court.

11          THE COURT:  What -- I don't know the answer to this

12  question.  Do you -- like, you pay to set up a domain name.

13  Do you pay YouTube to set up a YouTube channel?

14          MS. MARIELLA:  No, I believe that's free.

15          THE COURT:  Okay.

16          MS. MARIELLA:  I've never done it, but that's my

17  understanding.

18          MS. MCCAWLEY:  And, Your Honor, there is just one

19  more thing, that you asked for no more paper to be filed, so

20  we were mindful of that instruction.  But we wanted to

21  supplement our motion for sanctions with just one more item.

22  Well, two things came in, but one you already have.  We

23  received an e-mail on a Friday night from the Buttons.  And

24  while it is -- I am very comfortable with respect to their

25  attack on me, this included pictures of my associates.  So I

```
 1    would like to share that with the Court and then have an

 2    instruction that they no longer issue this type of e-mail

 3    communication to my colleagues or my firm.

 4              THE COURT:  Okay.  Well, tell me the date and time

 5    of the e-mail.

 6              MS. MCCAWLEY:  Sure.  The e-mail came in on

 7    Friday -- I'm sorry, Saturday, July 29th, at 1:18.

 8              THE COURT:  Do you have access to that e-mail,

 9    Mr. Button?

10              MRS. BUTTON:  I'm sorry, we couldn't hear anything

11    that they said, like, at all.

12              THE COURT:  Okay.  So I'll tell you what they said

13    about YouTube.  I asked them if there was additional

14    information.  And basically, they said, their experience is

15    they get nothing else from YouTube other than what they got.

16              I asked them about the proton.me e-mail site, and

17    that it was also part of the production from GoDaddy.  And

18    they did confirm that the proton.me is an e-mail address, that

19    it was associated with the justiceforthebuttons.com, and

20    Mr. Button in particular, I believe.  So there is that

21    connection.

22              MR. BUTTON:  (Inaudible.)

23              THE COURT:  I'm just telling you what was said, all

24    right?

25              I'm sorry, Ms. McCarley -- I was just going to add
```

1    an R to your name -- Ms. McCawley is talking about a Saturday,

2    July 18th e-mail that was sent from --

3            MS. MCCAWLEY:  29th.

4            THE COURT:  -- July 29th e-mail that was sent by

5    Mr. Button to her that had some pictures of her associates,

6    other people from the firm on it.  And I was asking if you

7    have access to that e-mail.

8            And if you want to hand it to my courtroom deputy,

9    I'll give you as much information as I can about the date and

10   time.

11           MR. BUTTON:  Yes, I'm familiar with that e-mail.

12   But the proton mail, those were two entirely separate

13   accounts, not the same one.

14           THE COURT:  Okay.  Give me one second, sir.

15           MR. BUTTON:  Yes.

16           THE COURT:  So she's asking, Ms. McCawley is asking

17   to supplement her motion for sanctions with the e-mail that's

18   sent Saturday, July 29, 2023, at 1:18 p.m.  And that e-mail

19   subject matter says, "Happy Anniversary."  And then, "Happy

20   Two-Year Anniversary."  It says, "Friends."  It's signed, "The

21   Buttons."  And the second and third pages of the e-mail have

22   pictures of -- it uses the Friends from the old TV show, the

23   Friends moniker, but it has pictures apparently of associates

24   with the firm, their heads, on the Friends' bodies.  And then

25   the third page has pictures of Jeffrey Epstein, Ghislaine

1  Maxwell, and I'm not for sure -- oh, I think it's Amanda Heard

2  and Johnny Depp.

3          MR. BUTTON:  That's correct.

4          THE COURT:  I'm not sure of the person when it comes

5  to famous people because I don't pay any attention.

6          That's who it is.  It's hard not to know about

7  Amanda Heard/Johnny Depp.

8          So, they're asking that I give an instruction that

9  e-mails of this nature with associates' pictures in this

10 manner not be sent in the future.  That was their request.

11         MR. BUTTON:  I see.

12         THE COURT:  So, if you want to respond now to -- you

13 can tell me about the protein.  -- protein? -- proton.me and

14 this e-mail, I'll listen, and then I'll consider your request.

15         MR. BUTTON:  Okay.

16         MS. MCCAWLEY:  And there's one more supplement.

17         THE COURT:  Just one at a time.

18         Okay.  Go ahead.

19         MR. BUTTON:  We submitted exhibits through --

20         THE COURT:  Ms. Garcia.

21         MR. BUTTON:  -- Ms. Garcia last -- yesterday.  Do

22 you have those in front of you there?

23         THE COURT:  I have them available.  I have not

24 looked at them.  It's just when a hearing --

25         MRS. BUTTON:  It's just one.  Yeah, it's just one,

```
 1   that we need to -- it's included as B-1.  It's a video file.

 2            THE COURT:  Let's see.  Oh, well, isn't this fun?  I

 3   don't think my computer will open it.  Let's see --

 4            MRS. BUTTON:  I can display it on my phone if you

 5   can see the screen, if that's better.

 6            THE COURT:  No.  It opened it.  I see it.

 7            MRS. BUTTON:  Great.

 8            THE COURT:  How long is this?

 9            MRS. BUTTON:  30 seconds.

10            THE COURT:  Okay.  Well, I have to tell you, I'm

11   blind enough that I can't read the writing.  I can see the

12   pictures --

13            MR. BUTTON:  That's okay.

14            THE COURT:  But why don't you tell me whether you,

15   first, not agree or disagree with their request to instruct

16   that no further e-mails of this nature go forward, but whether

17   you object to the supplementation.  Just as I allowed you guys

18   to supplement, I'm inclined to allow them to supplement.  It

19   doesn't mean I'm ruling one way or the other.

20            MR. BUTTON:  Right.

21            THE COURT:  But do you object to the supplementing?

22            MR. BUTTON:  No.  We actually -- every e-mail that

23   we send to them, we assume will wind up in this court at some

24   point, so we don't object to any of that.

25            THE COURT:  Okay.  So the request to supplement with
```

1    the e-mail is granted.

2         And I realize there's one other supplementation, I

3    think I have two copies, one with writing on it and one with

4    no writing.  I will keep the copy that is -- has no writing on

5    it and make it a supplementation to ECF Number 168.

6         Okay.  Now, go ahead.

7         MR. BUTTON:  Okay.  So in regard -- we didn't hear a

8    lot of what they said.  It's really quiet.  But in regards to

9    the first part, the two e-mail addresses that they received on

10   their subpoenas were not the same e-mail address, they just

11   used the same platform.  So it's almost like they would say

12   any address through Google mail or gmail.com is the same

13   address.  The one for YouTube was entirely devoid of the other

14   one.  So they're not related in any way, they just used the

15   same platform.  And neither one of those e-mails addresses

16   belong to us, and we don't have access to either one of them.

17        But the YouTube account and their subpoena that went

18   to YouTube yielded no results of ownership in any way.  The

19   website -- also, and this is one thing we'd like to clarify

20   with that exhibit there, because I believe that the evidence

21   is being misinterpreted on their behalf and that they don't

22   quite understand the difference in a domain and website.  So

23   we provided the evidence to prove --

24        MRS. BUTTON:  [Inaudible].

25        MR. BUTTON:  -- that the difference between a domain

1     and website is as simple as saying one's a piece of property

2     and one's a home.  They can belong to two totally different

3     people.  So that exhibit, as of last night, we purchased a

4     domain:  Thisisadomainnotawebsite.com.  And if any of you in

5     the courtroom -- and I'd love for them to try this, if they

6     are allowed to, on their phones right now -- go to

7     thisisadomainnotawebsite.com.  You'll find yourself on Boies

8     Shiller's website home page that they run, operate, and

9     maintain, that we have no connection to.  Because any website

10    can point to any domain; and any domain can point to any

11    e-mail.  You can type in a website, and it pops an e-mail up

12    on your phone.  But we do not now, nor did we ever, own a

13    website that pointed to the domain that we bought for our

14    family to one day restore the honor to our family name once

15    this litigation is done.

16            With that said, a domain is not a website.  And when

17    you pay $8 to own a domain space, someone has to create a

18    website to put -- to point to that.  But the fact that we can

19    buy a domain at 10:00 at night, and anyone can type that in in

20    the courtroom right now, and you'll find yourself in Boies

21    Shiller Flexner's site.  As I said, we don't control their

22    site.  We don't own it.  We have nothing to do with it.  But

23    that website is created, and the domain is separately --

24    separate from it entirely.

25            MRS. BUTTON:  [Inaudible].

```
1              THE COURT:  I am sorry.  Ms. Button, say that again.
2   Because I started to speak over you, and I didn't hear you.
3              MRS. BUTTON:  I'm sorry, that was my fault.  I was
4   saying the billing information that came back from their
5   subpoena is directed towards the domain.
6              MR. BUTTON:  Not us.
7              MRS. BUTTON:  Not the website.  So you have to have
8   two separate occasions:  One goes towards the website, and one
9   goes towards the domain, which we do not own, run, or operate
10  the website.  We had a domain name, like he said.
11             THE COURT:  I'm sorry, what -- first, what domain
12  name did you purchase yesterday?  Is that what you're telling
13  me?
14             MR. BUTTON:  It is www.thisisadomainnotawebsite.com.
15  And you'll understand the satire there, because that's exactly
16  what we're trying to explain is that purchasing a domain is
17  not running a website, and they're not related.  I could
18  actually have that domain go to your court website.  It's --
19  they're not related.
20             THE COURT:  You're telling me if I type that in now,
21  Mr. Button, it takes me to the Boies Schiller website?
22             MR. BUTTON:  Yes, Your Honor.
23             THE COURT:  That does not -- I understand the point
24  you're trying to make, but I am concerned about the point
25  you're trying to make.  I think that's inappropriate.  But let
```

1    me --

2            MR. BUTTON:  The only -- this is to prove that we --

3    we couldn't be further disconnected from Boies Schiller

4    Flexner.  But it shows that their website can pop up on that

5    URL and be entirely unrelated to us.  And it's a simple

6    hour-long exercise and then it will be unlinked.  But we

7    bought the domain last night just to prove that buying a

8    domain is not owning a website.  It's just owning a www.name

9    that any website from anywhere in the world can be pointed and

10   directed to.

11           MS. MCCAWLEY:  Your Honor, may I have the

12   opportunity to respond to this whenever you see fit?

13           THE COURT:  When I put this all one word,

14   thisisadomainnotawebsite, it takes me to Nevada Public Notices

15   website, State of Nevada, and then it takes me to NRS 205.465.

16           MRS. BUTTON:  [Inaudible].  You probably have a

17   proxy server because you're in the courtroom.

18           THE COURT:  My law clerk -- let me just take the

19   computer from him.  Let me take the computer.  All right.  I

20   now have my law clerk's computer in front of me.  And on his

21   computer -- I still don't -- I see our domain -- I don't know.

22   Thisisadomainnotawebsite.  I can't get that on my computer up

23   here.

24           In any event, if this takes -- let me say this,

25   Mr. and Mrs. Button, I understand the point you're trying to

 1   make.  I order you to take this down immediately.  It's not

 2   appropriate.

 3            MR. BUTTON:  Okay.  I can do it in the next three

 4   seconds.

 5            MRS. BUTTON:  All right.  We can do it right now.

 6   It was just for you so that you can see.  It's not -- yeah,

 7   we'll take it down right now.

 8            THE COURT:  You're ordered to do it.  Do it.  That's

 9   all I'm telling you.  Okay?

10            MRS. BUTTON:  Yeah, no problem.

11            THE COURT:  With respect to I understand you're

12   saying the proton.me is two separate things and it's not

13   associated -- they are not connected to each other.  I

14   understand what a platform is or Google versus .me, versus

15   .gmail, .hotmail, whatever you want to say, I understand the

16   distinctions between that.  But is there something else you

17   want to tell me about anything else that they have said so far

18   with respect to the supplement or your relationship with

19   Fletcher Reede, the Fletcher Reede YouTube channel?

20            MR. BUTTON:  Yes.  We have no association with

21   Fletcher Reede.  We do not own, create, maintain the website.

22   We at one point, a year or so ago, purchased a domain.  Any

23   website in the world can point to that domain, including Boies

24   Shiller.  We sent everything that we ever needed to all of the

25   people that still support us.  And when this began, we had

1    half a million people that loved and watched every second of

2    every day of our life.  All of those people since the onset of

3    this have been curious to follow it, and we're more than happy

4    to send them our files, nothing private, nothing sealed, but

5    everything that we own and possess to prove that -- what we're

6    trying to prove here today.  But the website, all their

7    results and their subpoena had yielded is that someone

8    purchased a domain and that we have no connection to the

9    YouTube, and we have no connection to the e-mail address or

10   the website.  They've provided -- they, of course, say that

11   that's evidence.  But then again, the last overwhelming

12   evidence that they filed was the declaration, and that's not

13   necessarily evidence when it comes from an attorney.

14            But, yeah, we have nothing to do with any of it, as

15   we've stated multiple times.  And I feel like we've been

16   litigating this website now for nine months, and prior to that

17   it was litigating text messages from Daryl Katz.  I feel like

18   we've kind of lost track in this litigation, and we're not

19   discussing the complaint in any way or any form.  It's been a

20   year and a half since we've really discussed sexual assault,

21   which is why we're all here.  And I would like to get back on

22   the topic of that at some point.

23            THE COURT:  Right.  Except that that's not the

24   truth.  I am not making any decisions about the substance of

25   this case.  My job is to manage the case as it goes towards

```
 1    trial --
 2              MR. BUTTON:  Right.
 3              THE COURT:  -- just so you understand the
 4    distinction.
 5              Now I understand -- I'm sorry, Miss Mariella wants
 6    to respond to something.
 7              Go ahead.
 8              Can you get close to the microphone and speak up --
 9              MS. MARIELLA:  Sure.
10              THE COURT:  -- because for some reason they're not
11    hearing you.  And if it's easier for you to sit, that's fine.
12              MS. MARIELLA:  Sure.  I just want to be sure -- can
13    you hear me Mr. and Mrs. Button?
14              THE COURT:  You're not being amplified, I'm not sure
15    why.
16              MS. MARIELLA:  How about now?
17              THE COURT:  Nope.
18              MS. MARIELLA:  The green light is on.  Maybe podium.
19              THE COURT:  I don't know why.  I'm sorry.  My
20    courtroom deputy, who is the expert, says, talk louder.
21              MS. MARIELLA:  Okay.  I'll do my best.
22              THE COURT:  Okay.  Thank you.
23              MS. MARIELLA:  I'm not yelling.
24              THE COURT:  Right.
25              MS. MARIELLA:  Your Honor, this distinction between
```

 1    domain and website, I understand it.  We understand it.  It's
 2    not that complicated.  The defendants are, quite frankly,
 3    playing a game with this court right now.  The reason that the
 4    defendants were able to link the Boies Shiller website to the
 5    domain name they purchased is because they own the domain
 6    name.  You cannot put anything on a domain if you don't own
 7    it.  They own justiceforthebuttons.com, therefore, they
 8    control the content that shows up.  It is not some stranger
 9    out there in the universe who is putting content on a domain
10    name that they own and pay for, that they can't figure out who
11    it is, that they can't take it down.
12              THE COURT:  So, but I need you to focus on Fletcher.
13    Because they've taken down the links to the videos on
14    justiceforthebuttons.com.  And I don't disagree with you that
15    that is the Buttons' website and that they control the
16    content.  But the content now is a Daily Mail publication.
17    That's it.  And I understand you might not like some of the
18    content; they didn't like the content of things that you
19    published.  We are where we are with that.  But Fletcher Reede
20    we're having a harder time with.  Not your fault; not their
21    fault.  Nobody's fault.  YouTube probably set up purposely for
22    this, which is just frightening, but that's a whole different
23    issue.  So that's why I'm wondering if there's something more
24    we can get from Fletcher Reede.  Because I'm prepared to enter
25    certain orders here today, depending.  But I understand the

1    difference between the content of a website and a domain name.

2         MS. MARIELLA:  As to the website, we have no problem

3    with the Daily Mail interview.  The defendants are entitled to

4    defend themselves in the media that's not intended to harass

5    witnesses and the plaintiffs.  That's fine.

6         I'll note that the defendants did not take down that

7    content, which we monitor very closely, until after we got the

8    GoDaddy subpoena, until after they stood in this court via

9    Zoom and said that they had nothing to do with the website,

10   after they in this court did not disclose that they owned that

11   domain name, even though we discussed it at length in this

12   court.  They did not take the content down until after we were

13   forced to incur costs to subpoena GoDaddy, follow up with

14   GoDaddy's counsel, spend time and resources on that, file

15   another substantial motion for sanctions and fly back here to

16   argue it again.  They did not take any of that down until

17   after we began that process.

18        The defendants also -- just, they lied in this court

19   about this.  They have known since October that they've owned

20   this domain name.  They didn't say, judge, we just want to

21   tell you that I know you're concerned about this content, we

22   do own the domain name, but we don't know who's doing the

23   content.  Why?  Because it's not possible.  They didn't

24   disclose that for a reason, because they didn't want to take

25   it down.  They didn't want to get caught, that's why they

1  wanted to quash the subpoena.

2          As to the YouTube, Your Honor, the evidence is

3  overwhelming that the defendants made these videos.  They have

4  no other explanation.  The evidence points to no one else.

5  And, quite frankly, it's just -- it's not conceivable that

6  someone else has made these extensive, long videos about this

7  case and our clients.

8          You have images of attorney-client communications.

9  You have non-public discovery materials that we've produced to

10  them that are screen shotted in the videos.  You have their

11  own personal photos and videos.  You have screen shots of

12  photos showing the meta data attached to the photos showing

13  that they're coming from a user called "Button" on a desktop

14  in a folder called "website".  You have defendants' e-mails

15  with third parties screen shotted in the video, such as their

16  leasing agent, and a screen shot of an e-mail confirming a

17  hotel reservation.

18          The language and themes in the videos almost

19  identically parallel the language and themes of the

20  defendants' defense in this lawsuit, things they have said in

21  this court.  There are memes in the videos that they have sent

22  us via e-mail.  And finally, in their response, the defendants

23  are not troubled by these videos.  Instead, they say, these

24  videos are the truth.  We don't know who's making them.  We

25  have no idea how to get them taken down.  We haven't reported

1    them to YouTube, but they're the truth.

2         Your Honor, it is -- the defendants keep saying we

3    can't prove it.  This is evidence.  It's not the evidence they

4    want, but it is evidence.  It's overwhelming.  And, quite

5    frankly, it's beyond a reasonable doubt at this point that

6    these videos belong to the defendants, that they made them,

7    and that they could at the very least take them down.

8         THE COURT:  Understood.  Thank you.

9         All right.  Mr. Button, do you wish to respond?

10        MR. BUTTON:  Yes, ma'am -- or yes, Your Honor.

11        I, I have a couple of questions on those statements.

12   She stated we lied in court about not owning the domain.  Can

13   we reference that in the ECF somewhere so -- because I don't

14   recall that ever taking place, and I was never asked about a

15   domain in court.

16        THE COURT:  In our last hearing, Mr. Button, I -- we

17   spoke at length about who owned the website -- that's what I

18   called it because I don't use the word domain because I'm not

19   as sophisticated -- the website, justiceforthebuttons.com, and

20   you did tell me that you and Mrs. Button didn't have anything

21   to do with that website, so --

22        MR. BUTTON:  And we do not.

23        MRS. BUTTON:  Correct.

24        THE COURT:  Well, I will set that aside for just a

25   second and let you argue --

```
 1                MR. BUTTON:  Okay.

 2                THE COURT:  -- what you want to argue.  I answered

 3      your question.

 4                So argue what you want to argue.

 5                MR. BUTTON:  All right.

 6                THE COURT:  Because I'd be very careful about the

 7      justiceforthebuttons.com, because the response from GoDaddy

 8      shows that Laura Button and Taylor, or Mitchell Taylor Button,

 9      paid for the website.

10                MRS. BUTTON:  Paid for the domain.

11                MR. BUTTON:  Yeah.

12                THE COURT:  Right.  And if you own the domain, you

13      are the ones who composed on the website.  It does not become

14      prejudicial --

15                MRS. BUTTON:  You are incorrect about that.

16                MR. BUTTON:  That would be my argument.  That's what

17      I'm saying here, because I am an expert on this and she's not,

18      so I'd love to speak on it.

19                THE COURT:  Go ahead.

20                MR. BUTTON:  So, you know, I know she's a bit worked

21      up about this, but it is actually entirely false what she just

22      stated.

23                And may I ask, Sabina, have you made a website

24      before?

25                THE COURT:  No, you can't ask her questions.
```

```
1            MR. BUTTON:  I can't?  Okay.  I apologize.

2            Let me just speak, because I have.  And I'll say

3   this.  That if the Court wanted to stay here for 45 minutes,

4   which it definitely doesn't because this has been, obviously,

5   a tolling on everybody, I could create a website right now.

6   And just like I did in reverse with their Boies Shiller

7   website, I could create a website of my own and point it to

8   their website.  So if you type in DSFLLT.com, you can go to my

9   website.  It's entirely -- goes both directions.  This isn't a

10  one-way thing.  Whoever owns a domain doesn't have access to

11  their website, just like I have no access to their website.

12  But if I did build a website, I could point it to anything.

13           For example, in 2013, I ran a charity where we

14  donated $25,000 of my product to the orphanage, and we drove

15  around town for Christmas in a U-Haul truck and picked up

16  presents for the orphanage.  When you went to my website

17  during those three months, we were running a charity raffle,

18  you went to the charity's website.  But it was my website.  It

19  went to theirs.  And vice versa.  So that's just not true.

20           THE COURT:  And Mr. Button, can I ask you a quick

21  question as you say this?

22           MR. BUTTON:  Yes, ma'am.

23           THE COURT:  If you create a website and you direct

24  it to the charity, that's you, the domain name holder/owner

25  who takes an action to direct something to that website;
```

 1    correct?  It's not a third party.

 2                MR. BUTTON:  No -- that's not.

 3                THE COURT:  I couldn't get on your domain name

 4    and -- I can't get on the U.S. District Court for the District

 5    of Nevada website --

 6                MR. BUTTON:  Right.

 7                THE COURT:  -- and direct to it someplace else as a

 8    third party.  I can't do that with your website -- with your

 9    domain name.  I can't do it with google.com.  I can't do it

10    with any domain name, whether it's -- I don't know why this

11    popped into my head, Toys 'R Us, or Nordstrom, or you pick the

12    website, the domain name that's owned.  I picked these

13    proprietary names like Nordstrom or, I don't know, whatever,

14    pick a name.

15                MR. BUTTON:  Right.

16                THE COURT:  Lexus.com, or Chevy.com if it exists, I

17    have no idea, I can't go to that website and point it -- I

18    can't go to that domain name and add content to it or point it

19    to another website.  I can't do that.  It's owned by --

20                MR. BUTTON:  Yes.

21                THE COURT:  So you own the domain name

22    justiceforthebuttons.com.  You are the people who can direct

23    that to the videos that are on Fletcher Reede.

24                MR. BUTTON:  That's -- no, that's not -- what I'm

25    trying to explain is that is not how it works.  And sure, that

```
 1    is a possibility.  However, if I create on a wix.com a website
 2    with no domain -- because, just so you know, when you create a
 3    website, you don't have a domain.  So I can create a website,
 4    and I can input your domain into my website.  And when you go
 5    to your domain, it will redirect you.  This actually happened
 6    in the 2022 election.  There was a case where people were
 7    sending people to actblue.org.  And when you went to this
 8    website, you were actually donating to the Republican party.
 9    Nobody had any idea this was happening.  It's a million-dollar
10    secret.
11            This happened even the other day.  My mother was on
12    the Internet ordering from Bed, Bath & Beyond.  It was an
13    entire scam that you're getting 95 percent off.  You weren't.
14    It's a fishing site doubling the website.  So when you go to
15    the website wix.com, a website builder, you don't have to have
16    a domain.  You can create an entire website as a structure and
17    then input whatever domain you want to pull that website to.
18    And that's just --
19            MRS. BUTTON:  But you don't have -- [inaudible].
20            MR. BUTTON:  That's correct.
21            THE COURT:  So here's the thing.  The Court looked
22    before the justiceforthebuttons.com at what was on the
23    website, or what it pointed to, what links were there, and
24    looked at it again not too long ago finding only the Daily
25    Mail.  So somebody, Mr. and Mrs. Button, I will tell you that
```

1   it's my -- and I'm the opinion that matters here -- it was

2   you, removed the links to those videos.  Because the response

3   from GoDaddy was such that the representations of no

4   connection to justiceforthebuttons.com was no longer a viable

5   position for you to take.  I'm not asking you to respond to

6   that, that's what I'm telling you.  And you don't have to

7   agree with me, but I'm telling you that that's the Court's

8   conclusion.

9            Now, as for Fletcher Reede, I don't know who owns or

10  created Fletcher Reede YouTube channel, the words "Fletcher

11  Reede".

12           MR. BUTTON:  I don't know either.

13           THE COURT:  No, I don't -- just give me a second.

14           What I can tell you is that I've looked at the

15  videos.  Sage Humphries Part One, Sage Humphries Part Two, The

16  Cats Out of the Bag.  There's one about Miss Doherty who is no

17  longer a part of the lawsuit.  And there's one other, and I've

18  forgotten the name of it, but I wrote it down.  Delusional--

19  it's about Jane Doe 1.  Jane Doe 1 -- Jane Doe Plus One,

20  Delusional and something else is in the word, I forget.  Here

21  it is.  Delusional Plagiarist.

22           The content of the Sage Humphries videos with a

23  flashlight underneath your chin, Mr. Button, is either

24  something you've given to somebody and told to put in a video

25  or something you created.  It's not the kind of thing that you

1    just get off the Internet.  I understand --

2            MR. BUTTON:  Flashlight -- I'm sorry, what do you

3    mean?

4            THE COURT:  There's several times in the videos

5    where there is -- it's dark outside, it looks like there's a

6    fire behind you, like an outside --

7            MR. BUTTON:  That was a marketing campaign for a

8    company.  It was all over the Internet.  It was public.  It

9    was a marketing campaign for a corporation.

10            THE COURT:  It's now in the reel Sage Humphries Part

11    One and Part Two, one or the other of them.  I didn't look at

12    them again, I've only looked at them once.  But, in any event,

13    let me explain to you, I am very concerned about the content

14    of those videos.  There is free speech and then there are

15    things that are not protected by free speech.

16            Free speech does not protect harassing or

17    threatening or intimidating witnesses or parties to a lawsuit.

18    And these videos do that.  There's -- whoever created them,

19    and I think, but don't yet have proof, that it was you.

20    Whoever created them intended to intimidate and harass.  But

21    even if you didn't, they are objectively inappropriate.

22    Beyond inappropriate.  They are, they are threatening in and

23    of themselves.  The music, the language, the content, the way

24    they are put together, they are intimidating and threatening

25    e-mails -- videos.

         1          And while I am going to grant plaintiffs the right

         2   to submit to me an order that will help them in any way it can

         3   for YouTube and Google to get additional information, and I

         4   will sign it --

         5          MR. BUTTON:  Please do.

         6          THE COURT:  -- if, in your heart, you know that you

         7   created or can control or have influence over whoever posted

         8   those videos and you do not exercise that control and that

         9   influence to take them down, I am prepared to enter

        10   case-terminating sanction recommendation.  In order to

        11   terminate the case, Judge Traum would have to agree with me.

        12   But I can recommend case-terminating sanctions that would

        13   include striking your counterclaim and striking your answer

        14   which would result in a default against you.  And all that

        15   would be left to prove is damages.

        16          I am not entering that today.  I am not entering

        17   that today because I am not -- while the evidence is

        18   substantial, as Ms. Mariella has presented to me, and I am not

        19   discounting it, I want to see if YouTube or Google can get us

        20   past what I would call the absolute no doubt line before I

        21   enter case-terminating sanctions.  Not because I'm unwilling

        22   to do so, but because it is a drastic measure.  And the Court

        23   takes it very seriously.  And the Court prefers cases to be

        24   decided on their merits.  But if those videos, if you have

        25   either -- either you posted them, you know who did, you can

1    influence who did, whatever it is, they need to come down.

2         Two weeks.  Today is July -- August 1st, that makes

3    it August 15th.  If they are not down by then, we will proceed

4    after we get the responses, and you can refile your motion for

5    case-terminating sanctions.

6         I am granting today the sanction of the costs

7    associated with the subpoenas to GoDaddy, to YouTube, to

8    Google, whoever it was that you went, and your costs for

9    appearing here today.  I'm not granting attorneys' fees --

10        MRS. BUTTON:  So we have --

11        THE COURT:  -- but the costs.  So you would have to

12    file a memorandum with the supporting documentation removing

13    any attorney-client privilege, but from costs there probably

14    shouldn't be any.  And then the Buttons will have ten days --

15    14 days to respond to the memorandum, and then I will rule on

16    the award of costs.

17        I have other things to say.  Is there something

18    else -- and I'll give you a chance, Mr. Button, and

19    Mrs. Button, if you want to say something else.  But go ahead.

20        So the motion for sanctions is granted in part and

21    denied in part as stated.  The part that is denied is denied

22    without prejudice.

23        Go ahead, Ms. Mariella.

24        MS. MARIELLA:  May we also reapply for attorney's

25    fees if that evidence comes back?

1          THE COURT:  You may reapply for attorney's fees if

2     the evidence comes back or the Court otherwise decides that it

3     is sufficient to grant them.

4          Yes, go ahead.

5          MS. MCCAWLEY:  Thank you, Your Honor.  The last

6     thing, just I wanted direction from the court, we have one

7     other supplement which already they submitted it to the court

8     record last night, but I would like it to be a supplement to

9     our motion for sanctions.

10         THE COURT:  What is that?

11         MS. MCCAWLEY:  I have some concerns that I just want

12    to address right now and see if we can come up with a solution

13    for that.  So that is last night they submitted an audio

14    recording to the court of a recorded call to Jane Doe 1's

15    therapist.

16         THE COURT:  I don't think that was submitted last

17    night.  That was submitted a while ago, because I listened to

18    it.  But I didn't listen to anything --

19         MS. MCCAWLEY:  It was the transcript.  I believe the

20    audio was -- oh, they mailed it to you.  I'm sorry.  We first

21    heard it yesterday --

22         THE COURT:  Okay.

23         MS. MCCAWLEY:  -- in what they provided to the

24    court.

25         THE COURT:  It's sealed, and that's -- you know.

1          MS. MCCAWLEY:  Sure, I understand that.  My concern

2     is about witness tampering.  So if you actually listen, not

3     look at the transcript, but you actually listen --

4          THE COURT:  I did.

5          MS. MCCAWLEY:  -- to the therapist, them not

6     identifying who they are, them telling her that she will be

7     reported to authorities if she doesn't respond to their

8     questions --

9          THE COURT:  The way Mrs. Button, Dusty said, she

10    said she was Dusty.  And when she was asked, again, who she

11    was, she explained that she was a plaintiff -- a defendant in

12    the case and that under New Hampshire law she would have to

13    report the failure to report the sexual abuse.  And all that

14    the therapist said was it was a long time ago and I don't have

15    anything to tell you.  And they signed off pleasantly enough.

16         I don't know that it goes so far as witness

17    tampering.  In cases that is of this heightened level,

18    while -- while Mrs. Button should identify herself up front,

19    and I would tell her to do that and explain why she is

20    calling, I don't know that reaching out to a potential witness

21    to ask if they have evidence is that inappropriate.  I just

22    don't find it beyond the pale, let me put it that way.

23         MS. MCCAWLEY:  Okay, Your Honor.  I just wanted to

24    address it.  I believe it was the second incident.  We had the

25    incident before with the subpoena that we issued to the dance

 1    company where they threatened that person with litigation, and

 2    then we had this incident.  So I just want to make sure that

 3    the witnesses who are third parties to this litigation, who

 4    don't deserve to be mistreated, that there's an instruction

 5    that we all just act responsibly.

 6            THE COURT:  I will tell you, Mr. and Mrs. Button, if

 7    you reach out to third-party witnesses, you need to identify

 8    yourselves up front, explain that you are the defendants in

 9    this case and you are seeking to gather evidence to support

10    your position in the case so that the person you're talking to

11    knows who you are and why you're calling up front.

12            To the extent that anything you said could be

13    construed as a threat, be careful with your language.  Threats

14    against witnesses third party by anybody at any time in any

15    case is against the law.  There's a separate federal statute

16    that prohibits it.  I don't really want to go there today.  I

17    want to tell you that I understand that you are beyond

18    frustrated, angry, many other emotions, words that I could use

19    about the case in the contents of this case.  But the outlet

20    for that is not against the witnesses or against the other

21    side's attorneys.  That is inappropriate.  That's just not an

22    appropriate outlet.

23            And I know you are not lawyers, so I'm giving you

24    this chance to understand how to curtail your efforts to not

25    use anything that could be considered a threat.  Because

1    sometimes -- like, what do they teach the Court?  It's not

2    whether there's an actual conflict, it's whether there's an

3    appearance to someone else that it could be a conflict.  If

4    there's something that appears to be a conflict, that's enough

5    for me to have to remove myself from a case.  It doesn't have

6    to be an actual conflict; it's been it just has to appear to

7    be one.  And that's what I'm telling you.  It just has to

8    appear to be a threat to the third party, it doesn't have to

9    be an actual threat.  So keep that in mind in your language

10   choice and your word choice in whatever you are doing to -- in

11   the attempt to defend yourselves.

12          All right.  As for the costs that I've awarded, the

13   motion that I have denied without prejudice, the attorney's

14   fees that I have denied without prejudice, is there anything

15   you want to say about those things?

16          MR. BUTTON:  I did too.

17          MRS. BUTTON:  Sorry, I just want to say quickly that

18   our motion for relief wasn't included in this, and it might

19   have been because it's not appropriate or we didn't write it

20   correctly, but like I was saying before, we have no money.  We

21   don't have the ability to actually pay them anything, which is

22   why this is such a big issue.  We can't even access our ECF

23   account.  Its been closed off.  So I had to contact Lindsey,

24   Lindsey Ruff, to ask them to send us the exhibits that they

25   filed because we can't log into our ECF account.  It's $131

```
1    that we don't have to put towards getting that ECF account
2    right now --
3              THE COURT:  So let me stop you there, Ms. Button.
4              MRS. BUTTON:  Okay.
5              THE COURT:  You can file an in forma pauperis
6    application.  It's available online.
7              MRS. BUTTON:  Yeah.
8              THE COURT:  Okay.  It's available on the website.
9    You don't have to be able to pay for anything.  You go to the
10   U.S. District Court --
11             MRS. BUTTON:  Okay.
12             THE COURT: -- for the District of Nevada and you
13   look for in forma pauperis.  The word in, then forma,
14   f-o-r-m-a, pauperis is p-a-u-p-e-r-i-s, and you apply for one.
15   It will come to me.  And I can grant you status if you
16   demonstrate you don't have the money so that you can get back
17   on your ECF account.  Okay?  That I can do.
18             MRS. BUTTON:  Okay.
19             THE COURT:  That I can do.
20             MRS. BUTTON:  Okay.  I just don't --
21             THE COURT:  Go ahead.
22             MRS. BUTTON:  Okay.  I just don't want it to look
23   like we aren't cooperating with what you said.  It's just that
24   I -- we're not able to actually send them that money.  So I
25   don't -- I know there are fines for a sanction, and its
```

1    continuous sanctions, but we don't have the money to give them

2    for those sanctions.  So, like, I don't know what to do when

3    it comes to that.  If there can be, like, you know problems if

4    we don't pay those sanctions.  So it's a little concerning

5    because we're already dealing with everything else, so I'm

6    just trying to figure that out.

7            THE COURT:  I understand it creates stress.  I do.

8    I'm going to address the whole status and trajectory of this

9    case after you have told me whatever else you want to tell me.

10   But apply for that, that in forma pauperis so I can get you

11   back on ECF -- CM/ECF, okay?  Do that.

12           MRS. BUTTON:  Okay.

13           THE COURT:  All right.  Is there anything else you

14   want to tell me?

15           MR. BUTTON:  Yes.  I'm just -- I'm a little unclear

16   on the YouTube thing.  So, and just to clarify, we're being

17   sued for sexual assault and rape, and we will lose this case

18   if YouTube videos that we don't own or control are not removed

19   when the subpoena is returned and has been returned that

20   verifies we have no involvement in any of those videos.  Is

21   that, for the record -- [inaudible]?

22           THE COURT:  That's not what I said, but it's close.

23           MR. BUTTON:  Okay.

24           THE COURT:  But I'll say it again.

25           The plaintiffs asked me to grant them today

```
 1    case-terminating sanctions.  I can't grant case-terminating
 2    sanctions, I can only recommend them.  I recommend them if I
 3    believe they should be granted.  And that recommendation goes
 4    to Judge Traum and, ultimately, she gets to decide.  Okay?
 5    That's one thing.
 6           Second, what I said is if there is -- if I am
 7    convinced, I'm close but I'm not there, that you made those
 8    videos, you, the Buttons, made the videos and posted them or
 9    had the ability to control the posting of them or can
10    influence those who post them, and they are not taken down,
11    then I will recommend case-terminating sanctions.
12           If there is no evidence of your control, your
13    ownership, your ability to influence, other than what I have
14    been presented so far, I will think about whether it is
15    appropriate to recommend those sanctions.  It's close, Mr. and
16    Mrs. Button.  There is a lot that ties you to those videos.
17    Not everything.  I think the one that ties you least is the
18    Daryl Katz one, because so much of it is about Mr. Katz and
19    not about this case.  But as to Sage Humphries Part One, Part
20    Two, the Jane -- I forget her first name, Doherty video, and
21    the Jane Doe Plagiarist, Delusional Plagiarist video, there is
22    a great deal to connect you to those videos.  And proof does
23    not mean absolute, 100 percent no doubt proof in civil
24    matters.  I think we've talked about before, proof in a civil
25    matter is by preponderance of the evidence.  Preponderance
```

means more evidence is on one side than the other.  If you
have a hundred pieces of evidence, the side with 51 pieces
wins.  It's a pretty low standard.

Now, I think they've met that burden.  But I'm
asking them to do a little bit more for me to consider whether
it's you and/or Mrs. Button -- Mr. Button, you and/or
Ms. Button, or Mrs. Button's mother, or a friend, or somebody
that you have a close relationship with, a relationship with
who can take those videos down.  Because they violate the
rules against intimidation and harassment of witnesses and
parties.  There's a federal statute that prohibits that.  It's
not a law I'm making up on my own.

And because I think, but do not know yet and have
not decided conclusively yet, that you have that ability, I am
giving you this one additional opportunity to exercise your
power to get those videos taken down.  And I am saying they
need to be taken down by the 15th of August.  That's all I'm
going to say --

MR. BUTTON:  May I ask -- may I ask, if I post -- if
I create an Instagram account and I post to everyone that I've
known and everyone that she's known, and we do the same, and
plead to whom ever made these accounts to please remove them,
we're discussing since the data, am I gonna see you back again
in two weeks because they're gonna file that we're harassing
them online by stating these videos online and just

 1    publicizing to more people?  Because it seems a little bit

 2    impossible to communicate with people if every time you

 3    communicate with anyone, which -- for example, when we leave

 4    this hearing today, we'll call 30 people, and then we'll tell

 5    everyone of our family and all of our support system, and

 6    they'll tell their support system and everyone else.  I mean,

 7    her mom still works in the industry.  So she tells everybody

 8    every weekend, and that's every weekend 40 weekends a year,

 9    everything that they need to know to understand what we're

10    going through right now.

11             So when you say, like, it's very clear that we have

12    an association, everything that you see on those videos, for

13    example, the flashlight, the fire, that was a global marketing

14    campaign for a company.  It was everywhere.  (Inaudible) -- we

15    send every file we have that's relevant that belongs to us,

16    nothing sealed, nothing we shouldn't share with anyone, to

17    everyone.  And that's a lot of people.  So I do get it.  But

18    if I post and say anything, alls they're going to do is

19    manipulate what that quote states and send it to the court and

20    say we're violating something else.  So it's almost like we're

21    between a rock and a hard place.  Do we try to do what it is

22    that you're advising us to do?  Or are we going to get in

23    trouble for that as well?

24             THE COURT:  So the bottom line is that parties are

25    always entitled to talk about their cases and defense.  What

```
 1    you're not allowed to do is tell -- is to intimidate or harass
 2    people in an effort to intimidate them and prevent them
 3    from --
 4            MR. BUTTON:  Mm-hmm.
 5            THE COURT:  -- continuing a lawsuit, bringing a
 6    lawsuit, participating in a lawsuit.  That is against the law.
 7    It's black letter law.  I wish I remembered the statute.  I
 8    don't remember it off the top of my head.  If I were to guess,
 9    Mr. Pocker could probably remember it off the top of his head.
10    But I don't remember it off the top of my head.
11            But, in any event, it's there.  And I am saying that
12    if there is -- if I have sufficient evidence, and I am close,
13    that you posted those videos, then I can order, after giving
14    you two opportunities, because I ordered this -- I gave you
15    the opportunity at the last hearing, this will be the second
16    time, second chance -- right? -- second bite at the apple to
17    get them taken down and you don't, then I will decide whether
18    I think case-terminating sanctions are appropriate.  Because
19    granting monetary sanctions don't work because you guys have
20    no money.  It doesn't impact you.  So I can't do that.
21            I grant the costs, but that's not effective.  So my
22    job is to find an effective sanction.  And -- but before I
23    sanction, and I have not sanctioned you about those videos
24    yet, and this is the second time it's come up, I'm giving you
25    the opportunity.  If you hang up the phone and call your
```

1    parents and your brothers and your sisters and your best

2    friends, say we had a hearing and I hate the outcome, whatever

3    you say, you're allowed to do that.  You're not allowed to go

4    online and say if we hear one more thing about this, the

5    judge, the lawyers, the witnesses are going to be sorry.  That

6    you can't do.  Right?

7              MR. BUTTON:  Yeah (inaudible).

8              THE COURT:  There's things you can do and things you

9    can't do.  It's just the law.  It's not unique to you, it's

10   the law.  Right?  You can't do it.  That's it.

11             MR. BUTTON:  But does that go both ways for them as

12   well?

13             THE COURT:  But I haven't seen anything posted from

14   them since before the lawsuit was filed.  And I don't have any

15   authority.  I have no power whatsoever regarding things that

16   happened before this lawsuit was filed with respect to --

17             MR. BUTTON:  I understand.

18             THE COURT:  -- what the New York Times,

19   Cosmopolitan, Boston Magazine, I forget what the Boston

20   Magazine was, what they published.  It's out there.  I

21   understand that.

22             MR. BUTTON:  That's not what I was talking about.

23             THE COURT:  And the Daily Mail article is out there

24   too.  So I think they're even.

25             MR. BUTTON:  (Inaudible.)

1      THE COURT:  My recommendation is that the parties

2  enter into an agreement that there be no more publications to

3  news outlets about this case.  But that's between the parties.

4  I said that at the beginning.

5      MRS. BUTTON:  [Inaudible].

6      MR. BUTTON:  I don't think it's possible because

7  from their last submission, they're -- the plaintiffs are

8  actually working on a documentary.  So that's currently -- I'm

9  assuming impossible to work out with them.

10     But what I was actually speaking to was the threats

11  that we received, and physical threats.  Because those videos

12  don't actually have any threats to anyone.  But ours was

13  either you drop this against Daryl Katz or I will kill you.

14  I'm assuming that would be --

15     THE COURT:  Daryl Katz is no longer a party to this

16  case.  I understand there's some individual who's associated

17  with him.  There's been some publication --

18     MR. BUTTON:  Mm-hmm.

19     THE COURT:  -- about that association.  I think I

20  saw that in the Daryl Katz video.  I think it was published on

21  a Canadian broadcasting system's news outlet.  I saw that.  I

22  understand who you're talking about.  I don't have any

23  authority to impact those people now.  They are not before me.

24     I do have limited authority.  I can't just reach out

25  into the world and tell people to stop behavior.  I don't have

1    that power.  Judge Traum does not have that power.  And Daryl

2    Katz isn't part of the case anymore, so I can't help you

3    there.  I understand what you allege.  I recall what you

4    allege.  I can't help you there.

5            If that continues, then go to the police, make a

6    police report --

7            MR. BUTTON:  We did.

8            THE COURT:  -- submit that to the Court with

9    whatever motion you want, but I don't have any authority over

10   Daryl Katz, and I have nothing that suggests that Boies

11   Schiller is coordinating with Daryl Katz to threaten you.  I

12   know you may believe that, but I don't have any evidence of

13   that.

14           MR. BUTTON:  So what --

15           THE COURT:  Go ahead.

16           MR. BUTTON:  But the Court, but the Court does have

17   control over someone that we have no control over that runs a

18   YouTube account that we don't run.

19           THE COURT:  I don't --

20           MR. BUTTON:  Is it not a different standard then?

21           THE COURT:  I'm not going to debate this with you,

22   Mr. Button.  I didn't say I did.  What I am going to say,

23   because I've already ruled on the third-party motion for

24   sanctions, granted in part and denied in part.  The part's

25   that's denied is denied without prejudice.  I am going to ask

1    defendants -- plaintiffs, rather, if they want to file a

2    written response to the newest motion for Rule 11 sanctions or

3    if I can rule on it from the bench today after I hear

4    argument?  Because that is ECF Number 219 that was filed

5    yesterday.

6            MS. MARIELLA:  We're comfortable -- oh, we don't

7    have that.  Go ahead.

8            MS. RUFF:  To the extent that was filed under seal,

9    the Buttons have not been copying us on their e-mails to

10   chambers of their filings, and they did not serve a copy of

11   that on us, so we don't have the filing from yesterday.

12           MR. BUTTON:  Do you want to respond to that?

13           MRS. BUTTON:  Yes, I can respond to that.  We

14   actually didn't send that to chambers, we filed it with the

15   clerk how we always do.  But when it's under seal, because I

16   can't access our ECF, I can't tell when anything is filed.  So

17   that is just -- that's a filing they received over 22 days

18   ago, 23 days ago, which is the Safe Harbor rule which is what

19   we learned.  I didn't expect that to be filed before this

20   hearing because it usually takes a day or two.  But it is

21   definitely relevant and something that we do want you to look

22   at.  But I understand that you've also looked at nine other

23   motions, so.

24           THE COURT:  Right.  But my question is if

25   defendants -- if plaintiffs haven't gotten it, then I don't

```
1    think it's fair for me to rule on it.
2              MR. BUTTON:  They have it.
3              MRS. BUTTON:  Oh, they have it.
4              THE COURT:  Right.
5              MRS. BUTTON:  They have it.
6              THE COURT:  Well, they say they don't.  So I am not
7    going to rule.
8              MRS. BUTTON:  I can show you the e-mail.
9              MS. RUFF:  I'm sorry, I apologize.  I wasn't -- I
10   didn't know which filing you're referring to.  If you're
11   referring to a Rule 11 motion related to Sage Humphries, they
12   did send us a copy of that 21 days ago.  We weren't aware that
13   they had filed it with the court yesterday.
14             THE COURT:  They mail things to the court because
15   they can't access their CM/ECF.  So they don't know,
16   necessarily, when it's going to be filed.  It was filed
17   yesterday late in the day.  So I -- I don't know, you know, I
18   don't know.  My question is:  Do you want to hold off on --
19   are you asking the Court to hold off on ruling on this or do
20   you want to address it today?
21             And if you want to speak among yourselves for a
22   second, you can.  Just put your fingers on the button so they
23   turn -- they go off, the green goes off.  They're just -- the
24   question is -- that they are discussing is whether we're going
25   to address the second motion for Rule 11 sanctions.
```

```
 1              MS. RUFF:  Okay.

 2              THE COURT:  Turn your mike back on.

 3              MS. MCCAWLEY:  It's green, so I'm good.

 4         Your Honor, I'm happy to address the law on that

 5    area, and I'm going to ask my colleague to address the facts

 6    of that particular motion, if that's fine.

 7              THE COURT:  Okay.  So with respect to ECF 219, I

 8    don't know, Mr. or Mrs. Button, who wants to argue that

 9    motion, but you can go ahead and do so.

10         (The Court sealed the hearing at this point.)

11              THE COURT:  The Court will seal the record

12    starting -- just go back to the beginning of Mr. --

13         (Audio resumed mid-sentence.)

14              THE COURT:  -- objective and whether there is no

15    legitimate basis in fact or law.  And I do not have evidence

16    before me that supports that conclusion.

17         I have evidence that says the two parties couldn't

18    be farther apart on what they believe happened and what they

19    are certain they can prove, but I cannot say that there is no

20    factual basis for what you believe any more than I can say

21    there is no factual basis for what they believe.

22         You each -- there are some things that I have read,

23    the texts from Miss Humphries that I've read that certainly --

24    I'm a long-practicing, intelligent human being, and I think to

25    myself, huh?  Not sure.  You know, that is for the jury.  That
```

1    is what you need to prove.  But it is not part of a Rule 11

2    sanction.

3            As I said at the beginning, focus your energy and

4    think about a Rule 56 motion.  Not because I'm telling you you

5    will prevail; I do not know.  I will not decide it.  But your

6    arguments belong in that type of motion, not in a Rule 11

7    motion.

8            It is a standard that is extremely difficult to

9    reach, and there is nothing about what Boies Schiller has done

10   here that suggests to me it would be appropriate.  I

11   understand your frustration with them, but they have not

12   behaved in this case in a manner that would come close to

13   warranting Rule 11 sanctions.  So ECF Number 219 is denied.

14           I want to ask, the close of discovery occurred when?

15   I know it was very recent.  Do you know what day it closed?

16           MS. RUFF:  It was last Thursday.

17           THE COURT:  Give me a date.  Last Thursday is not a

18   date.

19           MS. RUFF:  The 27th.  July 27th.

20           THE COURT:  The 27th.  But you still want to take --

21   you still want documents.  Is there any other discovery that

22   plaintiffs are looking for other than the production from

23   Laura Button?

24           MS. RUFF:  And the depositions of both defendants.

25           THE COURT:  And the depositions of both defendants.

```
1              MS. RUFF:  And the subpoena to YouTube that was

2   discussed today.

3              THE COURT:  Deposition of defendants, response from

4   Laura Button, and the subpoena to YouTube and/or from Google.

5   Does Google -- Google owns YouTube; correct?  Right.  I think

6   I saw that somewhere in the news sometime in the past.

7              Okay.  This is -- all right.

8              Mr. and Mrs. Button, is there discovery that you

9   have already sent out that you have not received responses to

10  that you are seeking to receive responses to?

11             MR. BUTTON:  We, we attempted to move Sage's

12  deposition, which she's been on, like, a European tour for a

13  while, and we're trying to schedule that now.  But we're -- we

14  were doing the depositions for the other plaintiffs by written

15  form, and I'm not sure how to proceed with that.

16             MRS. BUTTON:  We can't afford it.

17             MR. BUTTON:  Yeah, we can't pay for their

18  depositions, but we wanted to make sure we paid for Sage's.

19  So I'm not sure if we just -- what we do to right this.  We're

20  trying to figure that out.

21             And then aside from that, we have what we believe is

22  really important, cases open with Boston Police Department,

23  Orange County Police Department --

24             MRS. BUTTON:  Department of Justice.

25             MR. BUTTON:  Department of Justice, (inaudible)
```

1    Police Department, and Hillsborough County Sheriff's or Police

2    Department.  Those are open communications that we would love

3    to include, if possible, once they're completed, but we --

4    we've provided what we have thus far, and then we haven't

5    provided the remainder because there's still open

6    investigations.

7            THE COURT:  Okay.  So you've asked those police

8    departments and the DOJ for information, and you're waiting to

9    get it back from them, is that what I'm understanding?

10           MR. BUTTON:  That's correct.  And we did serve some

11   of them with subpoenas.  And then on the other end of that, we

12   actually asked the Department of Justice to open an

13   investigation against us for rape for Jane Doe 1's frame,

14   because during her deposition she stated that she had been in

15   communication with Timothy and Melissa from the DOJ, which

16   they -- Timothy indicated that they have had no idea what we

17   were talking about.

18           We asked them on our own behalf to open an

19   investigation against us for rape so that we could actually

20   have something there (inaudible.)

21           THE COURT:  The DOJ doesn't typically investigate.

22   I think, undoubtedly, Jane Doe was mistaken who she spoke to.

23   She probably talked to a district attorney.  Because the

24   Department of Justice is federal, and they don't get

25   involved -- if a federal employee were raped or a federal

1    employee were accused of rape, then the Department of Justice

2    might be involved in charging the employee or in responding to

3    a civil case filed by an employee, but they wouldn't be

4    involved in a case like this.  So they're not going to do an

5    investigation, because this is all state related.  State law.

6    It's not federal law that's involved here.

7            MR. BUTTON:  We did open one with New Hampshire as

8    well, and I forgot to mention that one.

9            THE COURT:  You did what?  I didn't understand --

10   Mr. Button, I didn't understand the last thing you said.

11           MR. BUTTON:  We did open one with New Hampshire

12   Police.  It was Bedford, New Hampshire Police Department as

13   well.  In Bedford, yeah, I'm sorry.  In regards to ourselves,

14   as well as in regards to, as we had mentioned and I think they

15   touched on earlier, failure to report child sexual assault, if

16   that were the case, or just to essentially get to the bottom

17   of exactly what took place there.

18           THE COURT:  Yeah.  Unfortunately, I don't think

19   these police departments are going to help you very much.  But

20   it sounds like we need to extend discovery so that plaintiffs

21   can depose both defendants.  They can get the response from

22   Laura Button, and the response to subpoenas, additional

23   subpoenas to YouTube/Google.  Defendants need time to depose

24   Sage Humphries, and they want to try written depositions to

25   the other plaintiffs.  I'm not going to rule on that at this

 1    time.  But I will tell you it is a very difficult process.

 2    You can't just do endless written questions the way -- you

 3    know, in a deposition you have seven hours.  You can't write

 4    out seven hours' worth of questions and require them to

 5    answer.

 6              MR. BUTTON:  Right.

 7              THE COURT:  If you have some very discrete

 8    questions, very discrete questions, 20 questions, maybe 30

 9    questions that you want to ask, but more than that, if the

10    plaintiffs file a motion because it is not the way that

11    depositions are traditionally and usually, vastly usually

12    conducted, I would probably agree with them.  I understand

13    your financial limitations.  I sympathize with it.  I have

14    thought about if there is any way that the Court can help you,

15    but I don't see that there is because this is just a standard

16    civil case, and we don't appoint civil counsel except for in

17    prisoner cases when they're bringing civil rights cases under

18    the U.S. Constitution.  So I just have limited ways to help

19    you.  But I'd think carefully about those written depositions

20    before you proceed down that road.

21              But, given what's left, I'm going to reopen

22    discovery, closing it on September 29, 2023.  That's

23    approximately 60 days.  It's a little less.

24              MR. BUTTON:  May I ask a question about that timing?

25              THE COURT:  Yes.

1          MR. BUTTON:  It's really just -- there were one

2     other depositions that we -- again, we're ignorant to how this

3     ends.  But we assume that if we didn't serve a deposition, you

4     know, at least 14 to 30 days prior to the end of discovery,

5     that we couldn't serve it because we -- a subpoena, sorry.

6     Because we weren't allowing equally the amount of time they

7     needed to respond.  Because I think Boston (inaudible)

8     subpoena took another 30 days to get back to us, and then

9     another 30 after that to finalize.  But if we would like to

10    still serve more subpoenas, do we -- is there a limit?  Can we

11    give people ten days -- is it okay? -- to respond?

12         THE COURT:  In Nevada, we prefer 14.  But ten isn't

13    unreasonable.  So give them at least ten days.  But I would

14    warn you about how many you issue.  Because while defendants

15    can't -- plaintiffs, excuse me -- plaintiffs can't object

16    based on burdensomeness, they can bring to me a motion that

17    the process is abusive, and I can rule on that form of motion.

18         Do you know who else you want to subpoena?  The

19    third parties?  Because you subpoena records, or you subpoena

20    a deposition.  And you can't afford the depositions, so you'd

21    be subpoenaing for records; right?

22         MR. BUTTON:  Right.

23         THE COURT:  So who else is it that you want to

24    subpoena for records?  Or what else?  What entities?

25         MR. BUTTON:  Off the top of my head, everyone we'd

1    serve a subpoena we've listed on our initial disclosure.

2           THE COURT:  But that's a hundred people.

3           MR. BUTTON:  No, but there's only three or four

4    other people that we would like to subpoena that we haven't

5    had an opportunity to do so.  And we have tried to serve

6    multiple people and failed because they evaded their

7    subpoenas.  But then we couldn't justify paying more money to

8    try to get those subpoenas served.

9           And the other thing is if we could figure out a way

10   to depose the other plaintiffs, and, you know, on video like

11   we did the other ones.  I don't know if there's any rule of

12   how long it has to be.  We can ask questions to some of these

13   people that would take less than an hour.  And if that were

14   the case, that would be great to still be able to do that.

15          THE COURT:  Yeah, the problem is -- you can do it by

16   video.  That's not a problem.  The problem is paying the court

17   reporter.  And you have to have a court reporter.  And I do

18   not know that there is a court reporter who will do this for

19   you pro bono.  There may be court reporters who allow you to

20   pay over time.  And I believe that plaintiffs' counsel

21   assisted by finding one for Jane Doe's deposition.  Maybe you

22   contact that court reporter and see if he or she, I don't know

23   if it was a man or a woman, would be willing to assist you.  I

24   would give you -- you can certainly -- in the next 60 days,

25   you can certainly set depositions for any of the plaintiffs

1    that you wish.  The maximum time of any deposition is seven

2    hours.  You can take one hour.  You can take one deposition

3    per hour and have the second person set for two hours later so

4    you have a break.  You can do a bunch of them in one day.  But

5    other than those depositions, they're not -- and the

6    depositions of you that have been described, I'm not going to

7    allow any other depositions to take place during this 60 days.

8         As for subpoena for documents, if there were three

9    or four, I will allow you to issue three or four more

10   subpoenas for documents.  The plaintiffs have two subpoenas,

11   essentially, the one outstanding to Laura Button, and the

12   other that will go to YouTube/Google, whoever that is.  If

13   it's two separate ones, you can, obviously, serve both of

14   them.  But other than that, no other subpoenas should go out.

15        So we have, at a minimum, three depositions that are

16   going to take place:  Each of yours and Sage Humphries'

17   deposition.  We have the subpoenas to YouTube, Google, Laura

18   Button, and potentially three or four from Mr. and Mrs. Button

19   that can be served in this 60-day period.  And while 60 days

20   sounds like a lot of time, it's not a lot of time in

21   litigation.  Somehow litigation time is faster than normal

22   people time, I don't know why.

23        So that takes us to the 29th.  Then there's what's

24   called the dispositive motion deadline.  That's the motion for

25   summary judgment.  You have the exact same day it's due.

1    Theirs is due on the same day yours is due.  And if you're

2    mailing it to the court, you need to make sure you mail it so

3    that it gets here in time for that deadline.  Because of the

4    nature of the case, I'm going to make the deadline

5    November 15th.  So the deadline to file that type of motion is

6    November 15th.

7            I am not going to set a date today for the joint

8    pretrial order, because I presume dispositive motions will be

9    filed, at least for some issues or some parties, even if it

10   doesn't dispose of the whole case.

11           The pretrial order will be due 30 days -- 60 days in

12   this case, 60 days after whatever dispositive motions are

13   decided.  Once they're all decided, you count 60 days, and

14   then the joint pretrial order is due.

15           Now, those are all the orders I'm going to enter.

16   But I am going to tell you that from my perspective this case

17   has turned into a monster that is extraordinarily

18   time-consuming for everyone.  And I cannot imagine the

19   expenditures Boies Schiller is -- has incurred.  I understand

20   the firm can probably afford it, but, nonetheless, it is

21   extraordinary.  And at some level, it seems like this has

22   turned into axe grinding, sort of the way American politics

23   has turned into, if I'm right; you must be wrong and bad and

24   evil.  And courts, civil litigation, the outcomes of civil

25   litigation don't resolve those kinds of feelings.  That's not

what litigation is about.  It doesn't make, especially civil

litigation, does not find beyond a reasonable doubt that

somebody did or did not do something, or somebody did or did

not tell the truth.  It's preponderance, which is a very light

burden.  And I would encourage you to think about, together,

whether it's with me or I would suggest with another judge --

because turning this over, having to recuse myself and turning

this over to another judge seems incredibly unfair -- to think

about whether you can try to resolve some, if not all, of the

claims that are raised in this case leaving less to be tried

through a settlement conference with one of the federal judges

on this bench, currently sitting on this bench.  And if you

can come to some agreement, I would attempt to get someone to

assist the Buttons in the process of settlement, because

they -- it's something that I think would likely lead or

create more likelihood to lead to a resolution.  Without

assistance of a lawyer, I'm afraid it wouldn't be fruitful.

But to appoint a lawyer or ask, for example, Randazza to come

in just for purposes of a settlement, I would be willing to

do.

          I know that the Buttons feel vehemently about their

defense.  I am sure the plaintiffs feel equally vehemently

about their cases.  But that doesn't mean that it's

appropriate to take this to a long, drawn-out, expensive trial

at which plaintiffs will have to be present for weeks.

 1    Defendants will have to be present; you'll have to be here for

 2    the trial.  It will be weeks long.  Boies Schiller will have

 3    to camp out in Las Vegas in a hotel or a VRBO now that they

 4    exist.  When I was doing this there was no such thing, so we

 5    were stuck in hotel rooms.  And it just -- it seems to me -- I

 6    became -- I became a lawyer first because I love American

 7    history.  And I love American history because I think America

 8    is unique on this planet.  Not even Western Europe protects

 9    people's rights and recognizes rights the way the U.S. does in

10    its constitution.  We are unique in that regard.  And our

11    legal system is unique in its form of juries and its

12    impartiality, especially at the federal court level, which, I

13    can tell you, I think is remarkable.  We do our very best

14    always to look not just at the immediacy of what's before us,

15    but also in ensuring that everybody's rights are protected,

16    that people understand the process.  I have done my best in

17    this case to do that.  We are the best in the world.  But it

18    doesn't mean that the outcome of a trial in this case is the

19    best outcome for anybody, including the plaintiffs who will

20    have to get on the witness stand in front of 12 jurors and

21    tell stories that will be undoubtedly emotionally traumatic.

22            And there might be other ways to reach resolution

23    for some of them, if not all of them, and with the Buttons

24    agreeing to appropriate resolutions.  Because I don't think

25    money is going to be the answer here.  Even if a Ferrari was

1    transferred, it's not enough to cover the legal fees let alone

2    any real damages.  It's just going to be an old car that's

3    worth a few -- $10,000, maybe 20, maybe 30, maybe 40.  That's

4    a drop in the bucket for a case like this.  So I'm

5    encouraging you -- I'm not ordering you, I can't -- I could

6    order you to a settlement conference, but I'm not.  Because

7    without agreement from the parties, it wouldn't be useful.

8    But I would ask you both to take a step back, take a breath,

9    think about if there's a way to resolve this for some, if not

10   all, of the claims made short of continuing this endless

11   motion practice that is getting you nowhere closer to the end.

12   It's not.

13          All right.  The transcript of this proceeding is the

14   order of the Court.  If you order a transcript, while I know

15   it's unusual, I am ordering you to send a copy to

16   plaintiffs -- defendants because there is no way they can pay

17   for a copy.  So, I'm issuing an in forma pauperis order, if

18   you will.

19          So if they order a transcript, they will send you a

20   copy by e-mail so that you can read it too.  Because what I've

21   said today is the order of the Court so that you have it in

22   front of you.  All right.

23          File that in forma pauperis application,

24   Mrs. Button.  Think about Rule 56.  Think about how you might

25   be able to resolve this without vindication.  Because no one's

1   going to be vindicated here.  Even if the plaintiffs win, you

2   will go on believing in your -- in your story and professing

3   your story.  And I know that's true.  And if they lose, they

4   will go on believing their story and professing their story.

5   It won't yield a true end.  Civil litigation rarely does

6   unless it's a contract over a specific thing that can be given

7   from one person to another.

8          It's just an imperfect system, as good as it is.

9          All right.  I've done enough lecturing.  We are

10  adjourned.  Thank you, everyone.

11      (Recording concluded at 12:17 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 87 pages,

5    constitutes a true and accurate transcript of the recording

6    created and is a full, true, and complete transcript of the

7    proceedings to the best of my ability.

8          Dated this 2nd day of August, 2023.

9

10          DONNA J. PRATHER, RMR, CRR, CCP, CBC

11          Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25