Mitchell Taylor Button
101 Ocean Sands Ct
Myrtle Beach, SC 29579
Telephone: 310.499.8702
Desmodynamica@gmail.com

Dusty Button
101 Ocean Sands Ct
Myrtle Beach, SC 29579
Telephone: 310.499.8930
Worldofdusty@gmail.com

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

|  |  |
|---|---|
| SAGE HUMPHRIES, GINA MENICHINO, ROSEMARIE DEANGELO, DANIELLE GUTIERREZ, JANE DOE 1 AND JANE DOE 2 | Case No. 2:21-cv-01412-ART-EJY |
| Plaintiffs/Counterclaim-Defendants, | |
| vs. | **DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT** |
| MITCHELL TAYLOR BUTTON AND DUSTY BUTTON, | **WITH COUNTERCLAIM** |
| Defendants/Counterclaimants | |

Defendants Mitchell Taylor Button and Dusty Button hereby move to dismiss Plaintiff's Third Amended Complaint pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(3) and 12(b)(6) and move to strike certain portions of the Third Amended Complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. This Motion is made pursuant to Rule 12 of the Federal Rules of Civil Procedure and is based upon the attached pleading on file herein and any oral argument permitted by this Court.

DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH COUNTERCLAIM - 1

# **TABLE OF CONTENTS**

Introduction……………………………………………………………………3

Statement of Relevant Facts………………………………………3,4,5,6,7,8

    I.   Motion to Dismiss State Law claims under Rule 12(b)(6)…8,9,10,11,12,13,14,15,16

    II.  Motion to Dismiss Federal Claims pursuant to Rule 12(b)(6)……………16,17,18,19

    III. Motion to Dismiss for lack of personal jurisdiction pursuant to Rule

        12(b)(2)…………………………………………………………………19

    IV. Motion to Dismiss for improper venue pursuant to Rule 12(b)(3)……………20,21

    V.  Motion to Strike pursuant to Rule 12(f)…………………………………21,22,23

Counterclaim………………………………………………24,25,26,27,28,29,30

    I.       Sage Humphries…………………………………………30-46

    II.      Jane Doe 1……………………………………………………46-49

    III.    Gina Menichino…………………………………………49-51

    IV.    Danielle Gutierrez………………………………………..51-53

    V.      Rosemarie DeAngelo……………………………………53,54

    VI.    Jane Doe 2………………………………………………54.55

    VII.   This Lawsuit……………………………………………56

    VIII.  Claims for Relief……………………………………………57 -76

Prayer for Relief………………………………………………………77

Conclusion………………………………………………………………77

## **INTRODUCTION**

This litigation consists of six Plaintiffs that have *conspired* against Defendants in an effort to gain fame, fortune and notoriety. Throughout discovery and over *two years* of litigation, it has been *proven* that Plaintiffs have perjured themselves, committed multiple crimes and have contradicted their own claims including with their own provided discovery. This litigation was never filed based on truth, it was filed by Plaintiffs out of spite, malicious intent and malice as they all conspired against Defendants/Counterclaimants Dusty and Taylor Button as proven with clear and convincing in the two years of litigation preceding this motion. On June 20th, 2023 Defendants filed a Rule 11 Motion against Jane Doe 1 (*at ECF No. 185*), which resulted in Plaintiff's Motion to Amend (*at ECF No 188*) being GRANTED, filing a Third Amended Complaint on August 2nd, 2023 (*at ECF 221*).

Defendants now move to dismiss Plaintiff's Third Amended Complaint pursuant to Rule 12(b)(1) *lack of subject-matter jurisdiction*, Rule 12(b)(2) *lack of personal jurisdiction*, Rule 12(b)(3) *improper venue* and Rule 12(b)(6) *failure to make a claim upon which relief can be granted*; as an amended complaint supersedes an original pleading, and parties are free to correct inaccuracies in pleadings by amendment. In addition, Defendants move to strike portions of the Third Amended Complaint for reason such as, Plaintiffs claims do not comply with Rule 12(f). Defendants have ensured to follow the Rule of Law and state the Federal Rules of Civil Procedure to the best of their knowledge as *pro se* Defendants. The following Motion to Dismiss is solely based on the foregoing statements and pursuant of Rule 12.

## **STATEMENT OF RELEVANT FACTS**

DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH COUNTERCLAIM - 3

Prior to the onset of this litigation on July 28th, 2021 (and the defamatory *global media campaign* waged against Defendants), Defendants were very well-respected individuals at the peak of their careers.  Defendant Taylor Button was a world-renowned Ferrari builder and designer with a large following both on social media and worldwide amassing millions of fans who idolized him and his work.  Taylor's work was recognized globally as he was considered to be the world's premier custom exotic car designer being published in countless global automotive publications while personally representing dozens of sponsors, manufacturers and government/military contractors around the world.  Defendant Taylor Button was a Swiss Watchmaker and horological manufacturer specializing in military timepieces, straight razors and luxury leather goods prior to becoming a pillar of motorsport and distributed his handcrafted products throughout stores in various countries including England, Dubai, Qatar and the United States.  Throughout his decade long journey to the top of the motorsport industry he was tapped by various companies seeking to harness his talent for design branding their own product with his name "Button Built" spanning luxury furniture, forged racing wheels, seats, body parts, watches, luggage and more.  Defendant Dusty Button was arguably the *most influential* and well-respected name in the dance industry, including from the onset of her training at the Royal Ballet School in London and the American Ballet Theatre in New York City, joining the Birmingham Royal Ballet in England in 2008, the Boston Ballet in 2012, being promoted to Soloist in 2013 and to Principal Ballerina with the Boston Ballet in 2014, (an unprecedented two years after joining the company). She became Red Bull's first ever (and only to date) ballet athlete, rendering global recognition in media and amassing an enormous following both on social media and worldwide allowing her to spread her talents into many other professional athletic industries

aside from ballet including Indy Car, Airplane Racing, Motocross, FlugTag, Formula 1 Racing and more.

Together, Defendants were sponsored ambassador's countless well-known companies such as Toyo Tires, Rotiform, Pelican, Red Bull, Bloch INC, New Balance, Adidas, WeWork, UFC, Body Armor, Brembo, Ferrari Parts, Bride, Momo, TubiStyle, Tial Concepts, KMC, Currie and many (many) others, setting an unparalleled and unique standard to the likes that their industries had never seen (and still hasn't) thus drawing media attention globally. Prior to the forementioned careers of both Defendants, Mr. Button was a dancer as a teenager eventually becoming a dance teacher and choreographer for a short time, approximately from the years of 2005 – 2010. Defendant Taylor Button was not a well-known dance teacher in the industry and was never recognized as a prominent figure in the dance industry. In 2006, Defendant Taylor Button met (his now wife), Defendant Dusty Button who *was* a prominent figure in the dance industry and very well-known and the two quickly became best friends. In August of 2007, Defendant Dusty Button moved to England to attend the Royal Ballet School and in July of 2008, she moved to Birmingham, England to join the Birmingham Royal Ballet. In November of 2010 after years of friendship Dusty and Taylor's friendship grew and Defendant Taylor Button moved to England to be with Defendant Dusty Button so that she would not have to sacrifice the job with Birmingham Royal Ballet that she had worked so hard to obtain. Defendants got engaged to be wed in 2011, (when they moved back to the U.S.) and once Defendant Dusty Button was settled into her position at Boston Ballet, they married in 2015.

There are six Plaintiffs in the Third Amended Complaint:

1. **Sage Humphries** danced professionally at Boston Ballet with Dusty Button, had a consensual dating relationship with both Defendants at the age of nineteen for approximately two and a half months in 2017.

2. **Gina Menichino** took dance classes from Defendant Taylor Button at the approximate age of fourteen when he was a dance teacher at Centerstage Dance Academy in Tampa, Florida in the approximate years of 2008 – 2010.

3. **Rosemarie DeAngelo** took dance classes from Defendant Taylor Button at the approximate age of seventeen when he was a dance teacher at Centerstage Dance Academy during the approximate years of 2008-2009.

4. **Danielle Gutierrez** was Defendant Taylor Button's girlfriend at the ages of eighteen, nineteen and twenty for approximately two years in the approximate years of 2008 – 2010 when Defendant Taylor Button was aged twenty-three, twenty-four and twenty-five. She taught her own dance classes and took dance classes at Center Stage Dance Academy during the time Defendant Taylor Button taught dance classes at Centerstage Dance Academy.

5. **Jane Doe 2** taught her own dance classes and took dance classes at Centerstage Dance Academy at the approximate ages of seventeen and eighteen when Defendant Mitchell Taylor Button was twenty-three and twenty four and during the approximate years of 2008 – 2010.

6. **Jane Doe 1** has never met either Defendant but alleges her claims took place in 2014 when she was approximately seventeen years old.

This case was originally filed on July 28th, 2021 by Ms. Humphries and Ms. Menichino, followed by an Amended Complaint on September 23rd, 2021 adding Danielle

Gutierrez, Rosemarie DeAngelo and Jane Doe 1 and a Second Amended Complaint on December 13th, 2021 adding Jane Doe 2 and Juliet Doherty (who has since voluntarily withdrawn), however, the Third Amended Complaint (*ECF No. 188*), which is at issue here, was filed with the Court on August 2nd, 2023. In the Third Amended Complaint Plaintiffs fail to state a claim, as their claims are insufficient and *do not establish* a cause of action, as no viable cause of action can exist against either Defendant and therefore, Plaintiff's Third Amended Complaint should be dismissed in its entirety. For the Court's convenience and to save the Court time, Defendants summarize the claims Plaintiffs have levied against them:

       • **Sage Humphries** asserted claims against Mitchell Button and Dusty Button for sex trafficking (18 U.S.C. §§ 1591, 1595), forced labor (18 U.S.C. §§ 1589, 1595), and involuntary servitude (18 U.S.C. §§ 1584, 1595).

       • **Gina Menichino** asserted claims against Mitchell Button for sex trafficking (18 U.S.C. §§ 1591, 1595), forced labor (18 U.S.C. §§ 1589, 1595), involuntary servitude (18 U.S.C. §§ 1584, 1595), battery, assault, false imprisonment, intentional infliction of emotional distress, breach of fiduciary duty, and sexual exploitation of a minor (18 U.S.C. §§ 2255, 2252).

      • ▉▉▉▉▉▉ asserted claims against Mitchell Button and Dusty Button for sex trafficking (18 U.S.C. §§ 1591, 1595), forced labor (18 U.S.C. §§ 1589, 1595), involuntary servitude (18 U.S.C. §§ 1584, 1595), battery, assault, false imprisonment, intentional infliction of emotional distress, breach of fiduciary duty, and sexual exploitation of a minor (18 U.S.C. §§ 2255, 2252).

      • **Danielle Gutierrez, Rosemarie DeAngelo, and** ▉▉▉▉▉▉ asserted claims against Mitchell Button for sex trafficking (18 U.S.C. §§ 1591, 1595), forced labor (18 U.S.C. §§

1589, 1595), involuntary servitude (18 U.S.C. §§ 1584, 1595), battery, assault, false imprisonment, intentional infliction of emotional distress, and breach of fiduciary duty.

Not only do Defendants *vehemently* deny any and all allegations but have through their filings and by their production of documents proven *beyond any* doubt, with clear and convincing evidence that Plaintiffs conspired against Defendants out of spite and malicious intent. In addition to the factual evidence Defendants possess, the common law claims that Plaintiffs have asserted against Defendants are time-barred by the expiration of the applicable statutes of limitation and therefore must be dismissed. In Plaintiff's Original Complaint, Amended Complaint, Second Amended Complaint *and* Third Amended Complaint, Plaintiffs *intentionally avoid* the statute of limitations by *failing* to plead when most of them reached the age of majority (though Defendants obtained them and thus provided them in this filing), as statutes are only tolled until the Plaintiff reaches eighteen years of age.

Finally, in the event that *any claims* argued in this Motion survive this Motion to Dismiss, Plaintiff's "Introduction" to the Third Amended Complaint should be stricken: as they were written purely to draw press and media to this case in the hopes of assuring the impossibility of an unbiased jury and to enflame the anger of anyone who reads the Third Amended Complaint.

## ARGUMENT

### I. MOTION TO DISMISS STATE LAW CLAIMS UNDER RULE 12(b)(6)

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Defendant may move to dismiss a case for "*failure to state a claim upon which relief can be granted*". In this instance many of the Plaintiffs *do not even* state when or where their allegations take place. In fact, most, if not all of the Plaintiffs *intentionally avoid naming their age* in which they allege

their claims took place. Plaintiff's statute of limitations has *long expired* and for that sole reason alone, Plaintiff's Third Amended Complaint should be dismissed, including because a claim that is filed after the running of the statute of limitations may be dismissed under Rule 12(b)(6) and, by extension, Rule 12(c) if "the running of the statute is apparent from the face of the complaint." *Conerly v. Westinghouse Elec. Corp., 623 F.2d 117, 119 (9th Cir. 1980); Brooks v. Ross, 578 F.3d 574, 579 (7th Cir. 2009) (*noting that the practical effect of addressing a statute of limitations defense under Rule 12(c) is the same as addressing it under Rule 12(b)(6)).

In this case, Plaintiffs Menichino, Gutierrez, DeAngelo, and Jane Doe 2 have asserted claims against Taylor Button for battery, assault, false imprisonment, intentional infliction of emotional distress, and breach of fiduciary duty and Plaintiff Jane Doe 1 has asserted the same claims against both Defendants.

NRS 11.190(4)(c) provides that claims for assault, battery, and false imprisonment have a 2-year statute of limitations. NRS 11.190(4)(e) provides that claims for intentional infliction of emotional distress also have a 2-year statute of limitations. Finally, claims for breach of fiduciary duty carry a 3-year statute of limitations. See 11.190(3)(d); Shupe v. Ham, 98 Nev. 61, 64, 639 P.2d 540, 542 (1982). Nevada tolls the statute of limitations until a minor has reached the age of majority. See NRS 11.250(1).

Regarding the Plaintiffs in this case that asserted common law claims:

• **Sage Humphries** was nineteen years of age when she alleges Defendants alleged conduct took place. Plaintiff Sage Humphries also claims that the alleged conduct against her occurred in 2017 and that the statutes of limitation on her common law claims should be tolled. Therefore, it is reasonable to conclude that all of the statutes of limitations on her

common law claims have expired. Defendants have not had contact OF ANY KIND IN ANY WAY with Sage Humphries since July 18th, 2017 (outside of litigation).

• **Gina Menichino** turned eighteen on July 29, 2014. Ms. Menichino alleges two occurrences that gave rise to her claims that occurred in 2010, when she was approximately thirteen or fourteen. The Third Amended Complaint's final claim of alleged conduct by Defendant Taylor Button towards Ms. Menichino allegedly occurred on her fourteenth birthday on July 29th, 2010. Defendant Mitchell Taylor Button moved to England in 2010 and has had no contact OF ANY KIND IN ANY WAY with Gina Menichino since 2010.

• **Rosemarie DeAngelo** turned eighteen in January of 2009 although The Third Amended Complaint *neglects to state* when Rosemarie DeAngelo turned eighteen and Plaintiffs failed to disclose that information. Defendants have since discovered her birth date which is January of 1991. Moreover, the Third Amended Complaint acknowledges that Ms. DeAngelo is over eighteen and argues that all statutes of limitation on her claims must be tolled. Therefore, based upon the allegations of the Third Amended Complaint, it is known that the applicable statutes of limitation on Ms. DeAngelo's claims have expired. Defendant Mitchell Taylor Button has not had any contact OF ANY KIND IN ANY WAY with Rosie DeAngelo since 2008.

• **Danielle Gutierrez** turned eighteen on June 7th, 2008. Plaintiffs *neglected* to provide Ms. Gutierrez's age or date of birth in the Third Amended Complaint. The only date provided in the Third Amended Complaint regarding Defendant Taylor Button's *alleged* conduct was in 2007. The Third Amended Complaint argues that the statutes of limitations should be tolled for Ms. Gutierrez. Therefore, the statutes of limitation have expired on all of Ms. Gutierrez's common law claims against Mr. Button. Defendant Taylor Button has not had any contact with Ms. Gutierrez OF ANY KIND IN ANY WAY since 2010.

• **Jane Doe 2** turned eighteen on May ███, 2008. Although the Third Amended Complaint *neglects to* provide her eighteenth birthday, Defendants were able to discover it. The Third Amended Complaint does claim that the *alleged* actions by Mr. Button occurred in 2006. It also argues that the statutes of limitation should be tolled. Therefore, based upon the Third Amended Complaint, all applicable statutes of limitation have expired. Defendant Mitchell Taylor Button has not had any contact OF ANY KIND IN ANY WAY with ███████ since 2009.

• **Jane Doe 1** turned eighteen on June ███, 2015. Plaintiffs *neglected* to provide her eighteenth birthday in the Third Amended Complaint but through discovery Defendants have confirmed her birthday. In addition, Plaintiff claims that Defendants' *alleged* conduct against her occurred in 2014, well over nine years ago and *do not allege* that the statutes of limitation should be tolled however, Defendants **have <u>never</u> met** Jane Doe 1.

Given that Plaintiffs have admitted that the statutes of limitation have expired with regard to the majority of their common law claims, they ask this Court to equitably toll the applicable statutes of limitation. Equitable tolling "operates apart from any statutory provision." *Smith v. Danis, 953 F.3d 582, 592 (9th Cir. 2020).* This Court's authority to toll an applicable statute of limitations "comes not from any statute but instead from [the] exercise of '[t]he judicial Power ... extending to all Cases, in Law and Equity, arising under th[e] Constitution, [and] the Laws of the United States.'" Id. (quoting U.S. Const. Art. III, § 2.). Equitable tolling is "unavailable in most cases," *Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999),* and "the threshold necessary to trigger equitable tolling is very high, lest the exceptions swallow the rule[.]" *Miranda v. Castro, 292 F.3d 1063, 1066 (9th Cir. 2002) (quoting United States v. Marcello, 212 F.3d 1005, 1010 (7th Cir. 2000)*)).

DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH COUNTERCLAIM - 11

When a Plaintiff asks a Court to equitably toll the statute of limitations, she bears the burden of establishing two elements: (1) *that she has been pursuing her rights diligently*; and (2) *that some extraordinary circumstance stood in her way and prevented timely filing*. See *Smith, 953 F.3d at 588 (quoting Holland v. Florida, 560 U.S. 631, 634 (2010)*. With regard to the first factor, the litigant must show that she "has been reasonably diligent in pursuing [her] rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing [her] claim in federal court." *Smith, 953 F.3d at 598-99*. It "is not enough for a petitioner seeking an exercise of equitable tolling to attempt diligently to remedy [her] extraordinary circumstances, [s]he must also be diligent in actively pursuing [her] rights." Id. at 599. Further, the litigant "must demonstrate a causal relationship between the extraordinary circumstances and the lateness of [their] filing." *Leonard v. Gittere, No. 2:99-cv-0360-MMD-DJA, 2020 U.S. Dist. LEXIS 84791*, at *24 (D. Nev. May 14, 2020). In multiple jurisdictions, assertions of emotional trauma as the basis for equitable tolling have failed. In the Second Circuit, the court held that a litigant's "conclusory and vague claim, without a particular description of how [the litigant's] condition adversely affected [their] capacity to function generally or in relationship to the pursuit of [their] rights, is manifestly insufficient to justify any further inquiry into tolling." *Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000)*.

In this case, to the extent that some of the Plaintiffs *allege* they were minors when the *alleged* conduct occurred, the applicable statutes of limitation were tolled until they reached the age of majority. When they reached eighteen, or the age of majority, the applicable statutes of limitation ceased to toll and expired unless Plaintiffs can articulate a justifiable reason why the applicable statutes of limitation should have been tolled for longer. **None of these Plaintiffs** can do so nor have they in the last two years of this litigation thus reaching the end of discovery

verifying their inability to meet the burden of proof that would constitute tolling statutes and thus their state law claims should be dismissed as follows.

### Gina Menichino

Ms. Menichino *alleges* that inappropriate conduct by Mr. Button toward her occurred in 2010 however, Defendant Taylor Button moved to England to be with his wife, Defendant Dusty Button in 2010. Ms. Menichino turned eighteen on July 29, 2014, over nine years ago. Ms. Menichino *makes no allegations* to suggest that she had been diligently pursuing her rights since she turned eighteen. Moreover, to the extent that she alleges that Defendant Taylor Button was the "extraordinary circumstance" that stood in her way and kept her from pursuing her claims, Defendant Taylor Button had no contact whatsoever with Gina Menichino after he left Centerstage Dance Academy in 2010, including after the onset of this litigation. Ms. Menichino's delusional obsession with Mr. Button and perverted fantasies (discovered through Ms. Menichino's text messages with a third party) of Taylor Button never came to fruition, furthering her obsession however, Mr. Button *never attempted to stop* Ms. Menichino or spoke to her regarding her allegations as the basis never existed for him to act against. Mr. Button had no knowledge of Ms. Menichino's obsession with him until the discovery phase of this lawsuit took place and therefore, had no reason to deter her or to stop her because **her allegations never took place.**

Additionally, Ms. Menichino claims that, after Mr. Button's alleged improper conduct apparently stopped, she went to therapy for it, evidencing that she knew she possessed claims against him. Upon discovery and therapy records produced by Plaintiff, Ms. Menichino stated nothing ever happened, that she had a crush on Taylor and that she wished to "finish" what she never started (referring to Bondage and Discipline, Dominance and Submission, Sadism and

Masochism, often known as "BDSM", that includes elements of role playing, dominance, submission, and other interpersonal related dynamics). A reasonable person would have known that she possessed claims against him (should her allegations have been true, which they are not), before the applicable statutes of limitation expired in 2016 and 2017. Her tardiness cannot be excused, she failed to prove Defendant Taylor Button's being the extraordinary circumstance that stood in her way and therefore the Motion to Dismiss should be granted.

**Rosemarie DeAngelo**

The Third Amended Complaint *does not allege* when Ms. DeAngelo reached the age of majority however, through discovery Defendants confirm she turned eighteen in January of 2009. The only alleged concrete allegation that Ms. DeAngelo makes against Mr. Button *allegedly* occurred in 2007. Moreover, the Third Amended Complaint asks that the applicable two-and three-year statutes of limitation be tolled. It also alleges that Ms. DeAngelo has had no contact with Mr. Button since before her senior year of high school, which had to occurred in 2008 or 2009 *proving* that Mr. Button in no way, shape or form interfered with Ms. DeAngelo's ability to pursue her claims, should they have been true, <u>which they are not</u>. Given that Mr. Button has not spoken to Ms. DeAngelo's for over 14 years, she did not diligently pursue her claims, even though she allegedly knew they existed when she allegedly entered therapy for them (though she failed to provide any proof of this therapy). As such, the common law claims that she asserted, with two-and three-year statutes of limitation, should be dismissed.

**Danielle Gutierrez**

From the allegations of the Third Amended Complaint, Ms. Gutierrez *allegedly* turned eighteen in 2008 however Defendants have confirmed Ms. Gutierrez turned eighteen on June 7th, 2008. Moreover, Ms. Gutierrez allegedly reported Mr. Button's alleged indiscretions in

August of 2018 however the indiscretions she reported directly contradict those that she alleges in her third amended complaint. Therefore, even though no evidence exists that anything stood in Mrs. Gutierrez' way way from pursuing her rights from 2008 to 2018 thus rendering a failure to meet the burden of proof after two years of litigation, the two-and three-year statutes of limitation on her common law claims still expired *even if* they were tolled until August 2018. Defendant Mitchell Taylor Button has not had any contact with Ms. Gutierrez since 2010.

The causes that have a two-year statute of limitations (assault, battery, false imprisonment, intentional infliction of emotional distress) expired in August of 2020, while the cause that has a three-year statute of limitation (breach of fiduciary duty) expired in August 2021. Ms. Gutierrez did not enter this case until Plaintiffs filed their Amended Complaint (ECF No. 18) on September 23, 2021. Therefore, the statutes of limitation on all of her common law claims expired before she asserted them and her claims in their entirety should be dismissed. In addition, Ms. Gutierrez committed a criminal act by knowingly filing a false report to law enforcement, a report that differs drastically from the claims of her third amended complaint.

**Jane Doe 2**

While the Third Amended Complaint *does not allege* when Jane Doe 2 turned eighteen, Defendants have confirmed via discovery that she turned eighteen in May ▮, 2008. The Third Amended Complaint does allege that Mr. Button's alleged conduct occurred in 2006 and that the statute of limitations has expired. It additionally alleges that she did not report Mr. Button's alleged conduct until this litigation began and the Amended Complaint was filed on September 23, 2021.

Plaintiff states that Mr. Button's *alleged* conduct *allegedly* occurred in 2006 yet Jane Doe 2 turned eighteen in 2008. Jane Doe 2 alleges that the "extraordinary circumstance"

that stood in her way was Mr. Button however, Mr. Button has not spoken to, heard of, heard from or thought of Jane Doe 2 since approximately 2009 as he moved to England to be with, and eventually marry, Dusty in 2010. Taylor Button had no reason to deter Jane Doe 2 or to stop her from reporting as **her allegations that never took place.** Plaintiff does not argue that she diligently pursued her claims after Mr. Button was out of her life but does indicate that she spent time in therapy (which has since been discovered) and which has no merit because Plaintiff cannot make that allegation, yet also argue that she did not realize what Mr. Button allegedly did was wrong. The common law claims that she asserted should not be tolled but should be dismissed and additionally, are expired.

**Jane Doe 1**

Jane Doe 1 alleges the conduct against her occurred in 2014, which would allegedly be nine years ago. Plaintiff does not allege that the statutes of limitation should be tolled with regard to Jane Doe 1. Therefore, for each of the common law claims that she has asserted to remain valid, she must have turned eighteen less than two years before the Amended Complaint was filed on September 23, 2021, which she did not. Plaintiffs *neglected* to state Jane Doe 1's birthday in the Third Amended Complaint however, Defendants learned through discovery that Jane Doe 1 turned eighteen on June ■th, 2015 and therefore all of her common law claims should be dismissed. In addition, Defendants had never heard of, spoken to, seen, or met Jane Doe 1 prior to her deposition via Zoom on June 29th, 2023 during this litigation. Defendants have linked the conspired acts between all Plaintiffs including Jane Doe 1 but have never met Jane Doe 1 in person.

**II.**     <u>**MOTION TO DISMISS FEDERAL CLAIMS PURSUANT TO RULE 12(b)(6)**</u>

Each Plaintiff has asserted federal claims for relief against Taylor and Dusty Button. Every named Plaintiff has asserted claims against one or both of the Defendants for sex trafficking (18 U.S.C. §§ 1591, 1595), forced labor (18 U.S.C. §§ 1589, 1595), and involuntary servitude (18 U.S.C. §§ 1584, 1595). Gina Menichino and Jane Doe 1 have additionally asserted federal claims for sexual exploitation of a minor (18 U.S.C. §§ 2255, 2252). Based on the foregoing information (including but not limited to the merits which are not at issue here and the fact that these allegations are entirely fraudulent and malicious) Plaintiff's Third Amended Complaint should be dismissed.

Pursuant to 18 U.S.C. § 1595(c), the statute of limitations for sex trafficking, forced labor, and involuntary servitude is either 10 years after the cause of action arose or 10 years after the alleged victim turned eighteen years of age. 18 U.S.C. § 2255(b) provides that the statute of limitation for sexual exploitation of a minor is either not later than 10 years after the Plaintiff reasonably discovers the basis of the violation or injury that forms the basis of her claim, or 10 years after she has reached the age of majority. The statutes of limitation are implicated in the following claims asserted by Plaintiffs:

• **Rosemarie DeAngelo**: The only specific allegation she made against Mr. Button *allegedly* occurred in 2007, which was over sixteen years ago and including that Ms. DeAngelo turned eighteen in January of 2008 which was over fifteen years ago, Plaintiff DeAngelo's claims are time-barred and should be dismissed.

• **Danielle Gutierrez**: Ms. Gutierrez allegedly turned 18 in 2008, and all of the improper conduct she alleges occurred over thirteen years ago. As with the state law claims, Ms. Gutierrez was *not diligent* about pursuing these claims prior to the expiration of the statutes of limitation. The federal claims that she asserted should be dismissed.

• **Jane Doe 2**: The alleged conduct that Jane Doe 2 asserts occurred in 2006 is over seventeen years ago. Jane Doe 2's eighteenth birthday May ██, 2008 which is over fifteen years ago. Her statutes have *long expired* and her claims should be entirely dismissed.

Plaintiffs cannot prove and have not *proven any fact* in over two years in this litigation, (*as it does not exist*), in which Plaintiff's rights were infringed upon and in which Plaintiffs were stopped from reporting any such allegation presented in the Third Amended Complaint. Plaintiff's assert that Defendants "threatened to use their power", "instructed Plaintiffs not to tell anyone", "intentionally deceived" and "controlled" Plaintiffs yet Plaintiffs fail to make any other allegations that would shed any light on *how* they were threatened, instructed, deceived or controlled that would have prevented Plaintiffs from filing suit prior to 2021. Defendant Taylor Button has not spoken to those Plaintiffs who allege abuse from Centerstage Dance Academy including Gina Menichino, Danielle Gutierrez, Rosemarie DeAngelo and Jane Doe 2, in nearly fourteen years. In fact, Plaintiffs have provided discovery which proves they were "destroyed" that Defendant Taylor Button moved to England to be with, and marry Defendant Dusty Button (including by admittedly stalking Defendants), as Mr. Button disassociated with the dance industry and most from the U.S after he moved to England. Furthermore, at the conclusion of discovery following two years of litigation ALL plaintiffs failed to provide ANY discovery that would remotely verify their claims much less verify that they were threatened, instructed or deceived to remain silent regarding their claims that never took place and as that burden of proof was not met (though they had two years to meet it) these claims must be disregarded and dismissed.

There are arguable facts that prove Plaintiffs were not prevented in any way to report their claims and there is no fact or law applicable to Plaintiffs statements that Defendant

Taylor Button took steps to prevent Plaintiffs from coming forward. In fact, Defendant Taylor Button had no knowledge of misconduct as Plaintiffs allegations are fraudulent and never took place. Additionally, Plaintiffs contradict their own claims by providing discovery that shows on multiple occasions they were aware of the opportunity to report their allegations and in some instances perjured themselves by reporting those fraudulent allegations.

Plaintiffs argue that Defendant Dusty Button and Defendant Mitchell Taylor Button (together) prevented Plaintiffs Sage Humphries from bringing forth this lawsuit and yet, Ms. Humphries (just three weeks after "breaking up" her *relationship* with Defendants) filed for a restraining order (through fraud on the Court) in Massachusetts and filed **five false police reports** in two different states against Defendants (that she withheld from that Court and this one) in which Defendants have taken it upon themselves to contact those officers. Defendants have not spoken to Sage Humphries since July 18th, 2017.

Plaintiffs also allege that Defendants prevented Jane Doe 1 from reporting her claims however, Defendants have never met Jane Doe 1 and her claims are *literally impossible*. There is no excusable delay for Plaintiff's failure to timely file suit as Plaintiffs proved through discovery they conspired long before filing this lawsuit. In fact, Plaintiff Gina Menichino filed this lawsuit just *one day* before her statute of limitations expired, as her birthday is July 29th, 1996 and her eighteenth birthday was July 29th, 2014, *proving* that Ms. Menichino *intentionally* and *strategically* filed her complaint **hours** before her statute of limitations **expired**. For all the reasons listed above, Plaintiff's NEW Third Amended Complaint should be dismissed.

### III.  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendants do not live in Nevada, do not reside in Nevada, do not domicile in Nevada, have no intention to ever return to Nevada as residents, visitors or to domicile in

Nevada, do not have property in Nevada, do not have businesses in Nevada, do not have future business in Nevada, do not maintain a place of business in Nevada, have no contractual agreements in Nevada, and have no future work in Nevada. Plaintiffs failed to meet the requirement for diversity jurisdiction and therefore, Plaintiff's Third Amended Complaint should be dismissed.

## IV.     __MOTION TO DISMISS FOR IMPROPER VENUE__

Plaintiffs filed their Third Amended Complaint in Nevada though it has no bearing on Defendants current domicile or residency as Defendants do not live in Nevada and have not lived in Nevada since September of 2022, as they were evicted from their home due to this litigation and the frivolous nature of the allegations that increased the cost of litigation as well as shunned by the Las Vegas community following the waves of defamatory media curated by Plaintiff's and the public relations team of Boies Schiller Flexner. It has been recognized by the Federal District Court of Nevada that Defendants do not live in Nevada including on April 5th, 2023 by Judge Youchah. In fact, Defendants did not even live in Nevada for ninety-days before this law suit was filed nor were they ever legal residents of Nevada though they domiciled in Nevada beginning less than 90 days prior to the original Complaint being filed. Defendants have never possessed a Nevada driver's license or ID, never had vehicles registered to vote in the State of Nevada, were never employed in the state of Nevada and had no friends or family in the State of Nevada. Furthermore, Defendants filed taxes another state in the year of 2021 and 2022, possessed South Carolina Driver's licenses or IDs, are registered to vote in South Carolina and both of their entire families reside in South Carolina. Defendants did not declare a Homestead Exemption, sell or transfer any real estate, make a Declaration of Domicile, earn income, change bank accounts, have a safety deposit box, register any vehicles, obtain a library card, have a will

or medical directive, have a local doctor, dentist or any medical records, or own any property in the State of Nevada. Nevada has no relationship to the parties or the claims in the case as Defendants were not, are not and will not be domiciled or be residents of Nevada for the duration of this litigation and beyond. In addition, and due to Plaintiffs frivolous and fraudulent lawsuit, including contradicting discovery and a Plaintiff whom Defendants have never met, Defendants have expended all funds and liquidated all assets including Defendant Dusty Button's engagement and wedding rings in order to sustain their ability to defend this lawsuit, which ultimately resulted in the withdrawal of their previous attorney for non-payment and is the direct result of Plaintiff's frivolous and malicious complaint. In fact, Defendants could not even afford to view their Court documents until their motion filed for *in forma pauperis* was GRANTED by Judge Youchah (*ECF No. 223*). Plaintiff's venue selection is improper upon filing their Third Amended Complaint and for this reason alone, Defendants Motion to Dismiss the Third Amended Complaint should be GRANTED.

Should this complaint survive due to Defendants living in Nevada when the Original complaint was filed, Defendants believe it appropriate for jurisdiction to be transferred to South Carolina as Defendants will not ever be able to afford travel expenses to Nevada during this litigation and are litigating a case from across the country with no ability to work due to Plaintiff's direct attack and global media campaign waged against Defendants, resulting in the destruction of Defendants reputation and livelihood.

### V. <u>MOTION TO STRIKE PURSUANT TO RULE 12(f)</u>

Should this case survive this Motion to Dismiss, portions of the Third Amended Complaint must be stricken. Rule 12(f) of the Federal Rules of Civil Procedure provides, in pertinent part, that the "court may strike from a pleading ... any redundant, immaterial,

DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH COUNTERCLAIM - 21

impertinent, or scandalous matter." The Rules provide for motions to strike "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010).* The grounds for a motion to strike "must appear on the face of the pleading under attack, or from matters which the Court may take judicial notice." In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig., 754 F. Supp. 2d 1145, 1169 (C.D. Cal. 2010). Portions of a pleading are "immaterial" when they have "no essential or important relationship to the claim for relief or the defenses being pled." Id. (quoting 5A Charles A Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 706-07 (1990)). "Impertinent material" is language that does not "pertain, and [is] not necessary to the issues in question." Id. Finally, "scandalous material" must "reflect cruelly upon the defendant's moral character, use repulsive language, or detract from the dignity of the court" or be "relevant, degrading charges that have gone into unnecessary detail." Flynn v. Love, 2020 U.S. Dist. LEXIS 171848, at *5 (D. Nev. 2020) (quoting Skadegaard v. Farrell, 578 F. Supp. 1209, 1221 (D. N.J. 1984)); see also Armed Forces Bank, NA v. FSG-4, LLC, 2011 U.S. Dist. LEXIS 130636, at *9-10 (D. Nev. Nov. 10, 2011) (holding that scandalous material is any allegation that "unnecessarily reflects upon the moral character of an individual or states anything in repulsive language that detracts from the dignity of the Court").

Many of the allegations of Plaintiffs' Third Amended Complaint should be stricken. The Third Amended Complaint, like those that preceded it, were written for the media, not for this Court, and that is precisely how it reads. In fact, one needs to look no further than the caption for proof that this case was designed to elicit as much attention from the media as possible. There are many additional issues with the allegations of the Third Amended Complaint.

For instance, Plaintifff's Third Amended Complaint does not even use the word "allegedly" in their Introduction (*at ECF No. 221*). Instead, the first paragraph states "This case *is* about a couple who *has* exploited their position of power and influence in the dance world *to sexually abuse young dancers across the country*" never using the word "allegedly", and creating bias for any reader or potential juror, leading the reader to believe the facts in the case to be true from the very first sentence. In fact, Plaintiff's state "across the country" when in fact the claims in this complaint are alleged to have taken place in just two states, Florida and Massachusetts. The first sentence goes on to discuss theoretical "sexual abuse" of "young dancers" which alludes to misconduct with possibly hundreds of children across the United States rather than focusing on the six Plaintiffs in this litigation alleging misconduct in two states. This was solely written for the purpose of "shock value" as Plaintiffs knew the media would take hold of such a dramatized statement. Paragraph two of Plaintiff's Third Amended Complaint also avoids the use of the word "allegedly" and states Defendants have "*been perpetuating this legacy of exploitation by inflicting an intentional combination of emotional control, financial manipulation, and sexual abuse against young dancers across the country since as early as 2007, when Taylor Button began abusing underage dancers as a dance instructor in Florida.*" Aside from the factual evidence proving those statements to be false, those two statements are both immaterial and impertinent, in that they have no bearing on the claims for relief or Defendants' defenses. They should be stricken from the Third Amended Complaint.

Similarly, statements three and four of the Third Amended Complaint make scandalous assertions about Defendants that are solely meant to inflame the reader and have no relevance in relation to Plaintiffs allegations. The Introduction as a whole should be stricken from the Third Amended Complaint or rewritten as they do not relate to any of Plaintiffs' claims

for relief and the sole purpose of this "Introduction" is to *bias* the reader before even reading the Complaint. In fact, Defendants *were not even served* with the Complaint until after it was published in The New York Times as Plaintiff's counsel communicated directly with The New York Times *prior* to filing their Complaint and *prior* to Defendants being served.

## COUNTERCLAIM

For their Counterclaim against Counterclaim Defendants, Counterclaimants Mitchell Taylor Button and Dusty Button hereby allege as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. This Court additionally possesses supplemental jurisdiction over Counterclaimants' claims pursuant to 28 U.S.C § 1367, as the Court has original jurisdiction of Counter Defendant's claims.

2. Venue is proper in this district because Counterclaimants are countering actions in this litigation which was filed with the District Court of Nevada at the time the Original Complaint was filed and Defendants are already parties to this lawsuit.

## THE PARTIES

3. Counterclaimant Taylor Button is an individual residing in South Carolina but who domiciled in Las Vegas, NV at the time the Original Complaint was filed Taylor Button is the husband of Defendant Dusty Button.

4.  Counterclaimant Dusty Button is an individual residing in South Carolina but who domiciled in Las Vegas, at the time the Original Complaint was filed. Dusty Button is the wife of Defendant Taylor Button.

5.  Counter Defendant Sage Humphries is an individual residing in the State of Massachusetts.

6.  Counter Defendant Gina Menichino is an individual residing in the State of New York.

7.  Counter Defendant Danielle Gutierrez is an individual residing in the State of Florida.

8.  Counter Defendant Rosemarie DeAngelo is an individual residing in the State of New York.

9.  Counter Defendant Jane Doe 1 is an individual residing in the State of Massachusetts.

10. Counter Defendant Jane Doe 2 is an individual residing in the State of Florida.

## FACTUAL BACKGROUND

11. Counterclaimant Dusty Button was a world-renowned ballet dancer who trained at the Jacqueline Kenned Onassis School at the American Ballet Theatre in New York City.

12. In 2007, she joined the Royal Ballet School in London and in 2008 she joined the Birmingham Royal Ballet in Birmingham, England.

13. Ms. Button is *best* known for her work with the Boston Ballet, which she joined in 2012. Ms. Button was promoted to Soloist in 2013 and in 2014, she was promoted to Principal Ballerina.

14. Ms. Button was Red Bull's first and only ballet athlete and has been published in media publications across the globe.

15. Ms. Button has positively influenced hundreds of thousands of people nationally and internationally, including by performing and teaching in over 30 different countries and across the United States.

16. Counterclaimant Mitchell Taylor Button was one of the world's *most influential* custom Ferrari builders and designers for seven years, approximately from 2014- July, 28th 2021.

17. As a child, Mr. Button was physically abused by his mother, forcing him to escape his mother's home at the age of fifteen, on his own. Mr. Button's mother was raped by her step father when Mr. Button was a child. Mr. Button's older sister was raped by her step-grandfather when Mr. Button was a child.

18. Mr. Button went to the University of North Carolina with focus on architecture and industrial design for approximately two and a half years in 2004 and 2005.

19. In October of 2006 and until the fall of 2010, Mr. Button was a dance teacher for a small studio in Florida, Centerstage Dance Academy.

20. In 2010, Mr. Button moved to Birmingham, England to be with Ms. Button.

21. In March of 2012, the Buttons moved to Boston. Mr. Button was a watchmaker by trade, building his brand and business alone, known as Meisturwerk, developing an influential and well-known brand across the globe.

22. The Buttons were separately, very prominent figures in both the dance industry and the car industry however, Taylor was never a prominent figure in the dance community and Dusty was never a prominent figure in the car industry although the Buttons were heavily involved in each other's professional lives as they enjoyed doing everything together, as a TEAM.

23. Mr. Button's work has been featured in numerous publications (prior to publications regarding this litigation) including but not limited to Performance BMW Magazine, Super Street Magazine, Eurotuner, FastCar UK, Speedhunters, PASMAG, SEMA News, Ferrari Magazine and various others.

24. Ms. Button's work has been featured in numerous publications (prior to publications regarding this litigation) including but not limited to Red Bull, The New York Times, Volcom, Glamour, Shape, Ferrari Magazine, The Boston Globe, Pointe Magazine, Dance Spirit, Dance Magazine, Dance Informa and many others.

25. In addition to his success and work designing and building custom automobiles, Counterclaimant Taylor Button worked together with his wife as a partner to assist her management of her career but does not, and has never considered himself his wife's manager. In addition to her success and work, Counterclaimant Dusty Button worked together with her husband to manage aspects of his career but has never considered herself his manager.

26. Dusty's relationship and marriage to her husband paired with her success and prominence in the dance community and in particular the ballet world, has encouraged the filing of false claims against the Buttons, such as the ones detailed in this Counterclaim.

27. The Buttons' prominence and success as a dynamic and influential "Power Couple" in the automotive industry and the dance industry has caused false claims to be asserted against them in this lawsuit.

28. The initial Complaint in this case was filed on July 28th, 2021 in the U.S. District Court for the District of Nevada (where Defendants were not and have never been legal

residents of) and featured two Plaintiffs, Sage Humphries and Gina Menichino, and only one Defendant, Taylor Button.

29. Sage Humphries danced professionally with Dusty Button at The Boston Ballet who was in an open consensual dating relationship with both Counterclaimants as an adult in 2017. Sage Humphries was never a student of Counterclaimants nor was she mentored by them.

30. Gina Menichino took dance classes at Centerstage Dance Academy during the years in which Taylor Button was a dance teacher at Centerstage Dance Academy in the approximate years of 2007-2010.

31. After being served with the Complaint, Mr. Button filed a Motion to Dismiss with this Court on September 9th, 2021. Rather than respond to the Motion, Plaintiffs filed an Amended Complaint on September 23rd, 2021, adding Rosemarie DeAngelo, Danielle Gutierrez, and Jane Doe 1 as Plaintiffs. The Amended Complaint additionally added Dusty Button as a Defendant on behalf of Jane Doe 1, who Counterclaimants have never met.

32. Rosemarie DeAngelo took dance classes at Centerstage Dance Studio for a short period of time at Centerstage Dance Academy in Florida at the time Mr. Button was a dance teacher at the studio between the approximate years of 2008 and 2010.

33. Danielle Gutierrez was Counterclaimant Taylor Button's girlfriend for approximately two and half years from the ages of eighteen, nineteen and twenty, took dance classes at Centerstage Dance Academy and was teacher at Centerstage Dance Academy in Florida during the years Mr. Button was a dance teacher at the studio during the years 2007-2010 and who is still currently a dance teacher at Centerstage Dance Academy,

34. Jane Doe 1 was a part-time student at Urbanity Dance in Massachusetts but who lived in New Hampshire and who Counterclaimants have since deposed Jane Doe 1 but had never met her prior to deposing her via Zoom on June 29th, 2023.

35. On December 13th, 2021, Plaintiffs filed their Second Amended Complaint, adding two new Plaintiffs to the Complaint, Juliet Doherty (who has since voluntarily dismissed herself) and Jane Doe 2.

36. Jane Doe 2 is Plaintiff ███████████ best friend who took dance classes at Centerstage Dance Academy and was a teacher at Centerstage Dance Academy in Florida during the years Mr. Button was a dance teacher at the studio during the approximate years of 2007 – 2010. She is currently a dance teacher at ██████████ ████████.

37. All three iterations of the Complaint filed by Plaintiffs contain salacious and untrue allegations about both Counterclaimants, falsely accusing them of multiple offenses that have been *proven* to be false throughout *this two-year long* litigation.

38. The false accusations made by each Plaintiff to this lawsuit are readily available in the Third Amended Complaint and need not be repeated here. These allegations were not made against the Buttons because they were true, they were made in an effort to gain fame and fortune. Neither Counterclaimant has ever abused or assaulted any of the Plaintiffs. In fact, Counterclaimant Dusty Button has only ever met one of the six Plaintiffs, which is Sage Humphries. In addition, neither Counterclaimant has never met Jane Doe 1.

39. Plaintiffs filed this case *with malice*, for the specific purpose of destroying the lives and reputations of both Counterclaimants by *intentionally* and *maliciously* defaming them.

40. Plaintiffs intended to, and have, utilized the media to assist them in their desire to destroy Counterclaimants' reputations. Thus far, prominent articles about this Nevada Federal case have appeared in, The New York Times, The Boston Globe, The Washington Post, CNN, Business Insider, People Magazine, The Daily Mail, Cosmopolitan, ABC, Fox News, Good Morning America, Vice News, The BBC, The New York Post and numerous other publications.

41. The Buttons did not speak to the press for over a year while they watched in horror as their names and reputations were destroyed by these disgusting and falsely defamatory allegations. As of August 23rd, 2023 Counterclaimants have still *only* been interviewed by one publication following the filing of their Original Counterclaim which was The Daily Mail in September of 2022. Counterclaimants obliged a request curated by Plaintiffs in Cosmopolitan magazine with a long email of factual truth and evidence to dismiss the defamatory claims they were so eager to publish, but Cosmopolitan neglected to print any of their factual statements in order to appease Sigrid McCawley and her public relations team as it was plaintiffs who requested these articles.

42. Thus far, Plaintiffs' false allegations against the Buttons have had the desired effect as Plaintiffs have made sure to dutifully feed their lies to the press in an effort to try this matter in the press, rather than in a court of law. In fact, Plaintiffs informed the media resulting The New York Times publishing an article consisting of Plaintiff Humphries and Menichino complaint *before Counterclaimants were even aware that they had been sued*.

43. Counterclaimants have lost everything to this litigation including but not limited to their home, careers, assets, ability to work, respect of their family name, health and wellness,

DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT WITH COUNTERCLAIM - 30

years of their lives and their reputations that they worked their entire lives to build. Defendants lost their previous counsel in October of 2022 due to these false allegations increasing the cost of litigation, to Daryl Katz hiring of Athony Pellicano to physically threaten Counterclaimants and their families lives and to Daryl Katz' aggressive legal threats and ultimatums to previous counsel and have been *pro se* ever since.

## I.   <u>SAGE HUMPHRIES</u>

44. Counterclaimants freely admit to having an open and romantic relationship with Sage Humphries. Specifically, the Buttons had a consensual sexual relationship with Plaintiff Sage Humphries as an adult and after she had reached the age of majority, *a sexual relationship that Sage Humphries initiated and has since acted to conceal in order to suppress the truth on her journey of fraud.*

45. Counterclaimants have *never* had any open relationship with anyone outside of their own relationship prior to meeting Sage Humphries or after. In fact, Counterclaimant Dusty Button had not even been in another relationship before her relationship with her husband and until meeting Sage Humphries.

46. The Buttons admit that allowing Sage Humphries to infiltrate their marriage (in an attempt to replace Dusty Button to marry Taylor Button as she stated on texts in evidence) and ultimately form a consensual dating relationship was an act of poor judgement however, at the time of the relationship, Counterclaimants believed it to be very real as the relationship was loving and caring in nature and the poor judgement was not readily apparent at the time. Nevertheless, there is nothing illegal nor tortious about an adult woman infiltrating a marriage and three adults ultimately forming a consensual relationship.

47. Sage grew up with hyper-controlling parents, Micah and Michael Humphries who would become enraged if Sage did not comply with their direction, even as an adult woman living on her own. This led to Sage seeking excitement in drug use and sexual promiscuity, something that left her controlling parents perplexed and horrified. In fact, Sage was sent to Florida prior to meeting the Buttons to dry out from her drug use. (*See Exhibit 1 – screenshots referring to Sage using drugs including prior to meeting Buttons*).

48. Sage Humphries sought out Dusty Button at The Boston Ballet in December of 2016 to introduce herself. (*See exhibit 2 – Sage and Dusty backstage at the Nutcracker*).

49. In February of 2017, Sage Humphries' mother visited Sage's forty-two-year-old boyfriend, (Anthony Giovanni Deane) in California in order to threaten him as she did with the Buttons, to ultimately intervene in his relationship with her daughter and end their relationship. Anthony Deane even referred to Micah Humphries as Micah Stalkovich as Sage had to hide her relationship with Anthony and continuously lie to her parents, even referring to herself as Scheming Sage to keep her relationship with Anthony a secret. Once Micah Humphries discovered their relationship continued, she flew to Boston for an intervention where she forced Sage to cease all communications with Anthony, just as she did with the Buttons' relationship with her daughter. At this point Sage began to conceal her messages with Anthony via Snapchat so that her parents would not discover their communications, just as she did with the Buttons. Once her relationship seemed impossible with Anthony, she began weaving her life and days in with the Buttons lives. (*See Exhibit 3 – referring to the texts with forementioned names*)

50. Sage began spending little to no time at her apartment and all of her free time with the Buttons, slowly blurring the lines that once existed between friendship and a romantic

relationship. During this time, Sage began sleeping over at the Button's home and slowing began moving her things into their home, initially sleeping in the Button's guest room but quickly began entering their bed and sleeping with the Buttons nearly every night. (*See Exhibit 4*).

51. In March of 2017, Counter Defendant Sage Humphries became increasingly physically affectionate toward Counterclaimants and ultimately stating to Counterclaimant Taylor Button while she was alone with him (as Counterclaimant Dusty Button was working) that she wished Dusty would want to have a threesome.

52. In March of 2017, Sage Humphries followed Counterclaimant Taylor Button down to basement restroom of a Japanese restaurant where they were having lunch and as he exited the restroom grabbed him and kissed him, thus initiating the first sexual contact with either Defendant. (*See Exhibit 5 – text from Sage to Taylor - "I want you to remember the girl who came down to the basement to be with you"*).

53. Over the next week, Sage Humphries began showing more sexual and physical affection toward both Counterclaimants.

54. In April of 2017, Sage Humphries and her parents Micah and Michael Humphries invited Counterclaimants to visit their home in California for Easter and to celebrate Defendant Mitchell Taylor Button's birthday which is April 16th and fell on the same weekend as Easter that year (*See exhibit 6 – group text messages with Micah Humphries, Sage, Taylor and Dusty, an Instagram comment from Micah Humphries and Taylor's birthday photos at the Humphries' house*).

55. While at Counter Defendant Sage Humphries' parent's home, Sage insisted that the Buttons sleep with her, in her bed, at her parent's house. The second night of the trip

Sage asked the Buttons to stay alone with her at her father's law office so that they could

have privacy for Taylor's birthday night stating she wanted to give him a birthday

present. That evening, Sage initiated what would be their first, of many, consensual

intimate relations as a "throuple" thus, marking the official beginning of their open

relationship with one another. (*See exhibit 7 – photo of Dusty, Taylor and Sage in bed*

*together, in Michael Humphries' office / beach house just hours before the "throuples"*

*first intimate relationship and video of the celebration of Easter and Taylor's birthday*

*with Sage and her family at her parents' house in Long Beach*).

56. The following morning, as the threesome laid in bed together nude, Michael Humphries

(Sage's father) walked in on the threesome and proceeded to converse with Sage

regarding her dentist appointment that morning. As the "throuple" left the building and

entered their vehicle, certain that Sage's father would address what he had seen, to their

surprise he approached the vehicle to recommend the best places for them to eat

breakfast. (*See exhibit 8 – text message from Sage to Dusty and Taylor*).

57. Following Sage's dentist appointment, Taylor, Dusty and Sage traveled to Orange

Country from Seal Beach to meet Taylor and Dusty's friends and see their cars where she

informed the Button's friend, Eric Cheney, that they had just had their first threesome.

(*See exhibit 9 – declaration of Eric Cheney and photos at Eric's shop*). Later that

evening, Sage's entire family went out to dinner with Sage, Dusty and Taylor to celebrate

Taylor's birthday. (*See exhibit 9 – photos from dinner with Sage's family*).

58. Following the flight home where Sage draped herself across Dusty and Taylor's laps the

entire flight and stating, "Best weekend ever" (*see exhibit 10 - video of Sage*). Sage

Humphries asked Counterclaimants to be their girlfriend following their return from

California. Upon the return home to Boston, Sage's appetite for sexual contact was extremely progressive and aggressive, leading her to ultimately ask Dusty and Taylor if that weekend meant she could now be their girlfriend, while the three were showering together. Counterclaimants followed Sage's question by asking if that was what she wanted to which Dusty, Taylor and Sage officially labeled their relationship. (*See exhibit 11 – asking Sage to be girlfriend*).

59. Sage Humphries continued staying at the Button's home. From that point, Sage Humphries and the Button's relationship continued to develop into what Dusty and Taylor perceived at the time as a very real, loving and caring, consensual dating relationship.

60. The relationship between Sage, Dusty and Taylor appeared, at the time, to be one of mutual love, affection, and respect. Sage frequently expressed this love by telling them both that they were the "loves of [her] life", and that she is "so in love with [both of them]." (*See exhibit 12 – texts from Sage*)

61. Sage messaged Dusty and Taylor stating she wanted to take the next step and the "normal relationship feeling of sex", begging Counterclaimant Dusty Button if she could take that next step with Counterclaimant Taylor Button, stating she wanted that normal "relationship" feeling of sex. (*See exhibit 13 and 14.1 – normal relationship feeling*). Sage continued to ask Counterclaimant Taylor Button if he felt "weird touching her when [she's] not there", referring to Counterclaimant Dusty Button.

62. One evening when Dusty, Taylor and Sage were intimate, Counter Defendant Sage Humphries asked Dusty if she could have sex with Taylor Button for the first time, while watching a movie. Until that evening, though their relationship was of a romantic and

sexual nature, Sage and Taylor had never had intercourse however, as the relationship developed, Sage found it to be unfair and unequal if she was not able to have sex with Taylor herself. Although Dusty sympathized with Sage's desire to have sex with her husband, and was led to believe that the three cared for each other equally, she obliged though doing so, brought tears to her eyes as her husband was the only person she had ever been intimate with until Sage Humphries infiltrated their marriage. (*See exhibit 15 – super equal*).

63. Micah Humphries, Sage's mother, ask if Mr. Button would help manage Sage's career though she knew Mr. Button had no involvement in Sage's industries. Mr. Button obliged by providing photography and videography that Sage utilized to promote herself through social media channels. Micah asked if Sage could move in with the Buttons in order to save money by living rent free and relinquishing her own apartment (*see exhibit 15 – Micah's text about managing, moving in with the Buttons, furniture to Michael*).

64. Following Sage Humphries' decision to move in with the Buttons, Sage's mother traveled to Boston and stayed with the Buttons in their home expressing how impressed she was with the Buttons' home and commenting on their luxurious home furnishings.

65. Sage told her mother she was going to Australia with Dusty and Taylor for the summer rather than to Europe with her family, in which her mother became enraged, unable to come to terms that she was losing the ability to control all aspects of Sage's life. (*See exhibit 16 – Australia text*).

66. Micah Humphries confronted Sage about her suspected "threesome" relationship with the Buttons and begin making plans to intervene and control her relationship, as she did with her previous relationships, though she was aware of that relationship from the moment

her husband walked in on the three of them in April and was a non-issue until she began

losing the ability to control her daughter's decisions. (*See exhibit 17 – Micah's text about*

*threesome*).

67. On May 17th, 2017, Sage Humphries told Celso Enrique (*her hair dresser from Salon Eva Michelle*) about her relationship with Defendants stating "lol, I just told Celso. He thinks we are awesome. He asked when you guys left if Taylor was my boyfriend. And I said yes and talked about him for a while, and then he asked about Dusty and I just told him the truth haha. It feels so nice" "He was so supportive. He's like, "I totally understand it's like a triangle love" and I was all… exactly (sunglasses emoji)". (*See exhibit 18 – Celso's texts*).

68. On May 17th, Sage Humphries received a text message from her mother stating she is coming to get her things as she was failing at controlling her daughter's decision to be in a relationship with Dusty and Taylor Button. (*See exhibit 19 – Micah's text*).

69. Verified through discovery, Micah and Michael Humphries launched a campaign against Dusty Button without their daughter's knowledge and after communicating and meeting with faculty at Boston Ballet convinced the ballet to fire Dusty Button, prematurely terminating her contract, citing the same lies that Sage now mimics in her complaint, though she spent the months following Dusty's firing negating those very claims her parents alleged.

70. Dusty Button was fired from Boston Ballet for "just cause" on May 22nd, 2017. (*See exhibit 21 termination letter*).

71. On May 23rd, Micah and Michael Humphries arrived to Boston to collect Sage Humphries' things, have dinner with Sage where they ask her to stay at the hotel with

them rather than the Button's home where she lived at the time. Sage did not oblige and at that point, her parents told her the lie that her grandfather had forty-eight hours to live and that she had to come home with them to say goodbye. Sage stated she would book her own flight and communicated all of this discussion via text message with the Buttons and following a phone call after dinner with her parents, and simultaneously expressed their disappointment in Sage. Though her grandfather was not dying, and this was a ploy to manipulate their daughter into leave the relationship that she was in with Dusty and Taylor. The following day, while Dusty was at work out of town, Taylor and Sage went on a date to a movie, at the AMC theatre across the street from the Button's home. Following this date, Taylor walked with Sage to Boston Opera House as Sage was performing that evening and returned home after.

72. On the evening of May 25th, 2017, (and through admissions and statements made from the Humphries and a "Boston Ballet Official", to Boston Magazine, "After Taylor walked Sage to the Opera House for that night's performance, Sage's phone rang. It was her father, who told her she wasn't performing that night. He and her mother were standing at the stage door. Panicked, Sage called Taylor to let him know what was happening. Then, according to Sage, rehearsal director Tony Randazzo emerged from backstage, linked his arm through Sage's, and escorted her down the stairs before gently pushing Sage out through the stage door where her parents were waiting in an Uber. Sage began to shriek.".

73. During Sage's phone call to Taylor, she stated that her parents were backstage and were forcing her to leave and asked him to call the Police because they were kidnapping her. (*See exhibit 21– phone call from Taylor to Taylor about police*).

74. followed her phone call with a text message to Taylor stating, "I'm hysterical. Tony literally escorted me out. I'm getting on a flight", the Buttons then received an extremely disturbing phone call from a very distraught Sage Humphries, screaming into the phone "My parents are forcing me into a car, Tony literally dragged me down the stairs by the arm, please help me, please save me", and repetitively and frantically screaming "Please don't leave me!" and after a few moments of what the Buttons perceived to be a physical struggle, it was made clear that Micah and Michael Humphries had taken Sage's phone. (*See exhibit 22– text from Sage to Taylor about Tony*).

75. Through discovery, the Buttons now possess admissions by Sage and her parents on record, verifying that everything stated above to be true. The Buttons also now possess record from Boston Ballet proving Dusty was fired due to Sage Humphries' parent's actions including email exchanges proving Sage's parents planned the kidnapping of Sage Humphries (as an adult), and coerced Boston Ballet to assist in that kidnapping. (*See exhibit 23 – emails from Boston Ballet and Peter Stark*).

76. Micah Humphries' own statements to Boston Magazine admit she kidnapped her daughter due to her choice to be in a relationship with Dusty and Taylor stating, "Sage had recently informed them [Sage's parents] that she was not coming home for the summer. Instead, Sage told her mother she was headed to Australia with Dusty and Taylor." "Sage's parents tossed some things into a suitcase, sped to LAX, and boarded a red-eye flight headed east". Boston Magazine states, "Micah told me a high-ranking Boston Ballet staffer met them for coffee at a coffee shop, where they discussed Sage and Dusty's relationship." And "Sage's parents had hatched a plan to extract Sage from the Opera House", and "Micah said they contacted Elizabeth Olds, assistant to artistic

director Mikko Nissinen, to put their plan in motion" and "(I reached out to the Boston Ballet to ask if they had previously had concerns about the relationship between Sage and the Buttons. The Ballet stated that they had no knowledge of the nature of Sage's relationship with the Buttons until they met with Sage's parents to help facilitate her exit from the Opera House). https://www.bostonmagazine.com/news/2022/08/02/ballet-scandal-boston/ ).

77. The relationship between Dusty, Taylor, and Sage was in fact, genuine… thus, verifying that their relationship was destroyed by Sage Humphries' parents prior to them filing a restraining order and forging Sage's signature without a witness or a notary, utilizing an affidavit she did not write or consent to, prior to manipulating her to portray their false narrative of defamatory statements to the world on a global scale, all while brainwashing their daughter to believe their narrative above the reality that Sage Humphries lived. (*See exhibit 24 – Sage stating forced to talk to lawyer, unsigned affidavit, restraining order cover*).

78. On May 27th, 2017, Micah and Michael Humphries sent harassing and threatening messages to Dusty and Taylor Button following kidnapping Sage from Boston.

79. May 28th, 2017 a false police report was called in by Micah Humphries reporting that the Buttons had hand grenades and land mines in their home along with "over-fifty" automatic weapons in which the Buttons home was raided by the police while they were away. The raid lasted for all of five minutes as authorities instantly recognized on inspection that the only thing inside the Buttons' home was plastic toys and instantly closed the claim as being false. Upon verification, the Buttons were informed by the Police that the phone call was made from Micah's phone number in utilizing Sage

Humphries' friends address, Dawn Atkins and Edsall Hilty. (*See exhibit 25 – police report*).

80. On June 1st, 2017 Sage Humphries contacted the Buttons from a stranger's phone while the Buttons were in the presence of their witness Rich Costa, who heard the entire conversation. Sage frantically begged Dusty to wait for her and repeated that she loved her, then she asked if Taylor was there and if she could speak to him. She then repeated the same things to Taylor and proceeded to say that she had borrowed the phone she was calling from, from a stranger and was in the bathroom of a Mexican restaurant that her family took her to. She asked the Buttons to please answer any call from any California number as she will try to get a phone from anyone she can, but that her parents had shut down her bank account, taken her driver's license and ID and her phone, would not allow her to communicate with anyone outside of the home and most disturbingly, that they had forced her to have exorcisms where her priest would pick her up from the house, drive her to an exorcism and then drive her home. This rushed phone call concluded when Sage begged the Buttons to send the police because she was being held captive against her will. (*See exhibit 26 – Rich Costa declaration, forced therapy, shut down her bank account*).

81. Sage Humphries' parents forced her into therapy having drained her bank account thus using her own money, therapy that she did not feel she needed or wanted.

82. From June 1st and until July 18th 2017, a series of events unfolded as Sage Humphries continued to contact the Buttons while they were in Boston, Texas and then in Australia. Sage Humphries began using her youngest brother's iPhone to contact the Buttons via Snapchat so her parents would not know that she was contacting them. After May 25th,

the Buttons never once initiated contact with Sage Humphries however, they continued to respond and communicate with Sage as they were still in a relationship. (*See exhibit 27*).

83. Sage wrote and performed multiple love songs for Dusty and Taylor Button while she was in California during the months of June and July 2017. (*See exhibit 28*).

84. Once Sage's parents discovered she was still speaking to the Buttons, they became enraged and immediately threatened Sage with her job at Boston Ballet, telling Sage that if she did not "break up" her relationship with the Buttons that she would not be allowed to go back to Boston and would not be released from their custody.

85. Sage warned the Buttons that she would be calling to leave a fake voicemail "breaking up" with the Buttons so that she could be allowed to go back to Boston and they could "be together", that she just needed to "make them think" she was breaking up with them stating to the Buttons "don't listen to the voicemail" "delete it immediately" and "don't believe a word I say". (*See exhibit 29*)

86. Once the fake "break up" voicemail was left on July 10th, 2017, Sage Humphries continued to message the Buttons until July 18th, 2017. (*See exhibit 30*).

87. On July 18th, 2017 Sage Humphries (though the Buttons believe it was her mother) sent a final message stating "I want you to know I am no longer your girlfriend, this is over and final". (*See exhibit 31*).

88. Over the course of the summer of 2017, it became clear that Sage was working with her parents, playing both sides and ultimately deciding the Buttons' lives and reputations were worth destroying by creating a fictitious narrative of sexual assault that never existed in the time of her relationship with Dusty and Taylor in order to save face with her family and secure her release back to her privileged life in Boston.

89. On August 1st, 2017, Sage did the unthinkable and filed for restraining orders against Taylor and Dusty, who just two weeks prior she claimed to be in love with and told she loved, though she warned them that if she did not file those restraining orders that her parents would not let her go back to Boston to work. Ultimately, Sage succumbed to her parents and chose to destroy the lives of Counterclaimants who loved her, cared about her and who had never harmed her to create a narrative in which she would be seen as a victim of sexual assault all while hiding her past relationship with Counterclaimants.

90. Sage Humphries withheld Police reports at her restraining order hearing on August 14th, 2017, showing up with no evidence to corroborate her "story" of sexual assault and threat. The Buttons appeared with over a thousand documents of texts, photos, songs and video proving they did not harm Sage Humphries however, the Judge neglected to take any as an exhibit. Sage Humphries did not bring her reports to law enforcement as they are detrimental to her fraudulent allegations.

91. On August 14th, 2018 Sage Humphries was renewed a permanent restraining order, Counterclaimants were not present (as they did not receive notification), against Dusty and Taylor (which is currently being appealed), again withholding incident reports she attempted filed against the Buttons as the reports contradict her allegations. The same Judge was assigned to her hearing the following year and granted her permanent order, without any evidence and though Sage Humphries' affidavits contradicted each other including that her original restraining order stated she was never forced, under duress or threatened by Dusty or Taylor.

92. The Buttons have since contacted all law enforcement in relation to Sage's reports and, (during this litigation) discovered that Sage lied to the Police numerous times.

93. For some time, the Humphries' spread false and defamatory rumors about the Buttons in an attempt to ruin their reputations.

94. When the false and defamatory rumors were not as successful in gaining the desired effect as she imagined. Sage decided to file this case and to use the press' coverage of this case to enflame opinion and bias against Taylor and Dusty in retaliation for her relationship with them and the new narrative her parents forced on her and brainwashed her to believe.

95. To that end, Sage has gone on a media blitz, telling her false tales of sexual assault to anyone who will listen, knowing that her allegations were not true in the slightest. Sage Humphries and her family have harassed and defamed Defendants since 2017.

96. On or about May 27th, 2022, Sage appeared on a pre-taped segment of the nationally-broadcast television show Good Morning America ("GMA").

97. On the GMA segment, Sage Humphries made multiple false and defamatory statements, alleging that Taylor sexually assaulted her.

98. Specifically, when asked "At what point do you say that the direction turned sexual – it was totally a normal night?", Sage responded:

99. [Taylor] suggested that we all watch a movie together. [The Buttons] thought we should all have one big group sleepover and bring the mattress out into the living room. I thought again that that was uncomfortable, so we just hung out we watched a movie and Dusty had fallen asleep. I was falling asleep and when I was falling asleep that was the first time that [Mitchell] violated me. And, you think that you're going to know to scream or to get up or to make a loud noise or do anything to stop it from happening, but I just froze and my body just tightened and I just waited for it to be over.

100.    The events, which flatly accuse Counterclaimant Taylor Button of sexually assaulting

Sage, are untrue. Taylor never assaulted Sage. The sexual conduct was initiated by Sage

and developed into a consensual relationship with not only Defendant Mitchell Taylor

Button but with named third-party conspirator and Defendant Dusty Button as well.

101.    Sage Humphries made numerous false, malicious and defamatory statements with

actual malice, about both Defendants in multiple publications including in The New York

Times, Cosmopolitan Magazine, Boston Magazine, Pointe Magazine, Good Morning

America, The Daily Mail and including on her own Instagram @sagehumphries.

102.    On or about August 2nd, 2022 Sage Humphries gave an interview to Gretchen Voss, a

journalist for Boston Magazine. The words from Sage Humphries' mouth regarding the

Buttons are defamatory literally in their entirety. Specifically Sage Humphries states,

"When they were all back in Boston, the couple barged in on her while she was

showering and told her she was now their girlfriend. It was not posed as a question." and

"the pair had sex with Sage whenever they wanted, with her consent." More specifically,

Sage states "she had grabbed someone's phone to message Taylor via Snapchat, who,

along with Dusty, was in Australia. According to the lawsuit, Taylor responded that he

wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse,

hang her from the ceiling, rape her, and leave her to die."

103.    On or about December 1st, 2021 Sage Humphries defamed the Buttons in Pointe

Magazine including by stating "One day it was just us hanging out and the next I had no

control over the activities that I did, even if it was just doing laundry or going to the

grocery store" "By the time that it got really bad I was completely trapped." And "I had a

friend ask me if I was okay, and I was hyper-defensive because I was told by my abusers

to shut down any criticism of them". (*See exhibit 32*

https://pointemagazine.com/grooming-and-sexual-abuse-in-ballet/ ).

104.    On or about July 29th, 2021 Sage Humphries spoke to Julia Jacobs, a reporter for The

New York Times and further defaming Counterclaimants stating "They had complete

control over me. If I wanted to do anything, I had to ask them first." and "They had

control over my phone and passwords to my Instagram, my email". (*See exhibit 33*

https://www.nytimes.com/2021/07/29/arts/dance/mitchell-button-dusty-button-

abuse.html ).

105.    Sage Humphries recently profited from a speaking engagement with Safe Haven

Ballet, who's company allegedly raises funds for sexual abuse survivors. On May 20th,

2023 Sage Humphries spoke at a "Black Tie Gala" sponsored by Safe Haven Ballet who

(*per their website*) have raised over one-hundred thousand dollars by donation for sexual

survivors since 2016. Sage Humphries' speaking engagement was attended by donors

who were influenced by her false and defamatory statements of sexual abuse by

Defendants to donate money to Safe Haven Ballet. This is not the first time Sage

Humphries has committed fraud.

106.    Sage Humphries and her family spread false and malicious rumors with defamatory

statements by posting on social media channels and by sending defamatory emails to

Defendants' former sponsors including an Instagram post, posted by one of her closest

friends (an attorney at David Wright Tremaine) with influence from Sage Humphries.

The particular post from May of 2021 has since been deleted but states "PSA: Dusty

Button is a predator who preys on young girls to use for sex acts with her husband." (*See*

*exhibit 34*).

107. Sage Humphries made her defamatory statements with actual malice and malicious intent as Sage knew that her allegations of Mitchell sexually assaulting her were false. She knew that she initiated this sexual conduct with Mitchell and that she consented to it. She knew that Mitchell did not sexually assault her or engage in any kind of non-consensual sexual conduct with her.

## II.     JANE DOE 1

108. Counterclaimants do not know Jane Doe 1. They have never seen, spoken to, taught, or met Jane Doe 1. In fact, they had never even heard of Jane Doe 1 until she became a Plaintiff in this lawsuit. Counterclaimants were made aware of Jane Doe 1's name on June 14th, 2022, searched diligently for any indication at any time ever that they may have encountered her and were unable to come up with the even the slightest sign that they had ever met her, much less had any sexual contact with her.

109. Jane Doe 1's claims are not only implausible and untrue, but they are also impossible, as the timeline required for Jane Doe 1's allegations to be true is inconsistent with facts known to the Counterclaimants, including the fact that the building Jane Doe 1 claims to have been assaulted in, did not exist at the time of the alleged assault in 2014.

110. In fact, Counterclaimants met Jane Doe 1 for the first time via zoom as they deposed her on June 29th, 2023 at 11am. During Jane Doe 1's deposition, she perjured and contradicted herself an abundant number of times and stating "I don't recall" over three-hundred times.

111. Defendants conducted a controlled, recorded call with Jane Doe 1's "therapist", ultimately resulting in the discovery that the "therapist" Jane Doe 1 alleged she told of this alleged sexual assault was not a therapist at all but was a social worker. Jane Doe 1's

social worker did not have the slightest idea what Defendants were referring to when speaking of the alleged sexual assault and proving that Jane Doe 1 perjured herself, again.

112.    Jane Doe 1 is mentally unwell, on multiple medications and seeks fame, attention and fortune (as stated in her therapy records).

113.    Jane Doe 1 was employed by a sponsor of Sage Humphries in Massachusetts – ███ ████ .

114.    Jane Doe 1 has provided discovery contradicting her deposition in which she stated she "had never spoken to any of the Plaintiffs" prior to the onset of this litigation and yet there are over seventeen references of communications with at least one Plaintiff in the year 2020.

115.    Jane Doe 1 claimed to have been assaulted in 2014 however, her very own words in therapy state she was not sexually assaulted by anyone as of 2017.

116.    In fact, none of her therapy records state she was ever "raped" or "sexually assaulted" prior to August 3rd, 2023, just one week after Sage Humphries' publication in The New York Times was released. On August 3rd, 2023 Jane Doe 1 stated in therapy that she was meeting with her new attorney at least 3 to 4 times a week (Sigrid McCawley), and newly alleges to her therapist that she was raped at the age of 15 by "a man and his wife who assisted".

117.    At the age of fifteen and based on Jane Doe 1's birthday which is June ██, 1997, the year she was fifteen was 2012, two years prior to her allegations and five years prior to her statement in therapy in 2017 when she stated she was never sexually assaulted furthermore the building she alleges she was raped in wasn't constructed until one year after the year that she alleges she was raped in it.

118.     Jane Doe 1 has committed fraud, perjury, malicious prosecution and defamation amongst other crimes. Her allegations are of the most disgusting and shocking nature and were intentionally meant to harm Defendants in such a way that they would never recover from the defamation Jane Doe 1 brought forward as her allegations state she was raped at gunpoint as a minor by Defendant Mitchell Taylor Button while Defendant Dusty Button recorded the rape.

119.     On or about September 30th, 2021, Jane Doe 1 made defamatory and false statements to Melissa Alonso, a journalist for CNN. Specifically, Jane Doe 1 stated "I am grateful to my fellow dancers for bravely bringing this action and for giving me the courage to come forward and speak out about the abuse I endured. Together we can stop the accused – our abusers – from ever damaging another young, vulnerable dancer."

120.     Upon information and belief, one or more of the Plaintiffs encouraged Jane Doe 1 to levy false claims against Counterclaimants in an effort to lend needed credibility to their frivolous allegations.

### III.     GINA MENICHINO

121.     Gina Menichino was a student at Centerstage Dance Academy during the time Defendant Mitchell Taylor Button was a teacher during the years of 2007-2010.

122.     Plaintiffs Gina Menichino, Danielle Gutierrez, Rosie DeAngelo and Jane Doe 2 took classes at Centerstage Dance Academy and were good friends prior to the jealous nature of the desire to be the "most noticed" at the dance studio.

123.     Ms. Menichino was approximately fourteen years old when she took classes from Defendant Mitchell Taylor Button however, Ms. Menichino was not as talented as some

of the other dancers at Centerstage Dance Academy including Ms. Gutierrez, who is also in this litigation.

124.    Gina has made multiple defamatory allegations regarding Counterclaimant Taylor Button including her interview with The New York Times which was published prior to Defendant Mitchell Taylor Button ever being served. Every claim Gina Menichino has brought forward is false, malicious, defamatory, intended to harm Counterclaimant Mitchell Taylor Button and was intentionally filed with actual malice.

125.    Gina Menichino was very jealous of other students at Centerstage Dance Academy and was never chosen as an assistant, (as Mitchell Taylor Button did not have assistants, as he was capable of demonstrating his choreography himself), and was never given "special attention" as Ms. Menichino alleges due to her dance technique severely lacking the ability to properly demonstrate the necessary dance steps for other students to learn from.

126.    Ms. Menichino was additionally very bitter that Counterclaimant Mitchell Taylor Button had not chosen her to be his assistant and that she was not able to spend more time with or receive attention from Taylor. She continued to attempt contact with Taylor after he moved to London to be with Dusty, but ultimately failed, increasing her bitterness toward Counterclaimant Mitchell Taylor Button.

127.    Counterclaimant Mitchell Taylor Button was shocked, horrified and disgusted at Ms. Menichino's blatant lies and defamatory statements as he has not seen, spoken to or mentioned Ms. Menichino's name, heard of, or even remembered Ms. Menichino since he moved from Florida to be with his wife and Counterclaimant Dusty Button in 2011.

128. Ms Menichino has made numerous defamatory statements about Mr. Button including her statements in The New York Times, Cosmopolitan Magazine, The Daily Mail and including statements on her own Instagram @ginamenichino.

129. On or about July 28th, 2021, Gina Menichino made defamatory statements to Julia Jacobs, a reporter for The New York Times, stating "The whole game was to keep him happy. Don't get him angry, or I was unworthy and I would lose my dance career."

130. On or about April 5th, 2022, Gina Menichino made addition defamatory statements to Cosmopolitan Magazine stating "It's the first memory of when the grooming began", that Counterclaimant Mitchell Taylor Button gave her a teddy bear sprayed with his cologne so she could feel like she was "sleeping" with him and stating "he devised reasons for them to be alone together and it went on for a year and a half. Additionally, Ms. Menichino stated "He [Counterclaimant Mitchell Taylor Button] made her believe that telling anyone about "them" would ruin her career".

131. Ms. Menichino has admitted herself through discovery, therapy and text messages to other Plaintiffs and third-parties from Centerstage Dance Academy that nothing serious ever happened with Defendant Mitchell Taylor Button but that she had a crush on him when she was a student at Centerstage Dance Academy.

132. Through discovery Ms. Menichino stated in a message that she had an obsession with BDSM (Bondage, discipline [or domination], sadism, and masochism [as a type of sexual practice], and wants to "finish" what she never had an opportunity to start with Mr. Button.

133. Gina Menichino has a history of self-mutilation, family trauma, alleged abusive relationships, unsuccessful career advancements. In addition, Gina Menichino admittedly

had a crush on Counterclaimant Mitchell Taylor Button that over time, developed into an obsession, including by stalking both Defendants through social media in the years Counterclaimant Mitchell Taylor Button moved from Florida to England and until this litigation began.

134.    During the time of Ms. Menichino's (false) allegations, Counterclaimant Mitchell Taylor Button was in a relationship with Plaintiff Danielle Gutierrez.

135.    Gina Menichino knew when filing this lawsuit that her statements were fraudulent, false, malicious and defamatory and did so with actual malice.

## IV.    DANIELLE GUTIERREZ (FKA) DOMINGUEZ

136.    Danielle Gutierrez was Counterclaimant Mitchell Taylor Button's ex-girlfriend in the approximate years of 2008-2010.

137.    Ms. Gutierrez took classes at Centerstage Dance Academy prior to Counterclaimant Taylor Button moving to Florida and teaching at Centerstage Dance academy. Ms. Gutierrez was also a teacher at Centerstage Dance Academy at the time Counterclaimant Taylor Button was a teacher at Centerstage Dance Academy.

138.    Danielle Gutierrez is the "woman scorned" in this matter as she was Taylor's girlfriend for approximately two years.

139.    Counterclaimant Taylor Button met Ms. Gutierrez after his wife (and Counterclaimant) Dusty Button moved to London in 2007.

140.    Counterclaimant Mitchell Taylor Button ended his relationship with Ms. Gutierrez prior to moving to England to be with Dusty. This resulted in Ms. Gutierrez lashing out against and attacking Taylor. In fact, Taylor maintains a scar on his stomach from her attack.

141.    Ms. Gutierrez continued to harass Counterclaimant Dusty Button once Taylor

planned his move to England by stalking her through social media and sending messages

through social media in hopes of deterring her from being in a relationship with

Counterclaimant Taylor Button solely out of spite and jealousy.

142.    Through discovery Ms. Gutierrez has contradicted her own allegations further

proving her defamatory allegations and statements in the press. In fact, through

discovery, Ms. Gutierrez provided text messages stating "The worst I ever got was a

bloody lip", referring to Counterclaimant Taylor Button and "I pushed him out", referring

to her relationship with Taylor and "I hope he dies alone". Once Counterclaimant Taylor

Button broke off his relationship with her and discovering he was moving to England to

be with Dusty.

143.    There is no record of Counter Defendant, Ms. Gutierrez, discussing the allegations at

hand with her previous school counselor or her therapist including in 2011 when her

relationship with Counterclaimant Taylor Button had just recently ended.

144.    On or about April 5th, 2022 Ms. Gutierrez made false and defamatory statements to

Cosmopolitan Magazine including her statements, "First, he was her teacher who told her

she was like his 'little sister'" and "Their [Taylor and Danielle's] relationship affected

everything: her mental health, her sense of safety. Even where she went to college – he

convinced her to stay local. And because he didn't want her partnering with other men in

classes there, she paused on studying dance. He yelled, berated her in public. If someone

attempted to intervene, he scared them off by becoming belligerent. She started believing

no one could help her. In the worst moments, she was afraid for her life."

145.     Ms. Gutierrez has a history of family trauma, unsuccessful career advancements and
current relationship complications.

146.     Ms. Gutierrez conspired with Plaintiff Sage Humphries in 2018 to defame, harass,
harm and destroy Counterclaimant Taylor Button.

147.     Counterclaimant Taylor Button has not spoken to, spoken of, heard of or even
thought of Danielle Gutierrez for nearly fourteen years and until she joined this litigation
in September of 2021.

148.     Danielle's defamatory and fraudulent statements were intentionally meant to harm
Counterclaimant Mitchell Taylor Button and were done with actual malice.

## V.     ROSEMARIE DEANGELO

149.     Ms. DeAngelo took classes at Centerstage Dance Academy for a short amount of
time during the years of approximately 2008-2010. During the time Ms. DeAngelo was at
the studio, Counterclaimant Taylor Button and Counter-Defendant Danielle Gutierrez
were in a dating relationship.

150.     Ms. DeAngelo dated one of Taylor Button's best friends when he was a teenager.

151.     Rosemarie DeAngelo has provided essentially nothing throughout two years of
discovery to even remotely show that her allegations could be true, which they are not.

152.     Ms. DeAngelo conspired with Plaintiff Sage Humphries in 2018 to intentionally
harm and defame Counterclaimant Mitchell Taylor Button.

153.     There are no records of Ms. DeAngelo stating any form of sexual assault in therapy
records or otherwise.

154.     On or around April 5th, 2022 Ms. DeAngelo made false and defamatory statements in
Cosmopolitan Magazine including her statements, "Rosie wanted them to like her, so she

decided to go with the flow. Even if it meant downplaying his unsettling attention. Like

how he would insist on taking her out to lunch. And how he slid sexual innuendos into

their conversations. Later, after he cornered her along, he manipulated her into believing

that nothing bad was happening to her. He claimed it wasn't illegal because he wasn't

that much older." And "He was her mentor; he told her it was okay".

155.    Ms. DeAngelo knew her statements were false, defamatory, malicious and

intentionally harmful and chose to do so out of actual malice.

### VI.    <u>JANE DOE 2</u>

156.    Jane Doe 2 took classes at Centerstage Dance Academy prior to Counterclaimant

Taylor Button moving to Florida and teaching at Centerstage Dance academy. Jane Doe 2

took classes and was a teacher at Centerstage Dance Academy during the approximate

years of 2007-2010.

157.    Jane Doe 2 and Ms. Gutierrez were ▮▮▮▮▮▮▮ at the time Counterclaimant Taylor

Button began teaching at Centerstage Dance Academy however, Jane Doe 2 showed

extreme jealousy when Ms. Gutierrez began dating Taylor ultimately distancing herself

from Ms. Gutierrez.

158.    Jane Doe 2 frequently discussed her attraction to Counterclaimant Taylor Button

during the time he taught at Centerstage Dance Academy and openly fantasized about the

"things [she] wanted to do to [Taylor]."

159.    After Counterclaimant Taylor Button moved to England to be with Dusty, Jane Doe 2

repaired her relationship with Ms. Gutierrez.

160.    Jane Doe 2 was bitter about Taylor's relationship with Ms. Gutierrez and grew even

more jaded when Taylor moved to England.

161.    Jane Doe 2 has provided discovery in which contradicts her allegations, proving she

knowingly filed false and frivolous allegations.

162.    Jane Doe 2 was never assaulted or abused in any way by Counterclaimant Taylor

Button and filed her defamatory claims and allegations with actual malice.

## VII.    THIS LAWSUIT

163.    The Plaintiffs intentionally filed this case to ensure that the Buttons were destroyed

beyond repair by the media using Plaintiff's tools of defamatory false claims and to ruin

the reputations that they had built from excelling for years in their respective industries.

164.    Most major media publications, including but not limited to The New York Times,

the Washington Post and the Boston Globe, were aware of this case before the Buttons

were ever made aware of it and including before they had even been served, in fact the

Buttons were technically served with the knowledge of Plaintiff's complaint by the New

York Times and their non investigative lazy journalism per the request of Boies Schiller

Flexner.

165.    In order to further smear the Buttons' reputations, Plaintiffs originally included

allegations from anonymous parties. These allegations were cleverly designed so that no

one could reasonably refute them – after all, if one is accused by an unnamed,

anonymous party, it brings us into "proving a negative" territory.

166.    Each Plaintiff in this litigation perjured themselves over two years ago and through

discovery have proven precisely what Counterclaimants / Defendants have stated from

the onset of this litigation, that they are lying, manipulative and malicious women who

used the wake of the MeToo and Cancel Culture movements to destroy the lives and

reputations of Dusty and Taylor Button.

167.     Prior to and from the onset of this litigation Plaintiffs have actively defamed

Counterclaimants and continue to defame them, justifying their defamatory conduct by

intentionally weaponizing their misunderstanding and false pretense that they are

protected by the First Amendment however, that right does not give the freedom to

publish, speak or advertise knowingly false statements which ruin innocent lives,

especially when those statements are purely for financial gain.  This litigation has come

to it's inevitable end after two years of Plaintiff's inability to disprove Counterclaimants

claims that this litigation was baseless from the start but with that end must come the

understanding that Boies Schiller Flexner and their Plaintiffs never expected

Counterclaimants to survive this abuse of process for two years and as discovery has

come to a close and their hand (or lack thereof) has been played in full the Court must

now rule based on factual evidence rather than the baseless claims it was originally

forced to litigate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Defamation Per Se**
(Against Sage Humphries)

168.     Counterclaimants reallege the allegations of the preceding paragraphs as if set forth

fully herein.

169.     Counterclaim Defendant Sage Humphries published false and defamatory statements

of and concerning Counterclaimant Taylor Button and Dusty Button as identified herein

to third parties – namely to journalists, media and television outlets.

170.     Counterclaim Defendant Sage Humphries' false and defamatory statements were

published to third parties without privilege.

171.     The gist of Counterclaim Defendant Sage Humphries' false and defamatory statements is that Counterclaimant Taylor Button sexually assaulted Sage Humphries one night while watching a movie after Dusty Button had fallen asleep.

172.     Sage made those statements amongst other similar statements to multiple journalists including Julia Jacobs of The New York Times, Amy Robach of Good Morning America, Gretchen Voss of Boston Magazine and Elizabeth Kiefer of Cosmopolitan Magazine.

173.     Sage for certain made defamatory statements, on camera, on or about May 27th, 2022 on Good Morning America.

174.     Upon information and belief, between April 11th, 2022 and July 7th, 2022 Sage additionally made defamatory statements to Gretchen Voss, a journalist with Boston Magazine. These statements and the Buttons' responses to each of the allegations are filed at ECF No. 54-23 & 54-24.

175.     Upon information and belief, on or about April 5th 2022, Sage additionally made defamatory statements to Elizabeth Kiefer, a journalist with Cosmopolitan Magazine stating "This was calculated. These people are predators. This is a pattern." Additionally, Sage stated "Their friendship began in the studio. Then Dusty invited Sage to come to her apartment. The walls were painted black. In one room, a collection of guns was displayed. That's when Sage met Taylor." "Later, when he offered to manage her social media, it made sense to say yes." "Taylor got the passwords to Sage's phone, email and accounts. That's when he started monitoring her communication. Infiltrating everything." And "Now it's interesting to me how the most evil people hid in plain sight, where no one would suspect."

176.   Upon information and belief, on or around December 1st, 2021, Sage additionally made defamatory statements to Kathleen McGuire, a journalist with Pointe Magazine.

177.   Upon information and belief, on July 27th, 2021 Sage Humphries made defamatory statements to Julia Jacobs, a journalist for The New York Times (prior to filing this litigation on July 28th, 2021).

178.   Upon information and belief, Sage Humphries communicated with multiple third-parties, including assisting in knowingly publishing defamatory statements about Counterclaimants Dusty Button and Taylor Button on social media on May 13th, 2021 on the account @realworldballerina.

179.   Upon information and belief, Sage Humphries knowingly posted defamatory statements on her own social media pertaining to this instant litigation including reposting articles on her own social media about Counterclaimants Dusty Button and Taylor Button.

180.   Upon information and belief, Sage Humphries communicated with third-parties such as sponsors, employers and other third-parties including knowingly false and defamatory statements pertaining to Counterclaimants Dusty Button and Taylor Button.

181.   The factual statements alleged to support the defamatory gist of Counterclaim Defendant Sage Humphries' statements are false and defamatory.

182.   Counterclaim Defendant Sage Humphries published the false and defamatory statements with actual malice.

183.   Counterclaimant Mitchell Taylor Button is not a public figure and was not a public figure at the time the defamatory statements were made.

184.    Counterclaimant Dusty Button is not a public figure and was not a public figure at the time the defamatory statements were made.

185.    At the time Counterclaim Defendant Sage Humphries published her false statements, Sage had actual knowledge that her statements were false and/or had reckless disregard for their falsity because she had no objectively reasonable basis for believing her statements were true.

186.    In publishing the false and defamatory statements, Counterclaim Defendant Sage Humphries knowingly and intentionally misrepresented the truth and manufactured false information out of whole cloth.

187.    Counterclaim Defendant Sage Humphries' false and defamatory statements constitute per se in that they tend to injure Counterclaimants Taylor Button and Dusty Button in their trade, business or profession, and they accuse Mitchell Taylor Button and Dusty Button of serious illegal conduct.

188.    The subject of Counterclaim Defendant Sage Humphries' statements was no more than an issue of public curiosity.

189.    Counterclaim Defendant Sage Humphries' statements were of concern to a mass audience, comprised of smaller audiences that tuned into all media channels and publications which Sage Humphries ensured were pushed to those audiences.

190.    Counterclaim Defendant Sage Humphries' asserted public interest of informing the public about her false story of sexual assault has only remote proximity to the content of her complained-of statements.

191.    Counterclaim Defendant Sage Humphries published her statements solely as part of a private controversy with Counterclaimants Taylor Button and Dusty Button.

192.    In addition to being false, the information Counterclaim Defendant Sage Humphries published was of a private nature and did not become of interest to the public merely by her making the statements to a journalist.

193.    Damages to Counterclaimant Taylor Button and Dusty Button are presumed by law since the defamation is *per se*.

194.    Counterclaim Defendant Sage Humphries' conduct was willful and intentional.

195.    Counterclaimant Taylor Button is entitled to an award of punitive damages to punish Counterclaim Defendant Sage Humphries for her unlawful conduct and to deter her from repeating such misconduct in the future.

196.    Counterclaimant Dusty Button is entitled to an award of punitive damages to punish Counterclaim Defendant Sage Humphries for her unlawful conduct and to deter her from repeating such egregious misconduct in the future.

197.    As a direct and proximate result of counterclaim Defendant Sage Humphries' actions, Counterclaimant Taylor Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

198.    As a direct and proximate result of Counterclaim Defendant Sage Humphries' actions, Counterclaimant Dusty Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

199.    As a direct and proximate result of Counterclaim Defendant Sage Humphries' actions, Counterclaimant Taylor Button has incurred attorneys' fees and costs for the protection of his name and interests.

200. As a direct and proximate result of Counterclaim Defendant Sage Humphries'
actions, Counterclaimant Dusty Button has incurred attorneys' fees and costs for the
protection of his name and interests.

201. As a direct and proximate result of Counterclaim Defendant Sage Humphries'
actions, Counterclaimant Taylor Button has been injured in an amount exceeding
$75,000.00.

202. As a direct and proximate result of Counterclaim Defendant Sage Humphries'
actions, Counterclaimant Dusty Button has been injured in an amount exceeding
$75,000.00.

## SECOND CLAIM FOR RELIEF

### Defamation Per Se

### (Against Danielle Gutierrez)

203. Counterclaimants reallege the allegations of the preceding paragraphs as if set forth
fully herein.

204. Counterclaim Defendant Danielle Gutierrez published false and defamatory
statements of and concerning Counterclaimant Taylor Button as identified herein to third
parties – namely to journalists, media and television outlets.

205. Counterclaim Defendants Danielle Gutierrez's false and defamatory statements were
published to third parties without privilege.

206. The gist of Counterclaim Defendant Danielle Gutierrez's false and defamatory
statements is that "their relationship" (speaking of Counterclaimant Taylor Button)
affected her sense of safety, convinced her to stay at a local college, yelled and berated
her in public, scared those who would attempt to intervene by becoming belligerent and
that in the worst moments, she was afraid for her life. Ms. Gutierrez false and defamatory

statements continue by stating Counterclaimant Taylor Button told her she was like his little sister and that later said their age difference didn't matter.

207. Ms. Gutierrez made these defamatory statements publicly including by posting them on her own social media @danidomi.

208. Specifically, Counter Defendant Gutierrez made defamatory and intentional harmful statements on or around April 5th, 2022 to Elizabeth Kiefer, journalist for Cosmopolitan Magazine.

209. The factual statements alleged to support the defamatory gist of Counterclaim Defendant Danielle Gutierrez's statements that Mr. Button was belligerent, controlling and manipulative are false and defamatory.

210. Counterclaim Defendant Danielle Gutierrez published the false and defamatory statements with actual malice.

211. Counterclaimant Taylor Button was not and is not a public figure.

212. At the time Counterclaim Defendant Danielle Gutierrez published her false statement, Danielle had actual knowledge that her statements were false or had reckless disregard for their falsity because she had no objectively reasonable basis for believing her statements were true.

213. In publishing the false and defamatory statements, Counterclaim Defendant Danielle Gutierrez knowingly and intentionally misrepresented the truth and manufactured false information out of whole cloth.

214. Counterclaim Defendant Danielle Gutierrez's false and defamatory statements constitute slander per se in that they tend to injure Counterclaimant Taylor Button in his trade, business, or profession.

215. The subject of Counterclaim Defendant Danielle Gutierrez's statements was no more than an issue of public curiosity.

216. Counterclaim Defendant Danielle Gutierrez's statements were of concern to a mass audience, comprised of smaller audiences that tuned into all media channels and publications which Danielle Gutierrez ensured were pushed to those audiences.

217. Counterclaim Defendant Gutierrez asserted public interest of informing the public about her false story of control, assault, and manipulation has only remote proximity to the content of her complained-of statements.

218. Counterclaim Defendant Danielle Gutierrez published her statements solely as part of a private controversy with Counterclaimant Taylor Button.

219. In addition to being false, the information Counterclaim Defendant Danielle Dominguez published was of a private nature and did not become of interest to the public merely by her making the statements to a journalist.

220. Damages to Counterclaimant Taylor Button are presumed by law since the defamation is *per se*.

221. Counterclaim Defendant Danielle Gutierrez's conduct was willful and intentional.

222. Counterclaimant Taylor Button is entitled to an award of punitive damages to punish Counterclaim Defendant Danielle Gutierrez for her unlawful conduct and to deter her from repeating such egregious misconduct in the future.

223. As a direct and proximate result of counterclaim Defendant Danielle Gutierrez's actions, Counterclaimant Taylor Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

224.     As a direct and proximate result of Counterclaim Defendant Danielle Gutierrez's

actions, Counterclaimant Taylor Button has incurred attorneys' fees and costs for the

protection of his name and interests.

225.     As a direct and proximate result of Counterclaim Defendant Danielle Dominguez's

actions, Counterclaimant Taylor Button has been injured in an amount exceeding

$75,000.00.

## THIRD CLAIM FOR RELIEF

### Defamation Per Se

(Against Rosemarie DeAngelo)

226.     Counterclaimants reallege the allegations of the preceding paragraphs as if set forth

fully herein.

227.     Counterclaim Defendant Rosemarie DeAngelo published false and defamatory

statements of and concerning Counterclaimant Taylor Button as identified herein to third

parties – namely to journalists, media and television outlets.

228.     Counterclaim Defendants Rosemarie DeAngelo's false and defamatory statements

were published to third parties without privilege.

229.     The gist of Counterclaim Defendant Rosemarie DeAngelos's false and defamatory

statements include that she "downplayed Counterclaimant Mitchell Taylor Button's

unsettling attention, that he insisted on taking her out to lunch and that he slid sexual

innuendos into their conversations". Ms. DeAngelo made additional defamatory

statements by stating Counterclaimant Taylor Button "cornered her, manipulated her and

claimed "it" wasn't illegal because he wasn't that much older". Additionally, Ms.

DeAngelo's false and defamatory statements include that Counterclaimant Taylor Button

was her mentor.

230. Ms. DeAngelo made these defamatory statements publicly including by posting them on her own social media @rooosiee on Instagram.

231. Specifically, Counter Defendant DeAngelo made defamatory and intentionally harmful statements on or around April 5th, 2022 to Elizabeth Kiefer, journalist for Cosmopolitan Magazine.

232. The factual statements alleged to support the defamatory gist of Counterclaim Defendant Rosie DeAngelo's statements are false and defamatory.

233. Counterclaim Defendant Rosemarie DeAngelo published the false and defamatory statements with actual malice.

234. Counterclaimant Taylor Button was not and is not a public figure.

235. At the time Counterclaim Defendant Rosemarie DeAngelo published her false statement she had actual knowledge that her statements were false or had reckless disregard for their falsity because she had no objectively reasonable basis for believing her statements were true.

236. In publishing the false and defamatory statements, Counterclaim Defendant Rosemarie DeAngelo knowingly and intentionally misrepresented the truth and manufactured false information out of whole cloth.

237. Counterclaim Defendant DeAngelo's false and defamatory statements constitute slander per se in that they tend to injure Counterclaimant Taylor Button in his trade, business, or profession.

238. The subject of Counterclaim Defendant DeAngelo's statements was no more than an issue of public curiosity.

239. Counterclaim Defendant DeAngelo's statements were of concern to a mass audience, comprised of smaller audiences that tuned into all media channels and publications which Rosemarie DeAngelo ensured were pushed to those audiences.

240. Counterclaim Defendant DeAngelo asserted public interest of informing the public about her false story of manipulation, assault and control has only remote proximity to the content of her complained-of statements.

241. Counterclaim Defendant DeAngelo published her statements solely as part of a private controversy with Counterclaimant Mitchell Taylor Button.

242. In addition to being false, the information Counterclaim Defendant DeAngelo published was of a private nature and did not become of interest to the public merely by her making the statements to a journalist.

243. Damages to Counterclaimant Taylor Button are presumed by law since the defamation is *per se*.

244. Counterclaim Defendant DeAngelo's conduct was willful and intentional.

245. Counterclaimant Taylor Button is entitled to an award of punitive damages to punish Counterclaim Defendant DeAngelo for her unlawful conduct and to deter her from repeating such egregious misconduct in the future.

246. As a direct and proximate result of counterclaim Defendant DeAngelo's actions, Counterclaimant Taylor Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

247. As a direct and proximate result of Counterclaim Defendant DeAngelo's actions, Counterclaimant Taylor Button has incurred attorneys' fees and costs for the protection of his name and interests.

248.     As a direct and proximate result of Counterclaim Defendant DeAngelo's actions,

Counterclaimant Taylor Button has been injured in an amount exceeding $75,000.00.

### FOURTH CLAIM FOR RELIEF

### Defamation Per Se

### (Against Gina Menichino)

249.     Counterclaimants reallege the allegations of the preceding paragraphs as if set forth
fully herein.

250.     Counterclaim Defendant Gina Menichino published false and defamatory statements
of and concerning Counterclaimant Mitchell Taylor Button as identified herein to third
parties – namely to journalists, media and television outlets.

251.     Counterclaim Defendants Gina Menichino's false and defamatory statements were
published to third parties without privilege.

252.     The gist of Counterclaim Defendant Gina Menichino's false and defamatory
statements includes grooming and assaulting her and by stating in Cosmopolitan
Magazine that Counterclaimant Taylor Button had worked with big names, that he
promised he could help her achieve her goals in the professional dance world, and that he
singled her out for a solo opportunity.

253.     Ms. Menichino stated additional defamatory statements including, "It's the first
memory of when the grooming began", that Counterclaimant Taylor Button gave her a
teddy bear sprayed with his cologne so she could feel like she was "sleeping" with him
and stating "he devised reasons for them to be alone together and it went on for a year
and a half. Additionally, Ms. Menichino stated "He [Counterclaimant Taylor Button]
made her believe that telling anyone about "them" would ruin her career".

254.    Ms. Menichino made these defamatory statements publicly including by posting them on her own social media @ginamenichino on Instagram.

255.    Specifically, Counter Defendant Menichino made these defamatory and intentionally harmful statements on or around April 5th, 2022 to Elizabeth Kiefer, journalist for Cosmopolitan Magazine.

256.    The factual statements alleged to support the defamatory gist of Counterclaim Defendant Gina Menichino statements are false and defamatory.

257.    Counterclaim Defendant Gina Menichino published the false and defamatory statements with actual malice.

258.    Counterclaimant Taylor Button was not and is not a public figure.

259.    At the time Counterclaim Defendant Menichino published her false statement she had actual knowledge that her statements were false or had reckless disregard for their falsity because she had no objectively reasonable basis for believing her statements were true.

260.    In publishing the false and defamatory statements, Counterclaim Defendant Menichino knowingly and intentionally misrepresented the truth and manufactured false information out of whole cloth.

261.    Counterclaim Defendant Menichino's false and defamatory statements constitute slander per se in that they tend to injure Counterclaimant Taylor Button in his trade, business, or profession and they accuse Taylor of serious illegal conduct.

262.    The subject of Counterclaim Defendant Menichino's statements was no more than an issue of public curiosity.

263. Counterclaim Defendant Menichino's statements were of concern to a mass audience, comprised of smaller audiences that tuned into all media channels and publications which Gina Menichino ensured were pushed to those audiences.

264. Counterclaim Defendant Menichino asserted public interest of informing the public about her false story of manipulation, assault and control has only remote proximity to the content of her complained-of statements.

265. Counterclaim Defendant Menichino published her statements solely as part of a private controversy with Counterclaimant Taylor Button.

266. In addition to being false, the information Counterclaim Defendant Menichino published was of a private nature and did not become of interest to the public merely by her making the statements to a journalist.

267. Damages to Counterclaimant Taylor Button are presumed by law since the defamation is *per se*.

268. Counterclaim Defendant Gina Menichino's conduct was willful and intentional.

269. Counterclaimant Taylor Button is entitled to an award of punitive damages to punish Counterclaim Defendant Gina Menichino for her unlawful conduct and to deter her from repeating such egregious misconduct in the future.

270. As a direct and proximate result of counterclaim Defendant Menichino's actions, Counterclaimant Taylor Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

271. As a direct and proximate result of Counterclaim Defendant Menichino's actions, Counterclaimant Taylor Button has incurred attorneys' fees and costs for the protection of his name and interests.

272.    As a direct and proximate result of Counterclaim Defendant Gina Menichino's actions, Counterclaimant Taylor Button has been injured in an amount exceeding $75,000.00.

## FIFTH CAUSE OF ACTION
### Defamation Per Se
### (Against Jane Doe 1)

273.    Counterclaimants reallege the allegations of the preceding paragraphs as if set forth fully herein.

274.    Counterclaim Defendant Jane Doe 1 published false and defamatory statements of and concerning Counterclaimant Taylor Button and Dusty Button as identified herein to third parties – namely to journalists.

275.    Counterclaim Defendant Jane Doe 1's false and defamatory statements were published to third parties without privilege.

276.    The gist of Counterclaim Defendant Jane Doe 1's false and defamatory statements is that Counterclaimants Taylor Button and Dusty Button sexually assaulted her at gun point and filming her.

277.    Jane Doe 1 for certain gave false and defamatory statements on or about September 29th, 2021 stating she was "grateful" to the first women who came forward and gave her the "courage" to speak out. Additionally, her exact quote to the Daily Mail was "I am grateful to my fellow dancers for bravely bringing this action and for giving me the courage to come forward and speak out about the abuse I endured" and "Together we can stop the accused – our abusers – from ever damaging another young, vulnerable dancer."

278.    Upon information and belief, on or around September 30th 2021 Jane Doe 1 additionally made defamatory statements to Melissa Alonso, a journalist with CNN.

279.     Upon information and belief, Sage Humphries communicated with third-parties including knowingly false and defamatory statements pertaining to Counterclaimants Dusty Button and Taylor Button.

280.     The factual statements alleged to support the defamatory gist of Counterclaim Defendant Jane Doe 1's statements are false and defamatory.

281.     Counterclaim Defendant Jane Doe 1 published the false and defamatory statements with actual malice.

282.     Counterclaimant Taylor Button is not a public figure and was not a public figure at the time the defamatory statements were made.

283.     Counterclaimant Dusty Button is not a public figure and was not a public figure at the time the defamatory statements were made.

284.     At the time Counterclaim Defendant Jane Doe 1 published her false statements, she had actual knowledge that her statements were false and had reckless disregard for their falsity because she had no objectively reasonable basis for believing her statements were true.

285.     In publishing the false and defamatory statements, Counterclaim Defendant Jane Doe 1 knowingly and intentionally manufactured false information out of whole cloth.

286.     Counterclaim Defendant Jane Doe 1's false and defamatory statements constitute per se in that they tend to injure Counterclaimants Taylor Button and Dusty Button in their trade, business or profession, and they accuse Taylor Button and Dusty Button of serious illegal conduct.

287.     The subject of Counterclaim Defendant Jane Doe 1's statements was no more than an issue of public curiosity.

288.　Counterclaim Defendant Jane Doe 1's statements were of concern to a mass audience, comprised of smaller audiences that tuned into all media channels and publications which Sage Humphries ensured were pushed to those audiences.

289.　Counterclaim Defendant Jane Doe 1's asserted public interest of informing the public about her false story of sexual assault has only remote proximity to the content of her complained-of statements.

290.　Counterclaim Defendant Jane Doe 1 published her statements solely for attention as she has never met either Counterclaimant.

291.　Damages to Counterclaimant Taylor Button and Dusty Button are presumed by law since the defamation is *per se*.

292.　Counterclaim Defendant Jane Doe 1's conduct was willful and intentional.

293.　Counterclaimant Taylor Button is entitled to an award of punitive damages to punish Counterclaim Defendant Jane Doe 1 for her unlawful conduct and to deter her from repeating such misconduct in the future.

294.　Counterclaimant Dusty Button is entitled to an award of punitive damages to punish Counterclaim Defendant Jane Doe 1 for her unlawful conduct and to deter her from repeating such egregious misconduct in the future.

295.　As a direct and proximate result of counterclaim Defendant Jane Doe 1's actions, Counterclaimant Taylor Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

296.　As a direct and proximate result of counterclaim Defendant Jane Doe 1's actions, Counterclaimant Dusty Button suffered negative consequences including complete loss of employment opportunities and severe mental anguish.

297.     As a direct and proximate result of Counterclaim Defendant Jane Doe 1's actions, Counterclaimant Taylor Button has incurred attorneys' fees and costs for the protection of his name and interests.

298.     As a direct and proximate result of Counterclaim Defendant Jane Doe 1's actions, Counterclaimant Dusty Button has incurred attorneys' fees and costs for the protection of her name and interests.

299.     As a direct and proximate result of Counterclaim Defendant Jane Doe 1's actions, Counterclaimant Taylor Button has been injured in an amount exceeding $75,000.00.

300.     As a direct and proximate result of Counterclaim Defendant Jane Doe 1's actions, Counterclaimant Dusty Button has been injured in an amount exceeding $75,000.00.

**SIXTH CAUSE OF ACTION**
**Abuse of Process**

301.     Plaintiffs/Counter Defendants Humphries, Doe 1, Menichino, Gutierrez, DeAngelo and Doe 2 filed the initial Complaint in this matter with an ulterior motive and for an improper purpose.

302.     Specifically, they filed the Complaint (and the subsequent Third Amended Complaint) to entice the media with allegations that the Buttons had been engaging in abhorrent and illegal behavior with their "students" and to ruin the Buttons' reputations with salacious and untrue allegations.

303.     These Plaintiffs/Counter Defendants ensured that the media had a copy of the Complaint before the Defendants/Counterclaimants were even aware they had been sued. This constitutes a willful act in the use of process not proper in the conduct of the proceeding.

304.    Counterclaimants have been damaged in an amount to be determined at trial and irreparably harmed by the conduct of these Counter Defendants who have ruined their lives and their reputations. Counterclaimants should be compensated for the irreparable harm Plaintiffs have caused through their abuse of the Court's proceeding.

305.    Counter Defendant's conduct was willful and made with actual malice. Counterclaimants are entitled to an award of punitive damages and for recovery of their attorneys' fees and costs.

### SEVENTH CLAIM FOR RELIEF
### Civil Conspiracy

306.    Counterclaimants reallege the allegations of the preceding paragraphs as if set forth fully herein.

307.    The named Counter Defendants agreed to conspire to ruin the Buttons' reputations through the filing of the instant lawsuit and by ensuring that the media had copies of the lawsuit before the Buttons even knew that they had been sued.

308.    The named Counter Defendants agreed to abuse process by filing a Complaint with this Court with the sole intention of ruining the Buttons' carefully maintained reputations.

309.    Counterclaimants have been damaged in an amount to be determined at trial and irreparably harmed by the conduct of these Counter Defendants. Counter Defendants have ruined their reputations, and Counterclaimants should be compensated for the harm they have caused through their abuse of the Court's process.

310.    Counter Defendants' conduct was willful, and Counterclaimants are entitled to an award of punitive damages and for recovery of their attorneys' fees and costs.

### EIGHTH CLAIM FOR RELIEF
### Civil Conspiracy

311. Counterclaimants reallege the allegations of the preceding paragraphs as if set forth fully herein.

312. The named counter Defendants agreed to conspire to ruin the buttons' reputations through the filing of the instant lawsuit and by ensuring that the media had copies of the lawsuit before the Buttons even knew that they had been sued.

313. The named Counter Defendants agreed to abuse process by filing a Complaint with this Court with the sole intention of ruining the Buttons' well-known and respected reputations.

314. Counterclaimants have been damaged in an amount to be determined at trial and irreparably harmed by the conduct of the counter Defendants. Counter Defendants have ruined their reputations in such a way that it is impossible to recover what has been lost.

315. Counterclaimants have not only lost their reputations but have lost their homes, their jobs and nearly their lives as Counterclaimants suffered severe mental anguish, harassment, embarrassment and loss of enjoyment of life due to Plaintiff's maliciousness, perjury, actual malice and intentional harm to Counterclaimants.

316. Counterclaimants should be compensated for the harm Plaintiffs have caused through their abuse of the Court's process.

317. Counter Defendant's conduct was will and Counterclaimants are entitled to an award of punitive damages and for recovery of their attorney's fees and costs.

## <u>JURY DEMAND</u>

Defendants/Counterclaimants Mitchell Taylor Button and Dusty Button demand a jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaimants Mitchell Taylor Button and Dusty Button hereby pray that this Court enter judgment as follows:

A.  Entering judgment for Defendants on all claims made against them in the Third Amended Complaint;

B.  Entering an Order directing that Plaintiffs pay Counterclaimants/Defendants' reasonable attorneys' fees and costs pursuant to any applicable law;

C.  For actual damages in an amount to be proven at trial;

D.  For punitive damages in an amount to be proven at trial;

E.  For entire costs of suit and attorney's fees;

F.  For pre-judgment and post-judgment interest on the foregoing sums;

G.  For such other and further relief as the Court deems proper; and

## CONCLUSION

For each and every reason expressed herein, Defendants/Counterclaimants Taylor Button and Dusty Button respectfully request Plaintiff's Third Amended Complaint be dismissed as requested by the argument of the Motion to Dismiss and that Defendants' Counterclaim be GRANTED on all parties named as Plaintiffs/Counter Defendants in this litigation.

Dated this 23rd day of August, 2023,

_____

Mitchell Taylor Button and Dusty Button

(*Pro Se*)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document was filed on August 23rd, 2023 with LV_public_docketing@nvd.uscourts.gov and served via email to all parties.

Respectfully,

_____

Mitchell Taylor Button and Dusty Button

(*Pro Se*)