# EXHIBIT Y

*Button et al v. The New York Times Co. et al*
Complaint

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DUSTY BUTTON AND MITCHELL TAYLOR BUTTON<br><br><br>PLAINTIFFS,<br><br>V.<br><br>THE NEW YORK TIMES COMPANY, JULIA JACOBS, LINDSEY RUFF, SABINA MARIELLA, DAWN SCHNEIDER, DEMETRI BLAISDELL and DAVID MCCRAW<br><br><br>DEFENDANTS. | Case No:<br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Dusty Button and Mitchell Taylor Button, (together, "Plaintiffs") file this Complaint and sue The New York Times Company, Julia Jacobs, Lindsey Ruff, Sabina Mariella, Dawn Schneider, Demetri Blaisdell and David McCraw, (together, "Defendants"), jointly and severally:

### <u>NATURE OF THE ACTION</u>

1. This case is about abuse of power, intimidation and the weaponization of the justice system by attorneys from Boies Schiller & Flexner, who *conspired* and *colluded* with The New York Times Company, ("The Times"), to *unethically* and *unlawfully* violate Plaintiffs' Constitutional rights to due process.

2. This is an action about attorney-media collusion and the unethical and unlawful practices of greedy, fame and power-hungry attorneys who are not interested in the truth or law they pled an oath to uphold and who are confident there will be no consequence to their unlawful, unethical and immoral conduct against innocent victims, such as Plaintiffs.

3. Defendants Lindsey Ruff and Sabina Mariella from Boies Schiller & Flexner, in collaboration with their public relations and communications director, Dawn Schneider and associate and non-party co-conspirator, Sigrid McCawley, unethically **colluded** with journalist Julia Jacobs and The New York Times, to *intentionally* compromise Plaintiffs' ability to prepare a defense against a frivolous lawsuit brought forth against them by publishing a defamatory, front-page article to The New York Times which disclosed a private lawsuit to a mass audience *prior* to Plaintiffs **ever being served** with the complaint.

4. This action is about former Boies Schiller & Flexner associate Demetri Blaisdell, now an attorney for The New York Times Company and Julia Jacobs, who infringed on Plaintiffs' due process, conspired with his former associates from Boies Schiller & Flexner and threatened Plaintiffs in order to impede and *intentionally interfere* with Plaintiffs' rights to due process and ability to seek the justice they deserve including

COMPLAINT AND DEMAND FOR JURY TRIAL

by abusing his power as an attorney in an effort to silence Plaintiffs from coming forward and seeking legal recourse against his client.

5. This action is about Defendant David McCraw, attorney for the New York Times, who colluded with Defendants to interfere in Plaintiffs' ability to timely pursue legal recourse against Julia Jacobs and The New York Times.

6. Journalist for The New York Times Company, Julia Jacobs, conspired and colluded with Boies Schiller & Flexner attorneys and their clients to publish and disclose a private lawsuit against Plaintiffs before Plaintiffs were *ever even served* or had *any knowledge of the lawsuit* or the allegations set forth within the complaint therefore, *intentionally inflicting severe emotional distress on Plaintiffs and their family* including because Plaintiffs were on the front page of The New York Times with their faces directly below a defamatory title stating they committed crimes they never committed, ruining the reputations, careers and livelihoods of Plaintiffs for the foreseeable future.

7. In addition to the collusion between the Defendants, Ms. Jacobs' article about Plaintiffs on July 29th, 2021, was not only defamatory in nature but was *intentionally published prior to service*, in conjunction with the complaint filed by attorneys from Boies Schiller & Flexner, as a favor, in order to completely and *intentionally* cripple Plaintiffs' defense against the false allegations including because **every single contract** of Plaintiffs was *entirely disseminated* before they even knew what the lawsuit was regarding.

8. Following Ms. Jacobs article being published, Plaintiffs *immediately lost everything* they had ever worked for including but not limited to their reputations, careers and

COMPLAINT AND DEMAND FOR JURY TRIAL

business relationships, resulting in the loss of *every asset* they owned or possessed and including the loss of their home which they were evicted from due to the crippled financial state following Ms. Jacobs' article and collusion with Defendants Ruff, Mariella, Schneider and non-party co-conspirator Sigrid McCawley.

9. This case is about Defendants, who exploited their positions of power and influence as attorneys, a globally renowned and frequently televised attorney and non-party co-conspirator, Sigrid McCawley, who orchestrated a false narrative and defamatory foundation in order to assure the careers, businesses, reputations and well- known and respected good names of the Plaintiffs in this case were *entirely decimated* **prior** to bringing forth a fraudulent lawsuit on behalf of their clients thus, *intentionally* crippling Plaintiffs' finances and rendering them incapable of defending themselves against the fraudulent litigation Defendants and their clients *strategically* ensured was published on the world stage *prior* to Plaintiffs ever learning that they were being sued[1].

10. The New York Times Company states it has a "Commitment to Quality Journalism"; however, that is simply not the case here, as Defendant Julia Jacobs intentionally chose to disregard her duties to investigate, write and publish a "story" consistent with

---

[1] On July 29th, 2021, the New York Times published interviews with Sigrid McCawley and her clients, including false and defamatory statements about Plaintiffs - https://www.nytimes.com/2021/07/29/arts/dance/mitchell-button-dusty-button-abuse.html . Plaintiffs received an email from Defendants proving Sigrid McCawley and PR Team member Dawn Schneider arranged an interview at least on one occasion with Julia Jacobs of the New York Times which took place on July 26th, 2021, days prior to the lawsuit being filed with the Court. As discussed further herein, to no coincidence; Plaintiffs contacted Julia Jacobs in 2023 addressing the defamatory article, were referred to her attorney David McCraw who then deferred Plaintiffs to a different attorney who Plaintiffs were led to believe represented to Julia Jacobs; Demetri Blaisdell, former associate of Boies Schiller Flexner LLP, who threatened Plaintiffs upon learning Plaintiffs intended to sue The New York Times and Julia Jacobs.

facts, which were available to her through Defendants who were in possession of those facts, various third-parties and through the public, proving the allegations against Plaintiffs to be false in their entirety prior to publishing her article before Plaintiffs even knew of the complaint[2].

11. Defendant Julia Jacobs conspired and agreed to an arranged interview by and through Dawn Schneider with Sigrid McCawley, Lindsey Ruff, Sabina Mariella and their clients, weeks prior to a written complaint being filed against Plaintiffs, later publishing that article prior to Plaintiffs being served with the Complaint.

12. This case is about attorneys from Boies Schiller & Flexner who *knowingly* violated the model rules of professional conduct by unlawfully and unethically conspiring with the media to publish a lawsuit before the lawsuit was served in an attempt to *intentionally taint any potential jury pool and the public's view of Plaintiffs regardless of the truth or falsity of the article or allegations.* (They are false).

13. This is not a case of Plaintiffs "disagreeing" or "disapproving" false statements published about them in the media; this case is an exemplary example of attorney-media collusion; attorneys with **power, fortune, fame and influence,** who *egregiously* made and amplified *knowingly* false and defamatory statements to a **mass** audience *aggressively*, *proudly, publicly and repeatedly***,** as an **orchestrated attack** to destroy the livelihoods, businesses, careers and reputations of Plaintiffs though targeted deployments of defamation to mass audiences including to those who not

---

[2] According to CPLR 304(a): "A pleading or paper filed in a Court of this state shall not be publicly disclosed or published until the summons has been served and the Defendant has appeared or waived service". This provision ensures that sensitive information about a lawsuit, including the identity of the parties involved and the claims being made, remains confidential until the Defendant has been formally notified and has had an opportunity to respond.

only subscribed to every move that Plaintiffs made in their respective careers but to those who merely received daily news by way of the media and the press in a defamatory global media campaign waged against Plaintiffs.

14. Defendants knew Ms. Jacobs' article against Plaintiffs would spread like wildfire, and it did, across the globe, to the extent of a globally televised interview on a major news publication, which in turn, *immediately* caused further and complete destruction of Plaintiffs' businesses, careers and reputations, resulting in the termination of *all employment* for Plaintiffs then and for the foreseeable future.

15. Defendants' conduct, shown forth in the complaint herein, is nothing more than **proof** that attorneys and media outlets such as Boies Schiller & Flexner associates and The Times have **such an abundance of power** that it allows them to engage in unethical and illegal acts with *no consequence*, leading to the complete destruction of the lives of innocent parties who fall victim to their unlawful, unethical and immoral practices.

## **THE PARTIES**

16. Plaintiff Dusty Button is an individual who resides and is domiciled in Myrtle Beach, South Carolina. Ms. Button is the wife of Plaintiff Mitchell Taylor Button ("Taylor Button", "Taylor").

17. Plaintiff Taylor Button is an individual who resides and is domiciled in Myrtle Beach, South Carolina. Mr. Button is the husband of Plaintiff Dusty Button ("Dusty").

18. Defendant, The New York Times Company, ("The Times"), is a New York corporation with its headquarters and principal place of business in New York. The Times publishes digital and print products, including its core news product, The New York Times, which is available on its mobile applications, on its website

(NYTimes.com), and as a printed newspaper, and associated content such as its
podcasts.

19. Upon belief, Defendant Julia Jacobs is an individual who resides and is domiciled in
New York City, NY and is a journalist with The New York Times in New York City,
NY.

20. Upon belief, Defendant Lindsey Ruff is an individual who resides and is domiciled in
New York City, NY and is an attorney with Boies Schiller & Flexner LLP in New
York City, NY.

21. Upon belief, Defendant Sabina Mariella is an individual who resides and is domiciled
in New York City, NY and is an attorney with Boies Schiller & Flexner LLP in New
York City, NY.

22. Upon belief, Defendant Dawn Schneider is an individual who resides and is domiciled
in New York City, NY and is an associate with Boies Schiller & Flexner LLP in New
York City, NY.

23. Upon belief, Defendant Demetri Blaisdell is an individual who resides and is
domiciled in New York City, NY and is an attorney for The New York Times
Company.

24. Upon belief, Defendant David McCraw is an individual who resides and is domiciled
in New York City, NY and is an attorney for The New York Times Company.

## <u>JURISDICTION AND VENUE</u>

25. Plaintiffs are citizens of the State of South Carolina for purposes of diversity
jurisdiction under 28 U.S.C § 1332.

COMPLAINT AND DEMAND FOR JURY TRIAL

26. Defendants are citizens of the state of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

27. Because The Times' principal place of business and headquarters is in this District, the injuries alleged herein from Defendants' unlawful conduct foreseeably occurred in this District.

28. Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(1) and (b)(2). The New York Times Company and Defendants reside and are subject to personal jurisdiction in New York.

29. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (b)(3) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district by virtue of the transmission and publication of the false and defamatory statements in this district (and elsewhere) and also because Defendants are subject to this Court's personal jurisdiction with respect to this action.

30. This Court possesses personal jurisdiction over Defendants on the grounds that Defendants committed a tortious act including but not limited to defamation in this state, (as alleged in this Complaint), and on the grounds that Defendants caused injury to Plaintiffs within the state arising out of an act or omission by Defendants outside of this state, while at or about the time of the injury, products, materials, or things processed, serviced, or manufactured by Defendants were used or consumed within this state in the ordinary course of commerce, trade, or use.

31. This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiffs

COMPLAINT AND DEMAND FOR JURY TRIAL

and Defendant and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

## **BACKGROUND**

32. Plaintiff Dusty Button was a world-renowned ballet dancer who trained at the Jacqueline Kennedy Onassis School at the American Ballet Theatre in New York City. In 2007, she joined the Royal Ballet School in London and in 2008 she joined Birmingham Royal Ballet in England.

33. In 2011, Ms. Button danced with American Ballet Theatre.

34. Ms. Button is best known for her work with the Boston Ballet, which she joined in 2012 and was promoted to their highest position of principal ballerina in 2014.

35. Ms. Button was Red Bull's first and only ballet athlete and has been published in media publications across the globe, positively influencing hundreds of thousands of people nationally and internationally, including by performing and teaching in over thirty different countries and across the United States.

36. Plaintiff Dusty Button's Instagram account, @dusty_button, at the time of the events described herein, amassed nearly half of a million followers and subscribers.

37. Ms. Button deleted her social media account in 2021 after succumbing to trauma from severe cyber bullying and harassment which Plaintiff endured as a direct result of Defendants' conspiracy, collusion with the media and defamatory statements, in an unethical play to a mass audience and waging a defamatory global media campaign against Dusty to destroy her livelihood, career, reputation and business and to gain attention and traction for Defendants' clients' false and fraudulent complaints.

38. Plaintiff Mitchell Taylor Button, ("Taylor Button"), was one of the world's most influential custom Ferrari and military vehicle designers and builders for seven years, approximately from 2014 – 2021, with his work having been published in media publications across the globe for his automotive design, builds and work in the industry.

39. Plaintiff has positively influenced hundreds of thousands of people nationally and internationally and has been procured from global organizations for speaking engagements and commissions that continue to live on with his legacy today despite the destruction of his life's work by Defendants.

40. Plaintiff Taylor Button's Instagram account, @button_built, at the time of the events described herein, amassed nearly half of a million followers and subscribers.

41. Mr. Button deleted his social media account in 2021 after succumbing to trauma from severe cyber bullying and harassment which Plaintiff endured as a direct result of Defendants' conspiracy, collusion with the media and defamatory statements, in an unethical play to a mass audience and waging a defamatory global media campaign against Taylor to destroy his livelihood, career, reputation and business and to gain attention and traction for Defendants' clients' false and fraudulent complaints.

42. Plaintiffs' names and likeness was their business and generated one hundred percent of their yearly revenue whereas, Plaintiffs, themselves and what they provided to their respective industries was solely based on what they provided as their name brands, known as Dusty Button, Taylor Button, Mitch/Mitchell Button, Mitchell Taylor Button, "The Buttons", Button Built, Button Brand, Bravado by Dusty Button, Meisturwerk and Meisturwerk Machinen.

43. Plaintiffs' established businesses, goods and services were directly sourced and provided from their good names, talent, expertise, reputations, skills, manufacturing and marketing capabilities, which were completely destroyed by Defendants and their abuse of power to influence the media, the public, the press and any potential juror as famous, world-renowned attorneys and one of the largest and most influential media publications in the world.

44. A culture of defamation permeates and plagues the #MeToo movement, particularly in the entertainment industries and has in turn, destroyed the credibility of real victims everywhere, while simultaneously mocking the judicial system and enabling people to weaponize the civil justice system with false accusations, which ultimately have the same consequence on innocent lives as they would if they were true accusations against guilty parties, rendering Courts and Parties afraid to defend against claims of this magnitude due to the inevitable nuclear social fallout.

45. The culture of defamation has dialed the integrity of civil litigation back decades, as recently seen in cases around the world such as Depp v. Heard[3], Bauer v. Hill[4] and recently, the Eleanor Williams[5] case in England, all of which proved innocent parties' lives were completely destroyed by false and defamatory statements, not only made through frivolous litigation, but in the media, the news and in the press.

46. Other prominent dancers have been publicly defamed and severely harassed in past years, through fraudulent and defamatory statements online including but not limited to British dancer and choreographer Liam Scarlett, who sadly took his own life as a

---

[3] Depp v. Heard, *No. CL-2019-2911 (Va. Cir. Ct. Jul. 25, 2019)*
[4] Trevor Bauer v. Lindsey C. Hill *(8:22-cv-00868) District Court, C.D. California*
[5] https://www.judiciary.uk/wp-content/uploads/2023/03/R-v-Eleanor-Williams-sentencing.pdf

11
COMPLAINT AND DEMAND FOR JURY TRIAL

direct cause of false and defamatory statements in the media and through industry gossip. "*We feel Liam would not have taken his life if his name hadn't been dragged through the press with inaccurate allegations*", stated by Deborah Scarlett, Liam's mother.

47. Liam Scarlett was *cleared of any wrongdoing*, but only *after* his death which included the false and defamatory statements of misconduct with children, which were **all proven to be false statements** but which were never acknowledged or rectified by any media source to date including but not limited to The New York Times Company[6].

## **STATEMENTS OF FACT**

48. On July 29th, 2021, Julia Jacobs published an article about Plaintiffs in the "Arts and Culture" section with the title, "*Former Dance Instructor Accused of Sexual Assault in Lawsuit*".

49. Defendant's article was published *prior* to Plaintiffs *ever being served* with the complaint or Plaintiffs having *any knowledge* of the lawsuit which had been filed against Taylor but which named his wife, Plaintiff Dusty Button, as a non-party co-conspirator.

50. The lawsuit was *intentionally* served on Plaintiff Mitchell Taylor Button *after* Ms. Jacobs' article was published.

---

[6] The New York Times even posted a disgusting "follow up" article following Liam Scarlett's suicide with the title "Liam Scarlett, Choreographer Accused of Sexual Misconduct, Dies at 35"…
https://www.nytimes.com/2021/04/17/arts/dance/liam-scarlett-dead.html .

51. In fact, the summons for Mr. Button had not yet even been issued until after Ms. Jacobs' article was published.

52. Two years later, Plaintiffs were provided an email which proved that attorneys from Boies Schiller & Flexner, Lindsey Ruff and Sabina Mariella in conjunction with their associate and non-party co-conspirator Sigrid McCawley and associate and Public Relations and Communications Director, Dawn Schneider, made an agreement arranging for Julia Jacobs to interview their clients for Ms. Jacobs' article during one of many telephone interviews on July 26th, 2021, days prior to filing the complaint with the Court.

53. Prior to July 26th, 2021, Ms. McCawley and her associates, including Ms. Schneider had already arranged prior meetings with Ms. Jacobs, as testified to by non-party and Defendant in a separate litigation with Plaintiffs, Madison Breshears[7] who took matters into her own hands by publishing an entire defamatory and harassment campaign against Plaintiffs on May 13th, 2021 as she "*knew the article was coming out*" and "*wanted to be the first to break the story*", as explained further herein.

54. Plaintiffs have sued Ms. Breshears who has admitted, now three years later, that she would not have made the defamatory posts on an anonymous Instagram account if she had known Plaintiffs were "going to sue her".

55. Madison Breshears is the friend of Sage Humphries, (one of the subjects of Ms. Jacobs' article and client of attorneys from Boies Schiller & Flexner), who "*knew the article was coming out in the New York Times*" **months prior** to the article being published, leading her to post false and defamatory statements against Plaintiffs on

---

[7] See case 1:24-cv-03757-MKV – Button et al v. Breshears

May 13th, 2021 via a viral Instagram bullying and harassment campaign against Plaintiffs so she would be the first to "*break the story*".

56. The following defamatory, harassing and online bullying campaign was waged against Plaintiffs on May 13th, 2021 by Madison Breshears in collusion with her friend Sage Humphries, Ms. Humphries' attorneys and Julia Jacobs.

57. May 13th, 2021, was the most traumatizing day of Plaintiffs' lives until Ms. Jacobs' article was posted on July 29th, 2021; the trauma and depression which followed nearly led Plaintiffs to take their own lives as a direct and proximate result of Defendants' conduct.

### *Defendants' Unethical Collusion with Non-Party, Madison Breshears on May 13th, 2021*

58. Around 9:00pm EST on May 13th, 2021, Plaintiff Dusty Button received an initial attack of two false and defamatory public comments on her Instagram profile page in response to a video she posted of herself dancing from Madison Breshears' personal Instagram account with the username, @mjbreshears, which stated the following:

"stop preying on young girls" and "feel like y'all should know she can't keep a ballet job bc she grooms young girls into sex acts with herself and her husband".



COMPLAINT AND DEMAND FOR JURY TRIAL

59. Within *seconds* of Plaintiffs blocking and reporting, (what Plaintiffs now know to be Madison Breshears' personal account), @mjbreshears, the following defamatory statements were posted by Madison Breshears on her anonymous, yet famous account @Real_World_Ballerina:

### POST ONE BY MADISON BRESHEARS

"PSA: DUSTY BUTTON IS A PREDATOR"



### POST TWO BY MADISON BRESHEARS

"This keeps getting removed. And she blocked me. But if you follow Dusty Button, you should know she can't keep a ballet job because she grooms young girls to engage in sex acts with herself and her husband".



**POST THREE BY MADISON BRESHEARS**

"[toxic emoji], if u or someone u know has been victimized by dusty_button, u aren't alone.

She can't keep a ballet job because she grooms young dancers for sex acts with herself and

COMPLAINT AND DEMAND FOR JURY TRIAL

her husband. This will probably get removed, she has managed to block and remove my other posts, but I hope at least someone can see this [toxic emoji]".



real_world_ballerina ☢️☢️☢️if u or someone u know has been victimized by dusty_button, u aren't alone. She can't keep a ballet job because she grooms young dancers for sex acts with herself and her husband. This will probably get removed, she has managed to block and remove my other posts, but I hope at least someone can see this. ☢️☢️☢️

**POST FOUR BY MADISON BRESHEARS**

"I have friends who have personally been victimized, or known someone victimized by @dusty_button. Don't give her a platform".

**POST FIVE BY MADISON BRESHEARS**

"I don't expect anyone to take my word on faith! This is a serious accusation, and you are justified in being skeptical. From my end, knowing what I know (but am unable to disclose in

detail), I feel like the right thing to do is at least warn you guys. If anyone is at least a little

more careful or cautious around her, it's worth it to me."



60. Madison Breshears posted near exact verbiage of what would be written in the written

complaint filed by Defendants McCawley, Ruff and Mariella and published by Julia

Jacobs **three months later**.

61. Madison Breshears is also a **licensed attorney** in New York, previously working for Davis Wright Tremaine.

62. On May 13th, **2024**, Plaintiffs filed a federal lawsuit against Madison Breshears for defamation, civil conspiracy and cyber harassment amongst other claims, which is currently pending in the Southern District Court of New York.

63. On May 24th, 2024, Plaintiffs filed a federal lawsuit against non-party to this litigation and co-conspirator, Sigrid McCawley, in the Southern District Court of Florida for defamation and civil conspiracy, pertaining to her *many* false and defamatory statements made to the media which fall outside her first amendment rights and privilege as an attorney, equally stating, (like Ms. Jacobs), that Plaintiffs were "criminally charged", amongst other false, defamatory and destructive statements[8]; whereas, a trial date has already been set for November of 2025.

64. Defendants' conspiracy and collusion is clear and intentional.

65. Defendant Julia Jacobs continued her collusion with Defendants by stating exactly what Ms. McCawley stated in her own defamatory statements and that is that Plaintiffs were criminally charged.

66. Plaintiffs have never been criminally charged with anything and Ms. Jacobs' false statement led readers to believe Plaintiffs had been charged with a crime.

67. As a direct and proximate result of the false, defamatory and misleading statements made by Boies Schiller & Flexner attorneys and their clients and Ms. Jacobs' decision to *intentionally harm Plaintiffs* by making a false statement of fact in her article that Plaintiffs "*denied the charges*", the following hate pages and defamatory statements

---

[8] See case: 0:24-cv-60911-DSL - Button et al v. McCawley

COMPLAINT AND DEMAND FOR JURY TRIAL

were made by innumerable third-parties about Plaintiffs as they were misled to believe

that Plaintiffs were "charged" and going to prison:

- "Hey Dusty! I hope prison is everything you hope for! Maybe those tilts and

competition tricks will come in handy behind bars?! Best of luck!" – Instagram user -

@lauramarbs



- "@schonraker_foto him and the missus have been too busy BF'n little girls to make

social media posts it would appear" – Instagram user @the_mechanicalanimal.



- "Hi! According to a recent post by @real_world_ballerina, dusty button is a predator who is not someone people should be looking up to! Just spreading the word." – Instagram User - @cheryltanxr



- "#dustybutton You child rap1st P#S. You need to be thrown in a wood chipper." – Instagram User - @dunerooster

- "Child rapist POS. You need to be thrown in a wood chipper." – Instagram User - @dunerooster



- As another example, (depicted by the screenshot below), numerous hate pages and accounts were created as a direct result of Defendants' conspiracy and collusion with

the media and the intentionally misleading statements that Plaintiffs were "charged"

and going to prison.

• Username – **@dusty_button_hatepage** (depicting Plaintiff Dusty Button in prison).





68. This is just a mere *fraction* of the communications, notifications, threats and
harassment which Plaintiffs received following Defendants' defamatory post, all of
which Plaintiffs have documented and preserved for discovery.

69. On May 27th, 2024, Ms. Breshears stated on a phone call to Plaintiffs that she had not
spoken to Boies Schiller & Flexner's clients prior to her defamatory statements being
made on May 13th, 2021, proving she conspired with non-party co-conspirator Sigrid

McCawley and Defendants Ruff, Mariella and Jacobs to make her online, defamatory publications prior to the complaint being filed as the information received by Ms. Breshears was identical to the defamatory statements made by Ms. McCawley and but which are not similar to the complaint but which created a platform for the article to come.

70. Defendants Ruff and Mariella, in conjunction with non-party co-conspirator, Sigrid McCawley colluded with their client, Ms. Breshears and Ms. Jacobs to produce and publish an article which supported the narrative that Ms. McCawley forced upon the public and any potential jury, intentionally crippling Plaintiffs defense.

71. In fact, Ms. Jacobs' title to her article even states, "*former dance instructor*"; Plaintiff Mitchell Taylor Button has not danced or instructed dance since 2010.

72. As previously stated, at the time of the events herein, Mr. Button was one of the world's most influential custom Ferrari and military vehicle designers and builders for seven years, approximately from 2014 – 2021, with his work having been published in media publications across the globe for his automotive design, builds and work in the industry.

73. The New York Times publication was detrimental to Plaintiffs as it not only contained false and fraudulent allegations related to the frivolous litigation, but it intentionally and falsely stated that Plaintiffs, together, abused Ms. Humphries and Ms. Menichino as a direct result of Sigrid McCawley's and Defendants' Ruff, Mariella and Jacobs' manipulative narrative which was so desperately forced on the public as comparison to Epstein and Maxwell, as the Boies Schiller Flexner firm had so recently received such fame and notoriety for.

74. Defendants Ruff and Mariella in conjunction with Ms. McCawley, knew their narrative to be false but colluded with Julia Jacobs to produce and publish a "story" which would corroborate their clients' false allegations and further, support their false narrative against Plaintiffs.

75. The New York Times article was reposted hundreds of thousands of times, additionally causing third parties within Plaintiffs' industries to further defame them including that it was posted to at least three different platforms whereas, each platform consists of a different audience[9].

76. Madison Breshears' involvement in the defamatory and harassing online campaign against Plaintiffs, paired with her testimony (on a legally recorded phone call), the date on which Boies Schiller & Flexner filed the July 28th, 2021 complaint and Ms. Jacobs' timing of the published article without Plaintiffs even having an issued summons or complaint in their hands proves beyond any reasonable doubt that Defendants strategically, unethically and unlawfully conspired and colluded against Plaintiffs to **completely destroy their livelihoods and defense against them.**

77. To further prove the strategic conspiracy against Plaintiffs, Defendants from Boies Schiller & Flexner filed their clients' (frivolous) complaint **on the day their clients' statute of limitations expired**, twelve years later.

---

[9] In *Kanerak v. Bugliosi,* an allegedly libelous book that was republished in paperback form, although identical in form and content to the earlier hardcover edition, was intended to and did reach a new group of readers, and therefore constituted the basis for a new cause of action. The Second Restatement of Torts states that the single publication rule does not include separate aggregate publications on different occasions. In these cases, if the publication reaches a new group, the repetition justifies a new cause of action. The originator of defamatory matter may be liable for each "repetition" of the defamatory matter by a second party "if he could reasonably have foreseen the repetition."

COMPLAINT AND DEMAND FOR JURY TRIAL

78. Ms. Jacobs' article *was even published prior* to a summons being issued to Plaintiff Mitchell Taylor Button on July 29th, 2021.

79. Two years later, on August 23rd, 2023, Plaintiffs discovered that attorneys and communications director from Boies Schiller & Flexner, Dawn Schneider, colluded with Ms. Jacobs and The New York Times Company to *intentionally* ensure Ms. Jacobs' article about Plaintiffs was published *prior* to the Complaint being filed and *prior* to Plaintiffs being served with the Complaint.

80. Aside from the allegations stated within the article being reliant on false allegations in their entirety, Ms. Jacobs' article consists of defamatory statements for example, her article intentionally misleads and confuses readers to believe that Plaintiffs had been "charged" with crimes and were going to prison as she makes an entirely false statement:

> *A lawyer for the couple said that they* ***denied the charges****.*

81. Ms. Jacobs intentionally misled readers to believe Plaintiffs had been "charged" with a crime, resulting in created hate pages against Plaintiffs, death threats and confusion whether or not Plaintiffs were charged with a crime; they were not.

82. Plaintiffs' attorney actually stated to Ms. Jacobs:

> "*Taylor and Dusty Button categorically deny these baseless claims and they look forward to the opportunity through court proceedings to disprove all of the plaintiffs' false and fraudulent allegations.*"

83. Ms. Jacobs knew that she was intentionally misleading readers, including any potential juror as she quoted Plaintiffs' attorney in the article and then made the decision to state that "*a lawyer for the couple said that they denied the charges*".

84. Ms. Jacobs additionally knew this was a misleading statement of fact which was false, defamatory and in fact, never said by anyone, as she appropriately leaves the statement out of quotations, proving it was an additional misleading and maliciously crafted statement made for shock value.

85. On October 1st, 2023, Plaintiff Dusty Button called Ms. Jacobs to address the defamatory nature of her article which was legally recorded as Plaintiffs reside in a one-party consent state.

86. On the call, Ms. Jacobs referred Plaintiffs to contact her attorney, Defendant David McCraw, to address any questions or concerns regarding her July 29th, 2021, article and her collusion with Boies Schiller Flexner attorneys stating:

    1) "*Because this is a litigation I should really discuss with our attorney*". And;

    2) "*Let me talk to our counsel to let me know how to proceed here*". Plaintiff Dusty Button proceeded to ask Ms. Jacobs if Sigrid McCawley informed Ms. Jacobs of the lawsuit prior to the lawsuit actually being served whereas, Ms. Jacobs' response was as follows:

        "*Okay… so… yea.*";

87. Ms. Jacobs further stated to Plaintiffs that if they wanted to send her an email, she "*can make sure that gets to our lawyer who should be dealing with these types of matters.*"

88. As seen from the forementioned statements, Ms. Jacobs confirmed attorneys and Defendants from Boies Schiller & Flexner conspired and colluded with Ms. Jacobs prior to the lawsuit ever being served on Plaintiffs to produce a narrative that was false and defamatory in its entirety.

89. On October 2nd, 2023, Ms. Jacobs sent a text message to Plaintiff Dusty Button with Defendant David McCraw's contact information.

90. On November 5th, 2023, Plaintiffs emailed Mr. McCraw the following message:

*Good evening David,*

*I am reaching out to you in regard to a federal civil litigation in Nevada in which my husband and I are Pro se Defendants against Boies Schiller Flexner in the case Humphries et. al v. Button (2:21-cv-01412-ART-EJY). I was given your contact information by Julia Jacobs who I spoke to very briefly a couple of weeks ago on the phone and stated we should contact you directly in regard to her article (which I have pasted below), as she is listed as a witness on Initial Disclosures for this case. We have also received communications pertaining to Ms. Jacobs in discovery and did have some questions regarding her involvement with Boies Schiller Flexner and Plaintiffs involved in the case, particularly the communications and publishing of her article prior to my husband and I ever being served with this lawsuit.*

COMPLAINT AND DEMAND FOR JURY TRIAL

*I did attempt to ask a few questions on the phone but Ms. Jacobs referred us to you for these questions and other relevant documents to this litigation. I did follow up with Ms. Jacobs via text message and am happy to provide those communications if necessary but respectfully, we are reaching out to you per her request. My husband and I were issued a subpoena for Ms. Jacobs by the Federal District Court of Nevada for the Production of Documents and are happy to have that served however, as she is represented by Counsel as many others have been, we know how daunting it is to be served publicly and really just have a few questions in relation to our Counterclaim against Ms. Humphries and Ms. Menichino regarding Ms. Jacobs' involvement, as well as her initial involvement with Boies Schiller Flexner regarding the article which was posted on July 28th, 2021. Our intentions are solely to perform our due diligence pertaining to witnesses as we are nearing the end of this litigation and will be pursuing other litigation and want to ensure all facts surrounding parties are accurate and absolute.*

*Please let me know if you will accept the subpoena via email or prefer personal service on Ms. Jacobs, or if (like others) you would prefer questions via email rather than service of the subpoena to Ms. Jacobs. If you or Julia Jacobs have followed our case, you'll know that we have enjoyed (though pro se), the last year battling such a corrupt firm and while they have now finally accepted the reality that their litigation was entirely frivolous and thus asked that we end this via a settlement conference, we have no intention of allowing their corruption and misconduct to go without consequence... misconduct and corruption that we believe you, yourself are all too*

*familiar with following David Boies' behavior with the New York Times on multiple*

*occasions and particularly in 2019.*

*If you prefer a phone call, my number is 310-499-8930. We appreciate your time.*

*Thank you,*

*Dusty and Taylor Button*

*(Pro se)*

https://www.nytimes.com/2021/07/29/arts/dance/mitchell-button-dusty-button-abuse.html

91. On November 8th, 2023, Plaintiffs received a response however, the response was not from Defendant David McCraw and instead, the response was from Defendant Demetri Blaisdell, "attorney for Ms. Jacobs" and *former associate* of Boies Schiller & Flexner LLP, (during the time in which Ms. Jacobs' article was published in 2021). The response was as follows:

*Ms. Button,*

*David forwarded your message to me**. I represent Ms. Jacobs so please contact me instead of Ms. Jacobs about this going forward**. Please let me know when you are available to speak by phone. As it stands, I can speak between 1:00 and 4:30 pm Eastern today. Thanks.*

*Best,*

*Demetri*

92. Following Plaintiffs' further email communications with Defendant Blaisdell, he additionally stated, "***I do represent** Ms. Jacobs **personally, as well as The Times**, regarding this matter. I work with David but **I'll be handling this."***

93. At 2:30pm on November 9th, 2023, Plaintiff Dusty Button spoke with Defendant Blaisdell for nearly an hour and a half whereas, Mr. Blaisdell made intentionally intimidating legal threats against *pro se* Plaintiffs on the phone call and unethically provided *pro se* Plaintiffs with unsolicited legal advice regarding Plaintiffs' litigation and the matters with his own client, which is the *modus operandi* of any attorney at Boies Schiller & Flexner LLP.

94. The following statements were made during a legally recorded phone call with Mr. Blaisdell on November 9th, 2023 on or around 2:30pm[10]:

- "*I'm kinda sposed to talk to a lawyer instead of you*".

- "*There's a few reasons why we are not inclined to go there*", (referring to Plaintiff Dusty Button's statement inquiring about the very questions Ms. Jacobs stated would be answered by her attorney, who then stated he was "*not inclined to go there*".

- "*We're not going to be waiving service or attempting an alternative method*".

- "*If you do decide to proceed, you'll need to **serve that on me because I am Ms. Jacobs lawyer**".

- "*To inform you of some things that I'm not sure you're aware of, there are shield laws in New York and Nevada which make it very difficult or impossible to get information that journalists have gathered in the course of their duties and so if you do try to*

---

[10] Plaintiffs are more than willing to provide the Court with the entire phone call on November 9th, 2023. The forementioned statements are the most relevant to this action in which Mr. Blaisdell intentionally threatened Plaintiffs to impede their defense and ability to discover imperative information.

*proceed down this ave[nue] I think it is extremely unlikely that you will be able to get*

*any documents or any information from my client."*

- *"I'm providing you with this information not to threaten you but just to let you know what you'd be facing in trying to get this information"*

- *"It really does sound like the information that you're looking for is exactly the information that's protected under the shield laws…"*

- *"Who my client spoke with and who Lindsey, (*referring to Defendant Ruff*), spoke with and the contents of those conversations, those are all exactly what is protected*".

- *"I would urge you to reconsider".*

- *"I do not think this will be a fruitful thing for you".*

- *"I don't want you to waste your time".*

- *"We're not going to make me Jacob's available on an informal or formal basis in this matter".*

95. Following the phone call with Mr. Blaisdell, Plaintiffs received the following email from Mr. Blaisdell:

*Ms. Button,*

*Thank you for speaking with me today. As we discussed, **my client Ms. Jacobs will not be providing any information regarding this matter and we will oppose any attempt to seek discovery from her via a subpoena**. Should you choose to serve a subpoena, you will need to serve it on me as Ms. Jacob's lawyer. Unless I hear from you further, **we will consider this matter closed**.*

*Best,*
*Demetri*

96. Mr. Blaisdell "closed the door" on a matter that was still very much relevant and open to *intentionally intimidate* and prevent Plaintiffs from further communication in order to withhold imperative information regarding *his* client and the unethical and unlawful collusion between Defendant Julia Jacobs and his former associates, Defendants McCawley, Ruff, Mariella, and Schneider.

97. Following Plaintiffs' phone call with Mr. Blaisdell, Plaintiffs conferred with Defendants McCawley, Ruff and Mariella to verify whether or not they communicated with their former associate Demetri Blaisdell whereas, they verified Mr. Blaisdell had reached out to them to inform them of Plaintiffs' communications and that Plaintiffs intended to serve a subpoena on Ms. Jacobs *prior* to the phone call with Ms. Button on November 9th, 2023.

98. On January 29th, 2024, following the conducted deposition of one of Boies Schiller Flexner's clients who was the subject of Ms. Jacobs' articles, Plaintiffs reached out to Mr. Blaisdell regarding the previously discussed retraction in Ms. Jacobs' New York Times article written on July 29th, 2021 about Plaintiffs, giving ample opportunity for that previously discussed retraction to take place.

99. Instead of Mr. Blaisdell providing a time for a discussion regarding the very retraction he proposed, he proceeded to give unsolicited legal advice regarding what could or could not be shared from the deposition, informing Plaintiffs of a protective order in their own litigation which was not of concern to Mr. Blaisdell particularly considering the discussion was not relevant to "sharing" information about that deposition stating, "As we have discussed previously, the protective order may limit what you are able to share with me regarding any recent deposition testimony".

100.    First, Plaintiffs had never mentioned a protection order; Second, Plaintiffs never stated they would be sharing deposition testimony with Mr. Blaisdell, nor did they intend to as they are aware of their own litigation and the procedures within that litigation however, Mr. Blaisdell should not be aware of any protection order in a litigation he is not involved it; Third, it is apparent that every word stated by Plaintiffs to Mr. Blaisdell was passed to the attorneys at Boies Schiller & Flexner who are still representing clients against Plaintiffs in a separate litigation which Mr. Blaisdell has no involvement in but who intentionally impeded upon.

101.    Instead of Mr. Blaisdell addressing the previously discussed retraction of his clients' article he stated, "*I disagree with your characterizations of Ms. Jacobs's reporting. The story was a fair account of the lawsuit that contained a statement **on behalf of you and Mr. Button**.*"

102.    As mentioned in the forementioned statements, Plaintiffs *were not even aware* of any lawsuit against them prior to or at the time Ms. Jacobs' article was published; *even if* they had been given the opportunity to "comment", that "comment" would have been a singular statement made with no context relevant to a lawsuit which Plaintiffs were not only unaware of but did not yet have in their possession.

103.    Further, *even if* Plaintiffs had been given the opportunity to "comment" on Ms. Jacobs article, Ms. Jacobs had already made the intentional decision to neglect her duties in investigating the allegations whereas, there was publicly available information and documentation proving the allegations to be false thereby, proving that Ms. Jacobs intentionally and knowingly published an article for shock value while

colluding with attorneys from Boies Schiller & Flexner to assist them in gaining an advantage in litigation.

104.     Moreover, it would not have mattered if Plaintiffs were given the opportunity to "comment" on a story which was already written, which contained false accusations that Ms. Jacobs would have known about had she been diligent in her duties to investigate as a journalist; as Sigrid McCawley and her associates from Boies Schiller had already colluded with Ms. Jacobs to produce and publish false and defamatory allegations including because Ms. McCawley and her associates intentionally withheld imperative documents which would have shown the lawsuit filed on July 28th, 2021, in its entirety… was fraudulent[11].

105.     Defendants McCawley, Ruff, Mariella and Schneider knew that the allegations stated within the complaint were frivolous and false in their entirety, intentionally neglecting to provide any documentation to support the allegations listed in the complaint and further, to support the article written by Ms. Jacobs.

106.     Defendants knew the article written by Ms. Jacobs prior to Plaintiffs being served, would cripple Plaintiffs defense against the fraudulent and heinous accusations as they knew Plaintiffs were highly respected and sought after in their respective industries; knew the misleading title of the article would destroy Plaintiffs' reputations and that it would result in the complete dissemination of Plaintiffs' careers and

---

[11] On February 17th, 2023, Honorable Judge Traum entered an Order in Nevada denying Sage Humphries' (client of Boies Schiller &Flexner attorneys and Defendants listed herein; and subject of Ms. Jacobs' article), motion to dismiss Dusty and Taylor Button's defamation claim against her whereas the Court stated: "*Based on the details herein and in lights of the record as a whole, the Court denies Sage Humphries' Motion to Dismiss the counterclaim of defamation per se.*"

COMPLAINT AND DEMAND FOR JURY TRIAL

business relations but colluded to produce and publish the article anyway to gain an advantage in the litigation against Plaintiff's.

107.     Ms. Jacobs' statement at the end of her article stating, *A lawyer for the couple said that they denied the charges*, is not only false in its entirety as their previous attorney did not in fact make this statement on behalf of the Buttons; Ms. Jacobs intentionally stated there were "charges" against Plaintiffs, leading the public and any potential juror to believe that Plaintiffs were charged with a crime.

108.     Plaintiffs have never been charged with a crime nor have they ever had pending charges against them for any crime, as they have never committed a crime.

109.     As previously stated, what Plaintiff's previous attorney actually stated was:


*"Taylor and Dusty Button categorically deny these **baseless claims** and they look forward to the opportunity through court proceedings to disprove all of the plaintiffs' false and fraudulent **allegations**."*


110.      As seen in the forementioned statement, Plaintiffs' former attorney never mentioned any statement about "charges" or the Plaintiffs "being charged", as there was no such statement and instead, there were two statements regarding the "claims" and "fraudulent allegations".

111.     Ms. Jacobs' choice of the word "charges" was intentional, defamatory and false in its entirety.

COMPLAINT AND DEMAND FOR JURY TRIAL

112.  Ms. Jacobs' article was published on The New York Times Instagram page whereas, it was posted to their 81 million followers and reposted to hundreds of thousands of various other third-party Instagram accounts.

113.  Ms. Jacobs' article was republished hundreds of times to various websites, social media platforms and republished in various other third-party newspapers, magazines and digital online platforms including but not limited to Instagram, TikTok, Snapchat, X Corp., Facebook, Reddit and LinkedIn.

114.  As a direct and proximate result of Ms. Jacobs' article, it encouraged and inspired a woman who Plaintiffs have never met, seen or heard of to "come forward" with allegations which are not only literally and physically impossible but which are the most heinous allegations of them all.

115.  This woman who Plaintiffs have never met in their lives read the article written by Ms. Jacobs and immediately came forward, filing her complaint against Plaintiffs on September 23rd, 2021, plagiarizing one of Julia Jacobs' subject's story in the complaint as a direct result of Ms. Jacobs' article.

116.  The media, i.e. The New York Times, supported the false narrative created by the attorneys at Boies Schiller Flexner, causing extreme distress to Plaintiffs who have now litigated against a woman they have never met for three years to the date[12].

117.  On July 22nd, 2024, Plaintiffs emailed Demetri Blaisdell once more stating:

*Mr. Blaisdell,*

---

[12] Plaintiffs have filed a separate Federal Case pertaining to Boies Schiller & Flexner's client whom they have never met, seen or heard and are additionally in communication with law enforcement regarding her criminal activity which attorney's from Boies Schiller & Flexner have supported after knowing her allegations are impossible and that she has never met Plaintiffs.

*Are you still active counsel on behalf of Julia Jacobs and the New York Times and therefore accepting service on their behalf?*

*Thanks,*

*Buttons*

118. On July 23rd, 2024, Mr. Blaisdell replied stating:

*Ms. Button,*

*Assuming this concerns the Humphries case, my colleague David (copied) and I represent The Times and Ms. Jacobs. What is it you intend to serve on our clients?*

*While we are authorized to accept service on behalf of The Times and Ms. Jacobs, you will need to go through the ordinary steps to serve whatever it is you are serving. In other words, we will not be waiving service or accepting service by email.*

*As I'm sure you are aware, the discovery period in the Humphries case closed some time ago and the Court has not permitted you to serve additional subpoenas on non-parties.*

*Best,*

*Demetri*

119. As seen in the forementioned statements sent by Defendant Blaisdell, he once again offers unrepresented Plaintiffs *unsolicited legal advice* regarding a litigation in which he is not involved in and further addresses discovery matters in which his former associates reminded him was "closed" and that the "Court has not permitted" Plaintiffs to "serve additional subpoenas on non-parties".

120.    Defendant Blaisdell once again, corresponded with Defendants Ruff, Mariella and non-party co-conspirator Sigrid McCawley to intimidate and prevent Plaintiffs from pursuing this instant litigation and any discovery matters associated with "his client", Julia Jacobs.

121.    Plaintiffs replied to Mr. Blaisdell and stated the following:

> Demetri,
>
> Your assumptions are incorrect as this service is not relevant to the, as you call it, "the Humphries case" and therefore, the close of discovery is irrelevant. It would serve in the best interest of all parties to refrain from further assumptions "as I'm sure you're aware", we would understand the close of discovery in "the Humphries case" more than anyone, including your colleague Ms. McCawley who created the "Humphries case" yet struggles to remember the names of any of the clients she recruited within that case.
>
> As you have most likely been informed by your colleagues, we are not interested in unsolicited legal advice so the question remains unchanged, much like our position since your client published her defamatory article in 2021; do you and David accept legal service, (in the form of a court ordered summons), on behalf of Julia Jacobs and the New York Times and by legal service of course, that is literal and thus, does not mean any waiver or service via email or otherwise but proper service as ordered by the Court, serving legal documents through a licensed process server. If so, please specify to whom each service should be provided pursuant to Julia Jacobs and the New York

COMPLAINT AND DEMAND FOR JURY TRIAL

*Times as you and David previously stated, all contact should be directed to you in regard to either entity.*

*The Buttons.*

122.    On July 23rd, 2024, Plaintiffs then received an unexpected and shocking reply from Defendant Blaisdell which only corroborates Plaintiffs' claim of conspiracy against Defendants which stated the follow:

*Ms. Button,*

*I'm not going to respond to every part of your email but you can serve whatever it is you intend to serve on The Times and Ms. Jacobs **on David** at the address below.*

*New York Times Company - Legal Department*

***ATTN: David McCraw***

*620 8th Avenue*

*New York, NY 10018*

*Best,*

*Demetri*

123.    Not only did Mr. Blaisdell efer Plaintiffs **back to Mr. McCraw** after stating he represented Ms. Jacobs and The New York Times but Mr. Blaisdell inadvertently admitted that he should have never been involved from the onset of Plaintiffs initially reaching out to Julia Jacobs attorney.

124.    Defendants Blaisdell and McCraw colluded and conspired with Defendants Ruff, Mariella, Schneider, Jacobs and non-party co-conspirator Sigrid McCawley to *intentionally impede* on Plaintiffs' defense and ability to appropriately address the

COMPLAINT AND DEMAND FOR JURY TRIAL

very claims stated in this complaint; intentionally causing undue burden and delay in Plaintiffs being able to seek legal recourse against Defendants.

125.    Additionally, Defendants colluded and conspired with each other to put Demetri Blaisdell, former associate and attorney at Boies Schiller & Flexner LLP, in contact with Plaintiffs in place of David McCraw, in order to have a "man on the inside", who would communicate with Plaintiffs and relay those communications with them only to notify Plaintiffs after ten months that Mr. Blaisdell was *not even who Plaintiffs should be in contact with* and that instead, it should be, Defendant David McCraw who could accept service on behalf of Ms. Jacobs.

126.    Boies Schiller & Flexner LLP is notorious for having their hands in places they do not belong and in fact, prevented Plaintiffs from properly being able to seek the justice they deserve.

127.    For example, Defendants from Boies Schiller & Flexner have filed a motion with one Federal Court to **Order** Plaintiffs to dismiss a lawsuit against a parties in another Federal Court in order to silence them and prevent them from seeking legal recourse against those who have harmed them; **it will not work.**

128.    The Boies Schiller & Flexner firm is known for its corruption including its representation of Harvey Weinstein, Theranos and Red Granite Productions, including but not limited to its contradictory and egregious acts involving The New York Times by representing "The Times" in two active cases while representing Harvey Weinstein and simultaneously, "convincing the Times that there was no rape".[13]

---

[13] https://www.nytimes.com/2017/11/09/opinion/david-boies-harvey-weinstein.html ;
https://www.nytimes.com/2018/09/21/business/david-boies-pleads-not-guilty.html

129.     Defendants from Boies Schiller & Flexner follow in the same steps here as they "convinced the Times" of the narrative they created, which is false in its entirety; the difference is, their narrative was proven to be fraudulent prior to Ms. Jacobs' article and yet, the narrative they created to produce and publish on July 29th, 2021, remained unchanged in order to publish a story that would shock any reader including any potential juror.

### *Defendants' Destruction of Plaintiffs' Business, Goods and Services*

130.     Defendants' intentional collusion and conspiracy, paired with the defamatory statements made in Ms. Jacobs' article caused Plaintiffs *severe emotional distress* including because Plaintiffs discovered they were being sued through The New York Times article rather than through the appropriate manner of being served a summons.

131.     Defendants' unethical behavior and defamatory statements to the media, the press and the public was the direct cause of Plaintiffs' loss of income, destruction of reputation and careers and severe emotional trauma.

132.     Due to Defendants' intentional defamatory statements and arrangement of a global media campaign against Plaintiffs, Dusty and Taylor Button immediately lost any and all business including that those who once employed and had business relations with Plaintiffs, entirely disassociated from them including but not limited to the examples of text messages below:

- Email from Holly Tudor Miles of BLOCH INC. who Plaintiff worked for and had a business and personal relationship with for over fifteen years but who completely disassociated from Plaintiff immediately following The New York Times article.

COMPLAINT AND DEMAND FOR JURY TRIAL



- Text message from Bree Hafen to Dusty Button, notifying Plaintiff of terminated agreement and negotiations regarding a collaboration.



• Text message from Shelby Richardson to Dusty Button, notifying Plaintiff of termination of

employment.



Hi Dusty,

First and foremost we wanted to thank you for all that you have taught our kids and bringing the love of ballet back into the classroom as its such a huge part of our program. However, at this time we will not be having you at our intensive this year. We had some concerned parents come forward with some social media posts and feel that we cannot ignore them even if social media is to be taken with a grain of salt. Our top priority is our families and the dance community we have built. This is a time where we need to put them first. I really hope you can understand where we are coming from as we truly have enjoyed having you at the studio and we are hopeful that we will have you back very soon. Again, thank you so much for all that you have done for our students. We will miss you having you at the intensive.

• Text message from Jacqueline Porter, (owner and director of The Dallas Conservatory),

to Dusty Button, notifying Plaintiff of termination of employment.

Hi, Dusty. I am sure you might have been expecting this. With profound respect for you and your years of incredible work … and gratitude for your work with our children … and deep regret for the situation that you find yourself in, I will need to cancel our agreement to bring you in for intensive.

There is a possibility that private clients who respect your work as I do might have you do a solo.

- These messages are just an example and a *tiny fraction* of what Plaintiffs suffered by way of loss of business and employment.

133.     As stated in the above references, Plaintiffs' names and likeness was their *only* business, which generated literally all of their revenue, income and business, whereas Plaintiffs, themselves, and what they provided to their respective industries was solely based on what they provided as their name brands known as Dusty Button, Taylor Button, Mitch/Mitchell Button, Mitchell Taylor Button, "The Buttons", Button Built, Button Brand and Bravado by Dusty Button.

134.     Plaintiffs' established business, goods and services were directly sourced and provided from their good names, talent, expertise and reputations, which were completely destroyed by Defendants, their agreement to destroy Plaintiffs' defense and Defendants' unethical play to the media and the press including but not limited to the false and defamatory publication by Ms. Jacobs.

135.     As stated in the above referenced facts, Plaintiffs were highly respected, extremely well-known, leaders of the dance industry and the automotive industry, and reliant on their businesses which were well established for over fifteen years, as each Plaintiff

was their own business in which they were hired based on their desired skill sets in their industries, which others could not offer.

136.    Plaintiffs had established business with signed negotiated contracts with three companies to manufacture and sell their dancewear line which was in its initial phase and well under way as Plaintiffs were beginning the second wave of these partnerships when Defendants' conspired efforts and collusion to destroy Plaintiffs' livelihood and defense byway of defamatory statements to a mass audience derailed all operations.

137.    Plaintiffs lost any and all business immediately and for the foreseeable future as a direct result of Defendants' unethical play to the media and intentional defamatory statements.

138.    Defendants made their statements and conspired with *actual malice* as they knew that, as a result of the publications, the Plaintiffs would suffer financial harm.

139.    Defendants knew that their statements were false and intentionally crippled Plaintiffs' business and ability to generate revenue and income as she maliciously referred to Plaintiffs' goods and services because the "power" she claims Plaintiffs "abused" was the power of their business which was their talent, expertise and their reputable names.

140.    Defendants knew that her statements were false and intentionally crippled Plaintiffs' goods and services which included Plaintiff Dusty Buttons' teaching, provided choreography, modeling, dancing, guest performing, speaking engagements, design concepts, marketing and brand ambassadorship, all of which were destroyed as Plaintiff Dusty Button was her own goods and services, as her name and career was her brand and her business.

COMPLAINT AND DEMAND FOR JURY TRIAL

141.    Defendants knew that her statements were false and intentionally crippled Plaintiffs' goods and services which included Plaintiff Taylor Buttons' design work, custom automotive creations, sponsorships, commercial shoots, events, marketing, advertising and speaking engagements, all of which were destroyed as Plaintiff Taylor Button was his own goods and services, as his name and career was his brand and his business.

142.    Defendants intentionally, willfully and maliciously made defamatory statements to numerous media and press outlets including but not limited to Defendant Julia Jacobs and The New York Times Company which in turn, resulted in further defamation by hundreds of thousands of third parties on social media, in the press and other new outlets including to every subscriber of The New York Times who maintain a subscriber list of 10.36 million subscribers to the paper as well as 9.7 million of digital only subscribers; all of whom had access to read and view Julia Jacobs' article about Plaintiffs.

143.    Defendants' defamatory article and fraudulent lawsuit spread like fuel-soaked wildfire throughout the dance industry and community, automotive industry and community and further, to dance and automotive forums including but not limited to Facebook, Reddit and TikTok and was widely spread via communications through various messaging platforms nationally and internationally.

144.    Defendants' conspiracy and attorney-media collusion to publish defamatory remarks, (which were not only spread in written form but widely spread via word of mouth through the grapevine of the industries which Plaintiffs were so highly respected and prominent in) were an intentional play to the media to interfere with

Plaintiffs' ability to defend themselves including by influencing any potential juror to bias the Court and create a false narrative against Plaintiffs.

145.    Defendants' defamatory posts and remarks to a mass media audience was intentionally dishonest and their defamatory remarks were stated for an improper motive with the intent to injure Plaintiffs without just cause or excuse.

146.    Defendants knew that, as a direct result of the publication, Plaintiffs would suffer financial harm and never be capable of generating revenue using their names again including by colluding with The New York Times and Julia Jacobs to publish and disclose a private lawsuit prior to Plaintiffs ever being issued a summons or service being completed.

147.    Plaintiffs suffered complete loss of business and sales including that their income was solely based on a per performance basis whereas, Plaintiffs' income was generated upon completion of work as they were themselves, their business.

148.    For example, Plaintiff Dusty Button's teaching classes and performances were immediately canceled following Defendants' defamatory statements including but not limited to, in The New York Times.

149.    As another example, Plaintiff Dusty Button immediately lost any and all business with all scheduled dance studios, summer intensive courses, and events which she was scheduled to guest teach and choreograph for, including scheduled guest performance appearances nationally and internationally as a direct result of Defendants' misconduct, conspiracy and defamatory statements and unethical play to the press and the media.

150.   As another example, Plaintiff Taylor Button immediately lost any and all business related to his brands including his business and brand "Button Built", with all scheduled events in the automotive industry including pre-planned design builds for clients and customers including prominent name brands which were sponsors of Plaintiff Taylor Button, all of whom canceled their builds and design concept work with Plaintiff for the foreseeable future.

151.   Further, Plaintiffs both immediately lost any and all contracts with sponsors, endorsements and event appearances in their respective industries including but not limited to: BLOCH Inc., Tiger Friday, Capezio, Yumiko, MPG Sport, Fenti, Volcom, Discount Dance, RedBull, Adidas, WeWork, Rotiform Wheels, Brixton Forged, Momo racing, Bride Racing, Nitto Tires, Toyo tires, Brembo, Ferrari Parts, Tial Concepts, Xona Rotor, Aviva Performance, Impressive Wraps, Inozetek, Tubi Style, Vivid Motorsport, Voodoo Automotive, SEMA Auto Show, Crep Protect, Accuair Suspensions, Currie axels, Pelican LLC, Greyman Tactical, PRP seats, KMC wheels, RAM mounts, Metalcloak suspension and body components, THULE, Rebel Offroad, PPG paint, Morimoto LED lighting solutions, BAJA off-road lighting solutions, Powertank, Maxxtraxx, HP tuners, Emory Motorsports, SABELT and Illest, amongst many others not listed here.

152.   Plaintiffs not only lost their business "Button Brand", suffering the complete destruction of their self-made brand but were forced to refund customers for items sold due to the connection of the defamatory statements made by Defendants and the third parties who "grapevined" off of her defamatory statements in the media and the press.

153.    Plaintiffs completely lost and forfeited their brand, Button Brand due to the
defamatory statements made in the media and The New York Times including because
their sponsors, business relations and employers read the article before Plaintiffs were
served with the lawsuit.

154.    Plaintiffs had a pre-planned, negotiated contract with dancewear company Tiger
Friday whereas, Plaintiffs designed, licensed and would market the line of leotards and
dancewear utilizing the Button name and brand to expand their already successful
company and image.

155.    Plaintiffs' contract was immediately canceled as a direct result of Defendants'
defamatory remarks.

156.    Plaintiffs were not paid for work already completed as Tiger Friday continued to
use Plaintiffs' already completed designs, due to the false and defamatory statements
made by Defendants', the New York Times article and the defamatory global media
campaign waged against Plaintiffs.

157.    Plaintiffs' brand, Bravado by Dusty Button was a dancewear and leotard line for
dancers in which Plaintiffs had previous negotiated contracts with sponsored third-
party companies and distributors such as Artists Simply Human, Discount Dance,
Showstopper and GK Elite, as well as advertised and garnered sales of this line
through their own website "bravadodancewear.com" and through Plaintiffs' former
social media page on Instagram, @bravado_dancewear and Plaintiffs' personal social
media account, @dusty_button.

158.    Bravado by Dusty Button was sold at various dance events for distribution,
whereas, sales and contracts were immediately terminated following $100,000.00 of

partner investment and nearly a year of travel and planning as a direct result of Defendants collusion with The New York Times including but not limited to the defamatory statements made against Plaintiffs.

159.    Defendants' conduct forced the termination of Bravado by Dusty Button as all sales came to a halt and additionally, customers demanded refunds stating the brand was associated with "sexual predators", "perpetrators", "criminal behavior" and "rapists".

160.    Immediately following Defendants' conduct and defamatory statements in the media and the press, Plaintiffs' businesses, Button Brand, Button Built, and Bravado by Dusty Button were completely destroyed, losing hundreds of thousands of dollars in revenue and costs, which were already paid, promised and negotiated with third party companies and distributors.

161.    Any and all marketing for the above reference brands with associated accounts advertising those brands including all sales were terminated as a direct result of Defendants' conduct and publication of Julia Jacobs' article in The New York Times.

162.    The seriousness of Defendants' defamatory statements proves a clear intention to cause damage to Plaintiffs including by way of attorney-media collusion.

163.    The nature and substance of Defendants' collusion, conspiracy, defamatory remarks and actual knowledge that their statements were untrue prove that Defendants' actions were willful, intentional and malicious.

164.    Defendants' defamatory statements and the audience that the Defendant intended to, and did reach, proves without question, their intent to harm Plaintiffs' careers, businesses and reputations as the false statements were aimed specifically at Plaintiffs'

colleagues, clients and target demographics through these defamatory statements in the global media campaign waged against Plaintiffs including but not limited to published defamatory statements in The New York Times, later republished to other innumerable mass media outlets including the press and nearly every major news outlet and social media account that were otherwise outside of Plaintiffs' industries which also included a variety of audiences as each platform reached a different audience.

165.    Defendants' attorney-media collusion and publication of defamatory statements caused the entire dance industry to not only turn against Plaintiff Dusty Button, (who had worked her entire life to build the reputation she was known for in her industry and was at the pinnacle of her career), but caused the industry to disassociate from Dusty, repost the defamatory statements and cease all communication with her, including halting any and all forms of employment for which she had been in extremely high demand for, for over fifteen years.

166.    Defendants' attorney-media collusion and published defamatory statements caused the entire automotive industry to not only turn against Plaintiff Taylor Button, (who had worked over thirteen years to build the reputation of the idol he was and that he was known for in his industry and was at the pinnacle of his career), but caused the industry to disassociate from Taylor, repost the defamatory statements and cease all communication with him, including halting any and all forms of employment for which he had been in extremely high demand for, for over thirteen years.

167.    The defamatory remarks and posts made by Defendants including by way of attorney-media collusion ignited a viral response which spread like wildfire, resulting

COMPLAINT AND DEMAND FOR JURY TRIAL

in a 'grapevine' effect throughout Plaintiffs' industries including to their co-workers, clients, employers, potential employers, parents and children of those Dusty taught in the dance industry, sponsors, potential sponsors, friends and family involved in the industries, customers, former employers, agencies, dance studio owners and other various third parties whereas, Plaintiffs could not defend themselves against such widespread industry gossip.

168.    Defendants *specifically targeted* Plaintiffs in their global media campaign waged against them, as they were influential and informative people in their industries in which the Defendants spread false statements further than it would seem at first blush.

169.    Plaintiffs were completely prevented from defending themselves to all third parties as Defendants' attorney-media collusion and conspiracy to publish the New York Times article prior to Plaintiffs being served which included defamatory statements were so immediately viral and out of control, that Plaintiffs could not control or manage the effects of Defendants' false, defamatory and malicious statements

170.    As a direct cause of Defendants' conspiracy including the publication of false and defamatory statements and global media campaign waged against Plaintiffs, Plaintiffs have been unable to even have a ringtone, vibration or sound on their phones when notifications or calls come in, due to the influx of notifications, messages, harassment, death threats, unwanted threatening calls and the overwhelming immediate responses to Defendants' posts, comments and reposts whereas, Plaintiffs even had to take turns watching for notifications on each other's phones to even sleep just one hour as the harassing, threatening and defamatory remarks continued for months on end.

171.    To this day, Plaintiffs keep their phones on silent as it results in severe trauma and PTSD as a direct result of Defendants' conduct and the defamatory statements and the global media campaign waged against them including because Defendants have intimidated and continue to intentionally harass and intimidate Plaintiffs, abusing their power to prevent Plaintiffs from coming forward regarding their misconduct and unethical attorney-media collusion.

172.    As previously stated herein, Plaintiffs' business, was their names and likeness as they were individually contracted due to their reputations of who they were as a business and as their names were their brands.

173.    Plaintiffs were well-known and prominent figures in their industries and therefore, were contracted, employed and in high-demand because of their names and reputations, as they, themselves were their businesses for over fifteen years.

174.    Plaintiffs' reputations, prior to Defendants' conduct and defamatory statements in the global media campaign waged against them and the slaughter of Plaintiffs' good names, was impeccable in both their respective industries whereas, Plaintiffs were well-liked, well-respected and in high demand due to their expertise in their industries, which others could not offer.

175.    Defendant Jacobs has never made any attempt to rectify the false and malicious statements even after Plaintiffs have proven her statements to be defamatory, false, misleading and intentionally harmful, including in litigation including after Plaintiffs contacted Ms. Jacobs to find resolution.

176.    The shock and confusion resulting from the defamatory statements, coupled with Defendants' abuse of power and influence resulting in intense threats, harassment, and

severe bullying and including the use of her fame as an attorney to intimidate and silence Plaintiffs while in litigation against her, Plaintiffs were led to believe recourse would be an impossibility against them.

177.    Plaintiffs were so traumatized by Defendants' misconduct and actions that they both suffered from suicidal thoughts, nearly taking their own lives as a direct result of the defamatory statements made by Defendants and the global media campaign waged against them however, they have since championed those dark thoughts without the help of the therapy they are unable to afford due to the destruction of their careers through Defendant's defamatory conduct.

178.    Defendants took affirmative steps, as late as July 24th, 2024, to ensure Plaintiffs were without the ability to seek recourse against her until now with the threat of a law degree and intentional harm she inflicted on Plaintiffs by way of forcing them to be unemployed with no ability to generate income, releasing her of any responsibility as they knew it was a possibility for the statutes of limitation to expire before Plaintiffs could take action against her.

179.    Defendant's defamatory campaign against Plaintiffs was directly responsible for hundreds of death threats and a hired convicted felon that was paid nearly $100,000.00 to force Plaintiffs to destroy evidence that Defendants' defamation was meant to conceal; a felon who broke into Plaintiffs' home and thus rendered them in fear of their lives.

180.    Accordingly, any statute of limitations applicable to Dusty and Taylor's claims, if any, is tolled.

181.    Defendants' actions described above deprived Dusty and Taylor of the

opportunity to commence this lawsuit before now.

182.    Defendants are equitably estopped from asserting a statute of limitations defense

as to Plaintiffs' claims.

183.    Allowing Defendants to do so would be unjust.

184.    Defendants took active steps to prevent Dusty and Taylor from commencing this

lawsuit before now, including by way of attorney-media collusion to influence every

party associated to Plaintiffs, destroying Plaintiffs' ability to work after the first

publication of her defamatory global media campaign against Plaintiffs in The New

York Times began and by using tactical intimidation by way of using their law

degrees to suppress and silence unrepresented Plaintiffs from defending against their

conspiracy, collusion and false and defamatory statements through the media and in

litigation.

185.    Plaintiffs have suffered and continue to suffer mental anguish, severe emotional

distress and loss of enjoyment of life as a direct and proximate result of Defendants'

conduct.

186.    Had Plaintiffs succumbed to the darkness that Defendants cast over their lives,

businesses, families and futures, this litigation would be criminal rather than civil as

they are directly responsible for serving as the catalyst of the global defamatory media

campaign waged against Plaintiffs and the fraudulent actions that nearly ended two

innocent lives that were once the brightest lights of their careers for millions of people

abroad.

187.    Plaintiffs allege the foregoing based upon personal knowledge, public statements of others, and records in its possession.

188.    Plaintiffs have actual knowledge that substantial additional evidentiary support, which is in the exclusive possession of The New York Times and Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

## CAUSES OF ACTION

## COUNT I - INJURIOUS FALSEHOOD

*Against Defendants The New York Times Company, Lindsey Ruff, Sabina Mariella, Dawn Schneider and Julia Jacobs*

189.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

190.    The unprivileged statements of fact made by Ms. Jacobs to others about Plaintiffs were false and defamatory.

191.    The Defendant's words were maliciously calculated to cause financial injury, constituting Plaintiffs' claim of Injurious Falsehood.

192.    The Defendant's article contained intentional false and defamatory statements which does not express statements of opinion and are not protected by any shield law, opinion defense or defamation liability.

193.    The Defendant's article contained the statement, "*A lawyer for the couple said that they **denied the charges**"* which was false, defamatory and intentionally misleading to a mass audience including any potential juror, resulting in the complete and total loss of Plaintiffs' businesses, business relations, affiliates and/or any and all

contractual agreements as Defendant Julia Jacobs intentionally led readers to believe Plaintiffs had been charged with a crime rather than allegations made in a civil complaint.

194.    Ms. Jacobs made a false statement of fact which was not based on any such statement within the lawsuit she wrote her article on and instead, diverted to a false statement of fact which was not stated by the Buttons' previous attorney or any other party in order to intentionally mislead a mass audience to believe there were "charges" against Plaintiffs; this malicious statement was knowingly and undeniably false and Ms. Jacobs made it anyway.

195.    The Defendant's article contained a false, defamatory and intentionally malicious statement which was only made to amplify her "story", made solely for shock value and which severely harmed Plaintiffs and caused extreme emotional distress.

196.    Plaintiffs claim special damages to be proven through contractual agreement, financial records and messages which prove the New York Times article was the direct and proximate cause of Plaintiffs complete and total loss of businesses, business relations, affiliates, and/or any and all contractual agreements including but not limited to the reputations, careers and livelihoods in their respective industries.

197.    Defendant's misleading title of the article, "*Former Dance Instructor Accused of Sexual Assault in Lawsuit"*, was intentionally misleading in order to appeal to viewers for shock value, by convincing and leading any reader to believe that Plaintiffs, together, were teaching and abusing their students which is false and defamatory in its entirety.

COMPLAINT AND DEMAND FOR JURY TRIAL

198.     Ms. Jacobs' statement is not protected by New York's anti-SLAPP law as Ms. Jacobs' statement was a false statement of fact, not a statement of opinion and therefore, unprotected by First Amendment rights or any other law which would relieve Ms. Jacobs from the consequences to her actions.

199.     Defendant's words were published in a written fashion to hundreds of thousands, if not millions of readers including in documented online content, newspapers, social media publications, law journals and in the new and media including on television programs.

200.     Defendant Julia Jacobs did not verify the accuracy of her subject's allegations before making her defamatory statements and therefore, made her statements out of neglect, reckless disregard for the truth and/or actual malice.

201.     Ms. Jacobs knowingly published, made defamatory and false statements and communicated those false statements to a **mass** audience of third parties including in the press and the media.

202.     Defendants Ruff, Mariella, Schneider and non-party co-conspirator Sigrid McCawley are liable for arranging the press and media outlets where the false and defamatory statements were made.

203.     Defendant The New York Times Company is liable for the false and defamatory statements made by Ms. Jacobs as the publication's is liable in editing, publishing, and distributing the defamatory material.

204.     The New York Times is liable for the false and defamatory statements made by Ms. Jacobs as the publication benefited and profited immensely from the content *even if* Ms. Jacobs acted independently.

205.    Ms. Jacobs' article was a direct cause of Plaintiffs' complete loss of business and sales related to their names, likeness and brands whereas, Plaintiffs suffered *actual damages* and special damages, proven by bank statements, email and text communications, approval of government assistance programs, loss of counsel, loss of employment and other economic and financial evidence of damages as a result of The New York Times' and Julia Jacobs' false and defamatory statements made to a mass audience.

206.    The unprivileged statements made by Ms. Ruff, Ms. Mariella, Ms Schneider, Mr. Blaisdell and non-party co-conspirator Sigrid McCawley to others about Plaintiffs caused complete loss and injury to Plaintiffs' businesses, whereas Plaintiffs have not worked one, single job since July 28th, 2021, including that any and all contracts including but not limited to the forementioned company contracts and agreements were immediately and prematurely terminated following the collusion between Defendants and the unethical conduct of publishing a defamatory article prior to Plaintiffs *ever being served*.

207.    Ms. Jacobs published and made her defamatory statements negligently, with knowledge of the falsity of the statements, with reckless disregard of their truth or falsity and/or with actual malice.

208.    At the time Julia Jacobs statements were made, she knew or should have known that they were false and defamatory.

209.    Ms. Jacobs published a direct quote from Plaintiffs' attorney citing that they deny the "allegations" and the "claims" pursuant to the civil action; there was no other purpose to make the unquoted statement, (that Plaintiffs' previous attorney did not

make), that Plaintiffs "**denied the charges**" other than to sensationalize the article and mislead any reader to believe that Plaintiffs had been charged with a crime and intentionally creating confusion and implying Plaintiffs were involved in criminal activity when they were not.

210.     Hundreds of thousands of people *actually* read and/or heard the false and defamatory statements.

211.     Ms. Jacobs' statements were not privileged.

212.     The statements were made by Julia Jacobs with reckless disregard for the truth, oppression and fraud in that she was aware at the time of the falsity of the statement.

213.     Defendants Ruff, Mariella, Schneider and Jacobs possessed information and had access to information which showed her statements were false including but not limited to publicly available records which showed the subjects of the articles lawsuit to be false in its entirety which were accessible to Ms. Jacobs and were in the possession of Defendants Ruff, Mariella, Schneider and non-party co-conspirator Sigrid McCawley such as evidence of false police reports, fraudulent restraining orders, text messages, photographs, videos, songs and voice recordings which contradicted the entirety of the lawsuit filed against Plaintiffs.

214.     Defendants made statements which had no factual basis including but not limited to by insinuating Plaintiffs had been "charged" with a crime.

215.     Moreover, the statements tend to so harm the reputation of Plaintiffs as to lower their professional reputation in the community or deter third persons from associating or dealing with them including termination of any and all business, contracts or employment and, as such, constitute *injurious falsehood*.

216.    As a direct and proximate result of the false and defamatory statements, Plaintiffs have been *severely* damaged.

217.    Plaintiffs are entitled to punitive damages, because Defendants' defamatory statements were made with hatred, ill will, and spite, with the intent to harm Plaintiffs or in blatant disregard of the substantial likelihood of causing them harm.

218.    Any statute of limitations, if any, should be tolled.

219.    The statute of limitations for defamation claims, including injurious falsehood may be tolled, "*during the pendency of a related lawsuit or arbitration related to the same defamatory statements*" and, "*the pendency of a motion to dismiss a related lawsuit may toll the statute of limitations until the motion is resolved*" whereas, Plaintiffs have been involved in a pending litigation for exactly three years with Defendants Ruff, Mariella and non-party co-conspirator Sigrid McCawley and their clients, resulting in any ability to financially afford representation and preventing Plaintiffs from seeking recourse against Defendants until now[14].

220.    Defendants' defamatory statements were intentionally and specifically timed to prevent Plaintiffs from seeking recourse against her as Plaintiffs could not afford to file claims against Defendants, as her defamatory statements *immediately* destroyed Plaintiffs' ability to work and to generate income; this was intentional so that Plaintiffs could not seek recourse against Defendant until now.

---

[14] The statute of limitations for defamation and/or injurious falsehood may be tolled, "*during the pendency of a related lawsuit or arbitration related to the same defamatory statements*" and, "*the pendency of a motion to dismiss a related lawsuit may toll the statute of limitations until the motion is resolved*". As previously stated, Plaintiffs have been involved in a pending Federal Civil case against attorneys from Boies Schiller & Flexner which is still pending Plaintiffs' Motion to Dismiss and Counterclaim against them which was filed in August of 2023.

221.     Additionally, Plaintiffs have been intimidated into silence by Defendants including by abuse of power, harassment and threats against *pro se* Plaintiffs who were prevented from seeking legal recourse until now.

222.     Defendants are equitably estopped from asserting a statute of limitations as a defense and allowing them to do so would be **unjust**.

223.     Plaintiffs' statutes, if any, must be tolled.

224.     Plaintiffs have actual knowledge that substantial additional evidentiary support, which is in the exclusive possession of The New York Times and Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

225.     Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiffs and/or reckless disregard for the truth, Plaintiffs seek an award for punitive damages.

WHEREFORE, Plaintiffs Dusty and Taylor Button demand judgment against Defendants Ruff, Mariella, Schneider and Jacobs for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## COUNT II – TORTIOUS INTERFERENCE

### *Against Defendants*

226.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

227.     The unprivileged statements made by Defendants and non-party co-conspirator Sigrid McCawley to others about Plaintiffs were false and defamatory.

COMPLAINT AND DEMAND FOR JURY TRIAL

228.     The unprivileged statements made by Defendants to others about Plaintiffs caused complete loss and injury to Plaintiffs' businesses whereas, Plaintiffs have not worked one single job since July, 29th, 2021 including that any and all contracts and agreements were immediately and prematurely terminated following Defendants' conduct and the publishing of Ms. Jacobs' and The New York Times article.

229.     Defendants made and published such statements negligently, with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity.

230.     At the time Defendants made and published such statements, they knew or should have known that they were false and defamatory.

231.     Hundreds of thousands of people *actually* read and/or heard the false and defamatory statements.

232.     Defendants' statements were not privileged.

233.     Defendants conspired and colluded to interfere with Plaintiffs' businesses, contractual agreements, relationships, sponsors, employers, business affiliates, reputations and business agreements in order to cripple Plaintiffs' defense against a lawsuit which was publicly disclosed prior to Plaintiffs ever being served with that lawsuit or having knowledge of the allegations set forth within the lawsuit.

234.     Defendants participated in attorney-media collusion and interference, compromising the fairness and integrity of the lawsuit which Plaintiffs were not yet served with and thereby, strategically disrupting the normal course of litigation and intentionally causing extreme harm to Plaintiffs including by influencing public perception and any potential juror prior to Plaintiffs having the ability to prepare a defense.

235.     Defendants possessed information and had access to information which showed that the statements within the lawsuit and later, the article were false.

236.     Defendants made statements for which they had no factual basis.

237.     Defendants suggested Plaintiffs were involved in a serious crime involving moral turpitude or a felony, exposing Plaintiffs to ridicule in which reflected negatively on Plaintiffs' characters, morality and integrity whereas, the defamatory statements impaired Plaintiffs' financial well-being including by publishing those suggested statements prior to Plaintiffs ever being served.

238.     The Defendant *intentionally* induced innumerable third parties to break their contracts with Plaintiffs including because Julia Jacobs' article intentionally interfered with the Plaintiffs' ability to defend themselves or settle the lawsuit and therefore, Defendants' actions constitute a tortious interference with Plaintiffs' legal rights.

239.     Defendants did so without justification as there was no self-interest in Plaintiffs' contractual agreements other than to destroy Plaintiffs ability to rightfully defend themselves.

240.     Defendants' false statements accused Plaintiffs of a serious crime and maligned Plaintiffs in their professions, those statements which resulted in constitute a tortious interference and Plaintiffs' injuries are presumed.

241.     Defendants' actions were motivated by a desire to harm the Plaintiffs.

242.     Moreover, the statements tend to so harm the reputation of Plaintiffs as to lower their professional reputation in the community or deter third persons from associating or dealing with them including termination of any and all business, contracts or employment, inducing third-parties through mass media publication to

sever contractual agreements and disassociate from Plaintiffs, preventing Plaintiffs from a rightful defense against the lawsuit including prior to Plaintiffs being served.

243.    As a direct and proximate result of the false and defamatory publication, intentional collusion with the media and disclosure of a lawsuit prior to service being completed including publication of false statements to a mass media audience and innumerable third parties by way of mass distribution, Plaintiffs have been severely damaged.

244.    Defendants' defamatory statements were intentionally and specifically timed to induce third-parties into severing any and all contracts with Plaintiffs and disassociating from Plaintiffs to harass and prevent Plaintiffs from seeking recourse against Defendants; Plaintiffs could not afford to file claims against Defendants, as their defamatory statements *immediately* destroyed Plaintiffs' ability to work and to generate income, disseminating any and all contractual agreements with third-parties.

245.    Defendant is equitably estopped from asserting a statute of limitations as a defense and allowing her to do so would be **unjust**.

246.    Plaintiffs' statutes, if any, must be tolled.

247.    Plaintiffs have actual knowledge that substantial additional evidentiary support, which is in the exclusive possession of The New York Times and Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

248.    Plaintiffs are entitled to punitive damages, because Defendants' defamatory statements were made with hatred, ill will, and spite, with the intent to harm Plaintiffs or in blatant disregard of the substantial likelihood of causing them harm as there was

publicly available information and data including information, data and documentation proving Defendants' statements to be false.

249.     Because Ms. McCawley's defamatory statements constitute intentional acts which were made with actual malice towards Plaintiffs and or reckless disregard for the truth, Plaintiffs seek an award for punitive damages.

WHEREFORE, Plaintiffs Dusty and Taylor Button demand judgment against Defendants for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## COUNT III – DEFAMATION PER SE

### *Against Defendants*

250.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

251.     The unprivileged statements made by Defendants to others about Plaintiffs were false and defamatory.

252.     The unprivileged statements made by Defendants to others about Plaintiffs caused complete loss and injury to Plaintiffs' businesses whereas, Plaintiffs have not worked one single job since July 28th, 2021 including that any and all contracts and agreements were immediately and prematurely terminated following Defendants' conduct and unethical misconduct.

253.     Defendants made and published such statements negligently, with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity.

254.     At the time Defendants made such statements, she knew or should have known that they were false and defamatory.

255.     Hundreds of thousands of people *actually read* and/or heard the false and defamatory statements.

256.     Defendants' statements were not privileged.

257.     The statements were published and stated by Defendants with actual malice, and/or reckless disregard for the truth, oppression, and fraud in that they were aware at the time of the falsity of the publication and thus, made said statements and publications in bad faith, out of hatred and ill-will directed towards Plaintiffs without any regard for the truth.

258.     Defendants possessed information and had access to information that showed her statements were false.

259.     Defendants received information which should have prompted action to retract the false statements of fact but instead, no action was taken, no apology was issued and there was no resolve.

260.     Defendants made statements for which she had no factual basis.

261.     Moreover, the statements tend to so harm the reputation of Plaintiffs as to lower their professional reputations in the community or deter third persons from associating or dealing with them including termination of any and all business, contracts or employment and, as such, constitute libel *per se.*

262.     As a direct and proximate result of the false and defamatory statements and publication of statements to third parties by Defendants, Plaintiffs have been *severely damaged.*

263.     Defendants made false and defamatory statements to a **mass** audience in which were so widely understood to be harmful that they are presumed to be defamatory as

COMPLAINT AND DEMAND FOR JURY TRIAL

Defendants made statements which accused Plaintiffs of committing crimes against children, particularly, ("young girls").

264. The statute of limitations for defamation claims, including defamation *per se* may be tolled, "*during the pendency of a related lawsuit or arbitration related to the same defamatory statements*" and, "*the pendency of a motion to dismiss a related lawsuit may toll the statute of limitations until the motion is resolved*" whereas, Plaintiffs have been involved in a pending litigation for nearly three years with attorneys from Boies Schiller & Flexner and their clients, resulting in any ability to financially afford representation and preventing Plaintiffs from seeking recourse against Defendants until now.

265. Defendants' defamatory statements were intentionally and specifically timed to prevent Plaintiffs from seeking recourse against them as Plaintiffs could not afford to file claims against Defendants, as their defamatory statements *immediately* destroyed Plaintiffs' ability to work and to generate income; this was intentional so that Plaintiffs could not seek recourse against Defendants until now.

266. Defendants are equitably estopped from asserting a statute of limitations as a defense and allowing her to do so would be **unjust**.

267. Plaintiffs' statutes, if any, must be tolled.

268. Plaintiffs are entitled to punitive damages, because Defendants' defamatory statements were made with hatred, ill will, and spite, with the intent to harm Plaintiffs or in blatant disregard of the substantial likelihood of causing them harm.

269. Plaintiffs have actual knowledge that substantial additional evidentiary support, which is in the exclusive possession of The New York Times and Defendants and their

COMPLAINT AND DEMAND FOR JURY TRIAL

agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

270.     Because Defendants' defamatory statements constitute intentional acts which were made with actual malice and/or reckless disregard for the truth towards Plaintiffs, Plaintiffs seek an award for punitive damages.

WHEREFORE, Plaintiffs Dusty and Taylor Button demand judgment against Defendants for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Against Defendants*

271.     Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

272.     At the time of the events herein and at the time Ms. Jacobs' article was published, Plaintiffs received innumerable messages and phone calls regarding the article and the lawsuit which was disclosed to a mass audience prior to Plaintiffs' being served, whereas, Plaintiffs were notified by various third-parties about the article.

273.     In fact, Plaintiffs own attorney, (who they previously retained following the May 13th, 2021 attack in order to sue Defendants' clients and non-party, Madison Breshears), did not even have a copy of the complaint filed and was in search for the complaint upon the release of Ms. Jacobs' article.

274.     Plaintiffs' attorney could not even comment on the article appropriately as he was unaware of what was written in the complaint.

COMPLAINT AND DEMAND FOR JURY TRIAL

275.     The unprivileged statements made by Defendants to others about Plaintiffs were false and defamatory and caused extreme distress on Plaintiffs and their family including that Plaintiffs became depressed and began having suicidal thoughts due to the shock of Ms. Jacobs' defamatory article as Defendants conspired to intentionally harm Plaintiffs.

276.     The unprivileged statements made by Defendants to others about Plaintiffs caused complete loss and injury to Plaintiffs business whereas, Plaintiffs have not worked one single job since July 29th, 2021 including that any and all contracts and agreements were immediately and prematurely terminated following Defendants' conduct.

277.     Defendant published such statements negligently, with knowledge of the falsity of the statements, malice, and/or with reckless disregard of their truth or falsity.

278.     At the time such statements were made by Defendants, they knew or should have known that they were false and defamatory.

279.     Hundreds of thousands of people *actually read* and/or heard the false and defamatory statements.

280.     The statements were not privileged.

281.     The statements were published by Defendant with actual malice and/or reckless disregard for the truth, oppression, and fraud in that they were aware at the time of the falsity of the publication and thus, made said publications in bad faith, out of hatred and ill-will directed towards Plaintiffs without any regard for the truth.

282.     Defendants possessed information and had access to information that showed their statements were false.

283.    Defendant also made statements for which they had no factual basis.

284.    Defendants acted intentionally and/or recklessly whereas, the Defendants' conduct was extreme and outrageous and was the direct cause of Plaintiffs' severe emotional distress in which Plaintiffs continue to suffer today.

285.    Moreover, the statements and publication prior to the service of the complaint on Plaintiffs tend to so harm the reputation of Plaintiffs as to lower their professional reputation in the community or deter third persons from associating or dealing with them including termination of any and all business, contracts or employment and, as such, constitutes *intentional infliction of emotional distress*.

286.    As a direct and proximate result of the false and defamatory publication of statements to innumerable third parties by Defendants, Plaintiffs have been *severely damaged*.

287.    The statute of limitations for defamation claims, including defamation *per se* may be tolled, "*during the pendency of a related lawsuit or arbitration related to the same defamatory statements*" and, "*the pendency of a motion to dismiss a related lawsuit may toll the statute of limitations until the motion is resolved*" whereas, Plaintiffs have been involved in a pending litigation for nearly three years with attorneys from Boies Schiller & Flexner and their clients, resulting in any ability to financially afford representation and preventing Plaintiffs from seeking recourse against Defendants until now.

288.    Because Defendants' defamatory statements constitute intentional acts which were made with actual malice towards Plaintiffs and/or reckless disregard for the truth, Plaintiffs seek an award for punitive damages.

289.    Plaintiffs have actual knowledge that substantial additional evidentiary support, which is in the exclusive possession of The New York Times and Defendants and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

290.    The unprivileged statements made by Defendants to others about Plaintiffs caused complete loss and injury to Plaintiffs' businesses whereas, Plaintiffs have not worked one single job since July 29th, 2021 including that any and all contracts and agreements were immediately and prematurely terminated following Defendants' conduct and unethical misconduct including but not limited to the publication and disclosure of the lawsuit prior to Plaintiffs *even being served* with the lawsuit or having any knowledge of the lawsuit or the allegations set forth within the complaint.

WHEREFORE, Plaintiffs Dusty and Taylor Button demand judgment against Defendants for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## COUNT V – CIVIL CONSPIRACY

### *Against Defendants*

291.    Plaintiffs incorporate by reference and reallege the preceding allegations as though fully set forth herein.

292.    Defendants conspired between each other, (parties which are consisting of media and attorneys), and colluded to commit an unlawful and unethical act such as defamation and invasion of Plaintiffs' privacy in order to coordinate coverage and mutual influence to cripple Plaintiffs' defense and destroy Plaintiffs' right to due

process including but not limited to publishing and disclosing a lawsuit prior to even serving the complaint on Plaintiffs.

293.    Defendant Blaisdell specifically and intentionally impeded on Plaintiffs' right to discover imperative information by colluding with his former associates at Boies Schiller & Flexner to prevent Plaintiffs from discovering further proof of collusion and to prevent Plaintiffs from bring forth the claims listed herein against the Defendants in a timely manner.

294.    Defendant Blaisdell intentionally intimidated, harassed and threatened Plaintiffs, who are unrepresented, in an effort to persuade them to cease any and all communications regarding "his client" Julia Jacobs to seek legal recourse against her.

295.    Defendant Blaisdell misled Plaintiffs into believing they had no legal recourse against "his client", Ms. Jacobs or against The New York Times Company.

296.    The unprivileged statements made by Defendants to others about Plaintiffs were false and defamatory.

297.    The unprivileged statements made by Defendants to others about Plaintiffs caused complete loss and injury to Plaintiffs' businesses whereas, Plaintiffs have not worked one single job since July 28th, 2021 including that any and all contracts and agreements were immediately and prematurely terminated following Defendants' conduct and unethical misconduct.

298.    Defendants intentionally, knowingly and maliciously conspired and colluded to prevent Plaintiffs from seeking legal recourse until now including but not limited to by publishing a false and defamatory statements prior to serving the complaint on Plaintiffs, as a long string harassment and bullying campaign against Plaintiffs to

intentionally sway any potential juror and to gain an unlawful advantage in an action of law.

299.    Defendants made and published such statements with knowledge of the falsity of the statements, and/or with reckless disregard of their truth or falsity and conspired and colluded anyway.

300.    At the time Defendants conspired to make and publish such statements, they knew or should have known that they were false and defamatory.

301.    At the time Defendants conspired and agreed to publicly shame, embarrass and harass Plaintiffs, Defendants knew that the complaint and published article would be written and published in such a way that it would completely damage Plaintiffs' careers, reputations, businesses and livelihoods in order to dismantle Plaintiffs' defense against the false and defamatory article consisting of allegations which Plaintiffs did not even have knowledge of.

302.    Hundreds of thousands of people *actually* read and/or heard the false and defamatory statements.

303.    Defendants' statements were not privileged.

304.    The statements were made and published by Defendants with actual malice and/or reckless disregard for the truth, oppression, and fraud in that she was aware at the time of the falsity of the publication and thus, made said statements and publications in bad faith, out of hatred and ill-will directed towards Plaintiffs without any regard for the truth.

305.    Defendants possessed information and had access to information that showed her statements were false but conspired to create a false narrative including by

intentionally disregarding evidence which was in the possession of the Boies Schiller & Flexner attorneys, Defendant Schneider, Julia Jacobs and The New York Times in order to specifically and intentionally file a frivolous lawsuit and publish and defamatory article which was not based on any of the evidence which was in Defendants' possession prior to the article being published or the lawsuit being filed.

306.    Defendants made statements which had no factual basis.

307.    Defendants Ruff, Mariella and non-party co-conspirator Sigrid McCawley made an express agreement with others, including but not limited to each Defendant named forth herein including the Boies Schiller & Flexner clients who were subjects of Ms. Jacobs' article and Defendants Julia Jacobs and The New York Times Company, whereas Defendants' actions outside of litigation prove that they conspired to defame, harass, bully, threaten and dismantle Plaintiffs in a joint effort to destroy their business, reputations, careers, ability to work and financial ability to defend the frivolous lawsuit Defendants and her clients brought forth on July 28th, 2021 to intentionally deprive Plaintiffs in an overt act in furtherance causing economic loss.

308.    Defendants' actions resulted in "Unfair Competition" by way of coordinating efforts to spread false information about Plaintiffs, (whose names and likeness were their business), to gain an advantage, by conspiring and colluding together to destroy Plaintiffs' reputations, careers, business and ability to work and defend themselves against the mass media attack against them and the frivolous litigation itself.

309.    Defendants **unethically** played to the media and the press in pursuance of conspiracy by way of making false and defamatory statements to intentionally harm

Plaintiffs, resulting in financial loss, damage to reputation and **severe emotional distress.**

310.     Defendants' actions were unlawful including that the defamatory statements made by Defendants, intentionally made and published were intentional and wrongful interreferences with Plaintiffs' business relationships.

311.     Defendants intentionally and knowingly made false statements about Plaintiffs to a mass audience, performing an unlawful act to gain notoriety and mislead the public and any potential juror through the media and the press to secure bias and to maintain the public praise which was awarded for the representation of Virginia Giuffre against Epstein and Maxwell, while knowing that Defendants' clients' allegations were false even after presented with factual evidence proving the allegations were fraudulent prior to filing the complaint and further, prior to the interviews and publication of Ms. Jacobs' article in The New York Times.

312.     Moreover, Defendants colluded and agreed to publish the article prior to a summons even being issued to serve Plaintiffs, and prior to service of the lawsuit on Plaintiffs to intentionally gain an advantage and prevent Plaintiffs from seeking legal recourse against Defendants and their clients, constituting a *Civil Conspiracy.*

313.     The statute of limitations for *Civil Conspiracy* may be tolled, "*during the pendency of a related lawsuit or arbitration related to the same defamatory statements*" and, "*the pendency of a motion to dismiss a related lawsuit may toll the statute of limitations until the motion is resolved*" whereas, Plaintiffs have been involved in a pending litigation for nearly three years with Defendants Ruff, Mariella and non-party co-conspirator and their clients, resulting in any ability to financially

COMPLAINT AND DEMAND FOR JURY TRIAL

afford representation and preventing Plaintiffs from seeking recourse against Defendants.

314.    Mr. Blaisdell intentionally made false statements to Plaintiffs to lead them to believe they could not seek legal recourse against Ms. Jacobs or The New York Times.

315.    Defendants conduct is of a similar pattern whereas; the *modus operandi* of attorneys from Boies Schiller & Flexner including non-party co-conspirator Sigrid McCawley is to engage in unethical practices of filing lawsuits and disclosing them to the press prior for fame and notoriety; as one recent example, attorneys from Boies Schiller & Flexner engaged in the same misconduct and pattern by representing two Olympians who filed allegations against their coach whereas, representatives of Defendant were asked for a comment but stated:

> *"We are aware of the lawsuits that were filed," the statement read. "U.S. Ski & Snowboard has not yet been served with the complaint nor have had an opportunity to fully review it. U.S. Ski & Snowboard is and will remain an organization that prioritizes the safety, health and well-being of its athletes and staff."*

316.    Defendants proof of conspiracy lies within their pattern to continue conspiring and unethically colluding with the media to gain an unlawful advantage.

317.    Defendants arranged and agreed to present false and defamatory statements to be published within Ms. Jacobs' article while intentionally and specifically timing the publication of the article to prevent Plaintiffs from seeking recourse against Defendants as Plaintiffs could not afford to file claims against Defendants, whereas,

COMPLAINT AND DEMAND FOR JURY TRIAL

their conspiracy to interfere with Plaintiffs' defense by way of publishing false and defamatory statements *immediately* destroyed Plaintiffs' ability to work and to generate income; this was intentional to prevent Plaintiffs from seeking legal recourse against them.

318.     Defendant is equitably estopped from asserting a statute of limitations as a defense and allowing Defendants to do so would be **unjust**.

319.     Plaintiffs' statutes, if any, must be tolled.

320.     As a direct and proximate result of Defendants' conspiracy including the false and defamatory publication of statements to the mass media and innumerable third parties by Defendants, Plaintiffs livelihoods were completely destroyed and which have been severely and irreparably damaged.

321.     Plaintiffs are entitled to punitive damages because Defendants' defamatory statements were made with hatred, ill will, and spite, with the intent to harm Plaintiffs or in blatant disregard of the substantial likelihood of causing them harm and because Defendants' conduct constitutes intentional acts of conspiracy which were made with actual malice towards Plaintiffs whereas, the conduct is part of a pattern of similar conduct directed at the public generally, indicating a reckless disregard for civil obligations, Plaintiffs seek an award for punitive damages.

WHEREFORE, Plaintiffs Dusty and Taylor Button demand judgment against Defendants for damages, punitive damages, court costs, and such other relief as the Court deems just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment against Defendants, awarding compensatory, consequential, exemplary, and punitive damages in an amount to be determined at trial, including but not limited to:

A. Entering judgment against the Defendant on all claims made against her in this Complaint;

B. Entering an Order directing that Defendant pay Plaintiffs reasonable fees and costs pursuant to any applicable law;

C. For actual damages in an amount to be proven at trial;

D. For punitive damages in an amount to be proven at trial;

E. For costs of suit;

F. For pre-judgment and post-judgment interest on the foregoing sums;

G. For such other and further relief as the Court deems proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby request a trial by jury on all causes of action asserted within this pleading.

Respectfully dated this 29th day of July, 2024,

Dusty Button and Mitchell Taylor Button (*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
Email: prosecanyousee@mailfence.com
Phone: 310-499-8930
Phone: 310-499-8702

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document was mailed as directed to pro_se_filing@nysd.uscourts.gov on July 29th, 2024.

Dated this 29th day of July, 2024,

/s/_____

Signature of Plaintiff Dusty Button (*Pro se*)

/s/_____

Signature of Plaintiff Mitchell Taylor Button (*Pro se*)