EXHIBIT 1

MASSACHUSETTS APPEALS BRIEF

HUMPHRIES V BUTTON
2023-P-1202

Mitchell Taylor Moore
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
(310)-499-8702
Desmodynamica@gmail.com

Dusty Button
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
(310)-499-8930
Worldofdusty@gmail.com

**COMMONWEALTH OF MASSACHUSETTS**

**APPEALS COURT**

**NO. 2023-P-1202**

ON APPEAL FROM BOSTON MUNICIPAL COURT CENTRAL DIVISION
FOR A MOTION TO VACATE A PERMANENT 209A

M.T.M and D.B

**Appellants,**

v.

S.H

**Appellee.**

**BRIEF OF APPELLANTS**
**M.T.M AND D.B**

# TABLE OF CONTENTS

TABLE OF AUTHORITES……………………………………………………...4,5

STATEMENT OF THE ISSUES……………………………………………….6

STATEMENT OF THE CASE………………………………………….....7,8,9,10

STATEMENT OF THE FACTS………………………….10,11,12,153,16,17,18

A. Procedural History……………………………………………...18,19,20

SUMMARY OF THE ARGUMENT……………………………..20,21,22,23,24

ARGUMENT………………………………………………………………24,25

**The Lower Court's Decision Should Be Reversed Because Appellants Were Deprived Of Their Right To A Fair Hearing**……………………………….24

**A.** The lower Court erred in violating Defendants' due process………………………………..24,25

I. TRIAL COURT JUDGEMENT DISCUSSION ERRORS……………...26

**2. BACKGROUND**………………………26,27,28,29

**3. LACK OF NOTICE**……………………………29,30

**4. FRAUD ON THE COURT**...30,31,32,33,34,35,36,37

**A. The Court Erred Stating S.H Was Cross Examined**………………………………...37,38

II. MOTION TO VACATE STANDARD………………...38,39,40,41,42

CONCLUSION……………………………………………………………42,43,44

CERTIFICATE OF COMPLIANCE……………………………………………45

CERTIFICATE OF SERVICE……………………………………………...46

ADDENDUM……………………………………………………………….47,48

# TABLE OF AUTHORITES

**Cases:**

*Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725, 729*…….20,38,40

*Commonwealth v. Delaney, 425 Mass. 587, 581 (1997)*……………………….30

*C.O. v. M.M, 442 Mass. 648, 815 N.E.2d 582 (Mass. 2004)*………...21,25,35,36

*Frizado v. Frizado, 420 Mass. 592, 651 N.E.2d 1206 (Mass. 1995)*……….21,25

*Idris I. v. Hazel H. No. 21-P-570 (Mass. App. Ct. 2022)*………………..25,36,37

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U.S. 600 (2003)*
……………………………………………………………………………17

*K.D. v. J.D.*, 92 Mass. App. Ct. 1115, 94 N.E.3d 881 (Mass. App. Ct. 2017)…40

*MacDonald v. Caruso, 82 Mass .App. Ct. 1120, 2012 WL 5457497 (2012)*
…………………………………………………………………...29,41,42

*M.C.D. vs. D.E.D. 90 Mass. App. Ct. 337*……………………………...8,30,40

*Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. 596, 598*…………….42

*Singh v. Capuano, 10 N.E.3d 1074, 468 Mass. 328 (Mass. 2014)*…………….26

*S.T. vs. E.M. 80 Mass. App. Ct. 423*…………………………………..28,35,37

*United States v. Faudman, 640 F.2d 20 (6th Cir. 1981)*……………………….18

*United States v. Essex, 407 F.2d 214 (6th Cir. 1969)*………………………….18

*United States v. Griffin, 589 F.2d 200 (5th Cir. 1979)*...........................18

*United States v. Hansen (2023) No. 22-179*.......................................17

*United States v. Smith, 234 F.2d 385 (5th Cir. 1956)*..............................18

*Vaccaro v. Vaccaro, 425 Mass. App. Ct. 153*.....................................40

*Wojcick v. Caragher, 447 Mass. 200*..............................................40

**Rules:**

Judicial Guidelines § 5:01 (*C.O. v. M.M, 442 Mass. 648, 815 N.E.2d 582)*..28,38

**Provisions:**

*18 U.S.C. § 1621 - U.S. Code - Unannotated Title 18. Crimes and Criminal Procedure § 1621*....................................................................18

**Other Authorities:**

*Brittany Pierce, 47* ***New Eng. L. Rev.*** *427 (No. 2, Winter 2012)*.................34

## STATEMENT OF THE ISSUES

1. Whether the trial Court violated Appellants' due process when ordering them not to speak on newly discovered evidence of fraud on the Court which occurred in 2017 and 2018 while allowing Appellee to speak on the very years Appellants were prevented from speaking on and instead required Appellants to prove a significant change in circumstances in the years that followed the issuance of the permanent 209A in 2018 rather than addressing the fraud on the Court?
2. Whether the lower Court abused discretion in its decision by negligently dismissing factual evidence of fraud presented by Appellants, depriving them of a fair hearing and causing error in judgement, resulting in incorrect, unsubstantiated and false statements made by the lower Court?

## STATEMENT OF THE CASE

This case is an appeal from a decision of the Boston Municipal Court Central Division, by order of Judge Steven M. Key. The parties are the Appellants, Mitchell Taylor Button ("M.T.M") and Dusty Button ("D.B") together, ("Appellants or Defendants"), and the Appellee is Sage Humphries ("S.H", "Plaintiff or "Appellee"). In January of 2023, Appellants filed a motion to vacate a permanently issued 209A on the grounds of fraud on the Court and newly discovered evidence which was not available to Appellants at the issuance of the 209A or when the Order was made permanent ex parte by the exercise of reasonable diligence and was only obtained in 2022 through civil litigation in Nevada, which involves both parties[1] (RA Vol. I 18-37)[2].

Appellants claim that S.H committed fraud on the Court to fraudulently obtain a permanent 209A against Appellants in 2017 and 2018 whereas, S.H abused and deceived the Court to obtain a permanent 209A under false and fraudulent pretenses as grounds for a plan to utilize the 209A and

[1] Appellee filed a civil suit against Appellants in the state of Nevada for $21,000,000.00 in July, 2021. Appellants have been *pro se* litigants for nearly three years in litigation and regularly confer with counsel representing S.H in Nevada who now represent her in this Court after being granted *pro hac vice*.
[2] Record of Appendix exhibits will be referenced with the abbreviation RA = record of appendix, Vol = volume and then the page number following. Example RA Vol 22 etc. Addendum is referenced as such – Add. and following page number, for example Add pg 52.

justify the fraud she has carried out as part of a larger pattern of harassment. See M.C.D., 90 Mass. App. Ct. at 342, quoting Adams, supra at 729-730 (*false allegation of abuse or false testimony alone insufficient to constitute fraud on court absent showing that it contributed to "'larger pattern of harassment' or 'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter'") – Add. pg 53.* Specifically, Appellants claim that S.H intentionally withheld police reports from the Court which contradicted her testimony in prior years and forged documents including her 209A and supporting affidavits which were presented to the Court in 2017 and 2018 in order to secure a favorable outcome. If the withheld reports had been presented to the Court in 2017 and 2018, the outcomes of the decisions would certainly have been different and would not have favored Appellee as the reports show the true nature of events which took place. (RA Vol II – Tr. Lyons – 98 and 93-95; RA Vol II – Tr. Key 113-117).

In January of 2023 Appellants filed motion to vacate based upon fraud on the Court which was heard on February 22nd, 2023 by Honorable Judge Tracy Lyons of the Boston Municipal Court. Appellants' motion to vacate was heard in part and additionally moved to a later date to ensure all evidence of fraud Appellants presented to the Court was also provided to S.H. and her attorney prior to the next hearing (RA Vol II 90-105). Appellants' motion to

vacate was scheduled to be heard again on March 27th, 2023. On March 13th, 2023, Appellee filed for attorney Sabina Mariella[3] admittance *pro hac vice* in Massachusetts. Appellants filed an opposition to however; Sabina Mariella was admitted *pro hac vice* and rather than assisting Appellee's attorney Maura Melcher, she replaced her, leading Appellee to perjure herself on the stand after Defendants made it known to Ms. Mariella that she was representing a client with contradicting allegations in Nevada[4] though her 209a states she was never forced, threatened or under duress (RA Vol I 17).

On March 27th, 2023 Appellants were heard on their motion to vacate by Honorable Judge Steven M. Key. (RA Vol II 109-175). Appellee filed an opposition and both parties appeared (RA Vol I 38-59). Appellants submitted

---

[3] Sabina Mariella is an associate of Boies Schiller Flexner LLC and represents S.H. in the Nevada District Court but is not relevant to Appellants' claim of fraud on the Court and in fact, represents contradicting allegations made by S.H in Nevada which are not consistent with the facts in Appellee's original affidavits in 2017 and 2018 (RA Vol III 16-18; RA Vol III 41-44; RA Vol IV 73-75; RA Vol IV 166-171)

[4] S.H gave testimony with new allegations which contradicted her 209A and affidavits but were on par with her complaint in Nevada. Defendants made Sabina Mariella aware of such contradictions during a meet and confer regarding the contradicting allegations in two states and that it would be a conflict of interest for Ms. Mariella to represent S.H in Nevada. The allegations presented by S.H on March 27th, 2023 were new allegations of "damage" which she alleges was due to "the rapes", which had never been stated in any prior complaint in Massachusetts and is also subject to defamation in Defendants counterclaim due to evidence presented by Defendants which shows the contradicting statements and perjury committed by S.H (RA Vol II – Tr. Key 150).

"two binders of materials containing nearly two hundred pages of pictures, text messages, emails, affidavits, police reports and selective pages of what seems to be a transcript of the initial two-party hearing" (RA Vol III; RA Vol I 60-91), however, within the first five minutes of the hearing, Appellants were instructed by the Court not to speak on the evidence of fraud or the years which new evidence obtained by Appellants in 2022 proves S.H committed fraud in 2017 and 2018 (RA Vol II Tr. Key 112-125). Additionally, the Court stated they would not look at the evidence provided by Appellants and that he is not going to look at those documents (dismissing the fact that the Motion to Vacate was filed on grounds of fraud on the Court (RA Vol II Tr. Key 114). On May 22nd, 2023, the lower Court issued its decision and Order on Appellants' motion to vacate and DENIED Appellants' motion to vacate. M.T.M and D.B filed their joint notice of Appeal on June 11th, 2023 (RA Vol I 102-103).

## STATEMENT OF FACTS

In April of 2017, at the age of Nineteen years and six months old, S.H, who was a co-worker of Appellant D.B at the Boston Ballet, initiated a consensual dating relationship with both Appellants M.T.M and D.B. The dating relationship in its entirety was nearly three months in length however, two of those three months, (in June and July) were purely through long distance messaging (RA Vol III 92-93; RA Vol III 105-107; RA Vol III 143-162).

Although Appellants admit the relationship was unorthodox and unfamiliar to them, the relationship between Appellants and Appellee was mutually loving and caring (RA Vol III 163-171).

On May 25th, 2017, after weeks of harassing their daughter regarding the disapproval of the relationship between S.H and Appellants, the parents of S.H took a flight from California to Massachusetts, kidnapped their **adult** daughter under false pretenses, stole her phone, driver's license and funds from her bank account, forced her onto a plane back to California, "into exorcisms" and into therapy because they did not approve of her choice to be in a relationship with Appellants (RA Vol III Tr. McKenna 94-95; RA Vol II Tr. Lyons 41; RA Vol II Tr. Key 125; RA Vol III 108-109; RA Vol III 171-175; RA Vol III 139; RA Vol III 37-40).

Three days later, Appellee's father knowingly filed two false police reports against Appellants, one with the Orange County Sherriff's Department in California falsely claiming Appellants had boarded a flight to California and were going to kidnap S.H and harm their family and another with the Somerville Police Department in Massachusetts, falsely stating Appellants had over fifty automatic weapons, hand grenades and land mines in their Somerville home, illegally using an address of a Somerville resident who lived in the same apartment complex as Appellants while making the call from California to file

the false report (RA Vol III 176; RA Vol III 7). Both reports were filed consecutively, within one minute of each other. The Somerville Police Department cleared the home of Appellants within minutes stating there were no such automatic weapons, hand grenades or land mines and the call was unfounded. In California, The Orange County Sheriff's Department interviewed S.H away from her father where she stated "there is no validity to the statements made by her father and she feels safe and that no harm would be done to her family". These reports were **withheld** from the Boston Municipal Court in 2017 and 2018 to intentionally deceive the Court and later obtained by Appellants through subpoenas issued by the Nevada District Court in 2022.

From May 25th, 2017 – July 18th, 2017 Appellee Sage Humphries pursued Appellants and expressed her desire to continue her relationship with them using various forms of communication on her own merit, borrowing strangers' phones, her parents' phones, her therapist's phone, and her younger brother's phone to contact Appellants via Snapchat, (who were in Australia at the time), in order to hide her communication with Appellants from her parents, who continued to withhold her phone, driver's license and funds from her bank account until she agreed to break off her relationship with Appellants (RA Vol III 125; RA Vol III 107).

On July 9th, 2017 S.H warned Appellants that she would be forced to leave a fake voicemail to convince her parents that she had ended the relationship with Appellants so that her parents would allow her to go back to Boston, giving back her driver's license, phone and bank account funds (RA Vol III 106; RA Vol III 125; RA Vol III 127 – 138). S.H followed through, leaving the fake break up voicemail on July 10th, 2017. Following the voicemail, S.H continued to pursue Appellants via Snapchat on her own accord telling Appellants to delete the voicemail and to "not believe a word [she] said" (RA Vol III 126; RA Vol III 134). Days later, S.H messaged Appellants stating her parents had forced her to see a lawyer and were forcing her to sign a restraining order against Appellants in order for her parents to allow her to go back to Boston, that she "got really upset and left" (RA Vol III 106). S.H stated via messages to Appellants that her desire was to be with them once she returned to Boston but that she needed to "make them [her parents] believe she ended the relationship" (RA Vol III 132). S.H continued to pursue Appellants and maintained her relationship with them until July 18th, 2017 sending a final message, "I want you to know I am no longer your girlfriend, this is over and final ~ Sagey".

Four days later, on July 22nd, 2017, S.H intentionally and knowingly filed a false police report with The Orange County Sherriff's

Department in California against Appellants, reporting sexual assault and threats to do bodily harm, contradicting her initial statement in her father's false report on May 28th, 2017 (RA Vol III 8). Officers interviewed S.H privately, away from her parents viewing any and all messages between S.H and Appellants on her phone and the report concluded that the allegations were unfounded based on the interview, the messages and the prior statements made to law enforcement by S.H. (RA Vol III 7). This report was **intentionally withheld** by S.H in 2017, 2018 and 2023 and was not obtained by Appellants until 2022 during litigation in Nevada whereas, Appellants subpoenaed The Orange County Sheriff's Department to obtain this report. Appellants were **never able** to cross examine S.H on this report as S.H did not bring the report with her to Court. The withholding of this report is due to its contradicting statements which would have certainly changed the outcome of the lower Court's decision in 2017. S.H **even admitted** in her deposition in Nevada that her attorney, Maura Melcher "did not find it necessary" to bring to Court in 2017 which Appellants cannot provide as the deposition was following the Motion to Vacate in March. However, this report was presented to Judge Key in Defendants' motion to vacate as it had never previously been litigated and shows by a preponderance of the evidence that S.H has committed fraud and that this was a calculated scheme to obtain an unwarranted abuse prevention order in 2017 for a larger purpose.

Appellants were never aware of these reports as they were not presented to the Court in 2017 or in 2018 however, even *if* Appellants were aware of the reports, they were not able to obtain the reports until a subpoena was served upon The Orange County Sheriff's Department (*California Public Records Act. - See Cal. Gov. Code 7923.600*)[5].

On August 1st, 2017, S.H. filed for an emergency 209A against Appellants in Massachusetts. On August 14th, 2017 S.H. was granted a 209A for extended period of one year (RA Vol I 9-17). On August 15th, 2018 S.H was granted a permanent 209A against Appellants ex parte (RA Vol IV 91-94). Appellants were not notified of the hearing as they had since moved to California in 2017, were not present for the hearing and there was no representation notified or present for Appellants at the 2018 hearing where the 209A order was made permanent (RA Vol II 87-91).

Following the final message from S.H on July 18th, 2017, there was no contact or association in any way between Appellants and S.H. Appellants were residents of Las Vegas, NV and **yet**, on May 13th, 2021 S.H with her friend Madison Breshears took to social media to post defamatory statements about Appellants stating "PSA: Dusty Button is a sexual predator. If u or someone you

---

[5] *California Public Records Act. - See Cal. Gov. Code 7923.600* - reports requested without a subpoena, court order or specific statutory authority will be treated as a request made under the California Public Records Act.

know has been victimized by dusty_button[6] u aren't alone. She can't keep a ballet job because she grooms young dancers for sex acts with herself and her husband." (RA Vol III 47-49). This immediately caused Appellants to lose any and all work and they have been unemployed for nearly three years. Appellants contacted an attorney for defamation however, three months later, (before Appellants could file their complaint against S.H) on July 28th, 2021, S.H filed a federal civil complaint in the District Court of Nevada citing allegations which contradict her previous affidavits presented to the Boston Municipal Court in 2017 and 2018. S.H has since been involved in ongoing litigation with M.T.M and D.B for nearly three years. Appellants currently have a pending Motion to Dismiss and a Counterclaim of defamation and civil conspiracy against S.H. In February of 2023, S.H filed to dismiss Defendant's counterclaim but her motion was DENIED, proving such defamation has taken place[7] including because S.H filed with the Boston Municipal Court that she never engaged in sexual relations

[6] @dusty_button was previously Appellant Dusty Button's Instagram username amassing over four hundred thousand follwers including children whom were taught dance classes by Appellants which would have seen the horrendous defamatory and disgusting allegations intentionally posted on social media by S.H.

[7] In May of 2022 S.H did an interview with Good Morning America (RA Vol III 46) citing allegations which differs from her complaint in Nevada and her previous narrative in Massachusetts. Appellants have included this interview in their counterclaim in Nevada which S.H motioned to dismiss but her dismissal was DENIED.

with Appellants by force, threat or while under duress yet, filed false police reports prior to the initial hearing stating otherwise and additionally filed a complaint in Nevada stating she was "forced" to engage in sexual relations with Appellants and omits being in a dating relationship with both Appellants. S.H has been extremely vocal in the press, managed by her PR team at Boies Schiller Flexner, including but not limited to interviews with Good Morning America[7], the New York Times, New York Post, Boston Magazine, Boston Globe, Cosmopolitan, the Washington Post, Breitbart, Perez Hilton, Fox News, CNN, ABC, Pointe Magazine, Dance Media, Dance Spirit Magazine and Safe Haven Ballet black tie Gala which was a fund raiser that raised a large sum of money to pay her to verbally tell her fraudulent story and thus, committing fraud on a federal level[8].

There have only been two instances where the Court paid attention all evidence presented by Appellants, once on February 22nd, 2023 in Appellants initial hearing for their motion to vacate in front of Honorable Judge Lyons and

---

[8] The Supreme Court has been unequivocal for decades that there's no First Amendment right to commit fraud. In Illinois v. Telemarketing Associates (2003), it stated that the "First Amendment does not shield fraud." In United States v. Stevens (2010), it observed "the prevention and punishment of" fraud has "never been thought to raise any Constitutional problem." And just two months ago in United States v. Hansen, Trump-appointed Justice Amy Coney Barrett noted that "fraudulent representations through speech for personal gain" are "not protected by the First Amendment." (*Add pg 55*).

in Nevada, when Defendants filed their counterclaim against S.H where both outcomes were favorable to Appellants, as the evidence shows S.H has knowingly perjured herself and will continue to do so, engaging in a federal crime each and every time she carries out the act.[9] *See - 18 U.S.C. §§ 1621 to 1623*[10] *(Add. pg. 71)*

## A. PROCEDURAL HISTORY

On August 1st, 2017 S.H. filed for an emergency Abuse Prevention Order against Appellants (RA Vol I 9-17). On August 14th, 2017 both parties appeared represented, Defendants presented evidence to the Court which included over 1200 documents as well as four external thumb drives of data pertaining to the relationship between the parties. This evidence was dismissed

---

[9] 18 U.S.C. §§1621 to 1623--perjury, subornation of perjury, and false declarations before grand juries and courts. It has been held by at least one court that simple perjury, the assertion of a false affirmative statement by an individual testifying under oath, is not an obstruction of justice under the omnibus clause of *18 U.S.C. § 1503*. See *United States v. Faudman, 640 F.2d 20, 23 (6th Cir. 1981); United States v. Essex, 407 F.2d 214, 218 (6th Cir. 1969). But see United States v. Griffin, 589 F.2d 200, 203, 204 (5th Cir.) (dicta), cert. denied, 444 U.S. 825 (1979); cf. Smith v. United States, 234 F.2d 385 (5th Cir. 1956)* (submission of false affidavits of others violates omnibus clause). However, if simple perjury is accompanied by other obstructive, truth-suppressing acts, an omnibus clause offense may exist.

[10] *Under federal law (18 USC § 1621), for example, the elements of the crime of perjury include: 1) Having taken an oath before any competent tribunal (court), officer, or person; 2) In any case where U.S. law authorizes an oath for truthful testimony, declaration, deposition, or certification; 3) Willfully and contrary to such oath; 4) States or subscribes to any material matter which they do not believe to be true. (see Add pgs. 62,63,64,65,66,67).*

and neglected by Judge McKenna as he did not put eyes on any evidence presented by Defendants and refused to enter the evidence presented as exhibits (RA Vol IV 5) and on August 14th, 2017 the lower Court extended the 209A for one year (RA Vol IV 80-91). On August 15th, 2018 S.H appeared at Boston Municipal Court, represented by her attorney Maura Melcher requesting the order be made permanent. The Court was presented with fraudulent evidence by Plaintiff and her attorney and in the absence of Defendants with no representation as neither were notified to appear in 2018 (RA Vol II 86-91). Defendants were not residents of Massachusetts in 2018 and had since moved to Los Angeles, CA in September of 2017. On August 15th, 2018 the 209A was made permanent ex parte and Appellants were notified of the permanent order months later in California.

On July 29th, 2021, S.H. filed a civil complaint against M.T.M and D.B in the state of Nevada, citing contradicting allegations to those mentioned in her 2017 and 2018 affidavits to the Boston Municipal Court which included documents Appellants later subpoenaed from law enforcement, further proving after four years, the documents received were intentionally withheld by Appellee S.H. and her attorney in 2017 and 2018 to calculate a planned scheme and deceive the Court. These documents "could not have been easily obtained with diligence" in prior years to 2022 but were intentionally withheld to use this

fraudulently obtained 209A as the catalyst to harass Appellants for over seven years.

Appellants presented this newly discovered evidence to the trial Court on March 27th, 2023 which included these false police reports, messages and incident reports made by S.H, her attorney Maura Melcher and her parents, forged documents and affidavits, evidence of Appellee harassing and stalking Appellants in 2020 and other instances of fraud, proving there was a calculated scheme which was planned by Appellee, her attorney and her family to fraudulently obtain a permanent 209A against Appellants (RA Vol IV 80-90; RA Vol IV 166 - 171; RA Vol IV 172-175; RA Vol III 98-99; RA Vol III 50-51; RA Vol III 27-34; RA Vol III 100-104; RA Vol III 19-26; RA Vol III 89-91).

## SUMMARY OF THE ARGUMENT

Appellants argue that the Court erred by 1) violating Defendants due process and right to be heard when presented with evidence of fraud on the Court and 2) abuse of discretion. The facts of this case far exceed the standard to vacate and expunge the permanent 209A due to fraud on the Court, where the requirements of such an extraordinary circumstance are abundantly clear in this case - See *COMMISSIONER OF PROBATION vs. AMANDA ADAMS. 65 Mass. App. Ct. 725 June 15, 2005 - March 10, 2006, (*"The District Court judge found that the 209A order against Adams was obtained through fraud on the court.")

(Add. pg 50). Appellants discovered new evidence in 2022 which was withheld by S.H and her attorney in 2017 and 2018 including false police reports, testimony and text messages via discovery in Nevada. Appellants performed their due diligence in obtaining and presenting evidence of fraud to the lower Court however, the trial Court turned a blind eye at the hearing, preventing Appellants from even speaking upon the evidence of fraud or the years in which the fraud occurred. This was a clear violation of Defendants due process, Appellants' right to be heard and their rights to a fair hearing. The evidence presented to the lower Court by Appellants was not available to Appellants prior to 2022 nor were the related issues litigated in 2017 or 2018 and therefore, S.H was never cross examined on these issues, as they were not presented to the Court prior to March 27th, 2023[11]. This new evidence **could not** have been obtained by Appellants prior to 2022 as it was withheld by Plaintiff and her

[11] Discovery requests in a G. L. c. 209A proceeding are left to the judge's discretion. See Guidelines § 1:03. *However*, this is not a simple discovery issue. Rather, the judge here improperly considered evidence that the defendant had never seen, and thus was unable to challenge. See *Frizado, 420 Mass. at 597-598, 651 N.E.2d 1206* (in G. L. c. 209A proceedings, "the rules of evidence need not be followed, provided that there is fairness in what evidence is admitted and relied on") (Add pg 53). And while the defendant is not required to disprove the allegations against her, her ability to raise issues of fact was necessarily impeded here by the lack of access to the plaintiff's evidence against her. See C.O. v. MM, 442 Mass. at 656-657, 815 N.E.2d 582. Guidelines § 1:02(f) (each party must be given meaningful opportunity to challenge other party's evidence) (add. pg 52)

attorney for years and Appellants were not aware of the existence of such evidence. (RA Vol IV 34). The lower Court refused to hear from Defendants in regard to the evidence of fraud or the years in which the fraud occurred; 2017 and 2018, stating "I do not want to hear about the years prior to the issuance of the permanent 209A" which includes evidence of fraud. (RA Vol II 113-114).

In preventing Appellants from speaking upon the fraud on the Court, the trial Court then made numerous errors in the final Order because it made the decision to negligently dismiss the evidence presented by Appellants, which would have certainly changed the outcome of the final decision and accurately depicted the nature of the case where judicial errors were made in neglecting the evidence[12].

---

[12] The Court erred in the final Order due to the dismissal of evidence which would have prevented such errors including but not limited to: 1) S.H was **not** unrepresented in 2018 but was represented by Maura Melcher 2) Defendants did not litigate issues which should have been litigated at the issuance of the initial 209A in 2017 and the Order which was made permanent in 2018. 3) Defendants were not allowed to cross examine Plaintiff on evidence of fraud which included evidence such as reports and text messages that were not readily available or easily obtained by Defendants in 2017 or 2018 and therefore, S.H was never cross examined on such issues. 4) Defendants did not publish any data of S.H in a daily mail article or otherwise in any YouTube videos as noted by Honorable Judge Lyons. 5) Defendants were not notified of an ex parte hearing in 2018. 6) Defendants were unable to defend themselves against statements of evidence presented by Plaintiff in 2018 as they were not notified by Plaintiff's counsel or the court and were therefore, unable to defend against evidence or testify otherwise. 7) Materials presented to the lower Court which includes evidence of fraud on the Court was dismissed therefore the Court's ruling of "Defendants argument of fraud upon the Court would be more compelling if there were

The Court demonstrated that the final Order is not consistent with the facts or evidence, made it clear that the factual basis behind Defendant's argument was not understood and that the Court did not make an independent assessment of facts presented by Defendants by determining which facts were relevant or true as the Court did not *allow* the facts that were relevant and true to be discussed. Appellants argue that the Court showed judicial bias by proceeding to allow S.H. to speak on the *very years* which Appellants were instructed *not to speak on*. In doing so, the Court allowed S.H. to present "new statements"[13] in her testimony which directly spoke on the years of 2017 and 2018 and the underlying issues of the original Order which *entirely* contradicted her prior 2017 testimony, (RA Vol II 150; 156).

It is without question that S.H, with the force of her parents and assistance of her attorneys have by definition, met every standard of committing

---

credible evidence of fraud on the Court" lacks foundation due to the Court's dismissal of credible evidence which was presented but dismissed.

[13] New statements provided by S.H in her testimony consisted of new allegations of rape in 2017 which had never previously been stated before and therefore, by the Court allowing this testimony to take place as S.H presented new statements from years Defendants were not allowed to speak on while offering evidence of fraud and perjury which was dismissed can only be deemed bias. It would be impossible for the Plaintiff's statements to not have swayed the Judge by providing additional testimony to her previous 2017 testimony yet, ordering Defendants to refrain from speaking on 2017 and 2018 though it was Defendants who were the moving party requesting a motion to vacate on the ground of fraud upon the Court.

fraud upon the Court. Appellants, who presented that fraud, were prevented from speaking on the very grounds of fraud they presented for their motion which proves by a preponderance of the evidence that S.H. willfully and knowingly committed the crimes of fraud upon the Court and perjury to obtain a permanent 209A and ultimately using that Order as grounds to deceive the Court and harass Appellants for the foreseeable future.

## ARGUMENT

### 1. The Lower Court's Decision Should Be Reversed Because Appellants Were Deprived of Their Right to a Fair Hearing

This case presents one singular issue for this Court and three sub-issues pertaining to the Order of the Court; 1) The lower Court violated Appellants' due process ordering them not to speak on the evidence of fraud on the Court which occurred in 2017 and 2018. The lower Court negligently dismissed the evidence of fraud on the Court presented by Appellants which shows that Appellee committed fraud on the Court in order to fraudulently obtain an Abuse Prevention Order against Appellants. The only relevant fact, that the Appellee has committed fraud on the Court, is undisputed.

#### A. The lower Court erred in violating Defendants' due process

Due process requires the Court provide a fair hearing to both parties; As the Supreme Judicial Court has held, "due process 'does not demand

the impossible.'" Defendants were not provided an opportunity to speak on the very issues which they filed their motion to vacate on.

"A defendant must be provided a meaningful opportunity to be heard in a G. L. c. 209A proceeding." *Idris I. v. Hazel H., 100 Mass. App. Ct. 784, 790 (2022) (Add pg 54)*. This includes the defendant's right to testify and to present evidence. *Frizado v. Frizado, 420 Mass. 592, 597* (1995)(Add pg. 53). "It is not sufficient to hear from the defendant's attorney and to deny the defendant the opportunity to present evidence. *C.O. v. M.M., 442 Mass. 648, 657* (2004) (Add. pg 52). Here, Defendants were not provided a meaningful opportunity to be heard and although Defendants presented new evidence to the Court, the Court made the decision not to look at any evidence presented which referred to documents obtained after 2018 but which proved fraud on the Court was committed in 2017 and 2018, the years of the issued Orders. In 2018, Plaintiff presented statements based upon reports that were withheld from the Court which Defendants were not made aware of or obtained until 2022 but which are statements that are proven to be fraudulent and yet, relied on by the Court to grant S.H a permanent 209A. Defendants made effort to explain this to the Court but their efforts were denied (RA Vol II Tr. Key 109-175).

*Idris I. v. Hazel H., No. 21-P-570 (Mass. App. Ct. Mar. 25, 2022),* ("without first hearing the evidence, a judge should not, over objection, vacate

any provision of a c. 209A order once issued", whereas Defendants should have been heard in order to vacate the order (Add pg 54). *Singh v. Capuano, 468 Mass. 328, 331, 10 N.E.3d 1074* (2014). (Add pg. 60). We see no reason why the same should not apply here: "a judge must first hear the evidence from both parties before extending a c. 209A order. This is especially true where here, as in most G. L. c. 209A cases, the judge did not hear from the defendant when the initial order was obtained on an ex parte basis. For that reason, the judge erred by extending the c. 209A order without first hearing the defendant's testimony.[14]

## I. TRIAL COURT JUDGEMENT 'DISCUSSION' ERRORS

The lower Court erred regarding the factual background of this case, making it clear the Court did not understand the facts behind Defendants' argument and could not have possibly determined which facts were relevant or true as the Court could not make an independent assessment of facts presented by Defendants due to the dismissal of that relevant and true evidence being denied.

1. BACKGROUND

---

[14] Similarly, not only did the original judge err by extending the c. 209A order without first hearing the Defendants' testimony… fraudulent statements were made to the Court in reference to false police reports which were withheld to conceal the truth of the reports and the contradicting evidence which proves the statements to the Court to be fraudulent and which Judge Key dismissed although presented with the evidence.

The Court states in the background portion of the order, "On August 14, 2018 Humphries appeared at the courthouse unrepresented." (RA Vol I 97) This statement is false as S.H appeared at the courthouse represented by her attorney, Maura Melcher (RA Vol I 80-90). The Court goes on the state "Humphries filed an affidavit asserting additional allegations relating to the Defendants' conduct and requested the Order be made permanent. After hearing from her, the judge made the order permanent. (RA Vol I 97). The Court errs in stating "after hearing from her" as the Court did not hear from S.H that day, but from her attorney, Maura Melcher who intentionally deceived the Court by making false statements to the Court including, "The Defendants were in their thirties", "They feed her drugs", and "She was underage", amongst other lies stated to the Court that day (RA Vol IV 83 Tr. McKenna). Statements regarding police incident reports that were filed on June 11th and on August 13th, 2018 were intentionally mischaracterized in statements made to the Court and yet, the reports **were not** provided to the Court (RA Vol IV 84-86; RA Vol III 87-88; RA Vol III 97). Appellants obtained these reports and presented them to Judge Steven Key however, the reports were not looked at, though there was evidence of fraud Defendants attempted to show.

S.H and her attorney took the opportunity to deceive and manipulate the Court with allegations that were unfounded, withholding reports

and documents which contradicted their statements to the Court that day for personal gain as Defendants were not present and no representation was present for Defendants allowing Plaintiff to make any statements necessary to obtain a permanent order as Defendants could not defend themselves against these false statements. This information and evidence *was* available to Judge Steven Key but was dismissed and Defendants were not allowed to speak on the evidence they obtained after 2018.

"While a judge surely may exclude irrelevant or inadmissible evidence, or even interrupt an argument or a witness examination that has become repetitious, [s]he should not terminate a hearing without ensuring that [s]he has heard all the relevant and admissible evidence once." *S.T., 80 Mass. App. Ct*. at 430-431, 953 N.E.2d 269. (Add pg 61) See Guidelines § 5:01. But a judge's "discretion is not unlimited and each side must be given a meaningful opportunity to challenge each other's evidence.[15] (RA Vol II 87).

On February 22nd, 2023 at the initial two-party hearing in 2023 regarding Defendants' motion to vacate, Honorable Judge Lyons took notice

[15] Appellants were *not* given a meaningful opportunity to challenge evidence in 2017 or 2018 and again in 2023, which was not available prior to this hearing however, Appellants presented evidence that was withheld from 2017 and 2018 but were instructed not to discuss such evidence and further, were prevented from cross examining S.H on these issues which were not previously litigated in 2017 or 2018 and where S.H was not cross examined on the issues.

that Defendants did not have proper notice, were not present and were not represented in 2018, yet, the 209A was made permanent ex-parte with Defendants having no knowledge of such allegations made by S.H and no way to defend themselves against the false allegations or statements made to the Court.

2. LACK OF NOTICE

The lower Court states, "The Defendants had notice of the next hearing date and chose not to appear at their own peril." (RA Vol I 98). Defendants contest that although the Clerk "announced" the Order, Defendants immediately moved out of the state Massachusetts following the hearing (RA Vol II 87-92). Additionally, as noticed by Honorable Judge Tracy Lyons, Plaintiff S.H was responsible for providing Defendants' new address to the Court thought Defendants were not notified of the hearing, the "additional allegations" presented to the Court or notified by Plaintiff's counsel regarding a 2018 affidavit… nor were Defendants notified by their previous counsel in regard to the extension hearing (RA Vol II 87). (*Tracy MacDonald vs. Kevin Caruso SJC-11381, A defendant served with an ex-parte order advising him of his right to be heard at a scheduled hearing has actual and constructive notice*

*that failure to attend the hearing may result in the extension of the order. Commonwealth v. Delaney, 425 Mass. 587, 581 (1997)*[16]*. (Add. pg 51 and 57).*

Finally, The Court relies on a Daily Mail Article submitted to the Court by Plaintiff to make a decision regarding Defendants' attendance to the 2018 hearing based on statements written by a journalist for the media which as the Court is aware, is hardly factual evidence to consider and never verbatim (RA Vol IV 133-165).

3. FRAUD ON THE COURT

Massachusetts law is clear, a permanent 209A should only be set aside on **extraordinary circumstances** when fraud has been committed or etc. (*Adams, 65 Mass. App. Ct. at 737. See M.C.D., 90 Mass. App. Ct. at 342, quoting Adams, supra at 729-730 (false allegation of abuse or false testimony alone insufficient to constitute fraud on court absent showing that it contributed to "'larger pattern of harassment' or 'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.'"*[17]*)*

---

[16] Defendants were never served with an ex-parte order advising them of their right to be heard at a scheduled hearing or that failure to attend the hearing may result in the extension of the order.

[17] A narrow exception to this rule allows for judicial expungement "in the rare and limited circumstance that the judge has found through clear and convincing evidence that the order was obtained through fraud on the court." - Adams, 65 Mass. App. Ct. at 737. (Add pg 53). See M.C.D., 90 Mass. App. Ct. at 342 (Add. pg 61).

(Add. pg 58). The Court states "The Defendants' fraud on the Court allegations would be more intriguing if there were credible evidence that there was fraud", yet, refused to listen to or view the credible evidence which Defendants presented but were prevented from speaking on. The Court DENIED Defendants the right to speak on the fraud on the Court and refused to look at the evidence of fraud therefore, it would have been *impossible* for the Court to review the credible evidence that there was fraud due to the negligence in denying Defendants the right to be heard. There is credible evidence which Defendants presented that would have established the fraud the Court but instead, this evidence was dismissed by the Court.

Evidence obtained by Appellants during the discovery of litigation in Nevada proves the 2018 police reports filed and withheld from the Court were fraudulent and that statements made by S.H and her attorney to the lower Court in 2018 were intentionally deceiving in order to obtain a permanent 209A including but not limited to:

**1)** A false police report filed by S.H and her attorney on June 11th, 2018 and a legally recorded phone call which contradicts the allegations stated in the false police report (RA Vol III 50-51; 97; 98,99). This recorded call was between Appellants and Jordyn Brown, whose sister's name, (Kennedy Brown), was used by S.H to fraudulently claim she was Appellants' personal assistant

who was "trying to get her address" and who Appellee and her attorney fraudulently claimed was Appellants' personal assistant while knowing this was untrue (RA Vol IV 84-85; RA Vol IV 172-173). The Melrose Police Department stated that even *if* the statements made by S.H and her attorney were true, it was not a violation of the 209A however, the allegations were intentionally false and the phone call between Appellants and Jordyn Brown proves S.H once again committed fraud and intended to harass Defendants by making false allegations which would enable her to obtain a fraudulent 209A by merely making statements to the Court of the allegations but withholding the actual report. Appellee intentionally made this fraudulent claim to the Melrose Police Department to obtain a permanent 209A at an ex-parte hearing where Appellants were not able to defend themselves or address the false allegations, they were unaware of for years. In addition to the false allegation and report, Appellee's attorney, Maura Melcher intentionally misrepresented the communication by Kennedy Brown to S.H stating "Oh I really need your address", which is not at all what is presented in the communications, (RA Vol IV 84; RA Vol III 97; RA Vol IV 172). Additionally, the message was sent to S.H from Kennedy in November of 2017 but was not reported until the night before her hearing.

**2)** On August 13th, 2018 (the night before Appellee's 209A extension request for a permanent Order), S.H filed another false police report

claiming Appellants were selling illegal firearms in California (RA Vol III 87). This report was discovered and obtained by Appellants in 2022 and was never introduced to the Court or to Appellants prior to discovery opening in Nevada. Appellants presented evidence to the lower Court on March 27th, 2023 to prove fraud was once again committed by S.H as she knowingly and willingly filed a false police report. Additionally, the photo S.H used to file this police report was a photo of a toy airsoft prop which was already confirmed by police and by the Court, (RA Vol III 87; RA Vol III 19-26; RA Vol III 89). The photo used by Appelle's parents was a screen shot of Defendant M.T.M's Instagram[18] story in 2017 where he was selling parts from his airsoft toy props in October of 2017 in Massachusetts, which were used for photography as props for marketing on social media. S.H intentionally post-dated a photo to make it seem as if the photo was taken in 2018 in California of a real gun when Plaintiff knew Defendants owned no firearms and never did (RA Vol III 19-26; 89-91; 100-104). The police report resulted in no violation as she stated to the police that she "just wanted the matter on record", the night before her 209A extension hearing and then withheld the report which ironically, she withheld again in her exhibits in 2023 thought she attached the files surrounding the report using the

[18] Instagram is an online social media platform which was used by both Appellants as public figures to promote their own brands and business, using the platform for marketing.

same pattern. Finally, at the extension hearing, S.H did not adjust her affidavit to the findings of the false police reports she filed and the statements made by officers and withheld the reports from the Court, resulting in fraudulent statements to the Court in order to obtain her permanent Order. Additionally, her 2018 affidavit is not signed or witnessed (just as her 2017 affidavit was not witnessed), and Appellants did not receive this affidavit until litigation in Nevada in 2022 (RA Vol IV 166-171).[19]

S.H knew that Appellants did not own firearms and therefore, her statement to police that Defendants were to turn over all firearms to the Boston Police Department as if they had not, was misleading and false as she knew that Defendants never had any firearms to turn over (RA Vol III 100; RA Vol III 141). S.H could have made this false allegation at any time prior to her 209A extension hearing yet, waited until the night before her hearing to file the false report with police, solely to state to the Court that she filed a report with the police and would be able to use the mere statement of a report in Court the following morning while withholding the actual report.

[19] "Any liar can get an order by merely asserting fear": Why Chapter 209A must be revamped to protect against the issuance of unnecessary abuse protection orders. Brittany Pierce, 47 New Eng. L. Rev. 427 (No. 2, Winter 2012)(Add pg 70).

These reports of fraud were presented to Judge Key in 2023 but dismissed, resulting in judicial abuse of discretion, ignoring the evidence of fraud which Defendants presented and were unaware of until 2022. As Defendants were not allowed to raise the issues of fraud, which was discoverable evidence obtained in 2022 and 2023, these issues could not have been previously raised which is why Defendants filed to vacate the 209A based upon fraud on the Court. The Court showed clear discrimination by forcing Defendants to argue fact that was not pertaining to fraud and instead directed them to "significant changes in circumstance".

Finally, the lower Court errs in their final Order stating "The Defendants' fraud on the court allegation would be more intriguing if there were credible evidence that there was fraud" yet, ordered Appellants not speak on the evidence of fraud and refused to look at documents which proved the fraud he states is missing within his order (RA Vol I 99) - "certain minimum standards of fairness must be observed." S.T. v. E.M., 80 Mass. App. Ct. 423, 429, 953 N.E.2d 269 (2011). (Add pg 61) It is undisputed that a defendant -- in any case -- "has a right to notice and an opportunity to be heard."

The lower Court states in their Discussion portion of the Order, "In making their fraud on the court case, the Defendants raise facts and issues that were either addressed or should have been addressed at the original hearing",

(RA Vol I 100). This statement by the lower Court is false and proves that Appellants did not receive a fair hearing[20] nor was the Order of the Court consistent with the facts or evidence presented by Appellants as the Court did not allow Defendants an opportunity to speak upon the fraud on the Court which relies on newly discovered evidence and therefore, it would be impossible for the Court to know whether or not the evidence Defendants presented and were instructed not to speak on was credible or not, which it is. (*Idris I. v. Hazel H., No. 21-P-570*[2] (Mass. App. Ct. Mar. 25, 2022) (Add pg 54) .[21] Appellants have never litigated the facts of fraud on the Court or the new evidence they presented to the Court which included withheld documents received through discovery in 2022 and police reports obtained in 2022 and 2023 which were subpoenaed by *pro se* Defendants and not used in Court in 2017 or 2018 and

---

[20] A defendant must be provided a meaningful opportunity to be heard in a G. L. c. 209A proceeding. See C.O. v. MM, 442 Mass. at 657, 815 N.E.2d 582 (Add. pg 52)

[21] Here, the defendant contends that the judge denied her a meaningful opportunity to challenge the plaintiff's evidence. In support of her claim, the defendant points to the fact that the judge had before her evidence that the defendant did not have, and had not seen. It was only once the plaintiff referred to certain exhibits in response to a question posed by the judge that the defendant's attorney even became aware of that evidence. She immediately brought it to the attention of the judge, but the judge did not respond. Instead, the judge allowed the plaintiff's attorney to continue his direct examination of the plaintiff. The judge also noted several times during the hearing that she was considering written evidence submitted by both parties; as a result, the judge admittedly relied on evidence that the defendant did not see, much less have an opportunity to challenge.

therefore, it would have been impossible for Appellants or their Counsel to have previously litigated the matters they attempted to litigate at the hearing for which they are filing this appeal as the evidence was not available to litigate.

A. **The Court Erred Stating S.H Was Cross Examined**

The lower Court states, "Humphries was cross examined on these issues by Defendants' attorney at the two-party hearing"[22] (RA Vol I 99). This is false. S.H was never cross examined on the issues of fraud Defendants presented at the hearing on March 27th, 2023, including because it was dismissed by the Court. The Court violated the Defendants' right to cross examine the Plaintiff on issues which had never before been presented to the Court or to Appellee on cross examination. *See Idris I. v. Hazel H., No. 21-P-570* (Mass. App. Ct. Mar. 25, 2022) (Add pg 54) - "the defendant also contends that the judge improperly limited her cross-examination of the plaintiff. Although the defendant's attorney began a cross-examination of the plaintiff, the judge sua sponte ended it and directed the attorneys to proceed to closing arguments. "While a judge surely may exclude irrelevant or inadmissible evidence, or even interrupt an argument or a witness examination that has become repetitious, [s]he should not terminate

---

[22] Judge Key refers to the 2017 two-party hearing but neglects to refer to the missing police reports from both years 2017 and 2018 which Appellee had never been cross examined on before as they were only obtained by Appellants in 2022 during discovery in Nevada litigation.

a hearing without ensuring that [s]he has heard all the relevant and admissible evidence once." *S.T., 80 Mass. App. Ct.* at 430-431, 953 N.E.2d 269. (Add pg 61) See Guidelines § 5:01. But a judge's "discretion is not unlimited and each side must be given a meaningful opportunity to challenge each other's evidence.[23]

The referred to police reports were withheld by S.H and her attorneys in 2017 and 2018 and were not obtained by Defendants until 2022 and 2023 therefore, it would have been *impossible* to litigate such issues or to cross examine Appellee on the issues of fraud that were not discoverable until four years later. Additionally, if one is not aware that new issues of fraud exist, they could not have been challenged and therefore the Court is incorrect in stating that Appellants were challenging the "underlying issues".

## II. MOTION TO VACATE STANDARD

Defendants presents a case to the lower Court which is not filed on ground of a standard motion to vacate and therefore should not require the same standard to vacate such as a "significant change is circumstance", that would be

[23] Appellants were not given a meaningful opportunity to challenge evidence in 2017 or 2018 which was not available prior to this hearing however, Appellants presented evidence that was withheld from 2017 and 2018 but were instructed not to discuss such evidence and further, were prevented from cross examining S.H on these issues which were not previously litigated in 2017 or 2018 and where S.H was not cross examined on the issues.

required of someone with a "standard" case, as this case shows clear and convincing evidence that there was fraud on the Court (see- COMMISSIONER OF PROBATION vs. AMANDA ADAMS 65 Mass. App. Ct. 725 where "The commissioner filed a motion to reconsider and to vacate the expungement order. The judge denied the commissioner's motion, reasoning that the District Court had the inherent power to expunge the record of the 209A order against Adams where the order was obtained by fraud on the court. The judge also found that Adams is an attorney, and that before either party had obtained a 209A order, her work had involved representing children. He further found that Jones falsely complained of Adams to the Board of Bar Overseers. As a result of Jones's false complaints, the terms and conditions of Adams's employment were altered to prevent her unsupervised contact with children. The judge found, but did not further specify why, Adams lost employment opportunities because of her listing in the system as an abuser).[24] (Add pg 50).

---

[24] S.H and her family sent the fraudulently obtained 209A to every single employer who D.B and M.T.M worked for with emails stating Appellants were abusers, harassing them online and causing any and all work to be lost due to the defamatory statements made by S.H and her family and friends (RA Vol III 47-49; 141-142). Appellants cannot find work due to the global media campaign against them and have not been able to continue their previous work as a majority of Appellant D.B's work involved teaching dance to thousands of children.

Moreover, instead of addressing the evidence of fraud on the Court, the Court instructed Appellants to discuss the "significant changes in circumstance" that had occurred after the permanent 209A was granted in 2018. Appellants were denied their rights and opportunity to speak and for this reason alone, the Court's order should, at the very least, be reversed however, there is evidence of fraud which directly allows for a motion to vacate and expungement of the Order; See - K.D. v. J.D., 92 Mass. App. Ct. 1115, 94 N.E.3d 881 (Mass. App. Ct. 2017) (Add. pg 56) - "It is well settled that a record of an abuse prevention order issued pursuant to G. L. c. 209A generally cannot be expunged via judicial order. See Vaccaro v. Vaccaro, 425 Mass. 153, 156-157 (1997) (Add. Pg 68); Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725, 728 (2006) (Add. Pg 50).

A narrow exception to this rule allows for judicial expungement "in the rare and limited circumstance that the judge has found through clear and convincing evidence that the order was obtained through fraud on the court." Adams, supra at 737. A false allegation of abuse or false testimony alone is insufficient to constitute fraud on the court absent a showing that it contributed to a " 'larger pattern of harassment' or an 'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.' " M.C.D. v. D.E.D., 90 Mass. App. Ct. 337, 342 (2016), quoting

from Adams, supra at 729, 730 (Add. pg 58). See Wojcicki v. Caragher, 447 Mass. 200, 210 (2006).[25] (Add. pg 69).

Plaintiff and the lower Court both reference MacDonald v. Caruso, 82 Mass. App. Ct. 1120, 978 N.E.2d 106 (Mass. App. Ct. 2013) (Add. pg 57) however, the referenced case does not apply here because the grounds for the motion to vacate are based on grounds of fraud upon the Court and not "significant changes in circumstance". Defendants are not presenting evidence of changes in circumstance because there were never circumstances that should have been changed as the entirety of Appellee's narrative is fraudulent and criminal. Not only does this case meet the requirements of an extraordinary circumstance to set aside a permanent 209A, Massachusetts fraud on the Court statute is clear, "A fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability

---

[25] The narrow exception applies here, in this case, where Plaintiff, who was in a consensual relationship with Appellants has lied to officers of the Court and law enforcement to abuse the Court system in order to obtain a permanent 209A against Appellants with future plans to harass Defendants through the media and litigation in two states as an unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter. S.H has used the lower Court and the District Court of Nevada against each other by committing fraud on the Court in both states for favorable outcomes in each Court and later admitting to the fraud which has been committed, and leaving Appellants to present evidence of fraud in each court but only after the decisions have been made, favoring Appellee due to fraud on the Court.

impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Id . at 729-730, quoting from Rockdale Mgmt. Co. v. Shawmut Bank, N.A , 418 Mass. 596, 598 (1994).).[26] (Add pg. 59).

S.H and her attorneys have continuously deceived the Court to ensure the result they are seeking is in their favor, only to later provide statements and documents (such as the deposition of S.H in September of 2023), which contradict the prior filings submitted and the successful manipulation of the Court, which consistently leaves Defendants in a position to refile evidence proving Plaintiff and her attorneys have deceived the Court.

## CONCLUSION

Appellee has not only committed perjury and fraud upon the Court, she has used the lower Court to commit fraud upon a different Court at a federal level in Nevada. S.H has intentionally and knowingly lied to Federal officers, law enforcement and officers of the Court for personal gain, to create a calculated scheme by using the Court to protect herself from the crimes she has

---

[26] Defendants argue that they are not challenging the underlying basis as the Court states by quoting Macdonald v. Caruso, Defendants presented evidence showing the Court fraud was committed by S.H in order to obtain and extend her 209A in 2017 and again in 2018.

committed. Appellants have been harassed for seven years by a woman who will continue to use the system to her advantage as long as the Court allows it. Appellants wanted nothing to do with S.H from the moment they realized she would commit any crime which would place Appellants as a pawn for her scheme and personal gain. Appellants have not simply "moved on" but have wanted nothing more than to be as far from S.H as they possibly can and have made efforts to do so since 2017 yet, S.H continued to stalk Appellants (admittedly in her deposition in Nevada), in California and file another complaint against them in 2021 after four years of silence. S.H has completely destroyed the lives of Appellants for nearly seven years causing them to lose all employment, their home, their assets and the ability to work due to the global media campaign against them using this fraudulently obtained 209A.

Appellants reside in South Carolina and live with Appellant's mother due to the loss of their home in Nevada and the inability to work. Appellants are on government programs for food and health such as SNAP and MEDICAID as they are unemployed, unable to get employment due to Appellee's global media campaign and fraudulent allegations against them.

Appellants put their lives on hold for nearly seven years due to Appellee's fraudulent allegations but have decided not to allow her fraud to put their lives on hold any longer and are expecting a child in August. Appellants

sole priority is the life they are bringing into the world and it is imperative that these false and fraudulent allegations which S.H has created are corrected and dismissed in their entirety and the Court must allow Appellants to be heard on the fraud and crimes S.H has committed.

For the foregoing reasons, Appellants respectfully ask the Court for relief in reversing the lower Court's decision and vacate the permanent 209A which was issued through fraud, under false pretenses in 2017 and made permanent in 2018 with evidence of fraud on the Court not available to Defendants until 2022 and which was dismissed by the lower Court on March 27th, 2023. In the event the Court does not reverse the lower Court's decision, Appellants request a new hearing where they are afforded the right to be heard and to present and speak on all of the new evidence which proves by the preponderance of the evidence that S.H and her attorney have intentionally committed fraud upon the Court.

**CERTIFICATE OF COMPLIANCE**

*Pro se* Appellants hereby certify, as required by *Mass R.A.P 16(k),* including but not limited to requirements listed in *Mass R.A.P 16a, Mass R.A.P 16(e), Mass R.A.P(f), Mass R.A.P 18, Mass R.A.P* and that this brief complies with the rules of court that pertain to the filing of Appellants' brief and including.

Respectfully dated this 26th day of January, 2024,

Mitchell Taylor Moore and Dusty Button

(*Pro se*)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing was filed on January 26th, 2024, via the Court's electronic filing system and sent to all parties on the e-service list including Attorney Maura Melcher for the Appellee.

Dated this 26th day of January, 2024,



Mitchell Taylor Moore and Dusty Button

(*Pro se*)

# ADDENDUM

## TABLE OF CONTENTS


| TITLE | START PAGE # |
|---|---|
| Mass G. L. C 209a §1 | 49 |
| Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725, 729 | 50 |
| Commonwealth v. Delaney, 425 Mass. 587, 581 (1997) | 51 |
| C.O. v. M.M, 442 Mass. 648, 815 N.E.2d 582 (Mass. 2004) | 52 |
| Frizado v. Frizado, 420 Mass. 592, 651 N.E.2d 1206 (Mass. 1995) | 53 |
| Idris I. v. Hazel H. No. 21-P-570 (Mass. App. Ct. 2022) | 54 |
| Illinois ex rel. Madigan v. Telemarketing Associates, Inc. 538 U.S.600 2003 | 55 |
| K.D. v. J.D., 92 Mass. App. Ct. 1115, 94 N.E.3d 881 (Mass. App. Ct. 2017) | 56 |
| MacDonald v. Caruso, 82 Mass .App. Ct. 1120, 2012 WL 5457497 (2012) | 57 |
| M.C.D. vs. D.E.D. 90 Mass. App. Ct. 337 | 58 |
| Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. 596, 598 | 59 |
| Singh v. Capuano, 10 N.E.3d 1074, 468 Mass. 328 (Mass. 2014) | 60 |
| S.T. vs. E.M. 80 Mass. App. Ct. 423 | 61 |
| United States v. Essex, 407 F.2d 214 (6th Cir. 1969) | 62 |
| United States v. Faudman, 640 F.2d 20 (6th Cir. 1981) | 63 |

United States v. Hansen, No.22-179 (9th Cir. 2023) 64,65

United States v. Griffin, 589 F.2d 200 (5th Cir. 1979) 66

United States v. Smith, 234 F.2d 385 (5th Cir. 1956) 67

Vaccaro v. Vaccaro, 425 Mass. App. Ct. 153 68

Wojcick v. Caragher, 447 Mass. 200 69

Brittany Pierce, 47 New Eng. L. Rev. 427 (No. 2, Winter 2012) 70

18 U.S.C. § 1621 - U.S. Code - Unannotated Title 18. Crimes and Criminal Procedure § 1621 71

Boston Municipal Court Order Judge Steven M. Key 05/22/23 72

casetext
Search all cases and statutes... All State & Fed.
Sign In Get a Demo Free Trial



# Mass. Gen. Laws ch. 209A § 1

Download PDF

Current through Chapter 87 of the 2023 Legislative Session

Next Section
Section 209A:2 - Abuse prevention proceedings; venue

Section 209A:1 - Definitions

As used in this chapter the following words shall have the following meanings:

"Abuse", the occurrence of one or more of the following acts between family or household members:

(**a**) attempting to cause or causing physical harm;
(**b**) placing another in fear of imminent serious physical harm;
(**c**) causing another to engage involuntarily in sexual relations by force, threat or duress.

"Court", the superior, probate and family, district or Boston municipal court departments of the trial court, except when the petitioner is in a dating relationship when "Court" shall mean district, probate, or Boston municipal courts.

"Family or household members", persons wh

(**a**) are or were married to one another;
(**b**) are or were residing together in the same household;
(**c**) are or were related by blood or marriage;
(**d**) having a child in common regardless of whether they have ever married or lived together; or
(**e**) are or have been in a substantive dating or engagement relationship, which shall be adjudged by district, probate or Boston municipal courts consideration of the following factors: (1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship.

"Law officer", any officer authorized to serve criminal process.

"Protection order issued by another jurisdiction", any injunction or other order issued by a court of another state, territory or possession of the United States, the Commonwealth of Puerto Rico, or the District of Columbia, or tribal court that is issued for the purpose of preventing violent or threatening acts or harassment against, or contact or communication with or physical proximity to another person, including temporary and final orders issued by civil and criminal courts filed by or on behalf of a person seeking protection.

"Vacate order", court order to leave and remain away from a premises and surrendering forthwith any keys to said premises to the plaintiff. The defendant shall not damage any of the plaintiff's belongings or those of any other occupant and shall not shut off or cause to be shut off any utilities or mail delivery to the plaintiff. In the case where the premises designated in the vacate order is a residence, so long as the plaintiff is living at said residence, the defendant shall not interfere in any way with the plaintiff's right to possess such residence, except by order or judgment of a court of competent jurisdiction pursuant to appropriate civil eviction proceedings, a petition to partition real estate, or a proceeding to divide marital property. A vacate order may include in its scope a household, a multiple family dwelling and the plaintiff's workplace. When issuing an order to vacate the plaintiff's workplace, the presiding justice must consider whether the plaintiff and defendant work in the same location or for the same employer.

*Mass. Gen. Laws ch. 209A, § 1*

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

**Casetext research**
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

# COMMISSIONER OF PROBATION vs. AMANDA ADAMS. [Note 1]

65 Mass. App. Ct. 725

June 15, 2005 - March 10, 2006

Hampden County

Present: GREENBERG, BECK, & MCHUGH, JJ.

Abuse Prevention. Domestic Violence Record Keeping System. Fraud. Practice, Civil, Fraud, Costs. Criminal Records. Statute, Construction.

This court concluded that a judge has the inherent power to expunge the record of a civil abuse protection order, issued against a defendant pursuant to G. L. c. 209A, from the Statewide domestic violence registry system, in the rare and limited circumstance where the judge has found through clear and convincing evidence that the order was obtained through fraud on the court. [728-737]

A District Court judge was without statutory authority to levy costs against the Commissioner of Probation in an action initiated by a private plaintiff. [737-738]

CIVIL ACTION commenced in the Springfield Division of the District Court Department on November 1, 2002.

Motions to vacate an abuse prevention order, to destroy records of the vacated order, and for reconsideration were heard by W Michael Ryan, J., and a motion for costs was also heard by him.

David M. Lieber, Assistant Attorney General, for the plaintiff.

Mary Ann Chase for the defendant.

---

**BECK, J.** In this case we are asked to decide whether a District Court judge has the inherent power to expunge a civil abuse protection order, issued pursuant to G. L. c. 209A, from the Statewide domestic violence registry when the order was obtained through fraud on the court. We hold that he does.

Introduction. Jake Jones and Amanda Adams were involved

Page 726

in a romantic relationship. Adams ended the relationship because Jones's violence and threats of violence caused her to fear for her life and safety. On October 30, 2002, Adams obtained an emergency abuse protection order against Jones pursuant to G. L. c. 209A. (We will refer hereafter to all abuse protection orders issued pursuant to G. L. c. 209A as 209A orders.) In retaliation, Jones filed a complaint for a 209A order against Adams. At an ex parte hearing on November 1, 2002, a District Court judge entered a temporary 209A order against Adams. On November 8, 2002, following a hearing at which both Jones and Adams were present, another District Court judge extended both 209A orders for one year. The order against Jones was later made permanent. Meanwhile, Jones was charged in both the Worcester and Springfield Divisions of the District Court Department with a violation of the 209A order against him, threats to commit a crime, and criminal harassment.

On April 29, 2003, Adams filed a motion to vacate the 209A order against her and requested the destruction of all records of the order. A different District Court judge granted her motion to vacate the 209A order but denied her request to destroy the records. Adams then filed a separate motion to destroy all records of the vacated order, including the records located in the Statewide domestic violence record keeping system (system) maintained by the office of the Commissioner of Probation (commissioner) pursuant to G. L. c. 209A, s. 7. See St. 1992, c. 188, s. 7. The commissioner intervened and opposed the motion. The judge granted the motion, reasoning that the prejudice to Adams outweighed the State's need to maintain records, and he ordered expungement of the record from the system.

The commissioner filed a motion to reconsider and to vacate the expungement order. The judge denied the commissioner's motion, reasoning that the District Court had the inherent power to expunge the record of the 209A order against Adams where the order was obtained by fraud on the court. [Note 2] The judge also found that Adams is an attorney, and that before either party

Page 727

had obtained a 209A order, her work had involved representing children. He further found that Jones falsely complained of Adams to the Board of Bar Overseers. As a result of Jones's false complaints, the terms and conditions of Adams's employment were altered to prevent her unsupervised contact with children. The judge found, but did not further specify why, Adams lost employment opportunities because of her listing in the system

Page 728

as an abuser. The commissioner appeals, arguing that the District Court has no authority to expunge the record of a 209A order from the system. We affirm.

General Laws c. 209A. "Civil restraining or protective orders ... may be entered pursuant to G. L. c. 209A, which provides that the courts have jurisdiction over abuse prevention cases as described therein. Orders for the protection of those abused may be granted under G. L. c. 209A, s.s. 3, 4, and 5, and are enforced under G. L. c. 209A, s. 7. By St. 1992, c. 188, s. 7, the Legislature authorized and directed the Commissioner of Probation . . . to develop and implement the system, which is to contain a computerized record of the issuance and violation of any restraining or protective order. Section Seven . . . restrict[s] access to the records in the system to judges and law enforcement agencies." Vaccaro v. Vaccaro, 425 Mass. 153, 155 (1997). [Note 3] "There is nothing in St. 1992, c. 188, s. 7, or in G. L. c. 209A, that permits a record to be removed or that authorizes the entry of a judicial order directing expungement of a record from the system." Id. at 156. "The system is designed to promote the goal of preventing abuse . . . by providing a judge (and other authorized agencies) with complete information about a defendant." Id. at 157.

Fraud on the court. The Supreme Judicial Court has long recognized the court's powers to protect its authority: "[T]he inherent powers of the courts are those whose exercise is essential to the function of the judicial department, to the

Page 729

maintenance of its authority, or to its capacity to decide cases. Opinion of the Justices, 279 Mass. 607, 613 (1932). Blankenburg v. Commonwealth, 260 Mass. 369, 373 (1927)." Sheriff of Middlesex County v. Commissioner of Correction, 383 Mass. 631, 636 (1981). "[E]very judge must exercise his inherent powers as necessary to secure the full and effective administration of justice." O'Coin's, Inc. v. Treasurer of the County of Worcester, 362 Mass. 507, 514 (1972).

In essence, the District Court judge found that the 209A order against Adams was obtained through fraud on the court. We recognize that the judge did not use the words "fraud on the court." However, he found that "[the nineteen] allegations by [Jones] are false and perjurious"; "[his behaviors] are indicative of an obsessive compulsion that is extremely alarming"; "[t]he seeking of the restraining order . . . is part of a larger pattern of harassment"; and "[i]n addition to filing affidavits that contain falsehoods . . . , [Jones] has falsely complained of [Adams] to the Board of Bar Overseers." In addition, the judge found that Jones obtained the ex parte order against Adams "without disclosing that [Adams] had a restraining order against him." See G. L. c. 209A, s. 3 (requiring disclosure of pending abuse prevention orders). See also Szymkowski v. Szymkowski, 57 Mass. App. Ct. 284, 287 (2003) (in considering 209A complaint, judge "must be alert against allowing process to be used" for purposes of harassment). We hold that these findings support a conclusion that the order was obtained through fraud on the court.

It has been repeatedly held that courts have the inherent power to revoke judgments obtained by fraud on the court. See Jose v. Lyman, 316 Mass. 271, 280 (1944); Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. 596, 598 (1994); Gray v. Commissioner of Rev., 422 Mass. 666, 672-673 (1996); Winthrop Corp. v. Lowenthal, 29 Mass. App. Ct. 180, 184 (1990). "Fraud on the court implies corrupt conduct and embraces only that species of fraud which does, or attempts to, defile the court itself." Munshani v. Signal Lake Venture Fund II, LP, 60 Mass. App. Ct. 714, 718 (2004), quoting from Winthrop Corp. v. Lowenthal, supra. "A `fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has

Page 730

sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. at 598, quoting from Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989).

A court must be sufficiently empowered in order to prevent fraud on the court, because allowing the court to be manipulated by fraud poses a danger to its authority. See Rockdale Mgmt. Co. v. Shawmut Bank, N.A., supra; Gray v. Commissioner of Rev., supra. Thus, the Supreme Judicial Court has held that "[w]hen a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct." Rockdale Mgmt. Co. v. Shawmut Bank, N.A., supra.

Fraud on the court has been found in cases where a party has perjured him or herself to the court and the court has relied upon the fabrications when reaching a judgment. See Matter of Neitlich, 413 Mass. 416, 423 (1992) (fraud on the court where attorney made false statement with intent to deceive court); Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. at 598-599 (fraud on the court where party forged letter, proffered forged letter in response to interrogatories, and testified under oath as to authenticity of letter); Munshani v. Signal Lake Venture Fund II, LP, 60 Mass. App. Ct. at 719-720 (fraud on the court where party fabricated an electronic mail message [e-mail], submitted fabricated e-mail with false affidavit to court, and attempted to hide fabrication from court for several months). In this case, Jones committed fraud on the court through his calculated pattern of false statements to the court, which influenced the District Court judge's decision to issue a 209A order against Adams. The District Court judge found that Jones made nineteen separate false statements under oath in four different affidavits submitted to the court, and that Jones's application for a 209A order against Adams was part of a larger pattern of harassment and lies to the court and to the Board of Bar Overseers.

Page 731

When faced with a finding of fraud on the court, "[t]he judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct." Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. at 598. The judge should seek "to secure the full and effective administration of justice." O'Coin's, Inc. v. Treasurer of the County of Worcester, 362 Mass. at 514. Judges may exercise their inherent powers to fashion remedies that not only realistically protect the integrity of the pending litigation, but that also "send an appropriate message to those who would so abuse the courts of the Commonwealth." Munshani v. Signal Lake Venture Fund II, LP, 60 Mass. App. Ct. at 721. When courts invoke their inherent authority to fashion remedies to respond to fraud on the court, "lack of statutory authorization . . . is immaterial." Brach v. Chief Justice of the Dist. Ct. Dept., 386 Mass. 528, 535 (1982). Such power exists "without statutory authorization and cannot be restricted or abolished by the Legislature." Gray v. Commissioner of Rev., 422 Mass. at 672, quoting from Brach v. Chief Justice of the Dist. Ct. Dept., supra. "We examine judicial responses to findings of fraud on the court for an abuse of discretion." Rockdale Mgmt. Co. v. Shawmut Bank, N.A., supra.

It is well established that, upon a finding of fraud on the court, judges may enter default judgments, dismiss claims, or dismiss entire actions. See Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. at 598-599; Munshani v. Signal Lake Venture Fund II, LP, 60 Mass. App. Ct. at 721. In cases where an attorney has committed fraud on the court, judges have used their inherent authority to suspend or disbar the attorney. See Matter of Neitlich, 413 Mass. at 423-425; Matter of Otis, 438 Mass. 1016, 1017 (2003). Common to these cases is the notion that judges have the authority to fashion remedies that will protect the integrity of the courts, and that will discourage the public from attempting to use the courts to perpetuate fraudulent schemes. See Munshani v. Signal Lake Venture Fund II, LP, supra.

In this case, vacating the 209A order against Adams is insufficient to protect the integrity of the courts and does not send an appropriate message to the public. Vacating the order leaves a record of the order in the system. See St. 1992, c. 188, s. 7. Not

Page 732

only does this leave a permanent mark against Adams, but it also leaves, in perpetuity, a record of a fraudulently obtained court order. Although labels such as "dismissed" or "closed" are applied to records in the system, no explanation is provided as to why the order was dismissed or the case closed. Many vacated 209A orders are vacated because of the victim's failure to prosecute. See Vaccaro v. Vaccaro, 425 Mass. at 158 n.5. Law enforcement officials will not be notified that the order was vacated because it was obtained by fraud on the court. Rather, they may presume it was vacated because of the victim's failure to prosecute or because of insufficient evidence. The perpetuation of a fraud amounts to a defiling of the court itself when law enforcement officials rely on inaccurate information produced by the court. See Winthrop Corp. v. Lowenthal, 29 Mass. App. Ct. at 184.

Just as vacating the order is an insufficient remedy in those circumstances, sealing the record of the order is equally inadequate. When records are sealed, they do not disappear. While sealed records become unavailable to the public, "the raw data continues to be available to law enforcement officials (police, probation officers, and courts)." Commonwealth v. Roberts, 39 Mass. App. Ct. 355, 356 (1995). Law enforcement officials would retain access to information that is inaccurate and misleading and was obtained through fraud on the court. Therefore, sealing would not remedy the defiling of the court.

Adams argues that Police Commr. of Boston v. Municipal Ct. of the Dorchester Dist., 374 Mass. 640, 661 (1978), controls the outcome of this case. In that case, the Supreme Judicial Court concluded that the "power to order expungement or its equivalent is a power that properly may be exercised by the courts of the Commonwealth as a necessary adjunct to their exercise of judicial power." Ibid. (citation and footnote omitted). "The power properly may be exercised where the utility of the records for law enforcement purposes is likely to be minimal or nonexistent." Ibid. In that case, the court held that a Juvenile Court judge had the inherent power to order the police department to expunge the arrest records of a juvenile after a delinquency proceeding against the juvenile had been dismissed with prejudice. Id. at 641-642. In doing so, the court reasoned

Page 733

that the unnecessary harm to the juvenile outweighed the government's interest in maintaining and disseminating records of a dismissed case. Ibid.

The commissioner argues that this case is controlled by Vaccaro v. Vaccaro, 425 Mass. at 157-159, in which the Supreme Judicial Court held that the District Court had no statutory or inherent power to order expungement of a c. 209A record from the system. In order to understand that holding, however, it is crucial to understand the facts of that case. There, the plaintiff, Mrs. Vaccaro, obtained an ex parte temporary protective order against the defendant, her husband, pursuant to G. L. c. 209A, s. 5. Id. at 154. At a subsequent hearing, Mrs. Vaccaro testified to incidents of the defendant's verbal and physical abuse and her ongoing fear that he would harm her. Ibid. The District Court judge found that the plaintiff was genuinely fearful, but that there was insufficient evidence to justify the continuation of the protective order. Ibid. Therefore, the judge vacated the 209A order and directed that the record be expunged from the system. Id. at 155. On appeal, the Supreme Judicial Court held that "no power to order expungement can be implied." Id. at 157. The court reasoned that the purpose of the system is to provide a judge with complete information about a defendant, and to allow a judge to identify subsequent situations in which a subsequent plaintiff may face a particularly heightened degree of danger. Ibid. See Commonwealth v. Gavin G., 437 Mass. 470 (2002) (where case against juvenile was dismissed due to Commonwealth's failure to prosecute, Juvenile Court has no inherent authority to expunge records maintained pursuant to statutory scheme where statute does not authorize expungement).

In Vaccaro v. Vaccaro, the Supreme Judicial Court distinguished Police Comm. of Boston v. Municipal Ct. of the Dorchester Dist., supra, on the ground that the Vaccaro case was "not a case where there is `little or no valid law enforcement purpose . . . served by the maintenance and dissemination of . . . records.' " 425 Mass. at 158, quoting from Police Commr of Boston v. Municipal Ct. of the Dorchester Dist., 374 Mass. at 642. In enacting G. L. c. 209A, the Legislature was concerned with the prevalence of domestic abuse and wanted to ensure that abusers were easily identifiable by law enforcement

Page 734

officials when they either violated 209A orders or committed other crimes in the future. Id. at 157-158. The Legislature specifically omitted an expungement provision in the statute because it did not want vacated 209A orders to go unnoticed. See id. Recognizing the realities of domestic abuse, the court noted that many victims initially obtain 209A orders but then either fail to prosecute them or, as in Vaccaro, fail to present enough evidence to allow a court to continue the issuance of one. See Vaccaro v. Vaccaro, 425 Mass. at 158 n.5. Therefore, although many 209A orders would likely be vacated, the Legislature determined that records of such orders would still provide valuable information to law enforcement officials. Ibid.

In Vaccaro, the Supreme Judicial Court also distinguished Police Commr of Boston v. Municipal Ct. of the Dorchester Dist., supra, by pointing out that while there is no statutory authority requiring the maintenance of juvenile arrest records, there is an express legislative directive to implement the domestic violence registry system. Vaccaro v. Vaccaro, 425 Mass. at 158. That distinction is immaterial to this case because when courts invoke their inherent authority to fashion remedies to respond to fraud, "lack of statutory authorization . . . is immaterial." Brach v. Chief Justice of the Dist. Ct. Dept., 386 Mass. at 535. See Gray v. Commissioner of Rev., 422 Mass. at 672. The District Court judge in the Vaccaro case was not invoking the court's inherent authority to remedy fraud on the court; therefore, the legislative directive omitting a provision for expungement controlled. Here, however, there has been fraud on the court, and the judge's inherent power to fashion an appropriate remedy is not vitiated by the statute's omission regarding expungement. See Commonwealth v. S.M.F., 40 Mass. App. Ct. 42, 43-45 (1996) (where sealing statutes are inapplicable and no statutory remedy is therefore available, trial courts may invoke inherent power to order expungement). Contrast Commonwealth v. Roe, 420 Mass. 1002, 1002-1003 (1995) (even though charges against defendant dismissed for want of prosecution, court lacked inherent authority to expunge criminal records of adult because legislative scheme allows such records to be sealed).

Allowing expungement in this case does not offend the

Page 735

Supreme Judicial Court's rationale in Vaccaro. [Note 4] As the court stated in that case, the purpose of G. L. c. 209A is to protect prospective victims. Vaccaro v. Vaccaro, 425 Mass. at 157. In the case before us, Adams was the victim of abuse. The 209A order against her was obtained fraudulently as a means of retaliation against her for seeking a 209A order against Jones, and the court was used as a mechanism to perpetrate the fraud. Compare Jose v. Lyman, 316 Mass. at 280 (use of court's inherent powers permissible to prevent fraud on the court), and Winthrop Corp. v. Lowenthal, 29 Mass. App. Ct. at 184 (same), with Vaccaro v. Vaccaro, 425 Mass. at 158, and Commonwealth v. Gavin G., 437 Mass. at 473. Expunging Adams's record not only remedies any harm suffered by her, but it also sends the appropriate message to the public: the courts will not be used as a vehicle for abusing G. L. c. 209A as a means of harassment through the seeking and obtaining of fraudulent 209A orders. Moreover, the court in Vaccaro stated that these orders should not be expunged because vacated orders serve an informational purpose. Vaccarro v. Vaccarro, 425 Mass. at 158. In contrast, the order in this case serves no informational purpose. Because the order was obtained through fraud on the court, a subsequent discovery of the order in the system by a law enforcement official will provide incorrect information to the official. Adams has not posed any threat to Jones, and any contrary record will impede the administration of justice.

Balancing test. The Supreme Judicial Court has cautioned that, before a court may invoke its inherent power to expunge a record, it must ensure that the government's interest in maintaining the record does not outweigh the harms suffered by the maintenance of the record. Police Comm: of Boston v. Municipal Ct. of the Dorchester Dist., 374 Mass. at 658-661. As in that case, the resulting harm here from the maintenance and dissemination of the fraudulent 209A order against Adams outweighs the government interest in keeping the record in the system. We have already discussed how the court's integrity and ability to secure the full administration of justice is severely

Page 736

weakened when a court order obtained through fraud remains a record available to and perhaps relied upon by law enforcement officials. Contrast Vaccaro v. Vaccaro, 425 Mass. at 157. Moreover, the harm suffered by Adams is obvious. Without expungement, she will suffer from a blemish on her record for the rest of her life. The District Court judge found that the existence of this record already has had a detrimental impact on the terms and conditions of her employment. [Note 5] The existence of a record can also adversely affect Adams if she is involved in any future 209A proceeding. See Wooldridge v. Hickey, 45 Mass. App. Ct. 637, 638 (1998). Furthermore, the existence of an order can have a negative effect on her during future bail proceedings. See Frizado v. Frizado, 420 Mass. 592, 594 (1995).

The potential harm to the courts and to Adams outweighs the governmental interest in maintaining and disseminating the fraudulently obtained 209A order, because the order contains absolutely no informational purpose. Contrast Vaccaro v. Vaccaro, 425 Mass. at 157; Commonwealth v. Gavin G., 437 Mass. at 473. Because the 209A order was obtained by fraud on the court, it does not offer any assistance to law enforcement officials. If anything, the existence of a vacated 209A order that was obtained through fraud is unhelpful because it provides false information to law enforcement. This impedes the fair administration of justice.

The commissioner also argues that the government has an interest in conserving resources and in not having to defend against frivolous attempts to expunge records from the system. We do not find this argument sufficiently persuasive to outweigh the egregious harms suffered by the courts and c. 209A defendants if expungement were not allowed in those limited circumstances. Courts must afford a hearing to c. 209A defendants within ten business days of the entry of a temporary order. G. L. c. 209A, s. 4. An additional hearing is required in

Page 737

order to extend the length of a 209A order beyond one year. G. L. c. 209A, s. 3. Should a c. 209A defendant claim that a plaintiff is pursuing the order through fraud on the court, he or she will have adequate opportunity to assert that argument at either or both of these hearings. If the judge does not make a finding of fraud on the court, the defendant will have no basis for a subsequent motion to expunge the record of the order from the system. Nothing in G. L. c. 209A, or in this opinion, requires a hearing on a defendant's motion for expungement. Furthermore, the "clear and convincing evidence" standard of proof required for demonstrating a fraud on the court finding will necessarily limit the number of instances when expungement may even be considered as an appropriate remedy.

We therefore conclude that a judge has the inherent authority to expunge a record of a 209A order from the Statewide domestic violence registry system in the rare and limited circumstance that the judge has found through clear and convincing evidence that the order was obtained through fraud on the court. Because the District Court judge's finding of fraud on the court was not an abuse of discretion, we hold that expungement of the order from the system in this case was appropriate. [Note 6] Cf. Corrado v. Hedrick, 65 Mass. App. Ct. 477 (2006).

Costs. The commissioner also appeals from the judge's order that the commissioner reimburse Adams for costs in the amount of $500 due to the commissioner's failure to attend a hearing at the initial hearing on her motion to destroy all copies of the 209A order. [Note 7] We conclude that the judge erred because he was without statutory authority to order the payment of costs in these circumstances.

"[C]osts against the Commonwealth, its officers, and agencies shall be imposed only to the extent permitted by law." Mass.R. Civ.P. 54(d), as appearing in 382 Mass. 821 (1980). "Consequently, express statutory authority is required to levy costs on

Page 738

the Commonwealth." Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. 430, 468 (1997). See Broadhurst v. Director of the Div of Employment Security, 373 Mass. 720, 722 (1977); Ware v. Commonwealth, 409 Mass. 89, 90 (1991). "This requirement arises out of the general rule of law that the Commonwealth `cannot be impleaded in its own courts except with its consent, and, when that consent is granted, it can be impleaded only in the manner and to the extent expressed . . . [by] statute.' " Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. at 468, quoting from General Elec. Co. v. Commonwealth, 329 Mass. 661, 664 (1953).

The District Court judge did not ground his decision to levy costs against the commissioner on any express statutory authority. Adams argues that G. L. c. 261, s. 14, authorizes the judge to levy such costs. That statute provides: "In civil actions and in proceedings which are instituted by, or in the name of, the commonwealth, and not at the relation, in behalf, or for the use, of a private person, the commonwealth shall be liable for costs as is an individual." G. L. c. 261, s. 14. It has been repeatedly held that s. 14 provides for the recovery of costs in civil actions that are initiated by the Commonwealth and does not allow for recovery of costs from the Commonwealth in civil actions initiated by a private plaintiff. See Broadhurst v. Director of the Div of Employment Security, 373 Mass. at 724; Ware v. Commonwealth, 409 Mass. at 92; Judge Rotenberg Educ. Center, Inc. v. Commissioner of the Dept. of Mental Retardation (No. 1), 424 Mass. at 468-469. The present action was initiated by a private plaintiff. Adams's motion seeking an order of expungement necessarily compelled the commissioner to intervene and oppose the motion. Therefore, G. L. c. 261, s. 14, does not authorize the District Court judge to levy costs against the commissioner.

That portion of the order dated February 27, 2004, awarding costs against the Commissioner of Probation is vacated. In all other respects, the order is affirmed.

So ordered.

---

FOOTNOTES

[Note 1] A pseudonym. The Commissioner of Probation intervened to oppose Adams's motion for expungement and is now the appellant in this matter. The original plaintiff, Jake Jones (a pseudonym), is not a party to this appeal.

[Note 2] The judge found that Jones made the following false statements under oath:

"1. [Adams] stated she had me under surveillance for six months."

"2. She stated to me that the people following me were members of organized crime."

"3. The defendant's family have many links to organized crime."

"4. Her uncle was `Bendo,' an enforcer for the Puglione family."

"5. I broke off our relationship."

"6. She has threatened my new girlfriend."

"7. She has threatened myself."

"8. The defendant has made numerous threats using the term `The boys owe me a favor.' "

"9. I feel the real danger is to myself as well as my children."

"10. [Adams's] threats to my children remain . .. very real."

"11. [Adams] . . .had made repeated threats such as `Your children will suffer,' and I will make things very inconvenient for you."

"12. She had me followed for six months by members of organized crime."

"13. [Adams] has made fraudulent statements."

"14.. . . the relationship ceased after I met another woman of another race."

"15. [Adams] arrived at my residence on October, 29, 2002 clearly intoxicated . . . in a rage . . . threatening my children . . . and stating she would make my life very inconvenient."

"16. [Adams] personally sabotaged a personal injury case for my father."

"17. [Adams] does in fact misrepresent herself by using an alias in her work as a lawyer."

"18. [Adams's] HIDDEN AGENDA to settle an old vendetta is her real motivation in this case."

"19. [Adams] is using her title to further harass me."

[Note 3] The relevant portion of St. 1992, c. 188, s. 7, provides as follows:

"The commissioner of probation is hereby authorized and directed to develop and implement a statewide domestic violence record keeping system . . . . Said system shall include a computerized record of the issuance of or violations of any protective orders or restraining orders issued pursuant to . . . [G. L. c. 209A]. Further, said computerized system shall include the information contained in the court activity record information system maintained by the office of said commissioner. The information contained in said system shall be made available to judges considering petitions or complaints pursuant to [G. L. c. 209A]. Further, the information contained in said system shall be made avail-able to law enforcement agencies through the criminal justice information system maintained by the executive office of public safety."

[Note 4] In fact, leaving the record on the system would reward Jones in his attempt to harass and destroy Adams. Refusal to expunge the record would fail to discourage others from committing similar frauds on the court.

[Note 5] The commissioner suggests that the judge's findings were unsubstantiated. He argues that the record in the system did not harm Adams because it was Jones who notified Adams's employer of the 209A order. The commissioner has failed to show that the judge's findings of fact were clearly erroneous. See Mass.R.Civ.P. 52(c), as appearing in 423 Mass. 1408 (1996).

[Note 6] As we hold that fraud on the court allows expungement of Adams's record from the system, we need not address Adams's due process argument.

[Note 7] According to the judge's findings, "[c]ounsel for the commissioner acknowledged receipt of notice of the first hearing but was unable to explain why the commissioner did not appear in opposition."



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

# COMMONWEALTH vs. MARTIN F. DELANEY, JR

## 425 Mass. 587

December 4, 1996 - July 28, 1997

Essex County

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR & GREANEY, JJ.

[Note: This opinion was revised by the court in v. 432 of Massachusetts Reports. The text below is that of the revised opinion.]

Where a defendant was served at his last and usual place of abode with a temporary restraining order issued pursuant to G. L. c. 209A, with notice that, if he failed to appear at a hearing, the order would continue in effect without further order of the court, and where the order was so extended pursuant to G. L. C. 209A, s. 4, personal service of the extended order was not a prerequisite to prosecution of the defendant for violation of the order [589-591]; moreover, where the defendant with reasonable inquiry could have discovered that the temporary order had been extended, there could be no argument on due process grounds that he was deprived of an opportunity to seek to have the extended order vacated [591-592]. LYNCH, J., dissenting.

Evidence at the trial of complaints alleging violation of a protective order was sufficient to warrant the conclusion that the defendant had knowledge of the terms of the order. [592-593] LYNCH, J., dissenting.

In a criminal case in which the defendant was charged with six counts of violation of a restraining order, intimidation of a witness and stalking, on four various dates within an eight-week period, the judge correctly joined the offenses for trial, where the allegations demonstrated a pattern of conduct by the defendant toward the same victim, where evidence of each offense would have been admissible at trials of the offenses separately, and where the defendant did not demonstrate any prejudice from joinder. [593-595]

The provisions of G. L. c. 209, s. 7, establishing a distinct crime for certain violations of c. 209A orders, do not require any further proof of a defendant's intent or mens rea than proof that the defendant knew the terms of the order in question. [595-597]

At a criminal trial, there was no substantial risk of a miscarriage of justice in the judge's exclusion of certain improper argument by defense counsel; of a certain improper reference to hearsay in defense counsel's opening remarks; and of certain cross-examination of a witness that was irrelevant to her credibility; further, error, if any, in the judge's instructions to the jury was harmless. [597-598]

No substantial risk of a miscarriage of justice was created at a criminal trial by the prosecutor's closing argument which was based on the evidence

Page 588

admitted and reasonable inferences therefrom; further, the judge's instructions made it clear that arguments of counsel were not evidence. [599-601] LYNCH, J., dissenting.

COMPLAINTS received and sworn to in the Lawrence Division of the District Court Department on September 29, 1992, October 9, 1992, and November 4, 1992, respectively.

The cases were tried before Michael T. Stella, Jr., J., and a motion for a new trial was heard by him.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

Mark J. Gillis for the defendant.

Marcia H. Slingerland, Assistant District Attorney, for the Commonwealth.

---

**ABRAMS, J.** On March 9, 1994, a District Court jury found the defendant, Martin F. Delaney, Jr., guilty of five counts of violating a protective order issued pursuant to G. L. c. 209A. [Note 1] The defendant appeals from the convictions, as well as from an order denying his motion for a new trial on various grounds. We transferred the case here on our motion. We affirm.

The following facts are not in dispute. On August 31, 1992, the victim, the defendant's former female companion, obtained an ex parte protective order against the defendant pursuant to G. L. c. 209A, s. 4. The order stated that the defendant was to refrain from having any contact with the victim, and specifically restrained the defendant from following the victim and making telephone calls to her. The order also stated that there was to be a hearing on September 11, 1992, to determine whether the order would be extended and that the defendant "may appear, with or without an attorney, to oppose any extension or expansion of this [o]rder. If the defendant does not appear, an extended or expanded [o]rder may remain in effect for up to one year." Service of the temporary order was made by leaving a copy of it at the defendant's last and usual place of abode on September 1, 1992. On September 11, 1992, the defendant did not appear at the hearing; the order was extended for one year to September 10, 1993. The extended order contained the same

Page 589

terms as the temporary order, but there is no evidence that the extended order was ever served on the defendant.

There was evidence from which the jury could have found the following facts. On September 14, 1992, the defendant telephoned the victim and stated, "You got a restraining order against me." The defendant offered to put a clutch in the victim's automobile for free if she would "drop" the restraining order against him. The defendant again telephoned the victim on September 18, 1992, and asked the victim to "give [him] another chance." On September 28, 1992, the defendant forced the victim's automobile off the road and apparently referring to charges in an unrelated matter told her, "You are going to drop the charges or else." The defendant was arrested following this incident. On October 8, 1992, the defendant pulled his vehicle up behind the victim and asked her "if [they] could handle their problems outside of court." Again, the defendant was arrested. Finally, on November 2, the defendant blocked the victim's vehicle as she tried to leave a gasoline station.

On appeal, the defendant argues that, because he never was served with the extended order he was charged with violating, the judge improperly asserted jurisdiction over this case and denied him his due process rights under the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The defendant also argues that the Commonwealth improperly joined the charges against him; he alleges error in the jury instructions and claims that the judge's biased treatment of defense counsel deprived him of his right to a fair trial. Finally, the defendant claims that his motion for a new trial was improperly denied because the Commonwealth's closing argument distorted the evidence against him. [Note 2]

1. Failure to serve the extended order. The defendant first argues that the failure to serve him with a copy of the extended order deprived the District Court judge of subject matter jurisdiction over his case. Because it is clear that the District Court had subject matter jurisdiction, [Note 3] we treat the defendant's argument as asserting that the statute requires that there be

Page 590

personal service on the defendant before he can be convicted of violating the order. We conclude that personal service of the extended order is not required.

General Laws c. 209A, s. 7, requires that a copy of an order issued under s.s. 3, 4, or 5 of G. L. c. 209A be served on a defendant. [Note 4] The defendant argues, therefore, that, absent such service, he cannot be convicted of violating an order issued pursuant to G. L. c. 209A. The defendant's argument, however,

Page 591

ignores the fact that the temporary order was served on him at his last and usual place of abode and that the evidence warranted a finding that he had knowledge of the order. This order warned the defendant that, if he failed to appear, "an extended or expanded [o]rder may remain in effect." [Note 5] Section 4 mandated that "the temporary order[] shall continue in effect *without further order of the court*" when the defendant fails to appear (emphasis added). [Note 6] The jury could have found that the defendant had actual and constructive notice of the order and that it continued in effect after the hearing date. In these circumstances the service of the extended order on the defendant was not a prerequisite to his prosecution for violating the terms of the order. This, however, does not end our inquiry. The defendant also argues that prosecuting a defendant for violating an order that has not been served on him violates the defendant's due process rights.

As the defendant points out, "[t]he fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." Matter of Kenney, 399 Mass. 431, 435 (1987). See Langlitz v. Board of Registration of Chiropractors, 396 Mass. 374, 376 (1985); LaPointe v. License Bd. of Worcester, 389 Mass. 454, 458 (1983). The defendant, however, does not argue that he was deprived of an opportunity to be heard before the judge entered the extended order. [Note 7] Apparently, the defendant's argument is that, because he was not served with a copy of the extended order, he was precluded from moving to have the extended order vacated. G. L. c. 209A, s. 3 ("[t]he court may modify its order at any subsequent time

Page 592

upon motion by either party"). The ex parte order informed the defendant that an extended order may be entered against him if he did not appear at the hearing. This information was certainly sufficient to put the defendant on notice, for "[n]otice of facts which would incite a person of reasonable prudence to an inquiry under similar circumstances is notice of all the facts which a reasonably diligent inquiry would develop." Commonwealth v. Olivo, 369 Mass. 62, 69 (1975), quoting Essex Nat'l Bank v. Hurley, 16 F.2d 427, 428 (1st Cir. 1926). Indeed, a party may not "shut his eyes to the means of knowledge which he knows are at hand, and thereby escape the consequences which would flow from the notice if it had actually been received." Commonwealth v. Olivo, supra, quoting NLRB v. Local 3, Bloomingdale Dist. 65, Retail, Wholesale & Dep't Store Union, 216 F.2d 285, 288 (2d Cir. 1954). Thus, the defendant, who with reasonable inquiry could have discovered that the temporary order had been extended, cannot be heard to complain that he was deprived of an opportunity to seek to have that extended order vacated.

Due process also requires that a person be given a "reasonable opportunity to know what the order prohibited, so that he might act accordingly." Commonwealth v. Butler, 40 Mass. App. Ct. 906, 907 (1996). See Commonwealth v. Freiberg, 405 Mass. 282, 289, cert. denied, 493 U.S. 940 (1989) (due process requires that individuals receive fair notice of conduct proscribed by statute); Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 522 (1986) (same); Commonwealth v. Williams, 395 Mass. 302, 304 (1985), quoting Kolender v. Lawson, 461 U.S. 352, 357 (1974) ("penal statute must 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement'"). Clearly, a showing that a defendant was served with a copy of a court order is strong evidence that a defendant had knowledge that certain conduct would not be permitted and could result in a criminal conviction. The failure of such service, however, is not fatal where the Commonwealth can prove beyond a reasonable doubt that the defendant had actual knowledge of the terms of the order. Bongiovi v. LaBeet, 155 A.D.2d 320, 321 (N.Y. 1989) ("[a]t any rate, respondent conceded that she was, in fact, aware of the order of protection and, therefore, personal service need not be demonstrated"). Cf.

Page 593

State v. Delap, 466 N.W.2d 264, 269 (Iowa Ct. App. 1990) (where defendant argues order not sufficiently clear, definite and unambiguous to support contempt adjudication irrelevant because defendant had actual knowledge of "no contact condition" in order and consequences of violating condition). Indeed, as long as a defendant had actual knowledge of the terms of the order, there is no danger that a defendant will be convicted of conduct not known to be violative of a court order. Cf. Lambert v. California, 355 U.S. 225, 229 (1957) (where there was "absence of an opportunity either to avoid the consequences of the law or to defend any prosecution brought under it," defendant's conviction violated due process).

We conclude then that the failure to serve a copy of the extended order on the defendant is not a bar to charging him with violating that order. Failure to serve the defendant, however, with a copy of the extended order is, of course, relevant to a determination as to whether the defendant possessed the knowledge required to convict him of violating the order. See note 5, supra. Evidence that the ex parte order delivered to the defendant's last and usual address was actually received warrants the conclusion that the defendant had actual knowledge of the terms of the extended order, as does the defendant's testimony that, following his arrest after the September 28 incident, he was aware that there was a protective order against him.

2. Joinder. Prior to trial, there was a joinder of numerous charges pending against the defendant. [Note 8] The defendant argues that the offenses joined did not involve a "pattern of conduct" and that he was severely prejudiced by the joining of these charges. We disagree.

A judge's decision on "whether joinder is appropriate is committed to the sound discretion of the trial judge." Commonwealth v. Montanez, 410 Mass. 290, 303 (1991). See Commonwealth v. Shelton, 37 Mass. App. Ct. 964, 964 (1994). The defendant bears the burden of demonstrating that prejudice will

Page 594

result from a failure to sever the charges. Commonwealth v. Gallison, 383 Mass. 659, 671 (1981). Indeed, Mass. R. Crim. P. 9 (a) (3), 378 Mass. 859 (1979), provides that where offenses are related, "[t]he trial judge shall join the charges for trial unless he determines that joinder is not in the best interests of justice."

Related offenses are defined in part as "aris[ing] out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Mass. R. Crim. P. 9 (a) (1), 378 Mass. 859 (1979). We have stated that offenses are related if the evidence "in its totality shows a common scheme and pattern of operation that tends to prove all the indictments." Commonwealth v. Feijoo, 419 Mass. 486, 494-495 (1995). Time and space play an important role in determining whether offenses are related offenses for the purposes of joinder. See Commonwealth v. Mamay, 407 Mass. 412, 417 (1990); Commonwealth v. Cruz, 373 Mass. 676, 690 (1977).

In the instant case, the judge joined for trial the charges of violating a c. 209A order, stalking, and intimidating a witness. All the incidents giving rise to the charges involved the same victim. All the incidents occurred between March and November of 1992; indeed, the six counts of c. 209A violations, which include the five counts of which the defendant was ultimately convicted, occurred within an approximate eight-week period. Thus, the offenses charged demonstrated a pattern of conduct by the defendant toward the victim because of his unhappiness with the ending of their relationship and his desire to reunite with her. See Commonwealth v. Feijoo, supra at 495 (joinder appropriate where offenses indicated scheme whereby defendant used his position as karate teacher to induce students to engage in homosexual activity); Commonwealth v. Mamay, supra at 416 (joinder appropriate where offenses indicated scheme whereby defendant used his position of authority and trust to commit sexual crimes on female patients visiting his office). As such, evidence of each offense would have been admissible at trials for a separate offense. See Commonwealth v. Feijoo, supra. Indeed, if the charges were tried separately, much testimony would be duplicated at each trial merely establishing the relationship between the victim and the defendant. See Commonwealth v. Hoppin, 387 Mass. 25, 32 (1982) ("[j]oinder may promote economy in the trial of criminal offenses, particularly

Page 595

when the same witnesses will testify concerning more than one offense"). Finally, we note that, in the instant case, the defendant has failed to demonstrate that he was prejudiced by the joinder of these offenses. The defendant's burden is "not satisfied by a showing merely that the defendant's chances for acquittal would have been better had the [complaints] been tried separately." Commonwealth v. Montanez, supra at 304. Rather, the defendant's burden is to show that "the prejudice resulting from a joint trial is so compelling that it prevent[ed] [him] from obtaining a fair trial." Commonwealth v. Clarke, 418 Mass. 207, 217 (1994), quoting Commonwealth v. Moran, 387 Mass. 644, 658 (1982). See Commonwealth v. Ferraro, 424 Mass. 87, 90 (1997). In the instant case, the jury acquitted the defendant of the stalking charge and the charge that he intimidated a witness. The defendant was also acquitted of one of the counts charging him with violating a protective order. Thus, it is clear that the jury carefully considered the evidence with regard to each crime charged.

3. Jury instructions. The defendant argues that, in order to be convicted of violating a c. 209A order, the Commonwealth must show a manifest intent on the part of the defendant to violate that order. We disagree.

The judge instructed the jury that, in order to convict the defendant of the crime of violating a c. 209A order, the Commonwealth must prove: "First . . . that a court had issued an order pursuant to Chapter 209A of our General Laws, which ordered the defendant to refrain from abusing the alleged victim. Second, that such order was in effect on the date that this violation of the order allegedly occurred. Third, that the defendant knew that the pertinent terms of the order were in effect, either by having received a copy of the order or in some other way. And fourth, that the defendant violated the order by failing to vacate the household or by abusing alleged victim."

The defendant argues that this charge was erroneous because, by allowing the jury to convict the defendant based solely on the fact that there was a violation of the order instead of requiring a finding that the defendant intended to violate the order, the instruction lowered the Commonwealth's burden of proof. The defendant urges us to look to the law of contempt and conclude that an essential element of the crime of violating a c. 209A order is a finding that the defendant intended to violate the order. Because there was no objection at trial, we review the

Page 596

charge to determine whether it "was so erroneous that it created a 'substantial risk of a miscarriage of justice.' " Commonwealth v. Preziosi, 399 Mass. 748, 751 (1987), quoting Commonwealth v. Murray, 396 Mass. 702, 705 (1986).

We have read s. 7 as limiting to the enumerated offenses those actions which will constitute a criminal violation of G. L. c. 209A. Commonwealth v. Gordon, 407 Mass. 340, 345 (1990). All other violations of a c. 209A order cannot be prosecuted as a statutory offense; rather, they can be prosecuted as criminal contempt. Commentary to s. 8:02 of the Guidelines for Judicial Practice: Abuse Prevention Proceedings (Oct. 1996).

In order to prove a defendant guilty of criminal contempt, the Commonwealth must prove beyond a reasonable doubt that "there was a clear, outstanding order of the court, that the defendant knew of that order, and that the defendant clearly and intentionally disobeyed that order in circumstances in which he was able to obey it." Commonwealth v. Brogan, 415 Mass. 169, 171 (1993), quoting Furtado v. Furtado, 380 Mass. 137, 145 (1980). See United Factory Outlet, Inc. v. Jay's Stores, Inc., 361 Mass. 35, 45 (1972) (Tauro, C.J., concurring) ("[t]he rule that intent is not an element of civil contempt is a direct consequence of the separate functions of criminal and civil contempt").

While intent is an element of criminal contempt proceedings, s. 7 of G. L. c. 209A establishes a distinct statutory crime for certain violations of c. 209A orders. The statute does not speak explicitly to the defendant's state of mind; it is conceded, however, by the Commonwealth that, in order to convict a defendant of violating an order, it must be proved beyond a reasonable doubt that the defendant knew of the order. See Commonwealth v. Crosscup, 369 Mass. 228, 234 (1975) (clear statutory language would be needed . . . to buttress an interpretation that knowledge was irrelevant"); Commonwealth v. Wallace, 14 Mass. App. Ct. 358, 364 (1982) ("[b]ecause traditionally, at common law, some element of intent or knowledge was required before punishment could be imposed . . . and because due process considerations may, in some cases, require some degree of notice . . . courts are reluctant to infer a legislative intent to impose absolute liability" [citations omitted]). This statute, however, requires no more knowledge than that the defendant knew of the order. We decline to read

Page 597

any additional mens rea requirements into the statute. [Note 9] Simon v. Solomon, 385 Mass. 91, 103 (1982) ("[a]lthough the requirement of due process places some limits on legislative power to penalize innocent conduct, legislatures generally have broad power to define and limit the mens rea element of criminal offenses"); Commonwealth v. Jackson, 369 Mass. 904, 909 (1976) ("Legislature has great latitude to determine what conduct should be regarded as criminal and to prescribe penalties to vindicate the legitimate interests of society"). The defendant does not argue that the failure of the statute to require a showing of intentional violation is unconstitutional.

4. Failure to allow certain arguments. The defendant also argues that the judge erred in failing to allow the defendant to pursue certain avenues of argument. [Note 10] The defendant attempts to cite five instances where the judge improperly discarded the defendant's arguments. We think that this argument is without merit.

At trial, the defendant did not object to the judge's rulings, instructions, or comments. Therefore, we examine whether the judge's actions constituted a "substantial risk of a miscarriage of justice." Commonwealth v. Boyer, 400 Mass. 52, 59 (1987).

The first occasion occurred during the defendant's opening statement where defense counsel made the following comment: "[The victim] has a motive in this trial, and you will hear it. She has a credibility problem, you will find out, that she has a hard time telling the truth." Following an objection by the prosecutor, the judge instructed: "The credibility and believability of witnesses is the sole province of the jurors. Refrain from making comment." There was no error. Defense counsel's statement was improper argument. See United States v. Dinitz, 424 U.S. 600, 612 (1976) (Burger, C.J., concurring). The judge

Page 598

did not create a substantial risk of a miscarriage of justice with his instruction. The defendant's second instance involved his discussion of a note left on a witness's automobile that related that the defendant "had tried to break [the victim's] arm" and that he was "violent." The judge reminded the jury that the opening statements were not evidence. The judge acted properly because the evidence from the note regarding the victim's arm was inadmissible hearsay and therefore improper to discuss as evidence during opening statements. See Commonwealth v. Murray, 22 Mass. App. Ct. 984, 985 (1986). The note was not offered as an exhibit.

The next two allegations of error involve the judge's refusal to allow the defense to pursue during cross-examination a line of argument that the victim had been on welfare. The defense contended that the issue was relevant to the defendant's credibility. Despite being given an opportunity to do so, the defense was unable to produce a relevant link between the victim's welfare status and her credibility. These rulings were not erroneous.

The defendant argues that the judge's instructions to the jury on an employer's obligation to report monies paid to employees did not permit defense's point to reach the jury. However, the facts that the witness evaded taxes did reach the jury. [Note 11] The judge's instruction to the jury merely clarified the distinction between the employer's obligation to report income and the employee's obligation to file a tax return. An error, if any, on the part of the judge was harmless.

[illegible]

served on the defendant, even though G. L. c. 209A, s. 7, [Note Dissent-1] clearly requires such service and even though the prosecutor told the jury that service had been made. Accordingly, I dissent.

It should be kept in mind that, although two protective orders issued against the defendant -- a temporary order and an extended order -- only one order, the extended order, formed the basis of the defendant's conviction. The temporary order expired on September 11, 1992.

During closing argument, the prosecutor stated:

"[At] the end of August of 1992, [the complainant] went to Lawrence District Court.... The court gave her a restraining order. This restraining order, ladies and gentlemen, which you will have with you in the jury room, it states on it, '[t]he court has issued the following orders to the defendant. You are not to abuse the plaintiff. You are to immediately leave and stay away from her address. You are to refrain from making phone calls to said plaintiff, not to follow her and to have no contact with her whatsoever.'

"[The complainant] again came back to the court on September 11, 1992, asking that order to be extended for a year. The judge ordered again [the defendant] to stay away from [the complainant]. You have in front of you-you will have in front of you the return of service. It states here it was left, a copy of this at the defendant's last and usual address.

"[The defendant], by his own admission, has lived at [that address] for the last twelve years. He gets his mail there. He gets his bills there. He gets his taxes there. In fact, all of his mail is left on the kitchen table. But this one very important piece of paper, he didn't get. Isn't that convenient?"

"You heard [the defendant], [the defendant's brother]

Page 603

and [the defendant's mother] testify that, when he got an important letter from his attorney, everyone was searching for him to find him. *But when there is a piece of paper given to [the defendant] by a police officer*, he's claiming he didn't get it. I would suggest that's a little too convenient." (Emphasis added.)

The court reads a paragraph break immediately prior to the prosecutor's reference to the return of service, and after so doing, asserts that "read in context" the Commonwealth's closing argument breaks down into two distinct parts, one part addressing the process by which the complainant obtained a protective order against the defendant and one part addressing the defendant's claim that he never received the original temporary protective order. Ante at 599-600 & n.12. The Commonwealth, however, did not argue that the prosecutor was making two distinct arguments, nor does the reproduction of the argument in the Commonwealth's brief insert a paragraph break. [Note Dissent-2] I contend that, read in context, it is clear that the prosecutor was improperly suggesting to the jury that what was in front of them was proof of service of the extended order when no such proof existed. Indeed, the prosecutor's reference to the extended order, which the Commonwealth concedes was not served on the defendant, is immediately preceded by the prosecutor's reference to September 11, 1992, the date the complainant obtained the extended order. Moreover immediately following is a reference to testimony that was elicited by the prosecutor alluding to the extended order. See note 5, infra. Furthermore, the prosecutor referred to "a piece of paper given to [the defendant] by a police officer." Not even the temporary order was given to the defendant by a police officer rather, the proof of service of the temporary order states that it was left at the defendant's last and usual address; thus the prosecutor compounded the misstatement she made earlier in her argument.

Because the prosecutor referred both to service and to proof of service which did not exist, her argument misstated the evidence and was improper. It is well settled that "[a] prosecutor must limit comment in closing statement to the evidence and fair inferences that can be drawn from the evidence." Commonwealth v. Kelly, 417 Mass. 266, 270 (1994). See Com-

Page 604

monwealth v. Kozec, 399 Mass. 514, 516 (1987); Commonwealth v. Shelley, 374 Mass. 466, 472 (1978), S.C., 381 Mass. 340 (1980), and 411 Mass. 692 (1992). Moreover, the prosecutor's statement cannot be characterized as responding to the defendant's argument that there was no service at all. The thrust of the defendant's argument was that he did not receive either order and was not aware at least until September 28, 1992, of the existence of a protective order. In support of this claim the defendant offered testimony to the effect that he did not spend a lot of time at the address where the temporary order was left and emphasized that no order was served in hand. More importantly, while the prosecutor was entitled to reply to the defendant's contention, she was not entitled to rebut his contention by stating that proof of service of the extended order would be before the jury and that he had been given written notice by a police officer when those facts were not in evidence. [Note Dissent-3]

In the face of such prosecutorial error, several factors must be considered, including whether the argument was seasonably objected to; whether the error was limited to collateral issues or went to the heart of the case; whether the judge's instructions to the jury may have mitigated the error; and generally, whether the error, in the circumstances, possibly made a difference in the jury's conclusion. See Commonwealth v. Kozec, supra at 517-518; Commonwealth v. Pavao, 34 Mass. App. Ct. 577, 581 (1993). Because the argument here was not objected to, review is limited to whether a substantial risk of a miscarriage of justice has occurred. Where the evidence before the jury has been distorted, however, "we have recognized that the failure to object and possibly obtain a curative instruction may be the very thing which permits the remarks to have their maximum prejudicial effect." Commonwealth v. Shelley, supra at 469. See Commonwealth v. Nordstrom, 364 Mass. 310, 314 (1973). See also Commonwealth v. Cifizzari, 397 Mass. 560, 578 (1986); Commonwealth v. Fitzgerald, 376 Mass. 402, 416 (1978).

Page 605

Clearly, the defendant's knowledge of the protective order and the terms it contained were crucial elements of the Commonwealth's case. Indeed, without proving beyond a reasonable doubt that the defendant knew of the existence of the order, the defendant could not be convicted of violating the order. Thus, this "is not a case in which overreaching argument was confined to collateral issues only." Commonwealth v. Shelley, supra at 470. Moreover, the judge's instructions on the mental state element of the crime emphasized that the Commonwealth must prove that the defendant had actual knowledge of the terms of the extended order, the very issue to which the prosecutor's improper arguments referred. Thus, absent specific instructions that mitigated the error, I do not believe that the judge's reminder to the jury that closing statements are not evidence cured the prejudicial impact of the prosecutor's argument. See Commonwealth v. Rosa, 412 Mass. 147, 160 (1992) (curative instruction regarding the prosecutor's improper closing argument not sufficient and new trial required given the importance to the Commonwealth's case of the issue that was part of improper argument); Commonwealth v. Clary, 388 Mass. 583, 591 (1983) ("judge's instructions to the jury, which stated only in general terms that the arguments of counsel are not evidence did not cure adequately the prejudicial impact of the prosecutor's assertion"); Commonwealth v. Pavao, supra at 581-582 (where prosecutor misstated evidence by improperly attributing to defendant a statement indicating defendant acted with intent necessary to be convicted of murder, new trial required even though judge did instruct the jury that closing arguments were not evidence because there were not forceful statements by judge that argument was inappropriate and should be disregarded); Commonwealth v. Shelley, supra (where overreaching argument not confined to collateral issues only, adequate curative instructions did not render the prosecutorial misconduct harmless).

The court suggests that the parties knew that the defendant had not been served with a copy of the extended order and chose to use their closing statements to argue whether the defendant received a copy of the temporary order -- a doubtful proposition particularly where, until today, a reading of the statute would suggest that a defendant must be served with a copy of the order he was charged with violating. I believe that a

Page 606

fairer and more plausible reading of the testimony and the closing arguments suggests that both defense counsel [Note Dissent-4] and the prosecutor [Note Dissent-5] operated as if the proof of service before them was

Page 607

proof of service of the extended order, an error that makes the distortion of the evidence during the prosecutor's closing argument even more significant.

Given that the outcome of the case essentially depended on whether the jury believed the complainant's or the defendant's version of events, the suggestion that the defendant was served with a copy of the extended order could very well have influenced the jury's assessment of the defendant's credibility and thus, their verdict. Indeed, this is hardly a case where there is overwhelming evidence of the defendant's guilt. See Commonwealth v. Clary, supra at 593; Commonwealth v. Shelley, supra. Contrast Commonwealth v. DeChristoforo, 360 Mass. 531, 538 (1971) (overwhelming evidence of guilt neutralizing prosecutorial misconduct). Thus, it is impossible to say that the improper argument, which undermined the defendant's credibility and went to a crucial issue in the case, did not make a difference in the jury's verdict, and I would order a new trial for the defendant. See Commonwealth v. Kelly, 417 Mass. 266, 271 (1994) (where improper argument went to police credibility, the crux of the case, new trial was necessary); Commonwealth v. Clary, supra at 593 (where argument of prosecutor struck at defendant's sole defense, that error contributed to conclusion that new trial was warranted); Commonwealth v. Shelley, supra at 470-471 (argument as to credibility of expert witness urging an inference that expert testimony was purchased "struck impermissibly, at the defendant's sole defense" and warranted a new trial).

Finally, I agree that great trust should be and is placed in the citizens who serve as jurors, for they are the foundation of our justice system. Where the evidence is distorted, however, it is unfair to those very jurors to place on them the burden of cor-

Page 608

recting or overlooking a prosecutor's mistake. [Note Dissent-6] Indeed, a jury's verdict can be only as fair as the trial allows. I would therefore reverse the defendant's convictions and order a new trial.

---

FOOTNOTES

[Note 1] The defendant was acquitted of one count of violating a protective order on October 12, 1992, one count of stalking on November 2, 1992, and one count of intimidating a witness on September 28, 1992.

[Note 2] The defendant also appeals from the denial of his motion for a new trial on the above grounds.

[Note 3] Subject matter jurisdiction refers to the "court's power to hear and determine cases of the general class or category to which proceedings in question belong; the power to deal with the general subject involved in the action." Black's Law Dictionary 1425 (6th ed. 1990).

General Laws c. 209A, s. 7, provides in pertinent part: "Any such violation may be enforced in the superior, the district or Boston municipal court departments." In addition, District Courts have jurisdiction of all misdemeanors, G. L. c. 218, s. 26, and violation of a c 209A protective order is a misdemeanor.

[Note 4] Section 7 of G. L. c. 209A provides: "Whenever the court orders under . . . [s.s. 3, 4, and 5] of [c. 209A] . . . the defendant to vacate, refrain from abusing the plaintiff or to have no contact with the plaintiff or the plaintiff's minor child . . . the appropriate law enforcement agency . . . shall serve one copy of each order upon the defendant ...."

Section 3 of G. L. c. 209A, provides: "A person suffering from abuse from an adult or minor family or household member may file a complaint in the court requesting protection from such abuse, including, but not limited to, the following orders: "(a)ordering the defendant to refrain from abusing the plaintiff, whether the defendant is an adult or minor; (b) ordering the defendant to refrain from contacting the plaintiff, unless authorized by the court, whether the defendant is an adult or minor ...."

Section 4 of G. L. c. 209A, provides: "Upon the filing of a complaint under this chapter, the court may enter such temporary orders as it deems necessary to protect a plaintiff from abuse, including relief as provided in section three. Such relief shall not be contingent upon the filing of a complaint for divorce, separate support, or paternity action.

"If the plaintiff demonstrates a substantial likelihood of immediate danger of abuse, the court may enter such temporary relief orders without notice as it deems necessary to protect the plaintiff from abuse and shall immediately thereafter notify the defendant that the temporary orders have been issued. The court shall give the defendant an opportunity to be heard on the question of continuing the temporary order . . . and of granting other relief as requested by the plaintiff no later than ten days after such orders are entered. Notice shall be made by the appropriate law enforcement agency as provided in section seven. If the defendant does not appear at such subsequent hearing, the temporary orders shall continue in effect without further order of the court."

Section 5 of G. L. c. 209A, provides: "When the court is closed for business, any justice of the superior, probate and family, district or Boston municipal court departments may grant relief to the plaintiff as provided under section four if the plaintiff demonstrates a substantial likelihood of immediate danger of abuse."

[Note 5] There was evidence that the defendant knew of the process of how a protective order begins as a temporary order and could be extended after a hearing. In fact, the defendant introduced evidence of a previous protective order obtained against him.

[Note 6] "The court may modify its order at any subsequent time upon motion by either party. G. L. c. 209A, s. 3, fourth par.

[Note 7] It is clear that "[d]ue process requires that no [extended] order be issued against a person without prior notice and the opportunity to be heard." Commentary to s. 5:05 of the Guidelines for Judicial Practice: Abuse Prevention Proceedings (Oct. 1996). "[T]he adequacy of notice so far as due process is concerned is dependent on whether the form of notice is 'reasonably calculated to give . . . actual notice of the proceedings and an opportunity to be heard." Commonwealth v. Olivo, 369 Mass. 62, 68 (1975), quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940). In the instant case, service of the temporary order was made by delivering a copy of the order to the defendant's last and usual address. The defendant does not argue that the extended order against him was entered improperly, and we do not consider that issue.

[Note 8] The Commonwealth was allowed to join the five offenses of which the defendant was convicted and three charges that he was acquitted of, including another charge that he violated a protective order on October 12, 1992, stalking, and intimidating a witness. See note 1, supra. The Commonwealth also sought to join for trial a charge of assault and battery, malicious destruction of property, and threatening to commit a crime which involved the same victim. The motion judge ordered these offenses to be tried separately and the defendant was found not guilty.

[Note 9] We note that the Appeals Court recently stated that, on a complaint charging a defendant with a violation of a G. L. c. 209A order, the Commonwealth must prove that "there was a clear, outstanding order of the court, that the defendant knew of the order, and that the defendant clearly and intentionally disobeyed the order in circumstances in which he was able to obey it." Commonwealth v. O'Shea, 41 Mass. App. Ct. 115, 118 (1996), quoting Commonwealth v. Brogan, 415 Mass. 169, 171 (1993). To the extent that that decision is inconsistent with our decision today, it is incorrect.

[Note 10] The defendant's argument includes references to bias on the part of the trial judge. There is neither support nor a specific argument for that claim. The defendant's discussion on that point does not rise to the level of appellate review. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

[Note 11] The following exchange occurred between the defense counsel and the witness:

DEFENSE COUNSEL: "Did you ever pay taxes on [the cash money you received from Riverside House of Pizza]?"

THE PROSECUTOR: "Objection."

DEFENSE COUNSEL: "It goes to credibility, Your Honor."

THE JUDGE: "She can have that."

DEFENSE COUNSEL: "Did you ever pay taxes?"

THE WITNESS: "No, I didn't."

DEFENSE COUNSEL: "You never reported that to the State or the Federal government?"

THE WITNESS: "No."

[Note 12] The prosecutor stated: "[At] the end of August of 1992, [the victim] went to Lawrence District Court. She went to Lawrence District Court in front of a judge, under oath, and she told the judge that she feared for her life and she needed help. She needed help from the court and she needed protection from the court. And that's what the court gave her. The court gave her a restraining order. This restraining order, ladies and gentlemen, which you will have with you in the jury room, it states on it, 'The court has issued the following orders to the defendant. You are not to abuse the plaintiff. You are to immediately leave and stay away from her address. You are to refrain from making phone calls to said plaintiff, not to follow her and to have no contact with her whatsoever.' [The victim] again came back to the court on September 11, 1992, asking that order to be extended for a year. The judge ordered again [the defendant] to stay away from [the victim]."

The prosecutor then shifted focus and continued: "You have in front of you -- you will have in front of you the return of service. It states here it was left, a copy of this at the defendant's last and usual address. [The defendant], by his own admission, has lived at 35 Groton Street for the last twelve years. He gets his mail there. He gets his bills there. He gets his taxes there. In fact, all of his mail is left on the kitchen table. But this one very important piece of paper, he didn't get. Isn't that convenient? You heard [the defendant], [the defendant's brother], and [the defendant's mother] testify that when he got an important letter from his attorney, everyone was searching for him to find him. But when there is a piece of paper given to Mr. Delaney by a police officer, he's claiming he didn't get it. I would suggest that's a little too convenient." (Paragraph break added.)

[Note 13] On direct examination, the defendant said that he had no knowledge of the order until he was arrested on September 28, 1992. Further, in closing argument defense counsel stated, "Look at the restraining order. The Commonwealth has to prove beyond a reasonable doubt that [the defendant] knew about the restraining order. Did he receive it in hand from a police officer? No." This statement clearly referred to the defense argument that neither the temporary restraining order nor the extended order had been served on the defendant.

[Note 14] The dissent suggests that all parties "operated as if the proof of service before them was proof of service of the extended order." Post at 606-607. We do not agree. Examination and the cross-examination of the defendant on the temporary order does not show that the parties focused solely on proof of service of the extended order. When the exhibit was introduced, it was introduced as the restraining order in effect against the defendant without reference to the return of service because that return was not yet at issue. Despite an effort to do so, the dissent cannot point to any instance in the transcript where the prosecutor stated or implied that the return of service was for the extended order. As we read the record, the prosecutor's challenge, see post at n.5, went to the defendant's testimony that he had not received the temporary order which was left at his last and usual home address.

[Note 15] The temporary order, left at the defendant's last and usual address, referred to a hearing date of September 11, 1992, and included the statement that "[i]f the defendant does not appear [at the scheduled hearing], an extended or expanded Order may remain in effect for up to one year."

[Note 16] Before any evidence was presented, the judge told the jury: "If one of the attorneys or I refer to some part of the evidence, and that does not coincide with what your recollection is, it is your recollection which you are to follow in your deliberation, not the attorneys or mine."

After the closing arguments had concluded, the judge again instructed the jury: "The opening statements and the closing arguments of the lawyers are not a substitute for the evidence. They are only intended to assist you in understanding the evidence and the contentions of the parties."

[Note Dissent-1] General Laws c. 209A, s. 7, states in pertinent part: "Whenever the court orders under . . . [s.s. 3, 4, and 5] of [c. 209A] . . . the defendant to vacate, refrain from abusing the plaintiff or to have no contact with the plaintiff or the plaintiff's minor child . . . the appropriate law enforcement agency . . . *shall* serve one copy of each order upon the defendant .... The law enforcement agency *shall* promptly make its return of service to the court" (emphasis added).

[Note Dissent-2] Indeed, the Commonwealth reproduces the same portion of the argument reproduced here and characterizes the argument as referring to "the issue of notice and to the service of the protective order."

[Note Dissent-3] The court reasons from evidence of a previous protective order obtained against the defendant "that the defendant knew of the process of how a protective order begins as a temporary order and then may be extended after a hearing." Ante at 591 n.5. It should be noted, however, that, while there was evidence that the complainant had obtained protective orders against the defendant in the past, she had also, on at least one occasion, failed to appear at the hearing as required in order to get the temporary order extended. Thus, in the defendant's experience, notice of a temporary order did not necessarily mean that an extended order would follow; the absence of any service of an extended order could only have buttressed this conclusion.

[Note Dissent-4] A review of several portions of the transcript indicates that defense counsel had confused the return of service of the temporary order as a return of service of the extended order. Indeed, when defense counsel moved for a directed verdict, alleging that the Commonwealth had not proved that the defendant had known of the existence of the order he was charged with violating (the extended order), she stated: "Under the facts that on that restraining order that they have entered into evidence, they have not proven that the defendant . . . either knew of the pertinent terms of the order were in effect by either having received a copy of the order or in some other way. The reason I would state that, Your Honor, is looking at the return of service checked off as leaving a copy at the defendant's last and usual address as shown on this order, Your Honor, that doesn't constitute proof that [the defendant] had any knowledge of the effect of this order. And he had no -- it does not prove that he had knowledge of any portion of the order."

In addition, in her own closing argument, defense counsel argued: "Look at the restraining order. The Commonwealth has to prove beyond a reasonable doubt that [the defendant] knew about the restraining order. Did he receive it in hand from a police officer? No. Could [the complainant] have told the police officer, well, he's never at that 35 Groton Street address, go to his parents' house .... She never told him that. If she told him that, maybe it would have gotten served. And who better to know [the defendant's] schedule, where he is? She knew when she went into court, she knew where that restraining order was going to be. Could she have gone and taken the restraining order? Could she have orchestrated his arrest?" Certainly, it would seem likely that, in both examples, if defense counsel was aware that the extended order had not been served on the defendant she would have just said so in her argument to both the judge and the jury.

[Note Dissent-5] Indeed, when the defendant was being cross-examined by the prosecutor, the prosecutor showed the defendant a copy of the extended order that had been introduced in evidence as the extended order obtained by the complainant on September 11, 1992. The defendant then testified that he lived at the address indicated on the order and received his mail there. The prosecutor then challenged the defendant's testimony that he did not receive a copy of the extended order in the following exchange:

THE PROSECUTOR: "You receive any and all correspondence that is sent to you at 35 Groton Street; isn't that correct?"

THE DEFENDANT: "Yes. What's your point now?"

TEE PROSECUTOR: "But you didn't receive this restraining order that was sent to you; is that correct?"

THE DEFENDANT: "No, I did not."

I would suggest that this exchange supports the inference that the prosecutor, who challenges the defendant's contention that he did not receive a copy of the extended order, was operating as if the proof of service before her was proof of service of the extended order. Indeed, she goes on to elicit testimony regarding what would happen to mail if left by a police officer with the defendant's brother at the 35 Groton Street address or in the mailbox.

In addition, in responding to the defendant's motion for a directed verdict, the prosecutor argued: "With regards to the . . . three counts of violations of restraining orders .... Judge, you have before you that is placed into evidence the service of the restraining order, that it has been left at the defendant's last and usual address, that being I believe, 35 Groton Street." I suggest that this reference to the return of service, coupled with the reference to the order in evidence, demonstrates that the prosecutor was acting as if the proof of service before the court was proof of service of the extended order.

[Note Dissent-6] The copy of the order is confusing at best apparently because the same piece of paper was used to indicate the existence and service of both. Thus, a "cursory glance" might give the impression to the jury that the order which had been served on the defendant was the order he was charged with violating.



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

# C.O. v. M.M.

## Summary

## Opinion

[illegible]

process rights by not permitting him to call any witnesses on his behalf or otherwise to challenge the evidence presented by the plaintiff during the hearing on the question of continuing the temporary order. After reviewing the parties' briefs and hearing oral argument, this court issued an order vacating the abuse prevention order. This opinion addresses the reasons for that order.[2] *Background.* We summarize the relevant and undisputed facts of this case as set forth in the parties' briefs and pleadings. The defendant, M.M., is a seventeen year old high school student accused of having sexually assaulted a fifteen year old schoolmate. The plaintiff in this case, C.O., is the mother of the young woman who was allegedly abused ("daughter"). Shortly after the alleged incident, the plaintiff filed a complaint and supporting affidavit on behalf of her daughter and obtained an ex parte abuse prevention order against the defendant pursuant to G.L. c. 209A, § 4. The plaintiff's affidavit alleges that the defendant offered to drive the daughter home from school and, along the way, stopped at his house, invited the young woman inside, and then forcibly sexually assaulted her in his bedroom. The defendant contests the occurrence of the incident.

> 2 The plaintiff also filed a motion to strike portions of the defendant's brief for failure to comply with Mass. R.A.P. 16 (e), as amended, 378 Mass. 940 (1979). We deny the plaintiff's motion. Our holding does not rest on any contested language in the brief, and we see nothing in the brief that is confidential or otherwise prejudicial to the plaintiff. See *Commonwealth* v. *Nadal-Ginard*, 42 Mass. App. Ct. 1, 13 (1997) (motion to strike portions of appellate brief denied where passages in question neither confused panel of Appeals Court nor prejudiced panel against defendant).

One day after an ex parte emergency temporary abuse prevention order was issued, see G.L. c. 209A, § 4, the defendant was arrested on charges arising from the alleged assault. The defendant was arraigned on these charges and subsequently released on bail. He was suspended from high school as a result of the arrest.

650 After a hearing during which both parties were represented *650 by counsel, a judge of the Brockton District Court extended the abuse prevention order for a period of one year. Defendant timely appealed the issuance of the order and shortly thereafter filed a motion to suspend the order pending appeal. The judge denied the defendant's motion to suspend the abuse prevention order pending appeal, and the defendant timely appealed the denial of that motion as well. Subsequently, the district attorney's office entered a nolle prosequi on all pending charges related to the alleged sexual assault, and the defendant immediately filed a motion to modify the abuse prevention order and requested an evidentiary hearing on his earlier motion to vacate. A different District Court judge denied the defendant's motion to modify, and the defendant once again timely appealed.

*Discussion.* We first consider whether the plaintiff's daughter and the defendant were engaged in a "substantive dating relationship" as defined in G.L. c. 209A, § 1. We then discuss whether the defendant's due process rights were violated during the hearing on the question of continuing the temporary order.

1. *Substantive dating relationship.* General Laws c. 209A, § 3, provides a range of protections and remedies for those "person[s] suffering from abuse from an adult or minor family or household member. . . ." Included within the definition of "family or household members" are those individuals who are or have been engaged in a "substantive dating or engagement relationship." G.L. c. 209A, § 1 ( *e*).[3]

> 3 The plaintiff does not assert the existence of an "engagement relationship," and there is no evidence in the record to suggest such a relationship ever existed between the parties. We therefore confine our analysis to whether there was a "substantive dating relationship."

The defendant maintains that the plaintiff failed to show the existence of a "substantive dating relationship" between him and the plaintiff's daughter, and that, consequently, the abuse prevention order against him was improperly issued and extended. The defendant further asks this court to clarify the meaning of "substantive dating relationship" in G.L. c. 209A, § 1. Because the statute enumerates four factors to be considered in determining the existence of a "substantive dating relationship," there is sufficient language in the statute to enable judges to make informed and consistent
651 determinations. *651 We need not add to this language by interpretation. We believe that the Legislature drafted the statute with purposeful flexibility in its definitions, and we acknowledge that intent by declining the invitation to add elements to the Legislature's definition. The existence of a "substantive dating relationship" is to be determined on a case-by-case basis applying the factors set forth in G.L. c. 209A, § 1 ( *e*) (1)-(4), while keeping in mind the statute's protective purpose.

The Legislature enacted G.L. c. 209A in 1978 to address the problem of domestic violence. St. 1978, c. 447, § 2. See *Turner* v. *Lewis*, 434 Mass. 331, 332 (2001), quoting *Commonwealth* v. *Gordon*, 407 Mass. 340, 344 (1990) (legislative purpose of G.L. c. 209A is to provide "a statutory mechanism by which victims of family or household abuse can enlist the aid of the State to prevent further abuse"). Since its inception, G.L. c. 209A has protected victims exclusively from abuse by "family or household members." G.L. c. 209A, § 3. However, the Legislature has consistently broadened the definition of "family or household member," and consequently expanded the scope of G.L. c. 209A's coverage. In 1978, the statute defined "[f]amily or household member" as a "household member, a spouse, former spouse or their minor children or blood relative." St. 1978, c. 447, § 2. In 1986, the definition of "family or household member" was expanded to include a "former household member" and a "person who, though unrelated by blood or marriage, is a parent of the plaintiff's minor child." St. 1986, c. 310, § 15. In 1990, the Legislature once again amended the definition of "family or household member" to its present form.[4] St. 1990, c. 403, § 2. General Laws c. 209A, § 1, now defines "[f]amily or household members" as "persons who: (a) are or were married to one another; (b) are or were residing together in the same household; (c) are or were related by blood or marriage; (d) having [ *sic*] a child in common regardless of whether they have ever married or lived together; or (e) *are or have been in a substantive dating or engagement relationship* . . ." (emphasis added).

> 4 In 1996, the Legislature made a grammatical correction to the definition that is immaterial to our analysis. St. 1996, c. 450, § 232.

652 Rather than establishing a rigid test to be applied to all *652 relationships, the statute directs courts to "adjudge" the existence of substantive dating relationships by considering four factors: "(1) the length of time of the relationship; (2) the type of relationship; (3) the frequency of interaction between the parties; and (4) if the relationship has been terminated by either person, the length of time elapsed since the termination of the relationship." G.L. c. 209A, § 1 ( *e*) (1)-(4). The Legislature thus anticipated that the existence or absence of a "substantive dating relationship" would be determined on a case-by-case basis. It is not our role to impose additional constraints on the interpretive instructions provided by the Legislature. See *Commonwealth* v. *Boucher*, 438 Mass. 274, 278 (2002) (declining to further limit phrase "likely" in G.L. c. 123A, and reasoning "[i]f the Legislature had intended to restrict 'likely' to a usage less broad than its commonly understood meaning, the Legislature would have done so"). See also *Sorgman* v. *Sorgman*, 49 Mass. App. Ct. 416, 418 (2000) (declining to imply limiting factors to plain statutory language of G.L. c. 209A). Had the Legislature intended to further limit the scope of "substantive dating or engagement relationship," it would have included any such limitation in the text of the statute.

This court has had only one prior opportunity to consider the meaning of "substantive dating relationship" within G.L. c. 209A, § 1 ( *e*). See *Brossard* v. *West Roxbury Div. of the Dist. Court Dep't*, 417 Mass. 183, 185 (1994) (person may be in more than one "substantive dating relationship" at any given time). In acknowledging the possibility of simultaneous "substantive dating relationships," we recognized the need for flexibility in applying the statute. Also instructive is our analysis in *Turner* v. *Lewis, supra* at 333-334, in which we broadly interpreted "related by blood," as set forth in G.L. c. 209A, § 1 ( *c*). In *Turner*, we recognized the changing nature of the concept of "family," as well as the Legislature's clear intent to extend protections to victims who experience violence beyond the context of the traditional "family." See *id.* at 334-336. The Legislature intended to encompass a variety of relationships within G.L. c. 209A. It would not accord with this intent to restrict the statute beyond its terms in the present case.

653 While the four statutory factors enumerated in G.L. c. *653 209A, § 1 ( *e*) (1)-(4), are the primary guidance for courts when making case-specific determinations about the existence of a "substantive dating relationship," courts should also consider the underlying purpose of G.L. c. 209A. See *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934) (statutory language is to be "interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished"). See also *Turner* v. *Lewis, supra* at 333, quoting *Telesetsky* v. *Wight*, 395 Mass. 868, 872 (1985). The Legislature intended to address violence stemming from relationships which may not be considered traditional "family or household" associations. See *Turner* v. *Lewis, supra* at 334, quoting C.P. Kindregan, Jr. M.L. Inker, Family Law and Practice § 57.5 (2d ed. 1996). The judicial guidelines on abuse prevention thus properly instruct courts to "give broad meaning to the term 'substantive dating relationship' to assure that the protective purposes of the statute are achieved." Guidelines for Judicial Practice: Abuse Prevention Proceedings § 3:02 commentary (Dec. 2000) (hereinafter, "Judicial Guidelines").

On the other hand, G.L. c. 209A is denominated a "domestic relations" statute within the General Laws. See Part II, Title III of the General Laws, entitled "Domestic Relations" (including, inter alia, marriage, divorce, and child custody statutes). The Legislature did not intend the statute to apply to acquaintance or stranger violence, nor did it intend to cover the myriad of relationships that exist or even to all those which might be considered "dating" relationships. See *Brossard* v. *West Roxbury Div. of the Dist. Court Dep't, supra* at 185 ("substantive dating relationship" existed where facts revealed "substantially more than a few casual dates"). The statutory language clearly requires something more — a " *substantive* dating or engagement relationship."

Dating is inherently personal and idiosyncratic, and relationships exist in endless variety. It would be unproductive to place a numerical quota on the number of "dates" that constitute a "substantive dating relationship," just as
654 it would be inappropriate *654 to mandate a minimum duration for a relationship to fall within G.L. c. 209A. Furthermore, any attempt by this court to elaborate on the meaning of "substantive dating relationship" by adding adjectives to an already well-designed statutory definition would be counterproductive. Such an effort might spawn additional litigation and result in unnecessary intrusions by courts into the precise nature of parties' interactions. See Judicial Guidelines § 1:01 commentary ("any attempt to explore the nature of the underlying relationship between the parties can inappropriately shift the focus of the proceedings away from the issue of protection. Such a shift of focus can weaken the plaintiff's resolve to seek protection . . .").

The plaintiff bears the burden of proving by a preponderance of the evidence that the parties were engaged in a "substantive dating relationship" within the meaning of G.L. c. 209A, § 1. See *Frizado* v. *Frizado*, 420 Mass. 592, 596, 597 (1995) ("The burden is on the complainant to establish facts justifying the issuance and continuance of an abuse prevention order," and "plaintiff must make a case for relief by a preponderance of the evidence.") See also Judicial Guidelines § 1:02 commentary par. (D). Here, the plaintiff failed to sustain her burden. During the hearing on the question of continuing the temporary order, the plaintiff testified that the defendant had "been over to the house and he ha[d] taken [the daughter] to the movies." When asked about the nature of the relationship, the mother testified that she was "really not sure. They did, you know, go out." Plaintiff's counsel asserts that the plaintiff's uncertainty related only to the then-existing state of the dating relationship, not its past existence. Even so, the judge's finding of a past "boyfriend/girlfriend" relationship is not supported by the plaintiff's testimony, and the relationship between the parties does not meet the statutory standard of a "substantive dating relationship." The plaintiff's counsel also contends that the judge properly made a credibility assessment of the plaintiff, who was the sole witness at the hearing, that this court should not disturb. See *Adoption of Larry*, 434 Mass. 456, 462 (2001) (deferring to judge's assessment of witness credibility). See also *Matter of*
655 *Antonelli*, 429 Mass. 644, 648 (1999). We do not *655 contest the judge's assessment of the plaintiff's credibility in the present case, but rather his misapplication of the standards set forth in G.L. c. 209A, § 1. See *Commonwealth* v. *Boucher*, 438 Mass. 274, 276 (2002) ("we will not substitute our judgment for that of the trier of fact. We do, however, scrutinize without deference the propriety of the legal criteria employed by the trial judge and the manner in which those criteria were applied to the facts").

The judge committed an error of law in relying on improper factors as the basis for his finding that the parties were engaged in a "substantive dating relationship." General Laws c. 209A, § 1 ( *e*) (1)-(4), directs judges to consider four factors. The judge in this case ignored these factors and instead improperly relied upon judicially constructed factors, including "the fact that a criminal matter [ *sic*] has issued," and "the age of the alleged victim." According to the judge, the determination was based "primarily" on the fact that a criminal case was pending. There was no testimony as to the length of time of the relationship or the frequency of the parties' interactions, as required by G.L. c. 209A, § 1 ( *e*) (1), (3). The plaintiff contends that the judge properly exercised his broad discretion in according weight to these nonstatutory factors. While judicial discretion and flexibility are appropriate in applying the statutory definition of "substantive dating relationship," they do not relieve a court of its obligation to apply the legislative criteria.

Although the plaintiff asserts that the judge could draw an adverse inference from the defendant's failure to testify, this alone does not cure the defects in the judge's analysis. "An inference adverse to a defendant may be properly drawn . . . from his or her failure to testify in a civil matter such as this, even if criminal proceedings are pending. . . . However, inference cannot alone meet the plaintiff's burden. . . . [A] defendant's failure to testify cannot be used to justify the issuance of an abuse prevention order until a case is presented on other evidence." (Citations omitted.) *Frizado* v. *Frizado, supra* at 596.

Since there is insufficient evidence in the record to support a finding of a "substantive dating relationship" between the defendant and the plaintiff's
656 daughter, the abuse prevention *656 order is vacated, and this case could be disposed of without further discussion. However, given the importance and merit of the defendant's due process claim, which both parties briefed, we choose to address it below.

2. *Due process claim.* The defendant on appeal claims that he was improperly denied the opportunity to present evidence and cross-examine during the hearing on the question of continuing the temporary order. There is no question that the defendant was denied a meaningful opportunity to be heard. This violated statutory rights given him expressly by G.L. c. 209A, § 4; apart from the statute, his constitutional right to due process was denied him.

General Laws c. 209A, § 4, requires a hearing "on the question of continuing the temporary order . . . no later than ten court business days after such [temporary] orders are entered." The statute explicitly states: "[t]he court shall give the defendant an opportunity to be heard on the question of continuing the temporary order." *Id.* This court has determined that "[t]he right of the defendant to be heard [in a G.L. c. 209A proceeding] includes his right to testify and to present evidence. A defendant has a general right to cross-examine witnesses against him." *Frizado* v. *Frizado*, 420 Mass. 592, 597 (1995). See Judicial Guidelines § 5:01 ("a [G.L.] c. 209A action is an adversarial proceeding in which both parties must be allowed to present evidence"). Furthermore, this court has recognized that G.L. c. 209A proceedings may implicate a defendant's constitutional due process rights. *Frizado* v. *Frizado, supra* at 598 ("[W]hether a defendant's constitutional rights have been violated will depend on the fairness of a particular hearing"). Due process requires that the defendant be given an opportunity to testify and present evidence. See *Commonwealth* v. *Delaney*, 425 Mass. 587, 591 (1997), cert. denied, 522 U.S. 1058 (1998), quoting *Matter of Kenney*, 399 Mass. 431, 435 (1987) ("[t]he fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner"); *Commonwealth* v. *Durling*, 407 Mass. 108, 113 (1990) (right to present evidence, call witnesses, and cross-examine adverse witnesses in context of parole revocation hearing); *Roche* v. *Massachusetts Bay Transp. Auth.*, 400
657 Mass. 217, 222 (1987), *657 and cases cited ("right of cross-examination [is] a right which has long been recognized in both civil and criminal cases"); Judicial Guidelines § 1:02 ("The adjudication of cases by a neutral court is a fundamental element of due process. In [G.L.] c. 209A cases, as in all other court proceedings, the court is responsible for protecting the rights of the accused . . .").

The record reveals that the defendant was not given any opportunity to present or to cross-examine witnesses. The defendant's counsel explicitly argued for the right to call witnesses on at least four occasions. The defendant was never permitted to present evidence.[5] The fact that defense counsel was permitted to argue on behalf of his client does not substitute for the opportunity to present evidence through the testimony of witnesses, to cross-examine adverse witnesses, and to have the judge take this testimony and cross-examination into account in making his findings.

> 5 During one such request, defense counsel stated: "I would like an opportunity to exercise my client's rights to cross-examine [the plaintiff] . . . and I would like to present additional evidence in terms of witnesses which I believe according to the rules is my right and my client's right to . . . due process." The defendant's counsel further stated that his witnesses would show that the daughter and the defendant were not engaged in a "substantive dating relationship" and that the alleged assault did not occur.

The plaintiff next claims that even if the defendant were denied the opportunity to call and cross-examine witnesses, those denials constituted a proper exercise of judicial discretion. While a defendant's right to present evidence is not absolute, and while a judge may limit cross-examination for "good cause" in certain situations, see *Silvia* v. *Duarte*, 421 Mass. 1007, 1008 (1995); *Frizado* v. *Frizado, supra* at 597-598, judicial discretion is not "unlimited," and "each side must be given a meaningful opportunity to challenge each other's evidence." *Frizado* v. *Frizado, supra* at 598 n. 5. Proceedings held pursuant to G.L. c. 209A are no different than any other adversarial hearings in that each party has a right to present evidence, and the moving party must satisfy the burden of proof and subject its witnesses to cross-examination. See *Frizado* v. *Frizado, supra* at 597 ("The practice in civil actions . . . is to permit cross-examination . . .); *Commonwealth* v.
658 *Durling, supra* at 113 (right to present evidence, call witnesses, and *658 cross-examine adverse witnesses). Cross-examination may be limited or denied in certain instances, *Frizado* v. *Frizado, supra* at 598 n. 5, such as to avoid harassment or intimidation of witnesses, confusion, delay, or other abuses of the proceedings. See, e.g., *Commonwealth* v. *Johnson*, 431 Mass. 535, 540 (in criminal context, "reasonable limits may be placed on cross-examination 'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant'" [citation omitted]); Judicial Guidelines § 5:01 ("the judge should not permit . . . cross-examination to be used for harassment or discovery purposes"). Absent these circumstances, a defendant in a G.L. c. 209A proceeding, as in any case, must be given the opportunity to present evidence and cross-examine witnesses. Here, there was no showing by the plaintiff of any of the grounds enumerated above that would justify a limitation on these rights.[6] In fact, the issue whether to limit cross-examination was never reached by the judge because he allowed no cross-examination at all. The judge abused his discretion in denying the defendant the opportunity to present testimonial evidence and cross-examine the plaintiff.

> 6 The plaintiff made bald assertions that the defendant intended to harass witnesses and create confusion in the proceedings, but these claims are unsupported by the record.

One final error of law by the judge in this case requires discussion. The judge improperly determined that the defendant's right to present evidence at an upcoming criminal hearing would sufficiently protect the defendant's due process rights. The judge stated, "if we have a [G.L. c. 209A protective order] . . . and there is no pending criminal matters pending [ *sic*], then that's a much different issue. In other words, we give both parties a full right to have a hearing and witnesses. . . . But if there's a criminal matter pending, then that's a different matter altogether." A defendant's right to present evidence at a G.L. c. 209A hearing is unrelated to his rights at a pending criminal proceeding. The right to be heard in one forum does not affect the right to be heard in another.

Although "[a]buse prevention order proceedings were intended by the
659 Legislature to be as expeditious and informal as *659 reasonably possible," *Zullo* v. *Goguen*, 423 Mass. 679, 681 (1996), citing *Frizado* v. *Frizado, supra* at 598, the proceedings may not violate the due process rights of defendants in an attempt to accommodate plaintiffs. "[T]he issue of family violence has become the focus of legitimate and increasing public concern. However, that concern must not be permitted to affect or diminish the court's responsibility to remain neutral, to protect the rights of the accused in each case, and to address each case individually on its own merits." Judicial Guidelines § 1:02 commentary. Just as we must guard against the potential that G.L. c. 209A proceedings may be used to harass and intimidate victims of domestic abuse, so too must we resist a culture of summarily issuing and extending these orders. Such a culture would ignore the legislative intent behind G.L. c. 209A and undermine a basic pillar of our judicial tradition — that all parties be given a fair and equal opportunity to be heard.

For the foregoing reasons, the abuse prevention order against the defendant is vacated.

660 *660

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research

Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

From Casetext: Smarter Legal Research

# Frizado v. Frizado

Download PDF Check Treatment

## Summary

In Frizado v. Frizado, 420 Mass. 592, 651 N.E.2d 1206 (1995), overruled on another ground by Zullo, 423 Mass. at 681, 672 N.E.2d 502, we rejected such facial challenges to c. 209A, holding that "[t]he general pattern to be followed in G. L. c. 209A proceedings is both fair and reasonably clear.

Summary of this case from Commonwealth v. Dufresne

See 4 Summaries

Meet CoCounsel, pioneering AI that's secure, reliable, and trained for the law.

Try CoCounsel free

Case Details

Full title: RICHARD W. FRIZADO vs. SHERLEY A. FRIZADO another

Court: Supreme Judicial Court of Massachusetts. Suffolk

Date published: Jun 15, 1995

Citations Copy Citations

420 Mass. 592 (Mass. 1995)
651 N.E.2d 1206

Citing Cases

S.T. v. E.M
The judge responded, "I beg to differ." Counsel then drew the judge's attention to Frizado v. Frizado, 420...

A.P. v. M.T.
The purpose of proceedings under c. 258E, like those under c. 209A, is "protective, not penal." A.T. v. C.R....

124 Citing Cases

## Opinion

April 4, 1995.

June 15, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, JJ.

*Abuse Prevention. Constitutional Law,* Trial by jury, Self-incrimination. *Due Process of Law,* Abuse prevention.

A defendant against whom an order was sought under the provisions of G.L.c. 209A was not entitled to a trial by jury pursuant to art. 12 of the Massachusetts Declaration of Rights. [594-595] A defendant against whom an order was sought under the provisions of G.L.c. 209A was not entitled to a jury trial pursuant to art. 15 of the Massachusetts Declaration of Rights where no common law right to trial by jury existed with respect to the wrongs or threats for which the statute provides a remedy. [595-596] The procedures prescribed for the issuance of orders under G.L.c. 209A do not compel a person charged thereunder to furnish evidence against himself in violation of his right under art. 12 of the Massachusetts Declaration of Rights. [596] General Laws c. 209A does not on its face violate the right to due process of law guaranteed by art. 12 of the Massachusetts Declaration of Rights. [596-598]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 26, 1994.

The case was heard by *Nolan, J.*

*Paul W. Patten* for the plaintiff.

*Edward D. Rapacki,* Assistant Attorney General, for Fall River Division of the
593 District Court Department of the Trial Court. *593 *Toni G. Wolfman, Anthony Mirenda, Michele A. Whitham, Claire Laporte Mark Rosen,* for Domestic Violence Council others, amici curiae, submitted a brief.

WILKINS, J.

We are concerned with constitutionally-based arguments that challenge the lawfulness of abuse prevention orders issued against Richard W. Frizado on the complaint of his former wife. In August and September, 1994, respectively, a District Court judge issued preliminary and permanent orders against Frizado pursuant to G.L.c. 209A (1992 ed.).

Frizado moved unsuccessfully in the District Court to dismiss the complaint and ex parte orders that had been issued pursuant to the complaint, on the grounds that the procedures prescribed by G.L.c. 209A violated his rights under the Declaration of Rights of the Constitution of the Commonwealth (1) to a jury trial (arts. 12 and 15), (2) not to be compelled to furnish evidence against himself (art. 12), and (3) to due process of law (art. 12).

Frizado commenced this action under G.L.c. 211, § 3 (1992 ed.), seeking relief from the G.L.c. 209A order issued against him after a hearing, alleging that G.L.c. 209A is facially invalid. The use of G.L.c. 211, § 3, to challenge an order entered under G.L.c. 209A was proper. *Callahan* v. *Boston Mun. Court Dep't,* 413 Mass. 1009 (1992). A single justice denied relief without issuing an opinion, and Frizado appealed. We shall refer to Frizado as the defendant because that was his status in the District Court proceeding. His challenges are based exclusively on the Constitution of the Commonwealth and assert the facial invalidity of G.L.c. 209A.

We shall reject the defendant's substantive challenges. First, however, we must consider the consequences of the fact that on October 14, 1994, the same day that the single justice denied relief, a District Court judge, other than the one who had entered it, vacated the outstanding abuse prevention order on the motion of the complainant. The defendant argues nevertheless that his appeal is not moot because he has a continuing stake in the appeal.
594 See *Johnson* v. *Commonwealth,* *594 409 Mass. 712, 716 n. 6 (1991); *Department of Youth Servs.* v. *A Juvenile,* 384 Mass. 784, 785-787 (1981); *Blake* v. *Massachusetts Parole Bd.,* 369 Mass. 701, 703-704 (1976). He asserts that the abuse prevention orders could have an adverse effect on him in any future G.L.c. 209A proceeding and in certain future bail proceedings. The assertion has some merit, assuming that the allowance of the motion to vacate the outstanding G.L.c. 209A order does not result in the removal from probation records of all abuse prevention orders entered in this G.L.c. 209A proceeding.[2] The record does not indicate what effect the order vacating the outstanding abuse prevention order may have on probation records. The Attorney General on behalf of the Fall River District Court makes no claim that the issues are moot. The issues may be expected to arise in other proceedings. We therefore address the defendant's arguments.

> 2 In any future matter involving a complaint under G.L.c. 209A, the judge must consider whether the defendant has a record of domestic violence contained in the Statewide domestic violence record keeping system of the commissioner of probation. G.L.c. 209A, § 7. See G.L.c. 276, § 85 (1992 ed.). When the Commonwealth moves in a criminal case for an order that the defendant is dangerous and should not be released on bail, the judge may consider whether the defendant has a history of orders issued against him under G.L.c. 209A, in deciding whether there are conditions of release that will assure the public safety. G.L.c. 276, § 58A (5) (Supp. Dec., 1994).

1. We consider first the claim that the Constitution of the Commonwealth requires that complaints under G.L.c. 209A concerning protection from abuse must be tried to a jury. The defendant makes separate arguments under arts. 12 and 15 of the Declaration of Rights.

The guarantee of art. 12 that "no subject shall be . . . deprived of his property . . . but by the judgment of his peers," is not violated when, without a jury trial, a court enters an order under G.L.c. 209A, provided that, in its implementation, the order does not confiscate property as a punishment for the commission of a crime. See *Commonwealth* v. *One 1972 Chevrolet Van,* 385
595 Mass. 198, 201-202 *595 (1982); *Commonwealth* v. *United Food Corp.,* 374 Mass. 765, 778-781 (1978). An order pursuant to G.L.c. 209A that requires a defendant to stay away from property in which the defendant has an interest (which is not the situation in the case before us) is not punitive in purpose. Relief granted pursuant to G.L.c. 209A, §§ 3, 4, and 5, is largely prospective (see, however, § 3 [*f*], concerning compensation for losses resulting from abuse), and thus the statutory process for issuing such an order appears unlikely in its application ever to involve a violation of art. 12 jury trial rights. See *Commonwealth* v. *Barboza,* 387 Mass. 105, 112-113, cert. denied, 459 U.S. 1020 (1982), in which the balancing of interests affected, including the State's interest in expedited hearings, indicated that art. 12 did not require a jury trial in the circumstances of that case. Consequently, the defendant's art. 12 rights were not violated by trial before a judge without a jury.

Article 15 does not require that there be a jury trial in a proceeding under G.L.c. 209A. Article 15 generally provides an opportunity for a jury trial in a civil action between two or more persons "except in cases in which it has heretofore been otherways used and practiced." Article 15 thus preserves the common law right to trial by jury as it existed when the Constitution of the Commonwealth was adopted in 1780. *Department of Revenue* v. *Jarvenpaa,* 404 Mass. 177, 185-186 (1989). The wrongs or threats for which G.L.c. 209A provides a remedy do not appear to be ones that juries considered under the common law of the Commonwealth. See *id.* at 186. Nothing similar to injunctive relief forbidding future domestic abuse and mandating that a person stay away from a complainant seems to have existed at common law. Cf. *Commonwealth* v. *Gulfside,* 402 Mass. 130, 135-136 (1988) (new cause of action, not a new version of a traditional proceeding; no art. 15 right to jury trial); *Commonwealth* v. *Mongardi,* 26 Mass. App. Ct. 5, 8-9 (1988). See also *Dalis* v. *Buyer Advertising, Inc.,* 418 Mass. 220, 228 (1994) ("art. 15 does not
596 guarantee a right to a trial *596 by jury in the class of cases traditionally reserved for courts of equity").

2. The processes of G.L.c. 209A do not compel a defendant to abandon his privilege against self-incrimination guaranteed by art. 12. The process does not force a defendant to testify or to present a defense, nor do they coerce a waiver of rights against self-incrimination. The burden is on the complainant to establish facts justifying the issuance and continuance of an abuse prevention order. The court must on request grant a "defendant an opportunity to be heard on the question of continuing the temporary order and of granting other relief." G.L.c. 209A, § 4. That opportunity, however, places no burden on a defendant to testify or to present evidence. The defendant need only appear at the hearing. *Id.*

The plaintiff must make the case for the awarding of relief. An inference adverse to a defendant may properly be drawn, however, from his or her failure to testify in a civil matter such as this, even if criminal proceedings are pending or might be brought against the defendant. See *McGinnis* v. *Aetna Life Casualty Co.,* 398 Mass. 37, 39 (1986); *Commonwealth* v. *United Food Corp., supra* at 771-772. The fact that the defendant may refuse to testify on the ground of self-incrimination does not bar the taking of an adverse inference. See *Quintal* v. *Commissioner of the Dep't of Employment Training,* 418 Mass. 855, 861 (1994). However, the inference cannot alone meet the plaintiff's burden. See *McGinnis* v. *Aetna Life Casualty Co., supra; Custody of Two Minors,* 396 Mass. 610, 616 (1986). Thus a defendant's failure to testify cannot be used to justify the issuance of an abuse prevention order until a case is presented on other evidence. *Id.*

3. Chapter 209A does not facially violate a defendant's right to due process of law stated in art. 12. The defendant argues that the absence of procedural safeguards makes G.L.c. 209A unconstitutional on its face.[3] A statute such as
597 *597 G.L.c. 209A need not repeat procedural practices that are established as generally acceptable. A court will fill in necessary and appropriate procedural elements unless circumstances indicate a contrary legislative intent. Cf. *Aime* v. *Commonwealth,* 414 Mass. 667, 683 (1993) (Legislature's elimination of constitutional safeguards from proposed legislation forecloses judicial adoption of them to save statute from constitutional attack). Although it is not expressly stated in G.L.c. 209A, it follows from custom and practice in civil cases that a G.L.c. 209A plaintiff must make a case for relief by a preponderance of the evidence. The circumstances of a G.L.c. 209A hearing do not require that a higher burden of proof be met. See *Medical Malpractice Joint Underwriting Ass'n* v. *Commissioner of Ins.,* 395 Mass. 43, 46-47 (1985).[4] The right of the defendant to be heard includes his right to testify and to present evidence.

> 3 Because a G.L.c. 209A proceeding is a civil, and not a criminal, proceeding, the constitutional right to confront witnesses and to cross-examine them set forth in art. 12 of the Declaration of Rights has no application in this case.

> 4 A judge may enter a temporary order only "[i]f the plaintiff demonstrates a substantial likelihood of immediate danger of abuse . . . ." G.L.c. 209A, § 4.

A defendant has a general right to cross-examine witnesses against him. There may be circumstances in which the judge properly may deny that right in a G.L.c. 209A hearing, and certainly a judge may limit cross-examination for good cause in an exercise of discretion. See *Commonwealth* v. *Durling,* 407 Mass. 108, 113, 117-118 (1990). The practice in civil actions, however, is to permit cross-examination (which is what happened in the case before us). See *Adoption of Mary,* 414 Mass. 705, 710 (1993); *Roche* v. *Massachusetts Bay Transp. Auth.,* 400 Mass. 217, 222 (1987); *Custody of Two Minors,* 19 Mass. App. Ct. 552, 556 (1985). A defendant or his counsel should be given adequate opportunity to consider any affidavit filed in the proceeding on which the judge intends to rely before being required to elect whether to cross-examine the complainant or any other witness. On the other hand, the rules
598 of evidence need not be *598 followed, provided that there is fairness in what evidence is admitted and relied on.

The Legislature devised a procedure in G.L.c. 209A that is intended to be expeditious and as comfortable as it reasonably can be for a lay person to pursue. Judges often must deal with large numbers of these emotional matters in busy court sessions. The process must be a practical one. The general pattern to be followed in G.L.c. 209A proceedings is both fair and reasonably clear. Whether a defendant's constitutional rights have been violated will depend on the fairness of a particular proceeding. Apart from the facial challenges that we have discussed and rejected, the defendant makes no claim that the hearing and decision in the matter before us denied him due process of law.[5] *Judgment affirmed.*

> 5 Many of the principles that we have stated also appear in the District Court's Draft Standards of Judicial Practice, Abuse Prevention Proceedings (December, 1994). See, e.g., § 5:01 ("Both parties must be allowed to present evidence"; "The plaintiff bears the burden of proof"; "Neither the defendant nor the plaintiff should be compelled to provide incriminating information"); § 5:03 ("The court need not apply the rules of evidence"); § 5:04 ("The standard of proof in c. 209A hearings is the civil standard of preponderance of the evidence").
> On the other hand, our view of the right of a defendant to cross-examine witnesses expresses a due process, fairness standard that § 5:01 of the abuse prevention standards does not express in the same way. The District Court standards (§ 5:01) state that "cross examination may be limited to the extent deemed appropriate by the court." The judge's discretion in restricting cross-examination may not be unlimited in particular situations. We agree when § 5:01 adds that "the court should not permit the use of cross examination for harassment or discovery purposes. However, each side must be given a meaningful opportunity to challenge the other's evidence."

599 *599

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

From Casetext: Smarter Legal Research

# Idris I. v. Hazel H.

Download PDF | Check Treatment

Delegate legal research to CoCounsel, your new AI legal assistant.
Try CoCounsel free

Case Details
Full title: IDRIS I. v. HAZEL H.
Court: Appeals Court of Massachusetts. Middlesex
Date published: Mar 25, 2022

Citations
Copy Citations
100 Mass. App. Ct. 784 (Mass. App. Ct. 2022)
185 N.E.3d 473

Citing Cases
A.D. v. M.D.
"A meaningful opportunity to be heard includes an opportunity to address the material and determinative...
T.E. v. M.L.
...Contrast Idris I. v. Hazel H., 100 Mass. App. Ct. 784, 789 (2022) (finding error where judge did...
13 Citing Cases

## Opinion

No. 21-P-570

03-25-2022

IDRIS I. v. HAZEL H.

Caroline L. Jones, of the District of Columbia, for the defendant. Idris I., pro se, submitted a brief.

BLAKE, J.

Caroline L. Jones, of the District of Columbia, for the defendant.

Idris I., pro se, submitted a brief.

Present: Rubin, Wolohojian, & Blake, JJ.

BLAKE, J.

474 Following a hearing conducted by video conference, a judge of the District Court extended, with certain modifications, a G. L. c. 209A abuse prevention order (c. 209A order) for one year. The defendant appeals, claiming that there was insufficient *474 evidence to extend the order. She also claims that she was denied a meaningful opportunity to be heard because she was unable to challenge the plaintiff's evidence, to meaningfully cross-examine the plaintiff, or to testify.[2] We agree that she was denied a meaningful *785 opportunity to be heard, and therefore we vacate the c. 209A order and remand the matter for a new hearing.

2 The plaintiff, a retired attorney, submitted a brief in lieu of a brief and did not appear for oral argument.

Background. On March 3, 2021, the plaintiff applied for and was granted an ex parte c. 209A order against the defendant. The plaintiff alleged that, beginning in 2017, the defendant mentally, sexually, and physically abused him. He claimed that he had recently received a "series of strange and menacing messages on [his] work and personal numbers from numbers [he did] not know." At the ex parte hearing, the plaintiff said that his last contact with the defendant had been on January 12, 2021, which was fifty days before he applied for a c. 209A order. When asked by the judge "what took ... so long [for him] to come in," the plaintiff responded that he was preparing an affidavit to give to his attorney.

On March 24, 2021, the day before the hearing after notice was scheduled to take place, the defendant's attorney sent the defendant's proposed exhibits to the court by e-mail.[3] Due to the ongoing COVID-19 pandemic and the closure of certain courts, the hearing scheduled for March 25, 2021, was rescheduled. It was eventually held on April 8, 2021, by video conference. Both parties appeared with counsel. The hearing judge was not the same judge who had issued the ex parte c. 209A order.[4]

3 The proposed exhibits included e-mail, text, and Facebook messages.

4 The parties agree that the hearing judge did not turn on her camera during the video conference. The better practice would be for all parties, and the judge, to turn on their cameras during hearings conducted over video conference platforms.

When the case was called, the judge first asked the plaintiff whether he wanted the c. 209A order extended. He said yes and asked for a permanent c. 209A order. The judge then asked the defendant if she opposed the extension and, if so, to explain why. The defendant's response was brief. She said that she opposed further extension of the c. 209A order because it had been issued based on an e-mail message that she sent to the plaintiff for "closure," and that it did not contain any threats. She denied all of the allegations in the plaintiff's affidavit.

The judge then asked the plaintiff "what [he] would ... like to tell [the judge] in regards to ... being in imminent fear of serious bodily harm from [the defendant]." The plaintiff said that the e-mail, which the defendant
786 acknowledged sending, contained "a *786 coded or implied threat of stabbing,"[5] and that there was "evidence ... on file with the [local] police." The judge asked whether the plaintiff was referring to certain documents that "were submitted to the [c]ourt." The defendant's attorney then interjected that she had not received any of the plaintiff's evidence, despite
475 the fact that she provided her evidence "well in advance to the plaintiff." *475 The judge did not address defense counsel's concern; rather, the judge asked the defendant if she sent the e-mail in question. As she had done earlier, the defendant acknowledged that she sent the e-mail. Thereafter the plaintiff's counsel was permitted to conduct a direct examination of the plaintiff.

5 The plaintiff testified that the e-mail contained an "implied threat" because the defendant used red, italicized text to "indicate precisely where the defendant intended to stab [him]." We note that the copy of the e-mail in the record appendix is not in color. The defendant's attorney contends that the copy she received from the clerk's office was a black and white scan of the original. On its face, the e-mail was not threatening.

The defendant's attorney then began her cross-examination of the plaintiff, but the judge did not permit her to complete it. For example, when the defendant's attorney asked the judge's permission to play voice mail messages in an apparent effort to impeach the plaintiff, the judge responded, "No, counsel. Next question." Shortly thereafter, the defendant's attorney explained to the judge that, at this point in the hearing, she would ordinarily approach the plaintiff with the exhibits to determine whether or not he sent them to the defendant. The judge interrupted and stated:

> "Counsel -- counsel, hold on. Hold on. The [c]ourt is fully aware, the [c]ourt has all of the information that's been provided by both the plaintiff and the defendant. So the [c]ourt has that information, it's the [c]ourt that needs to look at this and make a determination if in fact the [c]ourt is going to issue[ ] this order.
>
> "So I will tell you that the -- during this hearing, that I've [had] the opportunity to go through these documents as you're questioning [the plaintiff], and as your client was being questioned to see what was -- actually has been submitted, so I can digest that information. So that is there. If you want to make an argument at the end, that's fine, but the [c]ourt does have that information. That's fine."

787 *787

When the defendant's attorney then attempted to question the plaintiff about statements that he made to the defendant, the judge again interrupted. She said:

> "Counsel -- counsel, hold on. Hold on. As I indicated, the [c]ourt has the documents. We're not going to go specifically through each of those incidents. I have the information that I've read. You've submitted that these are communications between your client and [the plaintiff], that's fine. We're not going through each and every line of these documents."

The defendant's attorney then attempted to make an offer of proof. She said, in pertinent part, "[M]y concern is that if I don't bring [the statements] out in the hearing, that Your Honor might not see some of the extremely important texts and e-mails and threats that [the plaintiff] made to [the defendant] that --" Before she could finish her sentence, the judge interrupted and said, "[T]his is not your client asking for a restraining order." She added, "The [c]ourt gets it." As the defendant's attorney tried to continue her cross-examination of the plaintiff, the judge interrupted again and said:

> "[W]hat I'm going to do is have you and counsel for [the plaintiff] give your closing statements. The [c]ourt gets the relationship. The [c]ourt gets how tumultuous this relationship is. I get it. So I want to hear you both in closing as to what you would like this [c]ourt to consider."

Before starting her closing argument, the defendant's attorney addressed the judge and said, "Let me just -- I don't think the [c]ourt is going to indulge --" Without even hearing in what way the defendant's attorney sought the court's indulgence, the judge said, "No. Go ahead, counsel." After completion of the closing arguments, the judge extended the c. 209A order
476 for one year, with certain modifications.[6] *476 In so doing, the judge said that she had heard the testimony of both parties and arguments of counsel. She made no further findings.

6 The c. 209A order was modified to provide only that the defendant could not contact the plaintiff and that she turn in any firearms.

Discussion. We review the issuance of a c. 209A order for an abuse of discretion or other error of law. See Noelle N. v. Frasier F., 97 Mass. App. Ct. 660, 664, 149 N.E.3d 850 (2020). We begin by examining the scope and
788 manner in which the hearing after notice was conducted. *788 Unquestionably, these hearings can be informal, but "certain minimum standards of fairness must be observed." S.T. v. E.M., 80 Mass. App. Ct. 423, 429, 953 N.E.2d 269 (2011). It is undisputed that a defendant -- in any case -- "has a right to notice and an opportunity to be heard." M.M. v. Doucette, 92 Mass. App. Ct. 32, 34, 81 N.E.3d 1210 (2017). This principle applies with equal force in proceedings conducted pursuant to G. L. c. 209A. See id. See also Guidelines for Judicial Practice: Abuse Prevention Proceedings § 1:02 (Oct. 2021) (Guidelines).[7]

7 We recognize that the Guidelines were revised in October 2021, after the hearing at issue in this case. However, the relevant provisions remain substantially similar such that it does not change our analysis. We therefore cite to the most recent version of the Guidelines.

Here, the question is whether the defendant had a meaningful opportunity to be heard in the context of a G. L. c. 209A proceeding.[8] A meaningful opportunity to be heard includes an opportunity to address the material and determinative allegations at the core of a party's claim or defense and to present evidence on the contested facts. See Highland Tap of Boston, Inc. v. Commissioner of Consumer Affairs & Licensing of Boston, 33 Mass. App. Ct. 559, 571, 602 N.E.2d 1095 (1992). This includes the defendant's right to testify, to present evidence, and to cross-examine the witnesses against her. See Frizado v. Frizado, 420 Mass. 592, 597-598, 651 N.E.2d 1206 (1995).

8 Notice to the defendant is not contested.

The defendant first claims that she was not permitted to testify. At the start of the hearing the judge asked whether the plaintiff wanted the c. 209A order extended, asked whether the defendant opposed the extension, and asked each party the reasons for their positions. Apart from stating her name, this was the sum total of the defendant's testimony: it spanned twenty-one lines (or about four-fifths of one page) of a twenty-five page transcript. On the other hand, the plaintiff's attorney conducted a detailed, guided direct examination of the plaintiff. That testimony included, among other things, the plaintiff's view of the parties' relationship, the reasons that he was in fear, and his claimed reports to law enforcement. By contrast, the judge did not permit the defendant's attorney to conduct a direct examination of the defendant, let alone a detailed and guided one. Indeed, the defendant was never permitted to testify at all, as the judge interrupted her attorney's cross-examination of the plaintiff and immediately directed
789 the attorneys to present their closing arguments.*789 Unquestionably, "[w]ithout first hearing the evidence, a judge should not, over objection, vacate any provision of a c. 209A order once issued." Singh v. Capuano, 468 Mass. 328, 331, 10 N.E.3d 1074 (2014). We see no reason why the same should not apply here: that is, a judge must first hear the evidence from both parties
477 before extending a c. 209A *477 order. See id. This is especially true where here, as in most G. L. c. 209A cases, the judge did not hear from the defendant when the initial order was obtained on an ex parte basis. For that reason, the judge erred by extending the c. 209A order without first hearing the defendant's testimony. Further, this error was not cured by allowing the defendant's attorney to argue on her behalf, as arguments of counsel are not a substitute for evidence or the defendant's right to testify. See C.O. v. M.M., 442 Mass. 648, 657, 815 N.E.2d 582 (2004). See also Commonwealth v. Delaney, 425 Mass. 587, 591, 682 N.E.2d 611 (1997), cert. denied, 522 U.S. 1058, 118 S.Ct. 714, 139 L.Ed.2d 655 (1998), quoting Matter of Kenney, 399 Mass. 431, 435, 504 N.E.2d 652 (1987) ("[t]he fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner").

The defendant next contends that the judge denied her a meaningful opportunity to challenge the plaintiff's evidence. In support of her claim, the defendant points to the fact that the judge had before her evidence that the defendant did not have, and had not seen. It was only once the plaintiff referred to certain exhibits in response to a question posed by the judge that the defendant's attorney even became aware of that evidence. She immediately brought it to the attention of the judge, but the judge did not respond. Instead, the judge allowed the plaintiff's attorney to continue his direct examination of the plaintiff. The judge also noted several times during the hearing that she was considering written evidence submitted by both parties; as a result, the judge admittedly relied on evidence that the defendant did not see, much less have an opportunity to challenge.

We recognize that discovery requests in a G. L. c. 209A proceeding are left to the judge's discretion. See Guidelines § 1:03. However, this is not a simple discovery issue. Rather, the judge here improperly considered evidence that the defendant had never seen, and thus was unable to challenge. See Frizado, 420 Mass. at 597-598, 651 N.E.2d 1206 (in G. L. c. 209A proceedings, "the rules of evidence need not be followed, provided that there is fairness in what evidence is admitted and relied on"). And, while the defendant is not required to disprove the allegations against her, her ability to raise issues of
790 fact was necessarily impeded here by the lack of *790 access to the defendant's evidence against her. See C.O., 442 Mass. at 656-657, 815 N.E.2d 582. See also Guidelines § 1:02(f) (each party must be given meaningful opportunity to challenge other party's evidence).

The defendant also contends that the judge improperly limited her cross-examination of the plaintiff. Although the defendant's attorney began a cross-examination of the plaintiff, the judge sua sponte ended it and directed the attorneys to proceed to closing arguments. "While a judge surely may exclude irrelevant or inadmissible evidence, or even interrupt an argument or a witness examination that has become repetitious, [s]he should not terminate a hearing without ensuring that [s]he has heard all the relevant and admissible evidence once." S.T., 80 Mass. App. Ct. at 430-431, 953 N.E.2d 269. See Guidelines § 5:01. But a judge's "discretion is not unlimited and each side must be given a meaningful opportunity to challenge each other's evidence" (quotation and citation omitted). S.T., supra at 431, 953 N.E.2d 269. Here, there was no objection, and there was no suggestion that the cross-examination was designed to harass or intimidate the plaintiff, or that it had caused confusion or delay. The judge's reasoning
478 for prematurely terminating the cross-examination *478 -- that the "[c]ourt gets the relationship" -- and then directing the parties to proceed to closing arguments without permitting the defendant to testify was error. See C.O., 442 Mass. at 657, 815 N.E.2d 582.

Finally, we are not persuaded by the plaintiff's contention that the defendant did not preserve her claims of error for consideration on appeal. The hearing transcript reflects the efforts by the defendant's attorney to view the evidence that the plaintiff submitted to the judge but not to her, to conduct a comprehensive cross-examination of the plaintiff, and to permit the defendant to testify and present evidence. Illustrative of this point is the repeated but unsuccessful efforts by the defendant's attorney to make an offer of proof. Moreover, no specific words are required to preserve a claim of error.[9] In the circumstances of this case, we deem the claims of error preserved.

9 We also note that any additional objections by the defendant's attorney would likely have been futile. See Commonwealth v. McDonagh, 480 Mass. 131, 140 n.9, 102 N.E.3d 369 (2018) ("A party need not continue to voice an objection once it is clear that doing so would be futile").

In addition, although the defendant's objections could have been more fulsome, nothing in the transcript can be viewed as a tacit agreement to the
791 manner in which the judge conducted the *791 hearing. Contrast Diaz v. Gomez, 82 Mass. App. Ct. 55, 63, 970 N.E.2d 355 (2012) (no due process issue where defendant actively participated in determining scope and manner of G. L. c. 209A proceeding). And while the lack of a further objection in a civil case may constitute waiver, see Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 639, 751 N.E.2d 848 (2001), that principle does not control in G. L. c. 209A cases because of the sui generis nature of the proceedings, see Mitchell v. Mitchell, 62 Mass. App. Ct. 769, 773 n.9, 821 N.E.2d 79 (2005).[10] Lastly, there are particular circumstances that will prompt us to consider questions of law that were neither pressed nor passed upon by the lower court, particularly where an injustice might otherwise result. See White v. White, 40 Mass. App. Ct. 132, 133, 662 N.E.2d 230 (1996). This is one such case for at least three reasons: (1) the defendant's due process rights are implicated, see C.O., 442 Mass. at 656-657, 815 N.E.2d 582 ; (2) a c. 209A order has significant collateral consequences, see S.T., 80 Mass. App. Ct. at 430 n.7, 953 N.E.2d 269 ; and (3) violation of a c. 209A order is a criminal offense, see G. L. c. 209A, § 7.

10 We note that G. L. c. 209A proceedings are "purely statutory and, thus, are not among the cases to which the Massachusetts Rules of Civil Procedure ... apply." M.G. v. G.A., 94 Mass. App. Ct. 139, 145, 112 N.E.3d 837 (2018).

Conclusion. A defendant must be provided a meaningful opportunity to be heard in a G. L. c. 209A proceeding. See C.O., 442 Mass. at 657, 815 N.E.2d 582. As discussed in detail supra, that did not happen here. Accordingly, the c. 209A order must be vacated, and the case remanded for a further hearing.[11] We do not mean to intimate how the matter should be decided after a full and fair hearing. We recognize that credibility determinations and an evaluation of the sufficiency of all the evidence are matters for the hearing judge to decide. See Ginsberg v. Blacker, 67 Mass. App. Ct. 139, 140
479 n.3, 852 N.E.2d 679 (2006). However, under all of the circumstances, *479 we think it better that the matter be heard before a different judge.[12]

11 Because we conclude that a remand is required, we do not address the defendant's sufficiency argument.

12 The plaintiff's request for damages and costs is denied.

So ordered.

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

citation after argument, see *id.,* at 41, counsel directed us to the court's statement that "there is no allegation that [Telemarketers] made affirmative misstatements to potential donors." 198 Ill. 2d 345, 348, 763 N. E. 2d 289, 291 (2001)); see Letter from William E. Raney to William K. Suter, Clerk of the Court (Mar. 4, 2003). In so stating, the Illinois court overlooked, most obviously, the two affidavits attesting to Telemarketers' representations that "90% or more goes to the vets," and that there would be no "labor

609

represented that contributions would "be used to help and assist Viet[N]ow's charitable purposes." *Id.,* at 8, ~ 30.4

The 15 cents or less of each solicited dollar actually made available to VietNow, the Attorney General charged, "was merely incidental to the fund raising effort"; consequently, she asserted, "representations made to donors [that a significant amount of each dollar donated would be paid over to Viet[N]ow for its purposes] were knowingly deceptive and materially false, constituted a fraud[,] and were made for the private pecuniary benefit of [Telemarketers]." *Id.,* at 9, ~~ 34, 35.

Telemarketers moved to dismiss the fraud claims, urging that they were barred by the First Amendment. The trial court granted the motion,5 and the dismissal order was affirmed, in turn, by the Illinois Appellate Court and the Illinois Supreme Court. The Illinois courts placed heavy weight on three decisions of this Court: *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980); *Secretary of State of Md.* v. *Joseph H. Munson Co.,* 467 U. S.

expenses." See App. 111, 169 (capitalization omitted). In any event, the sentence fragment counsel identified falls short of showing, in the face of established Illinois case law, that the court "found" the affidavits annexed by the Illinois Attorney General *dehors* the complaint. Counsel's contention is further clouded by the Illinois Supreme Court's explicit notation that "the Attorney General ha[d] attached to his complaint the affidavits of 44 VietNow donors." 198 Ill. 2d, at 352, 763 N. E. 2d, at 293.

4 Illinois law provides that "[i]n any solicitation to the public for a charitable organization by a professional fund raiser or professional solicitor[,] [t]he public member shall be promptly informed by statement in verbal communications and by clear and unambiguous disclosure in written materials that the solicitation is being made by a paid professional fund raiser. The fund raiser, solicitor, and materials used shall also provide the professional fund raiser's name and a statement that contracts and reports regarding the charity are on file with the Illinois Attorney General and additionally, in verbal communications, the solicitor's true name must be provided." Ill. Compo Stat., ch. 225, §460/17(a) (2001).

5 The parties subsequently stipulated to the dismissal of all remaining claims. App. to Pet. for Cert. 30-31.

610

947 (1984); and *Riley* v. *National Federation of Blind of* N. c., *Inc.,* 487 U. S. 781 (1988). Each of the three decisions invalidated state or local laws that categorically restrained solicitation by charities or professional fundraisers if a high percentage of the funds raised would be used to cover administrative or fundraising costs. *Schaumburg,* 444 U. S., at *620; Munson,* 467 U. S., at 947; and *Riley,* 487 U. S., at 781; see 198 Ill. 2d, at 359, 763 N. E. 2d, at 297.

The Illinois Supreme Court acknowledged that this case, unlike *Schaumburg, Munson,* and *Riley,* involves no prophylactic provision proscribing any charitable solicitation if fundraising costs exceeded a prescribed limit. Instead, the Attorney General sought to enforce the State's generally applicable antifraud laws against Telemarketers for "specific instances of deliberate deception." 198 Ill. 2d, at 358, 763 N. E. 2d, at 296 (quoting *Riley,* 487 U. S., at 803 (SCALIA, J., concurring)). "However," the court said, "the statements made by [Telemarketers] during solicitation are alleged to be 'false' only because [Telemarketers] retained 85% of the gross receipts and failed to disclose this information to donors." 198 Ill. 2d, at 359, 763 N. E. 2d, at 297. The Attorney General's complaint, in the Illinois Supreme Court's view, was "in essence, an attempt to regulate [Telemarketers'] ability to engage in a protected activity based upon a percentagerate limitation"-"the same regulatory principle that was rejected in *Schaumburg[,] Munson,* and *Riley." Ibid.*

"[H]igh solicitation costs," the Illinois Supreme Court stressed, "can be attributable to a number of factors." *Ibid.* In this case, the court noted, Telemarketers contracted to provide a "wide range" of services in addition to telephone solicitation. *Ibid.* For example, they agreed to publish a newsletter and to maintain a toll-free information hotline. *Id.,* at 359-360, 763 N. E. 2d, at 297-298. Moreover, the court added, VietNow received "nonmonetary benefits by having [its] message disbursed by the solicitation process," and Telemarketers were directed to solicit "in a manner that

611

would 'promote goodwill' on behalf of VietNow." *Id.,* at 361, 763 N. E. 2d, at 298. Taking these factors into account, the court concluded that it would be "incorrect to presume ... [any] nexus between high solicitation costs and fraud." *Id.,* at 360, 763 N. E. 2d, at 298.

The Illinois Supreme Court further determined that, under *Riley,* "fraud cannot be defined in such a way that it places on solicitors the affirmative duty to disclose to potential donors, at the point of solicitation, the net proceeds to be returned to the charity." *Id.,* at 361, 763 N. E. 2d, at 298.6 Finally, the court expressed the fear that if the complaint were allowed to proceed, all fundraisers in Illinois would be saddled with "the burden of defending the reasonableness of their fees, on a case-by-case basis, whenever in the Attorney General's judgment the public was being deceived about the charitable nature of a fund-raising campaign because the fund-raiser's fee was too high." *Id.,* at 362, 763 N. E. 2d, at 299. The threatened exposure to litigation costs and penalties, the court said, "could produce a substantial chilling effect on protected speech." *Ibid.* We granted certiorari. 537 U. S. 999 (2002).

II

The First Amendment protects the right to engage in charitable solicitation. See *Schaumburg,* 444 U. S., at 632 ("charitable appeals for funds ... involve a variety of speech interests-communication of information, the dissemination and propagation of views and ideas, and the advocacy of

6 Contracts for fundraising campaigns in Illinois must be filed with the State's Attorney General, see Ill. Compo Stat., ch. 225, §§460/2(a)(10) and 460/7 (2001), and those contracts must disclose all fundraiser fees, including any "stated percentage of the gross amount raised" to be retained by the fundraiser, § 460/7(b); see § 460/7(d). The filings are open for public inspection. § 460/2(f). Illinois law also provides that fundraisers must disclose "the percentage to be received by the charitable organization from each contribution, if such disclosure is requested by the person solicited." §460/17(b). Telemarketers did not challenge these requirements.

612

causes-that are within the protection of the First Amendment"); *Riley,* 487 U. S., at 788-789. But the First Amendment does not shield fraud. See, *e. g., Donaldson* v. *Read Magazine, Inc.,* 333 U. S. 178, 190 (1948) (the government's power "to protect people against fraud" has "always been recognized in this country and is firmly established"); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 340 (1974) (the "intentional lie" is "no essential part of any exposition of ideas" (internal quotation marks omitted)). Like other forms of public deception, fraudulent charitable solicitation is unprotected speech. See, *e. g., Schneider* v. *State (Town of Irvington),* 308 U. S. 147, 164 (1939) ("Frauds," including "fraudulent appeals ... made in the name of charity and religion," may be "denounced as offenses and punished by law."); *Donaldson,* 333 U. S., at 192 ("A contention cannot be seriously considered which assumes that freedom of the press includes a right to raise money to promote circulation by deception of the public.").

The Court has not previously addressed the First Amendment's application to individual fraud actions of the kind at issue here. It has, however, three times considered prophylactic statutes designed to combat fraud by imposing prior restraints on solicitation when fundraising fees exceeded a specified reasonable level. Each time, the Court held the prophylactic measures unconstitutional.

In *Schaumburg,* decided in 1980, the Court invalidated a village ordinance that prohibited charitable organizations from soliciting contributions unless they used at least 75 percent of their receipts "directly for the charitable purpose of the organization." 444 U. S., at 624 (internal quotation marks omitted). The ordinance defined "charitable purposes" to exclude salaries and commissions paid to solicitors, and the administrative expenses of the charity, including salaries. *Ibid.* The village of Schaumburg's "principal justification" for the ordinance was fraud prevention: "[A]ny organization using more than 25 percent of its receipts on fund-

613

raising, salaries, and overhead," Schaumburg submitted, "is not a charitable, but a commercial, for-profit enterprise"; "to permit [such an organization] to represent itself as a charity," the village urged, "is fraudulent." *Id.,* at 636.

The Court agreed with Schaumburg that fraud prevention ranks as "a substantial governmental interes[t]," *ibid.,* but concluded that "the 75-percent requirement" promoted that interest "only peripherally." *Ibid.* Spending "more than 25 percent of [an organization's] receipts on fundraising, salaries, and overhead," the Court explained, does not reliably indicate that the enterprise is "commercial" rather than "charitable." *Ibid.* Such spending might be altogether appropriate, *Schaumburg* noted, for a charitable organization "primarily engaged in research, advocacy, or public education [that uses its] own paid staff to carry out these functions as well as to solicit financial support." *Id.,* at 636-637. "The Village's legitimate interest in preventing fraud," the Court stated, "can be better served by measures less intrusive than a direct prohibition on solicitation," *id.,* at 637:

"Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly," *ibid.*

Four years later, in *Munson,* the Court invalidated a Maryland law that prohibited charitable organizations from soliciting if they paid or agreed to pay as expenses more than 25 percent of the amount raised. Unlike the inflexible ordinance in *Schaumburg,* the Maryland law authorized a waiver of the 25 percent limitation "where [it] would effectively prevent the charitable organization from raising contributions." 467 U. S., at 950-951, n. 2. The Court held that the waiver provision did not save the statute. *Id.,* at 962. "[No] reaso[n] other than financial necessity warrant[ed] a waiver," *Munson* observed. *Id.,* at 963. The statute provided no shelter for a charity that incurred high solicitation costs because it chose to disseminate information as part of its fundraising. *Ibid.* Nor did it shield a charity

614

whose high solicitation costs stemmed from the unpopularity of its cause. *Id.,* at 967.

"[N]o doubt [there] are organizations that have high fundraising costs not due to protected First Amendment activity," the Court recognized; it concluded, however, that Maryland's statute was incapable of "distinguish[ing] those organizations from charities that have high costs due to protected First Amendment activities." *Id.,* at 966. The statute's fatal flaw, the Court said, was that it "operate[d] on [the] fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Ibid.* As in *Schaumburg,* the Court noted, fraud could be checked by "measures less intrusive than a direct prohibition on solicitation": Fraud could be punished directly and the State "could require disclosure of the finances of a charitable organization so that a member of the public could make an informed decision about whether to contribute." 467 U. S., at 961, and n. 9.

Third in the trilogy of cases on which the Illinois Supreme Court relied was our 1988 decision in *Riley.* The village ordinance in *Schaumburg* and the Maryland law in *Munson* regulated charities; the North Carolina charitable solicitation controls at issue in *Riley* directly regulated professional fundraisers. North Carolina's law prohibited professional fundraisers from retaining an "unreasonable" or "excessive" fee. 487 U. S., at 784 (internal quotation marks omitted). Fees up to 20 percent of the gross receipts collected were deemed reasonable; fees between 20 percent and 35 percent were deemed unreasonable if the State showed that the solicitation did not involve advocacy or dissemination of information. *Id.,* at 784-785. Fees exceeding 35 percent were presumed unreasonable, but the fundraiser could rebut the presumption by showing either that the solicitation involved advocacy or information dissemination, or that, absent the higher fee, the charity's "ability to raise money or communicate would be significantly diminished." *Id.,* at 785-786.

615

Relying on *Schaumburg* and *Munson,* the Court's decision in *Riley* invalidated North Carolina's endeavor to rein in charitable solicitors' fees. The Court held, once again, that fraud may not be inferred simply from the percentage of charitable donations absorbed by fundraising costs. See 487 U. S., at 789 ("solicitation of charitable contributions is protected speech"; "using percentages to decide the legality of the fundraiser's fee is not narrowly tailored to the State's interest in preventing fraud").

The opportunity to rebut the unreasonableness presumption attending a fee over 35 percent did not bring North Carolina's scheme within the constitutional zone, the Court explained. Under the State's law, "even where a prima facie showing of unreasonableness ha[d] been rebutted, the factfinder [still had to] make an ultimate determination, on a case-by-case basis, as to whether the fee was reasonable-a showing that the solicitation involved ... advocacy or [the] dissemination of information [did] not alone establish that the total fee was reasonable." *Id.,* at 786.

Training on that aspect of North Carolina's regulation, the Court stated: "Even if we agreed that some form of a percentage-based measure could be used, in part, to test for fraud, we could not agree to a measure that requires the speaker to prove 'reasonableness' case by case based upon what is at best a loose inference that the fee might be too high." *Id.,* at 793. "[E]very campaign incurring fees in excess of 35% ... [would] subject [fundraisers] to potential litigation over the 'reasonableness' of the fee," the Court observed; that litigation risk, the Court concluded, would "chill speech in direct contravention of the First Amendment's dictates." *Id.,* at 794. Especially likely to be burdened, the *Riley* opinion noted, were solicitations combined with advocacy or the communication of information, and fundraising by small or unpopular charities. *Ibid.* The Court cautioned, however, as it did in *Schaumburg* and *Munson,* that States need not "sit idly by and allow their citizens to be de-

616

frauded." 487 U. S., at 795. We anticipated that North Carolina law enforcement officers would be "ready and able" to enforce the State's antifraud law. *Ibid.*

*Riley* presented a further issue. North Carolina law required professional fundraisers to disclose to potential donors, before asking for money, the percentage of the prior year's charitable contributions the fundraisers had actually turned over to charity. *Ibid.* The State defended this disclosure requirement as a proper means to dispel public misperception that the money donors gave to professional fundraisers went in greater-than-actual proportion to benefit charity. *Id.,* at 798.

This Court condemned the measure as an "unduly burdensome" prophylactic rule, an exaction unnecessary to achieve the State's goal of preventing donors from being misled. *Id.,* at 800. The State's rule, *Riley* emphasized, conclusively presumed that "the charity derive[d] no benefit from funds collected but not turned over to it." *Id.,* at 798. This was "not necessarily so," the Court said, for charities might well benefit from the act of solicitation itself, when the request for funds conveyed information or involved cause-oriented advocacy. *Ibid.*

The Court noted in *Riley* that North Carolina (like Illinois here) required professional fundraisers to disclose their professional status. *Id.,* at 799; see Ill. Compo Stat., ch. 225, § 460/17(a) (2001); *supra,* at 609, n. 4, 611, n. 6. That disclosure, the Court said, effectively notified contributors that a portion of the money they donated would underwrite solicitation costs. A concerned donor could ask how much of the contribution would be turned over to the charity, and under North Carolina law, fundraisers would be obliged to provide that information. *Riley,* 487 U. S., at 799 (citing N. C. Gen. Stat. § *131C-16* (1986)). But upfront telephone disclosure of the fundraiser's fee, the Court believed, might end as well as begin the conversation: A potential contributor who thought the fee too high might simply hang up. 487 U. S., at 799-

617

800. "[M]ore benign and narrowly tailored options" that would not chill solicitation altogether were available; for example, the Court suggested, "the State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file," and "[it] may vigorously enforce its antifraud laws to prohibit professional fundraisers from obtaining money on false pretenses or by making false statements." *Ibid.*

III A

The Court's opinions in *Schaumburg, Munson,* and *Riley* took care to leave a corridor open for fraud actions to guard the public against false or misleading charitable solicitations. See *Schaumburg,* 444 U. S., at 637; *Munson,* 467 U. S., at 961, and n. 9; *Riley,* 487 U. S., at 795, 800.7 As those decisions recognized, and as we further explain below, there are differences critical to First Amendment concerns between fraud actions trained on representations made in individual cases and statutes that categorically ban solicitations when fundraising costs run high. See Part III-B, *infra.* Simply labeling an action one for "fraud," of course, will not carry the day. For example, had the complaint against Telemarketers charged fraud based solely on the percentage of donations the fundraisers would retain, or their failure to alert potential donors to their fee arrangements at the start of each telephone call, *Riley* would support swift dismissal.8 A State's Attorney General surely cannot gain case-by-case ground this Court has declared off limits to legislators.

7We are therefore unpersuaded by Telemarketers' plea that they lacked fair notice of their vulnerability to fraud actions. See Brief for Respondents 46, 49-50.

8 Although fundraiser retention of 85 percent of donations is significantly higher than the 35 percent limit in *Riley,* this Court has not yet accepted any percentage-based measure as dispositive. See *supra,* at 615 (quoting *Riley* v. *National Federation of Blind of N. C., Inc.,* 487 U. S. 781, 793 (1988)).

618

Portions of the complaint in fact filed by the Attorney General are of this genre. See, *e. g.,* App. 103, ~ 72 (asserting that Telemarketers' charge "is excessive" and "not justified by expenses [they] paid"); *id.,* at 86, ~~ 67H-67I (alleging statutory violations based on failure to disclose to prospective donors Telemarketers' percentage fee). As we earlier noted, however, see *supra,* at 608-609, the complaint and annexed affidavits, in large part, alleged not simply what Telemarketers failed to convey; they also described what Telemarketers misleadingly represented.

Under Illinois law, similar to the Federal Rules of Civil Procedure, "[w]hen the legal sufficiency of a complaint is challenged by a ... motion to dismiss, all well-pleaded facts in the complaint are taken as true and [the court] must determine whether the allegations ... , *when interpreted in the light most favorable to the plaintiff,* are sufficient to establish a cause of action upon which relief may be granted." *Connick* v. *Suzuki Motor Co., Ltd.,* 174 Ill. 2d 482, 490, 675 N. E. 2d 584, 588 (1997) (emphasis added). Dismissal is proper "only if it clearly appears that no set of facts can be proved under the pleadings which will entitle the plaintiff to recover." 198 Ill. 2d, at 351, 763 N. E. 2d, at 293.

Taking into account the affidavits, and reading the complaint in the light most favorable to the Attorney General, that pleading described misrepresentations our precedent does not place under the First Amendment's cover. First, it asserted that Telemarketers affirmatively represented that "a significant amount of each dollar donated would be paid over to Viet[N]ow" to be used for specific charitable purposes-rehabilitation services, job training, food baskets, and assistance for rent and bills, App. 9, ~ 34; *id.,* at 124, 131, 145, 163, 169, 187, 189-while in reality Telemarketers knew that "15 cents or less of each dollar" was "available to Viet[N]ow for its purposes." *Id.,* at 9, ~ 34. Second, the complaint alleged, essentially, that the charitable solicitation was a fa~ade: Although Telemarketers represented that donated

casetext
Search all cases and statutes... All State & Fed.
Sign In Get a Demo Free Trial
Opinion Case details
From Casetext: Smarter Legal Research

# K.D. v. J.D.

Download PDF Check Treatment

Take care of legal research in a matter of minutes with CoCounsel, your new AI legal assistant.

Try CoCounsel free

Case Details

Full title: K.D. v. J.D.

Court: Appeals Court of Massachusetts.

Date published: Nov 22, 2017

Citations Copy Citations

92 Mass. App. Ct. 1115 (Mass. App. Ct. 2017)

94 N.E.3d 881

## Opinion

16–P–1426

11-22-2017

K.D. v. J.D.

MEMORANDUM AND ORDER PURSUANT TO RULE 1:28

The defendant appeals from an order denying his motion to expunge an abuse prevention order issued pursuant to G. L. c. 209A (209A order). We affirm.

Background. On October 8, 2015, the plaintiff obtained the ex parte 209A order, which required that the defendant refrain from abusing the plaintiff, who is his daughter. The 209A order was set to expire on October 16, 2015, at 4:00 P.M. ; an extension hearing was held on that day, at which both parties were present. After hearing testimony from both the plaintiff and the defendant, the judge found that there was insufficient evidence to conclude that the 209A order should be extended and allowed the ex parte order to expire at 4:00 P.M. on that date.

On October 5, 2016, the defendant moved to have the 209A order expunged on the basis that his daughter proffered false testimony at the 209A order hearings. During a hearing on the expungement motion, the defendant stated that the 209A order on his criminal offender record information has prevented him from obtaining custody of his grandson from the Department of Children and Families. The judge explained the difference between expunging a record and the expiration of an order. The defendant's motion was subsequently denied.

Discussion. The defendant argues that he is entitled to have the 209A order expunged on the basis that his daughter perpetrated fraud on the court by making false statements during the 209A order hearings.

It is well settled that a record of an abuse prevention order issued pursuant to G. L. c. 209A generally cannot be expunged via judicial order. See Vaccaro v. Vaccaro, 425 Mass. 153, 156–157 (1997) ; Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725, 728 (2006) ; B.C. v. F.C., 90 Mass. App. Ct. 345, 349 (2016). A narrow exception to this rule allows for judicial expungement "in the rare and limited circumstance that the judge has found through clear and convincing evidence that the order was obtained through fraud on the court." Adams, supra at 737. A false allegation of abuse or false testimony alone is insufficient to constitute fraud on the court absent a showing that it contributed to a " 'larger pattern of harassment' or an 'unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter.' " M.C.D. v. D.E.D., 90 Mass. App. Ct. 337, 342 (2016), quoting from Adams, supra at 729, 730. See Wojcicki v. Caragher, 447 Mass. 200, 210 (2006).

Here, no finding was made that the plaintiff's testimony was false, and the fact that the 209A order was not extended does not support an inference that her testimony was in any way dishonest based on the circumstances presented in this case. We note that the defendant presented evidence of inconsistencies in the plaintiff's narrative. Even assuming that the plaintiff was untruthful in court in obtaining the 209A order, that fact, without more, does not constitute fraud on the court. We are mindful of the defendant's frustration and appreciate his cogent oral argument. However, the current law does not authorize an order of expungement in these circumstances. "If it is unwise, it is not for us to say so; the remedy lies with the Legislature." Murphy v. Police Commr. of Boston, 369 Mass. 469, 471 (1976). See Commonwealth v. Vickey, 381 Mass. 762, 767 (1980) ("[W]hen the statute appears not to provide for an eventuality, there is no justification for judicial legislation").

Based on the foregoing, the defendant's motion to expunge the 209A order was properly denied.

Order denying motion for expungement affirmed.

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

# TRACY MACDONALD vs. KEVIN CARUSO.

## 467 Mass. 382

### November 4, 2013 - March 11, 2014

Court Below: Probate and Family Court Department, Plymouth Division, Plymouth County

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

Records And Briefs:

(1) SJC-11381 01 Appellant Caruso Brief

Oral Arguments

---

Abuse Prevention. Practice, Civil, Presumptions and burden of proof. Evidence, Presumptions and burden of proof. Probate Court, General equity power.

This court concluded that, where a defendant seeks to terminate a permanent abuse prevention order under G. L. c. 209A, the defendant must prove by clear and convincing evidence that, as a result of a significant change in circumstances, it is no longer equitable for the order to continue because the protected party no longer has a reasonable fear of imminent serious physical harm; accordingly, a Probate and Family Court judge did not abuse her discretion in denying the defendant's motion to terminate an abuse prevention order, where the defendant failed to meet this burden of proof, in that he rested his motion solely on his own attestations. [385-394]

COMPLAINT for protection from abuse filed in the Plymouth Division of the Probate and Family Court Department on June 25, 1999.

A motion to terminate an abuse prevention order, filed on May 20, 2011, was heard by Lisa A. Roberts, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

Thomas Arthur Hensley for the defendant.

Claire Laporte, Rebecca Cazabon, Stacy Anderson, Benjamin Nardone, & Shrutih Ramlochan-Tewarie, for The Domestic & Sexual Violence Counsel, Inc., & others, amici curiae, submitted a brief.

---

**GANTS, J.** The central issue in this case is the standard to be applied when a defendant seeks to terminate a permanent abuse prevention order under G. L. c. 209A, § 3. We conclude that a defendant who seeks to terminate such an order must show by clear and convincing evidence that, as a result of a significant change in circumstances, it is no longer equitable for the order to continue because the protected party no longer has a reasonable

Page 383

fear of imminent serious physical harm. Having considered the evidence presented here in support of the defendant's motion to terminate the permanent order, in light of the totality of the circumstances, we conclude that the judge did not abuse her discretion in denying the motion. [Note 1]

Background. According to the complaint and affidavit filed by the plaintiff, Tracy MacDonald, on June 25, 1999, in support of her application for an ex parte temporary restraining order under G. L. c. 209A, § 4, against the defendant, Kevin James Caruso, the plaintiff had obtained an "order of protection" in the State of New York against the defendant in March, 1994. She left New York, where she had resided, on November 6, 1995, because the defendant threatened to kill her, and she has not lived in New York since that date. [Note 2] On June 1, 1999, she began receiving "odd mail" in Massachusetts, where she resided, postmarked in the region where the defendant then resided, stating that she had inquired about numerous products; one bore the defendant's handwriting. The defendant also used her social security number and forged her signature to acquire a credit card in her name, and she received a telephone call from the credit card company claiming that she was in default for failing to pay the $2,000 due on the card. On June 20, 1999, the plaintiff saw the defendant when she was on a boat ramp in Plymouth, near where she lived.

A Probate and Family Court judge issued a temporary abuse prevention order directing the defendant to refrain from abusing or contacting the plaintiff, to stay away from her residence in Halifax, and to surrender any firearms or ammunition to the police department in Highland, New York, where the defendant resided. The judge scheduled an adversary hearing for July 9, 1999, the date the temporary order was scheduled to expire. The defendant did not appear at the adversary hearing, and another

Page 384

Probate and Family Court judge issued an initial abuse prevention order for one year, to expire on July 9, 2000. [Note 3]

The defendant was present for the hearing on July 7, 2000, the next designated hearing date, but the order was further extended for one year, to July 6, 2001, with a new hearing scheduled for that expiration date. The defendant again appeared at that hearing, where a permanent order entered, with the judge noting that the surrender of firearms to the police department should also be extended because the defendant presented a likelihood of abuse to the plaintiff. The defendant did not challenge the permanent order on direct appeal.

In May, 2011, the defendant moved to terminate the permanent abuse prevention order. [Note 4] In his verified motion, he attested:

"[T]here is no further need for the order, because it is now twelve years old, with no alleged or proven violations. He has moved from New York to Park City, Utah, and [p]laintiff now resides in Massachusetts, a separation distance of more than 2,100 miles. He is married since 2004, and happily so. He has retired from the business world, and now seeks to pass his time with various recreational activities that are available to him in his new home, as well as with travel. He has clearly moved on with his life. . . ."

The defendant also noted that the abuse prevention order "continues to affect his life in ways that have nothing to do with [the] [p]laintiff." The collateral consequences he described included extra scrutiny at airports, his disqualification from charitable pursuits that require record checks, and his inability

Page 385

to hunt and to obtain a pistol permit for self-protection. After a hearing, at which the plaintiff did not appear, the judge (who was the same judge who had ordered the second one-year extension after an adversary hearing) denied the defendant's motion, concluding that the defendant had not met his burden of proving, by clear and convincing evidence, that there has been a significant change of circumstances and that the order was unnecessary to protect the plaintiff from harm or the reasonable fear of harm. [Note 5]

The defendant appealed, and in an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed the denial of the defendant's motion. MacDonald v. Caruso, 82 Mass. App. Ct. 1120 (2012). The court declined the defendant's invitation to modify the standard established in Mitchell v. Mitchell, 62 Mass. App. Ct. 769, 781 (2005), that an abuse prevention order "should be set aside only in the most extraordinary circumstances and where it has been clearly and convincingly established that the order is no longer needed to protect the victim from harm or the reasonable fear of serious harm." Applying that standard, the court concluded that the judge did not err in finding that the defendant failed to meet this burden. We granted the defendant's application for further appellate review.

Discussion. General Laws c. 209A provides "a statutory mechanism by which victims of family or household abuse can enlist the aid of the State to prevent further abuse" through orders prohibiting a defendant from abusing or contacting the victim, or requiring a defendant to stay away from the victim's home or workplace. Commonwealth v. Gordon, 407 Mass. 340, 344 (1990). See G. L. c. 209A, § 3. [Note 6] The statute, with other abuse prevention statutes, reflects "the Commonwealth's public

Page 386

policy against domestic abuse -- preservation of the fundamental human right to be protected from the devastating impact of family violence." Champagne v. Champagne, 429 Mass. 324, 327 (1999).

A temporary abuse prevention order may issue ex parte for up to ten court business days where a plaintiff shows a "substantial likelihood of immediate danger of abuse." G. L. c. 209A, § 4. After hearing, the temporary order may be extended for no more than one year if the plaintiff proves, by a preponderance of the evidence, that the defendant has caused or attempted to cause physical harm, committed a sexual assault, or placed the plaintiff in reasonable fear of imminent serious physical harm. [Note 7] G. L. c. 209A, § 3. See Iamele v. Asselin, 444 Mass. 734, 734-735 (2005). On or about the date the initial order expires, the plaintiff may seek to extend the duration of the order "for any additional time necessary to protect the plaintiff" or obtain a permanent order. G. L. c. 209A, § 3. See Moreno v. Naranjo, 465 Mass. 1001, 1003 (2013) (where relief is warranted, judge owes duty under G. L. c. 209A "to extend . . . abuse prevention orders for a time reasonably necessary for the protection of the plaintiff"); Crenshaw v. Macklin, 430 Mass. 633, 636 (2000) (duration of extension of initial abuse prevention order is within broad discretion of judge). The standard for obtaining an extension of an abuse prevention order is the same as for an initial order -- "most commonly, the plaintiff will need to show a reasonable fear of imminent serious physical harm at the time that relief . . . is sought." Iamele v. Asselin, supra at 735. See Smith v. Jones, 75 Mass. App. Ct. 540, 544 (2009). No presumption arises from the initial order; "it is the plaintiff's burden to establish that the facts that exist at the time extension of the order is sought justify relief." Smith v. Jones, 67 Mass. App. Ct. 129, 133-134 (2006). Therefore, a permanent order may not enter unless the plaintiff has twice proved by a

Page 387

preponderance of the evidence a reasonable fear of imminent serious physical harm. And where the initial order was one year in duration, the plaintiff must show that the fear of imminent serious physical harm remains reasonable approximately one year after the event that triggered the filing of the c. 209A complaint.

Where, as here, the defendant does not challenge on direct appeal the entry of a permanent abuse prevention order under G. L. c. 209A, it becomes a final equitable order. See Zullo v. Goguen, 423 Mass. 679, 682 (1996) ("orders under c. 209A are equitable in nature"). But relief from the order may still be obtained where it is "no longer equitable that the judgment should have prospective application." Mass. R. Civ. P. 60 (b) (5), 365 Mass. 828 (1974). See Mass. R. Dom. Rel. P. 60 (provisions identical to Mass. R. Civ. P. 60). In determining what standard to apply to determine when it is "no longer equitable" that a permanent c. 209A order continue to have prospective application, we note that G. L. c. 209A, § 3, provides that a "court may modify its [c. 209A] order at any subsequent time upon motion by either party." In doing so, the Legislature recognized that, given the complicated and dynamic nature of the relationships among "family or household members," and the complex web of personal ties and responsibilities that may still connect them even where there is an order, especially the parenting of children, even a carefully crafted abuse prevention order may require modification as circumstances change. See G. L. c. 209, § 3. The Legislature also recognized that modification may be sought by a plaintiff, by a defendant, or jointly by all parties, and that a motion to modify may seek to revise the terms of an abuse prevention order or to terminate the order itself. Trial Court Guidelines for Judicial Practice: Abuse Prevention Proceedings § 6:04 commentary, at 123 (Sept. 2011) ("Both parties have the right to ask the court to modify an existing order, by either increasing or decreasing the severity of the terms, or by terminating or vacating the order"). We decide here only the standard to apply where a defendant seeks to terminate an order, recognizing that the standard appropriate for such a motion may not be the same where the motion to terminate is brought by the

Page 388

plaintiff or jointly by all parties, or where the motion seeks only to modify the terms of an order. [Note 8]

A defendant's motion to terminate an order is not a motion to reconsider the entry of a final order, and does not provide an opportunity for a defendant to challenge the underlying basis for the order or to obtain relief from errors correctable on appeal. See Iamele v. Asselin, 444 Mass. at 742; Pentucket Manor Chronic Hosp., Inc. v. Rate Setting Comm'n, 394 Mass. 233, 236 (1985). Therefore, a defendant bringing such a motion bears the burden of proving a significant change in circumstances since the entry of the order that justifies termination of the order. See Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383 (1992) ("a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree"); United States v. Swift & Co., 286 U.S. 106, 114-115 (1932) ("a court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong"). See also Reporters' Notes to Rule 60, Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 1136 (LexisNexis 2012-2013) (motions to terminate or modify provide "relief from a judgment which was valid and equitable when rendered, but whose prospective application has, because of changed conditions, become inequitable"). See generally 11 C.A. Wright, A.R. Miller, & M.K. Kane, Federal Practice and Procedure § 2863, at 459-460 (2012) ("[rule 60 (b) (5)] does not allow relitigation of issues that have been resolved by the judgment. Instead it refers to some change in conditions that makes continued enforcement inequitable").

The significant change in circumstances must involve more than the mere passage of time, because a judge who issues a permanent order knows that time will pass. Compliance by the defendant with the order is also not sufficient alone to constitute a significant change in circumstances, because a judge who

Page 389

issues a permanent order is entitled to expect that the defendant will comply with the order. See G. L. c. 209A, § 3 ("The fact that abuse has not occurred during the pendency of an order shall not, in itself, constitute sufficient ground for . . . allowing an order to . . . be vacated"). See also Iamele v. Asselin, 444 Mass. at 738 ("obedience alone is not a ground for refusing an extension of the initial order"). However, if there is a significant change in circumstances not foreseen when the last order was issued, the passage of time and compliance with the order may be considered in determining whether, under the totality of circumstances, a defendant no longer poses a reasonable threat of imminent serious physical harm to the plaintiff.

The defendant contends that his burden should only be to prove by a preponderance of the evidence that the plaintiff no longer has a reasonable fear of imminent serious physical harm from the defendant. We conclude that, where a defendant seeks to terminate an abuse prevention order, the defendant must prove by clear and convincing evidence that, as a result of a significant change in circumstances, the plaintiff no longer has a reasonable fear of imminent serious physical harm from the defendant, and that continuation of the order would therefore not be equitable. See Mitchell v. Mitchell, 62 Mass. App. Ct. at 781.

Where the order a defendant seeks to terminate is only one year in duration, as it was in Mitchell v. Mitchell, 62 Mass. App. Ct. at 770, the defendant will have the opportunity within one year to challenge the continuation of the order at a hearing where the plaintiff will bear the burden of proving a continued reasonable fear of imminent serious physical harm. A motion prematurely to terminate such an order must be supported by more than a preponderance of the evidence to justify the burden, both on the plaintiff and the court, to revisit the order before its expiration. See id. at 781 n.22 ("Unwarranted requests to modify may themselves be a form of abuse and create a burden on the courts as well as on the opposing party").

Where the order is permanent, as it is here, a defendant has been found at least twice (here, three times) to pose a reasonable threat of imminent serious physical harm to the plaintiff, and the judge who issued the permanent order found (at least implicitly) that the defendant poses a permanent threat to the

Page 390

safety of the plaintiff. See Trial Court Guidelines for Judicial Practice: Abuse Prevention Proceedings § 6.09 & commentary ("In determining whether to issue a permanent order or an order for a particular period of years, the court may consider the severity and frequency of the violence involved, threats to do harm in the future and the ages of minor children, and any other relevant facts"). The standard of proof "serves as 'a societal judgment about how the risk of error should be distributed between the litigants.'" Cruzan v. Director, Mo. Dep't of Health, 497 U.S. 261, 283 (1990), quoting Santosky v. Kramer, 455 U.S. 745, 755 (1982). Where a defendant has been found over an extended period of time to pose this level of danger to a plaintiff, we conclude that the risk of error should be on the side of the plaintiff and that something more than proof by a preponderance of the evidence is necessary to ensure the plaintiff's safety. Cf. Moreno v. Naranjo, 465 Mass. at 1002 ("well-established purpose of [G. L. c. 209A] is to protect victims of domestic violence").

The clear and convincing evidence standard is more demanding than the preponderance standard, but we do not accept the defendant's characterization that it is either "amorphous" or "an enormously heavy burden of proof." Clear and convincing evidence is required to hold a litigant in civil contempt, see Birchall, petitioner, 454 Mass. 837, 852-853 (2009); to find libel against a public official or public figure, see Stone v. Essex County Newspapers, Inc., 367 Mass. 849, 870 (1975); and to terminate parental rights, see Adoption of Helen, 429 Mass. 856, 859 (1999). It is applied every day in our courts and the burden, while demanding, is often met. See, e.g., Birchall, petitioner, supra at 852-853. The standard is less demanding than the proof beyond a reasonable doubt standard required to justify an involuntary civil commitment, either because the respondent poses a danger to himself or to others, see Superintendent of Worcester State Hosp. v. Hagberg, 374 Mass. 271, 275 (1978), or because of sexual dangerousness. See G. L. c. 123A, § 14 (d).

In determining whether a defendant has met the clear and convincing evidence standard, a judge must determine whether the defendant has proven a significant change in circumstances since

Page 391

the order was issued, and whether, under the totality of the circumstances, the plaintiff, without the protection of an order of abuse prevention, would no longer reasonably fear imminent serious physical harm from the defendant. Here, the defendant has identified five changes in circumstances that he contends justifies termination of the order: (1) he has moved from New York to Utah, (2) he has been happily married since 2004, (3) he has retired from the "business world," (4) more than twelve years have passed since the issuance of the permanent order, and (5) there have been no "alleged or proven violations" of the order. We have already noted that the fourth and fifth alleged changes do not suffice alone to constitute a significant change of circumstances. As to the third alleged change, we are not persuaded that retirement from employment constitutes a relevant change in circumstances that reasonably may affect the risk posed by a defendant. The first and second alleged changes, however, may support a finding of a significant change of circumstances, in that the defendant's relocation from New York to Utah increases the cost and effort required for the defendant to see the plaintiff in Massachusetts, and his long-standing marriage may suggest that, as he contends, he has "moved on with his life" and no longer is so emotionally connected to the plaintiff as to pose a risk to her.

Assuming that the defendant has met his burden of proving a significant change in circumstances, we turn to whether the judge abused her discretion in finding that the defendant failed to meet his burden of proving by clear and convincing evidence that he no longer poses a reasonable threat of imminent serious physical harm to the plaintiff. The defendant asks us to give meaning to the plaintiff's failure to appear at the hearing or otherwise to object to his motion to terminate. We decline to do so. A judge should certainly give serious consideration to the plaintiff's position regarding a defendant's motion to terminate, regardless whether the plaintiff opposes or supports the motion, but a judge may not give meaning to a plaintiff's silence or failure to appear, because a judge cannot know whether silence reflects acquiescence in the termination or continued fear of the defendant. See Champagne v. Champagne, 429 Mass. at 327 n.2. Moreover, a plaintiff shoulders no burden at a termination hearing and is entitled to rest on the finality of the order.

Page 392

The defendant also asks us to consider the collateral consequences that a defendant may suffer from an abuse prevention order, including his inability to obtain a permit to carry firearms. We decline to do so. Where a defendant has failed to meet his burden to terminate an abuse prevention order, the order shall not be terminated, regardless how onerous the collateral consequences, because the only relevant issue is the safety of the plaintiff. See Moreno v. Naranjo, 465 Mass. at 1003 (judge may not rely "on considerations irrelevant to the plaintiff's need for protection" in deciding whether to extend abuse prevention order). Where the burden has been met, the order should be terminated, because its prospective application is no longer needed to protect the plaintiff and, even if there were no collateral consequences, it is no longer equitable for the order to remain in force. Therefore, the collateral consequences arising from the order are not relevant to the judge's decision regarding termination of the order. Cf. id. at 1002 (nothing in G. L. c. 209A authorizes judge to limit duration of abuse prevention order "out of concern for the defendant's visitation rights").

Addressing the relevant changes of circumstances, the additional distance between the defendant's and the plaintiff's residences may significantly diminish the reasonable fear of imminent serious physical harm if the abuse prevention order had issued when the plaintiff and defendant worked or resided in close proximity to each other, and the defendant had harmed or threatened harm to the plaintiff when their paths crossed. See Iamele v. Asselin, 444 Mass. at 740 (in evaluating risk of future abuse, judge should consider "the likelihood that the parties will encounter one another in the course of their usual activities"). But the orders in this case issued when the plaintiff resided in Massachusetts and the defendant resided in New York, so there was already considerable distance between the two. That the defendant would now need to travel approximatelysix hours by airplane rather than approximately six hours by car to see the plaintiff bears on the likelihood of his seeing her, and the expense and effort to do so, but by itself does not mean that he could not engage in the same conduct from afar that triggered issuance of the initial order.

The most significant change of circumstance in this case is

Page 393

the defendant's marriage to another woman since 2004, considered together with his undisputed compliance with the abuse prevention orders, which corroborates his contention that he has "moved on with his life." But the defendant rested his motion to terminate solely on his own attestations in his verified motion. He did not submit an affidavit from the chief of police or the keeper of the records of his city in Utah attesting that the police had no record of any allegations of domestic abuse, or submit the New York and Utah equivalents of the Massachusetts criminal offender record information (CORI) and Statewide registry of civil restraining orders records to show the absence of arrests or convictions or other restraining orders. To prove that he had truly "moved on with his life," the defendant in this case needed to demonstrate not only that he has moved on to another relationship but that he has "moved on" from his history of domestic abuse and retaliation. [Note 9] Because the defendant bears the burden of demonstrating, by clear and convincing evidence, that he no longer reasonably poses a threat to the plaintiff, the judge did not abuse her discretion in finding that the defendant's attestations alone fell short of meeting this burden.

Page 394

Although we conclude that the judge here, on this record, did not abuse her discretion in denying the defendant's motion to terminate the abuse prevention order, we leave open the possibility that the defendant might be able to meet his burden if he were to renew his motion with a stronger evidentiary foundation. The standard of clear and convincing evidence in these matters is properly demanding, but not insurmountable if supported by a persuasive evidentiary record demonstrating that a defendant no longer poses a reasonable risk of committing serious physical harm. Because we do not believe that a defendant's possibility of winning a motion to terminate an abuse prevention order is illusory, or that a judge can never abuse her discretion by denying such a motion, we direct judges to place their findings of fact regarding such motions on the record, regardless whether the motion is allowed or denied, to assist an appellate court in reviewing the determination on appeal. See Mitchell v. Mitchell, 62 Mass. App. Ct. at 781 ("if the judge determines that it is appropriate to allow a motion to vacate or terminate a c. 209A order, the decision should be supported by findings of fact").

Conclusion. We conclude that, on this record, the judge did not abuse her discretion in finding that the defendant failed to meet his burden of proving by clear and convincing evidence that, as a result of a significant change in circumstances, the plaintiff no longer has a reasonable fear of imminent serious physical harm. We, therefore, affirm the judge's denial of the defendant's motion to terminate the abuse prevention order.

So ordered.

---

FOOTNOTES

[Note 1] We acknowledge the joint amicus brief filed by The Domestic & Sexual Violence Council, Inc.; Greater Boston Legal Services; the Women's Bar Association of Massachusetts; DOVE, Inc.; Community Legal Aid; the Massachusetts Law Reform Institute; Community Legal Services and Counseling Center; The Second Step; Justice Center of Southeast Massachusetts LLC; Safe Passage; Professors Maritza Karmely and Christine L. Butler; HarborCOV; and the Foley Hoag Domestic Violence Prevention Project.

[Note 2] The plaintiff asserted that the defendant owned seven handguns.

[Note 3] The defendant later moved for a new court hearing to reconsider the one-year extension, contending that he did not understand that he needed to appear in court on July 9, 1999, and that he wished to "answer this order and put this issue to rest." His motion was denied. Because the audio transcripts of the hearings were destroyed after three years, in accordance with court practice, the testimony, if any, on which the court relied in issuing its initial abuse prevention order is not available.

[Note 4] The defendant titled the motion as a "motion to vacate" the abuse prevention order, but he sought only to prevent its prospective application, and did not challenge the grounds on which it was earlier entered. Because the "underlying basis [of the order] was not to be reviewed, nor its validity second guessed," the motion actually sought to terminate, not vacate, the permanent order. See Iamele v. Asselin, 444 Mass. 734, 742 (2005).

[Note 5] The record on appeal does not include a transcript of the hearing.

[Note 6] General Laws c. 209A, § 3, protects only "family or household members" from "abuse," with "family or household members" defined to include persons who are married, residing together in the same household, related by blood or marriage, having a child in common, or in a "substantive dating . . . relationship," and "abuse" defined as "the occurrence of one or more of the following acts[:] attempting to cause or causing physical harm; . . . placing another in fear of imminent serious physical harm; . . . causing another to engage involuntarily in sexual relations by force, threat or duress." G. L. c. 209A, § 1.

[Note 7] If the defendant does not appear at the hearing, the temporary order "shall continue in effect without further order of the court." G. L. c. 209A, § 4. Here, the temporary order was extended for one year when the defendant failed to appear at the scheduled hearing. A defendant served with an ex parte order advising him of his right to be heard at a scheduled hearing has actual and constructive notice that failure to attend the hearing may result in the extension of the order. Commonwealth v. Delaney, 425 Mass. 587, 581 (1997).

[Note 8] We note that the Trial Court Guidelines for Judicial Practice: Abuse Prevention Proceedings § 5.08 (Sept. 2011), provides that, after appropriate inquiry, a plaintiff who has moved to terminate an abuse prevention order "should be permitted to do so, regardless of the reason given or the presence of children."

[Note 9] In Freeman v. Freeman, 169 Wash. 2d 664, 673 (2010), the Supreme Court of Washington adopted a New Jersey court's eleven factors as "a sensible framework for analyzing whether . . . a restrained party will commit a future act of domestic violence." The factors are "(1) whether the victim has consented to lift the order, (2) the victim's fear of the restrained party, (3) present nature of the relationship between parties, (4) whether the restrained party has any contempt convictions for violating the order, (5) restrained party's alcohol and drug involvement, if any, (6) other violent acts on the part of the restrained party, (7) whether the restrained party has engaged in domestic violence counseling, (8) age and health of the restrained party, (9) whether the victim is acting in good faith to oppose the motion, (10) whether other jurisdictions have entered any protection orders against the restrained party, and (11) other factors deemed relevant by the court." Id., citing Carfagno v. Carfagno, 288 N.J. Super. 424, 435 (1995). We do not adopt any specific checklist of factors, recognizing that the relevant factors will differ depending on the circumstances of the case, and that the evaluation of risk must rest on the totality of the circumstances. See Iamele v. Asselin, 444 Mass. at 741 ("totality of the conditions" governs evaluation of future risk of domestic abuse). But we note that two of the factors adopted by the Washington Supreme Court concern other acts of violence and other restraining orders. In different circumstances, affidavits regarding the successful completion of mental health, anger management, or substance abuse counselling might be relevant in determining whether a defendant has met his burden of proof.

Home/Search Table of Cases by Citation Table of Cases by Name

Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

# M.C.D. vs. D.E.D.


## 90 Mass. App. Ct. 337

June 2, 2016 - September 23, 2016

Court Below: Probate and Family Court, Essex Division

Present: Kafker, C.J., Hanlon, & Neyman, JJ.

Amended December 2, 2016

Abuse Prevention. Domestic Violence Record Keeping System. Fraud. Practice, Civil, Notice of appeal, Fraud.



A Probate and Family Court judge properly denied the defendant's motion to dismiss, as untimely, the appeal of the Commissioner of Probation from an order expunging from the Statewide domestic violence registry system the record of an abuse prevention order issued pursuant to G. L. c. 209A, where the judge's original disposition did not clearly denote an order of expungement so as to give notice that the period for filing an appeal had been triggered, and the judge's subsequent findings of fact and order to expunge started the appeals period, within which the appeal was timely filed. [340-341]

This court vacated a Probate and Family Court judge's order of expungement of an abuse prevention order issued pursuant to G. L. c. 209A from the Statewide domestic violence registry system, where the judge's subsidiary findings were insufficient to support her ultimate finding of a fraud on the court, in that, while suggesting a deliberate purpose to the plaintiff's use of a false allegation (i.e., to obtain that order), the judge's findings concerning the plaintiff's conduct did not add up to a larger plan intended to harass the defendant or to undermine the judicial process. [341-344]


---

**COMPLAINT** for protection from abuse filed in the Essex Division of the Probate and Family Court Department on December 15, 2014.

A motion to vacate the abuse prevention order and to expunge the record, filed on March 6, 2015, was heard by Theresa A. Bisenius, J.

Natalie L. Lorenti, Special Assistant Attorney General (Sarah M. Joss with her) for Commissioner of Probation.

D.E.D., pro se.

---

**HANLON, J.** In this cross appeal, the Commissioner of Probation (commissioner) appeals from an order of a Probate and Family Court judge to expunge a G. L. c. 209A abuse prevention order (209A order) entered against the defendant. The commissioner challenges the judge's findings that the plaintiff's allegations of

Page 338

abuse were knowingly false and constituted a fraud on the court, as explained in Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725 , 729-730 (2006). We agree that the judge's subsidiary findings were insufficient to support her ultimate finding of fraud on the court, and we vacate the order for expungement. [Note 1]

Background. The plaintiff obtained the ex parte 209A order against the defendant on December 15, 2014. She alleged in her affidavit that, on December 3, 2014, the defendant had beaten her and that she was in fear of him. At the ex parte hearing, the plaintiff barely spoke, but her lawyer told the judge that his client had been beaten and that she was extremely reluctant to talk about the incident, but that the people who had treated her medically, as well as members of her family, believed that her injuries could not have been the result of a fall and were, in fact, the result of serious abuse. [Note 2]

On December 22, 2014, the day scheduled for the hearing after notice, the plaintiff did not appear and an associate of her lawyer appeared for her. The defendant was represented by counsel, who

Page 339

immediately informed the judge that her client was "an Assistant City Solicitor for [a city in Massachusetts]." She represented that she had "[overwhelming] evidence that . . . this allegation never . . . happened, that [D.E.D.] absolutely did not do anything to [his] wife." [Note 3] The defendant volunteered that he had "been an attorney in good standing with the Commonwealth of Massachusetts for 32 years. [He had] a completely unblemished . . . record. [He] enjoy[ed] an impeccable reputation among the legal bar and [his] peers. [He had] all witnesses . . . to show that it was -- absolutely could not -- [he] could -- it was not possible for [him] to have committed the act . . . that caused the injuries to -- to [his] wife." [Note 4]

The judge responded that there was no need to "get into the evidence" because there was no request to extend the order. The defendant and his lawyer repeatedly represented that there had been no abuse, that the defendant essentially had a solid alibi for the time in question and that his wife was an alcoholic who had fallen at other times in the past. When the judge inquired, the plaintiff's lawyer confirmed that his law firm did, in fact, have the medical records described earlier and would provide them to the judge if asked. The order was terminated.

On March 6, 2015, the defendant filed a motion to vacate the 209A order and to expunge all records of that order. After a March 30, 2015, hearing, the judge endorsed the first page of the

Page 340

defendant's motion, "Allowed." [Note 5] The docket entry stated, "Motion to vacate RO Allowed 3/30/2015."

The commissioner filed a request for clarification of the order to expunge the 209A order. The judge subsequently issued findings of fact in clarification of her order to expunge the 209A order. The judge found that, based on the evidence submitted by the defendant, the alleged abuse could not have happened as claimed by the plaintiff. The judge found that it had been shown by clear and convincing evidence that the plaintiff made false statements in court under oath for the purpose of obtaining the 209A order and that her false assertions constituted a fraud on the court. The judge further found that the harm to the defendant in maintaining a record of the 209A order outweighed the government's interest in keeping the record in the system. The commissioner filed this appeal.

Discussion. 1. Timeliness of appeal. The judge's allowance of the defendant's motion to vacate the 209A order and to expunge all records of such order was endorsed on the defendant's motion as "[a]llowed," with the date of March 30, 2015. No separate order was signed and the docket reflected only that the "motion to vacate RO Allowed 03/30/15." The commissioner moved for clarification, and the judge, on May 1, 2015, issued findings of fact in furtherance of her order to expunge. The findings were docketed on May 5, 2015, and the commissioner's notice of appeal was filed on July 1, 2015.

The judge thereafter denied the defendant's motion to dismiss the commissioner's appeal as untimely. The defendant, appearing pro se, cross-appealed on that basis but no longer presses the issue on appeal. We address the issue briefly as a matter of discretion.

The judge did not abuse her discretion in declining to dismiss the commissioner's appeal. In ruling on the defendant's motion to vacate the 209A order and to expunge, the judge's endorsement of "[a]llowed," to the extent it was intended to address expungement, was not clearly indicated by memorandum or order, nor did the docket entry reflect the substance of the order regarding expungement, as required by Mass.R.Civ.P. 79(a), 365 Mass. 839 (1974). In our

Page 341

view, the disposition of the defendant's motion did not clearly denote an order of expungement so as to give notice that the period for filing an appeal was triggered. See Department of Rev. v. Mason M., 439 Mass. 665 , 673 (2003); Zielinski v. Connecticut Valley Sanitary Waste Disposal, Inc., 70 Mass. App. Ct. 326 , 330-332 (2007). In these circumstances, the judge's subsequent findings of fact and order to expunge, the substance of which were recorded on the docket on May 5, 2015, started the appeal period. As such, the commissioner's notice of appeal, filed within the sixty-day limit permitted agencies of the Commonwealth under Mass.R.A.P. 4(a), as amended, 464 Mass. 1601 (2013), was timely.

2. Fraud on the court. Records of abuse prevention orders are not to be expunged from the Statewide domestic violence registry (registry) absent a showing that the order was obtained through the commission of fraud on the court. Silva v. Carmel, 468 Mass. 18 , 24-25 (2014). Here, the judge's subsidiary findings concerning the plaintiff's actions and allegations in pursuing the 209A order did not support her ultimate finding that the conduct constituted a fraud on the court. "A 'fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Adams, 65 Mass. App. Ct. at 729-730, quoting from Rockdale Mgmt. Co. v. Shawmut Bank, N.A., 418 Mass. 596 , 598 (1994).

The judge did not specifically find that the plaintiff's claim of abuse was sentiently false, though the judge did find that the false allegation was made for the purpose of obtaining the 209A order. [Note 6] From this, the defendant argues that the judge's findings satisfied

Page 342

the Adams standard because the plaintiff obtained the 209A order with the requisite awareness that her assertion of abuse was false.

However, while suggesting a deliberate purpose to the plaintiff's use of a false allegation -- to obtain the 209A order -- the judge's findings concerning the plaintiff's conduct did not add up to a larger plan intended to harass the defendant or to undermine the judicial process, as was the case in Adams. Here, there was no finding that the plaintiff's conduct was undertaken as part of a "larger pattern of harassment" or "unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter." Id. at 729, 730. We think it important to distinguish between a false allegation, on the one hand, and a deliberate scheme, on the other, typically involving others in the court system, combined with a larger pattern of harassment, that has been held to constitute fraud on the court. See MacDonald v. MacDonald, 407 Mass. 196 , 202 (1990) ("Examples are bribery of judges, employment of counsel to 'influence' the court, bribery of the jury, and the involvement of an attorney [an officer of the court] in the perpetration of fraud" [citation omitted]). Compare Wojcicki v. Caragher, 447 Mass. 200 , 210-211 (2006) (false testimony, alone, would not support a finding of fraud on the court, without evidence of more egregious conduct).

The judge's findings in this case point to a single instance of a party using a false allegation of abuse to procure a 209A order in an ex parte proceeding. At the hearing after notice, the plaintiff, through her attorney, did not recant from her earlier allegation; she merely sought to terminate the order. It was the defendant's own view, at the time of the hearing after notice, that the plaintiff suffered from alcohol addiction and did not knowingly make a false complaint. We understand that these are extremely difficult cases for everyone involved -- for plaintiffs who may (or may not) be disclosing personal information with likely serious consequences for their families and even for their safety; for defendants who face serious collateral consequences from the issuance of even an ex parte order, and who may not, in fact, have committed any abuse; and for judges who are charged with determining the truth.

Page 343

Nonetheless, we also have in mind that "'[t]here is nothing in St. 1992, c. 188, § 7, or in G. L. c. 209A, that permits a record to be removed or that authorizes the entry of a judicial order directing expungement of a record from the system.' [Vaccaro v. Vaccaro, 425 Mass. 153 , 156 (1997)]. 'The system is designed to promote the goal of preventing abuse . . . by providing a judge (and other authorized agencies) with complete information about a defendant.' Id. at 157." Adams, 65 Mass. App. Ct. at 728. Furthermore, in Vaccaro, supra at 157-158, the Supreme Judicial Court noted,

"The system is designed to promote the goal of preventing abuse as prescribed by a variety of statutes by providing a judge (and other authorized agencies) with complete information about a defendant. Such information 'can be essential to providing protection for the plaintiff.' See Guidelines [for Judicial Practice: Abuse Prevention Proceedings (Oct. 1996)], commentary to Guideline 2:10. Because all restraining and protective orders are listed, both active and inactive, a judge may be better able to identify situations in which the plaintiff 'may face a particularly heightened degree of danger.' Id. at commentary to Guideline 3:05. . . . The power of expungement cannot be a necessary or inevitable implication of the statutory mandate to record such orders and make them available to judges or other authorized agencies. On the contrary, such a power would be inconsistent with the manifest purpose of G. L. c. 209A and other abuse prevention statutes."

In Adams, supra at 729, this court carved out a narrow exception for fraud on the court where "[i]n essence, the District Court judge found . . . that '[the nineteen] allegations by [Jones] are false and perjurious'; '[his behaviors] are indicative of an obsessive compulsion that is extremely alarming'; '[t]he seeking of the restraining order . . . is part of a larger pattern of harassment'; and '[i]n addition to filing affidavits that contain falsehoods . . . , [Jones] has falsely complained of [Adams] to the Board of Bar Overseers.'" In so doing, we also explicitly distinguished Vaccaro, stating, "Allowing expungement in this case does not offend the Supreme Judicial Court's rationale in Vaccaro. As the court stated in that case, the purpose of G. L. c. 209A is to protect prospective victims. [Vaccaro], 425 Mass. at 157. In the case before us, Adams was the victim of abuse. The 209A order against her was obtained fraudulently as a means of retaliation

Page 344

against her for seeking a 209A order against Jones, and the court was used as a mechanism to perpetrate the fraud." Adams, supra at 734-735 (footnote omitted).

Applying this reasoning to the present case, we are satisfied that something considerably more systemic or egregious than what is shown here is required to constitute fraud on the court and therefore to outweigh the public interest in the commissioner's statutory mandate to maintain 209A records for use by the courts and other authorized agencies. See Vaccaro, supra.

Based on the foregoing, the order denying the defendant's motion to dismiss the commissioner's appeal is affirmed. The order to expunge all records of the 209A order is vacated, and a new order is to enter denying the motion.

So ordered.

---

FOOTNOTES

[Note 1] The defendant below appealed only the denial of his motion to dismiss the commissioner's appeal as untimely. He does not press that issue here, discussed infra.

[Note 2] Specifically, plaintiff's counsel told the judge that his client had been beaten "pretty badly [and that the defendant had] punched her in the face, grabbed her arms, bruising them. Her ankle was injured in the process. Uh, he punched her really badly. I mean, the -- the injuries are horrific. . . . She's got a big black eye. All of her arms are bruised. Her ankle was bruised." Plaintiff's counsel also said that the plaintiff had been admitted first to the Salem Hospital intensive care unit and then to a rehabilitation facility as a result of injuries to her ankle and knee. He represented that he had "a number of photographs . . . which really tell the story," and that the photographs would show how severe the beating had been. Plaintiff's counsel told the judge that it was his understanding that there had been a long-standing pattern of abuse in the marriage and that his client was "very reticent and has great difficulty talking about it. It was difficult to get her to assist in the affidavit." He told the judge that the plaintiff had been in the rehabilitation facility since the incident and was scheduled to be discharged the following day -- accounting for the reporting delay. Also, the lawyer represented that his client initially had insisted that she had fallen, but that medical personnel at both the hospital and the rehabilitation facility had "found that the injuries were not consistent with a fall." In the lawyer's view, the photographs would corroborate his argument that the injuries were not consistent with a fall. He stated that the plaintiff's children from a prior marriage had met with him months ago in connection with the pending divorce action "and laid out a very serious pattern of abuse." Finally, he said that his client had only recently agreed to disclose the abuse because "you've got someone who is somewhat in denial and reluctant to go forward, for fear of embarrassing her husband or . . . embarrassing the family."

[Note 3] Defense counsel continued, "I have witnesses subpoenaed here. I just wanted to make an offer of proof and like this -- and would like this order . . . terminated nunc pro tunc. I have . . . video evidence. I have . . . the parties' 19-year-old daughter . . . . [T]he plaintiff told her that she fell, not that . . . her father had . . . hit her. My client was at work all day. I have video evidence from the security cameras and from the office manager for the [city] that . . . [D.E.D.] was at work from around 10:30 in the morning till eight o'clock at night. I have . . . video evidence or . . . [ten]-minute time shots . . . of his car right outside the [city]. . . . And I would really [ask] . . . that this be . . .vacated or [terminated] nunc pro tunc."

[Note 4] "The . . . video evidence that my attorney . . . referred to shows me arrive at work at the City . . . at . . . about 10:40 A.M. It shows me leave the building at 12:06 . . . P.M. to move my car. And it shows me returning two minutes later -- and parked my car right in view of a -- of a high-definition video camera. And then it shows me leave -- . . . a fifth video shows me leave the building at eight o'clock P.M. And then . . . video slices of every ten minutes, from 11:30 A.M. to 8:30 P.M., show my car in the exact same spot. Never moved. [M]y office manager . . . who I work with, . . . is here. She will testify that I was at work all day."

[Note 5] The record does not indicate whether the plaintiff or any attorney representing her appeared at the hearing on the motion to vacate and to expunge; her counsel filed a motion to withdraw on March 25, 2015, and the motion was allowed on April 7.

[Note 6] The record appendix is incomplete. It contains none of the affidavits offered by the defendant to substantiate his claim that he could not have committed the abuse. Specifically, the defendant claimed in his "concise statement of facts and law . . . in support of [his] motion to vacate ab initio abuse prevention order . . . and all records of such order" that he had attached an affidavit from his daughter representing that the plaintiff (her mother) had told her daughter that the injuries were caused by a fall. He also represented that there was a second affidavit from a colleague in his office averring that the defendant had been in the office from 10:30 A.M. until 8:30 P.M. on December 3, 2014. A third affidavit, he represented, would show recorded images of his car parked at city hall. On the bare record we do have, it is neither clear nor convincing that the initial allegation was false and there is no recantation here from the plaintiff -- only a request to terminate the 209A order. Nevertheless, the judge observed each of the parties, albeit at different times, and her questions show that she paid close attention at each hearing. In addition, the judge had the benefit of reading the defendant's affidavits. For all of those reasons, we cannot say that she was wrong when she concluded the initial allegation was false.



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

From Casetext: Smarter Legal Research

# Rockdale Management Co. v. Shawmut Bank, N.A.

Download PDF Check Treatment

## Summary

Upholding dismissal for proffering forged document, providing misleading answers to interrogatories, and giving false deposition testimony

Summary of this case from Cent. Bank v. Hanson

See 3 Summaries

Delegate legal research to CoCounsel, your new AI legal assistant.

Try CoCounsel free

## Opinion

May 2, 1994.

August 12, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, GREANEY, JJ.

*Practice, Civil,* Dismissal. *Fraud. Due Process of Law,* Notice, Hearing.

In a civil action, the judge properly allowed the defendant's motion to dismiss the complaint for the plaintiffs' fraud on the court where the record clearly demonstrated that the plaintiffs undertook a course of conduct intended improperly to influence and deceive the defendant and the court, namely, the forgery of a document to prove damages, proffering the document in response to interrogatories, testimony under oath as to the document's authenticity and admitting to the forgery only after other testimony revealed the deception. [598-600] O'CONNOR, J., concurring. In a civil action, there was no merit to the plaintiffs' claim that they were entitled to an evidentiary hearing on the defendant's motion to dismiss the complaint, where the plaintiffs were afforded notice and an opportunity to be heard and where there were no contested issues. [600] A claim in a civil action was properly dismissed by agreement of the parties. [601]

CIVIL ACTION commenced in the Superior Court Department on March 27, 1992.

The case was heard by *Maria I. Lopez,* J., on a motion to dismiss.

The Supreme Judicial Court granted a request for direct appellate review.

*John J. Gushue* for the plaintiffs.

597 *Michael C. Gilleran* ( *Michael W. Sobol* with him) for defendant. *597

---

NOLAN, J.

The principal issue on appeal is the correctness of the allowance of the defendant's (Shawmut's) motion to dismiss. There was no error.

The plaintiffs, Rockdale Management Co., Inc. (Rockdale), Vincent Fernandes (Fernandes), and Geraldine R. Fernandes, filed a complaint against Shawmut alleging, inter alia, that Shawmut fraudulently concealed the gasoline and petroleum contamination of property purchased by Rockdale from Shawmut at public auction. The plaintiffs alleged fraud and negligence and sought contribution and indemnification under G.L.c. 21E (1992 ed.), and unfair and deceptive practices under G.L.c. 93A (1992 ed.).

In response, Shawmut pleaded a denial of wrongdoing and further in defense affirmatively asserted the exemption from liability accorded a lender under G.L.c. 21 and the statute of limitations.

The parties propounded interrogatories to each other, made demands for documents, and took several depositions. Shawmut filed a motion for summary judgment which was denied. Additional depositions were taken, and Shawmut filed a motion to dismiss based on the fraud of Vincent Fernandes, the president of Rockdale, who admittedly forged a letter maintaining that it came from Sun Refining and Marketing Company (Sun). The letter reported that Sun was prepared to lease the property purchased by Rockdale. The letter, on Sun letterhead, recited that Sun was prepared to lease the property from Rockdale for $12,000 a month and to advance $150,000 for equipment. The plaintiffs incorporated this forged letter by reference in an answer to an interrogatory propounded to them. Rockdale also sent the letter to a real estate appraiser and to Shawmut in support of its claim for damages allegedly incurred as a result of purchasing the contaminated property.

At a deposition, Fernandes testified under oath that the letter was genuine. After the nominal author of the Sun letter testified at his deposition that he did not sign the letter and that contents of the letter were false, Fernandes
598 recanted his earlier testimony and admitted the forgery. *598

Shawmut filed a motion for default or dismissal to which the plaintiffs filed an opposition. A hearing was held on the motion. The judge ruled that Rockdale had committed a fraud and allowed Shawmut's motion to dismiss.

1. *Motion to dismiss.* The motion judge relied on *Aoude* v. *Mobil Oil Corp.,* 892 F.2d 1115 (1st Cir. 1989), in which a motion to dismiss was allowed on the ground that the plaintiff service station operator had authored "a bogus purchase agreement" and annexed the agreement to the complaint. The dismissal was affirmed because the conduct of the plaintiff amounted to a fraud on the court. *Id.* at 1118.

Fraud on the court occurs where a party tampers with the fair administration of justice by deceiving "the institutions set up to protect and safeguard the public" or otherwise abusing or undermining the integrity of the judicial process. *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U.S. 238, 246 (1944). The United States Court of Appeals for the First Circuit skillfully defined the concept of fraud on the court in *Aoude, supra* at 1118, as follows: "A `fraud on the court' occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense."

When a fraud on the court is shown through clear and convincing evidence to have been committed in an ongoing case, the trial judge has the inherent power to take action in response to the fraudulent conduct. The judge has broad discretion to fashion a judicial response warranted by the fraudulent conduct. Dismissal of claims or of an entire action may be warranted by the fraud, see, e.g., *Aoude, supra* at 1118, as may be the entry of a default judgment, see, e.g., *Eppes* v. *Snowden,* 656 F. Supp. 1267, 1279 (E.D. Ky. 1986). We examine judicial responses to findings of fraud on the court for an abuse of discretion.

In the present case, the record clearly illustrates a course of conduct taken
599 by Rockdale intended improperly to influence *599 and deceive Shawmut and the court. Rockdale, through its president, Fernandes, forged a letter concerning lease arrangements with Sun in an effort to prove damages, proffered that letter in response to interrogatories propounded by Shawmut concerning damages, testified under oath as to the authenticity of the letter, and recanted that his testimony and admitted the forgery only after the deposition testimony of the nominal author of the letter revealed the deception. The motion judge dismissed the action on a showing of these facts. In *Aoude, supra* at 1119, the court recognized, as we do, the availability of options other than dismissal to punish a party wrongdoer who stoops to fraud. However, we cannot say that the motion judge abused her discretion in selecting the severe option of dismissal. See *Wyle* v. *R.J. Reynolds Indus., Inc.,* 709 F.2d 585, 589 (9th Cir. 1983). Dismissal for fraud on the court has been held to be appropriate in cases involving conduct similar to that of Rockdale. See, e.g., *Sun World, Inc.* v. *Lizarazu Olivarria,* 144 F.R.D. 384, 390-391 (E.D. Cal. 1992) (entry of default judgment in favor of plaintiff warranted where defendant proffered forged document in furtherance of his defense and counterclaim and testified falsely as to the document's authenticity); *Wyle, supra* at 589-591 (dismissal warranted either under Fed. R. Civ. P. 37 or pursuant to the court's inherent powers where defendant falsely denied facts through sworn testimony and answers to interrogatories, and wilfully failed to comply with discovery orders).

For the benefit of the trial courts in subsequent cases, we now outline conduct which has been determined in other jurisdictions to warrant dismissal or the entry of a default judgment for fraud on the court. We acknowledge that the determination whether a fraud on a court has been committed is a case-by-case, fact-specific determination; we offer the following merely for guidance. Dismissal or entry of a default judgment for fraud on the court has been warranted for creating and presenting false evidence in support of a claim or defense, see, e.g., *Hazel-Atlas Glass Co.,*
600 *supra* at 250 ("Had the District Court learned of the fraud . . . it would *600 have been warranted in dismissing [the] case"); *Aoude, supra*; destroying evidence and otherwise impeding the discovery process, see, e.g., *Synanon Church* v. *United States,* 579 F. Supp. 967, 974 (D.D.C. 1984), aff'd, 820 F.2d 421 (D.C. Cir. 1987); offering false and misleading testimony, see, e.g., *Nichols* v. *Klein Tools, Inc.,* 949 F.2d 1047, 1049 (8th Cir. 1991); *Eppes, supra; United Business Communications, Inc.* v. *Racal-Milgo, Inc.,* 591 F. Supp. 1172, 1187 (D. Kans. 1984); and falsifying past deposition testimony, see, e.g., *Combs* v. *Rockwell Int'l Corp.,* 927 F.2d 486, 488 (9th Cir. 1991). It is important to reiterate that it must be shown through clear and convincing evidence that a party's fraudulent conduct is part of a *pattern or scheme* to defraud.[2]

> [2] We also note that there exists a significant distinction between fraud on the court discovered before the entry of a judgment in an action, and fraud discovered after the entry of a judgment. Our discussion has focused on and is limited to the former.

Rockdale, in proffering a forged document, providing misleading answers to interrogatories, and giving false deposition testimony, to use the words of *Aoude,* "has sentiently set in motion [an] unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter." *Aoude, supra* at 1118.

2. *Hearing.* The plaintiffs argue that they were constitutionally entitled to an evidentiary hearing on the motion to dismiss. There is no merit to this contention because Fernandes admitted the forgery and, hence, there was no need for a hearing to take evidence. Furthermore, the plaintiffs neither demanded an evidentiary hearing in the Superior Court nor raised any constitutional issue there. See *Tamerlane Corp.* v. *Warwick Ins. Co.,* 412 Mass. 486, 491 (1992).

Due process requires only notice and an opportunity to be heard. The plaintiffs were afforded both. See *MacDonald* v. *MacDonald,* 407 Mass. 196, 201 n. 9 (1990). There were no contested issues.

3. *Claim of Geraldine Fernandes.* Geraldine Fernandes is the wife of Vincent Fernandes who forged the Sun letter. She figured only in count VI of the
601 complaint and she argues that *601 it was error to dismiss her claim because she did not commit the forgery. Count VI was dismissed with prejudice by agreement of the parties. Geraldine had no further claim. There was no error.

4. *Motion to alter or amend judgment.* There is no merit to Rockdale's argument that the judge was required to make findings of fact in connection with its motion to alter or amend the judgment. Rule 52 (a) of the Massachusetts Rules of Civil Procedure, 365 Mass. 816 (1974), provides that findings of fact and conclusions of law are unnecessary on such a motion.

*Judgment affirmed.*

---

O'CONNOR, J. (concurring).

Because the plaintiff Fernandez admitted to the judge that he had forged the letter ostensibly written on behalf of Sun Marketing and Refining Company, and because that letter would have been significant evidence favorable to the plaintiffs, I agree that the judge properly dismissed the case on account of fraud on the court.

I write separately only because I think that a word of caution is in order. The precious right of trial by jury is jeopardized by any suggestion that a jury case may be dismissed or the defendant may be defaulted whenever a motion judge or trial judge, after measuring a party's credibility and without the benefit of an admission such as the judge had in this case, finds by "clear and convincing evidence" that that party has committed perjury as "part of a pattern or scheme to defraud." *Ante* at 600. In my view, the court unwisely goes beyond the necessity of this case, and makes troubling suggestions about where it may go in the future, when it states that "[d]ismissal or entry of a default judgment for fraud on the court has been warranted for creating and presenting false evidence in support of a claim or defense," and then, by way of example, cites cases in which "offering false and misleading testimony" and "falsifying past deposition testimony" is said to have
602 occurred. *Ante* at 599-600. In *602 my view, in a jury case the question whether a party's trial or deposition testimony is true or false ought to be
603 for the jury, not the judge, to decide. *603

Case Details

Full title: ROCKDALE MANAGEMENT CO., INC., others vs. SHAWMUT BANK, N.A

Court: Supreme Judicial Court of Massachusetts. Bristol

Date published: Aug 12, 1994

Citations Copy Citations

418 Mass. 596 (Mass. 1994)

638 N.E.2d 29

Citing Cases

Commonwealth v. Cotto

Their conduct constitutes a fraud upon the court. See Rockdale Management Co., Inc. v. Shawmut Bank,...

Commissioner of Probation v. Adams

It has been repeatedly held that courts have the inherent power to revoke judgments obtained by fraud on the...

59 Citing Cases

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

From Casetext: Smarter Legal Research

# Singh v. Capuano

Download PDF | Check Treatment

## Summary

Recognizing defendant's "difficult choice between testifying in the [G. L.] c. 209A case or asserting his privilege against self-incrimination"

Summary of this case from M.K. v. D.B.

See 1 Summary

Take care of legal research in a matter of minutes with CoCounsel, your new AI legal assistant.

Try CoCounsel free

Case Details

Full title: Aneeta SINGH v. Scott CAPUANO (and a consolidated case).

Court: Supreme Judicial Court of Massachusetts

Date published: Jun 11, 2014

Citations: 468 Mass. 328 (Mass. 2014); 468 Mass. 328

Citing Cases

In re Adoption Talik: Custody of Two Minors, 396 Mass. at 616, 487 N.E.2d 1358. See Singh v. Capuano, 468 Mass. 328, 333-334, 10...

Quilla Q. v. Matt M.: We decide this matter due to the importance of the statutory policy at stake, and because of the significant...

24 Citing Cases

## Opinion

SJC–11491 SJC–11565.

2014-06-11

Aneeta SINGH v. Scott CAPUANO (and a consolidated case ).

Michael J. Licker (Kevin J. Conroy with him), Boston, for the plaintiffs. Cindy T.K. Palmquist for Women's Bar Association of Massachusetts, Inc., & others, amici curiae, submitted a brief.

IRELAND

1077 *1077 Michael J. Licker (Kevin J. Conroy with him), Boston, for the plaintiffs. Cindy T.K. Palmquist for Women's Bar Association of Massachusetts, Inc., & others, amici curiae, submitted a brief.
**Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.**

**IRELAND, C.J.**

The plaintiff, Aneeta Singh, appeals from two District Court orders extending for three months certain portions of an abuse prevention order that had issued against the defendant, Scott Capuano. Singh had sought to have the original order extended in its entirety for a full year. We granted Singh's applications for direct appellate review and consolidated the appeals. While the appeals have been pending, the underlying orders were succeeded by other orders, to which Singh does not object.

[2] We therefore dismiss these appeals as moot. Considering the importance of "proper judicial administration of ... restraining orders," *Uttaro v. Uttaro*, 54 Mass.App.Ct. 871, 873 n. 2, 768 N.E.2d 600 (2002), however, we exercise our discretion to comment on some of the issues presented.

2 Most recently, on January 28, 2014, a judge in the District Court extended the abuse prevention order against Capuano for a period of three years. Singh concedes that "[t]his extension renders moot [her] request for a remand to the [D]istrict [C]ourt." Although the most recent extension does not afford Singh all of the relief she sought when she applied for an abuse prevention order initially, she has not appealed from it.

3

3 We acknowledge the amicus brief filed by Women's Bar Association of Massachusetts, Inc.; Women's Bar Foundation of Massachusetts, Inc.; Domestic & Sexual Violence Council, Inc.; Domestic Violence Institute at Northeastern School of Law; HarborCOV; Casa Myrna Vasquez, Inc.; Justice Center of Southeast Mass. LLC; Second Step; and Community Legal Services and Counseling Center.

*Facts.* On February 14, 2013, Singh filed a complaint in the District Court seeking an abuse prevention order against Capuano pursuant to G.L. c. 209A. After an ex parte hearing, a temporary order issued granting custody of the parties' minor child to Singh and directing Capuano to have no contact with, to stay at least fifty yards away from, and not to abuse Singh or the child. The matter was scheduled to be heard next on February 22, 2013. Shortly after the ex parte hearing, Singh filed a report with the police concerning the events underlying the c. 209A complaint and also applied for criminal complaints against Capuano that eventually issued.

Both parties appeared with counsel before a second District Court judge on February 22, 2013. Despite Singh's request for an evidentiary hearing and to have the abuse prevention order extended for one year, the judge expressly declined to hold an evidentiary hearing. Instead, the judge extended the order until April 11, 2013, and continued the hearing to that date. The judge indicated that he believed that the Probate and Family Court was the appropriate forum for resolving the matter; he also referred to the possible
1078 *1078 consequences for Capuano in the criminal proceedings if he were to testify in the c. 209A proceeding.

On April 11, 2013, the parties appeared with counsel before the same judge, and Singh again requested a hearing and a one-year extension of the order. Once again, the judge declined to hold an evidentiary hearing, referencing concerns similar to those he had raised previously. Over Singh's objection and without hearing the evidence, the judge declined to extend the no-contact and stay-away provisions of the extant order; extended the no-abuse provision for three months, until July 11, 2013; stated that the order would be subject to any orders of the Probate and Family Court; and continued the matter until July 11.

When the parties returned to the District Court on July 11, 2013, they appeared before the judge who initially had granted the ex parte order. Singh once again sought an evidentiary hearing and a one-year extension of the c. 209A order as originally issued. An evidentiary hearing was held, at which Singh testified and was cross-examined. Capuano did not testify, but instead asserted his privilege against self-incrimination. Singh therefore requested that an adverse inference be drawn against Capuano. The judge summarily refused to draw an adverse inference, extended the no-abuse provision of the order for three additional months, and declined to reinstate the no-contact and stay-away provisions that initially had been part of the order.

*Discussion.* Because of the extraordinary sensitivity of abuse prevention matters, the applicable statute, G.L. c. 209A, and the guidelines promulgated by the Trial Court call for prompt evidentiary hearings on the merits of applications for such orders. See Guidelines for Judicial Practice: Abuse Prevention Proceedings § 5:00 (Sept. 2011) (Guidelines) ("A hearing after notice in a c. 209A case should be scheduled as soon as possible after an ex parte order is issued, but in no event later than ten court business days after the issuance of such an order"); *id.* at § 5:01 ("The hearing after notice in a c. 209A action at which both parties appear is an adversarial proceeding in which both parties must be allowed to present evidence"). See also *S.T. v. E.M.*, 80 Mass.App.Ct. 423, 429, 953 N.E.2d 269 (2011) ("absent serious court congestion or some other emergency, judges should hear and decide scheduled [c. 209A] matters if the parties are ready and wish to have a hearing"). Without first hearing the evidence, a judge should not, over objection, vacate any provision of a c. 209A order once issued, as the judge in this case did with the no-contact and stay-away provisions.

[4] *Id.* at 429–430, 953 N.E.2d 269 ("judges should not issue, or vacate, any part of an abuse prevention order, over objection, without hearing the evidence and giving the parties an opportunity to respond").

4 It is also incumbent on District Court judges to ensure that any District Court orders issued pursuant to G.L. c. 209A are consistent with related orders entered in the Probate and Family Court. See Guidelines for Judicial Practice: Abuse Prevention Proceedings §§ 1:11, 2:07, 12:00 et seq., 13:00 (Sept. 2011).

Specifically, the statute and guidelines contemplate that notice will be given to the defendant and an evidentiary hearing will be held within ten days of the temporary, ex parte order. Barring an agreement of the parties or emergency circumstances, both sides are entitled to an evidentiary hearing within ten days.

1079 [5] *1079 See Guidelines, *supra* at § 4:00 ("Orders entered after an ex parte hearing should have duration of no more than ten court business days"); *id.* at commentary ("the ex parte orders should last only until the hearing after notice can be held, and that hearing should be scheduled for a date as soon as possible, consistent with service on the defendant, and, in any event, no more than 'ten court business days' after the ex parte hearing. G.L. c. 209A, § 4, second par."); *id.* at § 5:01. As in all cases, a judge in a c. 209A proceeding has a measure of discretion regarding the scheduling of hearings, but continuances must not be granted lightly, especially in a c. 209A case. The decision to continue or suspend a hearing or to postpone the receipt of evidence must be made in light of the judicial responsibility to hear and decide cases in a manner that is consistent with the purposes of the statute and the interests of justice. As we recognized in *Soe, Sex Offender Registry Bd. No. 252997 v. Sex Offender Registry Bd.*, 466 Mass. 381, 391–392, 995 N.E.2d 73 (2013), quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97, 99–100 (2d Cir.2012), "the person seeking a continuance or a stay of proceedings 'bears the burden of establishing its need,'" and "a particularized inquiry into the competing circumstances of, and the competing interests in, the case" is required. See *Commonwealth v. Taylor*, 428 Mass. 623, 627–628, 704 N.E.2d 170 (2007) (discussing pretrial continuances without change of plea in criminal cases; stating that judges must exercise discretion to grant continuances "only when based upon cause and only when necessary to insure that the interests of justice are served," citing Mass. R. Crim. P. 10 (a) (1), 378 Mass. 861 [1979]). This is especially important in c. 209A proceedings, which focus on the applicant's need for protection, and where the consequences of holding a prompt hearing can be significant. See, e.g., *Moreno v. Naranjo*, 465 Mass. 1001, 1002, 987 N.E.2d 550 (2013).

5 It is not appropriate for a judge, over either side's objection, to extend an ex parte order and continue the case for months without a hearing, as was done here.

6

6 The judge in this case appears to have continued the case on his own initiative, not in response to any motion by the defendant. The same general principles apply, however. Regardless whether a case is continued at the request of a party or on a judge's own initiative, it must only be done based on demonstrated need and a careful weighing of the competing interests and circumstances.

In this case, neither the pending criminal proceedings against Capuano nor the fact that Singh could have sought relief in the Probate and Family Court provided a basis for continuing the matter without holding an evidentiary hearing. See Guidelines, *supra* at § 2:07 ("Plaintiffs initially seeking relief in the District Court, the Boston Municipal Court or the Superior Court Department should not be referred to the Probate and Family Court Department for any relief that is within the initial court's jurisdiction"); *id.* at commentary ("If the court in which a person initially seeks protection under c. 209A has jurisdiction, the person should be heard as soon as possible in court, and should not be sent to another court"). See also *S.T. v. E.M.*, 80 Mass.App.Ct. 423, 430, 953 N.E.2d 269 ("G.L. c. 209A, § 4 [c.] gives a choice of forum to the plaintiff.... A judge should not, sua sponte and over objection, discontinue an abuse prevention proceeding because he believes it should move to another forum—whether that forum is mediation, a criminal court, or another Trial Court department"). Notwithstanding that Capuano faced a potentially difficult choice between testifying in the c. 209A case or asserting his privilege against self-incrimination, Singh was
1080 nevertheless *1080 entitled to a prompt evidentiary hearing on her claim under c. 209A.

We also comment briefly on the permissible use of an adverse inference when a defendant in a civil abuse prevention matter, who also faces criminal charges, declines to testify and instead asserts his privilege against self-incrimination in the abuse prevention case. It is well settled that a fact finder may, but is not required to, draw an inference adverse to the nontestifying defendant in such a situation. See *Frizado v. Frizado*, 420 Mass. 592, 596, 651 N.E.2d 1206 (1995) ("An inference adverse to a defendant may properly be drawn ... from his or her failure to testify in a civil matter such as this, even if criminal proceedings are pending or might be brought against the defendant.... The fact that the defendant may refuse to testify on the ground of self-incrimination does not bar the taking of an adverse inference"). But there is a difference between, on the one hand, a fact finder considering whether to draw such an inference and declining to do so, and, on the other hand, the fact finder refusing outright even to entertain the possibility of drawing the inference. The situation is akin to one where a judge, with discretion to rule on a matter, fails or refuses to exercise that discretion, as to which we have said:

"The term discretion implies the absence of a hard-and-fast rule. The establishment of a clearly defined rule of action would be the end of discretion, and yet discretion should not be a word for arbitrary will or inconsiderate action. 'Discretion means a decision of what is just and proper under the circumstances.' *The Styria v. Morgan*, 186 U.S. 1, 9 [22 S.Ct. 731, 46 L.Ed. 1027] (1902) ], quoted in *Paquette v. Fall River*, 278 Mass. 172, 174 [179 N.E. 588] (1932) ]."

*Long v. George*, 296 Mass. 574, 578, 7 N.E.2d 149 (1937). See *Pierce v. Pierce*, 455 Mass. 286, 295, 916 N.E.2d 330 (2009); *Lonergan–Gillen v. Gillen*, 57 Mass.App.Ct. 746, 749, 785 N.E.2d 1285 (2003), quoting *Berryman v. United States*, 378 A.2d 1317, 1320 (D.C.1977) ("Where discretion to grant relief exists, a uniform policy of denying relief is error"). When a defendant has asserted his privilege not to testify, a judge, as fact finder, is required to carefully consider all the circumstances of the case when making the decision whether to draw an adverse inference. In this case, if the judge's statement that he would "not draw an adverse inference for [Capuano's] refusal to testify when there's a pending criminal matter" reflected a hard-and-fast rule never to draw an adverse inference against nontestifying defendants, it would have been improper. The assertion of the privilege against self-incrimination ought to have been considered and weighed as part of the evidence in the case. *Andrews v. Frye*, 104 Mass. 234, 236 (1870). While the decision whether to draw an adverse inference based on Capuano's failure to testify was ultimately one for the judge as fact finder, the judge was obliged to consider whether such an inference was fair and reasonable based on all the circumstances and evidence before him.

Finally, neither a defendant's visitation rights nor the pendency of criminal proceedings is an appropriate consideration in establishing the duration of a G.L. c. 209A order. The exclusive focus must be on the applicant's need for protection. As we said in *Moreno v. Naranjo*, 465 Mass. at 1002 n. 2, 987 N.E.2d 550:

"The Trial Court's guidelines for proceedings under G.L. c. 209A strongly suggest that an order after notice should be for a minimum of one year,
1081 unless the plaintiff requests a shorter period or the *1081 court finds that a shorter period is warranted, and that orders for shorter periods should not be routinely issued over the plaintiff's objection. Guidelines for Judicial Practice: Abuse Prevention Proceedings § 6.02 & commentary (Sept. 2011)." See *Iamele v. Asselin*, 444 Mass. 734, 739, 831 N.E.2d 324 (2005). In this case, the plaintiff was granted multiple orders for periods of less than one year, following proceedings at which it appears that factors other than her need for protection improperly were considered.

*Conclusion.* To fulfil the intended purposes of the statute, the procedure in abuse prevention matters pursuant to G.L. c. 209A should hew closely to the terms of the statute and the applicable Trial Court guidelines. It is essential, among other things, that hearings be held promptly. Neither the pendency of criminal proceedings against the defendant nor a judicial preference that the matter be decided in another forum is an appropriate consideration in deciding whether to continue a hearing. Decisions to grant, deny, extend, modify, or vacate orders must be based on the evidence, after hearings, and only upon proper considerations, and orders that are granted must be of sufficient duration to protect the plaintiff, for whose benefit they are issued.

Appeals dismissed as moot.

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research | Pricing | Switch | Big firm | Coverage | SmartCite | Law school access | Bar associations

About us | Jobs | News | Twitter | Facebook | LinkedIn | Instagram

Help articles | Customer support | Contact sales | Cookie Settings | Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information | Privacy | Terms

© 2024 Casetext Inc.

Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

# S.T. vs. E.M.

## 80 Mass. App. Ct. 423

### May 12, 2011 - September 19, 2011

Court Below: District Court Department, Somerville Division

Present: WOLOHOJIAN, MILKEY, & HANLON, JJ.

Abuse Prevention. Due Process of Law, Abuse prevention. Witness.

In an abuse prevention proceeding brought in District Court pursuant to G. L. c. 209A, the judge impermissibly prevented the plaintiff from calling the defendant as a witness; therefore, this court vacated the judge's order, which vacated a protective order previously issued against the defendant, and remanded the matter for a new hearing. [428-429]

Statement regarding the minimum standards of fairness that must be observed at abuse prevention proceedings conducted under G. L. c. 209A. [429-431]

COMPLAINT for protection from abuse filed in the Somerville Division of the District Court Department on February 23, 2010.

An abuse prevention order was vacated by Neil J. Walker, J.

Thomas R. Ayres, II (Kristyn M. Bunce with him) for the plaintiff.

Jill S. Gately for the defendant.

---

**HANLON, J.** The plaintiff appeals from the decision of a District Court judge vacating an abuse prevention order, previously issued against the defendant, pursuant to G. L. c. 209A. She argues that the judge impermissibly prevented her from calling the defendant as a witness at the hearing. We agree.

The plaintiff applied for and received an ex parte abuse prevention order on February 23, 2010. [Note 1], [Note 2] On March 10, 2010, both

Page 424

parties appeared at the court with counsel, apparently ready for the extension hearing, although the defendant's lawyer told the judge that she expected several witnesses to arrive soon. After the judge read the plaintiff's affidavit, he asked whether officials at the university the parties attended had been consulted; he expressed a strong preference that the matter be mediated, rather than litigated in court. [Note 3] The judge said that he had, in many cases, resolved such problems "by at least allowing a restraining order to continue without a hearing for a short period of time and ordering them back into mediation with a report to be filed with the Court as to . . . the results of that. In doing so, the restraining order exists only as to abuse. Everything else is deleted or vacated to allow the students to attend classes and be on the campus . . . ." The defendant's lawyer objected to extending the restraining order in any form, stating her view

Page 425

that if the judge heard the evidence, he would agree that even a no abuse order was inappropriate, because it was not supported by the evidence. The judge responded that he did not think his order was "going to affect anybody because any order that [he issued would be] continued specifically without a hearing and with specifically taking no evidence, with the thought that, again, you know, the matter can be mediated and/or, you know, taken to the authorities at [the university]." The defendant's lawyer responded that she had witnesses present. The plaintiff's lawyer argued that her client wished to keep the existing order intact. The judge explained again his preference for mediation, and also stated that any order that he issued would be "mutual, one against the other." The plaintiff's lawyer then stated, "[O]ur position is just that mediation is inappropriate where one of the students has raped the other student." The judge responded, "Excuse me, that's stricken from the record. Don't ever say that again on the record, unless you have something that you want to put forth to the Court, because I'll refer [this to the] District Attorney's office right now. You want that? You got it."

Thereafter, despite the efforts of both parties to persuade the judge to hold an evidentiary hearing on the restraining order, [Note 4] he suspended the proceeding and arranged for an assistant districtattorney to come to the courtroom to speak with the plaintiff. The judge said that if the prosecutor felt "there [was] any merit, then a complaint should be filed." In the meantime, he would give the parties "a month within which to further confer with the authorities at [the university]."

At the request of the defendant's lawyer, the judge retained jurisdiction of the matter; in the meantime, he vacated all but the no abuse and no firearms portions of the existing restraining order. It is not clear from the record before us whether the judge, in fact, also issued a mutual order against the plaintiff. See G. L. c. 209A, § 3, as appearing in St. 1990, c. 403, § 3("A court may issue a mutual restraining order or mutual no-

Page 426

contact order pursuant to any abuse prevention action only if the court has made specific written findings of fact").

The parties appeared before the same judge three weeks later; he told them that he would not have time to hear the case, due to court congestion. He again suggested that mediation would be appropriate, saying, "You're in effect throwing on the Court what is really the obligation of the university to assist their students, especially if [the plaintiff] is seriously concerned about her well-being and safety." When plaintiff's counsel drew the judge's attention to certain language in G. L. c. 209A, § 3 ("No court shall compel parties to mediate any aspect of their case"), the judge responded that he was "not unaware of what the statute says" but that he was "aware of the practicalities . . . of these matters," adding, "You know, what's the tuition now at [the university]? Whatever it is, that's [an] awful lot of money." He reiterated that he had an "extremely effective" program at his local university for dealing with these cases.

The defendant's lawyer again argued for a hearing, saying that she had witnesses who would report to the court that mediation had been unsuccessful. The judge responded that he would ask for a special assignment on a particular day to hear the case. The record indicates that the no abuse and no firearms order was continued without modification until April 16.

On the next court date, April 16, 2010, a police officer testified about the statement that she had taken from the plaintiff on March 19. [Note 5] The plaintiff then testified to the following. She and the defendant were in a particular scholars program at the university, and they had had a dating relationship which had deteriorated. The defendant broke up with her but continued to stay in touch with her, frequently asking personal questions that made her uncomfortable. On one occasion, the two went out to dinner, and the defendant told her that he regretted his behavior. They ended the night by having sexual relations.

Thereafter, according to the plaintiff, the relationship became increasingly violent. She described an incident in which the defendant screamed at her and grabbed her; she testified that on

Page 427

another occasion, he shoved her into a wall. At some point, she told him that she did not want to have a sexual relationship with him; however, they continued to spend time together. On November 8, 2009, they spent the evening together in the defendant's dormitory room, eating and watching television. The plaintiff was taking a prescription pain killer for an injury to her hand. At some point, she started to feel sick and vomited. According to her testimony, the defendant helped her clean up the vomit and encouraged her to lie on his bed. Thereafter, despite her protests, he touched her sexually and had oral sex with her. The plaintiff testified that, afterwards, although she tried to avoid him, the defendant harassed her, repeatedly texting her and coming to her room where he would yell, throw things, and kick the wall. At one point, she said, he drew a "picture of male genitalia" on a message board outside her dormitory room. She also testified that, when she told school officials that she wanted an order for the defendant to stay away from her, she was told that, if she pursued that course, she would have to drop out of the scholars program at school.

The plaintiff was cross-examined at some length and in some detail about her medical history at the time of her relationship with the defendant. In particular, she was asked about her medication history, her gynecological history, an alleged suicide attempt, and an untrue statement she agreed she had made to the defendant about having lymphoma. She was also asked about meetings with various officials at her school. Finally, she was asked about the alleged rape incident and why she did not report it immediately. Eventually, the judge took over the questioning and asked why she had come to court when she did, given that the sexual assault was said to have occurred the previous November.

The plaintiff responded, in essence, that at the time that she came to court, she believed that the university officials were ignoring her; that she was told that she would have to resign from her program if she insisted on a stay away order; and that she was afraid for her safety. The judge then summarized what he understood to be the history of the university's handling of the matter and concluded, "And it doesn't appear, at least according to this, that you were in any way happy with that." The plaintiff responded that she had tried "to work things out" in

Page 428

meetings with certain university officials. She told the judge that she had continued to be "terrified all the time" and that the defendant had recently approached her in the cafeteria and stared at her.

There was then some discussion of exhibits offered by the defense. From all we can discern from the record on appeal, defense counsel was still in the middle of her cross-examination at this point; there certainly had been no opportunity for redirect examination, and the plaintiff had not rested her case. [Note 6] The judge then asked the plaintiff's lawyer, "[D]o you have anything else that you want to introduce?" Counsel stated an intent to call the defendant. The judge responded, "You're not calling [the defendant]. . . . He doesn't have to. There's nothing, nothing to suggest that he can be either called as a witness nor does he have to testify." Counsel argued that the matter was a civil case and that, if the defendant chose not to testify, the court could draw a negative inference from that choice. The judge responded, "I beg to differ." Counsel then drew the judge's attention to Frizado v. Frizado, 420 Mass. 592 , 596 (1995) ("The plaintiff must make the case for the awarding of relief. An inference adverse to a defendant may properly be drawn, however, from his or her failure to testify in a civil matter such as this, even if criminal proceedings are pending or might be brought against the defendant"). The judge's response was that the plaintiff would not be permitted to call the defendant as a witness. The defendant never asserted a privilege not to testify, whether directly or through his lawyer. Nor did the judge inquire whether the defendant chose to do so.

There ensued an exchange between plaintiff's counsel and the judge about the credibility of the plaintiff's testimony; the judge inquired several times whether there was any corroboration. He then said, "The matter stands dismissed." Defense counsel said, "Thank you." The plaintiff's lawyer said, "Excuse me, your honor?" The defendant's lawyer said, "The matter stands dismissed." The court clerk said, "Again, after a full hearing on the restraining [order], that matter stands dismissed." The court officer said, "Court, all rise."

Defendant as plaintiff's witness. "The burden is on the complainant

Page 429

to establish facts justifying the issuance and continuance of an abuse prevention order." Frizado v. Frizado, 420 Mass. at 596. However, "[a]n inference adverse to a defendant may properly be drawn . . . from his or her failure to testify in a civil matter such as [an abuse prevention proceeding under G. L. c. 209A], even if criminal proceedings are pending or might be brought against the defendant." Ibid. See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627 , 643-644 (2010). See also McGinnis v. Aetna Life & Cas. Co., 398 Mass. 37 , 39 (1986), and cases cited.

We recognize that this judge, on these facts, may not have drawn such an inference, eventually, given his apparent view of the plaintiff's case. Nevertheless, the plaintiff should have been permitted to require the defendant to choose whether to testify. It may be that the defendant would have asserted his constitutional privilege not to testify, through counsel or otherwise. It is also possible that the defendant would have testified about some of the incidents described by the plaintiff and thus corroborated, or contradicted, some or all of her testimony. In any event, it was not the judge's prerogative to make that choice for him.

We reverse and remand for a new hearing. We do not mean to intimate how the matter should be decided after a full and fair hearing. Credibility determinations and an evaluation of the sufficiency of all the evidence are matters for the hearing judge to decide.

We recognize that there is often an informality to c. 209A abuse prevention proceedings in a busy court. See Frizado v. Frizado, 420 Mass. at 598 ("The Legislature devised a procedure in G. L. c. 209A that is intended to be expeditious and as comfortable as it reasonably can be for a lay person to pursue. Judges often must deal with large numbers of these emotional matters in busy court sessions"). Nonetheless, certain minimum standards of fairness must be observed. First, absent serious court congestion or some other emergency, judges should hear and decide scheduled matters if the parties are ready and wish to have a hearing. Second, judges should not issue, or vacate, any part of an abuse prevention order, over objection, without hearing the evidence and giving the parties an opportunity to

Page 430

respond. [Note 7] Third, G. L. c. 209A gives a choice of forum to the plaintiff. See G. L. c. 209A, § 2. A judge should not, sua sponte and over objection, discontinue an abuse prevention proceeding because he believes it should move to another forum -- whether that forum is mediation, a criminal court, or another Trial Court department. [Note 8] Fourth, each party should be given a fair opportunity to present his case. [Note 9] While a judge surely may exclude irrelevant

Page 431

or inadmissible evidence, or even interrupt an argument or a witness examination that has become repetitious, he should not terminate a hearing without ensuring that he has heard all the relevant and admissible evidence once. See C.O. v. M.M., 442 Mass. 648 , 657 (2004) ("[W]hile a judge may limit cross-examination for 'good cause' in certain situations, see Silvia v. Duarte, 421 Mass. 1007 , 1008 [1995]; Frizado v. Frizado, [420 Mass.] at 597-598, judicial discretion is not 'unlimited,' and 'each side must be given a meaningful opportunity to challenge each other's evidence.' Frizado v. Frizado, supra at 598 n.5").

Under all the circumstances of this case, including, particularly, what might be thought to be irregularities in the procedures employed here, we think it better that the matter be heard before a different judge.

Conclusion. The order vacating the abuse prevention order is vacated, and the matter is remanded for a new hearing before a different judge. [Note 10]

So ordered.

---

FOOTNOTES

[Note 1] In her affidavit supporting the application for the order, the plaintiff stated that she and the defendant were undergraduate students at a nearby university. They began a dating relationship in February, 2009; by the end of the year, the defendant "became increas[ing]ly controlling of [her]," refusing to let her do things alone and "always need[ing] to know where [she] was." She briefly described incidents in which, she said, the defendant threw things at her, and then related an incident in which, she said, the defendant "sexually assaulted" her.

[Note 2] The order directed the defendant not to abuse the plaintiff; not to have direct or indirect contact with her; to stay away from her residence; and "to leave any common area at the college whenever [the plaintiff] is present in that area." In addition, as required by G. L. c. 209A, § 3B, the order directed the defendant to surrender immediately to the local police department any "guns, ammunition, gun licenses and [firearms identification] cards."

[Note 3] The judge stated, "Have the authorities at [the university] been consulted?" When the defendant's lawyer responded that they were on their way to the court, the judge stated, "I'm not interested in anybody from [the university] coming in, unless they can tell me that they work with these kids to try to mediate the situation." Both lawyers addressed the court: defendant's counsel apparently tried to say that she had called certain school officials as witnesses; plaintiff's counsel stated that the school had "attempted a resolution, but at this point [the plaintiff did] not feel safe on campus." The judge interrupted each lawyer and concluded, "I'm sorry and I, again, point out the fact that I've been hearing a lot of these cases since I've been here. My home is Lowell. I deal with [a different university], and I deal with them fairly frequently. I am satisfied, in most cases, that once the college or university gets involved, they can do a lot more than I can. I will say to you at this point that I will not under any circumstances, unless it can be shown otherwise, . . . prevent any student from physically being on the campus, physically attending any and all classes. . . . I'm going to suggest you might want to sit down and discuss this because I'm going to tell you I'm going to be hard-pressed to continue an order that's going to prevent one student, okay, as opposed to the other, to attend a private institution." The judge continued, for several pages of transcript, explaining that the case should be mediated. He stated that he had had extensive discussions with officials at the university near his home court and had encouraged them to solve such problems internally because "any students, before they appear before this Court, or in Lowell at any event, they're subject, you know -- and its mandatory, it's not elective. It's not, well, I don't want to do it. It's mandatory that they at least sit down with the dean of students, with the proctors . . . ."

[Note 4] In particular, the defendant's lawyer argued that she had witnesses present, including one from out of State, and asked the judge to hold the case for a hearing later in the day. The judge responded that he apologized to the parties, but that he thought it more important that they "now look into the criminal aspects of the case."

[Note 5] The officer declined to provide any additional information about her investigation, and the judge sustained the plaintiff's objection to defense counsel's questions about it.

[Note 6] The defendant's lawyer confirmed this view at oral argument.

[Note 7] See Vittone v. Clairmont, 64 Mass. App. Ct. 479 , 486 (2005) (judge must consider carefully whether serious physical harm is imminent and should not issue a G. L. c. 209A order "simply because it seems to be a good idea or because it will not cause the defendant any real inconvenience"), quoting from Smith v. Joyce, 421 Mass. 520 , 523 n.1 (1995). Once an abuse prevention order is issued, it is recorded in a Statewide domestic violence record keeping system created by St. 1992, c. 188, § 7. See Vaccaro v. Vaccaro, 425 Mass. 153 , 156 (1997) ("There is nothing in St. 1992, c. 188, § 7, or in G. L. c. 209A, that permits a record to be removed or that authorizes the entry of a judicial order directing expungement of a record from the system"). Cf. Commissioner of Probation v. Adams, 65 Mass. App. Ct. 725 , 737 (2006) ("[A] judge has the inherent authority to expunge a record of a 209A order from the Statewide domestic violence registry system in the rare and limited circumstance that the judge has found through clear and convincing evidence that the order was obtained through fraud on the court"). A record of a c. 209A order has long-term collateral consequences for a defendant, creating "a blemish on [his] record for the rest of [his] life." Id. at 736. See Frizado v. Frizado, 420 Mass. at 594 n.2.

[Note 8] See Guidelines for Judicial Practice: Abuse Prevention Proceedings § 2:07 commentary (Dec. 2000) ("If the court in which a person initially seeks protection under c. 209A has jurisdiction, the person should be heard as soon as possible in that court, and should not be sent to another court"). Referring a case for mediation is particularly troubling in light of the statute's explicit directive that "[n]o court shall compel parties to mediate any aspect of their case." G. L. c. 209A, § 3. See Guidelines for Judicial Practice: Abuse Prevention Proceedings § 1:01. In addition, research conducted for the United States Department of Justice indicates that, "[d]uring any given academic year, 2.8 percent of women [in college] will experience a completed and/or attempted rape . . . [T]he level of rape and other types of victimization found in the survey becomes an increasing concern when the victimization figures are projected over a . . . full college career." Fisher et al., Natl. Inst. of Justice & Bureau of Justice Statistics, U.S. Dept. of Justice, The Sexual Victimization of College Women 33 (Dec. 2000). See Natl. Inst. of Justice, U.S. Dept. of Justice, Sexual Assault On Campus: What Colleges and Universities Are Doing About It 3, 8 (Dec. 2005) ("Less than 5 percent of completed and attempted rapes of college students are brought to the attention of campus authorities and/or law enforcement"; "A majority of campus administrators believe that requiring victims to participate in adjudication discourages reporting").

[Note 9] See Guidelines for Judicial Practice: Abuse Prevention Proceedings § 5:01 (Dec. 2000) ("[E]ach side must be given a meaningful opportunity to challenge the other's evidence").

[Note 10] The defendant's request for appellate attorney's fees and costs is denied.



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

casetext
Search all cases and statutes... All State & Fed.
Sign In Get a Demo Free Trial

Opinion Summaries Case details

From Casetext: Smarter Legal Research

# United States v. Essex

Download PDF Check Treatment

## Summary

Holding that § 1503 is not violated merely by making a false statement, id. at 217-18

Summary of this case from U.S. v. Poindexter

See 14 Summaries

Take care of legal research in a matter of minutes with CoCounsel, your new AI legal assistant.

Try CoCounsel free

## Opinion

No. 18457.

215 February 24, 1969. *215

John S. McLellan, Kingsport, Tenn., and Moses Krislov, Cleveland, Ohio, D. Bruce Shine, Kingsport, Tenn., Moses Krislov, Cleveland, Ohio, on brief, for appellant.

Thomas A. Williams, Asst. U.S. Atty., Chattanooga, Tenn., John H. Reddy, U.S. Atty., Chattanooga, Tenn., on brief, for appellee.

Before CELEBREZZE, McCREE and COMBS, Circuit Judges.

CELEBREZZE, Circuit Judge.

Patricia Ann Essex, Appellant, appeals her conviction for juvenile delinquency rendered in the United States District Court for the Eastern District of Tennessee pursuant to the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031 et seq. The finding of juvenile delinquency was based on an information charging that Appellant violated the Federal Obstruction of Justice Statute, 18 U.S.C. § 1503. The charge stems from the aftermath of the trial and conviction of James R. Hoffa where, in Hoffa's third motion for new trial, Appellant, one Catherine Johnson, and two others, filed affidavits in the United States District Court for the Eastern District of Tennessee alleging that they had had sexual intercourse with several petit jurors while the jury was sequestered for deliberations. The District Court, however, found the allegations of misconduct to be untruthful and rejected Hoffa's motion. United States v. Hoffa, 247 F. Supp. 692 (E.D.Tenn. 1965); affirmed, 382 F.2d 856 (6th Cir. 1967), cert. denied, 390 U.S. 924, 88 S.Ct. 854, 19 L.Ed.2d 984. Johnson was subsequently indicted and convicted of perjury under 18 U.S.C. § 1621 for giving false testimony about her alleged relations with the Hoffa jurors before a grand jury convened to investigate alleged misconduct during the Hoffa trial. Her conviction is now on appeal to this
216 Court, United States v. *216 Johnson, Case No. 18,377. So far as the record discloses, Appellant did not appear before this grand jury.

Appellant, a minor was indicted under the Federal Obstruction of Justice Statute, 18 U.S.C. § 1503. When it appeared that Appellant was a juvenile and consented to trial as such the indictment was withdrawn and proceedings were then instituted against Appellant by information pursuant to the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031 et seq. The information charged that:

> "[Appellant did] corruptly endeavor to influence, obstruct and impede the due administration of justice in the United States District Court [for the Eastern District of Tennessee] in that she wilfully caused to be filed an affidavit subscribed by her in support of [Hoffa's] motion for a new trial * * which [was] false and known by her to be false when made. * * *"

After an *in camera* hearing Appellant was found to have violated the statute and sentenced. Her contention on appeal, raised below by motion to dismiss, is that the information does not state an offense under 18 U.S.C. § 1503.

Section 1503 of Title 18, "influencing or injuring officer, juror or witness generally"[1], originated with the Act of March 2, 1831, 4 Stat. 487. The 1831 Act was intended to be "declaratory of the law concerning contempts of court."[2] The power of the United States courts to punish for contempt "in any cause or hearing before the same" had been recognized earlier by the Judiciary Act of 1789, 1 Stat. 83. In Section 1 of the Act of March 2, 1831, Congress restricted contempt jurisdiction and its summary proceedings to misbehavior occurring only in the presence of courts "or so near thereto, as to obstruct the administration of justice," see Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941). With Section 2 of the 1831 Act,[3] the predecessor of the statute before us, Congress provided that contempts occurring beyond the presence of courts should be punishable by indictment
217 and trial, and with all the safeguards thereof.[4] *217 The end result was this: Section 1 provided that if conduct amounting to contempt of court occurred in the presence of the court, the contemnor could still be punished summarily. And Section 2 provided that if contemptuous conduct, "influencing or injuring officer[s], juror[s], or witness[es]" in particular, occurred away from the court the offender was to be dealt with by indictment. Savin, Petitioner, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150 (1889). The principal distinction then, between Section 1 and Section 2 of the Act of March 2, 1831, aside from the added procedural safeguards under the latter, was geographical; they both proscribed contemptuous conduct, i.e., obstruction of court proceedings, United States v. Seeley, 27 Fed. Cas. p. 1010, No. 16,248a (C.C.N.Y. 1844).[5] Sections 1 and 2 of the Act of March 2, 1831 are now part of our present statutory scheme as 18 U.S.C. § 401, which condemns obstructive acts in the court's presence, and 18 U.S.C. § 1503, which prohibits contemptuous conduct away from court,[6] respectively.

1 Section 1503 provides: * * * "Whoever corruptly, or by threats or force, or by any threatening letter of communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter of communication, influences, obstructs, or impedes or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

2 Congress had directed its House Committee on the Judiciary "to inquire into the expediency of defining by statute all offenses which may be punished as contempts of the courts of the United States, and also to limit the punishment for the same." 7 Cong.Deb. 21st Cong., 2d Sess. Feb. 1, 1831, Cols. 560-561.

3 Section 2 of the 1831 Act provided: "That if any person * * * shall corruptly, or by threats or force, endeavour to influence, intimidate, or impede any juror, witness or officer, in any court of the United States, in the discharge of his duty, or shall, corruptly or by threats of force, obstruct, or impede, or endeavour to obstruct or impede, the due administration of justice therein, every person * * * so offending, shall be liable to prosecution therefor, by indictment * * *."

4 See Note, 28 Colum. Law Rev. 401 (1928). The author expresses the view that the intent behind Section 2 of the 1831 Act was to transfer certain denominated contempts to the category of indictable misdemeanors. Id. at 531. These were "constructive contempts" because the acts listed in Section 2, though causally related to the disruption of court proceedings, did not directly interfere with them. United States v. Seeley, 27 Fed. Cas. p. 1010, No. 16,248a, C.C.N.Y. 1844.

5 In Savin, Petitioner, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150 (1889), the Court recognized that an act of misbehavior, though covered in Section 2 of the Act of March 2, 1831, would be contempt if committed in the presence of the Court.

6 Section 1 of the 1831 Act was reenacted as Rev.Stat. 725, and then became 18 U.S.C. § 401, "Power of Court". Section 2 of this Act, reenacted as Rev. Stat. 5399, became 18 U.S.C. § 1503. The Supreme Court recently limited the power of courts to deal with contemnors by summary proceedings under § 401. Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed. 522 (1968).

The question before us narrows down to did Appellant's act of filing a false affidavit in the United States District Court for the Eastern District of Tennessee in support of Hoffa's third motion for new trial constitute a contemptuous act within the meaning of 18 U.S.C. § 1503? We think not.

It is now well beyond dispute that false testimony alone will not amount to contempt of court. In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945); Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172 (1941); Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919). As Justice Black said in In re Michael, supra:

> "All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore, it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of a trial is to sift the truth from a mass of contradictory evidence, and to do so the fact-finding tribunal must hear both truthful and false witnesses."

In In re Michael, petitioner was tried by a District Court for contempt before a grand jury. No witness testified that the petitioner was guilty of misconduct in the grand jury room of any kind other than false swearing. The transcript of his grand jury testimony was offered in evidence. The District Court, after hearing prosecution witnesses, disbelieved petitioner and found that his grand jury testimony had been false. The Supreme Court conceded that petitioner would have been guilty of perjury. The question before the Court, however, was whether it was proper for the District Court to try petitioner for contempt on the basis of his false testimony alone. Citing Ex parte Hudgings, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656 (1919), the Court held that before a court may punish for contempt "there `must be added to the essential elements of perjury * * the further element of
218 obstruction to the *218 Court in the performance of its duty.'" And, "`the presence of that element [obstruction] must be clearly shown in every case where the power to punish for contempt is exerted.'"

The Court was speaking in terms of the power to punish for contempt under what is now 18 U.S.C. § 401. But the above cited cases stand firmly for the rule that perjury alone lacks the element of obstruction which is the essence of contempt. Since the statute before us, 18 U.S.C. § 1503, is also a contempt statute the obstructive element, that is, impeding the court in the conduct of its business or endeavoring to do so beyond the mere rendering of false testimony, must, we believe, be alleged and proved before conviction can be had under it. See Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1931); In re Gottman, 118 F.2d 425 (2d Cir. 1941). Appellant, as in In re Michael, was charged with rendering false testimony and nothing more; although she may have perjured herself — and we do not decide this — she did not endeavor to influence or interfere with "officer[s], juror[s] or witness[es]" within the meaning of 18 U.S.C. § 1503, nor was she so charged.

The Government's reliance on United States v. Cohen, 202 F. Supp. 589 (D. Conn. 1962), one of a line of cases in which individuals were convicted under 18 U.S.C. § 1503 of corruptly endeavoring to influence grand jurors is misplaced. Although the opinion in *Cohen* is not too clear on this point, defendant's conviction therein seemed to turn on the second count of a two-count indictment — his act of falsifying a lease contract presented to the grand jury, and not on his false statements before that body, the subject of Count One of the indictment.[7] To the same effect are United States v. Siegel, 152 F. Supp. 370 (S.D.N.Y. 1957), affirmed 263 F.2d 530 (2d Cir. 1959), cert. denied, 359 U.S. 1012, relied on by the District Court in *Cohen,* and United States v. Solow, 138 F. Supp. 812 (S.D.N.Y. 1956). In *Seigel* and *Solow,* the indictments specifically charged that the grand juries therein were obstructed by the destruction of subpoenaed documents and not by the rendering of false testimony.

7 The Court said: "The question is whether or not either allegation [falls] within the purview of § 1503. *If either does,* the indictment must stand." United States v. Cohen, 202 F. Supp. 587, 588 (D.Conn. 1962). (Emphasis added). The Court then went on to hold: "certainly it is as much an `obstruction of justice' to cause to be presented to a grand jury a false document which is the subject of a grand jury investigation. The proferring of misleading documents intended to deceive the grand jury toward a false finding is no less corrupt then the fraudulent concealment of facts by the wilful destruction of documents." United States v. Cohen, supra at 589.

We would have little difficulty finding a violation of 18 U.S.C. § 1503 had the allegations of Appellant's affidavit been true. The Government wishes to prosecute her under 18 U.S.C. § 1503 even though the District Court in originally rejecting Hoffa's motion for new trial, the grand jury, and the same District Court again in the present case found that Appellant was untruthful in stating that she had contact with the Hoffa jurors. We refuse to broaden the obstruction of justice statute beyond the scope that Congress gave to it. As a criminal statute 18 U.S.C. § 1503 requires strict construction. The general clause at its end, moreover, must be read to embrace only acts similar to those mentioned in the preceding specific language. Haili v. United States, 260 F.2d 744 (9th Cir. 1958). Neither the language of Section 1503 nor its purpose make the rendering of false testimony alone an obstruction of justice. If appellant committed any offense at all, it was the perjury charged in the information against her.

In view of our disposition of this matter, we deem it unnecessary to reach other questions raised by Appellant.

Reversed.

219 *219

Case Details

Full title: UNITED STATES of America, Plaintiff-Appellee, v. Patricia Ann ESSEX, also...

Court: United States Court of Appeals, Sixth Circuit

Date published: Feb 24, 1969

Citations Copy Citation

407 F.2d 214 (6th Cir. 1969)

Citing Cases

U.S. v. Arredondo

Id. at 227-28, 66 S.Ct. 78. We applied Michael in United States v. Essex, 407 F.2d 214 (6th Cir. 1969), to...

U.S. v. Crispo

Defendant begins his argument by noting that § 1503 grew out of the second section of the Act of March 2,...

46 Citing Cases

Make your practice more effective and efficient with Casetext's legal research suite.

Get a Demo

Casetext research
Pricing
Switch
Big firm
Coverage
SmartCite
Law school access
Bar associations

About us
Jobs
News
Twitter
Facebook
LinkedIn
Instagram

Help articles
Customer support
Contact sales
Cookie Settings
Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information
Privacy
Terms

© 2024 Casetext Inc.
Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

# United States v. Faudman

Download PDF

Check Treatment

## Summary

Finding that altering corporate records subpoenaed by grand jury violates Section 1503

Summary of this case from U.S. v. Craft

See 7 Summaries

Meet CoCounsel, pioneering AI that's secure, reliable, and trained for the law.

Try CoCounsel free

## Opinion

No. 78-5209.

Argued December 1, 1980.

21 Decided February 4, 1981. *21

Neil H. Fink, Detroit, Mich., for defendant-appellant.

James K. Robinson, U.S. Atty., Martin Reisig, Alan Gershel, Asst. U.S. Attys., Detroit, Mich., for plaintiff-appellee.

Appeal from the United States District Court for the Eastern District of Michigan.

Before WEICK and LIVELY, Circuit Judges, and SPIEGEL,[–] District Judge.

– The Honorable S. Arthur Spiegel, Judge, United States District Court for the Southern District of Ohio, sitting by designation.

LIVELY, Circuit Judge.

This appeal requires us to decide whether 18 U.S.C. § 1503 (1976),[1] an obstruction of justice statute, may be the basis for prosecuting a person who alters or destroys corporate records with knowledge that the records are being sought by a grand jury investigating the company's activities.

1 § 1503. Influencing or injuring officer, juror or witness generally.

The defendant admitted altering and defacing records of the Borman Company at a time when a federal grand jury was investigating possible Medicare and Medicaid fraud. He knew that the Borman Company's directors had adopted a resolution to cooperate fully with the grand jury and that the records he altered had been requested by the FBI. Some of the records were sought by a grand jury subpoena duces tecum served on the company prior to the time the defendant delivered them in their altered condition to another company official. At trial the defendant presented a two-fold defense. He contended, in the first place, that his acts were not covered by § 1503. His second defense was lack of intent; that he did not intend to obstruct justice, but intended only to protect his brother and the company he had spent his life building. He presented psychiatric testimony to show that he suffered from anxiety neurosis at the time he altered the company records and that this condition deprived him of the capacity to form the intent required for culpability. The jury rejected this defense by its guilty verdict, and the only significant issue on appeal is whether § 1503 reaches the defendant's conduct.

The defendant argues that § 1503 is concerned only with obstruction of justice by threats or force — acts of intimidation — directed at officers, jurors or witnesses. He contends that the proscriptions of § 1503 are limited
22 to threats or actual violence *22 against persons involved in the administration of justice, and that other statutes cover the obstruction of justice by methods not enumerated in § 1503.[2] The government adopts the position of the district court, that the language of § 1503 is sufficiently broad to cover the defendant's acts. The "omnibus" language of § 1503, relied upon by the government, extends culpability under the statute to anyone who "corruptly . . . obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice. . . ." The defendant asserts that any conduct sought to be brought within this language must be similar to one or more of the acts enumerated in earlier portions of the statute; that is, it must involve intimidation of some person by threats or actual use of force.

2 *E. g.,* 18 U.S.C. § 1504 (influencing juror by writing); § 1506 (theft or alteration of record or process); § 1510 (obstruction of criminal investigations by, inter alia, bribery of or misrepresentations to a criminal investigator).

The defendant places heavy reliance on this court's decision in *United States v. Essex,* 407 F.2d 214 (6th Cir. 1969), particularly the following language:

> As a criminal statute 18 U.S.C. § 1503 requires strict construction. The general clause at its end, moreover, must be read to embrace only acts similar to those mentioned in the preceding specific language. *Haili v. United States,* 260 F.2d 744 (9th Cir. 1958). Neither the language of Section 1503 nor its purpose make the rendering of false testimony alone an obstruction of justice. If appellant committed any offense at all, it was the perjury charged in the information against her.

*Id.* at 218. In *Essex* the only act charged against the defendant was perjury before a grand jury. The holding of the court was that perjury before a grand jury is not sufficient, standing alone, to support a conviction under § 1503. The defendant argues that altering records is more akin to testifying falsely than to any of the acts enumerated in § 1503, and thus *Essex* should control this case.

Reliance is also placed upon decisions of the Ninth Circuit in which application of the ejusdem generis rule of construction to § 1503 prosecutions resulted in holdings that particular acts were not covered by the statute. *See Haili v. United States,* 260 F.2d 744 (9th Cir. 1958); *United States v. Metcalf,* 435 F.2d 754 (9th Cir. 1970); *United States v. Ryan,* 455 F.2d 728 (9th Cir. 1972). In *Haili* the court described the "particularly defined instances" in § 1503 as all relating to "conduct designed to interfere with the process of arriving at an appropriate judgment in a pending case and which would disturb the ordinary and proper functions of the court." 260 F.2d at 746. The only acts charged in *Haili* were interfering with the conditions of probation imposed upon a person convicted of a drug offense. It seems clear that the charged acts were of an entirely different kind from those enumerated in § 1503. Proper application of ejusdem generis led to the conclusion that the defendant's actions were not covered by the statute.

In *Metcalf, supra,* the court narrowed its earlier construction in *Haili.* Adopting a more restrictive view of the statute, it held that ordinarily § 1503 is violated only when administration of justice is impeded or obstructed by "intimidating actions." 435 F.2d at 757. This language in *Metcalf* is the strongest support we have found for the defendant's position in the present case. While *Ryan, supra,* required a strict construction of § 1503 and applied ejusdem generis, so many errors were discussed by the court of appeals that it is impossible to be certain of the basis for reversal. Although destruction of documents was involved, the facts in *Ryan* bore little resemblance to those of the present case. The holding appears to be that the Internal Revenue Service may not use grand jury subpoenas to obtain records which it is unable to secure by administrative subpoenas; particularly where it appears the grand jury is not even aware of the issuance of the subpoenas,
23 and the records have no relevance to the grand jury proceedings. *23

We believe prosecution of the defendant in the present case was properly founded on 18 U.S.C. § 1503. Neither the language of the statute nor our decisions require us to hold otherwise. It seems clear that the defendant endeavored "corruptly" to impede grand jury proceedings. The enumerated methods of obstructing justice are listed in the statute in the disjunctive. We disagree with the holding of *Metcalf* that someone must be intimidated for a violation of § 1503 to occur. We also conclude that *Essex* is distinguishable. There the only basis of the charge was the defendant's alleged perjury. She was not charged with interfering with the work of the grand jury in relation to the testimony of any other witness. In the present case, however, it was the testimony of the Borman Company, by way of its corporate records, which was sought by the grand jury. The defendant did impede the administration of justice by altering those records so that the "testimony" of the company would not implicate his brother. The acts of the defendant in the present case were aimed at distorting the evidence to be presented by the company and were intended to impede the administration of justice. These acts violated § 1503.

The court in *Essex,* while finding perjury alone insufficient for a § 1503 prosecution, recognized the propriety of a prosecution for falsifying or destroying records subpoenaed by a grand jury in its discussion of *United States v. Cohen,* 202 F. Supp. 587 (D.Conn. 1962); *United States v. Siegel,* 152 F. Supp. 370 (S.D.N.Y. 1957), *aff'd.,* 263 F.2d 530 (2d Cir. 1959), *cert. denied,* 359 U.S. 552, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1960); and *United States v. Solow,* 138 F. Supp. 812 (S.D.N.Y. 1956). The *Essex* court pointed out that in each of the cited cases the defendant was charged with something more than perjury — thus distinguishing them from *Essex.* 407 F.2d at 218. *Essex* is not to be read as limiting prosecutions under § 1503 to those instances where threats or force are used against a witness, officer or juror.

The rule of ejusdem generis is described in 2A *Sutherland Statutory Construction* (4th Edition) § 47.17 as follows:

> The rule "accomplishes the purpose of giving effect to both the particular and the general words, by treating the particular words as indicating the class, and the general words as extending the provisions of the statute to everything embraced in that class, though not specifically named by the particular words."[3]

3 Quoted from *National Bank of Commerce v. Estate of Ripley,* 161 Mo. 126, 131, 61 S.W. 587, 588 (1901).

The defendant in the present case was charged with "impeding the court in the conduct of its business or endeavoring to do so beyond the mere rendering of false testimony . . . ." *Essex, supra,* 407 F.2d at 218. Moreover, the defendant's conduct was embraced within a class of acts described in the particularized list of § 1503. He corruptly endeavored to impede a witness, the Borman Company, before a grand jury. Unless something more than the precise acts listed in the earlier language was intended for inclusion, the "omnibus" language of § 1503 would be surplusage.

Our view of the reach of § 1503 comports with that of the Third Circuit as expressed in *United States v. Walasek,* 527 F.2d 676 (1975). The facts in *Walasek* were similar to those of the present case. A corporate officer was charged with violating § 1503 by destroying records after being advised that a grand jury subpoena duces tecum for production of the records had been served on an office of the company. Recognizing the rule of ejusdem generis, the court held that its application to 18 U.S.C. § 1503 did not preclude a prosecution for deliberately destroying documents sought by a grand jury subpoena.

The defendant also seeks reversal for alleged errors in the jury instructions. The government argues that no question with respect to instructions was preserved for review since the defendant did not object to the instructions
24 of the court as required by *24 Rule 30, F.R.Crim.P. The defendant contends this court may consider his assignment of three of these claims under the "plain error" provision of Rule 52(b), F.R.Crim.P. and that the fourth was properly preserved. Upon consideration the court concludes that the claims that the jury was improperly instructed on the element of intent, on the defendant's state of mind and on the purpose of 18 U.S.C. § 1503 do not require reversal under the plain error rule. As we stated in *United States v. Vigi,* 515 F.2d 290, 293 (6th Cir.), *cert. denied,* 423 U.S. 912, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975), "In the absence of objection to instructions we cannot consider a claim of error unless the instructions are so manifestly prejudicial as to lead to a miscarriage of justice." (Citations omitted). The instructions complained of, particularly when read in context of the entire jury charge, simply do not meet this test.

The district court gave the following instruction on circumstantial evidence:

> There are two types of evidence. One is direct evidence — such as the testimony of an eyewitness. The other is circumstantial evidence — the proof of a chain of circumstances pointing to the commission of the offense.
>
> As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that, before convicting a defendant, the jury be satisfied of the defendant's guilt beyond a reasonable doubt from all the evidence in the case.

Though the defendant did not object to this instruction as required by Rule 30, he did request in writing an instruction which included a charge that "circumstantial evidence is proof of a chain of facts and circumstances indicating the guilt *or innocence* of a defendant." (Emphasis added). He contends that he was prejudiced by the court's stating that circumstantial evidence may point to the commission of the offense without adding that it may also indicate innocence. Since the requested instruction apprised the trial judge of defendant's position on the matter, his later failure to object to omission of the requested charge does not preclude our consideration of his claim. However, we conclude that any error in the failure to instruct as requested by the defendant was harmless. Rule 52(a), F.R.Crim.P.; *United States v. Eddings,* 478 F.2d 67, 73 (6th Cir. 1973). The jury was fully instructed on the burden of proof and presumption of innocence. Further, it was told to consider the testimony of witnesses and exhibits, regardless of who called the witnesses or produced the exhibits. And a proper instruction on reasonable doubt was given both before and after the one relating to circumstantial evidence.

The cases relied upon by the defendant differ from the present case. In *United States v. Fields,* 466 F.2d 119 (2d Cir. 1972), and *United States v. Clark,* 475 F.2d 240 (2d Cir. 1973), the erroneous circumstantial evidence instructions were prejudicial because of the likelihood of their misleading the jury as to the proof required to establish specific elements of the crimes charged. That was not the case here. The elements of the offense were clearly stated in the instructions, with particular emphasis on the necessity to prove specific intent.

The judgment of the district court is affirmed.

# UNITED STATES v. HANSEN (2023)

United States Supreme Court

UNITED STATES v. HANSEN(2023)

No. 22-179

Argued: March 27, 2023

Decided: June 23, 2023

[illegible]

Welcome to FindLaw's Cases & Codes

[illegible]

Go to Learn About the Law

UNITED STATES v. HANSEN (2023)

Docket No: 22-179

Decided: June 23, 2023

Court: United States Supreme Court

Need to find an attorney?

Find a lawyer

For Legal Professionals

Practice Management

Legal Technology

Law Students

Get a profile on the #1 online legal directory

Sign up

Get email updates from FindLaw Legal Professionals

Subscribe

Opinion of the Court

599 U. S. ____ (2023)

No. 22-179

## UNITED STATES, PETITIONER v. HELAMAN HANSEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2023]

JUSTICE BARRETT delivered the opinion of the Court.

A federal law prohibits "encourag[ing] or induc[ing]" illegal immigration. 8 U. S. C. §1324(a)(1)(A)(iv). After concluding that this statute criminalizes immigration advocacy and other protected speech, the Ninth Circuit held it unconstitutionally overbroad under the First Amendment. That was error. Properly interpreted, this provision forbids only the intentional solicitation or facilitation of certain unlawful acts. It does not "prohibi[t] a substantial amount of protected speech"--let alone enough to justify throwing out the law's "plainly legitimate sweep." *United States* v. *Williams*, 553 U. S. 285, 292 (2008). We reverse.

### I

In 2014, Mana Nailati, a citizen of Fiji, heard that he could become a U. S. citizen through an "adult adoption" program run by Helaman Hansen. Eager for citizenship, Nailati flew to California to pursue the program. Hansen's wife told Nailati that adult adoption was the "quickest and easiest way to get citizenship here in America." App. 88. For $4,500, Hansen's organization would arrange Nailati's adoption, and he could then inherit U. S. citizenship from his new parent. Nailati signed up.

It was too good to be true. There is no path to citizenship through "adult adoption," so Nailati waited for months with nothing to show for it. Faced with the expiration of his visa, he asked Hansen what to do. Hansen advised him to stay: "[O]nce you're in the program," Hansen explained, "you're safe. Immigration cannot touch you." *Id.*, at 92. Believing that citizenship was around the corner, Nailati took Hansen's advice and remained in the country unlawfully.

Hansen peddled his scam to other noncitizens too. After hearing about the program from their pastor, one husband and wife met with Hansen and wrote him a check for $9,000--initially saved for a payment on a house in Mexico--so that they could participate. Another noncitizen paid Hansen out of savings he had accumulated over 21 years as a housepainter. Still others borrowed from relatives and friends. All told, Hansen lured over 450 noncitizens into his program, and he raked in nearly $2 million as a result.

The United States charged Hansen with (among other crimes) violations of §1324(a)(1)(A)(iv). That clause forbids "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." In addition to convicting him under clause (iv), the jury found that Hansen had acted "for the purpose of private financial gain," triggering a higher maximum penalty. App. 116; see §1324(a)(1)(B)(i).

After the verdict came in, Hansen saw a potential way out. Another case involving §1324(a)(1)(A)(iv), *United States* v. *Sineneng-Smith*, was pending before the Ninth Circuit, which had *sua sponte* raised the question whether the clause was an unconstitutionally overbroad restriction of speech. 910 F. 3d 461, 469 (2018). Taking his cue from *Sineneng-Smith*, Hansen moved to dismiss the clause (iv) charges on First Amendment overbreadth grounds. The District Court rejected Hansen's argument and sentenced him.

While Hansen's appeal was pending, the Ninth Circuit held in *Sineneng-Smith* that clause (iv) is unconstitutionally overbroad. *Id.*, at 467-468. That holding was short-lived: We vacated the judgment, explaining that the panel's choice to inject the overbreadth issue into the appeal and appoint *amici* to argue it "departed so drastically from the principle of party presentation as to constitute an abuse of discretion." 590 U. S. ___, ___ (2020) (slip op., at 3). On remand, limited to the arguments that Sineneng-Smith had actually made, the Ninth Circuit affirmed her convictions. 982 F. 3d 766, 770 (2020). But Hansen's appeal was waiting in the wings, giving the Ninth Circuit a second chance to address the overbreadth question. It reprised its original holding in *Sineneng-Smith.*

As in *Sineneng-Smith*, the Ninth Circuit focused on whether clause (iv) is a narrow prohibition covering solicitation and facilitation of illegal conduct, or a sweeping ban that would pull in "statements or conduct that are likely repeated countless times across the country every day." 25 F. 4th 1103, 1110 (2022). It adopted the latter interpretation, asserting that clause (iv) criminalizes speech such as "encouraging an undocumented immigrant to take shelter during a natural disaster, advising an undocumented immigrant about available social services, telling a tourist that she is unlikely to face serious consequences if she overstays her tourist visa, or providing certain legal advice to undocumented immigrants." *Ibid.* Concluding that clause (iv) covers an " 'alarming' " amount of protected speech relative to its narrow legitimate sweep, the Ninth Circuit held the provision facially overbroad. *Ibid.*

The Ninth Circuit denied the Government's petition for rehearing en banc over the dissent of nine judges. Judge Bumatay, who wrote the principal dissent, attributed the panel's overbreadth concern to a misreading of the statute. See 40 F. 4th 1049, 1057-1058 (2022). Correctly interpreted, he explained, clause (iv) reaches only criminal solicitation and aiding and abetting. *Ibid.* On that reading, the provision raises no overbreadth problem because, "[e]ven if §1324(a)(1)(A)(iv) somehow reaches protected speech, that reach is far outweighed by the provision's broad legitimate sweep." *Id.*, at 1072.

We granted certiorari. 598 U. S. ___ (2022).

### II

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." Wisely, Hansen does not claim that the First Amendment protects the communications for which he was prosecuted. Cf. *Illinois ex rel. Madigan* v. *Telemarketing Associates, Inc.*, 538 U. S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud"). Instead, he raises an overbreadth challenge: He argues that clause (iv) punishes so much protected speech that it cannot be applied to *anyone*, including him. Brief for Respondent 9-10.

An overbreadth challenge is unusual. For one thing, litigants typically lack standing to assert the constitutional rights of third parties. See, *e.g.*, *Powers* v. *Ohio*, 499 U. S. 400, 410 (1991). For another, litigants mounting a facial challenge to a statute normally "must establish that *no set of circumstances* exists under which the [statute] would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987) (emphasis added). Breaking from both of these rules, the overbreadth doctrine instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and even at the behest of someone to whom the statute can be lawfully applied.

We have justified this doctrine on the ground that it provides breathing room for free expression. Overbroad laws "may deter or 'chill' constitutionally protected speech," and if would-be speakers remain silent, society will lose their contributions to the "marketplace of ideas." *Virginia* v. *Hicks*, 539 U. S. 113, 119 (2003). To guard against those harms, the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak. *Williams*, 553 U. S., at 292. If the challenger demonstrates that the statute "prohibits a substantial amount of protected speech" relative to its "plainly legitimate sweep," then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid. *Ibid.*; see *Hicks*, 539 U. S., at 118-119.

Because it destroys some good along with the bad, "[i]nvalidation for overbreadth is ' "strong medicine" ' that is not to be 'casually employed.' " *Williams*, 553 U. S., at 293. To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep. *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 14 (1988); *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 800-801 (1984). In the absence of a lopsided ratio, courts must handle unconstitutional applications as they usually do--case-by-case.

### III

#### A

To judge whether a statute is overbroad, we must first determine what it covers. Recall that §1324(a)(1)(A)(iv) makes it unlawful to "encourag[e] or induc[e] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."[1] The issue is whether Congress used "encourage" and "induce" as terms of art referring to criminal solicitation and facilitation (thus capturing only a narrow band of speech) or instead as those terms are used in everyday conversation (thus encompassing a broader swath). An overbreadth challenge obviously has better odds on the latter view.

##### 1

We start with some background on solicitation and facilitation. Criminal solicitation is the intentional encouragement of an unlawful act. ALI, Model Penal Code §5.02(1), p. 364 (1985) (MPC); 2 W. LaFave, Substantive Criminal Law §11.1 (3d ed. 2022) (LaFave). Facilitation--also called aiding and abetting--is the provision of assistance to a wrongdoer with the intent to further an offense's commission. See, *e.g.*, *Twitter, Inc.* v. *Taamneh*, 598 U. S. ___, ___-___ (2023) (slip op., at 13-14). While the crime of solicitation is complete as soon as the encouragement occurs, see LaFave §11.1, liability for aiding and abetting requires that a wrongful act be carried out, see *id.*, §13.2(a). Neither solicitation nor facilitation requires lending physical aid; for both, words may be enough. *Reves* v. *Ernst & Young*, 507 U. S. 170, 178 (1993) (one may aid and abet by providing " 'assistance rendered by words, acts, encouragement, support, or presence' "); MPC §5.02(2), at 365 (solicitation may take place through words or conduct); LaFave §11.1(c) (same). Both require an intent to bring about a particular unlawful act. See, *e.g.*, *Hicks* v. *United States*, 150 U. S. 442, 449 (1893) ("[W]ords of encouragement and abetting must" be used with "the intention as respects the effect to be produced"). And both are longstanding criminal theories targeting those who support the crimes of a principal wrongdoer. See *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.*, 511 U. S. 164, 181 (1994); LaFave §11.1(a).

The terms "encourage" and "induce" are among the "most common" verbs used to denote solicitation and facilitation. *Id.*, §13.2(a); see also 1 J. Ohlin, Wharton's Criminal Law §10:1, p. 298 (16th ed. 2021) (Wharton) ("[A]dditional language--such as *encourage*, counsel, and command--usually accompanies 'aid' or 'abet' " (emphasis added)). In fact, their criminal-law usage dates back hundreds of years. See 40 F. 4th, at 1062-1064 (opinion of Bumatay, J.). A prominent early American legal dictionary, for instance, defines "abet" as "[t]o *encourage* or set another on to commit a crime." 1 J. Bouvier, Law Dictionary 30 (1839) (emphasis added). Other sources agree. See, *e.g.*, Wharton §10:1, at 298 (" 'abet,' " at common law, meant "to *encourage*, advise, or instigate the commission of a crime" (emphasis added)); Black's Law Dictionary 6 (1st ed. 1891) (to "abet" "[i]n criminal law" was "[t]o *encourage*, incite, or set another on to commit a crime" (emphasis added)); cf. *id.*, at 667 (11th ed. 2019) (defining "encourage" with, in part, a cross-reference to "aid and abet").

This pattern is on display in the federal criminal code, which, for over a century, has punished one who "induces" a crime as a principal. See Act of Mar. 4, 1909, §332, 35 Stat. 1152 ("Whoever . . . aids, abets, counsels, commands, *induces*, or procures [the commission of an offense] is a principal" (emphasis added)); 18 U. S. C. §2(a) (listing the same verbs today). The Government offers other examples as well: The ban on soliciting a crime of violence penalizes those who "solici[t], comman[d], *induc[e]*, or otherwise endeavo[r] to persuade" another person "to engage in [the unlawful] conduct." §373(a) (emphasis added). Federal law also criminalizes "persuad[ing], *induc[ing]*, entic[ing], or coerc[ing]" one "to engage in prostitution" or other unlawful sexual activity involving interstate commerce. §§2422(a), (b) (emphasis added). The Model Penal Code echoes these formulations, defining solicitation as, in relevant part, "command[ing], *encourag[ing]* or request[ing] another person to engage in specific [unlawful] conduct." MPC §5.02(1), at 364 (emphasis added). And the commentary to the Model Penal Code notes that similar prohibitions may employ other verbs, such as "induce." See *id.*, Comment 3, at 372-373, n. 25 (collecting examples).

The use of both verbs to describe solicitation and facilitation is widespread in the States too. Nevada considers "[e]very person" who "aided, abetted, counseled, *encouraged*, hired, commanded, *induced*, or procured" an offense to be a principal. Nev. Rev. Stat. §195.020 (2021) (emphasis added). Arizona provides that one who "commands, *encourages*, requests, or solicits another person to engage in specific conduct" commits the offense of solicitation. Ariz. Rev. Stat. Ann. §13-1002(A) (2020) (emphasis added). And New Mexico imposes criminal liability on one who "with the intent" for another to commit a crime "solicits, commands, requests, *induces* . . . or otherwise attempts to promote or facilitate" the offense. N. M. Stat. Ann. §30-28-3(A) (2018) (emphasis added). These States are by no means outliers--"induce" or "encourage" describe similar offenses in the criminal codes of *every* State. App. to Brief for State of Montana et al. as *Amici Curiae* 1-44; see, *e.g.*, Ala. Code §13A-2-23(1) (2015) ("induces"); Colo. Rev. Stat. §18-1-603 (2022) ("encourages"); Fla. Stat. §777.04(2) (2022) ("encourages"); Haw. Rev. Stat. §705-510(1) (2014) ("encourages"); Ind. Code §35-41-2-4 (2022) ("induces"); Kan. Stat. Ann. §21-5303(a) (2020) ("encouraging"); N. D. Cent. Code Ann. §12.1-06-03(1) (2021) ("induces"); Tex. Penal Code Ann. §7.02(a)(2) (West 2021) ("encourages"); W. Va. Code Ann. §61-11-8a(b)(1) (Lexis 2020) ("inducement"); Wyo. Stat. Ann. §6-1-302(a) (2021) ("encourages").

In sum, the use of "encourage" and "induce" to describe solicitation and facilitation is both longstanding and pervasive. And if 8 U. S. C. §1324(a)(1)(A)(iv) refers to solicitation and facilitation as they are typically understood, an overbreadth challenge would be hard to sustain.

##### 2

Hansen, like the Ninth Circuit, insists that clause (iv) uses "encourages" and "induces" in their ordinary rather than their specialized sense. While he offers definitions from multiple dictionaries, the terms are so familiar that two samples suffice. In ordinary parlance, "induce" means "[t]o lead on; to influence; to prevail on; to move by persuasion or influence." Webster's New International Dictionary 1269 (2d ed. 1953). And "encourage" means to "inspire with courage, spirit, or hope." Webster's Third New International Dictionary 747 (1966).

In Hansen's view, clause (iv)'s use of the bare words "encourages" or "induces" conveys these ordinary meanings. See Brief for Respondent 14. "[T]hat encouragement can *include* aiding and abetting," he says, "does not mean it is *restricted* to aiding and abetting." *Id.*, at 25. And because clause (iv) "proscribes encouragement, full stop," *id.*, at 14, it prohibits even an "op-ed or public speech criticizing the immigration system and supporting the rights of long-term undocumented noncitizens to remain, at least where the author or speaker knows that, or recklessly disregards whether, any of her readers or listeners are undocumented." *Id.*, at 17-18. If the statute reaches the many examples that Hansen posits, its applications to protected speech might swamp its lawful applications, rendering it vulnerable to an overbreadth challenge.

#### B

We hold that clause (iv) uses "encourages or induces" in its specialized, criminal-law sense--that is, as incorporating common-law liability for solicitation and facilitation. In truth, the clash between definitions is not much of a contest. "Encourage" and "induce" have well-established legal meanings--and when Congress "borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word." *Morissette* v. *United States*, 342 U. S. 246, 263 (1952); see also, *e.g.*, *United States* v. *Shabani*, 513 U. S. 10, 13-14 (1994).

To see how this works, consider the word "attempts," which appears in clause (iv)'s next-door neighbors. See §§1324(a)(1)(A)(i)-(iii). In a criminal prohibition, we would not understand "attempt" in its ordinary sense of "try." Webster's New Universal Unabridged Dictionary 133 (2d ed. 2001). We would instead understand it to mean taking "a substantial step" toward the completion of a crime with the requisite *mens rea*. *United States* v. *Resendiz-Ponce*, 549 U. S. 102, 107 (2007). "Encourages or induces" likewise carries a specialized meaning. After all, when a criminal-law term is used in a criminal-law statute, that--in and of itself--is a good clue that it takes its criminal-law meaning. And the inference is even stronger here, because clause (iv) prohibits "encouraging" and "inducing" *a violation of law*. See §1324(a)(1)(A)(iv). That is the focus of criminal solicitation and facilitation too.

In concluding otherwise, the Ninth Circuit stacked the deck in favor of ordinary meaning. See 25 F. 4th, at 1109-1110; see also *United States* v. *Hernandez-Calvillo*, 39 F. 4th 1297, 1304 (CA10 2022) ("Our construction of [the verbs in clause (iv)] begins with their ordinary meaning, not their specialized meaning in criminal law"). But it should have given specialized meaning a fair shake. When words have several plausible definitions, context differentiates among them. That is just as true when the choice is between ordinary and specialized meanings, see, *e.g.*, *Corning Glass Works* v. *Brennan*, 417 U. S. 188, 202 (1974) ("While a layman might well assume that time of day worked reflects one aspect of a job's 'working conditions,' the term has a different and much more specific meaning in the language of industrial relations"), as it is when a court must choose among multiple ordinary meanings, see, *e.g.*, *Muscarello* v. *United States*, 524 U. S. 125, 127-128 (1998) (choosing between ordinary meanings of "carry"). Here, the context of these words--the water in which they swim--indicates that Congress used them as terms of art.

Statutory history is an important part of this context. In 1885, Congress enacted a law that would become the template for clause (iv). That law prohibited "knowingly assisting, *encouraging* or soliciting" immigration under a contract to perform labor. Act of Feb. 26, 1885, ch. 164, §3, 23 Stat. 333 (1885 Act) (emphasis added). Then, as now, "encourage" had a specialized meaning that channeled accomplice liability. See 1 Bouvier, Law Dictionary 30 ("abet" means "[t]o encourage or set another on to commit a crime"); Black's Law Dictionary 6 (1891) (to "abet" is "[t]o encourage, incite, or set another on to commit a crime"). And the words "assisting" and "soliciting," which appeared alongside "encouraging" in the 1885 Act, reinforce that Congress gave the word "encouraging" its narrower criminal-law meaning. See *Dubin* v. *United States*, 599 U. S. ___, ___ (2023) (slip op., at 12) (a word capable of many meanings is refined by its neighbors, which often " 'avoid[s] the giving of unintended breadth to the Acts of Congress' "). Unsurprisingly, then, when this Court upheld the 1885 Act against a constitutional challenge, it explained that Congress "has the power to punish any who *assist*" in introducing noncitizens into the country--without suggesting that the term "encouraging" altered the scope of the prohibition. *Lees* v. *United States*, 150 U. S. 476, 480 (1893) (emphasis added).

In the ensuing decades, Congress both added to and subtracted from the "encouraging" prohibition in the 1885 Act. Throughout, it continued to place "encouraging" alongside "assisting" and "soliciting." See Act of Mar. 3, 1903, §5, 32 Stat. 1214-1215; Act of Feb. 20, 1907, §5, 34 Stat. 900. Then, in 1917, Congress added "induce" to the string of verbs. Act of Feb. 5, 1917, §5, 39 Stat. 879 (1917 Act) (making it a crime "to induce, assist, encourage, or solicit, or attempt to induce, assist, encourage, or solicit the importation or migration of any contract laborer . . . into the United States"). Like "encourage," the word "induce" carried solicitation and facilitation overtones at the time of this enactment. See Black's Law Dictionary 617 (1891) (defining "inducement" to mean "that which leads or tempts to the commission of crime"). In fact, Congress had just recently used the term in a catchall prohibition on criminal facilitation. See Act of Mar. 4, 1909, §332, 35 Stat. 1152 ("Whoever . . . aids, abets, counsels, commands, *induces*, or procures [the commission of an offense], is a principal" (emphasis added)). And as with "encourage," the meaning of "induce" was clarified and narrowed by its statutory neighbors in the 1917 Act--"assist" and "solicit."

Congress enacted the immediate forerunner of the modern clause (iv) in 1952 and, in doing so, simplified the language from the 1917 Act. Most notably, the 1952 version dropped the words "assist" and "solicit," instead making it a crime to "willfully or knowingly encourag[e] or induc[e], or attemp[t] to encourage or induce, either directly or indirectly, the entry into the United States of . . . any alien . . . not lawfully entitled to enter or reside within the United States." Immigration and Nationality Act, §274(a)(4), 66 Stat. 229. Three decades later, Congress brought 8 U. S. C. §1324(a)(1)(A)(iv) into its current form--still without the words "assist" or "solicit." Immigration Reform and Control Act of 1986, §112(a), 100 Stat. 3382 (making it a crime to "encourag[e] or induc[e] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law").

On Hansen's view, these changes dramatically broadened the scope of clause (iv)'s prohibition on encouragement. Before 1952, he says, the words "assist" and "solicit" may have cabined "encourage" and "induce," but eliminating them severed any connection the prohibition had to solicitation and facilitation. Brief for Respondent 25-26. In other words, Hansen claims, the 1952 and 1986 revisions show that Congress opted to make "protected speech, not conduct, a crime." *Id.*, at 27.

We do not agree that the mere removal of the words "assist" and "solicit" turned an ordinary solicitation and facilitation offense into a novel and boundless restriction on speech. Hansen's argument would require us to assume that Congress took a circuitous route to convey a sweeping--and constitutionally dubious--message. The better understanding is that Congress simply "streamlined" the pre-1952 statutory language--which, as any nonlawyer who has picked up the U. S. Code can tell you, is a commendable effort. 40 F. 4th, at 1066 (opinion of Bumatay, J.). In fact, the streamlined formulation mirrors this Court's own description of the 1917 Act, which is further evidence that Congress was engaged in a cleanup project, not a renovation. See *United States* v. *Lem Hoy*, 330 U. S. 724, 727 (1947) (explaining that the 1917 Act barred "contract laborers, defined as persons *induced or encouraged* to come to this country by offers or promises of employment" (emphasis added)); *id.*, at 731 (describing the 1917 Act as a "prohibition against employers *inducing* laborers to enter the country" (emphasis added)). And critically, the terms that Congress retained ("encourage" and "induce") substantially overlap in meaning with the terms it omitted ("assist" and "solicit"). LaFave §13.2(a). Clause (iv) is best understood as a continuation of the past, not a sharp break from it.

#### C

Hansen's primary counterargument is that clause (iv) is missing the necessary *mens rea* for solicitation and facilitation. Brief for Respondent 28-31. Both, as traditionally understood, require that the defendant specifically intend that a particular act be carried out. *Supra*, at 6. "Encourages or induces," however, is not modified by any express intent requirement. Because the text of clause (iv) lacks that essential element, Hansen protests, it cannot possibly be limited to either solicitation or facilitation.

Once again, Hansen ignores the longstanding history of these words. When Congress transplants a common-law term, the " 'old soil' " comes with it. *Taggart* v. *Lorenzen*, 587 U. S. ___, ___-___ (2019) (slip op., at 5-6). So when Congress placed "encourages" and "induces" in clause (iv), the traditional intent associated with solicitation and facilitation was part of the package. That, in fact, is precisely how the federal aiding-and-abetting statute works. It contains no express *mens rea* requirement, providing only that a person who "aids, abets, counsels, commands, induces or procures" a federal offense is "punishable as a principal." 18 U. S. C. §2(a). Yet, consistent with "a centuries-old view of culpability," we have held that the statute implicitly incorporates the traditional state of mind required for aiding and abetting. *Rosemond* v. *United States*, 572 U. S. 65, 70-71 (2014).

Clause (iv) is situated among other provisions that work the same way. Consider those that immediately follow it: The first makes it a crime to "engag[e] in any conspiracy to commit any of the preceding acts," 8 U. S. C. §1324(a)(1)(A)(v)(I), and the second makes it a crime to "ai[d] or abe[t] the commission of any of the preceding acts," §1324(a)(1)(A)(v)(II). Neither of these clauses explicitly states an intent requirement. Yet both conspiracy and aiding and abetting are familiar common-law offenses that contain a particular *mens rea*. See *Rosemond*, 572 U. S., at 76 (aiding and abetting); *Ocasio* v. *United States*, 578 U. S. 282, 287-288 (2016) (conspiracy). Take an obvious example: If the words "aids or abets" in clause (v)(II) were considered in a vacuum, they could be read to cover a person who inadvertently helps another commit a §1324(a)(1)(A) offense. But a prosecutor who tried to bring such a case would not succeed. Why? Because aiding and abetting implicitly carries a *mens rea* requirement--the defendant generally must *intend* to facilitate the commission of a crime. LaFave §13.2(b). Since "encourages or induces" in clause (iv) draws on the same common-law principles, it too incorporates them implicitly.[2]

Still, Hansen reiterates that if Congress had wanted to require intent, it could easily have said so--as it did elsewhere in clause (iv). The provision requires that the defendant encourage or induce an unlawful act *and* that the defendant "kno[w]" or "reckless[ly] disregard" the fact that the act encouraged "is or will be in violation of law." §1324(a)(1)(A)(iv). Yet while Congress spelled out this requirement, it included no express *mens rea* element for "encourages or induces." Indeed, Hansen continues, the statute used to require that the encouragement or inducement be committed "willfully or knowingly," but Congress deleted those words in 1986. Brief for Respondent 30. Taken together, Hansen says, this evidence reflects that Congress aimed to make a defendant liable for "encouraging or inducing" without respect to her state of mind.

But there is a simple explanation for why "encourages or induces" is not modified by an express *mens rea* requirement: There is no need for it. At the risk of sounding like a broken record, "encourage" and "induce," as terms of art, carry the usual attributes of solicitation and facilitation--including, once again, the traditional *mens rea*. Congress might have rightfully seen the express *mens rea* requirement as unnecessary and cut it in a further effort to streamline clause (iv). And in any event, the omission of the unnecessary modifier is certainly not enough to overcome the "presumption of scienter" that typically separates wrongful acts "from 'otherwise innocent conduct.' " *Xiulu Ruan* v. *United States*, 597 U. S. ___, ___ (2022) (slip op., at 5); see also *Elonis* v. *United States*, 575 U. S. 723, 736-737 (2015).

Nor does the scienter applicable to a distinct element within clause (iv)--that the defendant "kno[w]" or "reckless[ly] disregard . . . the fact that" the noncitizen's "coming to, entry, or residence is or will be in violation of law"--tell us anything about the *mens rea* for "encourages or induces." Many criminal statutes do not require knowledge of illegality, but rather only " 'factual knowledge as distinguished from knowledge of the law.' " *Bryan* v. *United States*, 524 U. S. 184, 192 (1998). So Congress's choice to specify a mental state for this element tells us something that we might not normally infer, whereas the inclusion of a *mens rea* requirement for "encourages or induces" would add nothing.

It bears emphasis that even if the Government's reading were not the best one, the interpretation is at least " 'fairly possible' "--so the canon of constitutional avoidance would still counsel us to adopt it. *Jennings* v. *Rodriguez*, 583 U. S. ___, ___ (2018) (slip op., at 12). This canon is normally a valuable ally for criminal defendants, who raise the prospect of unconstitutional applications to urge a narrower construction. But Hansen presses the clause toward the most expansive reading possible, effectively asking us to apply a canon of " 'constitutional collision.' " 40 F. 4th, at 1059 (opinion of Bumatay, J.). This tactic is understandable in light of the odd incentives created by the overbreadth doctrine, but it is also wrong. When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict.[3]

### IV

Section 1324(a)(1)(A)(iv) reaches no further than the purposeful solicitation and facilitation of specific acts known to violate federal law. So understood, the statute does not "prohibi[t] a substantial amount of protected speech" relative to its "plainly legitimate sweep." *Williams*, 553 U. S., at 292.

Start with clause (iv)'s valid reach. Hansen does not dispute that the provision encompasses a great deal of nonexpressive conduct--which does not implicate the First Amendment at all. Brief for Respondent 22-23. Consider just a few examples: smuggling noncitizens into the country, see *United States* v. *Okatan*, 728 F. 3d 111, 113-114 (CA2 2013); *United States* v. *Yoshida*, 303 F. 3d 1145, 1148-1151 (CA9 2002), providing counterfeit immigration documents, see *United States* v. *Tracy*, 456 Fed. Appx. 267, 269-270 (CA4 2011) (*per curiam*); *United States* v. *Castillo- Felix*, 539 F. 2d 9, 11 (CA9 1976), and issuing fraudulent Social Security numbers to noncitizens, see *Edwards* v. *Prime, Inc.*, 602 F. 3d 1276, 1295-1297 (CA11 2010). A brief survey of the Federal Reporter confirms that these are heartland clause (iv) prosecutions. See 40 F. 4th, at 1072 (opinion of Bumatay, J.) (listing additional examples, including arranging fraudulent marriages and transporting noncitizens on boats). So the "plainly legitimate sweep" of the provision is extensive.

When we turn to the other side of the ledger, we find it pretty much blank. Hansen fails to identify a single prosecution for ostensibly protected expression in the 70 years since Congress enacted clause (iv)'s immediate predecessor. Instead, he offers a string of hypotheticals, all premised on the expansive ordinary meanings of "encourage" and "induce." In his view, clause (iv) would punish the author of an op-ed criticizing the immigration system, "[a] minister who welcomes undocumented people into the congregation and expresses the community's love and support," and a government official who instructs "undocumented members of the community to shelter in place during a natural disaster." Brief for Respondent 16-19. Yet none of Hansen's examples are filtered through the elements of solicitation or facilitation--most importantly, the requirement (which we again repeat) that a defendant *intend* to bring about a specific result. See, *e.g.*, *Rosemond*, 572 U. S., at 76. Clause (iv) does not have the scope Hansen claims, so it does not produce the horribles he parades.

To the extent that clause (iv) reaches *any* speech, it stretches no further than speech integral to unlawful conduct.[4] "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490, 502 (1949). Speech intended to bring about a particular unlawful act has no social value; therefore, it is unprotected. *Williams*, 553 U. S., at 298. We have applied this principle many times, including to the promotion of a particular piece of contraband, *id.*, at 299, solicitation of unlawful employment, *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations*, 413 U. S. 376, 388 (1973), and picketing with the "sole, unlawful [and] immediate objective" of "induc[ing]" a target to violate the law, *Giboney*, 336 U. S., at 502. It applies to clause (iv) too.[5]

Hansen has no quibble with that conclusion to the extent that clause (iv) criminalizes speech that solicits or facilitates a *criminal* violation, like crossing the border unlawfully or remaining in the country while subject to a removal order. See §§1253(a), 1325(a), 1326(a). He agrees that these applications of §1324(a)(1)(A)(iv) are permissible--in fact, he concedes that he would lose if clause (iv) covered only solicitation and facilitation of criminal conduct. Tr. of Oral Arg. 61-62. But he resists the idea that the First Amendment permits Congress to *criminalize* speech that solicits or facilitates a *civil* violation--and some immigration violations are only civil. Brief for Respondent 38. For instance, residing in the United States without lawful status is subject to the hefty penalty of removal, but it generally does not carry a criminal sentence. See *Arizona* v. *United States*, 567 U. S. 387, 407 (2012).

Call this the "mismatch" theory: Congress can impose criminal penalties on speech that solicits or facilitates a criminal violation and civil penalties on speech that solicits or facilitates a civil violation--but it cannot impose criminal penalties on speech that solicits or facilitates a civil violation. See Tr. of Oral Arg. 62-63; Brief for Eugene Volokh as *Amicus Curiae* 5-7. If this theory is sound, then clause (iv) reaches some expression that is outside the speech-integral-to-unlawful-conduct exception. Of course, "that speech is not categorically unprotected does not mean it is immune from regulation, but only that ordinary First Amendment scrutiny would apply." Brief for Respondent 44.

We need not address this novel theory, because even if Hansen is right, his overbreadth challenge fails. To succeed, he has to show that clause (iv)'s overbreadth is "*substantial* . . . relative to [its] plainly legitimate sweep." *Williams*, 553 U. S., at 292. As we have discussed, the provision has a wide legitimate reach insofar as it applies to nonexpressive conduct and speech soliciting or facilitating criminal violations of immigration law. Even assuming that clause (iv) reaches some protected speech, and even assuming that its application to all of that speech is unconstitutional, the ratio of unlawful-to-lawful applications is not lopsided enough to justify the "strong medicine" of facial invalidation for overbreadth. *Broadrick* v. *Oklahoma*, 413 U. S. 601, 613 (1973). In other words, Hansen asks us to throw out too much of the good based on a speculative shot at the bad. This is not the stuff of overbreadth--as-applied challenges can take it from here.

* * *

The judgment of the Ninth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

It is so ordered.

THOMAS, J., concurring

599 U. S. ____ (2023)

No. 22-179

## UNITED STATES, PETITIONER v. HELAMAN HANSEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 23, 2023]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full. I write separately to emphasize how far afield the facial overbreadth doctrine has carried the Judiciary from its constitutional role. The facial overbreadth doctrine "purports to grant federal courts the power to invalidate a law" that is constitutional as applied to the party before it " 'if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " *Americans for Prosperity Foundation* v. *Bonta*, 594 U. S. ___, ___ (2021) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 2) (quoting *United States* v. *Sineneng-Smith*, 590 U. S. ___, ___ (2020) (THOMAS, J., concurring) (slip op., at 1)). As I have explained, this doctrine "lacks any basis in the text or history of the First Amendment, relaxes the traditional standard for facial challenges," and distorts the judicial role. *Id.*, at ___ (slip op., at 9).

There is no question that the First Amendment does not shield respondent's scheme from prosecution under 8 U. S. C. §1324(a)(1)(A)(iv), which prohibits "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." Respondent defrauded nearly 500 aliens by telling them that they could become U. S. citizens through adult adoption; he charged them up to $10,000 apiece, knowing full well that his scheme would not lead to citizenship. The Ninth Circuit even acknowledged below that "it is clear," both "from previous convictions under the statute . . . and likely from [respondent's] conduct here, that [§1324(a)(1)(A)(iv)] has at least some 'plainly legitimate sweep.' " 25 F. 4th 1103, 1106-1107 (2022).

appeared. The delta between the purportedly narrow version of the statute that the majority points to, and what later happened to the statutory text, is important--and there is no dispute that Congress later removed the terms "soliciting" and "assisting" from the encouragement provision, leaving "encouraging" and "inducing" to stand "in isolation," 553 U. S., at 294. See *ante*, at 13. Tracing the history over time clearly establishes that Congress deleted the very narrowing terms that the majority now reads back into the statute.[4]

The majority brushes off Congress's revision by speculating that Congress was merely "engaged in a cleanup project" and was just "streamlin[ing]" the statutory language. *Ibid.* This contention, however, gets our ordinary presumption in statutory interpretation cases precisely backwards. We "usually presume differences in language . . . convey differences in meaning," absent some indication from Congress to the contrary. *BNSF R. Co.* v. *Loos*, 586 U. S. ___, ___ (2019) (slip op., at 10) (internal quotation marks omitted). Thus, we have found the presumption overcome where, for example, Congress has expressly "billed" the changes as "effect[ing] only '[t]echnical [a]mendments.' " *Id.*, at ___ (slip op., at 9).

Here, the majority points to no signal from Congress that it sought to change the encouragement provision's language without changing its meaning. It seems that the only support the majority can muster for its "cleanup project" theory is a 1947 Supreme Court case that at several points refers to the statute as a prohibition on "encourag[ing]" or "induc[ing]" certain unlawful immigration. *Ante*, at 13 (citing *United States* v. *Lem Hoy*, 330 U. S. 724 (1947)). From this, the majority infers that, when Congress amended the encouragement provision five years later to remove the words "solicit" and "assist," it must have been adopting *Lem Hoy*'s shorthand characterization of the statute. But the majority fails to support this connection--tenuous on its face--with any evidence that Congress actually consulted our 1947 decision when it drafted the 1952 amendments, or anything else that might establish the primary significance that the majority ascribes to our decision's phrasing.

The majority similarly characterizes Congress's decision to remove the intent requirement from the statute in 1986 as "a further effort to streamline" the encouragement provision. *Ante*, at 16. In other words, the Court today holds that Congress's removal of "willfully or knowingly" in the 1986 amendments did not change the *mens rea* required to violate this statute. But the majority offers no support at all for its view that Congress didn't *really* mean for the amendment to effect any substantive change. Instead, it conjures up its own "simple explanation": There was "no need" for an explicit *mens rea* because "encourage" and "induce" carry the *mens rea* associated with solicitation and facilitation. *Ante*, at 15; see also *ante*, at 14 (reasoning that Congress's use of "encourages" and "induces" brought along the "old soil" of "the traditional intent associated with solicitation and facilitation" (internal quotation marks omitted)). Of course, this argument merely assumes that Congress intended for "encourage" and "induce" as they appear in the encouragement provision to mean "solicit" and "facilitate"; it is a repackaging of the majority's unwarranted conflation of those terms. See Part II-A, *supra*.

The majority also invokes the presumption that a criminal law contains an intent requirement even where Congress does not explicitly include one. *Ante*, at 15-16. But, here, the statutory history undermines that presumption. Congress most certainly focused on the *mens rea* question because it not only decided to remove "willfully or knowingly" from the statute, it did so while inserting a separate *mens rea* requirement for the knowledge of the noncitizen's immigration status. The confluence of these choices implies that Congress's removal of the primary *mens rea* requirement was deliberate. And, when this deliberate choice is considered alongside the history of the provision's significant expansions, there is ample cause to think that Congress intended a substantive change in meaning.

### C

Other features of the encouragement provision (beyond its plain text and historical development) also suggest that Congress did not mean for the statute to be construed in accordance with established characteristics of solicitation or aiding and abetting. These features further highlight the poor fit between this statute and the narrow solicitation/aiding-and-abetting box into which the majority tries to squeeze Congress's broad language.

Recall that, in 1986, Congress made it a crime to encourage or induce a noncitizen not just to "come to" or "enter" the United States, but also to "reside" in this country. 100 Stat. 3382; *supra*, at 8-9.[5] As the majority notes, while it is a crime for a noncitizen to *enter* the United States illegally, it is generally not a crime--just a civil violation--to *remain* in the United States without lawful status, such as when a noncitizen overstays a visitor or student visa. See *Arizona* v. *United States*, 567 U. S. 387, 407 (2012); see *ante*, at 19. Thus, the encouragement provision on its face appears to *criminally* punish someone who merely encourages or induces a *civil* violation.[6]

That feature of the provision does not sit easily with its categorization as a solicitation or facilitation statute, because, ordinarily, a person may only be held criminally liable for aiding and abetting or solicitation when the underlying offense *is itself a crime.* Aiding-and-abetting liability is "a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond* v. *United States*, 572 U. S. 65, 70 (2014) (citing J. Hawley & M. McGregor, Criminal Law 81 (1899)); see also 18 U. S. C. §2(a) (the general federal aiding-and-abetting statute, providing that someone who "aids, abets, counsels, commands, induces or procures" the commission of a federal crime "is punishable as a principal"). As for solicitation, at common law, the solicited offense had to be a felony or a serious misdemeanor; otherwise, "the solicitor [was] guilty of no offense." 1 J. Ohlin, Wharton's Criminal Law §9:2 (16th ed. 2021) (Wharton's). Today, "in some jurisdictions, the offense solicited may be a felony or a misdemeanor; but in others, it can only be a felony"--either way, though, the underlying offense must be criminal. *Ibid.* (footnotes omitted); see also 18 U. S. C. §373 (the general federal solicitation statute, which is limited to the solicitation of violent felonies).

Here, by contrast, the encouragement provision on its face appears to permit a person to be punished as a felon for merely encouraging a civil violation. Thus, the statute is not an easy fit for the solicitation and facilitation role in which the majority has cast it.

This statute is fundamentally different from aiding-and-abetting liability and solicitation in other ways as well. As noted, aiding-and-abetting liability is a form of vicarious liability--*i.e.*, a way in which a person becomes liable for the crimes of the principal. Likewise, for solicitation, "the punishment . . . is usually geared to . . . the punishment provided for the offense solicited." Wharton's §9:11; see, *e.g.*, 18 U. S. C. §373(a) (providing, for example, punishment of "not more than one-half the maximum term of imprisonment . . . of the crime solicited"). But, notably, a person who violates the encouragement provision is not punished as if he were a principal of the underlying offense, nor does the prescribed punishment depend on the penalty for the underlying offense. So, for example, even if the underlying immigration offense is a civil violation, the person who encourages or induces that infraction could be punished by up to 10 years' imprisonment for violating the encouragement provision. Unlike solicitation and facilitation, then, punishment for violation of the encouragement provision is not tied in any way to the punishment prescribed for the underlying offense.

It is also telling that aiding-and-abetting liability (but not solicitation) requires that the principal *actually* commit the underlying offense. 2 W. LaFave, Substantive Criminal Law §13.3(c) (3d ed. 2018) ("[T]he guilt of the principal must be established at the trial of the accomplice as a part of the proof on the charge against the accomplice"). Yet, the encouragement provision on its face does not require that a noncitizen actually enter or reside in the United States.

* * *

For these reasons, none of the traditional tools of statutory interpretation makes the encouragement provision readily susceptible to the majority's narrowing construction.

### III

The majority nevertheless revises the statute, leaning on the canon of constitutional avoidance. *Ante*, at 16-17.[7] But that canon "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings* v. *Rodriguez*, 583 U. S. ___, ___ (2018) (slip op., at 12) (internal quotation marks omitted). It does not give the Court license "to rewrite a statute as it pleases." *Id.*, at ___ (slip op., at 14). And, here, for the reasons explained above, it is clear that the majority has mounted "a serious invasion of the legislative domain." *Stevens*, 559 U. S., at 481 (internal quotation marks omitted). The majority's rescue mission is especially problematic because it is taking place in the context of a First Amendment challenge to a statute on overbreadth grounds, as explained below.

### A

Overbreadth challenges are an "exception to the usual rules governing standing," a variation the Court has long permitted in recognition of the "danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Dombrowski*, 380 U. S., at

implores us to read into the statute the very element that it earlier opposed as atextual. See Brief for United States 23-28.

This debacle exemplifies the real and ever-present risk of continuing to have facially overbroad criminal statutes on the books. In its role as prosecutor, the Government often stakes out a maximalist position, only later to concede limits when the statute upon which it relies might be struck down entirely and the Government finds itself on its back foot.[10] I am not suggesting bad faith on anyone's part; these kinds of turnabouts might well be chalked up to institutional incentives and coordination challenges in a massive prosecutorial system. But given these dynamics, the answer to whether the Government has, as of today, prosecuted Hansen's hypothetical scenarios may understandably provide cold comfort to those living and working with immigrants.

In any event, it makes little sense for the number of unconstitutional prosecutions to be the litmus test for whether speech is being chilled by a facially overbroad statute. The number of people who have not exercised their right to speak out of fear of prosecution is, quite frankly, unknowable.

Moreover, criminal prosecutions are not the only method by which statutes can be wielded to chill free speech. Hansen's *amici* detail how Customs and Border Protection (CBP) relied on the encouragement provision to justify its creation of a "watchlist" of potential speakers that CBP had compiled in connection with its monitoring of a large group of migrants--a list that included journalists simply reporting factual information about the group's progress. Brief for Reporters Committee for Freedom of the Press as *Amicus Curiae* 5-6. CBP allegedly compiled dossiers on those reporters and singled them out as targets for special screenings. *Ibid.* There can be no doubt that this kind of Government surveillance--targeted at journalists reporting on an important topic of public concern, no less--tends to chill speech, even though it falls short of an actual prosecution.

Hansen's *amici* also describe how a group of Members of Congress recently sent a letter to three religious organizations that help undocumented immigrants, directing the organizations to preserve documents and communications related to their work in advance of a potential congressional investigation into whether such organizations are " 'harbor[ing], transport[ing], and *encourag[ing]* ' " noncitizens to settle unlawfully in this country. Brief for Religious Organizations as *Amici Curiae* 34 (emphasis added). Again, this kind of letter invoking the language of the encouragement provision can plainly chill speech, even though it is not a prosecution (and, for that matter, even if a formal investigation never materializes).

The majority nevertheless derides the fears of Hansen and his *amici* as an overimaginative "parad[e]" of "horribles." *Ante*, at 18. But what may seem "fanciful" to this Court at great remove, *ante*, at 5, might well prove to be a significant obstacle for those on the ground who operate daily in the shadow of the law. The "gravity" of the encouragement provision's chilling effect is "underscored by the filings of . . . *amici curiae* in support of " Hansen--including briefs from lawyers, immigration advocacy organizations, religious and other charitable organizations, journalists, local governments, and nonprofit policy institutions from across the ideological spectrum. *Americans for Prosperity Foundation* v. *Bonta*, 594 U. S. ___, ___ (2021) (slip op., at 17).

The substantial concerns that *amici* from such diverse walks of life raise illustrate that the "deterrent effect feared by" Hansen and his *amici* "is real and pervasive." *Id.*, at ___ (slip op., at 18). Moreover, at the end of the day, those fears reflect a determination to view enacted statutes as serious business, and, essentially, to take Congress at its word. This Court should have done the same.

As written, the encouragement provision is overbroad. Therefore, it should have been deemed facially unconstitutional and invalid under the First Amendment, as the Ninth Circuit held.

---

## FOOTNOTES

**Footnote 1**
Although the statutory terms are not coextensive, we use "alien" and "noncitizen" as rough equivalents here. See 8 U. S. C. §1101(a)(3); *Barton* v. *Barr*, 590 U. S. ___, ___, n. 2 (2020) (slip op., at 3, n. 2).

**Footnote 2**
The Ninth Circuit believed that the Government's "solicitation and facilitation" reading of clause (iv) would create impermissible surplusage with the aiding-and-abetting provision in clause (v)(II). 25 F. 4th 1103, 1108-1109 (2022). Hansen does not press that argument before this Court--for good reason. Clause (iv) criminalizes the aiding and abetting of an immigration violation, whereas clause (v)(II) prohibits the aiding and abetting of "any of the preceding acts." In other words, clause (v)(II) applies to aiding and abetting a first-line *facilitator*. Another difference: Clause (iv) criminalizes not only facilitation, but solicitation too.

**Footnote 3**
The canon of constitutional avoidance is a problem for the dissent. Attempting to overcome it, JUSTICE JACKSON suggests that the canon has less force in the context of an overbreadth challenge. *Post*, at 17. Our

From Casetext: Smarter Legal Research

# United States v. Griffin

Download PDF
Check Treatment

## Summary

Rejecting the argument that the legislative history of § 1503 militates against applying the statute to a witness's in-court statements

Summary of this case from United States v. Bonds

See 12 Summaries

Take care of legal research in a matter of minutes with CoCounsel, your new AI legal assistant.

Try CoCounsel free

## Opinion

No. 78-5093.

201 February 6, 1979. *201

Richard B. Bergstresser, Miami, Fla., for defendant-appellant.

Jack V. Eskenazi, U.S. Atty., Miami, Fla., James A. Hunolt, Atty., Crim. Div., App. Sec., Joseph S. Davies, Jr., Atty., Washington, D.C., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before WISDOM, GODBOLD and TJOFLAT, Circuit Judges.

WISDOM, Circuit Judge:

Thomas Griffin appeals his conviction under an indictment that charged him with "corruptly endeavor[ing] to obstruct the due administration of justice by testifying falsely" before a federal grand jury. In *United States v. Howard*, 5 Cir. 1978, 569 F.2d 1331, 1334, and *United States v. Partin*, 5 Cir. 1977, 552 F.2d 621, 631, *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189, we left open the question whether perjury by a witness can constitute an obstruction of justice punishable under 18 U.S.C. § 1503. The defendant objects on three grounds to the use of § 1503 to punish false testimony. He maintains first that the plain language of the statute covers obstructions of justice that result only from the actor's interferences with other witnesses, jurors, or court officials. Because § 1503 was originally enacted as a contempt statute, the defendant also argues that Congress did not intend the statute to cover simple perjury, an act not punishable summarily as contempt of court. Finally, Griffin urges that the statute would be unconstitutional if applied to this case because it does not give fair notice that it punishes false testimony. We reject these arguments and hold that the indictment states an offense under § 1503. Accordingly, we affirm the conviction.

## I.

In September 1975, an Argentinian aircraft bound for Panama crashed at Miami International Airport. A bank bag containing $15,046 was discovered in the wreckage. In October the Federal Bureau of Investigation began to investigate whether the flight was connected to loan sharking activities, including the transportation of money out of the country. The investigation soon focused on Charles "Bob" Ebeling and John Cifarelli, who were placed under electronic surveillance.

In January 1976, the FBI intercepted a number of conversations between the defendant Griffin and Ebeling. In these conversations, they discussed various ways to recover the money found in the crash. They also talked about a debt that Griffin owed Ebeling. Ebeling spoke of attempting to collect from a number of people indebted to him and said that he owed a substantial amount of money himself. The names of several individuals, including Jack, Dominick, and Angelo, figured prominently in the conversations. Although the FBI never identified these individuals, one name the defendant mentioned, Felix Herrerro, was identified as a

202 passenger who died in the Miami crash. *202

On March 9, 1976, Griffin was called to testify before a grand jury investigating the financing of loan sharking operations and the possible movement of money from the United States to South America. In response to questions concerning the crash, the debts, and the individuals mentioned in the conversations, Griffin either flatly denied knowledge or relied on an inability to recall the facts about which he was questioned. The following answers illustrate the nature of his testimony:

> Q. What's your relationship with Bob, also known as Charles William Ebeling?
>
> A. None, I just met him at the track and that's it. I don't even know his name.
>
> Q. Do you know anything about a plane crash of a plane going to South America?

A. Know anything about? No. sir.

> Q. Have you ever discussed with Mr. Ebeling, Bob, anything about a plane crash being on its way to South America?

A. Not that I can recall, with him.

. . . . .

Q. Do you know Felix Herrerro?

> A. No, I do not. I know a Felix, but it is not Herrerro.

Q. Do you know an individual named Jack?

A. Jack?

Q. Yes.

A. Jack, not that I can recall. In regards to what?

Q. In regards to anything.

A. No.

> Q. Did Mr. Ebeling ever tell you that if you didn't pay him the money you owed him you'd put him in the middle between him and some other people, put him in a bad spot?

A. I would put him in a bad spot?

Q. Yes, if you didn't pay him the money you owed him?

A. No.

Q. Do you know an individual named Dominick?

A. No, sir.

Q. Do you know anyone named Angelo?

A. No, sir.

Q. Do you know brothers named Dominick, Angelo?

A. No.

. . . . .

At his trial, Griffin testified that his grand jury testimony was true or innocently incorrect. He explained that he had fabricated the conversations about the money found in the airplane crash to avoid a joint financial venture proposed by Ebeling. Other conversations, Griffin said, were engineered by Ebeling to impress his wife. On December 6, 1977, the jury found Griffin guilty of obstructing justice. He was sentenced to 6 months imprisonment and 2 years probation.

## II.

203 A. Section 1503 is composed of two parts.[1] The first portion of the statute prohibits *203 the influencing, intimidating, or impeding of any witness, juror, or court official. The concluding clause of the statute penalizes anyone who "corruptly . . . endeavors to influence, obstruct, or impede, the due administration of justice". Relying on *ejusdem generis* and the principle that penal statutes must be strictly construed, the defendant argues that the concluding clause of the statute has no broader reach than the statute's specific language. Rather, the concluding clause makes clear that § 1503 prohibits any act that is similar in manner to intimidating witnesses and other court officials even though the act is not expressly described in the first part of the statute. The defendant urges us, therefore, to recognize a distinction between one who induces a witness to commit perjury, conduct which we expressly held forbidden by the concluding clause of § 1503 in *U.S. v. Partin*, 5 Cir. 1977, 552 F.2d 621, *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189, and one who perjures himself.

> [1] Section 1503 provides:
>
> "Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

We have rejected similar reasoning raised by a defendant convicted under § 1503 for selling transcripts of secret grand jury testimony to persons under investigation. In *U.S. v. Howard*, 5 Cir. 1978, 569 F.2d 1331, 1333, we said that "we cannot agree with this reading of the statute because it renders the omnibus clause superfluous, see *United States v. Walasek*, 527 F.2d 676, 679 n. 11 (3d Cir. 1975), and because the most natural construction of the clause is that it prohibits acts that are *similar in result, rather than manner*, to the conduct described in the first part of the statute".[2] (Emphasis added by the court.) The issue before us now is, as it was in *Howard*, whether the defendant's conduct tended to obstruct justice. Is the effect of giving false testimony before a grand jury to prevent justice from being duly administered?

> [2] Other courts have applied *ejusdem generis* to section 1503, however, reading the omnibus clause in a manner similar to that suggested by the defendant. See *United States v. Ryan*, 9 Cir. 1972, 455 F.2d 728, 733; *United States v. Metcalf*, 9 Cir. 1971, 435 F.2d 754, 756-57; *United States v. Essex*, 6 Cir. 1969, 407 F.2d 214, 218.

The clear implication of our analysis in *Partin* and *Howard* is that perjury constitutes an offense against the effective administration of justice. Although we left that question unanswered in *Partin*, we held there that one who conspired to induce a witness to testify falsely could be prosecuted under the omnibus clause of § 1503, not because the means chosen to obstruct justice violated the specific wording of the first part of the statute but because the object of the conspiracy was to obstruct justice. 552 F.2d at 631. In *Howard* we relied on *Partin* in holding that the omnibus clause aims at all conduct that results in an obstruction of justice. We explained further that using threats to prevent a grand jury witness from testifying has the result of destroying evidence. Although the accomplishment of this result by use of threats or bribes falls under the first clause, the destruction of evidence by the defendant alone comes under the omnibus clause. 569 F.2d at 1334.[3] Similarly, using threats or bribes to prevent a grand jury witness from testifying truthfully has the result of concealing and altering the nature of evidence. If such conduct constitutes an obstruction of the administration of justice, as we held in *Partin*,[4] then so does testifying falsely; the result in either case is the same.

> [3] Several courts have held that persons who destroy evidence relevant to judicial proceedings violate § 1503. See, e. g., *United States v. Walasek*, 3 Cir. 1975, 527 F.2d 676; *United States v. Weiss*, 2 Cir. 1974, 491 F.2d 460, *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59.
>
> [4] Indeed, we defined the statutory term "administration of justice" as "the performance of acts required by law in the discharge of duties such as appearing as a witness and giving truthful testimony when subpoenaed." *United States v. Partin*, 5 Cir. 1977, 552 F.2d 621, 641, *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189; *United States v. Howard*, 5 Cir. 1978, 569 F.2d 1331, 1334 n. 4.

204 The same conclusion was reached by the Court of Appeals for the Second *204 Circuit in *U.S. v. Cohn*, 2 Cir. 1971, 452 F.2d 881, *cert. denied*, 1972, 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249. Relying on the plain language of the statute, the *Cohn* court held that an obstruction of justice results when attempts to gather relevant evidence by a judicial body, which is charged by law with the task of investigating and punishing crime, are frustrated by the use of corrupt or false means. "The blatantly evasive witness achieves this effect as surely as by erecting a screen of feigned forgetfulness as one who burns files or induces a potential witness to absent himself." 452 F.2d at 884.

The *Cohn* court, however, characterized the gist of the defendant's offense as the concealment of knowledge from the grand jury rather than the injection of falsehood into the proceedings. And the indictment charged Cohn with evasive as well as false testimony. Griffin reminds us that evasive testimony, which obstructs the system's administration of justice in a procedural way by blocking the grand jury investigation, must be distinguished from testimony which is false. Although perjury may distort the truth, the defendant contends that it does not impede the judicial process; the criminal system is in fact designed to deal with falsehood through cross-examination and other means. Because Griffin was charged with giving only false testimony, he insists that the indictment does not state an offense amounting to an obstruction of the administration of justice.

Our Court, however, has long recognized that the purpose of § 1503 is to protect not only the procedures of the criminal system but also the very goal of that system — to achieve justice. "The statute is one of the most important laws ever adopted. It is designed to protect witnesses in Federal courts and also to prevent a miscarriage of Justice." *Samples v. United States*, 5 Cir. 1941, 121 F.2d 263, 265, *cert. denied*, 314 U.S. 662, 62 S.Ct. 129, 86 L.Ed. 530. The perjurious witness can bring about a miscarriage of justice by imperilling the innocent or delaying the punishment of the guilty. Thus, had Griffin's testimony been merely false, it might well have come under the terms of the omnibus clause of § 1503, nonetheless. Such a case is not before us, however.

The defendant has ignored the actual nature of his testimony. We find it impossible to differentiate a flat refusal to testify from an evasive answer or a falsehood such as Griffin's: "No; I don't know; Not that I can recall". By falsely denying knowledge of events and individuals when questioned about them, Griffin hindered the grand jury's attempts to gather evidence of loan sharking activities as effectively as if he refused to answer the questions at all. Whether Griffin's testimony is described in the indictment as "evasive" because he deliberately concealed knowledge or "false" because he blocked the flow of truthful information is immaterial. In either event, the government must, and in this case did, charge in the indictment and prove at trial that the testimony had the effect of impeding justice.

B. Griffin contends that our construction of the statute is contradicted by the legislative history. Section 1503 is derived from the Act of March 2, 1831, 4 Stat. 487. That act outlined the contempt jurisdiction of the United States courts. Section 1 of the 1831 Act, now 18 U.S.C. § 401, provided for summary punishment of contemptuous conduct in the presence of the court; section 2, the predecessor of § 1503, provided that contempts occurring outside the presence of the court would be punished after indictment subject to the safeguards of trial.[5] Because § 1503 was enacted as a federal criminal contempt statute, the defendant insists that it is necessary to determine whether the conduct charged as criminal under § 1503 amounts to contemptuous conduct. He points out that the Court of Appeals for the

205 Sixth Circuit has relied on the *205 rule that simple perjury cannot be punished summarily as contempt of court under 18 U.S.C. § 401 in holding that a person who files a false affidavit in an endeavor to secure a mistrial cannot be prosecuted under § 1503. *United States v. Essex*, 6 Cir. 1969, 407 F.2d 214.[6]

> [5] The history of the statute is outlined in Nelles King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401, 27 Colum.L.Rev. 525 (1928). *See also* Frankfurter and Landis, *Power of Congress Over Procedure in Criminal Contempt in "Inferior" Federal Courts — A Study in Separation of Powers*, 37 Harv.L.Rev. 1010 (1924); Goldfarb, *The History of the Contempt Power*, 1961 Wn.U.L.Q. 1.
>
> [6] The *Essex* court also departed from our construction of the omnibus clause of § 1503. 407 F.2d at 218. *See* note 2 *infra*.

We disagree. In the first place, we find that the defendant's testimony in this case amounted to contemptuous conduct. Moreover, we doubt that the limitation on a federal judge's power to punish perjury summarily is also a limitation on the power to punish under § 1503.

Originally all false swearing was punishable summarily as criminal contempt in the federal courts.[7] *See, e. g., In re Schulman*, 2 Cir. 1910, 177 F. 191. In a series of decisions, however, the Supreme Court cautioned against the indiscriminate use of the contempt power to punish the perjurious witness. In *Ex parte Hudgings*, 1919, 249 U.S. 378, 39 S.Ct. 337, 63 L.Ed. 656, a witness was held in contempt by the trial judge after he repeatedly asserted that he could not recall a certain event. The Court ordered relief, explaining that it hesitated to permit a court to impose summary punishment whenever it disbelieved a witness with the object of confining the witness until the court deemed the testimony to be truthful. 249 U.S. at 384, 39 S.Ct. 337. In a later decision, *In re Michael*, 1945, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30, the Supreme Court reviewed the propriety of a contempt citation imposed on a witness before the grand jury who answered willingly but whose testimony the trial judge disbelieved after hearing contradictory testimony by other witnesses. Justice Black wrote:

> [7] Until 1906, however, the federal courts permitted the witness to invoke the privilege of purgation of contempt by oath and be punished only for the crime of perjury, unless the contempt was clear on its face. *See United States v. Shipp*, 1906, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319; Curtis Curtis, *The Story of a Notion in the Law of Criminal Contempt*, 41 Harv.L.Rev. 51 (1927).

> All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth. Therefore it cannot be denied that it tends to defeat the sole ultimate objective of a trial. It need not necessarily, however, obstruct or halt the judicial process. For the function of trial is to sift the truth from a mass of contradictory evidence, and to do so the fact finding tribunal must hear both truthful and false witnesses. 326 U.S. at 227-28, 66 S.Ct. at 80.

Undeniably, the Supreme Court found that perjury alone does not have a necessarily inherent obstructive effect on the administration of justice. The Court made clear, however, that false testimony can amount to contemptuous conduct when added to the element of perjury there is the "' further element of obstruction to the Court in the performance of its duty'". *In re Michael*, 326 U.S. at 228, 66 S.Ct. at 80, *quoting Ex parte Hudgings*, 249 U.S. at 383, 39 S.Ct. 337. As an example, the Court cited the witness in a case where the requisite element of obstruction was found in sham inability to remember and blocking of the court's inquiry. *United States v. Appel*, S.D.N.Y. 1913, 211 F. 495. *See also Schleier v. United States*, 2 Cir. 1934, 72 F.2d 414, *cert. denied*, 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 697. *See generally* Dobbs, *Contempt of Court: A Survey*, 56 Corn.L.Rev. 183, 194-200 (1971). This additional element is present in the case before us. Griffin's testimony did not merely require the grand jury to ascertain the truth by resolving contradictory evidence; his denial of knowledge had the effect of closing off avenues of inquiry entirely.

Moreover, the range of conduct punishable under sections 1 and 2 of the 1831 Act was not identical. The critical distinction between the two sections was that summary contempt proceedings under section 1 left the determination of guilt to the judge rather than the jury. For this reason, the draftsmen

206 intended that section 1 of the *206 Act embrace not only obstructions in the court that were not geographically remote but also more limited kinds of contempt than section 2. "The point [of section 2] was to provide for things not covered by section 1. Section 1 excluded from summary punishment certain misbehaviors which Justice Johnson had said there was inherent power to punish . . . There was no necessity, or even expediency that they be dealt with summarily." Nelles King, *Contempt by Publication in the United States*, 28 Colum.L.Rev. 401; 28 Colum.L.Rev. 525, 531 (1928). Moreover, the Supreme Court cautioned that "[m]eticulous regard for those separate categories of offenses must be had, so that the instances where there is no right to jury trial will be narrowly restricted." *Nye v. United States*, 1941, 313 U.S. 33, 49, 61 S.Ct. 810, 816, 85 L.Ed. 1172.[8]

> [8] The Supreme Court's development of a jury trial right in non-petty criminal contempt cases since 1966, see *Cheff v. Schnackenberg*, 1966, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629; *Bloom v. Illinois*, 1968, 391 U.S. 194, 88 S.Ct. 1477, [illegible]

[illegible]

## III.

[illegible]

The judgment of the district court is AFFIRMED.

11 On November 18, 1954, the appellant was indicted on the basis of the affidavits in five counts alleging violations of Title 18 U.S.C. § 1503. In substance the indictment alleges that the affidavits constituted a corrupt endeavor on the part of the appellant Karl L. Smith to influence, intimidate and impede certain witnesses in the case of the United States v. Karl L. Smith, Criminal Action No. 6157-T, and that said defendant did corruptly endeavor to influence, obstruct and impede the due administration of justice in that the affidavits and statement were presented to the Assistant United States Attorney for the Southern District of Florida and were false.

12 Upon the trial of the charges alleged in the indictment, the appellant was convicted on Counts two, three, four and five and was acquitted on Count one.

13 The alleged errors are: (1) the defendant was prejudiced by reason of the fact that the trial judge on numerous occasions commented on the fact that the defendant had a right to testify in his own behalf; (2) the defendant was prejudiced by reason of the fact that the United States Attorney suggested in his argument that the defendant had not taken the witness stand in his own behalf; (3) the court erred in consolidating the cases for trial; (4) the verdicts were supported neither by substantial evidence nor by the weight of the evidence.

14 At the outset, it is appropriate to note that except for the fact that the appellant went to trial without counsel, any appellate court would be required to affirm these convictions without consideration of the points raised, because in no case did the appellant follow the basic requirements, universally recognized, to present for review the errors complained of. He made no timely objections; he made no motion for mistrial; he made no objections to the challenged actions of either trial judge or United States Attorney; and he made no timely or proper motion for new trial or for directed verdict.

15 In these circumstances we might well repeat what we said in Smith v. United States:[1]

16 "One reason the courts have found that assistance of counsel or an intelligent and competent waiver of such assistance is essential to due process in a trial under our Constitution is that the many technicalities of trial may sometimes affect the opportunity of the accused to have a real review of his trial on appeal. Johnson v. Zerbst, supra [304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461]. Once it is found, however, that such an accused has properly waived his right to counsel, the effects flowing from that decision must be accepted by him, together with the benefits which he presumably sought to obtain therefrom. * * *"

17 Upon such authority we might well be justified in dismissing the appeal for failure to present any grounds of error of which we could take notice. In what may be considered an excess of concern for the protection of the rights of appellant under the peculiar circumstances of this case, however, we proceed to a consideration of the points he relies on.

18 Here the court demonstrated great patience and unusual tolerance with the accused who undertook to combine argument, testimony in his own behalf, and interrogation of witnesses. The trial court would not conceivably have tolerated the self-serving statements made by the accused and his flat denials of statements made by witnesses, and his irrelevant comments, if made by a lawyer. In fact, the criticism now levelled at the trial court for referring to the right of the accused to testify in his own behalf arose entirely from the court's patient explanation, repeatedly made to Smith as he purported to cross examine government witnesses, that he could not argue with them or dispute them, as he repeatedly did, but that if he wanted to get his views to the jury he ought to take the witness stand. There is no merit in the contention that the court prejudiced appellant by any of such statements or by all of them taken together.

19 With respect to the charge that the United States Attorney suggested that the accused should have taken the witness stand, the statement complained of is not, we think, susceptible of that construction. He said:

20 "And he continuously talks about these `criminal actions' of the Department of Labor. These investigators, these criminal actions that they have performed. He had the opportunity to present any criminal action or what he thought was a basis for a criminal action in the form of testimony in the last two days, and you have seen none of it. And you won't see any of it. `Criminal actions.'"

21 We think it quite clear that this was fair comment on the defendant's failure to produce witnesses touching on a subject which he injected in his conduct of the trial. During his argument and cross-examination of witnesses, he referred to alleged criminal acts of government witnesses. The comment by the United States Attorney that the accused had the opportunity to present any criminal action in the form of testimony is similar to that which was found by the court to be unobjectionable in Langford v. United States.[2] There a statement by counsel that "the defendant has no witness to impeach the stories of [government witnesses]" was held by the court to be in substance a statement that the stories were not contradicted. As this court has said in Jamail v. United States,[3] the rule against commenting on the failure of a defendant to testify in his own behalf "does not go to the extent of forbidding argument by counsel for the prosecution to the effect that the evidence against a defendant is uncontradicted." The same is true with respect to a failure to produce testimony on any phase of the defense upon which the accused seeks to rely.

22 As to appellant's complaint that he was prejudiced by a consolidation of the cases for trial, it is not the province of this court to put the trial judge in error for acquiescing in a request intelligently and competently made by the accused himself. Nothing appears to indicate that he was in any way misled into making the requests or that he was prejudiced by the consolidation.

23 Finally, we turn to the complaint that the jury's verdicts were unsupported by the evidence. It cannot be seriously argued that there was not substantial evidence of the violation of the provisions of the Fair Labor Standards Act. The principal attack is made on the strength of the government's case on the felony charges.

24 Although the indictment charged that the defendant "did corruptly endeavor to influence, intimidate and impede" the signers of the affidavit and statement concerned, the statute makes it an offense for any person to do any one of these things as to a witness or as to the administration of justice. We have held that it is proper to charge in the conjunctive the various allegations in the accusing pleading where a statute specifies several means or ways in which an offense may be committed in the alternative. Heflin v. United States;[4] Price v. United States.[5] A corollary to the rule of pleading in such matters is the rule that only one of the several means or ways of committing the offense need be proved. Heflin v. United States, supra; Crain v. United States.[6] Thus it was only necessary here for the government to prove as to each of the three persons named in counts two, three and four of the indictment that Smith had corruptly endeavored either to influence, or intimidate, or impede him as a witness in the pending cases, and as to count five, to prove that Smith corruptly endeavored either to influence, or obstruct or impede the due administration of justice by the filing of the allegedly false affidavit and petition.

25 It is amply demonstrated that both the affidavit and statement contained information that the jury could well believe to be false. It is also undisputed that the affidavit purported to be sworn to and to express an honest statement of the ostensible affiants, whereas each of the signers testified that he had not read it and had not sworn to it before the notary public. It is further in evidence, in support of count two of the indictment, that the witness Moore was intimidated by fear of losing his job into signing the affidavit.

26 We conclude that there was substantial evidence from which the jury was authorized to find by the required standard of proof that Smith endeavored to influence, intimidate or impede each of the witnesses. His act in obtaining their statements in the form of an affidavit which he prepared and presented to them to sign without reading or explanation and subsequently passed off on the prosecuting officers as documents solemnly sworn to, supplies the ingredient of "corruptly" doing the acts. The same is true as to the count relating to the corrupt endeavor to influence, obstruct or impede the due administration of justice.

27 The court finds no error on the record and the judgments are

28 Affirmed.

---

Notes:

[1] 5 Cir., 216 F.2d 724, 727

[2] 9 Cir., 178 F.2d 48, 55

[3] 5 Cir., 55 F.2d 216, 217

[4] 5 Cir., 223 F.2d 371, 373

[5] 5 Cir., 150 F.2d 283, certiorari denied 326 U.S. 789, 66 S.Ct. 473, 90 L.Ed. 479

[6] 162 U.S. 625, 16 S.Ct. 952, 40 L.Ed. 1097

29 CAMERON, Circuit Judge (dissenting).

I.

30 A reading of the long record in this case leaves the distinct impression that this appellant was convicted because of his cantankerousness and not because he violated the statutes under which he was prosecuted. To take each count of the *Indictment* and segregate and analyze the evidence touching it is to be convinced that there is not sufficient evidence to convict him of any count of the felony charge. With regard to the *Information,* it may be that a proper trial would disclose violations of one or more of the counts. But this record is so scrambled and contains so much inadmissible evidence that, in my opinion, we ought not seriously to consider affirming the conviction on any count of either the Information or the Indictment.

31 The net result of this prolonged and belligerent encounter between him and the Wage and Hour Department is that appellant has been fined a total of $5,500 — doubtless a figure coming close to the entire value of the plant involved — and has been sentenced to imprisonment for a total of thirteen and one-half years which, by making the sentences run concurrently, has been reduced to three years which must be served. In addition, it is clearly inferable that this small rural business will be destroyed and its six employees put out of jobs. And upon what charge?

32 Basically, the only criticism the Wage and Hour Department had of appellant's operation was that he refused to keep his books the way they wanted them kept. Even his archenemy, the Wage and Hour investigator, stated: "It is just as easy to be in compliance as it is to be in violation. It won't cost you any more." Out of that simple controversy which ought to have been resolved without any trouble if both parties had shown a little forbearance and magnanimity, the whole feud between appellant and the Labor Department, of which these proceedings are the final chapter, arose. That feud, in my opinion, is what was tried by the jury and was the basis for the very severe penalties assessed.

33 Appellant was wrong in his contention about how wages should be figured, but he was not illogical. Most of the apparently meager books he kept showed employment of himself and of the other handful of employees by the Lone Palm Preserving Company on a monthly basis. The amount paid was well in excess of the minimum wages required, including overtime. The investigators insisted that appellant keep his books to show weekly wages and hours worked and rates per hour. If appellant had done that, he would have been in complete compliance. But he insisted on his books being tested for compliance on his paying overtime at one and one-half times the minimum wage, when the Regulations of the Department required that overtime be paid at one and one-half times the "regular rate".[1]

34 Of course, appellant's chief undoing resulted from his obstinate insistence upon handling his case before the jury. Not only was he no match for the government counsel, but every time he opened his mouth he succeeded in rubbing everybody in the court the wrong way until he built up such a crushing backlog of ill-will that the merits of the case were indubitably forgotten. But his faith in his own rectitude was such that he not only spurned proffered counsel but naggingly insisted upon speedy trial of his case.

II.

35 To grasp the mistakes of law committed by the Court below it is necessary to understand and keep constantly in mind the narrow issues involved in the violations of law charged against appellant.

36 Counts I and IV of the *Information* having been dismissed by the Government, it is necessary to consider only the three remaining counts. Count II charged that appellant failed to pay six individuals the minimum wages provided in the Act. Count III charged that appellant unlawfully and wilfully discharged Rose B. Davis for filing a complaint against him (which she denied doing); and Count V charged that appellant shipped guava jellies and preserves in interstate commerce without paying the prescribed minimum wages to the employees producing them.

37 *The Indictment.* Count one resulted in an acquittal of appellant.[2] Counts two, three and four charged appellant with attempting corruptly to influence, intimidate and impede three separate persons as witnesses in the case made against appellant in the information. The asserted intimidation *consisted solely of appellant's act in procuring the affidavit, Exhibit 3, to be signed* and delivered to him.[3] Count five charged a like corrupt effort to impede the due administration of justice in that appellant *presented* to the United States Judge and the United States Attorney three false communications. It is interesting to note that the Government dismissed Count IV of the *Information* charging failure to keep records properly, which was the only real law violation asserted against him at the outset.

38 Evidence was proper, therefore, only with respect to these questions: Did appellant fail to pay the five individuals named the minimum wages provided by law? Did appellant wrongfully discharge Rose Davis because she made a complaint against him? Did appellant corruptly endeavor to impede, influence or intimidate R. C. Moore and Mr. and Mrs. Underwood by causing them to sign a false affidavit? Did appellant corruptly endeavor to influence, obstruct and impede justice by presenting to the Judge and the Attorney the alleged false communications? No evidence was relevant or admissible except evidence tending to sustain affirmative answers to those questions.

39 Yet the government set out deliberately to prove these palpably irrelevant and highly prejudicial facts: that appellant had told another investigator in 1945 that he would not comply with the bookkeeping requirements of the Wage and Hour Law;[4] that appellant forbade Investigator McCutcheon to enter the plant to investigate the books or to interview any of the employees on its premises;[5] that appellant shut the plant down and ceased operations until statements taken by McCutcheon were returned to the ones who gave them; that appellant told McCutcheon that the government operators were a set of thieves and threatened to take a shot at McCutcheon;[6] and that appellant had demonstrated a guilty conscience.

40 None of that testimony had any tendency to furnish any sort of answer to the questions above set out, and none of it was relevant evidence in the case and all of it was highly prejudicial and inflammatory. If these collateral occurrences constituted law violations, they should have been made the subjects of prosecutions; but they should not have been used to prejudice the appellant in these cases.

41 I agree with the statement of the majority that the Court below demonstrated patience in its effort to deal with one whose unreasoning and bellicose attitude made everything he did irritating and provocative. But the trial Court did permit itself to be drawn unwittingly into what seem to me to be serious errors. Those errors consisted in the repeated making of statements in the presence of the jury which tended to draw its attention to the fact that the appellant could be expected to take the stand in his own behalf. This episode may be used to illustrate what happened: one of the government investigators was on the stand and appellant was cross-examining him about the meaning of certain provisions of a brochure the Wage and Hour Division had put out explaining the provisions of the Fair Labor Standards Act. An extended colloquy took place upon an objection by Mr. Muscarella, the government's attorney. Appellant was asking the attorney as to whether the digest he had in his hand was pertinent to the charge against him when this took place:

42 "Mr. Smith: You are probably talking about two different interpretations of the Wage and Hour Law. All I am trying to go by — all I have tried to go by — is a digest of the Federal Wage and Hour Law.

43 "Mr. Muscarella: If the Court please, if this man wants to testify he can take the stand. Whether he is going to stand there —

44 "The Court: If you want the jury to consider what you have to say Mr. Smith, you ought to testify in the case. If you want your statements to be considered by the jury as evidence — as testimony and evidence, you ought to testify — take the witness stand and testify and be subject to cross-examination under the rules of evidence."

45 That was an improper statement by the United States Attorney and an improper statement by the Court. In his effort to ascertain from the prosecuting attorney the relevance of the brochure which he wanted to question the witness about, appellant directed the remark to the government's attorney. A lawyer would probably have done the same thing — in other words, would have indicated that the defense felt that it was justified in proceeding under the literature put out by the Labor Department. For the government's attorney and the Court to set upon appellant in this way was certainly prejudicial and unjustified.

46 It is not sufficient answer to say that appellant had made it a practice throughout the examination of the witnesses to make statements of fact and to argue with the witness rather than confining himself to asking questions. In all of this, appellant showed an ignorance and a naïveté almost juvenile.[7] At the same time, it was the duty of government counsel and of the Court to exhibit patience at every stage of the examination and to rule properly on objections and to refrain from saying anything from which the jury might infer that it had a right to look forward to testimony from the lips of appellant. The attorney now representing appellant before us points out nineteen instances where references of a similar character were made. Of course, many of them were relatively harmless, but all of them tended to stress the idea expressed in the above quotation. It was not the province of the Court under the circumstances of this case to lecture the appellant repeatedly on the manner in which he should conduct his cross-examination. It seems to me that the Court could have avoided error by simply sustaining the objections as they were made. Few rights are more jealously guarded by the courts than the right of the defendant, exercised by appellant here, to fail to testify without having that failure commented on before the jury. Cf. 18 U.S.C.A. § 3481. And see Wilson v. United States, 149 U.S. 60, 13 S.Ct. 765, 37 L.Ed. 650.

47 Moreover, the investigators were permitted to testify before the jury in great detail as to what the various prosecuting witnesses had told them about the important facts of the case. In the early stages of the trial the Court intervened several times to shut off such testimony, but towards the latter part of the trial, ceased its effort to keep out hearsay testimony. Finally, the Court, itself, brought out some hearsay and prejudicial testimony.[8]

48 The government attorney knew, when he put in the hearsay evidence, that appellant was not familiar with the rules of evidence and the Court knew the same thing when it asked questions calling for the hearsay testimony. The prosecution cannot escape responsibility for the introduction of that testimony and the other inadmissible testimony mentioned in this opinion.

III.

49 It is perfectly plain to me that the Government failed completely to make out any case of violation of the statute under any count of the *Indictment.*[9] It is inconceivable that the mere *taking* of the three statements by the appellant could possibly violate any statute. *He had to make some use of them, or attempt to make some use of them, before the statute could be violated.*

50 Under the three counts charging appellant with having corruptly attempted to impede the three witnesses, it is clear that he could not be convicted unless he attempted to use the statement which had been given him to influence the testimony of these three witnesses. There was not a line of testimony that this was done. All three were used as prosecuting witnesses, and not one stated that appellant had ever mentioned the statement after it was taken. The fact is that not one of the three intimated that appellant had ever approached him in an effort to tone down his testimony although they had worked alongside of him daily for many months between the time the statement was executed and the trial of the case.[10] How could it possibly be said that appellant was corruptly endeavoring to intimidate or impede witnesses by the mere taking of the statement and putting it in his pocket?

51 Not only is the record completely barren of any evidence on this important point but the government's own witness showed that appellant's sole purpose and intent was to bring about, if he could, the prosecution of the investigators.

52 The Assistant United States Attorney placed on the stand by the prosecution to supply this essential ingredient of proof failed entirely to do so, but made out a complete defense to the indictment in all of its counts. After stating that appellant had come to his office four days after the information had been filed and subpoena served, the attorney testified as follows: "Karl Smith came to the building and came to my office *indignant and handed me these documents and urged that I, as Assistant United States Attorney, prosecute a man named McCutcheon* and a man named Dulaney * * *."[11] Appellant, in cross-examining the attorney, provided the usual irritant by asking if the attorney did not consider his refusal to prosecute McCutcheon a "cover-up, a side-track, a whitewash".

53 It is perfectly plain that appellant did not use or attempt to use the so-called affidavit or the petition or any other paper for any purpose at all except to induce prosecution of McCutcheon. This positive evidence shows affirmatively that appellant never had any intention of attempting to use those documents in connection with the Information pending against him or to intimidate or impede the witnesses, or to influence the Court or the attorney as far as that prosecution against him was concerned. His sole purpose and effort were directed towards hitting back at his enemy by causing prosecution to be instituted. That may be some sort of a crime, but it is not the crime for which appellant was prosecuted.

54 It is, therefore, clear that the burden rested upon the government to prove beyond a reasonable doubt that appellant, in taking the statement known as Exhibit 3, f.n. 12, *infra,* did so with the intention of making use of that statement in some way calculated to influence the testimony of the witnesses in the case then pending against him. Failure to prove that intent is fatal to the government's case. The witnesses covered by the counts of the Indictment upon which appellant was convicted all testified. Not one of them gave the slightest hint that appellant had attempted to use the statement with them in any manner whatsoever. More than that, the testimony of the government attorney establishes beyond reasonable doubt that the sole intent of appellant was to use the statements in a proposed criminal prosecution against McCutcheon.

55 The government showed its acceptance of the foregoing statement of the law by requesting instructions defining intent. Without such a concession the law is plain. Morrisette v. United States, 1951, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; Caldwell v. United States, 1954, 95 U.S.App.D.C. 35, 218 F.2d 370, and 67 C.J.S., Obstructing Justice, § 9, pp. 56-57.

56 Moreover, the government carried the burden of demonstrating the falsity of the affidavit upon which the indictment is based.[12] The witnesses who signed the affidavit were asked, one by one, whether they signed it, but not one of them was asked whether the affidavit contained any untruth. The farthest reach of the testimony concerning this document is that the witnesses did not read it over fully and did not go before a notary to swear to it. The affidavit demonstrates artlessness rather than perfidy. The jury must not have accepted the government's theory concerning Mrs. Davis because it found appellant not guilty of the crime charged against him in connection with his dealings with her. Much of the affidavit was expressive of the contention made explicit by the appellant throughout the trial, — that the prosecuting witnesses were not his employees, but that he, along with them, were employees of Lone Palm Preserving Company. He tried to stress in the entire course of questioning that this was a co-operative venture. Whether it was a corporation or not was not developed unless the "testimony" of government's counsel in the closing argument is to be accepted as proof.[13]

57 The short of this phase of the case is that appellant was well within his rights in seeking material with which to petition the government attorney to prosecute McCutcheon. The witnesses did not belong to the government; and the Judge and the United States Attorney could not be regarded as untouchables. The sole use he sought to make of this meaningless document was to make an unsuccessful plea to the proper government official that prosecution be instituted against the government investigator. The government failed to produce evidence sustaining any count of the Indictment.

IV.

# DONALDA E. VACCARO [Note 1] vs. GEORGE H. VACCARO.

## 425 Mass. 153

May 6, 1997 - June 5, 1997

Worcester County

Present: WILKINS, C.J., ABRAMS, O'CONNOR, GREANEY, & MARSHALL, JJ.

A District Court judge was without statutory or other authority to order the expungement of a record of the issuance of a temporary protective order pursuant to G. L. c. 209A from the Statewide domestic violence record keeping system. [155-162]

CIVIL ACTION commenced in the Clinton Division of the District Court Department on September 27, 1993.

A motion to expunge, filed on August 10, 1995, was heard by Thomas F. Fallon, J.

The Supreme Judicial Court granted an application for direct appellate review.

Joseph F. Whalen, Assistant Attorney General, for Department of Probation.

Paul W. Patten for the defendant.

---

**GREANEY, J.** A judge in the District Court allowed a motion by George H. Vaccaro to have his record expunged from the Statewide domestic violence record keeping system (system), created by St. 1992, c. 188, s. 7. The Department of

Page 154

Probation (department) moved to have the order vacated, The motion was denied by the judge. The department appealed, and we allowed George Vaccaro's application for direct appellate review, We conclude that the judge lacked authority to order expungement. Accordingly, we vacate the order.

The background of the case is as follows. On September 27, 1993, Donalda Vaccaro (Donalda), who was separated from her husband, George, applied in the District Court (with the assistance of the police) for an emergency temporary protective order against him, pursuant to G. L. c. 209A, s. 5. The following day, based on the representations set forth by Donalda in her affidavit, [Note 2] a judge in the District Court entered the requested temporary protective order pursuant to G. L. c. 209A, s. 4, and George was served with the order.

A hearing on the continuance of the temporary protective order was held on October 15, 1993, at which both parties appeared. As might be expected, conflicting testimony was presented to the judge as to what had occurred during the marriage and when George had entered the marital home. Donalda testified to incidents of verbal and physical abuse during the marriage and her ongoing fear that George would harm her. George denied having committed any acts of abuse and explained that he had entered the marital home to retrieve his tax return and personal belongings. At the conclusion of the hearing, the judge expressed his belief that Donalda was genuinely fearful, but ruled that he could not objectively conclude that she had been placed in fear of "imminent serious physical harm," justifying the continuation of the protective order. The judge then vacated the order. George filed a motion to expunge "the name George H. Vac-

Page 155

caro from the Domestic Offender Database." The department was not notified of the motion. After an ex parte hearing, George's motion was allowed. When it learned of the expungement order, the department promptly moved to have it vacated. The judge conducted a hearing, at which he received and considered memoranda of law. The judge denied the department's motion, and this appeal ensued.

1. We agree with the department that there is no statutory authority for the order directing expungement entered by the judge.

Civil restraining or protective orders, like the order involved in this case, may be entered pursuant to G. L. c. 209A, which provides that the courts have jurisdiction over abuse prevention cases as described therein. Orders for the protection of those abused may be granted under G. L. c. 209A, s.s. 3, 4, and 5, and are enforced under G. L. c. 209A, s. 7. By St. 1992, c. 188, s. 7, the Legislature authorized and directed the Commissioner of Probation (commissioner) to develop and implement the system, which is to contain a computerized record of the issuance and violation of any restraining or protective order. Section 7 goes on to restrict access to the records in the system to judges and law enforcement agencies. [Note 3] The commissioner was further directed by s. 7 to "make a written report to the joint committee on the judiciary regarding implementation of [the mandated] record

Page 156

keeping system no later than October [9, 1992]." In his report, the commissioner advised the Legislature that the system had been created, and that the records would contain not only data as to an original order, but also data on subsequent modifications. See Report to the Joint Committee on the Judiciary at 2 & Attachments One, Five (Oct. 9, 1992). The department suggests in its brief that the record in the system concerning George would reflect not only the entry of the temporary protective order on September 27, 1993, but also the fact that the order had been vacated on October 15, 1993,

There is nothing in St. 1992, c. 188, s. 7, or in G. L. c. 209A, that permits a record to be removed or that authorizes the entry of a judicial order directing expungement of a record from the system. George argues that express authority for a judicial order directing expungement is contained in the third paragraph of s. 7 of G. L. c. 209A, which states that "[t]he court shall notify the appropriate law enforcement agency in writing whenever any [restraining or protective] order is vacated and shall direct the agency to destroy all record of such vacated order and such agency shall comply with that directive." However, under the language of the second paragraph of G. L. c. 209A, s. 7, which deals with service of a restraining or protective order and its underlying complaint and summons, the "appropriate law enforcement agency" referred to in the third paragraph of s. 7 clearly refers to the agency to which orders are transmitted for service. According to Guideline 4:07 of the Guidelines for Judicial Practice: Abuse Prevention Proceedings (Oct. 1996) (Guidelines), which concerns the service of protective orders and their supporting papers, the words "appropriate law enforcement agency" mean the "police department of the municipality wherein the defendant can be found." Thus, the record identified for destruction in the third paragraph of G. L. c. 209A, s. 7, is the order previously transmitted to the police department called on to serve the order. In this manner, G. L. c. 209A ensures that the record of a vacated restraining or protective order at the police department level will be eliminated, thereby obviating the possible service of a vacated order or any harm that might occur from the intentional or inadvertent public disclosure of an expired order.

The third paragraph of s. 7 of G. L. c. 209A has no ap-

Page 157

plication to the department, which, of course, is not involved in the process of serving restraining or protective orders. The Legislature's express directive in the act, that a computerized record be kept in the system of all orders, inactive as well as active, and the absence of any provision for removal or authority for expungement, reflects a deliberate legislative decision that all records be available for review by a judge who is considering an application for a restraining or protective order and by other authorized agencies that have a legitimate need to see the record. See St. 1992, c. 188, s.s. 1, 2, 4, and 5. [Note 4]

It follows from what has been said that no power to order expungement can be implied. See School Comm. of Worcester v. Worcester Div. of the Juvenile Court Dep't, 410 Mass. 831, 836-837 (1991) (whether implied power of expungement exists is dependent upon whether "fair reading" of applicable statutes reveals such a power); Police Comm'r of Boston v. Municipal Court of the Dorchester Dist., 374 Mass. 640, 662-663 (1978), and cases cited (power of court must be articulated expressly or be "capable of being deduced by 'necessary and inevitable' implication"). The system is designed to promote the goal of preventing abuse as prescribed by a variety of statutes by providing a judge (and other authorized agencies) with complete information about a defendant. Such information "can be essential to providing protection for the plaintiff." See Guidelines, commentary to Guideline 2:10. Because all restraining and protective orders are listed, both active and inactive, a judge may be better able to identify situations in which the plaintiff "may face a particularly heightened degree of danger." Id. at commentary to Guideline

Page 158

3:05. [Note 5] The power of expungement cannot be a necessary or inevitable implication of the statutory mandate to record such orders and make them available to judges or other authorized agencies. On the contrary, such a power would be inconsistent with the manifest purpose of G. L. c. 209A, and other abuse prevention statutes.

In reaching this conclusion, we have considered and rejected George's argument that, as a result of our decision in Police Comm'r of Boston, supra, the order of expungement is a lawful incident of, and ancillary to, the court's original jurisdiction under G. L. c. 209A. That case concerned the maintenance of juvenile arrest records, in the absence of express statutory authority requiring them to be kept, when the existence of the record poses a substantial danger of harm to the juvenile and its maintenance is not counterbalanced by any valid State interest. Unlike that case, George's record has been maintained in response to an express legislative directive that contains no provision for expungement. See Commonwealth v. Vickey, 381 Mass. 762, 772 (1980) (distinguishing the Police Comm'r of Boston decision; no judicial enlargement required where statutory scheme is spelled out by Legislature). Further, the focus of the statutory framework that resulted in the creation and maintenance of the system is on the protection of prospective victims, and the protective purpose of both the act and G. L. c. 209A, is undisputed. Thus, this is not a case where there is "little or no valid law enforcement purpose . . . served by the maintenance and dissemination of . . . records." Police Comm'r of Boston, supra

Page 159

at 642. Finally, there is a statutory and administrative scheme in place to ensure the confidentiality of records in the system. [Note 6]

2. George also argues that the District Court's power to expunge his record arises from the inherent power of the court to uphold art. 12 of the Declaration of Rights of the Constitution of the Commonwealth. [Note 7] There are two parts to his argument. As we understand the first part, George claims that St. 1992, c. 188, s. 7, is facially unconstitutional because the directive in St. 1992, c. 188, s. 4, that a judge, who is considering an application for relief under G. L. c. 209A consult the system to review the "civil or criminal record," of the alleged abuser, effectively gives criminal weight to a civil restraining or protective order. Second, George argues that

Page 160

the application of St. 1992, c. 188, s. 7, to include his record in the system has violated his due process rights under art. 12.

George's first contention - that inclusion of information regarding civil orders along with criminal data effectively makes the former criminal in nature - lacks merit. We have held that the procedures involved in the consideration and issuance of civil restraining or protective orders under G. L. c. 209A do not infringe on a defendant's due process rights under art. 12. Frizado v, Frizado, 420 Mass. 592, 596 (1995). The requirements of s.s. 4 and 7 of St. 1992, c. 188, do not diminish any of the due process protections established in Frizado, nor does the inclusion of all relevant data, both civil and criminal, involving domestic violence on the part of an individual into one system also violate that individual's due process rights. The Legislature could properly require that a judge (and others enforcing the domestic violence laws) have available and review all pertinent information before issuing a new order against an individual or taking other action, and it makes little sense to maintain two systems and require an independent examination of both. Further, a judge who is reviewing a particular individual's record is presumed to understand the difference between a civil order and a criminal violation and to accord to each its proper weight. See Commonwealth v. Colon-Cruz, 393 Mass. 150, 168 (1984).

George's second argument - that, as applied to him, St. 1992, c. 188, s. 7, has violated his due process rights under art. 12 - is also not persuasive.

The United States Supreme Court has held that a person's reputation is not a protected liberty interest under the Fourteenth Amendment to the United States Constitution unless "a right or status previously recognized by state law [is] distinctly altered or extinguished." Paul v. Davis, 424 U.S. 693, 711 (1976). See Siegert v. Gilley, 500 U.S. 226, 233-234 (1991) (affirming the conclusions of Paul v. Davis); Romero-Barcelo v. Hernandez-Agosto, 75 F,3d 23, 32 (1st Cir. 1996), quoting Beitzell v. Jeffrey, 643 F.2d 870, 878 (1st Cir. 1981) ("actionable deprivation of a liberty interest in one's reputation 'must be accompanied by a change in the [person's] status

Page 161

or rights'"). [Note 8] There is, as noted below, no express protection for reputation contained in art. 12, [Note 9] and, in the context of the present case, we follow the analysis set forth above in the Paul decision in deciding whether art. 12 has been violated.

Accordingly, George must show more than a generalized fear of injury to his reputation; absent evidence of "a change in [his] status or rights," he cannot show that St. 1992, c. 188, s. 7 violates his right to due process. See Romero-Barcelo, supra. The sole assertion made by George is his subjective feeling that, because of the record in the system, he is "put in a very difficult position" as a licensed insurance broker by questions on applications for renewal of his insurance licenses. We have already pointed out that there are ample confidentiality procedures in place to protect the information in the system from general dissemination. See Bishop v. Wood, 426 U.S. 341, 348 (1976) (where information is not made public, it cannot form basis for claim of injury to reputation). George does not allege that the Commonwealth has released any information from the criminal justice information system (see note 6, supra) to any prospective licensing agency, nor that, under current statutory restrictions, the Commonwealth could legally release such information. It has not been shown that any requirement of St. 1992, c. 188, s. 7, has affected George's ability to gain employment or otherwise has altered or extinguished a previously existing right or status held by him. See Paul v. Davis, supra at 701, 711.

Page 162

This is an entirely different situation from that presented in Valmonte v. Bane, 18 F.3d 992 (2d Cir. 1994), where the United States Court of Appeals for the Second Circuit found that an individual's liberty interest had been violated because an unfounded child abuse accusation was maintained on a State registry. Id. at 1001. The Valmonte decision was based on the State's requirement that this information be disseminated to potential employers in the child care field. Id. at 1002. George cannot and does not claim that licensing authorities are authorized to access information maintained in the system. See Hodge v, Jones, 31 F.3d 157, 165 (4th Cir. 1994) (retention of records pertaining to child abuse did not implicate liberty interest where loss was "no more than a conclusory allegation of reputational injury"); Glasford v. New York State Dep't of Social Servs., 787 F. Supp. 384, 388 (S.D.N.Y. 1992) (no liberty interest implicated where neither claimant's employment prospects nor family relationships were affected by failure to expunge claimant's name from registry of child abusers). We therefore conclude that George has failed to show an injury to a liberty or property interest protected under art. 12, and his constitutional claim must fail.

3. The order of the District Court entered on May 6, 1996, allowing George's motion to expunge is vacated, and a new order is to be entered denying the motion.

So ordered.

---

FOOTNOTES

[Note 1] Donalda Vaccaro is not a party to this appeal. The Department of Probation (department) sought to become a party to the case by reason of the motion to vacate the order that is the subject of this appeal. As a result of the motion, the parties to the appeal, George Vaccaro and the department, treated the department as having intervened. There is no question that the department has a cognizable interest in the case because of the duties imposed on the Commissioner of Probation by St. 1992, c. 188, s. 7, to maintain a Statewide system of records of various types of domestic violence orders. There is also no question that the issues presented in the appeal are of public importance and concern the interests of many individuals involved in abuse prevention proceedings. We therefore include the department as a party, despite its failure to file a formal motion to intervene.

[Note 2] In her affidavit, Donalda stated that George had broken into the marital home through a second story window, had taken personal papers and otherwise disrupted her home office, and had removed his collection of handguns and rifles from the safe in the house. George did not have a key to the home and had agreed with Donalda that he would make prior arrangements with her before coming to the home. Donalda was fearful because, she said, George, in addition to disrupting her office, had left a semi-automatic rifle and ammunition lying around and the safe door open. In her affidavit, Donalda said that she was afraid because George appeared unstable, and she referred to incidents of prior verbal and physical abuse and harassment. The information provided to the court in Donalda's affidavit was sufficient to allow the court to conclude she had been placed in fear of "imminent serious physical harm." See G. L. c. 209A, s.s. 1 (b), 4.

[Note 3] This portion of s. 7 (which has not been codified in the General Laws) reads as follows:

"The commissioner of probation is hereby authorized and directed to develop and implement a statewide domestic violence record keeping system . . . . Said system shall include a computerized record of the issuance of or violations of any protective orders or restraining orders issued pursuant to [G. L. c. 208, s.s. 18 and 34B; c. 209, s. 32; c. 209A; c. 209C, s.s. 15 and 201. Further, said computerized system shall include the information contained in the court activity record information system maintained by the office of said commissioner. The information contained in said system shall be made available to judges considering petitions or complaints pursuant to [G. L. c. 208, secs. 18 and 34B; c. 209, s. 32; c. 209A; c. 209C, s.s. 15 and 20]. Further, the information contained in said system shall be made available to law enforcement agencies through the criminal justice information system maintained by the executive office of public safety. . . ."

[Note 4] These provisions of the act require a judge to "cause a search to be made of the [system]" and to "review the resulting data to determine whether the named defendant has a civil or criminal record involving domestic or other violence." In addition to amending G. L. c. 209A, s. 7, the act made the search requirement applicable to the statute governing divorce, G. L. c. 208, by inserting s. 34D; amending the statute governing husbands and wives, G. L. c. 209, s. 32; amending the statute governing children born out of wedlock, G. L. c. 209C, s. 15; and also amending, through St. 1992, c. 188, s. 6, the District Court statute governing process, issuance of complaints for misdemeanor, consideration of criminal records and domestic violence records, and the right to a hearing, G. L. c. 218, s. 35A. Further, G. L. c. 276, s. 58A (1), the statute governing pretrial detention where a defendant is alleged to be dangerous, lists the issuance of orders under G. L. c. 209A, s.s. 3, 4. or 5, as a factor to be considered in deciding whether dangerousness has been demonstrated.

[Note 5] While, in George's case, the temporary protective order was vacated after a hearing before a judge, more frequently such orders are vacated because the plaintiff has chosen not to pursue the order. The dynamics of this choice are complex and can involve the plaintiffs self-esteem, financial and family pressures, a desire for reconciliation, coercion, intimidation, or the heightened sense of danger that accompanies a separation. See Guidelines for Judicial Practice: Abuse Prevention Proceedings commentary to Guideline 2:06 (Oct. 1996). Because a fair proportion of such vacated orders may include a high level of abuse, inclusion of vacated orders in the system can provide meaningful information, notwithstanding their inactive status and regardless of the reason for termination. See Office of the Commissioner of Probation, The Tragedies of Domestic Violence (Oct. 1995).

[Note 6] George argues that the existing system is inadequate to protect his confidentiality because it is incapable of preventing unwarranted disclosure. The legislative and administrative scheme in place adequately protects George, and others similarly situated: the records in the system are available only to trial court judges through the court's computer system and to law enforcement agencies through the criminal justice information system (CJIS), access to which is limited by regulation to certified criminal justice agencies and to those otherwise authorized by the criminal history systems board. CJIS information is to be used "only for a criminal justice purpose in the performance of . . . official duties and responsibilities." 803 Code Mass. Regs. s. 3.05 (1995). The CJIS regulations also contain additional restrictions governing who can have access to the information and for what purpose. See 803 Code Mass. Regs. s.s. 3.02-3.09 (1995). This statutory and regulatory scheme forecloses general access by the public to records of civil restraining and protective orders. Access to the system is thus limited to those agencies or persons who require such information in order to further the protective purpose of the act, G. L. c. 209A, and other statutes aimed at preventing abuse.

[Note 7] George does not make a direct argument that the District Court possesses the inherent power to expunge names from the registry. An inherent power is a power "whose exercise is essential to the function of the judicial department, to the maintenance of its authority, or to its capacity to decide cases." Gray v. Commissioner of Revenue, 422 Mass. 666, 672 (1996), quoting Brach v. Chief Justice of the Dist. Court Dep't, 386 Mass. 528, 535 (1982). Inherent powers involve the internal functioning of the judiciary, see Brach v. Chief Justice of the Dist. Court Dep't, supra, and are only implicated when the lack of a statutorily authorized power impairs the function of the court or threatens the maintenance of its authority. See Sheriff of Middlesex County v. Commissioner of Correction, 383 Mass. 631, 635 (1981). There is nothing in St. 1992, c. 188, s.s. 4 or 7, that impairs the court's function or threatens its authority or ability to decide cases so as to require an exercise of any inherent power of expungement. Compare Police Comm'r of Boston v. Municipal Court of the Dorchester Dist., 374 Mass. 640, 664-665 & n.18 (1978).

[Note 8] This analysis is referred to as the "stigma plus" test for determining whether an injury to an individual's reputation constitutes a deprivation of a liberty or property interest protected by the Fourteenth Amendment. See Valmonte v. Bane, 18 F.3d 992, 999-1000 (2d Cir. 1994).

[Note 9] George contends that because the Declaration of Rights makes express reference to an individual's character, the due process protections of art. 12 are automatically implicated when State action injures an individual's reputation. This is not the case. Although other articles of the Declaration of Rights refer to "character" (see art. 11 [right to access to courts and speedy trial]; art. 18 [right to demand qualifications of public officeholders]; art. 29 [right to a fair trial and impartial jury]), there is no reference to character in art. 12, on which the defendant has based his due process claim. In addition to art. 12, due process protection is also provided under arts. 1 & 10 of the Declaration of Rights, and under Part II, c. 1, s. 1, art. 4, of the Constitution of the Commonwealth, Opinion of the Justices, 423 Mass. 1201, 1229 n.20 (1996), but there is no mention of character in these provisions. We therefore conclude that there is no independent protection for an individual's reputation under art. 12.



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

# EDMUND WOJCICKI, individually and as executor, [Note 1] vs. JOAN E. CARAGHER.

447 Mass. 200

April 4, 2006 - July 11, 2006

Essex County

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

[illegible]

affect the result." DeLuca v. Boston Elevated Ry., 312 Mass. 495, 497 (1942). Although the judge need not be convinced that the new evidence would result in a different verdict, it must nevertheless be "important evidence" that "would have genuine effect" on the jury. Davis v. Boston Elevated Ry., supra.

The judge found that Hochberg's testimony concerned "an issue that was central to the case," but made no other findings related to its materiality. The plaintiff argues that Hochberg's testimony affects the very foundation of his case because it made the NINDS study, which established the standard of care for the administration of t-PA, irrelevant to the decedent. [Note 20] Citing the juror's posttrial comment as proof of the impact of Hochberg's testimony, the plaintiff claims that the fact that some study participants reported having been diagnosed previously with cancer would make a difference at a new trial.

Page 216

However, given the evidence uncovered posttrial, this seems unlikely. [Note 21] If there were another trial, the jury would learn that fifty-nine study participants had been diagnosed with cancer at some point in their lives. Presumably, however, the jury also would learn that patients with serious medical illnesses were excluded from the study, and that several physicians involved with the study believed that no patients with active cancer participated at their hospitals. [Note 22] Furthermore, the jury would hear expert testimony that there are risks associated with administering t-PA to cancer patients; t-PA should never be used to treat patients with brain metastases; and the testing to determine whether the decedent's cancer had metastasized had not been completed -- all evidence supporting the verdict for the defendant. Finally, the plaintiff extracted a significant concession from Hochberg at trial, namely that cancer was not listed as an exclusion factor in the NINDS study. "[A] new trial "ought not to be granted unless on a survey of the whole case it appears to the judge that otherwise a miscarriage of justice would result.' " Spiller v. Metropolitan Transit Auth., 348 Mass. 576, 580 (1965), quoting Nicholas v. Lewis Furniture Co., 292 Mass. 500, 507 (1935). The mere possibility that allegedly newly discovered evidence might affect the outcome does not require a new trial. DeLuca v. Boston Elevated Ry., 312 Mass. 495, 500 (1942).

d. Sanctions. After allowing the plaintiff's motion for a new trial, the judge imposed sanctions against the defendant and Hochberg to compensate the plaintiff for expenses incurred at the first trial and during posttrial proceedings. Sanctions may be ordered "to compensate the aggrieved litigant for the actual loss incurred by the misconduct of the offending party." Avelino-Wright v. Wright, 51 Mass. App. Ct. 1, 5 (2001), citing Clark v.

Page 217

Clark, 47 Mass. App. Ct. 737, 744-745 (1999). For the reasons explained above, however, no new trial is required; therefore, there is no longer a need to compensate the plaintiff for costs associated with a second trial. [Note 23]

3. Conclusion. For the foregoing reasons, we conclude that the judge abused her discretion in granting the plaintiff's motion for a new trial and imposing sanctions against the defendant and Hochberg. We accordingly vacate the orders of the judge, reinstate the jury verdict, and enter a final judgment of dismissal.

So ordered.

---

FOOTNOTES

[Note 1] Of the estate of Sherry Wojcicki.

[Note 2] A stroke is caused by a sudden interruption of blood flow to the brain. An ischemic stroke is caused by the blockage, typically by a blood clot, of a blood vessel in the brain. A hemorrhagic stroke, the less common type, is caused by the sudden rupture of a blood vessel in the brain.

[Note 3] For example, patients were not considered appropriate candidates for t-PA therapy, and therefore were not eligible to participate in the NINDS study, if they had experienced a stroke or serious head trauma within the preceding three months; they had undergone surgery within the previous two weeks; they had a history of intracranial bleeding; or they had high blood pressure or a blood clotting disorder. Stroke patients with symptoms deemed mild or rapidly improving also were not eligible to participate in the study because the risks associated with t-PA use would outweigh its potential benefits for those patients.

[Note 4] The CT scan performed shortly after the decedent's arrival in the emergency department likely would not have identified brain metastases: the experts who testified at trial agreed that generally an MRI or an enhanced CT scan are the best methods of detecting metastatic cancer. The defendant could not perform these tests in the emergency department, and no neuroradiologist was available at the hospital on July 2, 1999, to review the unenhanced CT scan results.

[Note 5] The decedent arrived at that hospital more than three hours after the onset of her stroke and therefore was not eligible for t-PA therapy there.

[Note 6] It is not clear from the record whether the decedent in fact had metastatic cancer when she suffered the stroke on July 2, 1999. However, eight of fourteen lymph nodes, sampled when the decedent's tumor was removed later that summer, tested positive for cancer, and the plaintiff testified that the decedent died as a result of metastatic disease, after the cancer spread to her bones.

[Note 7] On direct examination, Hochberg testified to the following:

Q.: "Dr. Hochberg, are you familiar with the NINDS study that was published in December of 1995?"

A.: "Yes."

Q.: "And as part of this study, Dr, Hochberg, based upon your review of it together with your knowledge, training, and experience, as a neurologist, were there any patients included in that study who presented with cancer?"

A.: "No."

Q.: "Were there any patients who are part of that study who presented with breast cancer?"

A.: "There were no patients with breast cancer in the NINDS, either part one or part two of that study."

[Note 8] The following exchange occurred during Hochberg's cross examination:

Q.: "How many patients in the NINDS Study had cancer?"

A.: "Zero."

Q.: "No one knows."

A.: "Excuse me, zero."

Q.: "You're telling the ladies and gentlemen of this jury that this study indicates how many patients had cancer?"

A.: "That's correct."

Q.: "Okay. Let's --"

A.: "It's not published in there."

Q.: "-- well, let's have a look at it, Doctor. Exhibit 12 is a copy of the NINDS Study. Can you tell us where in that study it states that none of the patients had cancer?"

A.: "You're referring to the study or the publication of the study?"

Q.: "What is it that you're holding in your hand, sir?"

A.: "This is the publication of the study. You asked me about the actual NINDS Study, and the answer is zero. The publication makes no mention of the cancer patients. The actual study contained no cancer patients."

[Note 9] On redirect examination, defense counsel asked Hochberg, "[W]hat is the difference between the publication of the study and the study results themselves?" Hochberg responded: "The NINDS Study was completed in approximately 1994. The current study data, which include the data of every patient who was entered into the study, those who were included, those who were not included . . . all are included in two large cd-roms that are available from the National Institutes of Health. To publish the results of the study in the New England Journal of Medicine requires that those data be distilled down to an article that can be read by physicians and by non physicians alike, that will give them the bare information that is logical about the nature of this study. But the actual study details are not embedded in this article."

[Note 10] According to an affidavit from plaintiff's counsel, this juror said that she was "most impressed by Dr. Hochberg," and "after he testified that no cancer patients had been included in the NINDS study, "that was the end of the case as far as [she] was concerned.' "

[Note 11] Hochberg testified that he telephoned the biostatistician and asked whether a patient like the decedent, who had active breast cancer, the extent of which was not known, and was receiving chemotherapy, would be included in the study. He claimed that she said no, and that he did not ask any other questions. Hochberg's telephone records revealed a thirty-second telephone call to the biostatistician's office.

[Note 12] Eleven physicians from eight hospitals throughout the United States served as principal investigators for the NINDS study. Hochberg obtained affidavits from three of the eleven principal investigators. One of the three stated that six study participants from his hospital reported a previous diagnosis of malignancy. At his direction, a data coordinator reviewed the medical records of these patients, and none of them had active cancer during the study. The affidavits provided by the two other principal investigators do not indicate whether anyone reviewed the medical records of the participants enrolled through their hospitals who reported a previous diagnosis of malignancy: their affidavits state only that, to the best of their knowledge and recollection, no patients with active cancer from their hospital participated. Hochberg also obtained an affidavit from a physician on the NINDS data safety monitoring committee, who reported that, to the best of his knowledge and recollection, no patients with acute or active cancer, receiving chemotherapy, were included in the research because they "would have been excluded as a result of an acute medical condition."

[Note 13] The judge ordered that the defendant pay the plaintiff's costs and attorney's fees for services "wasted" during the first trial, and for costs incurred at some of the posttrial proceedings, totaling $68,380. Hochberg was ordered to pay the plaintiff's costs and attorney's fees for the remainder of the posttrial proceedings, as well as the costs associated with empanelling a jury for the new trial, totaling $20,305.

[Note 14] The judge did not specify whether she granted relief under Mass. R. Civ. P. 59 (a), 365 Mass. 827 (1974), or under Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974). The plaintiff argued for relief under both rules in the same document and on essentially the same grounds: that Hochberg, assisted by defense counsel, gave false and misleading testimony on an important issue at trial. It appears that the judge granted relief under rule 59: her memorandum and order refer to the plaintiff's request for relief as a motion for a new trial, and the plaintiff filed the motion within ten days of the judgment, as required by rule 59.

[Note 15] In the judge's memorandum and order, she noted that "[a] finding of fraud on the court must be shown by clear and convincing evidence," and she proceeded to find clear and convincing evidence that Hochberg intentionally testified to a fact without knowing it to be true, deliberately misled the jury, and lied during his posttrial deposition. However, the judge did not discuss or cite any cases dealing with fraud on the court, nor did she explicitly find that a fraud on the court occurred in this case.

[Note 16] The specific findings in the judge's memorandum and order relating to Hochberg's misconduct likewise do not support a finding of fraud on the court. She found that defense counsel helped create the false impression that Hochberg had reviewed the study data, and that he failed to correct Hochberg's testimony that "zero" cancer patients participated in the study. This, however, does not constitute a sentient scheme to defraud the court, particularly where defense counsel had reason to believe that Hochberg had talked to an investigator from the National Institutes of Health about the exclusion of patients with active cancer. The judge also found that defense counsel made inadequate pretrial disclosures about the testimony expected from Hochberg, but "[c]onduct such as nondisclosure to the adverse party or the court of facts pertinent to the matter before it, without more, does not constitute a fraud on the court . . . ." Sahin v. Sahin, 435 Mass. 396, 406 (2001).

[Note 17] On appeal, the defendant and Hochberg argue that Hochberg's testimony was based on his education, training, and experience. When Hochberg was deposed posttrial, he insisted that his testimony was based on a telephone conversation with the biostatistician. However, he never mentioned this telephone call at trial.

[Note 18] We express no opinion as to whether this testimony constituted perjury.

[Note 19] After discussing the matter with his own expert, counsel contacted the NINDS project officer to confirm that cancer patients were not excluded from the study. Counsel contacted the project officer on a Friday afternoon, and was informed on the following Tuesday that fifty-nine participants reported some history of malignancy.

[Note 20] Although the plaintiff now claims that the NINDS study was a critical piece of evidence at trial, we note that neither attorney mentioned the study during opening statements or closing arguments. Although defense counsel referred to Hochberg's testimony once during his closing, and the plaintiff referred to his testimony several times, these references did not concern his testimony about the study.

[Note 21] The judge alluded to this during a posttrial hearing when she remarked that "one of the most disturbing things about this is the fact that an honest, legitimate defense is likely to have been successful in this case." She expressed a similar sentiment in her memorandum and order, noting that "a retrial is by no means certain to result in a verdict in favor of plaintiff."

[Note 22] The plaintiff has not produced any evidence showing that patients with active cancer were included in the study: he relies on the fact that the NINDS data reveal only that fifty-nine participants had been diagnosed with cancer at some point, and suggests the status of their cancer during the research will never be known.

[Note 23] Because we vacate the order imposing sanctions against Hochberg and the defendant, we need not address Hochberg's contention that the judge lacked the authority to impose sanctions against a nonparty witness.



Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.

# "Any liar can get an order by merely asserting fear": Why Chapter 209A Must Be Revamped to Protect Against the Issuance of Unnecessary Abuse Prevention Orders

BRITTANY PIERCE[*][1]

**ABSTRACT**

Chapter 209A of the Massachusetts General Laws defines "abuse" broadly, giving judges wide discretion in determining whether to grant an abuse prevention order. As a result, judges have issued such orders generously, and many individuals are able to obtain abuse prevention orders when they do not need them.

False allegations of abuse can result in a variety of negative consequences for defendants, while plaintiffs who use false allegations to obtain the unnecessary orders may receive multiple benefits. This often provides plaintiffs with an incentive to obtain unnecessary abuse prevention orders.

To combat abuse of this process, the state legislature should rewrite Chapter 209A's definition of abuse with an eye toward specificity. In particular, Massachusetts should require that the defendant's actions meet the definitions of specific crimes set out in the Massachusetts General Laws before a court issues an abuse prevention order. Additionally, the state legislature should empower courts to impose a penalty on individuals who falsely allege abuse. These changes will avert the issuance of unnecessary abuse prevention orders and the resultant destruction to defendants' lives.

---

[*] Candidate for Juris Doctor, New England Law | Boston (2013). B.A., Psychology, *magna cum laude*, Elon University (2010). I would like to thank my family, friends, and the *New England Law Review* staff for their support throughout the writing process.

[1] Gregory Hession, *Fighting False Restraining Orders*, MASSOUTRAGE, http://www.massoutrage.com/ma/restraining-order-resources/fighting-false-restraining-orders/ (last updated Jan. 2, 2012).

# 18 U.S. Code § 1623 - False declarations before grand jury or court

U.S. Code    Notes

prev | next

**(a)** Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

**(b)** This section is applicable whether the conduct occurred within or without the United States.

**(c)** An indictment or information for violation of this section alleging that, in any proceedings before or ancillary to any court or grand jury of the United States, the defendant under oath has knowingly made two or more declarations, which are inconsistent to the degree that one of them is necessarily false, need not specify which declaration is false if—

**(1)** each declaration was material to the point in question, and

**(2)** each declaration was made within the period of the statute of limitations for the offense charged under this section.

In any prosecution under this section, the falsity of a declaration set forth in the indictment or information shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations material to the point in question in any proceeding before or ancillary to any court or grand jury. It shall be a defense to an indictment or information made pursuant to the first sentence of this subsection that the defendant at the time he made each declaration believed the declaration was true.

**(d)** Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

**(e)** Proof beyond a reasonable doubt under this section is sufficient for conviction. It shall not be necessary that such proof be made by any particular number of witnesses or by documentary or other type of evidence.

(Added Pub. L. 91–452, title IV, § 401(a), Oct. 15, 1970, 84 Stat. 932; amended Pub. L. 94–550, § 6, Oct. 18, 1976, 90 Stat. 2535; Pub. L. 103–322, title XXXIII, § 330016(1)(L), Sept. 13, 1994, 108 Stat. 2147.)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

BOSTON MUNICIPAL COURT
CENTRAL DIVISION
DOCKET NOS. 1701RO000181 &
1701RO000182

SAGE HUMPHRIES,
Plaintiff,

v.

MITCHELL MOORE and
DUSTY BUTTON,
Defendants.

**MEMORANDUM REGARDING DEFENDANTS**
**MOTION TO VACATE PERMANENT RESTRAINING ORDER**

Nearly five years after this Court granted Sage Humphries (Humphries) a permanent Abuse Prevention Order (Order) against Mitchell Moore (Moore) and Dusty Button (Button) (Collectively the Defendants), the Defendants ask this Court to vacate that Order. As grounds for their request, the Defendants argue 1) they did not receive notice of hearing at which the Order was made permanent; and 2) Humphries committed fraud upon the Court. In support of their motion, the Defendants have submitted two binders of materials containing nearly two hundred pages of pictures, text messages, emails, affidavits, police reports and selective pages of what seems to be a transcript of the initial two-party hearing.[1] For the reasons stated *infra*, the Defendants' Motion to Vacate is **DENIED**.

**BACKGROUND**

On August 1, 2017, Humphries filed a complaint in this Court requesting an emergency restraining order against the Defendants. The request for an emergency order was allowed as to both Defendants and the matter was scheduled for a two-party hearing. On August 15, 2017,

[1] Subsequent to the hearing regarding the Defendants' Motion to Vacate, the Defendants submitted an Emergency Motion to Supplement their Motion to Vacate that was denied.

both parties appeared represented by Counsel. Humphries was the only party to testify at the hearing. The Defendants' counsel cross-examined her and present argument as to why the Order should not issue. The judge concluded there was "more than clear and convincing evidence" to justify the extension of the Order and extended the expiration date to August 14, 2018. The parties were informed in court by the Clerk that the Orders were extended. The Clerk also announced that the next hearing date would be August 14, 2018 at 9:00 a.m. In addition, the Clerk noted that the parties were being served in hand by the Court officer. The next hearing date was also hand written on the Order.

On August 14, 2018, Humphries appeared at the courthouse unrepresented. The Defendants did not appear. Humphries filed an affidavit asserting additional allegations relating to the Defendants' conduct and requested the Order be made permanent. After hearing from her, the judge made the order permanent.

Humphries filed a civil action against the Defendants in the United States District Court in Nevada.[2] In response to Humphries' discovery requests in that case, the Defendants produced a number of documents, including text messages and other data, that came from Humphries iPhone which the Defendants asserted Humphries uploaded onto an external hard drive before the commencement of the litigation and the issuance of the Order. They asserted they believed they turned everything over that was covered by the Order but did not realize they had a backup copy of the material until they began searching for and preserving evidence for the civil case. These "newly" discovered copies were filed with the Court which made them available to the public. The Daily Mail, a news media outlet with an online publication, obtained access to the court filings and used them in an online story featuring Button. (Exhibit 1). Humphries filed a

[2] There are 6 plaintiffs total; 2 of them are unnamed.

motion for sanctions in the Nevada litigation for the alleged violation of the Order. The Nevada court ordered the Defendants to surrender the items to Humphries' counsel and ordered them to pay counsel's fees. (Exhibit 2).

In January of this year, a YouTube® subscriber identified as Fletcher Reede[3] posted a two-part video series titled "The Real Sage Humphries" containing pictures, letters, messages, invoices and commentary asserting that Humphries is a liar[4] and portraying the Defendants as victims. (Exhibit 3).

## DISCUSSION

### A. LACK OF NOTICE

I do not find the Defendants' claim that they did not receive notice of the August 14, 2018 hearing credible. All three parties were present for the evidentiary hearing on August 15, 2017. After the judge notified the parties that he was issuing the Order, the Clerk read into the records that the order would remain in effect for one year and announced there would be a further hearing regarding the Orders on the August 14, 2018 at 9:00 a.m. in Courtroom C. Additionally, the date, time and location of the next hearing is clearly written in Section C of the respective Orders. There is no doubt the Defendants were informed of the next hearing date and I have no doubt, for whatever reasons, they chose not to appear.[5] "A party may not 'shut his eyes to the means of knowledge which he knows are at hand, and thereby escape the consequences which would flow from the notice if it had actually been received.'" *Commonwealth v. Delaney*, 425 Mass. 587, 592 (1997) quoting *Commonwealth v. Olivo*, 369

[3] Fletcher Reede is the main character from the Movie "Liar Liar" who is a pathological liar cursed with the inability to lie.

[4] Some of the screenshots from the YouTube® video are similar to those contained among the two hundred pages of material provided by the Defendants.

[5] In the Daily Mail article, the reported noted that the Defendants admitted "they didn't fight the Boston court's decision despite having …a 1.200-page binder of texts, love notes and songs demonstrating the abuse was fabricated." (Ex. 1, p.17).

Mass. 62, 69 (1975); *see NLRB v. Local 3, Bloomingdale Dist. 65, Retail, Wholesale & Dep't Store Union*, 216 F.2d 285, 288 (2d Cir.1954). The Defendants had notice of the next hearing date and chose not to appear at their own peril.

B. FRAUD ON THE COURT

The Defendants' fraud on the court allegation would be more intriguing if there were credible evidence that there was fraud. A party commits fraud on the court when the party "tampers with the fair administration of justice by deceiving 'the institutions set up to protect and safeguard the public' or otherwise using or undermining the integrity of the judicial process." *Rockdale Management Co., Inc. v. Shawmut Bank, N.A.*, 418 Mass. 596, 598 (1994) quoting *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250 (1944). The complaining party must establish by clear and convincing evidence that the opposing party intentionally "set in motion some unconscionable scheme calculated to interfere the judicial system's ability to impartially adjudicate a matter by improperly influencing the prior or unfairly hampering presentation the opposing party's claim or defense." *Rockdale Management Co., Inc., supra* quoting *Aoude v. Mobile Oil Corp.*, 892 F.2d 1115, 2118 (1st Cir. 1989); *see B.C. v. F.C.*, 90 Mass. App. Ct. 345, 348-49 (2016).

In making their fraud on the court case, the Defendants raise facts and issues that were either addressed or should have been addressed at the original hearing. They present written messages between the parties and pictures evidencing the apparent amorous nature of the relationship between the parties. Humphries was cross examined on these issues by the Defendants' attorney at the two-party hearing. The Defendants presented documents showing that the purported firearms in his home were toys, not real. This also was addressed in the two-party hearing. Humphries acknowledged that the purported firearms were toys. However, she

also testified that Mitchell told her that the toys could be modified so as to become real. This testimony went uncontradicted.

Raising the claim of fraud on the court does not give a party the opportunity to relitigate issues that were presented to the original factfinder. That factfinder found Humphries to be credible and made his decision to issue the order with that in mind.

C. MOTION TO VACATE STANDARD

A motion to vacate the issuance of a permanent order is not a motion to reconsider the entry of a final order and does not provide the defendant an opportunity to challenge the underlying basis for the order or to obtain relief from errors correctable on appeal. *MacDonald v. Caruso*, 467 Mass. 382, 388 (2014). A defendant moving to do as much must prove by clear and convincing evidence that **there** has been "a significant change in circumstances since the order was issued such that the protected party no longer has a reasonable fear of imminent serious physical harm from the defendant, and that continuation of the order would therefore not be equitable. *Id*, at 389-90. Looking at the totality of the circumstances, there must be a showing that the plaintiff, without the protection of an order of abuse prevention, would no longer reasonably fear imminent serious physical harm from the defendant." *Id*, at 390-91. The passage of time or compliance with the order by themselves is not sufficient. *Id* at 388.

The Defendants' decision to file the digital materials found in response to Humphries' discovery request with the Nevada Court thereby making them available to the public along with the fortuitous use of some of that material in an online article in which the Defendants defend themselves causes me pause and wonder whether the Defendants were fortuitous in finding this material or if it was an intentional act on their part. Combine this with the videos posted on YouTube®, blatantly hostile towards Humphries, by someone using a fictitious name clearly

siding with the Defendants and using materials similar to those provided by the Defendants in this motion vacate convinces me that the Defendants have not met their burden of establishing that Humphries no longer has a fear for her safety. Quite the opposite. The materials presented convince me that such an order remains necessary.

The Defendants' request that the permanent orders be vacated is **DENIED.**

Date: May 22, 2023

Steven M. Key
The Honorable Steven M. Key
Associate Justice
Boston Municipal Court