EXHIBIT 3

MASSACHUSETTS APPEALS COURT VOL. II

# VOL. II

Mitchell Taylor Moore
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
(310)-499-8702
Desmodynamica@gmail.com

Dusty Button
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
(310)-499-8930
Worldofdusty@gmail.com

**COMMONWEALTH OF MASSACHUSETTS**

**APPEALS COURT**

| | |
|---|---|
| M.T.M and D.B<br><br>**Appellants,**<br><br>v.<br><br>S.H<br><br>**Appellee.** | **Docket No. 2023-P-1202**<br><br>**APPELLANTS'**<br>**RECORD OF APPENDIX**<br>**VOLUME II OF IV** |

1
2

**<u>TABLE OF CONTENTS</u>**

3
<u>Document Name</u>                                          <u>Start Page #</u>

4
5

**VOLUME II**

6

Transcripts relied upon for this appeal

7
8
Judge Lyons transcript dated 02/02/23                          4

9
Judge Key transcript dated 03/27/23                          109

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

APPELLANTS' RECORD OF APPENDIX VOLUME II OF IV

```
1                                           VOLUME: 1 of 1
2                                           PAGES: 1 - 104
3
4                   COMMONWEALTH OF MASSACHUSETTS
5
6   SUFFOLK, SS.                MUNICIPAL COURT, CENTRAL DIVISION
7                               DOCKET NO:  1701RO181, 1701RO182
8
9   SAGE HUMPHRIES          )
10                          )           MOTION HEARINGS
11  V.                      )          February 22, 2023
12                          )
13  MITCHELL MOORE, and     )
14  DUSTY BUTTON            )
15
16              Before the Honorable Tracy Lee Lyons
17
18  APPEARANCES:
19
20  For the Plaintiff:
21  Maura Melcher, Esquire
22  800 Hingham Street
23  Rockland, MA  02370
24
25  Sabina Mariella, Esquire
26  Boies Schiller Flexner
27  55 Hudson Yards, New York, NY 10001
28
29
30  For the Defendants:
31  Mitchell Taylor, Pro Se
32  Dusty Button, Pro Se
33
34
35
36      Proceedings Recorded by Electronic Sound Recording,
37       Transcript produced by Approved Court Transcriber
38
39
40
```

**Pamela Borges DosSantos, Notary Public**
**Massachusetts and New York Approved Court Transcriber**
**PBH Paralegal & Transcription Services, Inc.**
**190 William Street**
**New Bedford, MA  02740**
**(508) 996-3898**
**Fax (508)996-2403**

**D I S C L A I M E R**

--        Interrupted speech, unfinished sentences, or lengthy pauses are designated by two [2] dashes where the interruption occurs. Resumption of interrupted speech is also indicated by two dashes.

[     ]        Brackets are also used to designate transcriber comments. For example the words [END OF SIDE ONE, TAPE ONE], [SIDEBAR], etc., are shown in brackets as they are transcriber comments and not part of the actual litigation audio record.

When the transcriber is unable to ascertain a spoken word or words, the word is typed as it sounds phonetically followed by the word "phonetic" in brackets.

If a speaker uses a term or word that is known to be incorrect, the term shall be typed as spoken followed by "sic" in brackets after the term or word.

1    [Cases called at 11:00:56 a.m.]

2        THE CLERK:  Your Honor, good morning to you.  This is the

3    plaintiff -- it's two matters, Your Honor.  This is Sage Nicole

4    Humphries, the plaintiff on both matters.  Mitchell Taylor

5    Moore is the defendant on docket number 201701RO, docket number

6    181, and the other matter, Your Honor, same plaintiff, Ms. Sage

7    Nicole Humphries.  The defendant on this matter is Dusty

8    Button.  This is docket number 201701RO, docket number 182.  If

9    the parties could please identify themselves for the record,

10   beginning with counsel for the plaintiff.  Please, and thank

11   you.

12       MS. MELCHER:  Good afternoon, Your Honor.  Attorney Maura

13   Melcher for Sage Humphries.

14       THE COURT:  Okay.  Good morning.

15           [Discussion re Location/Screens/Cameras]

16       THE COURT:  All right.  So, one moment.  I'm just taking a

17   moment to look at the documents before the Court.  And, today's

18   hearing is --

19       THE CLERK:  So, Your Honor, there are two events.  This is

20   on -- Both matters are on a complaint for contempt filed by the

21   plaintiff as to each of the defendants.  And, also defendant

22   has filed, this defendant, on 183, Dusty Button, as the

23   defendant, has filed a motion to terminate the 209 order that

24   was marked up for today.  That is right here.

25       THE COURT:  Okay.  So let me start first with the

1  contempt, since that was put down --

2      THE CLERK:  Certainly.

3      THE COURT:  -- for today, February 22nd of 2023.  And, the

4  moving party has submitted the motion for the Court.

5      THE CLERK:  That's correct.

6      MS. MELCHER:  The complaint for contempt with a large

7  affidavit, exhibits, and there's also to the -- the affidavit

8  that was filed just to supplemental.

9      THE COURT:  Okay.  One moment.

10     THE CLERK:  Okay.

11     THE COURT:  Is this -- Can you show counsel this?  Is this

12 what she's speaking of?

13     THE CLERK:  That was filed this morning, Judge.

14     THE COURT:  Oh.

15     THE CLERK:  This is the affidavit in opposition of the

16 motion to vacate.

17     THE COURT:  Oh, that's a separate -- We're not going to do

18 that just yet?

19     MS. MELCHER:  No.  That's --

20     THE CLERK:  That's the rest of this --

21     MS. MELCHER:  -- I will refer to that affidavit --

22     THE COURT:  Okay.

23     MS. MELCHER:  -- in regards to the contempt.

24     THE CLERK:  You will --

25     MS. MELCHER:  'Cause it contains the most --

1          THE CLERK:  Okay.  [Crosstalk at 11:04:52 a.m.] --

2          MS. MELCHER:  -- issues --

3          THE COURT:  Okay.  And, it has --

4          Have the defendants, Ms. Button and Mr. Moore, have you

5     received the plaintiff's affidavit in support of the opposition

6     to vacate?

7          MR. MOORE:  No, Your Honor, we have not.

8          THE COURT:  Okay.

9          MS. MELCHER:  It has been served on them.  We sent out --

10    We had it -- Actually, I gave you a certificate of service, but

11    we sent out the original contempt and the exhibits, we had

12    those served by a constable.

13         THE COURT:  Okay.

14         MS. MELCHER:  They tried to return them to their house

15    three times, and then just with the affidavit, we put in the

16    mail to them.

17         THE COURT:  All right.  So you sent it certified?

18         MS. MELCHER:  Yeah.

19         THE COURT:  So, did you hear that --

20         MS. MELCHER:  Not certified.  U.S. Mail.

21         THE COURT:  Oh.  U.S. Mail.  Okay.  To what address?

22         MS. MELCHER:  I can give you the exact address.  I just

23    need a minute, Your Honor.

24         THE COURT:  Okay.  Take your time.  There's no rush.

25         MS. MELCHER:  The copy that I sent was unsigned because

```
1   she didn't sign it 'til this morning.  I had her sign and date
2   it this morning.  But I --
3        THE COURT:  Okay.
4        MS. MELCHER:  -- did send an unsigned copy.
5        THE COURT:  All right.
6        MS. MELCHER:  --
7        THE COURT:  Well, I guess what we can do -- You said
8   you're going to refer to this.  I would like them to have a
9   copy of it if you're going to refer to it.
10       MS. MELCHER:  Sure.  I can -- I mean, I can send it over
11  to them right now.
12       THE COURT:  Yes.
13       MS. MELCHER:  I would probably -- Can I take five minutes
14  so I can get someone in my office to make sure that it's
15  [Indiscernible at 11:06:55 a.m. - speaking away from
16  microphone].
17       THE COURT:  Yes.  And, you have their correct e-mail
18  address?
19       MS. MELCHER:  Can we confirm it right now?
20          [Discussions re E-Mail Address/Sending Document]
21                    [Pause through 11:12:48 a.m.]
22       MS. MELCHER:  It's been sent.
23       THE COURT:  Okay.  All right.  Mr. Moore and Ms. Button,
24  the attorney has notified the Court that the e-mail has been
25  sent to your e-mail address.  Did you receive it?
```

1        MS. BUTTON:  I just got it.

2        THE COURT:  Very good.  Okay.

3        MS. BUTTON:  It's just going to take one second because

4 it's a Zip file.  So I just need to download it.

5        THE COURT:  Of course, take your time.

6        MR. MOORE:  Would you like us to read all of this right

7 now?

8        THE COURT:  Well, perhaps we can continue with the

9 hearing, and if counsel could refer to the page, then you could

10 read that page that she's referring to.  Does that make sense?

11        MR. MOORE:  Okay.  Yes.

12        MS. BUTTON:  Yes.

13        THE COURT:  Okay.  All right.  So, the Court has had a

14 chance to review a restraining order that was issued by Judge

15 McKenna.  And, it was made permanent, I believe, in August of

16 2018.

17        MS. MELCHER:  Correct, Your Honor.

18        THE COURT:  All right.  Moving party, I will hear you.

19        MS. MELCHER:  Referring to that order, Your Honor, not

20 only was no abuse, and no contact, contact my third parties is

21 ordinarily ordered, but they were ordered, if you note at the

22 bottom, it's written in to surrender all electronic materials

23 belonging to Ms. Humphries and not to publish any of that

24 content.  Since that date, the defendants have done every item

25 that was prohibited on that restraining order.

1    Started with -- I would say -- And, they've admitted to

2  this actually in many different pleadings there.

3    So, since the restraining order took place, my client and

4  five, or six other girls that are all dancers with the ballet

5  filed a lawsuit against the Buttons for sexual trafficking.  My

6  client, if you need to see the details of the original

7  affidavit that led to the restraining order, --

8    THE COURT:  Mm-hmm.

9    MS. MELCHER:  -- was a minor.  And, she was groomed by the

10  Buttons, who are a married couple, [Indiscernible at 11:15:04

11  a.m. - speaking away from microphone] dancers.  They had

12  offered to become her manager.  They had invited her to come

13  live with them.  They had a -- an intimate sexual relationship

14  with them that -- then over time, that when that broke off, she

15  ended up with a restraining order, --

16    THE COURT:  Mm-hmm.

17    MS. MELCHER:  -- they engaged in other relationships with

18  other dancers from the ages of 14 upwards, I believe.  And, it

19  sort of demonstrated that -- that's all the subject of the

20  Nevada lawsuit.  What we have here is a restraining order

21  prohibiting contact, abuse, and the electronically stored

22  information.  So, in many of their pleadings, they ra -- say

23  "Well, we don't have her -- we never copied her electronically

24  stored information."  They acknowledge they have a copy of her

25  old IPod and all the images on it, but they say "Oh, well she

1    voluntary uploaded it" -- From what I understand of their

2    argument, "She voluntarily uploaded it to our computer when we

3    were all together way back in 2016 or 17," and they never, as

4    they were ordered to do, got rid of those copies, and they

5    continue to use those texts and images all the way through

6    until they published in the Daily Mail.  They gave the Daily

7    Mail copy -- copies of her text messages private from her cell

8    phone that were published in a newspaper article.  I had given

9    you copies of that attached to the contempt.  They published

10   them online.  They put them in a YouTube video.  And, so the --

11   But the allegation is, from what I understand, they're saying

12   they have access to this because she voluntarily uploaded her

13   phone to their computer.

14       We believe that the order was very clear.  All

15   electronically stored information should have been turned over.

16   They are not to use it.  They are not to publish it.  And, they

17   shouldn't have it.  If they saw a file later, as they say "Oh,

18   we discovered it later," they should've deleted it immediately.

19   And, that they've been violating this restraining order ever

20   since.  They go online, they refer to the dishonorable Judge

21   McKenna.  They have great upset about having this restraining

22   order.  They say even though they were represented, they had

23   the opportunity to testify, they chose not to.  And, now they -

24   - online, in many different news articles and publications,

25   they talk about how the unjust proceedings here.  How it was

1    abusive to them, and unfair.  They've never got their fair

2    chance.  They chose not to appeal it.  They chose not to come

3    back in 2018.  Judge McKenna was so -- for his own reasons,

4    made that order permanent, because, as stated, he found my

5    client to be extremely credible, and the evidence that she

6    presented to be very credible.

7         So, in some of these -- In our complaint for contempt,

8    just to give you a few examples of how they publish this

9    information.  After -- Now, they have this carbon copy -- a

10   comprehensive copy it had of her cell phone has photos, videos,

11   text messages between her and many different people.

12        THE COURT:  And, what year is that --

13        MS. MELCHER:  This --

14        THE COURT:  -- cell phone from?

15        MS. MELCHER:  2017.

16        THE COURT:  So, you're saying that --

17        MS. MELCHER:  Prior to the restraining order.  And, so

18   what I'm saying is, for example, --

19        THE COURT:  So, you're saying that your client uploaded

20   information from her phone onto their computer?

21        MS. MELCHER:  Well, they were all living together.  So, I

22   believe her phone, automatically, when you plug your phone into

23   a computer, it will automatically download and --

24        THE COURT:  If you allow it?

25        MS. MELCHER:  Yeah.  So, she may've done that on the

1  computer at some point.  And, they're saying --

2       THE COURT:  So, they're saying that they're in --

3       MS. MELCHER:  They're saying --

4       THE COURT:  -- they are in --

5       MS. MELCHER:  -- possession --

6       THE COURT:  -- possession of that information?  The --

7       MS. MELCHER:  Correct.  And, my client would tell you that

8  he -- that Mr. Button had taken her phone from her and stolen

9  that information.  What -- However that happened, they're in

10 possession of it, --

11      THE COURT:  Okay.

12      MS. MELCHER:  -- because they continue to use it.

13      THE COURT:  And, what exactly is the information that's on

14 that phone that you are --

15      MS. MELCHER:  It is years' worth of text messages.

16 Anything that could be on a phone.  Photographs, --

17      THE COURT:  Mm-hmm.

18      MS. MELCHER:  -- recordings, videos.  So, as we put in the

19 contempt --

20      THE COURT:  May I see the original restraining order

21 again?  I think I --

22      THE CLERK:  Certainly, Your Honor.

23      THE COURT: -- might've given it back to you.

24      One moment.  Let me look at the --

25      MS. MELCHER:  Sure.

1    THE COURT:  -- original.  Oh here it is.  Yeah.  One

2    moment.

3    [Reviewing document]

4    Okay.  So I'm reading Paragraph 14.  Judge McKenna,

5    "Defendant is to surrender any and all personal information

6    pertaining to the plaintiff including electronically stored

7    information, and is not to publish such information."  Okay.

8    MS. MELCHER:  Okay?  So, in our complaint for contempt, we

9    reference, for example, September 7th, 2022.  The defendants

10    gave an interview to the Daily Mail.  The text of this article,

11    Ms. Button says she has troves of texts from Ms. Humphries.

12    And, she says her sole focus for now is pouring over the

13    thousands of texts, photos, and documents to disprove my

14    accusers.  She had gone public to the Daily Mail to fight her

15    case, and to speak -- spate -- speak to her side of the story.

16    But she talks about, you know, going through Sage's documents

17    and using those to justify herself.

18    THE COURT:  Mm-hmm.

19    MS. MELCHER:  The reason we know those are the documents

20    she's talking about is she gave copies of texts between Sage

21    and third parties to the Daily Mail for publication.

22    THE COURT:  And, was that on September 7th of '22?

23    MS. MELCHER:  2022, correct.  Most recently, Your Honor,

24    and this is our -- the current affidavit exhibit, Paragraph 3,

25    4, 5.  If you go on either YouTube, or there's another site

1  called justiceforthebuttons.com, --

2      THE COURT:  Mm-hmm.

3      MS. MELCHER:  -- we can see the Buttons created two

4  videos.  Well, they created a plethora of videos.  But two

5  specifically called *The Real Sage Humphries Part 1*, and *The*

6  *Real Sage Humphries Part 2*.  They post videos -- These, I would

7  say, are abusive.  They post videos of my client, pictures of

8  her with a nose growing out like Pinocchio's nose.  They say

9  she's a liar.  They call her a liar.  They -- Most of the video

10  is them giving the finger through the camera to my client.

11  Memes saying "F you.  The truth will come out.  Liar, liar."

12  There --

13      THE COURT:  So, is there a case in Nevada?

14      MS. MELCHER:  There is an ongoing case, --

15      THE COURT:  Okay.

16      MS. MELCHER:  -- litigation in Nevada.

17      THE COURT:  Okay.  Ongoing case.  Is that --

18      MS. MELCHER:  This --

19      THE COURT:  -- in Federal Court?

20      MS. MELCHER:  Federal Court.  For --

21      THE COURT:  Okay.

22      MS. MELCHER:  -- sexual trafficking.

23      THE COURT:  Okay.  And, what is -- When's the next date

24  for that case?

25      MS. MELCHER:  That I would refer to this -- Well, an

1    attorney for the Nevada case is here.

2        MS. MARIELLA:  Good morning, Your Honor.

3        THE COURT:  Good morning.

4        MS. MARIELLA:  There's no current scheduled hearing in

5    that case, but we are set to wrap up discovery next month so

6    there should be a trial coming up, I would guess in the fall.

7        THE COURT:  Okay.

8        MS. MARIELLA:  [Indiscernible at 11:22:27 a.m. - speaking

9    away from microphone].

10       THE COURT:  And, it involves five people, six people --

11       MS. MELCHER:  Yes.

12       MS. MARIELLA:  Seven.

13       THE COURT:  Seven --

14       MS. MELCHER:  Seven all together.

15       THE COURT:  Okay.  So that case is ongoing in Nevada?

16       MS. MARIELLA:  Correct.

17       MS. MELCHER:  Correct.  So, they've created, and

18   unfortunately I've watched this video, that is on the YouTube

19   channel, and then on the justiceforthebuttons, they create

20   links to the YouTube channel.  And, as I said, these videos are

21   called *The Real Sage Humphries*.  The videos themselves are just

22   portraying her as a liar.  They actually play the recording of

23   the abuse prevention order hearing from 2017.  They play --

24   They must've ordered the transcripts online and got the

25   recording.  This video has that recording in the background,

1   has my client testifying throughout the video.  So, to -- You

2   know, very personal disturbing situation that happened when she

3   was both under age and very young, 18 years old, and 19.

4   Sorry.  But, you know, point being made, they broadcast the

5   contents of this courtroom --

6        THE COURT:  Mm-hmm.

7        MS. MELCHER:  -- on that video, while simultaneously

8   referring to her as a liar.  Telling people to request the real

9   evidence, find out the real truth alleging her testi -- their

10  own innocence.  So, that would be, you know, a second example

11  of them -- or actually a second and third of their, you know,

12  ongoing harassment.

13       They also harass her parents.  They've had people stalking

14  her parents' house.  They've -- I don't -- If Your Honor -- I

15  could bring it up if Your Honor was inclined to see the video,

16  to see if it does violate the abuse and no contact.  It's a

17  little difficult to say whether this is contact.  It's

18  definitely directed at her.  And, it's --

19       MR. MOORE:  Show them.

20       MS. MELCHER:  -- you know, and the video itself is

21  entitled *The Real Sage Humphries*, like I said, Part 1 and 2.

22  They're substantively about her, her family, and attack on her

23  character and her family, --

24       THE COURT:  Mm-hmm.

25       MS. MELCHER:  -- and allegations of that case out in

1  Nevada.  And, those were -- Those show that online about -- A

2  month or two ago, just in the last few months.  They are about

3  28 minutes long.  And, they basically cherry pick parts of the

4  texts from when she was in the active relationship with them,

5  during the time that they were supposed to have turned over all

6  these texts.  They actually post those texts that they

7  should've turned over and gotten rid of, post them in this

8  video so you can read -- so anybody can read them.  So, you

9  know, publishing, making it all very public.

10     They drink -- They're drinking in the video by the fire

11 pit.  And, you know, raising their middle finger.  They fire a

12 weapon.  Mr. Button fires a gun in the video.  There were

13 allegations they had a room full of weapons.  Back in the

14 original restraining order there were some pictures turned in.

15 It was a very disturbing room devoted to his gun collection,

16 which he now defends and says it's only an airsoft gun.  But at

17 the time -- I don't know whether that's true --

18     MR. MOORE:  [Issue with Zoom at 11:25:45 a.m.] --

19     MS. MELCHER:  -- or not.  But it's disturbing video, video

20 clip.  In this video that he posted online has him firing a

21 weapon after he talks about --

22     MR. MOORE:  [Issues with Zoom at 11:25:57 a.m.] --

23     MS. MELCHER:  -- his upset with Sa -- Ms. Sage Humphries.

24 And, then, --

25     THE COURT:  And, the date of that video is what?

1          MS. MELCHER:  Last month.  I don't -- Let me see if I have

2     a specific date.

3          THE COURT:  So, are you --

4          MS. MELCHER:  January 15th, 2023 -- Actually, February

5     14th, 2023.  It's on the YouTube channel.

6          THE COURT:  Are you turning these --

7          MS. MELCHER:  Well, I --

8          THE COURT:  -- into evidence?

9          MS. MELCHER:  -- I refer to -- I didn't bring the videos.

10    I printed out screen shots from the videos --

11         MR. MOORE:  [Issues with Zoom at 11:26:34 a.m.] --

12         MS. BUTTON:  [Issues with Zoom at 11:26:34 a.m.] we had

13    one --

14         MS. MELCHER:  -- so you could see that the screenshots

15    themselves were -- like the text themselves were put into these

16    videos.  We did capture stills of the video, and those are

17    attached to this affidavit.

18         THE COURT:  Okay.

19         MS. MELCHER:  So, you can see the violation within the

20    images.  I'd be happy to play the video for you now, Your

21    Honor, if you wanted to see it, or to turn in -- turn over a

22    copy of it the -- on a thumb drive today.

23         MR. MOORE:  [Issues with Zoom at 11:27:15 a.m.].

24         THE COURT:  Well, that's your prerogative, counsel.  You

25    can --

1          MS. MELCHER:  I will provide --

2          THE COURT:  -- This is --

3          MS. MELCHER:  -- I will provide --

4          THE COURT:  -- This is --

5          MS. MELCHER:  -- I will provide a copy of the video today

6   --

7          THE COURT:  This is a hearing where everyone will be heard

8   --

9          MS. MELCHER:  Okay.

10         THE COURT:  If you are --

11         MS. MELCHER:  I will --

12         THE COURT:  -- offering things into evidence, you may do

13  so.

14         MS. MELCHER:  I will --

15         THE COURT:  That is --

16         MS. MELCHER:  -- provide you with a copy of the download

17  of the YouTube video --

18         THE COURT:  And, just so --

19         MS. MELCHER:  -- that I refer to --

20         THE COURT:  -- we're clear, you have to be specific about

21  the date so that Ms. Buttons and Mr. Moore know exactly --

22         MS. MELCHER:  So, --

23         THE COURT:  -- what you're referring to.

24         MS. MELCHER:  -- very specifically, I'm referring to their

25  YouTube channel, in paragraph three, you know, that we last

1  accessed it, it says February 14th, 2023, but downloaded, there

2  are two specific videos called *The Real Sage Humphries Part 1*,

3  --

4        THE COURT:  Okay.

5        MS. MELCHER:  -- and *The Real Sage Humphries Part 2*.

6        THE COURT:  Okay.

7        MS. MELCHER:  So, we would turn those over.  There's also

8  a second video from their -- They have a Fletcher -- They call

9  it Fletcher Reed channel, which is the name of the character in

10 Liar Liar, which is a reference to my client, apparently.  And,

11 that's referred to in Paragraph 12.  And, so we can provide a

12 copy of that video.  It's called *The Cat's out of the Bag*.

13 Provide that for the Court as well.

14       THE COURT:  Okay.

15       MR. MOORE:  May I ask which paragraph of this that we're

16 referencing?

17       THE COURT:  Twelve.

18       MS. MELCHER:  Twelve.

19       MR. MOORE:  Okay.

20       MS. MELCHER:  And, --

21       THE COURT:  Twelve.

22       MR. MOORE:  Thank you.

23       THE COURT:  All right.  You're welcome.

24       MS. MELCHER:  Also, in Paragraph 18, there is a -- I can

25 also provide a 36-page document called *The Humphries' Timeline,*

1    *2200 Days of Hell on Earth and Coming*, which is also included

2    in this -- these websites, so.

3        THE COURT:  Okay.

4        MS. MELCHER:  And, that's on Page 18.  So I can --

5        THE COURT:  I see.

6        MS. MELCHER:  -- mark all those and turn them over.

7        THE COURT:  That's on Bullet Point 18?

8        MS. MELCHER:  Yes.

9        THE COURT:  Okay.  All right.

10       MS. MELCHER:  And, I'll have those to you before the day

11   is over.

12       THE COURT:  All right.  And, -- One moment.

13       Okay.  Is there anything else, counsel?  Are you through?

14       MS. MELCHER:  Yeah.  For the most part, Your --

15       THE COURT:  For this portion --

16       MS. MELCHER:  -- for Your Honor -- Yes --

17       THE COURT:  For this portion?  All right.

18       MS. MELCHER:  Yes, we are.

19       THE COURT:  Okay.  So, --

20         [Discussion Regarding Exhibits/Numbering Exhibits]

21       MS. MELCHER:  Your Honor?

22       THE COURT:  Yes.

23       MS. MELCHER:  I didn't ask, but also my client wanted to

24   know if she could make one small statement on the record.

25       MS. MOORE:  A what?

1      MS. BUTTON:  A statement.

2      MS. MELCHER:  [Indiscernible at 11:31:36 a.m. - speaking

3   away from microphone].

4      THE COURT:  One moment.  So, could you just -- Before I

5   hear from Ms. Button and Mr. Moore, in one moment, could you

6   just summarize for the Court the specific contempt issues that

7   you see?  I have Paragraph 3, 4, 5.

8      MS. MELCHER:  The things I'm bringing --

9      THE COURT:  Yeah.  Could you just summarize really

10  quickly.  And, then, I'm going to have them respond.

11     MS. MELCHER:  I'm not sure if you mean the things we're

12  going to provide after or the issues of contempt --

13     THE COURT:  Well, I -- It's got to be now 'cause this is

14  the hearing.

15     MS. MELCHER:  Okay.  So, I'm referring to -- Okay.  I'm

16  referring to --

17     THE COURT:  Just summarize for the Court the areas of

18  contempt.

19     MS. MELCHER:  Okay.  Well, providing the electronically --

20  keeping the electronically stored information.  Continuing to

21  harass and abuse the plaintiff --

22     THE COURT:  And, when you say keeping the electronic

23  information, the order that I have from Judge McKenna was that

24  this information was to be turned over to the Boston Police.

25     MS. MELCHER:  Correct.

24

1      THE COURT:  So, did that happen?

2      MS. MELCHER:  No.  We're alleging it did not, or if it

3  did, they kept a copy.

4      THE COURT:  So the Boston Police Department have never

5  received it?

6      MS. MELCHER:  I'm not sure whether they turned it over or

7  not, Your Honor.

8      THE COURT:  Okay.  Okay.

9      MS. MELCHER:  I believe they turned something over, but

10 they clearly kept --

11     THE COURT:  Something.  Okay.

12     MS. MELCHER:  -- a lot of --

13     THE COURT:  All right.

14     MS. MELCHER:  -- information.

15     THE COURT:  All right.

16     MS. MELCHER:  So, keeping the electronically stored

17 information, and then publishing the electronically stored

18 information.

19     THE COURT:  And, the dates of the publishing again,

20 please?

21     MS. MELCHER:  There was the September 7, 2022.  These were

22 all noted in the affidavit.  And, then, the on -- There's

23 certainly ongoing dates from January and February of 2023.

24 And, then, during the litigation that's been ongoing in Nevada

25 and during this discovery process --

```
 1        THE COURT:  Mm-hmm.

 2        MS. MELCHER:  -- last fall, is when they announced that

 3   they had this copy of her cell phone.  That's when they --

 4        THE COURT:  Okay.

 5        MS. MELCHER:  Actually, I have a copy in the file, Your

 6   Honor, if you'd like to see it.  It's one of their defensive

 7   pleadings in the Nevada case.  But I could turn that over to

 8   you if you wanted to see it.  But they specifically talk about

 9   how -- why they have a copy of her phone, that they have a copy

10   and they're accessing.  It's in their memorandum of law on an

11   emergency motion to strike plaintiff's motion for sanctions.

12        THE COURT:  Okay.  So, the dates I have are 9/7/22, and

13   January and February of 2023?

14        MS. MELCHER:  Yeah.  And, ongoing during discovery period.

15   I mean, all through the fall the -- certainly.

16        THE COURT:  Okay.  All right.  Well, I will certainly hear

17   from you again, but I would ask Ms. Button and Mr. Moore if you

18   would like to respond?

19        MR. MOORE:  Yes, Your Honor.

20        MS. BUTTON:  Yes, please.

21        THE COURT:  Yep.  One moment.  The Clerk just needs to

22   swear you in.

23                    [DUSTY BUTTON, Sworn.]

24                    [MITCHELL MOORE, Sworn.]

25        THE CLERK:  Thank you.  And, would you each just please
```

1  state your names for the record?

2      MR. MOORE:  I am Mitchell Moore.

3      MS. BUTTON:  And, I'm Dusty Button.

4      THE CLERK:  Thank you very much.  Thank you, Your Honor.

5      THE COURT:  All right.  Thank you.

6      MR. MOORE:  You're welcome.

7      THE COURT:  So, I will hear from whoever would like to

8  speak first with regards to this issue of contempt --

9      MR. MOORE:  Okay.

10      THE COURT:  -- of a restraining order.

11      MR. MOORE:  Okay.  First, we'd like to thank you for

12  letting us attend this on Zoom, Your Honor.  I know it's

13  inconvenient for everyone.

14      THE COURT:  Mm-hmm.

15      MR. MOORE:  And, we apologize for the informality, you

16  know, representing ourselves in all of this.  We're not very

17  familiar with procedure.  But, you know, we'll start at the

18  beginning and if we get off track, please let us know.

19      Just quickly responding to Ms. Melcher's statements of

20  things that we've admitted to.  I'm not sure what she's

21  referring to, but we've admitted to nothing aside from truth

22  and evidence that disproves her client's claims from 2017 to

23  date.  She stated that we were both dancers at the time.

24  That's also untrue.

25      As Sage stated herself in her affidavit and on her police

27

1  report, I was a watch maker and my wife was one of her

2  coworkers, of course, a dancer.

3      It says in our pleadings we said that we never copied her

4  data.  I'm not sure what she's referring to there, and that we

5  were ordered to, quote, "get rid of those copies," which did

6  strike a little bit of curiosity here, considering that the

7  only thing that we retained was our own data on our phone at

8  the time.  Until we discovered this in 2021 when the Court

9  forced us to comb through every single hard drive and device

10 that we had.  The hard drive that this folder from Sage's

11 backup was found on was corrupt, and we actually had to pay

12 service to restore the drive and replace the Seda [phonetic]

13 drive on the drive in order to access this folder.  At which

14 point, we discovered it because we had no access to that hard

15 drive until then, and we were happy to provide all this

16 correspondence with our attorneys, even though it's privileged.

17     But even Sage's new counsel themselves, in an e-mail dated

18 August 12th, 2022 stated that she was forced to obtain these

19 prevention orders.  Stating that the court in Boston ordered us

20 to destroy all electronic information.  All of this information

21 in question just proves beyond any doubt, not only a reasonable

22 doubt, that we have never done everything that Sage claims.

23 Every word in every affidavit that she has filed has been

24 untrue.

25     And, by definition, I believe at the bottom [Issues with

1  Zoom at 11:37:28 a.m.] this one that you have here it says by

2  penalty of perjury, that we possess evidence, which some of

3  which we provided to the court.  I'm not sure if it's there

4  today, but we sent it in our motion to vacate, that she's

5  perjured herself multiple times on every affidavit that she

6  signed her name to.  Ironically the one that we have here, her

7  name's not signed to.

8      But I assure you that everything that she stated is a lie.

9  We've proven that all of it is a lie.  And, in 2017 we

10 attempted to provide this evidence to the court, which

11 ironically Ms. Melcher said it wasn't turned over, but she

12 herself possesses a copy of all of it that we had in our

13 possession at the time.  Of course, Sage's iPhone backup was

14 not in our possession --

15     MS. BUTTON:  She said she was satisfied --

16     MR. MOORE:  Yeah.  And, -- And, according to court record,

17 Ms. Melcher, you yourself said "I am satisfied with the turning

18 over of evidence."  So, I'm not sure why we're here today

19 discussing the fact that it wasn't satisfactory, when, in fact,

20 you yourself stated that it was.

21     But moving forward to this data.  As I said --

22     THE COURT:  So, let me just -- Let me ask one question.

23 So, what was turned over to the Boston Police?

24     MR. MOORE:  Every single piece of data that we had at the

25 time, we turned over to Boston Police, Ms. Melcher, and Judge

1  McKenna at the time, --

2       MS. BUTTON:  Right.

3       MR. MOORE:  -- as well as a copy for her family, I

4  believe, considering that they're the reason why all of this

5  began.

6       THE COURT:  Okay.  So, do you know the name of the -- Was

7  it a detective?

8       MS. BUTTON:  It was sent to him.  It --

9       MR. MOORE:  I do --

10      MS. BUTTON:  Well, we --

11      MR. MOORE:  -- And, actually we do have all of their names

12  somewhere.  But we -- No, I -- I can't reference that here.

13      MS. BUTTON:  We sent it via UPS -- We sent it via USPS --

14      THE COURT:  Oh --

15      MS. BUTTON:  -- afterwards.  But we also gave her --

16      MR. MOORE:  Mm-hmm.

17      MS. BUTTON:  -- four thumbnail -- thumb drives that were

18  each --

19      MR. MOORE:  Five.

20      MS. BUTTON:  Oh, give thumb drives that were 8 gigabytes

21  each, as well as a binder full of thousands of text messages

22  that prove that every single thing that Sage has said was a

23  lie.  And, we can negate that every time.

24      MR. MOORE:  The -- The order does say turn over to the

25  Boston Police Department or her attorney, which was Ms. Melcher

30

```
 1    at the time, and who did receive a copy that she stated she was
 2    satisfied with.
 3          THE COURT:  Okay.  And, what was the name of that
 4    attorney?
 5          MR. MOORE:  That was Ms. Melcher.  We gave it to her
 6    directly in court --
 7          THE COURT:  Yes.
 8          MR. MOORE:  -- in her hands.
 9          MS. BUTTON:  Our -- Our previous counsel was Kevin
10    Mahoney.
11          MR. MOORE:  Right.
12          THE COURT:  Okay.  One moment.
13          Counsel?
14          MS. BUTTON:  Yeah, no problem.
15          MS. MELCHER:  I honestly don't recall that they gave it to
16    me.  I don't remember contesting that they gave us -- gave me
17    thumb drives -- they did --
18          MR. MOORE:  Thumb drive --
19          THE COURT:  So, done -- What about the five thumbnail
20    drives?
21          MS. MELCHER:  They may have given me five thumbnail
22    drives.  But the point being that they keep copies of
23    everything and then they're going to continue to use it.
24          THE COURT:  Right.
25          MS. MELCHER:  Copies don't matter.
```

```
 1          THE COURT:  Well, it's true.
 2          MS. MELCHER:  I mean, they -- What they said was they were
 3   giving me everything they had --
 4          THE COURT:  Mm-hmm.
 5          MS. MELCHER:  -- and that clearly wasn't true, because
 6   they --
 7          THE COURT:  Did you make copies?
 8          MR. MOORE:  Your Honor, these -- Just so I can be clear.
 9   What she's referencing were our own messages that Sage sent to
10   us on our devices and our phones.  These were our -- This is
11   our data.
12          THE COURT:  Yep.  But --
13          MR. MOORE:  I think the confusion here -- I'm sorry?
14          THE COURT:  No, go ahead.  I'm listening.
15          MR. MOORE:  I believe the confusion here is that they're
16   referencing multiple different things.  On one hand, Sage
17   herself did backup her IPhone camera roll --
18          THE COURT:  Yep.
19          MR. MOORE:  -- to my hard drive.
20          THE COURT:  Okay.
21          MR. MOORE:  Per her request, because she had been charged
22   $1,100 from her phone carrier because she hadn't returned her
23   old device before upgrading it.
24          THE COURT:  Mm-hmm.
25          MR. MOORE:  Her mother, freaking out on her like she did
```

1  countless times, was angry that the ca -- that her account had

2  been charged $1,100.  In order to return that phone, she needed

3  to restore -- she needed to store her data --

4      THE COURT:  Yep.

5      MR. MOORE:  -- somewhere, and she did not have a hard

6  drive large enough to store her 17,000 selfies, and everything

7  else that was on this camera roll.  So, she herself uploaded

8  this folder to our hard drive.  This hard drive was corrupted

9  for years, never utilized, until January where we had to

10 restore it and pay money to have it fixed.  At which point, we

11 discovered this folder, and immediately told our attorneys of

12 it.  And, instantly, that was the -- that was our basic

13 process.  Like, we never had any knowledge of this folder until

14 2021 --

15      MS. BUTTON:  Otherwise we would --

16      MR. MOORE:  -- at which point --

17      MS. BUTTON:  -- have used it --

18      THE COURT:  Yeah.

19      MR. MOORE:  Absolutely --

20      MS. BUTTON:  -- in 2017, because it would've been helpful.

21      MR. MOORE:  And, may I say, I -- I know that you asked

22 earlier what some of these sensitive text messages were.  These

23 sensitive text messages, the reason why this is such a big

24 issue for Sage, and her family, and her other attorney sitting

25 in the court today that flew across the country to witness

1  this, is because it proves that she illegally prostituted

2  herself to a billionaire, and that her mother trafficked her

3  for this prostitution.  And, I'm sorry to say, but that's why

4  this data is such a huge issue, only beginning in 2021.  But --

5      MS. BUTTON:  The owner.

6      MR. MOORE:  -- the argument here, I guess, is for

7  contempt.  And, -- But the main basis of this contempt is a

8  YouTube channel and a website that Ms. Melcher claims we own --

9      MS. BUTTON:  [Issues with Zoom at 11:41:55 a.m.] --

10     MR. MOORE:  -- but she doesn't bring forth any evidence

11 that we own it, and we do not.  So, I would ask that if you

12 want to provide these videos, by all means, we would love for

13 any judge to view these videos, that we ourselves have viewed,

14 and are very descriptive of exactly why everything she stated

15 is a lie.  But, please, provide the videos.  But with it, this

16 time, like you refused to do in 2017, provide some evidence to

17 substantiate your baseless claims.  Because, two dates

18 beginning in 2017 until 2023, not one claim that Sage Humphries

19 has brought forward comes with evidence.

20     Even in the Nevada hearing, we've had 18 months for them

21 to provide one piece of evidence that proves the claims she's

22 made, and she's provided nothing.  Yet, we provide hordes of

23 data referencing your claim of contempt in the Daily Mail.

24 Sage Humphries and her public relations team, which should tell

25 you everything that you know, because we ourselves don't have a

1  public relation -- relations team, went on a global media

2  campaign, where we found out in the New York Times that we were

3  being served with a lawsuit before we were ever served with a

4  lawsuit. From there, it was Boston Globe, Boston Magazine --

5      MS. BUTTON: Cosmopolitan.

6      MR. MOORE: -- ev -- Cosmopolitan magazine, Vogue

7  magazine. All of the publications that Sage herself dreamed of

8  being in since she was a kid. In these articles she defamed

9  us. And, the only reason we ever had an attorney in Las Vegas

10  to begin with is because we planned to sue Sage for defamation

11  after years of harassment beginning in 2017.

12      She filed contempts of this restraining in 2018, which was

13  why it was granted to be --

14      MS. BUTTON: Permanent.

15      MR. MOORE: -- permanent. And, 2018, the photograph,

16  which we have here, that I also provided when we filed for this

17  motion to vacate, that she gave to Judge McKenna, was over a

18  year old, and she herself had the date on the -- on the photo.

19  She had the receipts in her hand from the hearing in 2017

20  proving that the things that she told Judge McKenna were

21  firearms, were in fact toys. And, they were being sold online

22  in Boston in 2017. Yet she told Judge McKenna that we were

23  selling them illegally in California, therefore, violating the

24  order.

25      MS. BUTTON: The night before, ironically.

1        MR. MOORE:  The night before.  That -- No, that -- that

2   never -- the restrain -- that was the police report.

3        MS. BUTTON:  Yeah.

4        MR. MOORE:  Then she told Judge McKenna that Dusty's

5   secret employee for our secret company had reached out to her,

6   Dusty's personal assistant, which, number one, she doesn't have

7   a personal assistant, nor has she ever.  Number two, the woman

8   that Sage is talking about, owned a t-shirt company with her

9   mother and had nothing to do with Dusty.  She told Judge

10  McKenna that this was a secret company and our mission to gain

11  Sage's new address.  But I assure you, from the date that she

12  was kidnapped by her parents in 2017, we wanted nothing more to

13  be as far away from her on this planet as we possibly could.  I

14  would actually not prefer to see her in this room today.

15       So, that was itself, perjury.  She lied to the judge.

16  And, the evidence is right here.  Photograph from 2017.  Not

17  only that, she did file a police report the night before the

18  2018 hearing that this was made permanent.  In an attempt to

19  get some fortification for her lies, the judge -- the police

20  that she filed it to, themselves, reviewed the evidence and

21  verified beyond any reasonable doubt, that this was not a

22  firearm and therefore not a violation.  They also inspected her

23  claim about Kennedy, Dusty's, you know, alleged assistant, and

24  verified that they had nothing to do with us.  And, that this

25  also was not a violation.  This police report --

1    THE COURT:  No, could you just -- I -- That last sentence

2    I -- you said something about a violation.  What did you say?

3    MR. MOORE:  She claimed in 2018, to make this order

4    permanent, that -- we were unaware of this hearing by the way,

5    and we were unaware that we could appeal, because we were told

6    that it was useless to do so since the decision was reached

7    before we ever walked into that courtroom.  But, in 2018, she

8    filed a police report that we were selling illegal firearms in

9    California.  This was a lie.  She's aware of it --

10   THE COURT:  Right.  I got that part that the gun wasn't a

11   real gun.

12   MR. MOORE:  Right.

13   MS. BUTTON:  Right.

14   MR. MOORE:  Yes.  And, then, --

15   THE COURT:  But the sentence after that I did not get.

16   MR. MOORE:  The second part was the woman that she claimed

17   was Dusty's personal assistant in our secret company, a secret

18   employee trying to get Sage's address, the police confirmed and

19   verified that this had nothing to do with us, and that this was

20   also not a violation of the order.

21   THE COURT:  Oh.

22   MR. MOORE:  However, Sage withheld that report from Judge

23   McKenna the next day, because if she had shown it to him and he

24   saw that the police investigated the matter and guaranteed that

25   it was no violation, he couldn't grant the order.

1     She also happened to withhold her police report in 2017,

2   which you'll see from the transcript, our attorney asked her if

3   she brought with her today in court. And, she said "No, I

4   don't have it with me today, but I have a number" --

5     MS. BUTTON:  [Crosstalk at 11:46:11 a.m.] --

6     MR. MOORE:  -- He asked her "What number do you have?"

7   She said "A report number." It's in my phone if you want to

8   look at my phone. In that report her parents phoned in a call

9   for rape. I think it's code 261 --

10    MS. BUTTON:  261.

11    MR. MOORE:  -- in California. When they interviewed Sage

12  privately, the police investigated her phone and read through

13  all of her messages with us, and at the end of their report,

14  said that there is no fear of imminent danger. This was a

15  consensual relationship. There was no harm, and she could've

16  left the relationship at any point. But they had to interview

17  her privately because her parents clearly still had her under

18  duress. Which is why, if you reference some of the text

19  messages that she texted us warning us that her father had

20  written a restraining order and would force her to sign it in

21  order to regain her freedom to return to Boston to her life,

22  where she told us then we could, quote, "still be together."

23  You know, all of these messages persisted over the summer in

24  secret as she hid from her parents, and downloaded Snapchat on

25  her brother's phone, so that she could message us and they were

1   delete afterwards --

2       MS. BUTTON: [Crosstalk at 11:47:07 a.m.].

3       MR. MOORE:  -- and her mother would never find out.  Which

4   fully -- Yeah, which brings us to that.

5       MS. BUTTON:  The Snapchat point, where Ms. Melcher herself

6   said Snapchat is an app that deletes itself.  But then Sage

7   goes on record and says that Taylor ordered her to delete them.

8   Which is ironic, considering that totally contradicts itself.

9   Because if Snapchat is an app that deletes itself, no one needs

10  to order anyone to delete it.  Which also brings us to the

11  point that Sage actually told us to delete the messages.  And,

12  gave us her password and said "If my parents find out I'm using

13  Snapchat, I want you to delete my account."

14      So, there are -- We can negate this all day long.  We have

15  every single thing that proves --

16      MR. MOORE:  Everything.

17      MS. BUTTON:  -- this is a lie.  Her parents did not like

18  the fact that she was in a threesome, which, mind you, we made

19  a mistake and let her infiltrate our marriage.  And, I truly

20  believe that she wanted to replace me, and she used me, and I

21  fell for it.  And, I think that that is where we stand today.

22  And, we can provide you with any evidence whatsoever.  We would

23  never hide anything because we have nothing to hide.

24      MR. MOORE:  We actually want the Court to have all of this

25  evidence.  Which is ironic because Ms. Melcher and her team,

1    and everybody else from Nevada sitting there to the left,

2    actually want nothing more than to destroy it.  And, you would

3    have to ask yourself, what kind of court of law would want

4    someone to destroy evidence?  And, that's all you guys have

5    been fighting for for the last 18 months.  Well, you actually

6    haven't seen -- since 2017.  But the team sitting to your

7    right, they've been fighting for nothing but to destroy

8    evidence.  And, no, not you, your attorney.  You've been

9    fighting -- So, you -- you -- I mean, think about the order.

10   It's a restraining order.  You're -- We're being restrained

11   from someone we never hurt to give data, data that was sent to

12   our phones.  How strange is that?  Data that proves she's a

13   liar.  Yet, for 18 months now, we've been fighting for -- to

14   destroy that evidence.  Kind of odd, right?  I mean, evidence

15   that just -- I mean, I can read you any of these texts.  On any

16   of these texts -- I mean, here's the photo --

17       MS. BUTTON:  Actually --

18       MR. MOORE:  -- of Sage at her therapist, the one that was

19   in court in 2017 laughing --

20       MS. BUTTON:  Making fun of --

21       MR. MOORE:  -- making fun of the therapist that her

22   parents forced her into and used her own money as they shut her

23   bank account down, and wouldn't let her go free with no cell

24   phone or communication without [Crosstalk at 11:49:06 a.m.] --

25       MS. BUTTON:  [Crosstalk at 11:49:06 a.m.] --

1        MR. MOORE:  -- unless she bowed down and did what she

2   wanted.

3        MS. BUTTON:  [Crosstalk at 11:49:08 a.m.] --

4        MR. MOORE:  The only damage that's been done to that woman

5   was done by her parents.

6        MS. BUTTON:  She actually stated in her 2017 transcript

7   that she didn't know how to handle everyone disapproving of the

8   relationship.  And, that is ultimately why she did what she

9   did, because she was playing both sides.  And, we can prove

10  every single bit of that, and they can't, and that's why they

11  want it destroyed.  They have literally destroyed our lives.

12  We're on food stamps.  We have no assets.  We lost our home.

13  We have nothing.

14       MR. MOORE:  Haven't had income in two years.

15       MS. BUTTON:  Nothing.

16       MR. MOORE:  She said we were firing a weapon.  I'm not

17  sure if you're familiar with the definition of the word weapon.

18  But an airsoft toy that shoots plastic BBs is by no means a

19  weapon.  And, you, again, yourself, have those receipts.  And,

20  I don't know why -- I don't know -- Are we still on here?

21       THE COURT:  Yes.

22       MS. MELCHER:  Mm-hmm.

23       THE COURT:  Okay.

24       MR. MOORE:  Okay.  I -- We just lost the screen for some

25  reason.

1      MS. BUTTON:  We lost our screen.  I'm not sure --

2      MR. MOORE:  I -- I'm not sure why you -- you yourself are

3  unsure if you have these receipts.  Because we have the court

4  record right here that states that you do.  It's odd.  Because

5  even our attorney on the transcript stated that you have all of

6  the receipts from every one.  And, it's -- Specifically the one

7  in the video, and the one that your client, here, in this

8  photo, is laughing and pointing at the camera playing with the

9  gun.  So, these toys, these plastic toys, you know, --

10     MS. BUTTON:  Saw that.

11     MR. MOORE:  -- by all means there is no weapon involved --

12     MS. BUTTON:  This is --

13     MR. MOORE:  -- yet you persist, you lie again in court and

14  tell a judge that these are weapons.

15     MS. BUTTON:  They're just holding a BB gun.

16     MR. MOORE:  It's a airsoft --

17     MS. BUTTON:  An airsoft [Crosstalk at 11:50:34 a.m.] --

18     MR. MOORE:  -- plastic toy --

19     MS. BUTTON:  -- plastic toy in this photo.  This is a

20  screenshot from a Snapchat of us playing around with them.  She

21  knew very well that these were not real.  Yet she tried to have

22  us arrested.  Had us SWAT'd.  Said that we had over 50

23  automatic weapons, hand grenades, and landmines, and a report

24  we received from our friends who worked at the police

25  department downstairs, who were kind enough to let us know that

1  we should fire our dog walker, because they were the ones that

2  let her in while we were away.  So, all of this --

3       MR. MOORE:  And, --

4       MS. BUTTON:  -- can be negated.

5       MR. MOORE:  -- I will say, again, we're here to vacate a

6  order because we want our records --

7       THE COURT:  Well, --

8       MR. MOORE:  -- to reflect who we really are.  And, I know

9  the argument is for the contempt.  But, really, I have to tell

10  you, thanks to Sage Humphries and her superstar legal team

11  sitting behind out of frame there, we had a known felon, 17

12  year old convicted felon -- I'm -- 17 year old -- 17 year

13  convicted felon hired by one of the richest men in the country

14  to, in his own words, silence us at any means.  And, by the

15  way, known for putting bullet holes through journalists'

16  windows, break into our home and attempt to tap our phone

17  lines.

18       All of this because they do not want this information to

19  be public.  Because since 2017 the only thing that we possess

20  are everything that clears our name.  And, all of this is the

21  things that they want to destroy.  Because, I mean, if I had

22  lied and made -- I mean, think about the committed felonies

23  here.  We got sex trafficking your daughter, prostitution, tax

24  evasion, because I will remind you that some of the evidence on

25  those text messages that we were forced to give to her

1  attorney, 'cause we don't have a copy.  The Nevada Court forced

2  us to give it to their attorneys, which we did, and they told

3  us we could get it back in discovery --

4      MS. BUTTON:  It was recorded --

5      MR. MOORE:  -- but we won't get it back because they

6  refused every request for discovery that we've put forth so

7  far.  Those texts prove that Daryl Katz, the billionaire in

8  question, paid Sage -- is it $75,000 --

9      MS. BUTTON:  That we know of.

10     MR. MOORE:  -- in exchange for sexual acts.  Now, I would

11 want to hide those as well because that is prostitution.  It is

12 tax evasion.  And, he himself did create her Swiss bank account

13 at UBS for her to deposit those funds into, instructing her to

14 use them for herself because she should treat herself.  And, he

15 needs intimacy, both physical and mental, and everything else

16 above -- I mean, I -- I don't blame her for wanting to hide it,

17 but they shouldn't have started this to begin with, because at

18 this point the only thing we have is to show our innocence and

19 that that data, along with all the text messages she sent to

20 us, does exactly that.

21     THE COURT:  And, counsel, do you have any questions for

22 Mr. Moore or Ms. Buttons?

23     MS. MELCHER:  I'm assuming that was also part of their

24 argument on their motion to vacate.

25     THE COURT:  I'm keeping that separate because it's too

1  convoluted.  So, we're just doing the contempt right now.

2      MS. MELCHER:  Oh.  Okay.  No.  I -- The only thing I

3  wanted to note to Your Honor was the exhibits that are attached

4  to the affidavit that I handed you this morning.

5      THE COURT:  Mm-hmm.

6      MS. MELCHER:  Because it does show you all the screenshot

7  printouts.  The fact that they do have -- That we did have the

8  text messages and the download of the phone.

9      I guess I have a question for Mr. B -- Mr. and Mrs.

10  Button.

11      MS. MELCHER:  So, was it this fall you discovered that you

12  actually have a folder that contained the contents of Sage's

13  phone on your computer?

14      MR. MOORE:  This is -- We are not in fall yet, so it can't

15  be --

16      MS. MELCHER:  No, no, no --

17      MR. MOORE:  -- this fall, that would be --

18      MS. MELCHER:  Two thousand --

19      MR. MOORE:  -- last fall --

20      MS. MELCHER:  -- This past fall --

21      MR. MOORE:  And, if it were [Crosstalk at 11:53:54 a.m.] -

22  - I'm sorry.  I can't hear you.  I was responding --

23      MS. MELCHER:  Yeah.  So, in 20 --

24      THE COURT:  I think the microphone -- You have to pull the

25  microphone closer to you.

1    MS. MELCHER:  Sorry.

2        In 2022, in the fall, is that when you discovered that you

3    had this folder with the contents of Sage's phone on your

4    computer, yes or no?

5        MR. MOORE:  So, we're -- We're referencing seasons and not

6    specific times and months.  I can -- I can pull the e-mail to

7    your attorneys that we sent it and give you the exact date

8    rather than just being vague.

9        MS. BUTTON:  Yeah, I'll look for now, but I think it's --

10       MR. MOORE:  If you give us a minute, we'll find that.

11   Because I don't believe that being vague has any place in

12   court, that's why we find ourselves in this positions to begin

13   with.

14       MS. BUTTON:  It was after the lawsuit was filed, and we

15   were told to look for the first part of interrogatories and

16   production of documents.  So, whatever that first date was,

17   which I believe would have probably been September of --

18   actually it -- Was it 2022?  2020 --

19       MS. MELCHER:  I'd have to --

20       MS. BUTTON:  I'll find it --

21       MR. MOORE:  -- I'd have to reference --

22       MS. BUTTON:  But it was --

23       MR. MOORE:  -- actual facts, rather than assumption --

24       MS. BUTTON:  Actually, Sevina, behind you, probably has

25   the date faster than me, because I actually had to turn my

```
 1  phone on -- Wi-Fi off [Crosstalk at 11:54:55 a.m.] --

 2       MS. MELCHER:  Move to strike --

 3       MS. BUTTON:  -- get interrupted --

 4       MR. MOORE:  I mean --

 5       MS. MELCHER:  Can we move to strike all --

 6       MR. MOORE:  -- [Crosstalk at 11:54:47 a.m.].  I'm sorry -

 7       MS. BUTTON:  Sorry?

 8       MS. MELCHER:  Just this is non-responsive.  I just asked

 9  if it was in the fall of 2022.

10       MR. MOORE:  It sounded like a response to me.  And, I told

11  you we'd look for the data if you want it --

12       THE COURT:  Okay.

13       MR. MOORE:  -- but I'm not going to answer vaguely --

14       MS. MELCHER:  So, --

15       THE COURT:  Well, --

16       MR. MOORE:  -- you know.  I'm -- I'm just trying to --

17       THE COURT:  Okay.

18       MR. MOORE:  Sorry?

19       THE COURT:  So, if you would like to find the exact date

20  since you want to be direct, I will give you time to do that

21  and we will stop talking.

22       MR. MOORE:  Okay.  Okay.  I just don't want to be

23  incorrect while under oath.

24       MS. MELCHER:  Great.

25                          [Pause]
```

1      MS. BUTTON:  So, it would've been in 2021.  So, it

2  would've been in a -- I would say around August, September of

3  2021, because Katz -- Daryl Katz was not brought in as the

4  third party until August of 2022.  So, at that time, we --

5  well, like we said, we had to hire someone to actually fix that

6  hard drive because it was corrupt.  And, that hard drive had

7  been in storage for five years.

8      MS. MELCHER:  Okay.  And, then, the -- you -- the folder

9  was repaired, you repaired the folder, correct?

10      MS. BUTTON:  We repaired the actual hard drive.  So, we

11  had to replace the Seda drive in the hard drive, but yes, we

12  had to replace it, which is why they only got a certain amount

13  of documents from it to be begin with --

14      MR. MOORE:  Yeah.

15      MS. BUTTON:  -- because certain ones were corrupted.  And,

16  we didn't want to make it seem like we withheld anything, so we

17  actually had to pay to get the rest of it.

18      MR. MOORE:  The --

19      MS. MELCHER:  Okay.

20      MR. MOORE:  -- The truth is we --

21      MS. MELCHER:  And, --

22      MR. MOORE:  -- we -- we were -- I'm sorry?

23      MS. MELCHER:  I think I received the answer to my

24  question.  So, --

25      MR. MOORE:  Okay.

1          MS. BUTTON:  Okay.

2          MS. MELCHER:  -- what I would like to know is at that

3     point, did you contact the police to let them know that you

4     still had documents and turn them over to the Massachusetts

5     Police?

6          MR. MOORE:  We actually contacted our attorney

7     immediately, and were -- were instructed to turn them over to

8     them.

9          MS. MELCHER:  Did you --

10         MR. MOORE:  At which point [Crosstalk at 11:57:54 p.m.] --

11         MS. MELCHER:  -- Did you contact --

12         MR. MOORE:  I'm sorry?

13         MS. MELCHER:  -- the Massachusetts Police?  If you would

14    listen to the question that I ask and just respond to that, if

15    you don't mind.  Did you contact the Massachusetts Police and

16    turn those documents over to them --

17         MR. MOORE:  No.

18         MS. BUTTON:  No.

19         MS. MELCHER:  -- at that time?  Okay.

20         MS. BUTTON:  No.

21         MS. MELCHER:  And, do you know who runs the website the

22    justiceforthebuttons.com?

23         MR. MOORE:  No.

24         MS. MELCHER:  Do you have any -- You have no communication

25    with the person who's the author of that website?

49

1        MS. BUTTON:  No.

2        MR. MOORE:  No.  We actually --

3        MS. MELCHER:  Okay.

4        MR. MOORE:  I mean, and, again, --

5        MS. MELCHER:  Thank you.

6        MR. MOORE:  -- in the order -- I'm sorry.

7        MS. MELCHER:  Are you familiar with the videos, *The Real*

8   *Sage Humphries One and Two*?

9        MR. MOORE:  Yes.  We were made aware of these by Sage's

10  new legal team.

11        MS. MELCHER:  Okay.  Do you know who made these videos?

12        MR. MOORE:  No.

13        MS. BUTTON:  No.

14        MS. MELCHER:  Do you -- Were you aware that these videos

15  contain privileged texts from your own counsel to you?

16        MR. MOORE:  Yes.  We were made of that, again, by her

17  legal team this past week, I believe.

18        MS. MELCHER:  Okay.  Well do you think your counsel gave

19  whoever created justiceforthebuttons, and this video, YouTube,

20  do you think your counsel gave those videos -- those text

21  messages to the person who --

22        MR. MOORE:  I don't --

23        MS. MELCHER:  -- created the website?

24        MS. BUTTON:  I wouldn't think so.

25        MR. MOORE:  I wouldn't think they would do that.

1        MS. MELCHER:  Okay.  I wi -- Yeah.  Okay.

2        THE COURT:  So, just for the Court's clarification,

3   justiceforthebuttons.com is not owned by Ms. Buttons and Mr.

4   Moore, correct?

5        MS. MELCHER:  That's what they --

6        THE COURT:  And, --

7        MS. MELCHER:  -- just testified.

8        THE COURT:  -- once again, for the Court's clarification,

9   the ne -- *The Real Sage Humphries One and Two*, that video was

10  not owned or produced by Ms. Buttons and Mr. Moore?

11       MS. BUTTON:  That's right.

12       MR. MOORE:  That's correct.

13       MS. MELCHER:  Okay.  And, -- But those videos contain text

14  messages between your counsel and yourself, correct?

15       MR. MOORE:  That is -- I believe it might be an e-mail,

16  but yes, it contains messaging --

17       MS. MELCHER:  Okay.

18       MR. MOORE:  -- [Issues with Zoom at 12:00:01 p.m.] --

19       MS. MELCHER:  Okay.

20       MR. MOORE:  -- [Issues with Zoom at 12:00:02 p.m.] --

21       MS. BUTTON:  I don't remember.  I think --

22       MR. MOORE:  Yeah.

23       MS. BUTTON:  Yeah.  I think it's e-mail.  We've watched

24  them after they let us know, but --

25       MS. MELCHER:  And, --

1    THE COURT:  So, are these -- So, just once again for the

2  Court's clarification, the text message that -- the text

3  messages that are in *The Real Sage Humphries One and Two* --

4    MS. MELCHER:  Some --

5    THE COURT:  -- are allegedly from the phone --

6    MS. MELCHER:  N -- Some are from the phone of Sage

7  Humphries, they appear to be, correct?

8    MS. BUTTON:  From --

9    MR. MOORE:  From --

10    MS. BUTTON:  -- Okay.

11    MR. MOORE:  -- From what we've viewed, absolutely all of

12  them were text messages from our phones.  And, we see --

13    THE COURT:  Oh, from --

14    MR. MOORE:  -- nothing that --

15    THE COURT:  -- their phone.

16    MR. MOORE:  -- that were from Sage's.

17    MS. MELCHER:  Okay.  And, -- Okay.

18    THE COURT:  Okay.

19    MS. MELCHER:  And, did you also provide some of the

20  contents from this folder on your computer, did you also

21  provide some to the Daily Mail?

22    MR. MOORE:  No.  Actually, to the Daily Mail, I believe

23  that everything that they posted was from the docket, from the

24  legal docket.  I believe that it actually has Nevada's Court

25  docket in the bottom of their --

```
 1          MS. MELCHER:  But did you provide them --

 2          MR. MOORE:  -- thing --

 3          MS. MELCHER:  -- with any external information, whether

 4    they printed it or not, did you provide --

 5          MR. MOORE:  Yeah.  We did an interview with them.

 6          MS. BUTTON:  We did an interview --

 7          MR. MOORE:  Yes.

 8          MS. BUTTON:  -- with them and provided them with things

 9    from our phone.

10          MS. MELCHER:  Okay.

11          THE COURT:  From your phone?

12          MR. MOORE:  Nothing -- Yes, nothing from --

13          MS. BUTTON:  Correct.

14          MR. MOORE:  -- hers --

15          MS. BUTTON:  Nothing from hers.

16          MS. MELCHER:  Okay.

17          MR. MOORE:  And, can I reference one --

18          MS. MELCHER:  Do you still possess --

19          MR. MOORE:  -- one --

20          MS. MELCHER:  -- Do you still possess --

21          THE COURT:  Okay.  One moment.  You'll have a chance to

22    speak, Mr. Moore.

23          I'll let you have a question, counsel.

24          MS. MELCHER:  Do you still possess the contents of Sage

25    Humphries' phone?  I believe you said tens of thousands of
```

1  photographs, and text messages?  Do you still possess all this

2  information?

3      MR. MOORE:  No.  We actually filmed a 25 minute long video

4  returning it to her new legal team and destroying it, because

5  we had a feeling that they would manipulate the court to

6  believe that we did possess a copy of the folder.  So, we

7  returned it per court order.

8      MS. MELCHER:  When did you --

9      MS. BUTTON:  So, we -- Yeah, we did.

10     MS. MELCHER:  -- When did you do that?

11     MR. MOORE:  I can pull the video --

12     MS. BUTTON:  [Crosstalk at 12:01:52 p.m.] UPS --

13     MR. MOORE:  I can give you an exact date.

14     MS. BUTTON:  I believe it was about -- It was ordered to

15  be back by the 31st of December to them.  So, we did send it --

16     MS. MELCHER:  2022?

17     MS. BUTTON:  Correct.

18     MR. MOORE:  In December for s --

19     MS. BUTTON:  In December of 2022.  I can find the exact

20  date if you need it.

21     MR. MOORE:  We have a delivery receipt, so.

22     MS. BUTTON:  Yeah.  We do have the -- the delivery receipt

23  of the USPS receipt.

24     MS. MELCHER:  So, the -- Some of these videos that were

25  posted were posted from 2023 that contain the contents of what

1    you just said were Sage Humphries' phone, isn't that true?

2        MR. MOORE:  I don't know.  From what -- From what we see,

3    actually, in 2023, any of these videos that were posted, if

4    it's referencing something that was on a public docket, it's

5    available, because it's on the public docket.  But there's

6    nothing in that video that was from Sage Humphries' phone or

7    her backup.  That was the camera roll back up, by the way, not

8    an entire IPhone back up that has been returned to her.  But,

9    again, under oath, --

10        THE COURT:  Okay.

11        MR. MOORE:  -- we certify --

12        THE COURT:  One moment --

13        MR. MOORE:  -- that --

14        THE COURT:  -- One moment --

15        MR. MOORE:  -- that we returned it.

16        THE COURT:  -- One -- One moment.

17        So, once again, for the Court's clarification, counsel,

18    what exactly are you referring to that's in the videos that

19    would have come from the phone?

20        MS. MELCHER:  Can I take one second?

21                          [Pause]

22        MS. MELCHER:  I'm sorry.  So, in 2023, I believe, there

23    was a Daryl Katz video, *The Cat's out of the Bag* that I

24    referred to earlier, that was posted.  Are you aware of that?

25        MR. MOORE:  I am aware of that.

1        MS. BUTTON:  We're aware of that now.

2        MS. MELCHER:  And, that video contained text messages

3   between Ms. Humphries and Mr. Katz that were only available

4   through her phone or his phone, is that correct?

5        MR. MOORE:  That's incorrect.

6        MS. BUTTON:  That's incorrect.

7        MS. MELCHER:  Okay.

8        MS. BUTTON:  They're also available on the Daily Mail and

9   on the public docket, which, for what we saw, is the exactly --

10       MS. MELCHER:  How did --

11       MS. BUTTON:  -- the same that someone pulled from the

12  docket.

13       MS. MELCHER:  How did the Daily Mail get copies of these

14  text messages?

15       MR. MOORE:  They access the public docket, like most other

16  people.  I mean, you guys got a huge media campaign --

17       MS. MELCHER:  What public docket --

18       THE COURT:  Wait --

19       MS. MELCHER:  -- What public docket are you referring to?

20       MR. MOORE:  The one in Nevada.

21       MS. BUTTON:  The lawsuit that we're currently dealing

22  with.

23       MS. MELCHER:  Okay.  All right.

24       MS. BUTTON:  It's in the counterclaim against Sage, which

25  was actually dismissed last week because the judge reviewed our

```
 1  information.
 2       MR. MOORE:  Sage's request --
 3       MS. MELCHER:  Motion to strike --
 4       MR. MOORE:  -- for a dismissal --
 5       MS. MELCHER:  -- Your Honor, --
 6       THE COURT:  Okay.
 7       MS. MELCHER:  -- This is non-responsive.
 8       MS. BUTTON:  Oh, yeah, the counterclaim was not dismissed
 9  because --
10       MS. MELCHER:  Motion to strike --
11       THE COURT:  All right.  So --
12       MS. BUTTON:  -- the judge --
13       MS. MELCHER:  -- please --
14       THE COURT:  So, I do -- I would like to keep this hearing
15  just focused on what we have before the Court, and not --
16  unless --
17       MR. MOORE:  Okay.
18       THE COURT:  -- you think --
19       MS. BUTTON:  Okay.
20       THE COURT:  Unless the -- Unless a party thinks that
21  something is relevant to this hearing, that's taking place in
22  Nevada.
23       MS. BUTTON:  Okay.  Sorry about that.
24       THE COURT:  That's okay.
25       MS. MELCHER:  So, is it your testimony that this -- the
```

1  Humphries timeline, *2,200 Days of Hell on Earth and Counting*,

2  you did not write this?

3      MR. MOORE:  Is it -- Sorry.  Can you say that one more

4  time --

5      MS. MELCHER:  Did you --

6      MS. BUTTON:  Yeah.  You cut out.

7      MS. MELCHER:  -- Did --

8      MS. BUTTON:  Sorry.

9      MS. MELCHER:  Were you the author of *The Humphries*

10  *timeline, 2,200 Days of Hell on Earth and Counting*?

11      MR. MOORE:  We are not a author of the Humphries timeline.

12  But, however, --

13      MS. MELCHER:  Do you --

14      MR. MOORE:  -- that --

15      MS. MELCHER:  -- Do you know who wrote it?

16      MR. MOORE:  No.

17      MS. MELCHER:  Did you contrib --

18      MR. MOORE:  But I can -- I -- I -- I would assume that all

19  of us wrote it con -- considering it's factual, but no, we did

20  not write that and we do not own the website.  We do not

21  publish to the website.

22      MS. MELCHER:  I'm sorry.  Did you say "All of us wrote

23  it"?

24      MR. MOORE:  Everyone involved in this since 2017, 'cause

25  it seems to be a recap of history.

1        MS. MELCHER:  Are you saying that Sage wrote it?

2        MR. MOORE:  I'm saying that no, we did not write it.  And,

3    no, we are not the authors of it.  And, no, we did not publish

4    it onto the website.

5        MS. MELCHER:  Okay.  And, no, you did not give copies of

6    your texts from own counsel to you to this -- to these websites

7    to post?

8        MR. MOORE:  No.

9        MS. MELCHER:  Okay.

10        Can I take one minute, Your Honor?  I just have one more

11    thing.

12                    [Pause]

13        MS. MELCHER:  Do you know how the -- these texts between

14    Ms. Humphries and Mr. Katz were put on the public docket?

15        MS. BUTTON:  We --

16        MR. MOORE:  [Crosstalk at 12:07:11 p.m.] --

17        MS. BUTTON:  I'm sorry.  We sent them to our attorney as

18    soon as we found everything that we never knew we had, until we

19    were told to search for it.  We sent everything to --

20        MS. MELCHER:  Okay.

21        MS. BUTTON:  -- our attorney, and then --

22        MS. MELCHER:  So, you --

23        MS. BUTTON:  -- [Crosstalk at 12:07:21 p.m.] --

24        MS. MELCHER:  Sorry.

25        MS. BUTTON:  Sorry.

1-57

```
 1        MS. MELCHER:  Go ahead.

 2        MS. BUTTON:  Can you hear me?

 3        MS. MELCHER:  I'm sorry.  Go ahead.

 4        MS. BUTTON:  Oh.  I was -- I was saying, for a character

 5   reference, he said he was going to put it in the docket,

 6   because --

 7        MS. MELCHER:  Mm-hmm.

 8        MS. BUTTON:  -- of the text messages between them just to

 9   show -- Basically, by him adding Katz --

10        MS. MELCHER:  Thank you.

11        MS. BUTTON:  -- as a third party --

12        MS. MELCHER:  This is non-responsive, if you don't mind,

13   Your Honor.

14        MS. BUTTON:  But, I'm trying to [Crosstalk at 12:07:43

15   p.m.] --

16        MR. MOORE:  Can you explain what non-responsive --

17        MS. BUTTON:  Yes.

18        MR. MOORE:  -- means, --

19        MS. MELCHER:  It means --

20        MR. MOORE:  -- because we're not lawyers?

21        MS. MELCHER:  -- I mean, if I ask you a specific question,

22   I'd like you to focus on that question and --

23        MS. BUTTON:  I'm just --

24        MR. MOORE:  Oh.

25        MS. BUTTON:  -- [Crosstalk at 12:07:51 p.m.].
```

1    MS. MELCHER:  -- just answer that question.  So, if I say

2  --

3    MR. MOORE:  But you -- you --

4    MS. MELCHER:  So, I'm going to ask --

5    MS. BUTTON:  [Crosstalk at 12:07:54 p.m.]

6    MS. MELCHER:  -- you a question now.  I'm going to say, --

7    MR. MOORE:  You just --

8    MS. MELCHER:  -- so you --

9    MR. MOORE:  -- did.

10    MS. MELCHER:  -- told me that you provided those e-mails

11  to your lawyer, who then published them in the docket, correct?

12    MR. MOORE:  So, you just admitted that we did respond.

13  So, it is responsive.  And, yes, that is correct.

14    MS. MELCHER:  I'm sorry.  That's non-responsive.  But, can

15  -- may you -- could you please answer my question?  Is it

16  correct --

17    MS. BUTTON:  We're trying --

18    MS. MELCHER:  -- to summarize that you provided those text

19  messages to your attorney to publish in this public docket?

20    MR. MOORE:  No.  That's incorrect.

21    MS. BUTTON:  That's incorrect.

22    MR. MOORE:  We did not provide them to him to publish.  We

23  provided them to him, and on his own merit, he published,

24  because he's the lawyer and he's the one that understands how

25  the legal system works.

1        MS. MELCHER:  Okay.

2        MR. MOORE:  So, no, we did not --

3        MS. MELCHER:  But, --

4        MR. MOORE:  -- provide them [Crosstalk at 12:08:32 p.m.]

5        MS. MELCHER:  -- Ms. -- Mrs. Button, I'll address you,

6    specifically, since you just said that with your knowledge, he

7    published those documents in the public docket, is that

8    correct?  You --

9        MS. BUTTON:  With my --

10        MS. MELCHER:  -- You --

11        MS. BUTTON:  -- knowledge, --

12        MS. MELCHER:  -- were aware?

13        MS. BUTTON:  -- yes.

14        MS. MELCHER:  Yes.  Okay.

15        MS. BUTTON:  I was aware of it afterwards.

16        MS. MELCHER:  And, you were --

17        MS. BUTTON:  I don't ever talk --

18        MS. MELCHER:  -- you were prohibited --

19        MS. BUTTON:  -- [Crosstalk at 12:08:46 p.m.] --

20        MS. MELCHER:  -- by the restraining order from publishing

21    any of the contents of Sage -- any electronically stored

22    information, whether it be texts --

23        MR. MOORE:  That's correct.

24        MS. MELCHER:  -- or photos or --

25        MR. MOORE:  That's right.

1          MS. MELCHER:  -- anything else?

2          MS. BUTTON:  The -- You are correct --

3          MR. MOORE:  And, we did not --

4          MS. BUTTON:  -- in saying that.

5          MR. MOORE:  -- publish --

6          MS. MELCHER:  Okay.

7          MS. BUTTON:  But, we did not --

8          MS. MELCHER:  And so, --

9          MS. BUTTON:  -- publish them.

10         MR. MOORE:  -- We didn't publish any of them.

11         MS. MELCHER:  But, --

12         MR. MOORE:  My name's not Marc --

13         MS. MELCHER:  -- But, they were as a --

14         MR. MOORE:  -- [Crosstalk at 12:09:03 p.m.] --

15         MS. MELCHER:  -- result of your actions printed in the

16    public docket, correct?

17         MS. BUTTON:  So, we do not know what a docket is.

18         MS. MELCHER:  Okay.

19         MS. BUTTON:  We're new to this.

20         MR. MOORE:  We --

21         MS. BUTTON:  So, with him putting them anywhere --

22         MR. MOORE:  It's his choice.

23         MS. BUTTON:  -- in the legal system, it's his choice.  I

24    have no idea what he [Crosstalk at 12:09:16 p.m.] --

25         MR. MOORE:  We did --

1       MS. BUTTON:  -- [Crosstalk at 12:09:17 p.m.] --

2       MR. MOORE:  -- as our attorney --

3       MS. BUTTON:  -- [Crosstalk at 12:09:17 p.m.]

4       MR. MOORE:  -- told us to and provided the -- provided the

5   text messages.  And, no, we did not provide them to publish,

6   and no, we did not publish.

7       MS. MELCHER:  Okay.

8       MR. MOORE:  Mr. Randazza did, [Issues with Zoom at

9   12:09:26 p.m.] --

10       MS. MELCHER:  Thank --

11       MR. MOORE:  -- [Issues with Zoom at 12:09:27 p.m.].

12       MS. MELCHER:  -- Thank you, Your Honor.  I'm all set.

13       THE COURT:  Mm-hmm.  Thank you.

14       So, is there anything else, Ms. Button and Mr. Moore, that

15   you would like the Court to know with regards to this hearing?

16       And, then, counsel, I'll hear you with regards to your

17   recommendation to the Court for a prayer for relief.

18       MS. BUTTON:  [Issues with Zoom at 12:09:53 p.m.], or?

19       MR. MOORE:  Yeah.  There -- Well, in regards to the

20   contempt, there was one thing that we didn't touch on, that Ms.

21   Melcher falsely accused us of and, again, twisted.  Dusty's

22   statement to the Daily Mail, we do admit she did say, in fact,

23   that she would "be pouring over thousands of messages in order

24   to prove her innocence."  But, what she did not say is that she

25   would be pouring over thousands of Sage's text messages from

1  her backup.  So, they're trying to twist that statement into

2  the fact that we're pouring through her folder that she

3  willingly uploaded onto our hard drive.  But, in fact, Dusty

4  meant she's pouring over the messages that Sage sent to her.

5  All of the loving, caring, "I'm in love with you, and I want to

6  be married to you and have children with you" messages is what

7  she was referring to.  And, I just want to make that clear

8  that, yes, she does admit to saying that, but, no, she was not

9  referencing Sage's folder.

10       THE COURT:  Mm-hmm.

11       MS. BUTTON:  Not by any means.

12       THE COURT:  Okay.  Is there anything else?

13       MS. BUTTON:  I'm --

14       MR. MOORE:  For the contempt?

15       MS. BUTTON:  In regards to contempt, or just in regards to

16  everything?

17       THE COURT:  In regards to contempt.

18       MS. BUTTON:  I don't believe so.

19       MR. MOORE:  I don't think so.

20       THE COURT:  Okay.

21                         [Pause]

22       THE COURT:  Is there anything else?

23       MS. MELCHER:  Not on the issue of contempt, except as it

24  results to the prayer for relief and looking for attorney's

25  fees.

1    THE COURT:  I'll hear you.

2    MS. MELCHER:  Okay.  Your Honor, this -- Obviously, we're

3  loo -- this is a permanent restraining order because of the

4  egregious allegations back when it was originally put forward.

5    THE COURT:  Mm-hmm.

6    MS. MELCHER:  And, knowing that these parties continue to

7  interact through the -- this -- the court legal process, it's

8  very important that my client's, you know, privacy and right to

9  not be abused, be protected.  So, we're asking that not only --

10 that they now destroy whatever copy they have on their folder,

11 whether they know -- they're aware of it or not, that they

12 search everything they have, which they should've done in the

13 beginning, every hard drive they own, to make sure, and then

14 provide a sworn affidavit that everything has been destroyed

15 and turned over.

16    At this point, to clarify, we ask for sanctions of a

17 hundred dollars a day until they provide a sworn affidavit that

18 this has been done, in addition to destroying all -- any copies

19 of documents, the original files, however they want to parse it

20 or word it.  We do not want to hear about them having copies

21 somehow magically in the future.

22    We were also looking for contempt sanctions for at least f

23 -- the four times that we're aware of that they published her

24 information, one being on the public docket in Nevada, that

25 they just testified to, one being by provided images to the

66

1  Daily Mail, and two for the two websites that's in the two

2  videos that they -- that have been created, *The Real Sage*

3  *Humphries One and Two*, which we would say, although they deny

4  making these videos, the fact that the videos contain their

5  privileged e-mails from their own counsel to themselves,

6  there's no way -- They testified they don't believe their

7  counsel gave these messages to the creator of the video.

8       So, it begets the question of how on earth could the

9  creator of a video get privileged messages between counsel and

10  the Buttons without the Buttons having provided it?  If the

11  Buttons are telling us their lawyer didn't do it, that leaves

12  one other person that would've had access to those messages.

13  So, we are looking for sanctions for each of those four

14  occasions, and we are looking for onwards of attorney's fees,

15  of which I can provide an affidavit for today.  I was waiting

16  until this hearing was finished so I would know how long the

17  hearing was.

18       THE COURT:  Okay.  Thank you.

19       Mr. Moore, Ms. Buttons [sic], would you like to respond?

20       MR. MOORE:  Yeah.  Yeah.  We'll try to respond to

21  everything [Issues with Zoom at 12:14:31 p.m.] in the ending of

22  that -- closing of that argument, she referenced how someone

23  could magically obtain privileged communications between our

24  attorney and us, but we asked the same thing of how Ms. Melcher

25  magically obtained -- or how Sage's other legal team magically

1  obtained private communications between our attorney and Daryl

2  Katz's attorney.  Which is what, ultimately, led to us -- And

3  again, on record, under oath -- forfeiting that folder,

4  returning it to her attorney, and destroying every copy that we

5  had of it.

6      I -- We're more than happy to, as soon as we hang up this

7  call, provide a declaration.  We provided, maybe, a dozen of

8  them already, which is ironic, because Sage herself won't go on

9  oath -- won't go under oath and -- and state any of these

10 things, aside from the things that she's stating here today,

11 the things that we've disproved and every single bit of

12 evidence that we have.  But, like I said, we're happy to

13 provide it.  We're under oath now.  We're saying, yes, it was

14 destroyed.  We, actually, again, knew that this would happen,

15 so we filmed an unbroken video for 20 minutes, making sure that

16 the Court understood fully that we abided by the orders, to

17 which we returned, and then to -- not to our surprise, they did

18 find that they didn't receive everything in the folder.  But,

19 yeah, we -- we -- we've destroyed it.  It's all been destroyed.

20 We don't publish it.  We have no plans to publish it.  Again,

21 we want nothing to do with Sage Humphries or her family, or

22 anyone else that represents her, for that matter.

23      MS. BUTTON:  Ever.

24      MR. MOORE:  Only thing that we want to do is put her and

25 that terrible part of our life behind us, and it -- Like we

68

```
 1   said before, we understand that this relationship was
 2   unconventional and odd to begin with, but we don't believe that
 3   it constitutes destruction of two innocent lives.
 4        THE COURT:  All right.  Did you want to say something,
 5   counsel?
 6        MS. MELCHER:  Just I noted that he said Ms. Humphries
 7   wouldn't testify under oath.  She did want to make a statement
 8   --
 9        THE COURT:  Certainly.
10        MS. MELCHER:  -- if you allow.
11                        [SAGE HUMPHRIES, Sworn.]
12        THE COURT:  All right.  Thank you.  Good afternoon.
13        MS. HUMPHRIES:  Good afternoon.  Thank you so much for --
14        THE COURT:  Mm-hmm.
15        MS. HUMPHRIES:  -- respectfully considering what I have to
16   say.
17        When I filed this restraining order initially in the
18   summer of 2017, it's because I was afraid for my life.  The
19   abusive situation that I escaped from Dusty and Taylor I
20   wouldn't wish upon my worst enemy.  I was in grave danger and
21   fear over these two people.  I wrote the affidavit myself in
22   the summer of 2017, and I did so knowing that they would not
23   stop unless I got this protective order.
24        When I was here testifying for this protective order, I
25   asked the judge to please consider adding that extra section
```

1  about my electronically stored information, because I knew that

2  these people were vengeful and malicious, and I knew that they

3  would try to blackmail me later in my life.  I had seen

4  evidence from the time that I spent with them that they did

5  that with people who crossed them.

6      In the summer of 2020, I met another woman who was abused

7  by Taylor at the young age of 14, which prompted me and her to

8  file the civil lawsuit in Nevada.  We are now joined by five

9  other women who are very brave in coming forward about this

10 traumatic part of our lives.

11     As you can tell, by the way that the Buttons talk, they

12 are very manipulative people, and the way that they talked over

13 me at the young age of 19 left me powerless in that situation,

14 but I refuse to be powerless now.  I stand before you at 25

15 years old, and I am continuously being harassed by them and

16 their use of my personal information.  My worst fears were

17 confirmed the summer when they filed third-party lawsuits using

18 that protected material to defame me and my character and paint

19 a false narrative of who I am and who my family is.

20     We filed sanctions in Nevada against the use of this

21 information in our litigation, and I went through the proper

22 legal channels to make sure that this information would be

23 contained, even though they had no right to have it in the

24 first place.  The sanctions were granted in Nevada.  Despite me

25 going through the propel -- proper legal matters to obtain the

1  sanctions and to prevent them from using this information, they

2  have chosen to publicly post this information on YouTube,

3  Instagram, and their website, JusticefortheButtons.  They have

4  sent it out to colleagues of mine.  They have sent it out to

5  friends of mine.  This has caused me personal and professional

6  harm.  It has caused my family personal and professional harm.

7       I am asking that you please consider the criminal actions

8  of these two people and their utter disregard for the legal

9  system, and that they have been ordered to surrender this

10  information years ago, yet they continue to use it to harass me

11  and bully me, alongside the six other plaintiffs in this case.

12  Thank you.

13       MS. MELCHER:  Your Honor, one other point.  I do have

14  those videos.  If you wanted, I could forward them to the court

15  e-mail if the Court wanted them to review.

16       THE COURT:  Mm-hmm.  Are you speaking about *The Real Sage*

17  *Humphries One and Two*?

18       MS. MELCHER:  All the videos that I referred to --

19       THE COURT:  So, --

20       MS. MELCHER:  -- earlier.  But, yes, those --

21       THE COURT:  -- So, during the course of the hearing, there

22  was testimony, and I asked for clarification --

23       MS. MELCHER:  Yep.

24       THE COURT:  -- a couple of times that the authors or

25  producers of these videos were not the defendants, correct?

1        MS. MELCHER:  They deny being the defendants, but they

2   also admit that -- of the contents of that video being

3   communications between themselves and their own personal

4   attorney.  They testified --

5        THE COURT:  Right.

6        MS. MELCHER:  -- that their attorney didn't provide those

7   e-mails to the v -- to the makers of this video.

8        THE COURT:  Mm-hmm.

9        MS. MELCHER:  The videos contain, also, all of the images

10  which he noted coming from Ms. Humphries cellphone, --

11       THE COURT:  Mm-hmm.

12       MS. MELCHER:  -- which he was in poss -- they were in

13  possession of.

14       THE COURT:  When you say they, --

15       MS. MELCHER:  Mr. and Mrs. Taylor Button.  I understand

16  that --

17       THE COURT:  But, how could the Court link up -- connect

18  the dots to all --

19       MS. MELCHER:  I would say it's an --

20       THE COURT:  -- to this evidence that --

21       MS. MELCHER:  -- abundance of --

22       THE COURT:  -- was not produced or authored by Mr. Moore

23  or Ms. Buttons?

24       MS. MELCHER:  Well, simply because they had the motive and

25  opportunity.  They're known -- They have a reputation for

1   creating these types of videos, the video's --

2       THE COURT:  Well, and the Court needs --

3       MS. MELCHER:  -- specific purpose is --

4       THE COURT:  I mean, the Court needs more than --

5       MS. MELCHER:  And, the fact that it --

6       THE COURT:  -- creativity or --

7       MS. MELCHER:  No.

8       THE COURT:  -- reputation.

9       MS. MELCHER:  It's not just creativity.  It's that they --

10  How on earth would the makers of this video that they claim not

11  to even know get ahold of their privileged communications --

12      THE COURT:  So, who --

13      MS. MELCHER:  -- through counsel?

14      THE COURT:  -- who are the makers of these videos?

15      MS. MELCHER:  They claim they don't know.

16      THE COURT:  When you say they, does -- do you or your

17  investigators know?

18      MS. MELCHER:  We -- I believe that it -- And, I know that

19  in a lot --

20      THE COURT:  No, not --

21      MS. MELCHER:  -- of cases --

22      THE COURT:  -- just believe.  I -- The Court needs hard

23  evidence.

24      MS. MELCHER:  So, the videos do con -- also contain

25  personal discovery that was provided by Ms. Humphries to their

1    counsel in the Nevada lawsuit.  Again, it's circumstantial

2    evidence.  I understand --

3        THE COURT:  Mm-hmm.

4        MS. MELCHER:  -- it's not hard evidence, Your Honor.  But,

5    there's so much privileged information that is included in

6    these videos, which are made for the benefit of *Justice for the*

7    *Buttons*, for the benefit of the Buttons, --

8        THE COURT:  Mm-hmm.

9        MS. MELCHER:  -- clearly containing information that only

10   they have access to.  I don't see how they can stand there and

11   claim that they don't know who created --

12       THE COURT:  And, --

13       MS. MELCHER:  -- or that they weren't involved directly.

14       THE COURT:  -- And, you said that their attorney gave it

15   to the producers of these videos?

16       MS. MELCHER:  No.  They said that their attorney did not.

17   I asked them that in the -- these series of question.  I said,

18   "Do you think" -- They -- I said, "Did you see that these

19   videos contained e-mails from your counsel to you," and they

20   said "Yes."  I said, "Do you think your attorney gave the maker

21   of the video copies of these e-mails?"  "No."  They don't think

22   the attorney did that.  They don't think so.  And so, it leaves

23   one other person --

24       THE COURT:  Mm-hmm.

25       MS. MELCHER:  -- that would yet have copies of these

1-72

1   communications.  They're privileged communications from a

2   lawyer to a person.  I just don't see how else anybody could

3   have them to put [Crosstalk at 12:23:02 p.m.] --

4       MR. MOORE:  That's not true.

5       THE COURT:  Did you want to respond, Mr. Moore or Ms.

6   Buttons?

7       MR. MOORE:  And, we're -- We're sitting here today, so I

8   don't know why we're discussing -- Like, if -- if Marc Randazza

9   should be in a hearing, I feel like he should be here to speak

10  for himself.  But, as we stated, no, to our knowledge, and, no,

11  do we never believe he would, because as a lawyer I feel like

12  it would be pretty stupid to do something like that.  And, he

13  does have a Bar Association to worry about, ethic violation,

14  and I -- I -- I can't believe and/or imagine that he would

15  violate those ethics that he swore to for the Bar Association.

16      THE COURT:  All right.  Thank you.  Well, with regards to

17  this hearing, the Court is going to take this matter under

18  advisement.

19      MS. MELCHER:  Thank you, Your Honor.

20      THE COURT:  Yep.

21      THE CLERK:  And, Your Honor, --

22      THE COURT:  Mm-hmm.

23      THE CLERK:  -- for clarification --

24      THE COURT:  Excuse me?

25      THE CLERK:  Just for --

1       THE COURT:  Yep.  For your clarification --

2       THE CLERK:  Please and thank you, --

3       THE COURT:  Yes.

4       THE CLERK:  -- is there anything further that's being

5  submitted by plaintiff's counsel that was referenced earlier?

6  I don't know if anything else is coming in or not.

7       MS. MELCHER:  Can I -- I was asking can I video -- can I

8  e-mail over the videos for counsel's review -- for the

9  attorney's review -- Judge's review?  Sorry.  And, they're very

10  clearly referenced, you know, dates and times and e-mail

11  addresses in the affidavit.  And, --

12       MR. MOORE:  Am I allowed to speak or --

13       THE COURT:  Yes.  We -- We're not -- I'm not saying

14  anything, sir.  Did you want to say something?  I'm thinking.

15       MR. MOORE:  I was -- I was asking, if you're going to send

16  those videos over, can you send the evidence of who created

17  them and who owned them, as well, considering that's required

18  of this Court to prove that it's us, since she claimed it was

19  us?

20       THE COURT:  Well, since you did submit them, and Mr. Moore

21  and Ms. Button do have a copy of what was submitted, you can

22  offer into evidence.

23       So, as I look at this other document before the Court, was

24  there a YouTube channel created?  You -- You're not referencing

25  that, are you?

```
 1        MS. MELCHER:  The videos are shown on the YouTube channel,
 2   --
 3        THE COURT:  Oh, --
 4        MS. MELCHER:  -- but --
 5        THE COURT:  Okay.
 6        MS. MELCHER:  Yeah.
 7        THE COURT:  Thank you.  All right.  As I said, the Court
 8   will take this matter under advisement.
 9               [Pause 12:25:49 p.m. to 12:26:45 p.m.]
10        THE COURT:  So, as I stated, the Court is going to take
11   this matter under advisement.  I know there's a second motion
12   before the Court.  The Court is inclined -- Right now, I need
13   to take a 10-minute recess before we start the next motion, or
14   we can start at two o'clock, because the Court needs to break
15   from one to two for a matter.
16        MS. BUTTON:  Okay.
17        MR. MOORE:  Whatever's best --
18        MS. BUTTON:  Whichever --
19        MR. MOORE:  -- for the Court.
20        MS. BUTTON:  Yeah, convenient for you.
21                          [Pause]
22        THE COURT:  I'll be back in five minutes.  How about that?
23   All right?
24        MS. MELCHER:  Thank you.
25                  [Matter in Recess at 12:27:46 p.m.]
```

```
1                    [Back on Record at 12:40:48 p.m.]

2         THE COURT:  Can you hear us?

3         THE CLERK:  All right.  Good afternoon, everyone.  We're

4    back on the record.

5         MS. BUTTON:  Good afternoon.

6         MR. MOORE:  Good afternoon.

7         THE CLERK:  Thank you.

8         THE COURT:  So, I would like to take the lunch hour to see

9    if, procedurally, the Court would hear a motion to vacate a

10   permanent restraining order.  So, I can come back at two

11   o'clock, or I could put this over to another date.  But, I want

12   to be sure that this is, procedurally, the avenue to go.

13        MR. MOORE:  Okay.

14        MS. BUTTON:  Okay.

15        THE COURT:  So, parties, would you like to come back at

16   two o'clock, or we can put it over for another date?

17        MR. MOORE:  We originally -- Last week we filed for a

18   continuance to try to allow ourselves time, because we weren't

19   aware that it would be compounded with today, so we wouldn't

20   mind another date, if that's all right with everyone there.

21        MS. BUTTON:  But, if it's inconvenient --

22        MR. MOORE:  Yeah.

23        THE COURT:  It's not --

24        MS. BUTTON:  -- for you, then --

25        THE COURT:  -- It's not about -- It's not inconvenient to
```

```
 1   the Court.  I wanted to make sure the parties are --

 2        MS. MELCHER:  My --

 3        THE COURT:  -- informed and ready.

 4        MS. BUTTON:  Okay.  So, we're -- we're okay with either

 5   option.  We -- And, another date would be great, but if not,

 6   then --

 7        THE COURT:  Okay.

 8        MS. BUTTON:  -- you know, --

 9        THE COURT:  I do need time to look into this.  I do need

10   time, --

11        MS. MELCHER:  Is it possible that --

12        THE COURT:  -- procedurally.

13        MS. MELCHER:  -- yeah, that we would not have a hearing,

14   potentially?  My client --

15        THE COURT:  It could go --

16        MS. MELCHER:  -- did --

17        THE COURT:  -- either way.  I don't know.  I don't -- I

18   cannot --

19        MS. MELCHER:  Right.

20        THE COURT:  -- give you a definitive answer without

21   looking into it.

22        MS. MELCHER:  I understand, Your Honor.  And, I did do

23   some research on it myself.  My client did take the day off

24   from work today, --

25        THE COURT:  Mm-hmm.
```

1        MS. MELCHER:  -- so she was more inclined to come back at

2   two o'clock.

3        THE COURT:  Mm-hmm.  Okay.  It doesn't matter to me.  I'm

4   here all day.  So, before you go, you said you did research on

5   what, counsel?

6        MS. MELCHER:  On the issue of vacating the current

7   restraining order.

8        THE COURT:  And, what did you --

9        MS. MELCHER:  I --

10       THE COURT:  -- find in your research?

11       MS. MELCHER:  Nothing compelling.  I have somebody --

12       THE COURT:  Nothing --

13       MS. MELCHER:  -- sending me --

14       THE COURT:  -- compelling?

15       MS. MELCHER:  -- over a memo right now, but.  So, --

16       THE COURT:  Okay.

17       MS. MELCHER:  -- I might have some more information for

18   you --

19       THE COURT:  Okay.

20       MS. MELCHER:  -- after the break.

21       THE COURT:  Two o'clock.  Thank you.

22       MS. MELCHER:  Thank you.

23       MR. MOORE:  Thank you.

24       THE CLERK:  Certainly.  I just want to make sure I

25   understood your previous finding on the videos that counsel had

1   mentioned as to specific dates.  Is the Court requesting that

2   those be --

3        THE COURT:  They can be submitted.

4        THE CLERK:  Okay.

5        THE COURT:  Yes.

6        THE CLERK:  Would you like -- Is there a particular manner

7   in which you'd like them submitted, either a -- a thumb drive

8   or something, or --

9        THE COURT:  Whatever's convenient to the court.

10       THE CLERK:  Okay.

11                    [Crosstalk at 12:43:22 p.m.]

12       THE CLERK:  While everyone's here, just to clarify what

13   exactly that is, --

14       MS. MELCHER:  There's --

15       THE CLERK:  -- counsel?

16       MS. MELCHER:  -- two videos, *The Real Sage Humphries One

17   and Two*, that we're going to send over.

18       THE CLERK:  Okay.  And, this is -- this is d -- this is

19   referenced from February 14 of '23?

20       MS. MELCHER:  I believe that's the date -- the last day we

21   accessed them.  I'm not sure exactly their posting --

22       THE CLERK:  Okay.

23       MS. MELCHER:  But, that's what we --

24       THE CLERK:  So, --

25       MS. MELCHER:  Yeah.

1    THE CLERK:  The Real Sage videos part one and two?

2    MS. MELCHER:  Correct.

3    THE CLERK:  Okay.  And, is it possible that those could be

4  submitted via thumb drive or something to that effect to go

5  from here and brought to the court?

6    MS. MELCHER:  Certainly.  I mean, it's more convenient to

7  e-mail them, but I could have --

8    THE COURT:  You could --

9    MS. MELCHER:  -- someone drive it in.

10    THE COURT:  -- E-mail is fine.

11    THE CLERK:  Okay.  Okay.

12    THE COURT:  E-mail is --

13    THE CLERK:  [Crosstalk at 12:44:02 p.m.] --

14    THE COURT:  -- fine.

15    THE CLERK:  -- [Crosstalk at 12:44:03 p.m.].  And, is

16  there anything else?

17    MS. MELCHER:  Okay.

18    THE CLERK:  There were a few other things that were

19  mentioned.  I just wanted clarity as to what's coming in and

20  what's not coming in.

21    MS. MELCHER:  I would submit all the videos that I

22  mentioned prior, if the judge wants to see them, but I think

23  the strongest ones are Sage Humphries One and Two.

24    THE COURT:  Counsel, it's your case.  You can submit

25  whatever you'd like into evidence.

1       MS. MELCHER:  Okay.

2       THE COURT:  I mean, we have moved on, but --

3       MS. MELCHER:  The ones that I --

4       THE COURT:  -- but --

5       MS. MELCHER:  -- that I mentioned that I said I would

6  submit, I will submit them.

7       THE COURT:  Okay.

8       THE CLERK:  Okay.  Thank you.

9       THE COURT:  Thank you.

10       THE CLERK:  Okay.

11       THE COURT:  Two o'clock.

12       THE CLERK:  Two o'clock.  Thank you, --

13       THE COURT:  Yes.

14       THE CLERK:  -- Your Honor.

15       THE COURT:  Thank you, counsel.

16       THE CLERK:  Okay.  For the record, it's 181 and 182.

17  That's 2017RO.  This is the hearing on the complaint for

18  contempt has been taken under reservation [sic].  Plaintiff's

19  counsel to submit at least the parts one and two of -- The name

20  of the video again, counsel?

21       MS. MELCHER:  Sa -- *The Real Sage Humphries*.

22       THE CLERK:  *The Real Sage Humphries One and Two*, and that

23  can be, with the Court's permission, e-mailed.  I'll give you

24  our e-mail address --

25       MS. MELCHER:  Yep.

1    THE CLERK:  -- and just indicate that -- indicate that

2   that's for the Court with the docket number.  As I said --

3    MS. MELCHER:  Yep.

4    THE CLERK:  -- a moment ago, our e-mail is fairly

5   voluminous, and we want to --

6    MS. MELCHER:  Okay.

7    THE CLERK:  -- get this to the Court as soon as we can, so

8   --

9    MS. MELCHER:  [Crosstalk at 12:45:21 p.m.] --

10    THE CLERK:  -- we'll -- we'll --

11    MS. MELCHER:  -- [Crosstalk at 12:45:22 p.m.]

12    THE CLERK:  -- kind of tag it, please and thank you.  It's

13   bmccentral@jud.state.ma.us.  And, as soon as we get them, we

14   will get those over to the Court.

15    MS. MELCHER:  The name of the other video, just so you

16   know, is e-mail is *The Katz out of the Bag*.

17    THE CLERK:  Okay.  So, just for -- I know the Court's not

18   on the bench anymore, but I understand everyone's --

19    MS. MELCHER:  I'm sorry.

20    THE CLERK:  -- still listening.  We're still on the

21   record.  So, this is parts -- from *The Real Sage Humphries*

22   *Parts One and Two* and video of *The Katz out of the Bag*,

23   referenced in Paragraph 12 of what?

24    MS. MELCHER:  Of the affidavit Sage Humphries dated today.

25    THE CLERK:  Thank you.  Okay.  That's everything that's

84

1-82

 1  coming over, as best we know.  We'll take whatever you have.  I

 2  just want everybody to be on the same page.

 3       MS. MELCHER:  Okay.

 4       THE CLERK:  Okay.

 5       MS. MELCHER:  Thank you.

 6       THE CLERK:  Thank you.  And, everyone else here on the

 7  motion to vacate, we'll continue at two p.m.

 8       All right, folks, you can log back on at two p.m., same

 9  everything, same Zoom instructions.  You don't have to stay on.

10  That work?

11       MS. BUTTON:  Yeah.  That's --

12       MR. MOORE:  Yes, sir.

13       MS. BUTTON:  -- perfect.

14       THE CLERK:  All right.

15       MS. BUTTON:  Thank you.

16       THE CLERK:  Thank you very much, everyone.  This court

17  will stand in recess until two p.m.

18       MR. MOORE:  Thank you.

19       THE CLERK:  Thank you.

20                 [Matter in Recess at 12:46:48 p.m.]

21                 [Back on Record at 2:14:54 p.m.]

22       THE CLERK:  Recalling Docket No. 201701RO, Docket Nos. 181

23  and 1701RO Docket No. 182.

24       THE COURT:  Thank you.

25       All right.  Good afternoon.  Everyone, good afternoon.

1    One moment.

2        MS. BUTTON:  Good --

3        MR. MOORE:  Good --

4        MS. BUTTON:  -- afternoon.

5        MR. MOORE:  -- afternoon.

6        THE COURT:  So, the Court is asking the clerk to look at

7    the docket for the restraining order with regards to notice to

8    the defendants.

9        If you could talk so I can hear --

10       THE CLERK:  Certainly.

11       THE COURT:  -- everyone can hear?

12       THE CLERK:  Certainly.  So, reading off of Docket No. 181,

13   Your Honor, the initial 209A complaint was filed on August 1st

14   of 2017.  Return of service was -- And, the defendant is Mr.

15   Moore on that particular Docket 181.  Return of service was

16   made in-hand, it looks like, on October 2nd of 2017.  On

17   October 3rd, notice of appearance by Attorney Kevin Mahoney was

18   filed in the Clerk's Office.

19       THE COURT:  This is 2017?

20       THE CLERK:  Yes.

21       THE COURT:  Okay.

22       THE CLERK:  The extension hearing on August 15, it looks

23   like plaintiff's counsel, Attorney Melcher, was present,

24   Attorney Mahoney was present, plaintiff sworn, testified,

25   introduced exhibits, and the order was extended.  The record

1   states that plaintiff was given a copy in-hand in court, and

2   the defendant was served in court by the court officer.  That

3   was the first extension hearing on August 15 of 2017.

4        A year later, August 14 of 2018, it looks like Attorney

5   Melcher was here for the plaintiff.  Defendant was not present.

6   Counsel was not present.  At that time, the order was extended

7   and made permanent.  And, there was an updated address provided

8   for the defendant by either plaintiff or plaintiff counsel at

9   7950 Sunset Boulevard, West Hollywood, California.

10       THE COURT:  And, what date was that?

11       THE CLERK:  That was August 14 of 2018.

12       THE COURT:  Oh.  So, how did the court get that address if

13  the attorney wasn't here?

14       THE CLERK:  No.  The -- I apol -- The plaintiff provided

15  that updated address --

16       THE COURT:  Oh.

17       THE CLERK:  -- for the defendant, according to the docket.

18       THE COURT:  Okay.  So, according to the docket, just to

19  reiterate, on August 14th of 2018, the defendants were not

20  present in court, and they were -- there was no attorney

21  present in court for the defendants?

22       THE CLERK:  According to the docket, that's correct,

23  Judge.

24       THE COURT:  And so, there was a hearing ex parte with just

25  one side present?

1      THE CLERK:  Yes.

2      THE COURT:  And, a permanent --

3      THE CLERK:  Parties -- The defendants --

4      THE COURT:  -- [Crosstalk at 2:17:33 p.m.]?

5      THE CLERK:  -- were notified.  But, yes, according to the

6  docket, plaintiff's counsel was present, defendants were not

7  present, defense counsel was not present, and that was the time

8  when the order was made permanent.  I can verify that with the

9  other docket, Your Honor.  It may be the same.  I don't know.

10     THE COURT:  Yes, please.

11     THE CLERK:  Certainly.  Notice of appearance August 3 of

12  2017 by Attorney Mahoney for the defendant.  Attorney Mahoney

13  was present on -- Again, these dates are the same.  This is as

14  to Docket 182 where Ms. Button is the defendant.  Plaintiff

15  given copy of the extension order of one year to 8/14/18 in-

16  hand.  Defendant served in-hand by the court officer.  And,

17  again, August 14th of 2018, Attorney Melcher was here

18  representing the plaintiff.  Defendant was not present.

19     THE COURT:  Okay.  Thank you.

20     THE CLERK:  Certainly.  Then the order was extended on a

21  permanent basis.  The record is pretty much the same, Your

22  Honor.  Plaintiff provided an updated address for the

23  defendant, 7950 Sunset Boulevard, West Hollywood, California.

24     THE COURT:  So, there's no proof in the record that they

25  were represented or that they were given notice to appear?

1        THE CLERK:  No.  They were in court the year before.

2        THE COURT:  The year before?

3        THE CLERK:  And, given that date, which [Crosstalk at

4    2:19:01 p.m.]

5        THE COURT:  And, was there two different addresses?  Did

6    they move from one address to another in the interim?

7        THE CLERK:  According to the -- the complaint for abuse

8    prevention, first has a Somerville address for, I believe, both

9    parties.

10        THE COURT:  Mm-hmm.

11        THE CLERK:  It looks like it's 445 Artisan Way, Apartment

12    531 in Somerville, and that's as to both defendants.  And, the

13    updated address stated is the West Hollywood, California

14    address that was provided by plaintiff to the court on August

15    14th of '18.  I can continue on, if it's helpful to the Court.

16    I don't know.

17        THE COURT:  As far as what?

18        THE CLERK:  The -- The continuation of the case, there was

19    a affidavit of service with --

20        THE COURT:  What date is that?

21        THE CLERK:  -- for the permanent order, so after August 14

22    of 2018, there was --

23        THE COURT:  So, this is after the hearing --

24        THE CLERK:  That's --

25        THE COURT:  -- occurred?

1          THE CLERK:  -- correct.

2          THE COURT:  Okay.

3          THE CLERK:  Yes.  This is after the hearing.

4          THE COURT:  Okay.  I don't think I need that --

5          THE CLERK:  Okay.

6          THE COURT:  -- for --

7          THE CLERK:  Certainly.

8          THE COURT:  -- this motion.

9          THE CLERK:  Sure.  Thank you.

10         THE COURT:  Okay.  So, I did say to all parties that I

11    took the lunchbreak to see if, procedurally, a motion to vacate

12    in this court is proper, and after our research, it is.  The

13    defendants were procedurally correct in filing their motion to

14    vacate.  General Laws Chapter 209A, Section 3 provides that the

15    court may modify an order at any subsequent time upon motion by

16    either party.  And, the information that has just been provided

17    to the Court by the Clerk is that at the time of the -- the

18    permanent hearing was issued -- the permanent restraining order

19    was issued, the defendants were not present to be heard, and

20    there was no lawyer for them at this hearing.  So, I do think

21    that it's proper to file this motion.

22         I do think that the Court would set this down for a

23    hearing.  As I said, the Court can, at any time, modify an

24    order subsequent to any motion by either party, and that would

25    be whether to not vacate the order, modify the order, change

```
 1   the time period, or modify any other party restraining order,
 2   it is proper for the Court to hear.
 3        MS. BUTTON:  Thank you, Your Honor.
 4        THE COURT:  You're welcome.
 5        So, the Court -- If the parties would like to agree to a
 6   date, I would say sooner than later.
 7        MS. BUTTON:  We are happy with whatever date you would be
 8   willing to provide for us.
 9        THE COURT:  Mm-hmm.
10        MS. BUTTON:  We're happy to make anything work.
11        THE COURT:  Okay.
12        I'll ask counsel, what would be preferable to you?
13        MS. MELCHER:  Were we not proceeding with that today?
14        THE COURT:  No.
15        MS. MELCHER:  Okay.
16        THE COURT:  We're not.
17        MS. MELCHER:  Let me -- If you don't mind, I'm just going
18   to --
19        THE COURT:  Absolutely.
20        MS. MELCHER:  -- pull my calendar up.
21        THE COURT:  Take your time.
22        MS. MELCHER:  Okay.
23        THE COURT:  And, like I said, it could be a shorter date.
24   But, I am going to allow a hearing on the motion to vacate that
25   was filed --
```

1      MS. BUTTON:  Thank you.

2      THE COURT:  -- that was filed by the defendants in this

3  case.

4      THE CLERK:  Your Honor, just one other thing.

5      THE COURT:  Yes.  Of course.

6      THE CLERK:  The Clerk's Office received, via e-mail, this

7  afternoon --

8      THE COURT:  Yeah.

9      THE CLERK:  -- It was given to me shortly before I came

10  down for two o'clock -- something from the defendants listed as

11  a declaration, so I don't -- It looks like counsel for --

12      THE COURT:  Oh.

13      THE CLERK:  -- plaintiff was cc'd on it, but we've got --

14      THE COURT:  On the prior hearing?

15      THE CLERK:  -- one here for each one.

16      THE COURT:  Okay.  One moment.

17                          [Pause]

18      THE COURT:  Okay.  All right.  Thank you.

19      THE CLERK:  Certainly.

20      THE COURT:  Yes?

21      MS. MELCHER:  We can do March 27th.  If the Court could do

22  a Monday, --

23      THE COURT:  Mm-hmm.

24      MS. MELCHER:  -- the first Monday?  My client has Mondays

25  off.

```
 1        THE COURT:  That's fine.

 2        Is March -- Does March 27th --

 3        Did you want an eleven o'clock call?  Is that what we had

 4   ordered, Mr. Clerk?

 5        THE CLERK:  The initial --

 6        THE COURT:  Eleven --

 7        THE CLERK:  -- [Crosstalk at 2:23:55 p.m.] --

 8        THE COURT:  -- o'clock call on March --

 9        THE CLERK:  -- [Crosstalk at 2:23:56 p.m.].

10        THE COURT:  -- 27th, is that agreeable to the defendants?

11        MR. MOORE:  Yes, Your Honor.

12        MS. BUTTON:  Yes, Your Honor.  Are we able to do it on

13   Zoom again, or do we need to be present in --

14        THE COURT:  No.  You can do it on Zoom.

15        MS. BUTTON:  Okay.  Thank you.  Yes.  That works for us.

16        THE COURT:  Mm-hmm.  Now, the other thing -- Now, the

17   Court, during the lunchbreak did read, obviously, the motion to

18   vacate, and in that motion, when this hearing does take place,

19   I would encourage all parties to bring to court any police

20   reports or any exhibits or anything like that that they would

21   like to introduce at the next hearing.  So, if there were

22   mentions of police reports, those should be delivered to the

23   Court prior to the hearing, not the day of.

24        MR. MOORE:  Okay.

25        MS. BUTTON:  Yes, Your Honor.
```

1          THE COURT:  Same with counsel.

2          MS. MELCHER:  Certainly, Your Honor.  To make it clear --

3          THE COURT:  Yeah.

4          MS. MELCHER:  -- that anything that gets delivered to the

5    court should also be copied to me, because --

6          THE COURT:  Yes.

7          MS. MELCHER:  -- it wasn't --

8          THE COURT:  Of course.

9          MS. MELCHER:  -- last time.

10         THE COURT:  Of course.

11         MS. MELCHER:  Just --

12         THE COURT:  Of course.  Yes.

13         MS. MELCHER:  -- so they understand.

14         THE COURT:  So, --

15         MS. MELCHER:  But --

16         THE COURT:  Of course.  Yes.

17         MS. MELCHER:  -- also, it's my understanding --

18         THE COURT:  So, let me just reiterate --

19         MS. MELCHER:  Sure.  Yeah.

20         THE COURT:  -- that to them.

21         So, Ms. Button and Mr. Moore, if you are going to file

22   some of the police reports that you stated in your motion, you

23   have to file them -- Well, you have to send them to counsel, as

24   well.  So, anything that the Court gets, counsel gets, as well,

25   so we all have the same information.  So, as I said, when I

1-92

```
 1   read it over the lunchbreak, I noticed there were a number of
 2   police reports that were mentioned.  Mentioning is not
 3   sufficient enough.  It has to be provided to the Court if
 4   you're going to argue them.
 5        MR. MOORE:  Yes.
 6        MS. BUTTON:  Yes, Your Honor.
 7        THE COURT:  Same goes for both sides.  Okay?
 8        MR. MOORE:  Can we -- I'm sorry.  Can we ask, do we mail
 9   these or e-mail these?  What's the best method?
10        THE COURT:  Mr. Clerk, what would you prefer, the e-mail?
11        THE CLERK:  They could be e-mails, so long as it's a
12   reasonable amount of time before the date.  The e-mail is very
13   voluminous, as I'm sure everyone may have experienced already,
14   so if it's within a week before the date, at least as far as
15   the Clerk's Office goes, that gives us enough time to make sure
16   everything is filed and that we have everything for the Court.
17        THE COURT:  Thank you.
18        MS. BUTTON:  We can send it as soon as possible.  Thank
19   you.
20        THE COURT:  All right.  And, did you want to say
21   something, counsel?
22        MS. MELCHER:  I just -- Yeah.  I wanted to mention, I was
23   looking over the break, as well, at the --
24        THE COURT:  Yes.
25        MS. MELCHER:  -- MacDonald vs. Caruso case, and it seemed
```

```
1   to me --

2       THE COURT:  Which case?

3       MS. MELCHER:  MacDonald vs. Caruso.  It's a SJC case, I

4   think, originally in 2014.  It went to 2019, 467 Mass. 382.  I

5   don't know --

6       THE COURT:  Okay.

7       MS. MELCHER:  -- if you have --

8       THE COURT:  Could you --

9       MS. MELCHER:  -- it there.

10      THE COURT:  -- Could you give that to me again, please?

11      MS. MELCHER:  Sure.  467 Mass. 382.  That was a 2014

12  opinion.

13      THE COURT:  2014?  And, what --

14      MS. MELCHER:  Yes.

15      THE COURT:  -- you like to say?

16      MS. MELCHER:  Just that they do talk about the fact that -

17  - you know, that the plaintiff has already proved her burden by

18  the time you get to a vacate hearing three times, like the

19  original 209A.

20      THE COURT:  Mm-hmm.

21      MS. MELCHER:  So, that this isn't about the plaintiff per

22  --

23      THE COURT:  No.  This -- So, --

24      MS. MELCHER:  It said it was about the preponderance of

25  evidence whether or not it should be vacated.
```

96

1        THE COURT:  But, we haven't got there yet.

2        MS. MELCHER:  But, that's what the hearing is going to be

3   about.

4        THE COURT:  But, --

5        MS. MELCHER:  It's not upon the plaintiff to --

6        THE COURT:  -- But, --

7        MS. MELCHER:  -- prove a burden.

8        THE COURT:  Understood.

9        MS. MELCHER:  Yes.

10       THE COURT:  Understood.  But, what I'm -- what I was

11  looking at the, obviously, the motion to vacate, but the fact

12  that the defendants weren't present, they didn't have an

13  opportunity to be heard, and they didn't have an attorney.  So,

14  --

15       MS. MELCHER:  It just seems to me, Your Honor, that they --

16  you know, they were given notice of the very -- the initial

17  hearing.  They were given notice of the day and the time of the

18  hearing, and they chose not to come back the next year.  My

19  client was told what --

20       MR. MOORE:  [Crosstalk at 2:27:39 p.m.]

21       THE COURT:  Okay.  So, --

22       MR. MOORE:  [Crosstalk at 2:27:41 p.m.]

23       MS. MELCHER:  -- day and time.  They were served in-hand

24  in court, as your officer just read to you, that they received

25  that date and time in-hand.  That's just like my client

1-95

```
 1   received it.  We knew to come back to court on the day and time
 2   that you wrote on the -- or Judge McKenna wrote on the specific
 3   order, and they received the exact same order.  I'm not sure
 4   why they should be given the chance to challenge it when --
 5        THE COURT:  But, even with that, --
 6        MS. MELCHER:  -- [Crosstalk at 2:28:05 p.m.]
 7        THE COURT:  -- they can certainly -- any party can come
 8   back to court and ask for the Court to, you know, modify an
 9   order.
10        MS. MELCHER:  Modify or vacate, sure, but the --
11        THE COURT:  Right.
12        MS. MELCHER:  -- the burden is different -- Well, just be
13   my point.  If they're talking about bringing police reports
14   from the initial --
15        THE COURT:  No, no.  I was reading their -- They -- In
16   their claim, they say there was fraud on the court.  In order
17   for the court to find such things, there has to be something.
18   It just can't be someone saying there's fraud on the court.
19   They mentioned false police reports.  If that's the case, or --
20   I mean, I'm just -- I think that --
21        MS. MELCHER:  They would've had to have --
22        THE COURT:  -- any court --
23        MS. MELCHER:  -- been --
24        THE COURT:  -- I think that any court, when someone is
25   making -- either side is making an allegation or a statement,
```

```
 1   that it should be backed up and supported.  That's all I'm
 2   saying.  I don't know if it can be or it can't be, but I'm
 3   saying that when I see that and I have two pro se defendants
 4   here, I -- I'm just going to say it openly that at a next
 5   hearing, I would expect both parties to bring in whatever they
 6   have to support their position.
 7        MS. MELCHER:  I understand.
 8        THE COURT:  And, I hear what you're saying about the
 9   burden, but I'm not even there yet.
10        MS. MELCHER:  I just am concerned, because, having read
11   their motion to vacate, it seems to be readdressing the issue
12   that should've gone to appeal.  And, that order that I referred
13   to in the MacDonald vs. Caruso does talk about the fact that
14   when you're at this motion to vacate, attacking the original
15   order has no place in that, because the plaintiff had already
16   proven the burden on several occasions, because the order was
17   granted and then continued for a --
18        THE COURT:  Mm-hmm.
19        MS. MELCHER:  -- year.  But, that was --
20        THE COURT:  So, are you --
21        MS. MELCHER:  -- that ship has --
22        THE COURT:  -- are you claiming --
23        MS. MELCHER:  -- sailed.
24        THE COURT:  -- that they had -- You're claiming that they
25   had notice?
```

```
 1          MS. MELCHER:  Oh, absolutely.  They were handed notice.
 2    But, it's written right on the order --
 3          THE COURT:  Mm-hmm.
 4          MS. MELCHER:  -- the date of the next hearing, the date
 5    and time.
 6          THE COURT:  Mm-hmm.
 7          MS. MELCHER:  And, that's what --
 8          THE COURT:  But, --
 9          MS. MELCHER:  -- [Crosstalk at 2:29:56 p.m.]
10          THE COURT:  -- they also didn't live in the state,
11    correct?  They moved from Somerville to --
12          MS. MELCHER:  I -- You know, --
13          THE COURT:  -- to --
14          MS. MELCHER:  -- they didn't --
15          THE COURT:  -- I don't know, --
16          MS. MELCHER:  -- notify me --
17          THE COURT:  -- Las Vegas --
18          MS. MELCHER:  -- of that.
19          THE COURT:  -- or something?
20          MS. MELCHER:  They -- You know, they -- for -- I believe
21    that I learned that through my client, but I mean, I would say
22    the onus is upon them as a defendant having been received an
23    order that they have a follow-up hearing, and if they're going
24    to move, they should let the court know what their new address
25    is.  But, --
```

1    THE COURT:  Mm-hmm.

2    MS. MELCHER:  -- that was not when they were -- they

3  didn't move and then hear about the new hearing date.  When

4  they were standing --

5    MR. MOORE:  We never heard.

6    MS. MELCHER:  -- in court, they were given a piece of

7  paper that had the hearing date and time.

8    THE COURT:  Okay.  All right.

9    Did you want to respond, because, I mean, I will say, I

10  hear your argument; however, I did make -- My decision is to

11  set this case down for a hearing based on everything I've read.

12    MR. MOORE:  Our -- Our only response is -- is that we were

13  not only unaware of the hearing, we were unaware of the ability

14  to appeal.  In fact, we were told by counsel that it's useless,

15  because the decision had been reached before we ever got to the

16  courtroom, and he suspected something fishy was at play that

17  led to that decision --

18    THE COURT:  Well, --

19    MR. MOORE:  -- being made.  But, you know, --

20    MS. BUTTON:  Yeah.  Aside from that, --

21    MR. MOORE:  Yes.

22    MS. BUTTON:  -- we respect your decision --

23    MR. MOORE:  Yes.

24    MS. BUTTON:  -- and would like the -- the opportunity, if

25  you'll allow it.

1      MR. MOORE:  Yes.

2      THE COURT:  I think each --

3      MS. BUTTON:  [Crosstalk at 2:31:18 p.m.]

4      THE COURT:  -- I think all parties deserve a right to be

5  heard.  That's -- That would be my decision, and I hear both of

6  you.  I hear counsel for the plaintiff, and I hear the

7  defendants' position, as well.  And, with that, I would allow

8  this to be heard at a future date that the parties have chose,

9  which was eleven o'clock on March 27th.  Okay?

10      MS. MELCHER:  I am, --

11      MS. BUTTON:  Thank you.

12      MS. MELCHER:  -- just for the record, looking at Page 2,

13  it does state right up there the date and the time of the

14  hearing.  So, when they got this, -- When they were served with

15  that order, it says it right there, "Next hearing date 8/15/17,

16  nine a.m."  And, then, the next one, again, "Next hearing date

17  8/14/18 --

18      THE COURT:  Okay.

19      MS. MELCHER:  -- at nine a.m."

20      THE COURT:  Yes.  But also, just -- And, I don't want to

21  keep --

22      MS. MELCHER:  No.  I --

23      THE COURT:  But, what I'm --

24      MS. MELCHER:  -- get you.

25      THE COURT:  -- saying is that any party at any time has

1  the right to come into court to ask the court -- We do it every

2  day --

3        MS. MELCHER:  To chal -- Sure.

4        THE COURT:  -- to modify it, --

5        MS. MELCHER:  Mm-hmm.

6        THE COURT:  -- to change it, to sometimes change the time

7  period, to change some of the -- you know, the paragraphs.  The

8  Court is open to hearing --

9        MS. MELCHER:  I --

10       THE COURT:  -- to hearing all sides and feels as though

11 each side should have a fair opportunity to express their

12 position, especial -- And, I don't mean especially with pro se

13 defense, but these two people, are not represent -- not giving

14 them any more weight and you any more weight because you

15 represent your client, I am not.

16       MS. MELCHER:  Mm-hmm.

17       THE COURT:  I am doing my best to be fair and objective.

18       MS. MELCHER:  Mm-hmm.

19       THE COURT:  Okay?  So, we'll see you on the 27th.

20       MS. MELCHER:  Okay.

21       THE COURT:  Thank you.

22       MS. BUTTON:  Thank you, very --

23       MR. MOORE:  Thank you.

24       MS. BUTTON:  -- much, Your Honor.

25       THE COURT:  Yep.  So, right now, this is all in pla --

1  Just so you know, this restr -- this is still in place.

2  Nothing has changed.  It's all in place.  So, nothing has

3  changed.  It is still in effect.

4       Did you want to say something?

5       THE CLERK:  And, just for my own edification, --

6       THE COURT:  Yep.

7       THE CLERK:  -- Judge, March 27 at eleven a.m.?

8       THE COURT:  Yes.

9       THE CLERK:  The -- I believe there -- I believe the

10  defendant, Ms. Button, had filed a motion to vacate, but it --

11  it seems to -- it possibly references both -- both cases.

12  Okay.  And, the defendants are permitted to be present via

13  Zoom, is that correct?

14       THE COURT:  Yes.

15       THE CLERK:  Okay.  Are the plaintiffs in person or the

16  plaintiffs Zoom, what --

17       THE COURT:  Whatever the plaintiffs would like.

18       And, you don't have to make up your mind right now.  You

19  can let the clerk know whatever's best for you.

20       MS. MELCHER:  Thank you, Your Honor.

21       THE COURT:  All right.  We don't mind people in person, but

22  if it's better for you and your calendar and your client, --

23       MS. MELCHER:  Okay.

24       THE COURT:  -- that's fine, too.

25       MS. MELCHER:  Thank you, Your Honor.  Appreciate that.

1   Thank you.

2       THE CLERK:  Thank you.  For the record, as to both

3   matters, Docket No. 201701RO, Docket No. 182, as the plaintiff

4   is Sage Humphries, the defendant is Mr. Moore.  As to the other

5   matter, -- Excuse me, that's 181.  As to 1701RO, Docket 182,

6   Ms. Humphries is the plaintiff, Ms. Button as the defendant.

7   Over the Court's break, the Court did receive sworn

8   declarations regarding the backup of the plaintiff's camera

9   roll that is in file, and counsel, you seem to be included in

10  that e-mail.

11      MS. MELCHER:  I've --

12      THE CLERK: If you haven't, I'll give you a copy of it

13  right now.

14      MS. MELCHER:  I was copied but --

15      THE CLERK:  Okay.  The motion to -- Or, the hearing on

16  contempt remains under advisement.  The parties will be

17  notified of the Court's decision via e-mail, if that's all

18  right with your office, counsel.

19      MS. MELCHER:  Certainly.

20      THE CLERK:  And, as to the motion to vacate, this is as to

21  both defendants on both matters, that matter has been set down

22  for March 27th, 2023, at eleven o'clock in the morning.  Both

23  defendants are permitted to be present via Zoom.  The Court has

24  authorized plaintiff to appear via Zoom if plaintiff so

25  chooses.  Does that take care of everything?

1-103

1          THE COURT:  Yes.  Thank you.

2          THE CLERK:  Okay.

3          MS. MELCHER:  Thank you.

4          THE COURT:  Thank you.

5          THE CLERK:  Thank you, Your Honor.

6          MS. BUTTON:  Thank you, Your Honor.

7          MR. MOORE:  Thank you.

8                    [End of Hearing at 2:35:13 p.m.]

**C E R T I F I C A T I O N**

I, Pamela Borges DosSantos, an Approved Court Transcriber,
do hereby certify that the foregoing is a true and accurate
transcript from the audio recording provided to me by The
Office of Transcription Services for the BMC Central
Court proceedings in the above-entitled matter.

I, Pamela Borges DosSantos, further certify that the
foregoing is in compliance with the Administrative Office of
the Trial Court Directive on Transcript Format.

I, Pamela Borges DosSantos, further certify that I neither
am counsel for, related to, nor employed by any of the parties
to the action in which this hearing was taken, and further that
I am not financially nor otherwise interested in the outcome of
the action.

_Pamela Borges DosSantos_
Pamela Borges DosSantos

July 24, 2023
Date

190 William Street

New Bedford, MA 02740

Telephone: (508)996-3898

Email: p.dossantos@verizon.net

107



**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

## AUDIO ASSESSMENT FORM

> ***For court transcribers:*** *Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** July 24, 2023          **TRANSCRIBER NAME:** Pamela Borges DosSantos

**CASE NAME:** Humphries vs. Moore & Button    **DOCKET #:**   1701RO000181, 1701RO000182

**RECORDING DATE:** February 22, 2023      **TRANSCRIPT VOLUME:**   1  **OF**      1

*(circle one)* **TYPE: [CD] TAPE     QUALITY:  EXCELLENT      [GOOD]     FAIR    POOR**

*(circle all that apply)* **ISSUES** *(include time stamp):*

**[ ] background noise**          **time stamp:** _____

**[ ] simultaneous speech**          _____

**[ ] low audio at sidebar**          _____

**[ ]  mumbling**          _____

**[x] speaking away from microphone**   **11:06:55; 11:15:04; 11:22:27; 11:31:36**

**other:**_____          **time stamp:**_____

_____          _____

_____          _____

**COMMENTS:**    There was a constant talking over one another by the parties and judge.  The plaintiff and her counsel were present in the courtroom.  The defendants were present on Zoom.  The attorneys in the courtroom were not directly at microphones.  The judge allowed the Attorney Melcher to question the defendants and both defendants answering questions at the same time, so it is not a Q and A format.

_____

_____

_____

```
 1 |                                        VOLUME: 1 of 1
 2 |                                        PAGES:  1 - 66
 3 |                                        EXHIBITS:    3
 4 |
 5 |                  COMMONWEALTH OF MASSACHUSETTS
 6 |
 7 | SUFFOLK, SS.                 MUNICIPAL COURT, CENTRAL DIVISION
 8 |                             DOCKET NO:  1701RO181, 1701RO182
 9 |
10 | SAGE HUMPHRIES            )
11 |                          )          MOTION TO VACATE
12 | V.                       )          March 27, 2023
13 |                          )
14 | MITCHELL MOORE, and      )
15 | DUSTY BUTTON             )
16 |
17 |               Before the Honorable Steven Key
18 |
19 | APPEARANCES:
20 |
21 | For the Plaintiff:
22 | Maura Melcher, Esquire
23 | Emily Myers, Esquire
24 | 800 Hingham Street
25 | Rockland, MA  02370
26 |
27 | Sabina Mariella, Esquire
28 | Boies Schiller Flexner
29 | 55 Hudson Yards, New York, NY 10001
30 |
31 |
32 | For the Defendants:
33 | Mitchell Taylor, Pro Se
34 | Dusty Button, Pro Se
35 |
36 |
37 |
38 |      Proceedings Recorded by Electronic Sound Recording,
39 |       Transcript produced by Approved Court Transcriber
40 |
41 |
42 |        Pamela Borges DosSantos, Notary Public
43 |    Massachusetts and New York Approved Court Transcriber
44 |        PBH Paralegal & Transcription Services, Inc.
45 |                  190 William Street
46 |               New Bedford, MA  02740
```

**(508) 996-3898**
**Fax (508)996-2403**

**D I S C L A I M E R**

--          Interrupted speech, unfinished sentences, or
lengthy pauses are designated by two [2] dashes where the
interruption occurs. Resumption of interrupted speech is also
indicated by two dashes.

[    ]          Brackets are also used to designate transcriber
comments. For example the words [END OF SIDE ONE, TAPE ONE],
[SIDEBAR], etc., are shown in brackets as they are transcriber
comments and not part of the actual litigation audio record.

          When the transcriber is unable to ascertain a
spoken word or words, the word is typed as it sounds
phonetically followed by the word "phonetic" in brackets.

          If a speaker uses a term or word that is known
to be incorrect, the term shall be typed as spoken followed by
"sic" in brackets after the term or word.

**I N D E X**

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

**SAGE HUMPHRIES**
[By Ms. Mariella]        27

| EXHIBITS | PAGE |
|---|---|
| 1    Daily Mail Article and Documents | 35 |
| 2    Nevada Sanctions | 52 |
| 3    YouTube Screenshots | 52 |

**CLOSING ARGUMENT**                                53

**CERTIFICATE OF ACCURACY**                         66

1  [Case called at 11:21:47 a.m.]

2      MS. MARIELLA:  If I may, Your Honor, I have a courtesy

3  copy of our file and exhibits that's tabbed that might be a

4  little bit easier to follow along with.

5      THE COURT:  Before we do that, have you given copies to --

6      MS. MARIELLA:  Yes, I gave them.

7      THE COURT:  -- the defendants?

8      MS. MARIELLA:  They're in Nevada, is my understanding.  I

9  sent them a electronic version of this binder.

10      THE COURT:  Before we do that, I understand this is a

11  permanent restraining order, is that correct?

12      MS. MARIELLA:  Correct.

13      THE COURT:  And, can you identify yourself for the record,

14  please?

15      MS. MARIELLA:  Correct.  My name is Sabina Mariella for

16  the plaintiff, Sage Humphries.

17      THE COURT:  Mariella?  Can you sell your last name?

18      MS. MARIELLA:  M-A-R-I-E-L-L-A.

19      THE COURT:  And, with you?

20      MS. MYERS:  Emily Myers, attorney for plaintiff, Sage

21  Humphries.

22      MS. MELCHER:  And, Attorney Maura Melcher.

23      THE COURT:  [Indiscernible at 11:23:27 a.m. - speaking

24  away from microphone]?

25      MS. MARIELLA:  No.

1      THE COURT:  Or who's from -- Or you're from --

2      MS. MARIELLA:  Well, I'm barred in New York, but we have

3  ongoing litigation in Nevada, which may be why there's a

4  notation about it.

5      THE COURT:  All right.  And, I -- on the Zoom, I have --

6  Who do I have on the Zoom?

7      MS. BUTTON:  I'm Dusty Button.

8      MR. MOORE:  And, I would be Mitchell Moore.

9      THE COURT:  So, you are acting pro se.

10     MR. MOORE:  That's correct.

11     THE COURT:  So, my understanding is this is a motion to

12  vacate a permanent restraining order and I've got a ton of

13  documents here that you submitted, that Ms. Button and Mr.

14  Moore have submitted, and I also have a number of documents

15  that have -- were received from the plaintiff.  A lot of it

16  seems to go back to the initial granting -- that relate to the

17  initial granting of the restraining order, and a motion to

18  vacate a permanent order, and I'm not litigating the issues

19  that led to the granting of the order.

20     The issue for a motion to vacate is whether there's clear

21  and convincing evidence that there is no need -- no further

22  need for the order.  So, I'm not going to get into -- We're

23  having an evidentiary hearing.  I'm not going to get into the

24  merits of the underlying order.  What I would be looking for is

25  evidence relating to what has happened since the order was made

1    permanent; not what has been learned, but what has happened

2    since the order has been made permanent, whether or not by

3    clear -- there's clear and convincing evidence that there's no

4    further need for the permanent order.

5        So, looking at a lot of the documents that were submitted,

6    it looks as if it really is addressing the underlying order,

7    which I'm not going to look at all of those documents for that

8    purpose.  But, I want to hear, for the purposes of this

9    hearing, from Ms. Button and Mr. Moore is the evidence that

10   they believe they have to suggest that the order is no longer

11   necessary under the circumstances since it was issued -- made

12   permanent back in 2018.  Do you understand that?

13       MS. MARIELLA:  Yes, Your Honor.

14       MS. BUTTON:  Yes.

15       MR. MOORE:  Yes.

16       THE COURT:  If we start getting into things that have --

17   I'm not going to -- If it's testimony about what happened prior

18   to 2018, I'm going to strike it.  I'm not going to listen to

19   it, okay?

20       MR. MOORE:  Okay.

21       THE COURT:  Okay.  So, that said, and I'm not going to

22   take any exhibits now.  I'm not going to look at any exhibits

23   now.  I want to see what happens during this hearing and, if

24   there are exhibits that were submitted that need to be

25   referenced as to what happened after 2018, then you can direct

1  my attention to that, okay?

2      MR. MOORE:  Okay.

3      THE COURT:  Okay?

4      MS. BUTTON:  Okay.

5      MS. MARIELLA:  Yes, Your Honor.

6      THE COURT:  All right.  Great.  Can we swear in the

7  witnesses, please?

8                    [PARTIES, Sworn.]

9      THE COURT:  So, the burden is on Mr. Moore and Ms. Button.

10  You can have a seat.

11      Can you see the screen from where you are?

12      MS. MARIELLA:  Sort of in my peripheral vision, but I

13  cannot see the Defendants directly.  But, I think it's most

14  important that you see them, so I'm okay with the way it's set

15  up.

16      THE COURT:  I want everybody to see everything, so that --

17  that's all part of testimony.

18      Great.  Now, you can see every -- All right.

19      So, what I'm going to do is, Ms. Button, your name is the

20  name that shows up on the Zoom.  I'm going to start with you.

21  Tell me why you believe that there's evidence to suggest that

22  this permanent restraining order should be vacated.

23      MS. BUTTON:  The way to start this is pretty difficult

24  because, as you said, you don't want to hear anything from 2017

25  and 2018.  Our argument isn't a typical restraining order

1-8

1  motion to vacate.  Our argument is that there was fraud on the

2  Court in 2017, which is why Judge Lyons, who heard us in

3  February 22nd, gave us the opportunity to speak today because

4  she saw our mentions of false police report and she saw

5  mentions of other fraud on the Court that she said we should

6  get our exhibits together and present to the Court and to the

7  plaintiff because she did see that we weren't represented in

8  2018.  We had no knowledge of 2018 in the hearing.  So, no one

9  was there with a one-sided argument.

10      But, since 2018, if we are looking past that, as you asked

11  for, Sage Humphries has used this restraining order that should

12  have never been granted to begin with because there was no

13  abuse, to file $131 million dollar lawsuit against us in Nevada

14  and that restraining order contradicts everything that they're

15  stating in Nevada, which is why her counsel there, who

16  submitted pro hac vice, was granted pro hac vice because she

17  was in good standing, but the opposing argument is that, in

18  Nevada, Sage is stating that she was forced and under duress

19  and raped by us, which is entirely false.  And, in Boston, as

20  you can see any APO order, she did not check mark the box that

21  she was forced under duress or in any way threatened to be in a

22  relationship.

23      The basis of this restraining order is that she was in a

24  relationship with us, consensually, albeit unconventional and

25  it's never happened before and would never happen again, but it

1    was a loving relationship and the problem now is we've been

2    presented in 2022 with false police reports and we verified

3    those with law enforcement that could exceed beyond just this -

4    - this hearing with criminal charges because these are false

5    police reports that were reported that we can prove every

6    single thing against her, that what she stated was a lie.

7    Those police reports were withheld from the Court and she's

8    withheld it today again.  It's not in their exhibits, but we've

9    provided it.  We provided all five false police reports and I

10   understand you don't want to hear from 2017 and 2018, but this

11   evidence was presented to us in 2022.

12       And, we -- we have 5,000 pages of documents in 2017 to

13   prove that we did not abuse this woman.  But, four years later,

14   she filed a lawsuit, based on this restraining order that was

15   falsely granted, because she never presented any of these

16   police reports that contradict what she said, and the law

17   enforcement actually said that we did no wrong, and we have

18   those exhibits in there.  So, we could never have argued this

19   in 2017 and 2018.  We could only argue this now and which is

20   why we filed the motion to vacate, based on fraud on the Court,

21   and that's why Judge Lyons gave us this opportunity because she

22   saw the mentions of that fraud on the Court.

23       THE COURT:  So, you were represented by counsel in the

24   past, though, right?

25       MS. BUTTON:  Only in 2017.

1    THE COURT:  Okay.  And, you had the right to appeal that

2    decision back in 2017?

3    MS. BUTTON:  They were not -- I understand that that's

4    typical, but we were not informed that we could appeal that and

5    we were not notified of this hearing.  We actually moved to Los

6    Angeles prior to the hearing in 2017 and we received no

7    notification and there -- They will argue, "Well, it was

8    written on the report a -- a year prior," but we actually did

9    not have that.  We did not have that piece of paper.  We were

10   never served with any other piece of paper after that.

11   THE COURT:  So, tell me, since 2018, what interaction, if

12   any, have you had with Ms. Humphries?

13   MS. BUTTON:  None, absolutely none.  We could not be

14   further from this woman [Issues with Zoom at 11:32:29 a.m.].

15   THE COURT:  But, did you move to Nevada?

16   MS. BUTTON:  I'm sorry.  Say that one more time, please.

17   THE COURT:  When did you move to Nevada?

18   MS. BUTTON:  We moved -- Well, we moved to Nevada in 2020

19   because of everything that was happening in California in

20   regards to, you know, COVID and -- and all that stuff.  So, we

21   actually moved to Los Angeles in 2017 and we moved prior to the

22   first hearing that happened in Boston.  We lived in Los Angeles

23   for nearly four years and, then, we moved to Las Vegas in 2020

24   and we've been there since.

25   THE COURT:  Okay.  And, have your paths -- Other than

1  issues relating to this restraining order, have your paths

2  crossed with Ms. Humphries since the restraining --

3     MS. BUTTON:  No, not at all.  And, -- And, actually, in

4  their opposition, they state that it's possible that I would be

5  in her same industry.  It -- It -- No one could pay me enough

6  money to be a part of the dance industry ever again.  I was

7  actually fired from Boston Ballet as their principal dancer

8  because of Sage's parents.

9     So, I lost everything in regards to that dance industry,

10  but I'm so disgusted by the industry that no one can pay me any

11  amount of money to ever work in that industry ever again.  I

12  despise it.  I despise anything to do with that industry and I

13  will never, ever, ever work for that industry.  I've lost jobs

14  because of this restraining order because of background checks.

15  Obviously, you're put in the domestic violence national

16  database, which we've never abused anyone.  We did have an

17  unconventional relationship with her, but there was no abuse

18  involved, and it's cost us everything.  We're pro se here.

19  We're pro se in Nevada.

20     And, at this point, I would never want or desire to be in

21  that industry and that's their argument, that we would cross

22  paths, but we absolutely would not.  And, in the case that I

23  did, I couldn't stomach being around that woman because of what

24  she's done to us.  So, I would never want to be in any

25  proximity of her whatsoever.

1    THE COURT:  So, you're not involved in any industry

2    similar to what Ms. Humphries is involved in?

3    MS. BUTTON:  No, and I never will be, ever.

4    THE COURT:  So, the -- no reason for you to have any

5    contact with Ms. Humphries?

6    MS. BUTTON:  Absolutely not.  I would actually like a no-

7    contact order on our behalf if this were to be vacated.

8    THE COURT:  And, what about social media presence?  Has

9    there been any social media --

10    MS. BUTTON:  No.

11    THE COURT:  -- discussed about this matter?

12    MS. BUTTON:  No.  We had -- We don't have social media.

13    In fact, in May -- On May 13th of 2020, there's a post from one

14    of Sage's friends that Sage influenced, stating that I was a

15    predator and raped little kids, which has never happened and

16    that absolutely destroyed my life.  It was disgusting, and I --

17    Sorry.  And, yes, I would never be a part of the industry,

18    never be on social media.  I despise everyone in that industry

19    and, unfortunately, have had to live with this for five years,

20    getting death threats from people on social media because of

21    what they posted in New York Times, in Las Vegas, and I know

22    that that doesn't have anything to do with Boston.

23    But, like I said, unconventional relationship.  Truly

24    cared about this woman, and she's -- ending up doing this to us

25    and I understand the case is, like, very unusual, which is why

 1   I don't think any case law could really reference what we've

 2   been through.  I don't think Boston will ever see a case like

 3   this, but we've lost everything.  We're pro se here.  We're pro

 4   se in Nevada.  Lost the thing that I was best at, at Boston

 5   Ballet, and I'm -- I'm never going to have a job in that

 6   industry and I don't want one.  I think the people are

 7   disgusting.  I think that the way they turned their back on me

 8   because of word of mouth.  She hasn't proven anything.  This

 9   woman is entirely uncredible.  We did love her.

10       But, I have produced and he has produced so much evidence

11   in this case and no one has taken the time to look at it until

12   Judge Lyons.  She was the first person, after five years, to

13   actually look at it and say I -- you deserve to be heard.  And,

14   I apologize for being emotional because emotions don't involve

15   the Court, so I apologize.

16       But, it's -- it -- we have called every law enforcement

17   agency as a party that the defendant to understand why these

18   police reports are being filed.  They were all filed falsely

19   and, even though they were filed falsely, two of them are filed

20   the night before her restraining order hearings, only to have

21   it put on record.  She didn't even have any proof.  And, then,

22   after she filed it, she didn't even bring that report to the

23   court.  She just simply told them that we were stalking her,

24   which we have now a recording with the woman that doesn't even

25   understand why she was brought into it.  Sage brought in a

```
 1   third party to say that we were stalking her.  That third party
 2   had no idea of this report until we informed her a week ago,
 3   which is the recording in one of the exhibits, which I know
 4   that you don't have time to look at, but we've literally gone
 5   through all the necessary measures to prove that we have never
 6   abused this woman.
 7       THE COURT:  Tell me, --
 8       MS. BUTTON:  Never.
 9       THE COURT:  -- you say you're not going back into that
10   industry and I would assume that's the dance industry.  What
11   kind of work are you doing now?
12       MS. BUTTON:  I have never worked.  We've actually been
13   kicked out of restaurants because of the New York Times and the
14   Cosmopolitan's articles that they've played in the media.  So,
15   I can't even pay with my own debit card if I had money because
16   people look at my debit card and see Dusty Button and think,
17   "Oh, that's the woman that I saw in the New York Times, that
18   this woman has claimed has done all this stuff to us."
19       THE COURT:  So, you're --
20       MS. BUTTON:  I can't -- I'll never work in this industry.
21   I'm sorry, say again?
22       THE COURT:  I'm asking -- I asked what type of work are
23   you doing now?
24       MS. BUTTON:  None.  I can't work.  We're on food stamps.
25   I can't get a job because of my name.
```

1    MR. MOORE:  They'll run a background check and they see

2  this order.

3    MS. BUTTON:  They run a background check and they see this

4  order as well.

5    THE COURT:  And, so, since 2018, you're saying you had no

6  interaction with Ms. Humphries?

7    MS. BUTTON:  That's correct.

8    THE COURT:  And, you've not posted anything on social

9  media regarding Ms. Humphries ever since then?

10    MS. BUTTON:  No.

11    MR. MOORE:  Never.

12    MS. BUTTON:  Not one time, which is also why, in the

13  hearing with Judge Lyons, they actually tried to file contempt

14  against us, saying we violated the order again and this is the

15  sixth time they've tried to file something against us.  Judge

16  Lyons ruled in our favor.  After research, after two weeks,

17  almost, of research, and sent us an e-mail and said there was

18  no contempt, that the plaintiff did not present the burden that

19  she was supposed to present.

20    MR. MOORE:  She can't.

21    MS. BUTTON:  Because she can't.

22    THE COURT:  Is there anything more that you want to tell

23  me about this restraining order and the issues relating to it

24  after 2018?

25    MS. BUTTON:  Sorry.  In regards to, like, how it's been

1-16

1  affect -- affecting our life or in regards to how --

2      THE COURT:  No.  Just how --

3      MS. BUTTON:  -- what we've presented?

4      THE COURT:  -- Is there a need -- Whether there's a need

5  for the order to remain permanent.

6      MS. BUTTON:  There's no -- There's no need for the order.

7  There was never a need for the order to begin with and I'm sure

8  you hear this all the time.  But, the reason that there was no

9  need for the order to begin with is because there are multiple

10  police reports that were never presented to the Court, and she

11  still hasn't presented it today.

12      MR. MOORE:  She was forced to sign it.

13      MS. BUTTON:  And, she was -- She was forced to sign the

14  restraining order.  She warned us that she was being forced to

15  sign the restraining order.  We have those text messages.  We

16  have the text messages, saying that she's going to leave us

17  fake voicemails to appease her parents to break up with us

18  because her parents wouldn't let her go back to Boston.  Her

19  parents kidnapped her from Boston, as a grown adult.  She was

20  almost 20 years old, took her back to California, took away her

21  phone, her driver's license, her money.  We have texts saying

22  her Dad is f'ing up her money and that he won't let her go back

23  to Boston.

24      Any Orange County police report that they filed, which I

25  actually called the woman, who went -- who was dispatched to

1    their house, said there were numerous calls that were all

2    unfounded.  That's also an exhibit, Exhibit C of our motion to

3    vacate, says that she -- it was consensual.  She has

4    opportunity to leave at any time.  In her text messages he

5    reviewed, said it was of a sexual nature, but had no imminent

6    threat.  When she came back to the Court, and in her

7    transcript, she was -- where also another exhibit list -- says

8    blatantly that she did not know how to handle people

9    disapproving of the relationship.  And, our attorney said,

10   "Then what happened?"  And, she said, "I had to make a

11   decision."  And, he said, "A decision to do what, Ms.

12   Humphries?"  And, she said, to either break up with us or to

13   leave everything she ever knew, her family, friends and career

14   because her parents would not let her go back to Boston because

15   they didn't approve of her relationship.

16       So, this entire restraining order is not only involving

17   evidence that they want to suppress, that her mother subjected

18   her to a man that was 63 years old, one of the wealthiest men

19   in Cal -- in -- in the United States and for $75,000 --

20       MS. MARIELLA:  Your Honor, I just object to all of this

21   for the record as not relevant and move to strike it.  It's all

22   --

23       MS. BUTTON:  It's --

24       MS. MARIELLA:  -- rehashing things she was cross examined

25   about --

1    MS. BUTTON:  -- That's --

2    MS. MARIELLA:  -- and litigated extensively.

3    THE COURT:  Overruled.  Go ahead.

4    So, actually, I want --

5    MS. BUTTON:  And, it --

6    THE COURT:  -- to stop you there, 'cause my quest -- I

7  just wanted to -- I really want to focus on what happened after

8  2018 and I think you're going back into litigating the --

9    MR. MOORE:  Nothing.

10    MS. BUTTON:  Nothing.

11    THE COURT:  -- explain to --

12    MS. BUTTON:  Nothing past the --

13    THE COURT:  So, you mentioned something about Orange

14  County and that's where Los Angeles is, is that right, Orange

15  County?

16    MS. BUTTON:  Correct.

17    THE COURT:  You had moved --

18    MS. BUTTON:  Well, Orange County is an hour-and-a-half

19  away from Los Angeles.  However, we were not in Los Angeles

20  when Sage reported this police report.  Her mother made the

21  call.  We were still living in Boston.  So, as soon as we were

22  warned that her -- her father, who's a lawyer, by the way, was

23  filing a restraining order and was going to make her sign it,

24  which we have text messages in the top two exhibits --

25    THE COURT:  Well, hold on.

```
 1          MS. BUTTON:  -- saying that they --
 2          THE COURT:  Let me ask my question -- Let me get to my
 3    point.  All right.  So --
 4          MS. BUTTON:  Okay.
 5          THE COURT:  But, you had moved to Los Angeles in 2017?
 6          MS. BUTTON:  That's correct.
 7          MR. MOORE:  That's correct.
 8          THE COURT:  So, you were in the area of Orange County,
 9    California, right?
10          MS. BUTTON:  No.
11          MR. MOORE:  No.  We were an hour-and-a-half from Orange
12    County.
13          THE COURT:  An hour-and-a-half away, okay.  All right.
14    But, that's where Ms. Humphries was from?
15          MR. MOORE:  No.  She's from Long Beach.
16          MS. BUTTON:  No.  She lived in Boston and --
17          MR. MOORE:  She's -- yes.
18          MS. BUTTON:  -- she's from Long Beach.
19          MR. MOORE:  She's from Long Beach, but she was living in
20    Boston for years before --
21          THE COURT:  Well, how far is Long Beach --
22          MR. MOORE:  -- all of this was pending.
23          THE COURT:  -- from Orange County -- from L.A.?
24          MR. MOORE:  About two hours, depending on traffic.  I
25    mean, L.A. traffic is terrible, but it's nowhere near L.A.
```

```
 1        THE COURT:  Okay.  But, there was -- But, the time when
 2   you moved to Los Angeles, you didn't have any interaction with
 3   her or her family in the California area?
 4        MR. MOORE:  Never.
 5        MS. BUTTON:  No, we did not, no.
 6        MR. MOORE:  She's in Boston.  No, we would -- we never had
 7   --
 8        THE COURT:  [Crosstalk at 11:43:45 a.m.] --
 9        MR. MOORE:  -- We never even thought --
10        THE COURT:  I'm talking to Ms. Button, so she should be
11   the one answering my questions.
12        MS. BUTTON:  Oh, sorry.
13        THE COURT:  All right.  So, actually, now, Mr. Moore, I'll
14   go to you.
15        MR. MOORE:  Okay.
16        THE COURT:  You're also -- Were you and Button -- Are you
17   -- The two of you have been moving together from Boston to L.A.
18   to what -- Nevada and Las Vegas?
19        MR. MOORE:  Yes, we never separate.
20        THE COURT:  Okay.  And, since 2018, have you had any
21   interaction with Ms. Humphries?
22        MR. MOORE:  No, absolutely not.
23        THE COURT:  All right.  And, have you posted anything on
24   social media related to Ms. Humphries or the situation
25   involving you and Ms. Humphries?
```

1    MR. MOORE:  Not in any way, shape or form, no.

2    THE COURT:  And, he's -- you're involved in the same

3 lawsuit?

4    MR. MOORE:  Yes, sir, I am, but I wasn't involved in the

5 same industry.

6    THE COURT:  Okay.  You are not in the dancing industry at

7 all?

8    MR. MOORE:  No.  I was actually -- As she put in her

9 restraining order in 2017, I was a watchmaker when I met Sage

10 and, until I also lost all of my work and -- and currently

11 unemployed, I dealt exotic cars and military vehicles, for car

12 events and -- on the West Coast.

13    THE COURT:  Okay.  And, you're still engaged in that

14 business now?

15    MR. MOORE:  No.  Actually, I was canceled as well, at the

16 same time as Dusty, and we were both fired from every job and

17 every sponsor that we had.

18    THE COURT:  Okay.  And, you -- So, other than the lawsuit

19 -- You're represented pro se in the lawsuit in Neva -- up there

20 in Nevada?

21    MS. BUTTON:  We weren't -- We weren't pro se to begin

22 with, but the bills started adding up to over $400,000.  So, we

23 couldn't afford anymore.  So, we did have the option to file

24 bankruptcy, but, again, we have proof that we've never done

25 anything wrong.  So, we continued pro se and we will be

1   continuing pro se.

2       THE COURT:  Okay.  So, while you're -- while this case is

3   being litigated, that will be mean that, at some point, you'd

4   have to have some interaction with Ms. Humphries?

5       MS. BUTTON:  The only interaction that would take place

6   would be a deposition, in which we have already spoken to other

7   counsel about having a third party in there and guest that the

8   magistrate would choose.  But, again, there's no possibility on

9   our end.  There's no -- There's no reason for this abuse

10  prevention order to be there because we didn't abuse her and I

11  understand that's going back.  But, taking -- moving forward,

12  all we want out there is the truth, whether that -- in this

13  case or in Nevada and we will make sure that that happens.

14  However anything goes.  But, yes, the only thing that we would

15  -- that we would have that would reference us being around her

16  would be deposition --

17      MR. MOORE:  Court.

18      MS. BUTTON:  -- and, then, the court -- if it makes it to

19  trial, which it might not, that would be the only other

20  instance.  But, we wouldn't have any interaction with her,

21  aside from that.  Everything goes through her counsel.  So,

22  there's no -- there's no communication with her.

23      MR. MOORE:  And, there's been absolutely no contact since

24  May of 2017, except for the contact in April or May -- I'm

25  sorry --

1    MS. BUTTON:  In July.

2    MR. MOORE:  -- July and August that Sage initiated to us.

3  But, since August, maybe 5th or 4th or something, from 2017, we

4  have never had any type of contact with her, or spoken of her

5  or about her.

6    MS. BUTTON:  Or her friends of her or anything that --

7    MR. MOORE:  And, anybody relative [Crosstalk at 11:47:38

8  a.m.] --

9    THE COURT:  What contact are you talking about in July and

10  August?

11    MS. BUTTON:  Yes.

12    THE COURT:  July and August --

13    MR. MOORE:  Yes.

14    THE COURT:  -- of what year?

15    MS. BUTTON:  2017, before this -- before the temporary

16  order was granted.

17    MR. MOORE:  Yeah.

18    THE COURT:  Okay.

19    MS. BUTTON:  And, what -- And, just to reference that

20  shortly, it was because, in May is when her parents took her

21  from Boston to California and, then, in June, she started using

22  her younger brother's phone to send us Snapchat -- which we

23  never asked her to do -- started sending us Snapchats and,

24  basically, she was playing both sides.  She was still being in

25  a relationship with us and, on the other end, she was being

131

1-24

 1   brainwashed by her parents to think that we were terrible

 2   people.  And, we have proof of this.  This isn't hearsay.  I

 3   know you said you don't have time to look at all the exhibits,

 4   but they are there in order, chronological order, to show

 5   exactly what happened.

 6       THE COURT:  Mm-hmm.

 7       MS. BUTTON:  And, since then, there's been no contact

 8   whatsoever, not even in the same state, ever.

 9       MR. MOORE:  Not even a mention.

10       MS. BUTTON:  Not in mention, not talking to anybody that

11   knows her.  We've stayed as far away from her as humanly

12   possible.

13       THE COURT:  So, then, there are two possible opportunities

14   to have some type of contact with Humphries, is at a deposition

15   and trial.

16       MS. BUTTON:  That's correct.  Opposing counsel, Sabina,

17   who's there, has filed so that we actually cannot depose her in

18   person.  She's filed that we have to get depositions in

19   writing.  And, I know this is an entirely relevant in Boston,

20   but based on their misconduct in Nevada, we actually don't

21   trust that they would write those themselves, considering her

22   affidavit in 2018 isn't even signed, and her affidavit in 2017

23   is not witnessed.  And, she told us it was forced and that she

24   was under duress, and they wouldn't let her go back to Boston.

25   So, that actually is not signed by a witness.  It's only signed

132

1   by Sage, and we can only attest to the fact that she told us

2   she was forced to sign it.  So, we don't trust that those

3   written depositions would take place --

4        THE COURT:  Is that an order --

5        MS. BUTTON:  -- properly, which is --

6        THE COURT:  Was that an order of the Court, that it be

7   done that way?

8        MS. BUTTON:  Sorry.  Which way?

9        THE COURT:  The --

10       MR. MOORE:  The writing.

11       THE COURT:  -- The deposition by writing, was that an

12  order of the court?

13       MS. BUTTON:  That's what Sabina and Mariella have sought -

14  - Well, her firm.  I can't say just her, but that's what their

15  firm is objecting to because we -- we filed so many depositions

16  that we wanted so many depositions because we have a lot of

17  people to depose, and --

18       THE COURT:  So, it -- So, --

19       MS. BUTTON:  -- there's only two of us.

20       THE COURT:  -- So, has the court made an order as to how

21  Ms. Humphries deposition is to be taken?

22       MS. BUTTON:  No.  It's on -- April 5th is our hearing for

23  that, because we objected to it.

24       THE COURT:  Okay.  All right.  I'm going to hear from Ms.

25  Humphries side now.  Okay?

1    MS. BUTTON:  Okay.  Thank you.

2    THE COURT:  Thank you.

3    MS. MARIELLA  Thank you, Your Honor.  Would you like to

4  hear from Ms. Humphries first or would you like me to --

5    THE COURT:  Sure.  You --

6    MS. MARIELLA  -- make some legal argument.

7    THE COURT:  -- That'll be fine.  So, what I'm going to do,

8  then, is she can take the witness stand here.  And, let's turn

9  the camera so that the defendants can see her on the stand.

10                           [Pause]

11    MS. BUTTON:  She's lying right now.  Like, literally right

12  now, and I have the paperwork to prove it.  We did not object

13  or violate anything --

14    MR. MOORE:  Violate any [Crosstalk at 11:51:12 a.m.] --

15    MS. BUTTON:  -- in Nevada.

16    MR. MOORE:  Judge Lyons already ruled --

17    MS. BUTTON:  So she's about to testify --

18    MR. MOORE:  Yeah.

19    MS. BUTTON:  -- to something that's a lie again.

20    THE COURT:  Nobody said anything yet.  Hold on.  Relax.

21  Nobody's testified, nobody said anything.  She's just getting

22  on the stand right now.

23    MS. MARIELLA  She's previously --

24    MR. MOORE:  Sorry.  We overheard the [Issues with Zoom at

25  11:51:27 a.m.] --

1    MS. BUTTON:  We overheard the conversation, that's why we

2    said that.  I apologize.

3    THE COURT:  All right.  You may have a seat.

4    You may pose some questions.

5    MS. MARIELLA  Thank you, Your Honor.

6    **DIRECT EXAMINATION OF WITNESS, SAGE HUMPHRIES**

7    BY:  MS. MARIELLA

8    Q    Ms. Humphries, how old are you today?

9    A    I'm 25 years old.

10   Q    Where do you currently live?

11   A    I currently live in the south end of Boston.

12   Q    And, what do you do for a living?

13   A    I'm a professional ballet dancer.

14   Q    Where did you meet the defendants?

15   A    At Boston Ballet when I was a member of the [Indiscernible

16   at 11:51:47 a.m. - speaking away from microphone] and she was a

17   principal dancer.

18   Q    Okay.  Do you know where the defendants currently live?

19   A    They currently live in Nevada.

20   Q    And, do you intend to live in Boston forever?

21   A    I do not see myself living in Boston for the rest of my

22   life.  I would love to -- to go to the West Coast when I start

23   a family.  I want to be closer to my parents and I do not

24   intend live there forever.

25   Q    Where do your parents live?

```
1   A    My parents in Seal Beach, California, which is not an hour
2   and a half drive.  It's about 45 minutes without traffic, but.
3   Q    When you say 45 minutes without traffic, do you mean from
4   Los Angeles?
5   A    I mean from Los Angeles.
6   Q    Okay.  Is California close to Nevada?
7   A    It is, yes.
8   Q    Do you know how many times the defendants have moved since
9   you've known them?
10  A    Since I've known them, they lived in Boston, California,
11  and Nevada.  But prior to me knowing them, they moved around a
12  lot.  They lived in Europe for the time -- for a period of
13  time.  They lived in different places.  They spent time in
14  Asia.  They -- They moved around a lot.
15  Q    Back in 2017 or 2018, did they ever express that they
16  might move to Texas?
17  A    They did.
18  Q    At any point, did they live in Australia?
19  A    They --
20       THE COURT:  Let's talk about what happens -- been going on
21  since 2018.
22       MS. MARIELLA:  Okay.
23       THE COURT:  Okay?
24       MS. MARIELLA:  Yes, Your Honor.
25  BY:  MS. MARIELLA
```

1  Q    Sage, since you've received your permanent abuse

2  prevention orders in 2018, have you learned anything about the

3  defendants that makes you continue to fear them?

4  A    Yes, I have.

5  Q    What have you learned?

6  A    Since the initial restraining order hearings, I have come

7  to learn that they have used minors, that they did not stop

8  with me.  That there were two other girls --

9       MR. MOORE:  Your Honor, --

10       MS. BUTTON:  Objection.

11       MR. MOORE:  -- may we object to this?

12       MS. BUTTON:  Objection.

13       MR. MOORE:  There is --

14       THE COURT:  Counsel, [Crosstalk at 11:54:05 a.m.] of this?

15  What's the foundation of that she's learned this?  How --

16  Where's this coming from?

17       MS. MARIELLA:  May I inquire about --

18       MR. MOORE:  [Crosstalk at 11:54:10 a.m.] evidence --

19       MS. MARIELLA:  -- the foundation?

20       THE COURT:  Yeah.  Let's get a foundation for that.

21       MS. MARIELLA:  Okay.

22  BY:  MS. MARIELLA

23  Q    How did you learn about the allegations against the

24  defendants that they have harmed others?

25       MR. MOORE:  May we object to this?

1    MS. BUTTON:  Objection.  That's irrelevant.

2    MR. MOORE:  It's irrelevant.

3    MS. BUTTON:  Irrelevant.

4    THE COURT:  Go ahead.  Answer the question.

5    MR. MOORE:  It's hearsay.

6  BY:  MS. MARIELLA

7  A    The -- The -- The reason that I filed the lawsuit in

8  Nevada --

9    THE COURT:  Not the reason.  The question is how did you

10 find out about the alleged abuse to other minors?

11   THE WITNESS:  Through meeting them, Your Honor.

12   THE COURT:  Meeting the minor?

13   THE WITNESS:  I -- I met Gina, who started the lawsuit

14 with me in the summer of 2020, who my brother's best friend,

15 who is a dancer, and she wasn't a minor when I met her.  She

16 was my age.  But, she recounted that when she was 14, she was

17 molested by Taylor at a Ali Studio in Florida, and that there

18 were five other girls --

19   MS. BUTTON:  Objection.

20   THE WITNESS:  -- who were also underage and molested.

21   MS. BUTTON:  That's irrelevant.

22   THE COURT:  [Crosstalk at 11:55:18 a.m.] --

23   MS. BUTTON:  And, we have --

24   THE COURT:  -- they were minors at the time?

25   THE WITNESS:  They were all minors.

1    THE COURT:  And, have they had any interaction with the

2    defendants since 2018?

3    THE WITNESS:  Taylor moved to be with Dusty.  I don't know

4    the exact age of -- of -- of him, but I know that all of the

5    girls at that dance studio were --

6    MR. MOORE:  [Crosstalk at 11:55:36 a.m.] --

7    THE WITNESS:  -- minors who he molested.  He would have

8    sleepovers or movie nights with them, similar to what he did

9    with me.  And, the stories and the patters were so similar.

10   And, when I talked to this girl Gina, it was like learning that

11   it -- I was just another piece in their pattern and when he met

12   Dusty, they started doing it together.  He started abusing

13   girls himself, and then started abusing them with her.

14   MS. BUTTON:  Objection.

15   THE COURT:  These are statements from other --

16   MS. BUTTON:  There's no -- There's --

17   THE COURT:  -- girls that have told you, right?

18   THE WITNESS:  There are in the lawsuit, there are six of

19   us.  And, I've had more encounters with other dancers who

20   aren't a part of this lawsuit because they live in fear of

21   these two people because they are vindictive.  And, they --

22   THE COURT:  So, --

23   THE WITNESS:  -- are very violent and very scary, and I

24   live in fear of them, constantly.

25   THE COURT:  All right.  You may pose some more questions.

1  BY:  MS. MARIELLA

2  Q    Have the defendants done anything in the Nevada litigation

3  to make you fear them?

4  A    Every step of this process in the Nevada litigation feels

5  like I'm reopening the abuse.  Last week they sent 280

6  questions for admissions.  And, many of the questions were very

7  graphic and it feels like I'm reliving the abuse that I

8  suffered.  Not to mention the fact that they attack my parents

9  constantly and try to say outlandish claims that my parents

10  forced me to get this restraining order, which I wrote the

11  affidavit myself.  There are so many things that happened one

12  after another over the course of me starting this lawsuit that

13  make me realize why many girls do not stand up for themselves

14  and talk about abuse because I'm being constantly victim blamed

15  and harassed by them.  Not to mention, and I know that this is

16  not proven, but they have -- you asked them about social media.

17      THE COURT:  Pose a question.

18  BY:  MS. MARIELLA

19  Q    Have the defendants filed a -- any counterclaims against

20  you in Nevada?

21  A    Yes.  They --

22  Q    What are those counterclaims?

23  A    They filed a claim for defamation against me.  They filed

24  a counterclaim against my parents, three third-party lawsuits

25  against people from my past.

1  Q    And, those people from your past that they attempted to

2  sue in Nevada included former partners, right?

3  A    An ex-boyfriend, a guy who I knew for a few months in New

4  York, and the billionaire that they speak of who I had business

5  dealings with at one point in my life.

6  Q    Did the defendants call you a prostitute in their filing

7  in Nevada?

8  A    They did call me a prostitute, and my mom a pimp.

9  Q    Did they call your mother a sex trafficker in that filing?

10 A    Yes, they did.

11 Q    Did they call you sexually promiscuous in that filing?

12 A    Yes, they did.

13 Q    Did they attach text messages between you and other third

14 parties to that filing on a public docket?

15 A    --

16 Q    Have the defendants -- Sorry.  Go ahead and give a --

17 Sorry.

18 A    Keep going.

19 Q    Okay.  Since 2018, have the defendants give any me --

20 given any media interviews about you?

21 A    Yes.  To the Daily Mail.

22      MS. MARIELLA:  Your Honor, I submitted the Daily Mail

23 article as Exhibit L.  Do you want a copy of that now, or do

24 you have that with you?

25      THE COURT:  Have you seen the article from the Daily Mail?

1    MR. MOORE:  Yes, Your Honor.

2    MS. BUTTON:  Yes, Your Honor, we have.

3    MS. MARIELLA:  May I approach the witness with a copy,

4  too?

5    THE COURT:  Sure.  The article is 47 pages long?

6    MS. MARIELLA:  There's a lot of photos, Your Honor.

7    And, just for the benefit of the defendants, this is Tab L

8  in the electronic binder that I sent you.

9  BY:  MS. MARIELLA

10 Q    Sage, do you recognize this article?

11 A    I do.

12 Q    Is that the Daily Mail article that you referenced?

13 A    Yes.

14 Q    In that article, did the defendants call you Ballerinas

15 Amber Heard?

16 A    Yes, they did.

17    MR. MOORE:  [Issues with Zoom at 12:00:47 p.m.] record.

18    MS. MARIELLA:  I'd offer Exhibit L into evidence at this

19 time.

20    THE COURT:  Hold on.  So, 47 pages, has pictures, and

21 screenshots of text messages.  This is all part of the article?

22 As well as a page of a lawsuit?

23    MS. MARIELLA:  Correct, Your Honor.  I'll represent that I

24 PDF'd that from the Daily Mail's website.  And, Ms. Humphries

25 should be intimately familiar with it if you have questions

1   about its authenticity.

2       THE COURT:  Is that your understanding about what the

3   Daily Mail article was?

4       MR. MOORE:  Is what -- I'm -- I apologize.  What -- Is

5   what our understanding?

6       THE COURT:  These text messages, screenshots, copies of

7   the filings, in the litiga --

8       MR. MOORE:  Yes, the same evidence that we presented to

9   the court today.

10      THE COURT:  Okay.  All right.  This will be Exhibit 1.

11  And, this -- What's the date of this?

12      THE WITNESS:  This was September 7th.

13      **[Daily Mail Article/Documents Marked as Exhibit No. 1]**

14  BY:  MS. MARIELLA

15  Q    Could you read the year, Ms. Humphries?

16  A    2022.

17  Q    Okay.  Does the Daily Mail --

18      THE COURT:  [Crosstalk at 12:02:05 p.m.] --

19      MS. MARIELLA:  Excuse me.

20      THE COURT:  Exhibit 1.

21      MS. MARIELLA:  Thank you, Your Honor.

22  BY:  MS. MARIELLA

23  Q    Does the Daily Mail article include images of text

24  messages between you and the defendants?

25  A    Yes.

1    Q    Does it include photos of you and the defendants?

2    A    Yes.

3    Q    Does it include images of text messages between you and

4    other people?

5    A    Yes.

6    Q    Have the defendants ever violated the abuse prevention

7    orders entered in this case since 2018?

8    A    It is my belief that they have, yes.

9         MS. BUTTON:  So, we --

10        THE COURT:  Go ahead.  Ask --

11        MS. MARIELLA:  Thank you.

12        THE COURT:  I understand what -- the -- you're -- you've

13   made a legal conclusion as to whether or not they violated it.

14   Talk about what you claim the violation was.

15        MS. MARIELLA:  Of course.

16   BY:  MS. MARIELLA

17   Q    Ms. Humphries, in addition to ordering the defendants to

18   stay away from you, what else did the abuse prevention orders

19   require them to do?

20   A    I was concerned at the time the abuse prevention orders

21   were being written that they had electronically stored

22   information of mine, including the not limited to text

23   messages, photos, e-mails, access to contacts of mine.  I could

24   not know --

25        THE COURT:  So, what did the order tell you to do?  What

1    was -- What did the order prevent them from doing?

2        THE WITNESS:  It prevented them from publishing,

3    distributing, keeping in any capacity, they were supposed to

4    surrender --

5        MS. BUTTON:  That's not true.

6        THE WITNESS:  -- it to the authority.

7        MR. MOORE:  We object.

8        MS. BUTTON:  Objection.

9        MR. MOORE:  It did not -- It did not say we do not keep a

10   copy.  It said no publishing.  Not -- It did not say --

11       MS. BUTTON:  [Crosstalk at 12:03:42 p.m.] same period --

12       MR. MOORE:  -- do not keep a copy.

13       THE WITNESS:  I believe the word was surrender --

14       THE COURT:  The order will speak for itself.  I'll take a

15   look.  Can you direct me to where, in the order, you're

16   referring to the other conditions, please?

17       THE WITNESS:  Section 14.

18       MS. MARIELLA:  Yes, Your Honor.  So, it's the permanent

19   order.  And, it's in Box 14.  Do you have a -- Would you like a

20   copy or?

21       THE COURT:  I'm at the order.

22       MS. MARIELLA:  It's in Box 14 that says -- It's that

23   additional information at the bottom.  I'm happy to read it

24   into the record, if you'd like me to.

25       THE COURT:  I see in the order, Box 14.  It says that,

1    looking at order 1701RO182, defendant is to surrender any and

2    all personal information to the Boston Police Department,

3    meaning to plaintiff, using electronically stored information,

4    -- He is not to publish any such info.  It looks like personal

5    information.

6         Okay.  I see that in Box 14 the defendants were ordered to

7    not publish any personal -- personally stored information.

8    BY:  MS. MARIELLA

9    Q    Ms. Humphries, did the defendants publish your personally

10   stored information since 2018?

11   A    Yes.  They did.

12   Q    How did they do that?

13   A    They published it in the Daily Mail article.  And, they

14   also --

15        MR. MOORE:  [Issues with Zoom at 12:05:59 p.m.].

16   BY:  MS. MARIELLA

17   Q    Prior to the Daily Mail article, did they publish --

18   A    They published --

19   Q    -- your personal information?

20   A    -- in the Boston Magazine.

21   Q    And, did they publish it on the docket in the federal case

22   in Nevada?

23   A    They did publish in the docket in the federal case in

24   Nevada.

25   Q    What did they publish in the federal case in Nevada?

1  A    Through the third party claims, they included personal

2  text messages between me and the people that I mentioned from

3  my past.  They also have photos that could only have been

4  retrieved from my cellular device at that time.

5       MS. BUTTON:  [Issues with Zoom at 12:06:42 p.m.]

6  BY:  MS. MARIELLA

7  Q    And, Ms. Humphries, did the Nevada court find that that

8  was a violation of the abuse prevention orders in this case?

9  A    Yes.  The Nevada court issued sanctions against that

10 information in light of my restraining order and Section 14.

11 Q    Okay.  And, are you familiar with that order?

12 A    I am.

13      MS. MARIELLA:  May I approach with the order, Your Honor,

14 to have her authenticate it?

15      THE COURT:  Is that part of the exhibits you provided to

16 the defendants?

17      MS. MARIELLA:  Yes.  It's Exhibit I.

18      THE COURT:  Sure.

19 BY:  MS. MARIELLA

20 Q    Ms. Humphries, is that a copy of the Nevada Court's

21 sanction order?

22 A    Yes.

23      THE COURT:  Have you seen the sanction order, Ms. Button

24 and Mr. Moore?

25      MS. BUTTON:  Yes, Your Honor.  But what they're not --

1    They're failing to mention that we attached in our -- our

2    exhibits is our objection to those sanctions because Nevada

3    ruled on a Bachman order because her firm specifically

4    manipulated them to think that we were supposed to destroy any

5    and all information, which is untrue.  We also attached that

6    exhibit.  And, the sanctions are objected to, which is to be

7    heard on April 5th, because the judge saw that that is untrue.

8    She willingly uploaded information onto our hard drive when she

9    was dating us.  Everyone forgot that that was there.

10       And, in the order at the end of the 2017 hearing, Maura

11   Melcher, who's sitting there, her attorney, previous attorney,

12   mentioned that she was satisfied with what was given to her,

13   which at the time we thought all the information they wanted

14   was the fact that she didn't want people to know that she was

15   in a threesome relationship.  We had no idea that she forgot

16   what was left on our hard drive.

17       Five years later we were asked by the Nevada Court to look

18   through every bit of information we had regarding Sage

19   Humphries.  We found old hard drives that had been in storage

20   for five years, and realized that there were text messages from

21   her to a third party involving an exchange of $75,000 for sex,

22   which she told us in a Never Have I Ever game.

23       And, this has happened for five years.  And, that's why

24   it's a suppression of evidence.  We've never published

25   anything.  We gave this information to our attorney, which at

```
 1  the end of the 2017 hearing, the judge ordered it's fine if you
 2  gave it to the Attorney Melcher, which we did, --
 3       THE COURT:  So, you're aware of the order --
 4       MS. BUTTON:  -- everything [Crosstalk at 12:09:51 p.m.] --
 5       THE COURT:  So, you're --
 6       MS. BUTTON:  I'm sorry.  One more time --
 7       THE COURT:  -- You're aware of the sanction order?
 8       MS. BUTTON:  Correct.  Which is objected to.
 9       THE COURT:  Okay.  Thank you.
10       MS. MARIELLA:  Thank you, Your Honor.
11  BY:  MS. MARIELLA
12  Q    Ms. Humphries, if you could just turn to Page 7 of that
13  order, please?
14  A    Yes.
15  Q    Could you just read Heading B into the record?
16  A    "Defendants' disclosure of documents on Humphries iPhone
17  was a willful -- willful violation of the Boston Municipal
18  Court's orders."
19       MR. MOORE:  No.
20  BY:  MS. MARIELLA
21  Q    Thank you --
22       MS. BUTTON:  Yeah --
23  BY:  MS. MARIELLA
24  Q    Thank you, Ms. Humphries.
25       Ms. Humphries, is there anything else that's happened
```

1  since 2018 that you would like to advise the Court about that

2  has caused you to continue to fear the defendants?

3  A    I have had to undergo a lot of therapy, both physically

4  and emotionally since the time of the abuse.  And, having

5  spoken to experts, realizing the scale and the sophistication

6  of how they manipulated me at such a young age, it's truly

7  unimaginable.  And, I'm still uncovering how sophisticated it

8  was, and realizing the pattern through, unfortunately, meeting

9  other victims of theirs from past and future.  I also have had

10 to seek help with four specialists.  I've had scar tissue, and

11 issues with my hips since the rapes, since the abuse.  I have

12 had to constantly relive this through all of that work that

13 I've tried to do to get myself back to myself.  And, me

14 initiating the lawsuit in Nevada with Gina was a step towards

15 trying let others who have the same stories come forward and

16 the magnitude of it has been astounding.  It's not astounding

17 in a positive sense.  It's horrifying how many people over so

18 many different states, over so many different ages, before me

19 and after me, they have continued to abuse.

20 Q    Ms. Humphries, are you aware of the Buttons doing anything

21 to attempt to harm your career?

22 A    They have -- They will say that it was not them contacting

23 colleagues of mine, sending e-mails to my boss --

24      THE COURT:  So, you don't know if they've actually done

25 it?  You suspect that they've done this?

1    THE WITNESS:  The Instagram handle reads "Formerly known

2    as Dusty Button" and "Formerly known as Button Built," which

3    was both their Instagram handles before the litigation started.

4    Those messages had been sent to people that are only close to

5    me.  There have been websites made, *Justice for the Buttons*,

6    YouTube videos, *The Real Sage Humphries*, where they --

7        MR. MOORE:  Objection, Your Honor.  Judge Lyons has

8    already ruled against all of this.

9        THE COURT:  So, --

10       MS. MARIELLA:  Your --

11       MR. MOORE:  This are baseless claims.

12       MS. MARIELLA:  -- Your Honor, she found that she hadn't

13   prove -- proven contempt by clear and convincing evidence.  But

14   I think it's relevant to this motion.

15       MR. MOORE:  It's [Crosstalk at 12:13:20 p.m.] --

16       THE COURT:  Well, I guess the question is how do you know

17   that it's from the Buttons were in the --

18       THE WITNESS:  May I speak on that?

19       THE COURT:  -- to Mr. Moore?  Right?  'Cause it's -- She

20   indicated herself, it's -- from her indication from where she

21   started her testimony, it sounded like it was speculative.

22   BY:  MS. MARIELLA

23   Q    Sage, do you want to go ahead and address why you believe

24   that the websites, and the e-mails, and whatnot were sent by

25   the Buttons?

```
 1  A    I am not a tech genius.  I don't have the information to
 2  prove it.  But I did live with them for several months.  I know
 3  their tone and the way that they speak.  Again, speculative.
 4  But there's nobody on this planet who has a vendetta against me
 5  who would want to ruin my life, who would want to ruin my
 6  career, other than these two people.  There's nobody else who I
 7  would consider an enemy in my life.  And, those are the only
 8  two people who would try to falsely say information about me,
 9  about my family, would try to come up with stories.  I've --
10  When I've lived with them I saw the lengths that they would go
11  to to defame and -- and make others feel small.  The -- The
12  threats that they would make towards anyone who would cross
13  them.  That's why I asked Judge --
14       MR. MOORE:  Objection, hearsay.
15  BY:  MS. MARIELLA
16  A    -- the judge in the first place for the electronic --
17       THE COURT:  Overruled.
18  BY:  MS. MARIELLA
19  A    I asked --
20       MR. MOORE:  It's not evidence --
21  BY:  MS. MARIELLA
22  A    -- I asked for it in the first place because I knew that
23  they would try to blackmail me.  I knew that they would try to
24  go after anything that I had.  I knew that if I stood up for
25  myself that they would come after me, and they're continuing to
```

1    come after me.  And, they will go to any lengths to hide it,

2    but that is my opinion, and I'll rest my case with that.

3        MS. BUTTON:  Sorry.

4    BY:  MS. MARIELLA

5    Q    You mentioned a YouTube channel, and we won't spend too

6    much time on it.  But are you aware of the kinds of images that

7    the YouTube channel contains that relate to you?

8    A    Yeah.  They're -- They're like mockery.  It's -- It's

9    putting me in -- in -- in memes.  Putting Pinocchio noses on my

10   face, and calling me Amber Heard.  And, saying curse words.

11   And, calling me the big liar and using quotes from movies about

12   people who lie.  And, just trying to paint me as a completely

13   different person than who I am.

14   Q    Do the YouTube videos about you contain additional images

15   of your messages with the defendants?

16       THE COURT:  Well, first of all, who --

17   A    It does --

18       THE COURT:  -- give me a foundation about this YouTube

19   channel, --

20       MR. MOORE:  Oh, --

21       THE COURT:  -- [Crosstalk at 12:16:23 p.m.].  What is it?

22       MS. MARIELLA:  Yes, Your Honor.  May I approach with

23   screenshots from it for the --

24       THE COURT:  Sure.

25       MS. MARIELLA:  -- for the witness?

1        THE COURT:  Yes.  And, you've provided this to the

2   defendants?

3        MS. MARIELLA:  Yes.  It's Q in their packet.

4   BY:  MS. MARIELLA

5   Q    Ms. Humphries, just -- Do these images appear to be images

6   from videos entitled *The Real Sage Humphries Part One of Two*,

7   and *The Real Sage Humphries Part Two of Two*?

8   A    Yes.

9   Q    And, do they appear to be images of those videos posted on

10  an account called "Fletcher Reed" on YouTube?

11  A    Yes.

12  Q    Is the first image on this page an image of you and the

13  defendants?

14  A    Yes.

15  Q    If you go to the third page, what is that images -- image

16  on the top?

17  A    The -- The -- The order number of the airsoft guns?

18  Q    No, sorry.  If you go to the third page, front and back,

19  so counting the back.

20  A    Oh, I see.  I'm -- I apologize.  The victim card?

21  Q    No, sorry.  The one that says "The Humphries took the

22  Buttons to dinner."

23  A    Oh, sorry.  I think I got it out of order.

24  Q    That's okay.

25  A    Oh, yes.  Yes.  "The Humphries took the Buttons to dinner

1    and cocktails to celebrate Taylor's birthday."  Yes.

2    Q    And, what does that appear to be an image of?

3    A    It's an image of my family and I having dinner with the

4    Buttons in California.

5    Q    Okay.  Do you know who would have access to that image?

6    A    The Buttons.

7    Q    What's right below that?

8         MR. MOORE:  Objection, Your Honor.  This is posted on the

9    internet for half a million people to see.  So, that's

10   incorrect --

11        MS. BUTTON:  Prior to anything.

12        MR. MOORE:  Yes.  Prior to this happening.  We all posted

13   this image between half a million followers that we deleted

14   from Instagram.

15        THE COURT:  Okay.

16   BY:  MS. MARIELLA

17   Q    What's the image right under that?

18   A    The image right under that is the firing notice of Dusty

19   Button from the Boston Ballet.

20   Q    So, I want to skip ahead two pages to -- Well, what do you

21   see two pages ahead of that?

22   A    What do you see two pages ahead of that?

23   Q    Do you see the -- and -- a page that has [Indiscernible at

24   12:19:24 p.m. - speech].com on the top?  And, then, --

25   A    Yes, I do.  Yes.

```
 1    Q    What does that appear to be?

 2    A    So, that appears to be the purchase, or the delivery

 3    address of Taylor and Dusty ordering an airsoft gun.

 4    Q    And, it is evidence that the defendant submitted in 2017

 5    or 2018?

 6    A    No.

 7    Q    Does --

 8         MR. MOORE:  Objection.  Yes, it is.  Objection.

 9    Absolutely yes it is.  Object -- We presented in 2017.  Judge

10    Lyons did not accept it into an exhibit, and it was never

11    viewed as evidence.

12    BY:  MS. MARIELLA

13    A    Okay.

14         MS. BUTTON:  No.  Judge M --

15         MR. MOORE:  I'm sorry.  Judge McKenna.

16    BY:  MS. MARIELLA

17    Q    If you skip ahead two pages --

18         THE COURT:  Okay.  So, that's sustained then.  You're

19    going not read that.

20         MS. MARIELLA:  Okay.

21         THE COURT:  Okay.

22         MR. MOORE:  You're lying.  You're -- You're an attorney.

23    What are you doing?

24         THE COURT:  So, -- Go ahead.  Continue.

25         MS. MARIELLA:  Thank you, Your Honor.
```

1    BY:  MS. MARIELLA

2    Q    If you skip ahead two pages, do you see an e-mail from

3    someone named Lynn College to Dusty Button?

4    A    Yes.

5    Q    Thank you.  And, if you go to the back of that page, what

6    is that image of on the bottom?

7    A    That's me, and my mom, and Dusty, and Taylor.

8    Q    Okay.  And, then, on the next page, is there another image

9    of you and the defendants?

10   A    Yes.  That's -- These are both images from my phone.

11   Q    And, are these screenshots all consistent with what you've

12   seen on these YouTube videos, *The Real Sage Humphries, Part One*

13   *and Part Two*?

14   A    Yes.

15        MS. MARIELLA:  That's all on that, Your Honor.

16        THE COURT:  So, I have some questions about that.  Who is

17   Fletcher Reed?

18        MR. MOORE:  They don't know.

19        THE WITNESS:  Fletcher Reed is a fictional character in

20   the movie "Liar Liar".

21        THE COURT:  And, the images that are on that page, were

22   those images ever posted on any social media account prior to

23   the issuance of the current restraining order in 2017?

24        THE WITNESS:  No.  I never posted -- I never posted this

25   photo of my mom, and Dusty, and Taylor, and I.  I never --

157

```
 1         MR. MOORE:  We did.

 2         THE WITNESS:  I don't -- I don't recall posting that.  But

 3   this is not the only image.  There are so many other images.

 4         MS. BUTTON:  How can you sit there any lie?

 5         THE COURT:  All right.

 6         MR. MOORE:  [Issues with Zoom at 12:22:14 p.m.].

 7         THE COURT:  All right.  You may continue.

 8         MS. MARIELLA:  I have no further questions for the

 9   witness.

10         THE COURT:  All right.  Thank you.  Hold on.  Don't move

11   just yet.

12         THE WITNESS:  Sorry.

13         THE COURT:  You started mentioning about Instagram

14   messages --

15         THE WITNESS:  Yes.

16         THE COURT:  -- that you believe were sent by the

17   defendants in this case.  Who posted the Instagram messages?

18         THE WITNESS:  So, I received probably 10 different

19   messages from friends and colleagues of mine around the country

20   reaching out saying that an account, the -- "Formerly Known as

21   Dusty Button" and "Formerly Known as Button Built" sent them

22   links to the website *Justice for the Buttons*, and these YouTube

23   videos.  And, I was made aware that people at my work were

24   receiving the same Instagram messages.  So, I was just getting

25   calls at least one a week.
```

1      THE COURT:  And, when were you getting -- When was that?

2      THE WITNESS:  That was -- It started heavily in January --

3      THE COURT:  Of?

4      THE WITNESS:  That's of this year.  And, has continued up

5  until last month was the last call I received from a friend in

6  Houston who received the links through that Instagram page.

7      THE COURT:  And, according to the Instagram messages, when

8  were they posted?

9      THE WITNESS:  The videos?

10      THE COURT:  The messages --

11      THE WITNESS:  Or the messages --

12      THE COURT:  -- or the Instagram messages, when were they

13  posted?

14      THE WITNESS:  Oh, those -- They were -- They were --

15      THE COURT:  Were they posted before 2018 or after?

16      THE WITNESS:  After.  But they were private messages

17  directly to my friends.  And, the same Instagram --

18      THE COURT:  You have those messages?

19      THE WITNESS:  I have pictures of my friends sending me the

20  messages.

21      THE COURT:  Do you have them, counsel, and have you

22  provided them to the defendants?

23      MS. MARIELLA:  I don't have those printed out.  No, I

24  haven't sent them to the defendants.

25      THE COURT:  Okay.

1        MR. MOORE:  Why would you not?

2        THE COURT:  Please.  Thank you.

3        MS. MARIELLA:  We're happy to submit those to the Court at

4   some --

5        THE COURT:  I'm not going to take them.  And, no further

6   questions?

7        MS. MARIELLA:  No further questions, Your Honor.

8        THE COURT:  Okay.  You can step down.  Thank you.

9        Was it your intent from the sanction order from Nevada

10  marked as an exhibit?

11       MS. MARIELLA:  Yes, Your Honor.

12       THE COURT:  As well as the YouTube screenshots?

13       MS. MARIELLA:  Yes.  The YouTube screenshots, the

14  sanctions order, and the Daily Mail article, I believe I

15  admitted through the witness.

16       THE COURT:  You submitted them.  They weren't necessarily

17  admitted.  So, --

18       MS. MARIELLA:  May I submit them now for admission into

19  evidence?

20       THE COURT:  The Nevada sanctions, Exhibit 2.

21       Exhibit 3 will be the YouTube screenshots.

22            **[Nevada Sanctions Marked as Exhibit No. 2]**

23            **[YouTube Screenshots Marked as Exhibit No. 3]**

24       THE COURT:  Any other witnesses?

25       MS. MARIELLA:  No, Your Honor.

1          THE COURT:  All right.  Would you like to make an

2    argument?

3          MS. MARIELLA:  Yes, Your Honor.

4                        **CLOSING ARGUMENTS**

5          MS. MARIELLA:  As Your Honor correctly pointed out at the

6    beginning of this hearing, this is not about whether or not Ms.

7    Humphries was abused or feared the defendants in 2017 or 2018.

8    Judge McKenna already made that finding.  It's a final finding.

9    And, he found that protection was necessary permanently.

10         Plaintiff had no burden whatsoever in this hearing under

11   binding case law from the SJC.  She had no burden to prove that

12   abuse again.  She had no burden to prove ongoing fear.  She had

13   no burden to prove anything at all.  The defendants have the

14   burden here to prove by clear and convincing evidence a change

15   in circumstances.  And, the mere passage of time is not enough

16   to prove a change of circumstances warranting -- vacating an

17   abuse prevention order, especially one that a Court found was

18   warranted permanently.  Compliance with the order is not enough

19   under the law.  And, this is all laid out explicitly in the

20   MacDonald case by the SJC, which we have a copy of it if you'd

21   like it.

22         THE COURT:  I have it.  MacDonald vs. Caruso?

23         MS. MARIELLA:  Correct, Your Honor.

24         THE COURT:  I have it.

25         MS. MARIELLA:  If those things were sufficient, you would

1-54

1  be in this courtroom everyday hearing cur -- motions to vacate
2  permanent restraining orders all the time, if defendants could
3  simply show that they had no intention of contacting the
4  plaintiff again or complied with the order.  They have to show
5  something more here.  They have to show a significant change in
6  circumstances.
7      As you've seen, and as the record clearly demonstrates,
8  nothing has happened between now -- between 2018 and today to
9  demonstrate that there has been some change in circumstances
10  warranting vacating the order.  If anything, you can see that
11  there is still much hostility between these parties.  There's
12  ongoing litigation.  She may have to be cross-examined by them
13  at trial.  She may have to be deposed by them.  They submit
14  filings disparaging her.  Which it's their right to defend
15  themselves in that litigation, but these circumstances just
16  show that this is not a situation where the parties are done
17  with each other and moving on with their lives in any way.
18      And, under MacDonald, they have to show not only that
19  they've moved on from the plaintiff, but they have to show that
20  they've moved on from their histories of abuse and retaliation.
21  Here we have anything but that.  They're giving media
22  interviews about the plaintiff.  And, I don't want to spend too
23  much time on these websites because we have only circumstantial
24  evidence that it's them.  But there's been, you know,
25  disparaging comments about my client on the internet that, you

162

1  know, relate to this case and the facts of this case.  You

2  know, they did the Daily Mar -- Mail interview.  And, there

3  have been allegations against them by other women.  And, again,

4  they have the right to attempt to disprove them and defend

5  themselves.  But these circumstances show anything but people

6  who have moved on from their histories of abuse.  There just

7  are more and more allegations against these people as time goes

8  on.  And, she continues to have a reasonable fear of these

9  individuals

10      Their move to Nevada is not relevant.  There are -- it's

11  case, after case, after case where the defendant says I've

12  moved to a different state.  I've gotten remarried.  That

13  should be enough.  And, the Courts have found that's not

14  enough.  They needed to submit affirmative evidence,

15  demonstrating by clear and convincing -- a clear and convincing

16  standard, that they are not going to hurt anyone again, that

17  they are not a threat to her again.

18      For example, in these cases, the court has said well you

19  didn't provide me with police records showing that you've never

20  been accused of anything since the date of the order, or that

21  you haven't been arrested, or that you've completed some

22  rehabilitation program demonstrating that you have no -- you

23  show no risk of future harm to the plaintiff.  They have not

24  even tried to do that here, and have spent the majority of the

25  their time, and exhibits, and written submissions on attempting

1    to reprove the underlying abuse, which, again, is not

2    appropriate here.

3        I would also like to point out that the courts have found

4    that the defendants mere say so that they have no intention of

5    crossing paths with the plaintiff is, again, not enough.  These

6    are people who move around constantly, and the plaintiff is in

7    an industry that will require her to move around constantly.

8    And, she intends to move back to the West Coast, which is not

9    very far from these individuals, to a place where they lived

10   for years.  So, it is plausible, to say the least, that their

11   paths could cross again.  And, again, the defendants say so

12   that they have no intention of working in the industry again,

13   it doesn't mean that they won't, and they have the burden of

14   proving that here.  Their violations of the abuse prevention

15   order, again which they contest, but a court in another

16   district found to be proven, should be per se evidence that the

17   abuse prevention order should not be lifted as well.

18       I just want to make sure I don't have anything else, Your

19   Honor.

20       Oh, and, of course, you know, the provision of the abuse

21   prevention order that was specifically drafted to protect the

22   plaintiff from online harassment by the defendants, doesn't

23   matter where they live.  They can do that from anywhere.  So,

24   the fact that they've moved really has no bearing on her fear

25   of harm in that way, which Judge McKenna found was nec -- it --

1  he found it was necessary to protect her in that way permanent

2  from -- permanently from the defendants as well.

3      I think that's all I have, Your Honor, unless you have

4  questions for me about the Nevada litigation, or any other

5  procedural issues.

6      THE COURT:  No, I don't.  I mean, on the one hand I agree

7  that the movement from Boston to Nevada, the distance that they

8  live in is not, by itself, something to consider vacating the

9  order, but it's a fact you could take into consideration

10  [Indiscernible at 12:32:19 p.m. - speaking away from

11  microphone].

12      MS. MARIELLA:  Sure.  It's one of various factors.

13      THE COURT:  Thank you.  As well as any lack of contact or

14  communication [Indiscernible at 12:32:27 p.m. - speaking away

15  from microphone].

16      MS. MARIELLA:  Well, the lack of contact itself is just

17  complying with the order, --

18      THE COURT:  Mm-hmm.

19      MS. MARIELLA:  -- which, itself, under the case law, it's

20  presumed that they will be complying with the order, and that

21  itself is not a change in circumstance, --

22      THE COURT:  Mm-hmm.

23      MS. MARIELLA:  -- is my interpretation of MacDonald.

24      THE COURT:  Mm-hmm.  And, their removal of themselves from

25  the industry is [Indiscernible at 12:32:47 p.m. - speaking away

1-58

1  from microphone] the fact can take into consideration as well.

2       MS. MARIELLA:  I think that slightly decreases the

3  possibility of them crossing paths with her, but again,

4  MacDonald found that the defendant's own attestations that he

5  had moved on from --

6       THE COURT:  Mm-hmm.

7       MS. MARIELLA:  -- the plaintiff, were not in itself enough

8  in terms of proof.

9       THE COURT:  Fine.  Thank you.

10      MS. MARIELLA:  Your welcome, Your Honor.

11      THE COURT:  All right.

12      Ms. Button and Mr. Moore, I'll give you -- You have the

13  last and final say regarding whether or not the evidence is

14  clear and convincing to warrant the vacating of the permanent

15  order.

16      MR. MOORE:  Okay.  And, are we allowed -- I mean, I'm --

17  I'm -- I'm not certain what we're allowed to speak on, but as

18  I'm making notes while Ms. Mariella talks, she referenced 2017

19  and 2018 a lot.  So, are we allowed to go back and reference

20  this while we're responding to what they stated?

21      THE COURT:  I didn't hear a lot of references to 2017 and

22  2018.  I'm talking [Indiscernible at 12:33:43 p.m. - speaking

23  away from microphone] what happened after 2018.  The --

24      MR. MOORE:  I see.  Okay.  So after 2018 --

25      THE COURT:  -- [Crosstalk at 12:33:48 p.m.] the evidence

1    that I have here are the story from the Daily Mail which was

2    from 2022, the Nevada litigation, which was after 2018, and the

3    YouTube videos, --

4         MR. MOORE:  Okay.

5         THE COURT:  -- screenshots that were also after 2018.

6         MR. MOORE:  Yeah.  The -- So, just I'll touch on those

7    topics.  We -- We have nothing to do with the YouTube videos or

8    the website.  We don't --

9         MS. BUTTON:  [Crosstalk at 12:34:10 p.m.] --

10        MR. MOORE:  We do not post on social media.  If, in fact,

11   they knew that this was us sending social media messages, they

12   would've provided those to the Court today.  Just like they

13   withheld the police reports back in the day, they withheld

14   these from the Court, because I don't believe they possess

15   those to begin with.  I think it just [Issues with Zoom at

16   12:34:25 p.m.] to try to convince the Court that we're

17   dangerous and that we're harassing them.

18        The fact of the matter is every single claim that they've

19   made about us today, they have provided the Court with no

20   evidence to prove.  They reference and point to things, but

21   we've done no wrong.  We haven't -- We didn't think of her

22   after August 10th or August 14th in 2017 ever once, until 2018

23   when we were served with the restraining order that we were

24   unaware was happening in the hearing.  And, then, after that

25   point moving forward, considering our counsel told us we were

1  unable to do anything despite that, we again put her out of our

2  mind entirely.  Never -- Ne -- They never crossed paths.  And,

3  the dance industry is divided.  She is a ballet dancer in a

4  company.  When Dusty was a dancer, which she hasn't been since

5  2021, her career is an entirely different path.  She was

6  teaching contemporary.  She wasn't even in the ballet industry.

7  So, while they were both dancers, they're not entirely the same

8  industry.

9       We had no contacts with her or anyone relative to her.

10  We've harassed her in no way, shape, or form.  We've harassed

11  none of her friends.  All of the claims that Ms. Mariella just

12  made against us, she's provided you with no evidence for.  And,

13  there's absolutely nothing to substantiate any claims.

14       And, we came in here today having had the last hearings,

15  being told that it was expected for us to present -- present

16  evidence to prove why 2017 and 2018 were invalid to begin with.

17  And, I know we're -- now we're talking past that, but it --

18  it's difficult to kind of go through with something that we

19  were told otherwise for prior to coming into the courtroom.

20       But they -- they talked about change in circumstance and

21  we haven't undergone rehabilitation.  There's nothing to

22  rehabilitate.  Everything that they just stated that's

23  irrelevant to this case we would really love to be stricken

24  from the record, because again, they've provided no evidence to

25  any claims.  But you can't rehabilitate somebody that's done no

1    wrong.

2          And, in -- in regard to change in circumstance, that was

3    the police reports that we discovered.  The police reports that

4    stated there is no eminent danger that they wouldn't show the

5    judge when they were granted the order to begin with.  We

6    assert one more time, we don't even want to be involved in

7    Nevada right now.  It was her decision to sue us for $131

8    million dollars.  It wasn't our decision to be present there.

9    We're trying to get away from this as quickly as possible.

10   And, there's nothing that could every make us, in any way,

11   shape, or form cross paths with her.

12         If we found out she's in the state or she moved into the

13   state that we live in, we will vacate the state immediately

14   because it -- we can't stomach being in the presence of someone

15   that's destroyed our lives through lies.  And, we thought that

16   we would have the ability to show every single lie, because if

17   we had today, prior to her testimony on the stand, that

18   testimony would have no credibility because we provided

19   evidence that the previous two testimonies she gave under oath

20   in court was full -- full of lies, and not one statement was

21   honest, not one statement was true.

22         So, she continues to lie under oath as late as last

23   Friday.  We had an admission from her that she never withheld

24   police reports from 2017 or 2018 from the Boston Court, but we

25   see here today that she did.  Not only did she withhold them

 1  back then, she withheld those same reports from the Court
 2  today, which are re -- very relevant to this hearing.  We
 3  provided them.  But she lied as late of Friday in Nevada, under
 4  admissions, under oath, stating that she had never withheld
 5  police reports.
 6      She claimed on the stand here that she was raped, but
 7  you'll see on the original restraining order she said that she
 8  was never under duress, everything was consensual.  She was in
 9  a dating relationship with both of us.  But she changes that
10  claim because the word rape is a trigger word.  And, rather
11  than her speaking and being afraid to come forward, it's lies
12  like this under oath, lies that we can prove all day long,
13  every day, and every word that we say is true, that keep people
14  from coming forward.  Because all she did was abuse the Me Too
15  movement in an attempt to get head and suppress the data that
16  incriminates her.  Because what she won't say on the stand is
17  that message.  The messages that they're referencing do
18  incriminate her for prostitution.  And, that's why they're so
19  afraid for that to be addressed publicly.  That's why for the
20  last year Ms. Marienella -- Mariella, has been fighting to
21  destroy that evidence.
22      Rather than taking a Boston order and accepting it for
23  what it was, we provided in the exhibits, the evidence that her
24  attorneys have actually attempted to force us to destroy the
25  evidence.  And, while they say Nevada rules that it was a

1  violation, Judge Lyons, just two weeks ago, ruled that, in

2  fact, it was not.  So, what they're doing is attempting to

3  supersede the Boston rulings by having Nevada litigate on

4  something that they're totally not involved in.

5      And, because they know that here in Boston we provided all

6  this evidence, so rather than being able to show that evidence

7  in Nevada, they're just attempting to manipulate the Court that

8  there's been a violation to an order, while providing no

9  evidence of any violation.

10     All the violations they claimed in 2018 in our absence

11 when we weren't present to represent ourselves, we provided

12 evidence for testimony from the woman that she fraudulently

13 used her name of to gain that order stating that all of those

14 lies.  Not one thing was true in 2018.  Not thing -- one thing

15 was true in 2017, and not one thing is true today.  But the one

16 certainty that's not changed, the one certainty that remains

17 the same, is that she's never been abused.  She's never been

18 able to provide evidence of abuse because none ever happened.

19 We provided the opposition to that, which proves that no abuse

20 ever took place.

21     The only abuse she suffered is when she was kidnapped by

22 her family.  And, they state here, as if it's a joke.  Her

23 mother admitted in the media and in the press that she

24 kidnapped her daughter under force, forced her and trafficked

25 her to California, imprisoned her --

1        MS. BUTTON:  [Crosstalk at 12:39:34 p.m.] --

2        MR. MOORE:  -- and stripped her of her bank account, her

3    cell phone, everything.  The only reason we were ever concerned

4    about this during that summer, recorded all of this data, is

5    because Sage made the phone calls, you'll see in our

6    declaration from our sworn witness, to please send the police

7    and arrest her because they had forced her into exorcism,

8    exorcism that she lied about on the stand in 2017.  And, as

9    you'll see from the evidence, she called and begged us to -- to

10   rescue her.  As she even -- She wanted us to all the police.

11   But ironically we're the ones with five fraudulent police

12   reports that all were withheld from the court.  Because

13   fortunately for us the police actually have to look at all of

14   the evidence like they didn't look at in 2017.

15       So, all we've wanted -- I mean, even -- even Judge McKenna

16   did state, I have no preponderance of evidence, but I don't

17   need that.  Her original testimony was enough.  And, for a

18   209A, that preponderance of evidence is required.  There was no

19   fear of danger.  There never has been.  And, we -- we -- and

20   telling you to not -- if we didn't love our country so much,

21   we'd happily leave this country and sign a paper that we'll

22   never come back to be as far away from her as possible.

23       The only thing that we can't stomach is that on our

24   history, when people run a background check on us, we look like

25   bad people.  And, we -- We came here today with 400 pages to

1  prove that we're not.  Hard evidence, rather than beliefs and

2  hearsay like everything that they just stated in their

3  testimony.

4      THE COURT:  Okay.  Thank you.

5      I'm going to take the matter under advisement.  I'm going

6  to review the documents that have been admitted and accepted as

7  exhibits at this hearing, and then I'll issue a decision

8  afterwards, --

9      MS. MARIELLA:  May I just --

10     THE COURT:  -- so the order will re --

11     MS. MARIELLA:  I'm sorry.

12     THE COURT:  -- the order will remain -- Nope.  Not --

13  That's it.  Arguments have been made.

14     The order will remain in effect pending what my decision

15  is.  Thank you.

16     MS. MARIELLA:  Thank you, Your Honor.

17     FEMALE:  Thank you, Your Honor.

18     MR. MOORE:  Thank you, Your Honor.

19     MS. BUTTON:  Thank you.

20     THE CLERK:  These matters, 1701RO181, and 17RO182, the

21  motion to vacate is under advisement.

22              [End of Hearing at 12:41:32 p.m.]

23

24

25

**C E R T I F I C A T I O N**

1
2
3
4      I, Pamela Borges DosSantos, an Approved Court Transcriber,
5
6  do hereby certify that the foregoing is a true and accurate
7
8  transcript from the audio recording provided to me by The
9
10 Office of Transcription Services for the BMC Central
11
12 Court proceedings in the above-entitled matter.
13
14
15     I, Pamela Borges DosSantos, further certify that the
16
17 foregoing is in compliance with the Administrative Office of
18
19 the Trial Court Directive on Transcript Format.
20
21
22     I, Pamela Borges DosSantos, further certify that I neither
23
24 am counsel for, related to, nor employed by any of the parties
25
26 to the action in which this hearing was taken, and further that
27
28 I am not financially nor otherwise interested in the outcome of
29
30 the action.
31
32
33
34                          *Pamela Borges DosSantos*
35                          Pamela Borges DosSantos
36
37                              July 24, 2023
38                          Date
39
40                          190 William Street
41
42                          New Bedford, MA 02740
43
44                          Telephone: (508)996-3898
45
46                          Email: p.dossantos@verizon.net
47
48
49

174



**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

## AUDIO ASSESSMENT FORM

*For court transcribers:* Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.

**TODAY'S DATE:** _July 24, 2023_ **TRANSCRIBER NAME:** Pamela Borges DosSantos

**CASE NAME:** _Humphries vs. Moore & Button_ **DOCKET #:** _1701RO181, 1701RO182_

**RECORDING DATE:** _March 27, 2023_ **TRANSCRIPT VOLUME:** _1_ **OF** _1_

---

*(circle one)* **TYPE: [CD] TAPE     QUALITY:     EXCELLENT     [GOOD]     POOR**

**ISSUES** *(include time stamp):*

**[ ] background noise**          **time stamp:** _____

**[ ] low audio at sidebar**      _____

**[x] speaking away from microphone** _various (Zoom interference)_____

**[ ] simultaneous speech**       _____

**other:**_____       **time stamp:**_____

_____       _____

_____       _____

**COMMENTS:** _The defendants were on Zoom, while the other parties were in the courtroom. The Zoom audio interferes with the other microphones in the courtroom, especially when there is speaking over each other. See Word Index_ _____

175