UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

SAGE HUMPHRIES, GINA MENICHINO, ROSEMARIE DeANGELO, DANIELLE GUTIÉRREZ, JANE DOE 1, and JANE DOE 2,

                    Plaintiffs,

        v.

MITCHELL TAYLOR BUTTON and DUSTY BUTTON,

                    Defendants.

Case No 2:21-cv-01412-ART-EJY

ORDER ON MOTIONS FOR SUMMARY JUDGMENT
(ECF Nos. 437, 452, 457, 474, 461, 514, 516)

Plaintiffs bring claims stemming from alleged sexual abuse by Defendants Mitchell Taylor Button and Dusty Button, who deny any abuse and bring counterclaims alleging defamation. Plaintiffs have brought various state and federal claims against Defendants for sex trafficking, forced labor, involuntary servitude, sexual exploitation of a minor, battery, assault, false imprisonment, intentional infliction of emotional distress, and breach of fiduciary duty. Defendants have brought counterclaims against several Plaintiffs for defamation, related to statements published in media articles.

Before the Court are Plaintiffs' motion for summary judgment on Defendants' defamation counterclaims (ECF No. 437), and Defendants' motion for summary judgment on Plaintiffs' claims (ECF No. 452). Also before the Court are Plaintiffs' motion to supplement their motion for summary judgment (ECF No. 457), and Defendants motion for judicial notice of compliance with court orders (ECF No. 474), motions to supplement their motion for summary judgment (ECF Nos. 461, 514), and motion to strike (ECF No. 515.) For the reasons stated below, the Court grants in part Plaintiffs' motion for summary judgment and grants Plaintiffs' motion to supplement. The Court denies Defendants' motion for

summary judgment, denies as moot Defendants' motion for judicial notice, grants Defendants' first motion to supplement, and denies Defendants' second motion to supplement and motion to strike.

## I.    BACKGROUND

The claims in this case primarily arise out of allegations of sexual abuse and assault by six Plaintiffs. Plaintiffs Jane Doe 2, Danielle Gutiérrez, Rosemarie DeAngelo, and Gina Menichino, allege that they were sexually abused between by Mr. Button between 2006 and 2011, when they were minors and he was their dance teacher. Jane Doe 1 alleges that she met Mr. and Ms. Button as a minor while dancing at a company affiliated with the company Ms. Button danced for Boston, and that she was subsequently invited to their apartment and raped by Mr. and Ms. Button in 2014. Sage Humphries alleges that as an adult, she was coerced into a sexual relationship with Mr. and Ms. Button, which included instances of sexual abuse.

### A. Allegations and Evidence of Sexual Abuse

#### 1. Jane Doe 2

Jane Doe 2 alleges that she was sexually assaulted by Mr. Button around 2006, when she was a minor and he was her dance teacher. Payment records submitted by Defendants indicate that Mr. Button was paid $1,000 in 2006 by Centerstage Dance Academy, for what he alleges was a workshop. (ECF No. 447-5.) The records indicate that in 2007—2009, Mr. Button was paid for teaching much more regularly. (*Id.*)

Jane Doe 2 testified in her deposition that at a sleepover, Mr. Button came inside a bedroom she was in, closed the door, laid down on top of her, and touched her above and below her underwear while putting his tongue in her mouth. (ECF No. 464-30.) Therapy notes from an interview in 2018 state "15 molested by dance teacher," and describes Mr. Button coming into a room Jane Doe 2 was in at a sleepover, getting on top of her, and kissing her. (ECF No. 464-

31.) The notes also state that Mr. Button "shunned her over time," "put her in back of dances," and he had "threaten[ed] her with suicide." (*Id.*) Therapy notes from 2021 also state that she was "molested by a dance teacher at 15. Didn't speak about it till age 25." (ECF No. 464-32.) In connection with the investigation Ms. Menichino initiated, Jane Doe 2 provided a statement to police in 2018, which recounts Mr. Button coming into a bedroom at a sleepover, laying down next to her, kissing her, and touching her vagina. (ECF No. 462-27 at 21.)

Dr. Raghavan's expert report states that Jane Doe 2 was molested around 2006/2007 when she was about 16 or 17. (ECF No. 464-33 at 2.) The report states, "[i]t is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse by TB in the context of coercively controlling abuse affected Jane Doe 2's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (*Id.* at 6.) The report also states that she found Jane Doe 2's reported history to be believable based on her interviews, as well as "Jane Doe 2's scores on the SIRS- 2 and the TSI-2 both strongly support a narrative that is not malingered." (*Id.* at 8.)

Mr. Button denies all allegations of abuse by Jane Doe 2. His declaration states "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

**2. Danielle Gutiérrez**

Plaintiff Danielle Gutiérrez alleges that she was manipulated into a sexual relationship with Mr. Button around 2007, when she was 17 and Mr. Button was her dance instructor. She alleges that the relationship involved physical, sexual, and emotional abuse. (ECF No. 221 at 9-12.) Ms. Gutiérrez testified at her deposition to physical abuse such as being pushed, shoved, and slapped; having her hair pulled; receiving a bloody nose and bruised lip. (ECF No. 462-15.) She testified that Mr. Button once pinned her against the wall and held a knife to her

throat. (*Id.*) She also testified that Mr. Button forced her to have sex with him, and they began having sex when she was 17. (*Id.*) In communications to third parties in 2010 and 2011, Ms. Gutiérrez described her relationship with Mr. Button as "abusive (physically, mentally, emotionally);" that the abuse "led to bruises nose bleeds and a busted lip"; that he was violent with her; and that he hit her. (ECF Nos. 462-16, 462-17, 462-18). In communications to a third party, she stated, "worst I got from him was that he gave me a bloody lip from elbowing me." (ECF No. 444-6 at 4.)

Therapy notes from 2011 state that Ms. Gutiérrez had been in an abusive relationship with her ex-boyfriend where she felt "controlled and manipulated," that he was "physical aggressive," and had "received a bruised and bloody nose." (ECF No. 464-12 at 5.) The notes also state that "she felt like he was a "con artist" in the sense that he completely lied about their relationship and cheated on multiple women including herself." (*Id.*) In connection with the investigation Ms. Menichino initiated, Ms. Gutiérrez provided a statement to police in 2018, which described physical abuse occurring "more than 15 times," that she "felt pressured to have sex" with Mr. Buttons, and that they first had sex when she was 17. (ECF No. 462-27 at 20.) The police report and expert report indicate that they broke up in 2010, and that Mr. Button "cut all contact with her" and that Mr. Buttons "blocked her and all the other girls from the studio." (ECF Nos. 464-13 at 2, 21; 462-27.)

Dr. Raghavan's expert report states, "[i]t is my professional opinion to a reasonable degree of psychological certainty that the years of coercively controlling captive abuse by TB lead to severe mental health issues in 2010/2011 and these effects remain in powerful ways." (ECF No. 464-13 at 3, 8.) Dr. Raghavan's report also states that she found Ms. Gutiérrez's history to be believable based on her interview as well as her scores on the TSI-2, the SIRS-2, and another test, the PAI-2, which "indicated genuine responding." (*Id* at 9-10.)

Mr. Button denies all allegations of abuse by Ms. Gutiérrez. His declaration states, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

### 3. Rosemarie DeAngelo

Ms. DeAngelo alleges that she was sexually assaulted by Mr. Button around 2007, while she was a minor and he was her dance teacher. Ms. DeAngelo testified in her deposition that Mr. Button insisted that they go into a private bedroom, closed the door, kissed her, put his hand under her shirt, touched her through her pants, and put her hand on his penis. (ECF No. 464-34.) Ms. DeAngelo's therapy records from 2017 indicate that at that time, she denied having experienced sexual, physical, or emotional abuse. (ECF No. 444-7.) When asked about this at her deposition, Ms. DeAngelo stated that "I didn't realize that what had happened to me was considered sexual abuse until very recently." (ECF No. 464-32 at 4.)

Dr. Raghavan's expert report states "[i]t is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse and coercive control by TB affected RAD's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-35 at 7.) The report also states that Ms. DeAngelo's "scores on the PAI-2, SIRS-2, and TSI-2 all support credible reporting," and that "her emotional and physical responses during the interview were consistent with the experiences she relayed." (*Id.* at 8.)

Mr. Button denies all allegations of abuse by Ms. DeAngelo. His declaration states, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

### 4. Gina Menichino

Plaintiff Gina Menichino alleges that Taylor Button sexually abused her in 2010, at age 13 when he was her dance teacher. Among her allegations are that Mr. Button digitally penetrated her and solicited child pornography from her. Ms. Menichino testified at her deposition that Mr. Button touched her under blankets, penetrated her with his finger, and that they exchanged sexual photos and videos. (ECF No. 462-22 at 8.) However, at another time in her deposition Ms. Menichino stated that Mr. Button had not coerced her into sending "naked photos" of herself to him. (ECF No. 444-5 at 5.) Ms. Menichino also denied in her testimony that Mr. Button controlled her social media. (*Id.* at 12.) Emails to a third-party that Ms. Menichino had in 2019 state that "when I was a kid, 13, my dance teacher who was in his late 20's was the first man I ever submitted to." (ECF No. 462-25 at 3.) The emails also state that "I suppose I did have a crush on him at first," "I really fell head over heals [sic] for him," and "I think the BDSM attracts me because ultimately of him. In a way i [sic] think it could fill what me and him never finished." (*Id.* at 2, 3.)

Therapy records from 2017, 2019, 2020, and 2021 discuss "sexual abuse" and "rape" by a dance teacher, reports of being assaulted between 12-14 years old, and other discussions about sexual abuse. (ECF Nos. 464-16, 464-17, 464-18, 464-19, 464-20.) Ms. Menichino made a police report in 2018 which stated that Mitchell Moore (Taylor) touched her vagina on two occasions, made her touch his penis, would text her sexual things, and that they sent videos of themselves masturbating to one another. (ECF No. 462-27 at 14-15.) The case was "cleared by exception," with notes indicating that while there was probable cause to move forward, the state could not meet the high standard of proof to file criminal charges because "v is now 22," "no witnesses, no physical evidence," other "v's not cooperative," and "suspect lawyered up." (*Id.* at 40.)

Plaintiffs submitted an expert report of Dr. Chitra Raghavan, whose report

concluded, "It is thus my professional opinion to a reasonable degree of psychological certainty that the sexual abuse by TB in the context of coercively controlling abuse affected GM's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-21 at 3, 8.) Dr. Raghavan's report also states that based on her interview, "GM's emotional and physical responses during the interview were consistent with the experiences she relayed," and that the results of two tests she conducted—a test of malingering (the SIRS-2) and a "focused sensitive assessment of trauma" (the TSI-2), Ms. Menichino's scores "both strongly support a narrative that is not malingered." (*Id.* at 11.)

Mr. Button denies all allegations of abuse by Ms. Menichino. His declaration states "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4.)

### 5. Jane Doe 1

Jane Doe 1 alleges that she was raped by Mr. and Ms. Button in 2014, when she was a minor. Therapy records and interrogatory responses indicate that Jane Doe 1 would have been 16 or 17 in 2014. (ECF No. 444-9 at 48, 70).  Jane Doe 1 alleges that she met Ms. Button while dancing for Urbanity Dance, a company that rented space from Boston Ballet, where Ms. Button worked; Jane Doe 1 was accepted into the Urbanity Dance Summer Institute in 2014. (ECF Nos. 221 at 16; 462-41.) Ms. Button's declaration states that she joined the Boston Ballet in 2012, where she was promoted to principal in 2014. (ECF No. 462-6.) Ms. Button was terminated from Boston Ballet in 2017. (ECF No. 462-7.) Email correspondence indicates that Urbanity Dance used space for classes at Boston Ballet during 2014. (ECF No. 462-43.) Urbanity Dance social media posts and email correspondence indicate that Dusty Button taught classes for Urbanity in 2013, 2015, and 2016 (ECF Nos. 462-44, 462-45, 462-46.)

Jane Doe 1 alleges that she was raped in Mr. and Ms. Buttons' apartment, in a room with a mattress on the floor and what appeared to be guns hanging on the wall. (ECF No. 221 at 17.) She testified at her deposition of the assault, saying that that "she pinned me down when you penetrated me," (referring to Mr. and Ms. Buttons), and that she said stop "multiple times." (ECF No. 464-22 at 9, 10.) she also stated, that "I believe I was drugged and I was not in my body. And that there was a gun held to my head and that I was raped." (ECF No. 464-23 at 4.) In therapy records from 2013 and 2017, Jane Doe 1 denied having experienced sexual assault or abuse. (ECF No. 444-9 at 35, 44.) However, 2021 therapy records indicate that Jane Doe 1 had a history of emotional and sexual abuse, with a note stating "rape @ 15 years old" and "wife assisted." (ECF No. 464-24 at 36.) Dr. Raghavan's expert report states "[i]t is my professional opinion to a reasonable degree of psychological certainty that a sexual assault occurring sometime in 2014/2015 affected Jane Doe 1's mental health, quality of life, and successful adaptation into society in deleterious ways with lasting effects." (ECF No. 464-29 at 3.) The report also states that "Jane Doe 1's scores on the SIRS-2 and the TSI-2 both strongly support a narrative that is not malingered." (*Id.* at 8.)

Defendants submitted evidence that the apartment they owned which contained the "gun room" (a room full of airsoft guns) was constructed in 2015, and they entered into a lease agreement in January of 2015. (ECF No. 444-9 at 59-68.) Mr. and Ms. Button denies all allegations of this sexual assault against Jane Doe 1. Mr. and Ms. Buttons' declarations state that neither of them "have ever met Jane Doe 1 nor have we ever been inside of the same building as her... she has never been in our home," and that they have never "touched her much less sexually assaulted her." (ECF No. 471-14 at 4, 8.)

**6. Sage Humphries**

Plaintiff Sage Humphries alleges that in 2017, she was coerced, as an adult,

into a sexual relationship with Mr. and Ms. Buttons, which included instances of sexual abuse. Neither party disputes that the three of them were in a sexual relationship. Text messages between the three of them during this period indicate a romantic relationship; for example, texts from Ms. Humphries to Mr. Button read, "I am so in love with you Taylor," and he responds, "You have all of me still I promise." (ECF No. 444-4 at 5.) Text messages between all three of them include phrases like "I am completely falling in love with both of you" and "we love you, and you have 100% of us." (*Id.* at 11.) According to Ms. Humphries' affidavit in August of 2017, at the end of April 2017, the couple "said I was their 'girlfriend' and started to push sexual acts on me." (ECF No. 444-4 at 15.) Text messages from Ms. Humphries' mother to her on May 17, 2017, indicated that she was concerned about the relationship, stating "they are not your masters" and "I love you sage but this situation is destructive to you…[a]nd not healthy." (*Id.* at 25; *see also* ECF No. 466-2 text messages between Ms. Humphries and her mother.) Ms. Humphries responded that "this is my choice" and "[n]obody is controlling my life." (*Id.* at 26.) According to the same affidavit, on May 25, 2017, Ms. Humphries' parents showed up at the ballet in Boston and took her home to Southern California. (*Id.* at 16.) Ms. Humphries and the Buttons' continued to communicate throughout June and July (*Id.* at 28-60.) On July 8, 2017, Ms. Humphries sent a Snapchat message to one of the Buttons' saying that "My parents wanted me to call you today and end our relationship," with both of them because "they want me out of the threesome" and that she "may have to take a voicemail on your phone," because she "just need to make them think I'm ending it," but "[d]on't believe a word I say." (ECF No. 466-4 at 22-34.) The Buttons and Ms. Humphries continued to communicate romantic messages after this point. *See e.g.* ECF No. 466-6 at 10, ECF No. 444-4 at 28.)

On August 1, 2017, Ms. Humphries filed a complaint for protection from abuse in Massachusetts, indicating she had suffered abuse by Mr. Buttons. (*Id.*

at 62.) On the complaint form, the boxes for "attempted to cause me physical harm," "caused me physical harm," and "placed me in fear of imminent serious physical harm" are checked, but it appears that the box for "caused me to engage in sexual relations by force, threat, or duress" was not checked. (*Id.* at 62.) Ms. Humphries testified that the handwriting on the form is not hers, other than the signature. (*Id.* at 64.) Ms. Humphries testified in her deposition that Mr. Button "slammed me to the bed and violently penetrated me." (ECF No. 462-57 at 3.) Ms. Humphries discussed another occasion where Mr. and Ms. Button tied her up and assaulted her by touching her vagina, had sex next to her, and that she was "begging to be untied and crying." (*Id.* at 6.) In a 2017 affidavit, Ms. Humphries described the same incident. (ECF No. 462-58 at 3.) She also described an instance in which "Taylor came into the shower, bent me over and forced himself on me. I went limp, started crying and felt used and abused in that moment." (*Id.*) Ms. Humphries also stated that Mr. Button took over her Instagram and discouraged her from having relationships with friends, family members, and colleagues. (*Id.* at 2.) She also stated that in July 2017, Mr. Button "has threatened to kidnap me, throw me in the back of his car, take me to a rented warehouse that he got in advance, suspend me from the ceiling, fuck me until I was uncomfortable, and put a cloth over my mouth to make me pass out." (*Id.* at 4.) According to a 2018 police report, Ms. Humphries told police that Mr. Button first sexually assaulted her by penetrating her with his finger, after she had tried to push his hand away, in the living room after Ms. Button had fallen asleep. (ECF No. 462 at 7.) Her report recounted several other instances of sexual assault. (*Id.*) It also states that Mr. Button took over her social media accounts. (*Id.* at 12.)

Dr. Raghavan's expert report states "SH's experience of abuse with the Buttons and her subsequent painful recovery is most accurately viewed through a captive abuse trauma lens rather than as a series of individually abusive acts

that she endured" and describes different "stages" of the Buttons' "coercive control" over Ms. Humphries. (*Id.* at 3, 17-26.) The report states "[i]t is my professional opinion to a reasonable degree of psychological certainty that the predatory entrapment followed by coercively controlling abuse and violent sexual assaults by the Buttons affected SH's mental health and quality of life at the time in severe and clinically significant ways," and that she believes Ms. Humphries' reported history to be believable based on her interview and "[h]er scores on the PAI-2, SIRS-2, and TSI-2 all support credible reporting of mental health symptoms and ways of relating." (*Id.* at 3, 9.)

Mr. and Ms. Button do not deny that they were in a relationship but deny allegations of sexual abuse towards Ms. Humphries. Mr. and Ms. Buttons' respective declarations state, "I have never wronged or assaulted any plaintiff in this litigation in any capacity . . . nor have I ever attempted to stop them from speaking out about any abuse that never took place." (ECF No. 471-14 at 4, 8.)

## II.    Motions for Judicial Notice, to Supplement, and to Strike

### A. Motion for Judicial Notice of Compliance

Defendants filed a motion for judicial notice of compliance with court orders, notifying the Court of difficulties uploading exhibits to their January 6, 2025 filing, and regarding confusion about the date their opposition to Plaintiffs' motion for summary judgment was due. (ECF No. 474.) Plaintiffs responded, arguing that they do not dispute the timeliness of either submission. The Court finds that both submissions were timely and denies this motion as moot. (ECF No. 478.)

### B. Motions to Supplement

Under Local Rule 7-2, "[a] party may not file supplemental pleadings, briefs, authorities, or evidence without leave of court granted for good cause."

Defendants filed two motions to supplement their motion for summary judgment. (ECF Nos. 461, 514.) In the first motion, Defendants request to

supplement the record with the second deposition transcript of Jane Doe 1. Defendants submitted correspondence indicating that they did not receive the transcript until January 10, 2025, after their motion for summary judgment was filed. (ECF No. 461-3.) The Court finds good cause to permit this supplementation and will grant the motion.

In the second motion, Defendants request to supplement the record with an order in *Button v. Lopresti*, Case No. 3:25-cv-00867-DMS-DDL, in the Southern District of California, as well as allegations of "procedural misconduct," "misuse of the judicial system," and "ethical breach(es)." (ECF No. 514.) The order in *Button v. Lopresti* is a screening order, granting the Buttons' IFP status and permitting them to proceed with defamation and other claims against the defendant. That order is unrelated to this motion, as are Plaintiffs' other allegations contained in the motion. The court therefore denies this motion to supplement.

Plaintiffs filed a motion for leave to submit supplemental authority in support of their motion for summary judgment. Courts "may grant leave to file supplemental authority 'for good cause.'" *Stallone v. Farmers Grp.*, Inc., No. 2:21-CV-01659-GMN-VCF, 2022 WL 10091489, at *1 n.1 (D. Nev. Oct. 15, 2022) (quoting LR 7-2(g)). Plaintiffs' motion requests leave to submit a decision in *Button v. McCawley*, Case No. 0:24-cv-60911, in the Southern District of Florida. This order considered Defendant McCawley's motion to dismiss Plaintiffs' defamation claims, and in doing so, found that the Buttons were public figures. *Button v. McCawley*, No. 0:24-CV-60911, 2025 WL 50431 (S.D. Fla. Jan. 8, 2025). While not precedential, this authority provides helpful guidance regarding the instant motion. "Good cause may exist when the proffered supplemental authority controls the outcome of the litigation, or when the proffered supplemental authority is precedential, or particularly persuasive or helpful." *Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP*, 526 F. Supp. 3d 805, 812 (D. Nev. 2021). The Court

1    therefore grants Plaintiffs' motion.

2        **C. Motion to Strike**

3        Defendants filed a motion to strike a variety of evidence submitted by

4    Plaintiffs in support of their summary judgment briefing, arguing that it is

5    inadmissible. (ECF No. 516.) This motion was filed on July 29, 2025, just two

6    days before oral argument was scheduled. Briefing on these motions was

7    completed in February. Defendants have not shown good cause for why such a

8    late filing, which adds new arguments, should be accepted. To the extent that

9    Defendants seek to argue that specific evidence proffered by Plaintiffs is

10   inadmissible, they may do so in a motion in limine prior to trial.

11   **III.   LEGAL STANDARD FOR SUMMARY JUDGMENT**

12       "The purpose of summary judgment is to avoid unnecessary trials when

13   there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S.*

14   *Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is

15   appropriate when the pleadings, the discovery and disclosure materials on file,

16   and any affidavits "show there is no genuine issue as to any material fact and

17   that the movant is entitled to judgment as a matter of law." *Celotex Corp. v.*

18   *Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient

19   evidentiary basis on which a reasonable factfinder could find for the nonmoving

20   party and a dispute is "material" if it could affect the outcome of the suit under

21   the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

22   The court must view the facts in the light most favorable to the non-moving party

23   and give it the benefit of all reasonable inferences to be drawn from those facts.

24   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

25   Importantly, "the court does not make credibility determinations or weigh

26   conflicting evidence" at the summary judgment stage. *Soremekun v. Thrifty*

27   *Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007)

28       The party seeking summary judgment bears the initial burden of informing

the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party satisfies this burden, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists[.]" *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991). For cross-motions for summary judgment, the Court considers each party's evidence without considering which motion provided the evidence. *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

## IV. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### D. Statute of Limitations and Equitable Estoppel/Tolling

Defendants argue that the federal claims brought by Ms. Gutiérrez, Ms. DeAngelo, and Jane Doe 2 are barred because they were brought outside of the statute of limitations. Claims for sex trafficking (18 U.S.C. § 1591), forced labor (18 U.S.C. § 1589), and involuntary servitude (18 U.S.C. § 1591) have a ten-year statute of limitations for a civil remedy. 18 U.S.C. § 1595(c). If a victim was a minor, the statute of limitations begins to run when the minor turns 18. *Id*. It is undisputed that these three Plaintiffs brought their claims outside of the applicable statute of limitations. Plaintiffs argue that these claims should be subject to equitable estoppel and/or equitable tolling. Because these claims arise under federal law, federal common law governs the availability of an equitable estoppel or tolling defense. *See Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008); *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002); *Menominee Indian Tribe of Wisconsin v. United States*, 577 U.S. 250, 255 (2016).

A court may equitably toll the statute of limitations for a claim when a

14

plaintiff can demonstrate "(1) that they have been pursuing their rights diligently, and (2) that some extraordinary circumstance stood in their way and prevented timely filing." *Millia Promotional Servs. v. Arizona Dep't of Econ. Sec.*, 650 F. Supp. 3d 814, 825 (D. Ariz. 2023) (citing *Smith v. Davis*, 953 F.3d 582, 597-98 (9th Cir. 2020)). To show diligence, a plaintiff must show that they have "been reasonably diligent in pursuing [their] rights not only while an impediment to filing caused by an extraordinary circumstance existed, but before and after as well, up to the time of filing [their] claim in federal court." *Smith*, 953 F.3d at 598-600. To show an extraordinary circumstance "courts are not bound by mechanical rules and should make a determination based on all of the facts of the case." *Millia Promotional Servs.*, 650 F. Supp. 3d at 825 (quoting *Smith*, 953 F.3d at 600) (internal quotation marks omitted). Summary judgment is improper if tolling of the statute of limitations requires the resolution of disputed factual issues. *Retail Clerks Union Loc. 648, AFL-CIO v. Hub Pharmacy, Inc.*, 707 F.2d 1030, 1033 (9th Cir. 1983).

Equitable estoppel "focuses primarily on the actions taken by the defendant in preventing a plaintiff from filing suit." *Johnson v. Henderson*, 314 F.3d 409, 414 (9th Cir. 2002). The Ninth Circuit considers several factors in assessing equitable estoppel: "(1) the plaintiff's actual and reasonable reliance on the defendant's conduct or representations, (2) evidence of improper purpose on the part of the defendant, or of the defendant's actual or constructive knowledge of the deceptive nature of its conduct, and (3) the extent to which the purposes of the limitations period have been satisfied." *Id.*; *Millia Promotional Servs. v. Arizona Dep't of Econ. Sec.*, 650 F. Supp. 3d 814 (D. Ariz. 2023). Equitable estoppel "may come into play 'if the defendant takes active steps to prevent the plaintiff from suing in time.'" *Johnson*, 314 F.3d at 414. Unless no facts are in dispute, the "question of estoppel is one of fact, thereby being inappropriate for the purposes of summary judgment." *Kendall v. Am. Hawaii Cruises*, 704 F. Supp. 1010, 1017-

18 (D. Haw. 1989) (citing *Golden v. Faust*, 766 F.2d 1339, 1341 (9th Cir. 1985)).

Here, Plaintiffs argue that both equitable estoppel and equitable tolling apply. Specifically, they argue that the coercive effects of Mr. Button's alleged abuse, alleged threats made towards Plaintiffs, and misleading statements about the illegality of his alleged conduct warrant tolling/and or estoppel. Courts have applied equitable estoppel or equitable tolling based on a range of this type of factual circumstance, such as misleading plaintiffs about claims, abuse that left the plaintiff incapacitated, or threats by a defendant towards a plaintiff.

For example, various courts have found that statute of limitations defenses may be subject to equitable tolling or estoppel where a defendant's actions mislead a plaintiff about their claims. *See Mueller v. Dep't of Pub. Safety*, No. CV 17-00571 HG-WRP, 2021 WL 3056073, at *8 (D. Haw. July 20, 2021) (bench trial finding that under Hawaii law, which mirrors federal test, equitable tolling applied to plaintiff's claims related to sexual assault because the government's "lulling" of the plaintiff into inaction by providing incorrect information constituted extraordinary circumstances); *Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d 779, 799-800 (N.D. Cal. 2020) (equitable tolling applied under California law where an investigation into sexual misconduct made plaintiffs believe that the defendant did nothing wrong, created "self-doubt, blame, minimization, and uncertainty" and led them to believe they did not have a claim). The Ninth Circuit has also found that tolling was warranted in circumstances where abuse had extreme psychological effects on a plaintiff which prevented her from asserting her rights. *Stoll v. Runyon*, 165 F.3d 1238, 1242 (9th Cir. 1999), *as amended* (Mar. 22, 1999) (sex discrimination claims were tolled as a matter of law where "repeated sexual abuse, rape, and assault she experienced left her severely impaired and unable to function in many respects," preventing her from asserting her rights.)

Finally, several courts have also found that threats and intimidation by a

16

defendant can be sufficient to claim equitable estoppel under state laws. *See Meza-Perez v. Sbarro LLC*, No. 2:19-CV-00373-APG-NJK, 2020 WL 12752817, at *2-3 (D. Nev. Dec. 16, 2020) (under Nevada law, threats and intimidation of Plaintiff created factual issue of whether defendants should be equitably estopped from bringing a statute of limitations defense); *Ateeq v. Najor*, 19 Cal. Rptr. 2d 320, 323-24 (Cal Ct. App. 1993), *as modified* (May 18, 1993) (threats of deportation by defendant sufficient for equitable estoppel under California law); *M.N.O. v. Magana*, No. CIV. 03-6393-TC, 2006 WL 559214 (D. Or. Mar. 6, 2006) (threats of physical harm created jury issue regarding equitable estoppel under Oregon law).

This case law indicates that Plaintiffs' theories for equitable estoppel and/or tolling are legally viable; however, factual issues remain. As discussed below, the Court finds that Plaintiffs have raised genuine issues of material fact as to whether these three Plaintiffs' federal claims should be estopped and/or tolled.

### 1. Jane Doe 2

Jane Doe 2 alleges abuse as a minor. Jane Doe 2 turned 18 in 2008. (ECF No. 464-33.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2018. Jane Doe 2 brought her claims in December of 2021. (ECF No. 25.) Plaintiffs argue that Jane Doe 2's statute of limitations should be tolled and/or estopped because Mr. Button's abuse meant that she was "psychologically not ready" to file her claims earlier, and that Mr. Button told her, as a minor, "it didn't matter because of the difference in our age." (ECF No. 464-30 at 3, 6-7.) Defendants argue that Mr. Button could not have prevented her from filing a lawsuit because they have not had contact since 2010 or 2011, when Mr. Button, according to Jane Doe 2's police report, "left the country and blocked everyone." (ECF No. 462-27 at 22.) They also argue that Jane Doe 2's 2018 police report undercuts her argument that she was too afraid to come forward. (*Id.*) In

response, Plaintiffs point to Jane Doe 2's testimony that she was "afraid" to file a police report in 2018 but was able to do so because she "had the help of an organization that walked me through the process," and argue that civil lawsuits offer less protections than the criminal justice system. (ECF No. 464-30 at 6-7.) At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report in this case details the psychological consequences of the alleged abuse on Jane Doe 2. (ECF No. 464-33.)

The Court finds that factual issues preclude summary judgment for Defendants based on the statute of limitations for Jane Doe 2's federal claims. Plaintiffs have brought forth evidence from which a reasonable trier of fact could find that Jane Doe 2's statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged statements which mislead her as to the legality of his conduct. These factual issues include whether Jane Doe 2's testimony is credible, whether Mr. Button mislead Jane Doe as to the illegality of his conduct, and whether she was psychologically unable to bring a civil claim at an earlier time.

### 2. Danielle Gutiérrez

Ms. Gutiérrez alleges abuse as a minor. She turned 18 in 2008. (ECF No. 464-13.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2018. Ms. Gutiérrez brought her claims in September of 2021. (ECF No. 18.) Plaintiffs argue that Ms. Gutiérrez's claims should be tolled and/or estopped because of the effects of Mr. Buttons' alleged threats and intimidation towards her. Ms. Gutiérrez testified that "[t]here is a lot of fear around you, you know, after being mentally, physically, emotionally abused by you for so long with the combination of all the threats you made on my life, my family's life" and that he threatened to kill her and her family if she told anyone about the abuse. (ECF No.

462-15 at 20, 28.) Defendants argue that he could not have prevented her from coming forward because the expert report and police report state that in 2010, he "cut all contact with her" and "blocked her and all the other girls from the studio." (ECF Nos. 464-13 at 2, 21; 462-27.) Like Jane Doe 2, they also argue that her 2018 police report undercuts her argument that she was afraid to come forward. To this, Ms. Gutiérrez testified that she was at the time focused on criminal charges and "wasn't going to pursue damages on my own" until she saw that "there was something already in the works." At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report details the psychological consequences of the alleged abuse on Ms. Gutiérrez. (ECF No. 464-13.)

The Court finds that factual issues preclude summary judgment for Defendants based on the statute of limitations for Ms. Gutiérrez's federal claims. Plaintiffs have brought forth evidence from which a reasonable trier of fact could find that her statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged threats towards Ms. Gutiérrez and her family. The factual issues include whether Jane Doe 2's testimony is credible, and whether the psychological effects of the alleged abuse and/or threats prevented Ms. Gutiérrez from coming forward earlier.

### 3. Rosemarie DeAngelo

Ms. DeAngelo alleges abuse as a minor. She turned 18 in 2009. (ECF No. 464-35.) She was thus required under 18 U.S.C. § 1595(c) to bring her claims by 2019. Ms. DeAngelo brought her claims in September of 2021. (ECF No. 18.) Plaintiffs argue that her statute of limitations should be tolled and/or estopped because Mr. Button told her that his sexual conduct with her was not illegal because of the size of their age difference. At her deposition, Ms. DeAngelo testified, "I had trusted you and what you had told me that because of our age

difference and there wasn't a large enough difference . . . I had understood it based on what you told me as this wasn't sexual abuse," and that "I was pressured, again, by a person in a position of power that I trusted to not say anything; that there was nothing to say, that there was nothing to report." (ECF No. 462-54 at 9.) Ms. DeAngelo also testified that she didn't realize that what had happened to her was sexual abuse until recently. (ECF No. 464-32 at 4.) Defendants argue that Mr. Button could not have prevented Ms. DeAngelo from coming forward because the last alleged coercive statement was in 2007/2008, and they have had no contact because the expert report states that sometime after 2008, Mr. Button blocked her from his phone. (ECF Nos. 462-54 at 9; 464-35 at 2, 12.) At oral argument, Plaintiffs also proffered that evidence of psychological consequences of abuse would support their tolling argument. Dr. Raghavan's expert report details the psychological consequences of the alleged abuse on Ms. DeAngelo. (ECF No. 464-35.)

Like the other two Plaintiffs, the Court finds that factual issues preclude summary judgment for Defendants based on the statute of limitations for Ms. DeAngelo's federal claims. Plaintiffs have brought forth evidence from which a reasonable trier of fact could find that her statute of limitations should be tolled due to the extraordinary circumstances of the psychological consequences of the alleged abuse and should be equitably estopped due to Mr. Buttons' alleged statements which mislead her as to the legality of his conduct. These factual issues include whether Ms. DeAngelo's testimony is credible, whether Mr. Button mislead her as to the illegality of his conduct, and whether the psychological effects of the alleged abuse prevented her from coming forward earlier.

For these reasons, the court denies Defendants' motion for summary judgment as to the statute of limitations for Jane Doe 2, Ms. Gutiérrez, and Ms. DeAngelo's federal claims.

**E. Inconsistent Statements and Contradictory Evidence**

Defendants' primary argument is not that Plaintiffs have not brought forth evidence in support of certain elements of their claims, but rather, that Plaintiffs' statements are false or contradicted by other evidence in the record. As detailed above, each Plaintiff provided testimony regarding their alleged assaults, as well as therapy records, expert reports, and in some cases third-party communications which support their allegations. Defendants have brought forth evidence of contradictory statements in the record. Because the Court does not make credibility determinations nor weigh conflicting evidence, the Court finds that summary judgment is inappropriate on Plaintiffs' claims. The Court will briefly address Defendants' arguments with respect to each Plaintiffs' claims and why summary judgment is inappropriate.

**1. Jane Doe 2**

The Defendants argue that the evidence in support of Jane Doe 2's allegations is contradictory because different evidence states that Jane Doe 2 was abused at different ages and/or years. For example, therapy notes from 2018 state that she was molested at 15 by a dance teacher, but Dr. Raghavan's expert report states that she was molested at 16 or 17 around 2006/2007. (ECF Nos. 464-31, 464-33 at 2.) Whether this renders Jane Doe 2's testimony as to her alleged assault not credible is a determination left to the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Defendants also argue that Mr. Button did not become a regular teacher at Centerstage Dance Academy until 2007, as evidenced by the fact that he only made $1000 for one workshop at Centerstage in 2006. (ECF No. 447-5.) The Court finds that this is again an issue of credibility or conflicting evidence, and that a rational juror could conclude that Mr. Button was teaching at Centerstage when Jane Doe 1 alleges she was assaulted.

### 2. Danielle Gutiérrez

Defendants argue that Ms. Gutiérrez's therapy records and statements to third parties indicate that she is lying. First, they argue that her narrative is false because her therapy records indicate that she was not abused, but rather that she was angry about the breakup and Mr. Button cheating on her, pointing to therapy notes in which Ms. Gutiérrez expresses anger about the breakup and says that Mr. Button cheated on her. That Ms. Gutiérrez was upset about the breakup and/or cheating in her relationship, however, does not negate her testimony that she was abused. Second, Defendants argue that Ms. Gutiérrez is lying about the physical abuse she alleges because she made a statement to a third party stating, "worst I got from him was that he gave me a bloody lip from elbowing me." (ECF No. 444-6 at 4.) Even if this statement is somewhat contradictory to Ms. Gutiérrez's other statements about physical abuse, this is still a credibility determination to be made by the jury.

### 3. Rosemarie DeAngelo

Defendants argue that Ms. DeAngelo's therapy records are contradictory, pointing to Ms. DeAngelo's therapy records from 2017 in which she denied experiencing any sexual, physical, or emotional abuse. (ECF No. 444-7.) Ms. DeAngelo's testimony regarding this is that "I didn't realize that what had happened to me was considered sexual abuse until very recently." (ECF No. 464-32 at 4.) Again, Ms. DeAngelo's credibility in light of this contradictory evidence is a determination to be made by the jury.

### 4. Gina Menichino

Defendants first argue that Ms. Menichino should not be believed because she made a false police report in 2018, pointing to the fact that the case was "cleared by exception." (ECF No. 462-27.) However, this does not mean that the police found Ms. Menichino's testimony to be false. Rather, the report indicates it was cleared because while there *was* probable cause to move forward, the state

could not meet the high standard of proof to file criminal charges because "v is now 22," "no witnesses, no physical evidence," other "v's not cooperative," and "suspect lawyered up." (*Id.* at 40.)

Defendants also argue that evidence shows that Ms. Menichino had a "delusional obsession" with Mr. Button, based on some of her statements to a third party in emails where she stated that she had a crush on him and that she "thinks the BDSM attracts me because ultimately of him." These statements do not disprove Ms. Menichino's claims, and once again raise if anything only an issue of credibility for the jury. Defendants further argue that Ms. Menichino's testimony contradicts itself and pointing to her denial that Mr. Button coerced her into sending "naked photos" of herself to him (ECF No. 444-5 at 5.) Other evidence suggests that there were sexual photos and videos exchanged. (See ECF Nos. 462-22; 462-27 at 14-15.) This is again an issue of credibility.

Finally, Defendants argue that Ms. Menichino directly contradicted her complaint when she denied that Mr. Button controlled her social media. (*Compare* ECF No. 444-5 at 12 with ECF No. 221 at 6.) While this statement does contradict the factual allegations in the complaint, whether Mr. Button controlled Ms. Menichino's social media is not essential to her claims, and in any event comes down to another issue of credibility.

**5. Jane Doe 1**

Defendants argue that evidence contradicts Jane Doe 1's version of events; namely, their statements that they have never met Jane Doe, as well as records indicating that the apartment in which they had the "gun room" did not exist until 2015, after at the time of the alleged rape in 2014. (ECF No. 444-9 at 59-68.) They also argue that Jane Doe 1's allegations are contradicted because different evidence states that Jane Doe 2 was raped at different ages and/or years. For example, the complaint alleges that she was raped by the Buttons in 2014, as a minor; Ms. Raghavan's expert report states that Jane Doe 1 was raped

in 2014/2015 (ECF No. 464-29 at 3); and therapy records state that she was raped at 15 years old (ECF No. 464-24 at 36). Based on therapy records and interrogatory responses, Jane Doe 1 would have been 16 or 17 in 2014. (ECF No. 444-9 at 48, 70.) Finally, Defendants argue that Jane Doe 1's therapy records from 2013 and 2017, where she denied having experienced sexual assault or abuse, show that her testimony regarding the alleged rape is false. (ECF No. 444-9 at 35, 44.)

The Court finds that there is a factual issue as to, if Jane Doe was assaulted by Defendants, when that alleged assault occurred and whether she was a minor. As to the argument that they have never met Jane Doe, a rational juror could find based on Jane Doe 1's testimony as well as records indicating that Jane Doe 1 and Ms. Button may have danced in the same building in Boston during the period when the alleged rape occurred. (*See* ECF Nos. 462-43, 462-44, 462-45, 462-46.) Defendants' other arguments about contradictory evidence and testimony raise credibility issues not appropriate for summary judgment.

### 6. Sage Humphries

Defendants argue that Ms. Humphries allegations of abuse are false, pointing to evidence supporting a narrative that the three of them were in a consensual romantic relationship; that Ms. Humphries' family "kidnap[ped]" her by taking her to California against her will, and that Ms. Humphries afterwards continued to pursue Defendants via phone messages, even after staging a "fake break up" to appease her parents. (See ECF No. 443 at 24-25.) While a reasonable juror could conclude from the record that Ms. Humphries was in a romantic relationship with the Buttons based on text messages and her own testimony, whether this relationship was consensual or included instances of physical and emotional abuse is an issue of fact for the jury.

Defendants also argue that Ms. Humphries allegations are false because she has filed false police reports and lied to police on several occasions, as well

as that she has ulterior motives for filing this lawsuit. They also point to Ms. Humphries' abuse prevention form from 2017, where the box for "caused me to engage in sexual relations by force, threat, or duress" was not checked, which they say contradicts her allegations. (ECF No. 444-4 at 62.) As discussed above, issues of contradictory statements and alleged "lies" are credibility determinations for a jury to decide. The same is true for Defendants ulterior motives theory.

**F. Expert Report**

Defendants argue that Dr. Raghavan's expert report should be stricken because she was not provided with the entire record, only some evidence, which makes her assessment biased (such as evidence where Plaintiffs contradicted their claims). However, as Plaintiffs point out, this argument goes to weight and credibility, not admissibility. "[A]n argument that an expert should have addressed different evidence 'at best, goes to the weight or credibility of [the expert's] analysis, not its admissibility.'" *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1033 (S.D. Cal. 2023) (quoting *Vaporstream, Inc. v. Snap Inc.*, No. 2:17-cv-220, 2020 WL 2543814, at *7 (C.D. Cal. Jan. 10, 2020), and collecting cases). As discussed above, weight and credibility are issues for the jury, and not for the Court. *Soremekun*, 509 F.3d at 984. The Court therefore finds no reason to strike Dr. Raghavan's expert report as inadmissible.

**G. Damages**

Defendants argue that Plaintiffs never produced any proof of emotional distress or economic loss to support a claim of damages. However, as Plaintiffs point out, each Plaintiffs' testimony supports their claims of emotional distress, and they have submitted expert psychology and forensic accounting reports which detail each Plaintiff's emotional distress and economic damages. (ECF Nos. 464-2, 464-21, 464-13, 464-29, 464-33, 464-35, 464-36.) The Court finds these sufficient to create a genuine dispute of material fact as to damages.

1    **V.    CROSS-MOTIONS FOR SUMMARY JUDGMENT ON DEFAMATION**

2    Plaintiffs' motion for summary judgment on Defendants' defamation claims

3    argues that the claims are barred as waived compulsory counterclaims and

4    because Defendants failed to seek leave of court to file their amended

5    counterclaims; the statements underlying the claims are protected by fair

6    reporting privilege; Defendants are limited or general purpose public figures, and

7    Defendants have presented no evidence of actual malice. Defendants' motion

8    argues that summary judgment should be granted on their defamation claims

9    because they are not public figures; the statements are not protected by fair

10   reporting privilege; and the statements are false. For the reasons discussed

11   below, the Court grants in part and denies in part Plaintiffs' motion for summary

12   judgment and denies Defendants' motion for summary judgment.

13   **A. Nevada Law Applies to Defendants Defamation Counterclaims**

14        As a preliminary matter, Nevada law applies to Defendants' defamation

15   claims. "A federal court sitting in diversity must look to the forum state's choice

16   of law rules to determine the controlling substantive law." *Lazar v. Kroncke*, 862

17   F.3d 1186, 1194 (9th Cir. 2017) (quoting *Zinser v. Accufix Research Inst., Inc.*,

18   253 F.3d 1180, 1187 (9th Cir. 2001)). Nevada's choice-of-law principals are

19   governed by Section 145 of the Restatement (Second) of Conflict of Laws in tort

20   actions "unless another, more specific section of the Second Restatement applies

21   to the particular tort*." General Motors Corp. v. Eighth Judicial Dist. Court of State

22   of Nev.*, 134 P.3d 111, 116 (Nev. 2006). The Second Restatement uses a "most

23   significant relationship" test to determine which state's law applies. In *Cornett v.*

24   *Gawker Media, LLC*, a court in this district determined "Section 150 of the Second

25   Restatement applies to multistate defamation and provides that when, as here,

26   'a natural person claims that he has been defamed by an aggregate

27   communication, the state of most significant relationship will usually be the state

28   where the person was domiciled at the time, if the matter complained of was

26

published in that state.'" No. 2:13-CV-01579-GMN-CW, 2014 WL 7330940, at *7 (D. Nev. Dec. 19, 2014) (quoting Restatement (Second) of Conflict of Laws § 150(2) (1971)); *see also Newton v. Nat'l Broad. Co.*, 109 F.R.D. 522, 539 (D. Nev. 1985) (relying on Second Restatement to determine Nevada citizen's defamation claim was governed by Nevada law); *Laxalt v. McClatchy*, 116 F.R.D. 438, 450 (D. Nev. 1987) (same). Here, Defendants admit that they lived in Nevada when this case was filed, up until September of 2022; this means that they were domiciled in Nevada when each alleged defamatory statement was published. (ECF No. 231 at 20, 25.) Defendants do not argue that there is a more significant relationship with another state.[1] As such, the Court finds that Nevada law applies to their defamation claims.

**B. Procedural Background**

Plaintiffs filed their Second Amended Complaint on December 13, 2021. Defendants filed an Amended Counter-Complaint on August 12, 2022, which contained defamation claims against Ms. Humphries for statements made to Good Morning America in an interview on May 27, 2022, and statements made to Boston Magazine in an article published on August 2, 2022. (ECF No. 67.) The Court will refer to these claims as the "original counterclaims." The Court later granted Plaintiffs motion to file a Third Amended Complaint, filed on August 2, 2023. (ECF No. 221.) In response, Defendants filed a Motion to Dismiss and Amended Counter-Complaint, on August 23, 2023. (ECF No. 231.) This amended counter-complaint included several new defamation claims: (1) claims against Ms. Humphries and Ms. Menichino related to statements made to the New York Times in an article published on July 29, 2021; claims against Ms. Humphries for statements made to Pointe Magazine in an article published on December 1, 2021; claims against Ms. Humphries, Ms. Menichino, Ms. Gutiérrez, and Ms.

---

[1] This Court earlier rejected Defendants' argument that it lacks personal jurisdiction over them in Nevada. (*See* ECF No. 379 at 4-5.)

DeAngelo for statements made to Cosmopolitan in an article dated April 5, 2022, and claims against Jane Doe 1 for statements made to the Daily Mail[2] in an article published on September 30, 2021.[3] The Court will refer to these claims as the "new counterclaims." Plaintiffs argued in their motion to dismiss that Defendants' counterclaims were waived as compulsory. The Court found that "the record is unclear as to when Defendants became aware of the facts underlying their new defamation counterclaims, and thus whether Defendants were required to bring the claims earlier," and permitted Plaintiffs to raise the issue again at summary judgment. (ECF No. 379 at 13.) The Court now considers this argument.

### C. Compulsory Counterclaims

Plaintiffs argue that the new counterclaims raised in Defendants'/Counterclaimants' Amended Counter-Complaint filed on August 23, 2023, are compulsory counterclaims that were waived by not being brought in Defendants' original counter-complaint.

Under Federal Rule of Civil Procedure 13(a)(1), a compulsory counterclaim is "any claim that–at the time of its service–the pleader has against an opposing party if the claim . . . arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." A claim also must have matured at the time the pleading is first served to be compulsory. *Navarro v. Hamilton*, No. 5:16-CV-01856-CAS-SPX, 2017 WL 10589992, at *1 (C.D. Cal. Mar. 15, 2017) (quoting *Procare Labs., Inc. v. Gull Labs., Inc.*, 50 F.3d 15, *2 (9th Cir. 1995)). *Lexington*

---

[2] Defendants' counter-complaint references this statement as being made to CNN, however, based on the attached exhibits, this statement was actually published in a Daily Mail article. See ECF No. 437-25 at 4-5.

[3] Defendants also argue that they alleged additional defamation in their counterclaim. However, to plead a defamation claim, Defendants must point to the specific statement they allege is defamatory. *Ponder v. Wild*, No. 2:16-CV-2305-JCM-PAL, 2018 WL 473003, at *3 (D. Nev. Jan. 18, 2018) (citing *Blanck v. Hager*, 360 F. Supp. 2d 1137 (D. Nev. 2005)), *aff'd*, 220 F. App'x 697 (9th Cir. 2007)). The other claims that Defendants reference are general allegations which fail to point to any specific statement or were made by third parties.

*Ins. Co. v. Langei*, No. C12-1036 RSL, 2014 WL 3563380, at *2 (W.D. Wash. July 18, 2014). A compulsory counterclaim is waived if not brought in response to the original pleading. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 470 n.1 (1974).

### 1. Same Transaction or Occurrence

Defendants' counterclaims arise out of the same transaction or occurrence as the Plaintiffs' original claims. In *Pochiro v. Prudential Ins. Co. of Am.*, the Ninth Circuit held that defamation claims were compulsory counterclaims where "the allegedly defamatory statements are sufficiently related to subject matter of the original action," "the facts necessary to prove the two claims substantially overlap," and "the collateral estoppel effect of Prudential's victory in the first action would preclude the Pochiros from denying the truth of Prudential's statements." 827 F.2d 1246, 1251 (9th Cir. 1987). Other courts have applied this same logic to defamation claims related to claims brought in an underlying/original action. *Anspach v. Meyer*, No. CV-13-01877-PHX-DGC, 2014 WL 345676 (D. Ariz. Jan. 30, 2014); *Neuropathy Sols., Inc. v. Massachusetts Bay Ins. Co.*, No. SA-CV-220-1263-DOC-JDE, 2022 WL 6589002 (C.D. Cal. Sept. 7, 2022).

Here, the allegedly defamatory statements are related to the subject matter of the original action—the alleged sexual, physical, and emotional abuse. As in *Pochiro*, the same facts are necessary to prove both Plaintiffs' original claims of abuse and assault, and Defendants' defamation claims. *See* 827 F.2d at 1251. Finally, if Plaintiffs prevail in this action and a jury determines the allegations are true, this would preclude Defendants from denying the truth of these statements. *See id.*

### 2. Maturity

Whether a claim is mature for purposes of Fed. R. Civ. P. 13(a)(1) is synonymous with whether a claim has accrued for statute of limitations purposes. *United Factory Furnishings Corp. v. Alterwitz*, No. 2:12-CV-00059, 2012

WL 2138115, at 3* (D. Nev. June 13, 2012); *Estavilla v. Goodman Grp., LLC*, No. CV 21-68-M-KLD, 2022 WL 539192, at *11 (D. Mont. Feb. 23, 2022) (both citing *Cabrera v. Courtesy Auto, Inc.*, 192 F. Supp. 2d 1012, 1015 (D. Neb. 2002). Because claim accrual for the purposes of statute of limitations is governed by state law, Nevada law governs. *See Mitchell v. Nye Cnty.*, No. 2:20-CV-00086-APG-VCF, 2023 WL 2242149, at *7 (D. Nev. Feb. 27, 2023) (applying Nevada law governing statute of limitations to defamation claim arising under Nevada law, citing *Felder v. Casey*, 487 U.S. 131, 151 (1988) and *Guaranty Trust Co. v. York*, 326 U.S. 99, 109-10 (1945)).

While it appears that in some jurisdictions, a defamation claim arises at the time of publication[4], in Nevada, such a claim accrues when it is discovered, or in other words, when a party knows or should have known of the facts. In Nevada, "there is a two-year statute of limitations on defamation claims, [and] a cause of action does not arise until the party discovers it." *Nutri Pharms. Rsch., Inc. v. Stauber Performance Ingredients, Inc.*, No. 2:20-CV-01041-KJD-DJA, 2021 WL 6773089, at *3 (D. Nev. Mar. 3, 2021) (quoting *Lahren v. Nevada Sys. of Higher Educ.*, 238 P.3d 831, at *1 (Nev. Sep. 18, 2008) (unpublished opinion)); *Mitchell*, 2023 WL 2242149, at *7 (finding that defamation claim accrues under Nevada law when "the aggrieved party knew, or reasonably should have known, of the facts giving rise to the damage or injury" (quoting *G & H Assocs. v. Ernest W. Hahn, Inc.*, 934 P.2d 229, 233 (Nev. 1997) (per curiam)).

Plaintiffs argue that Defendants knew, or should have known, of the facts underlying all their new counterclaims at the time that they filed their original counter-complaint on August 12, 2022. Each article or interview was published before that date. Plaintiffs point out that knowledge of the facts of each

---

[4] *Morales v. Sprint Connect, LLC*, No. CV 18-2816-JFW(AGRX), 2018 WL 2448466, at *4 (C.D. Cal. May 30, 2018) (under California law, defamation claim accrues at time statement is published); *Cusano v. Klein*, 264 F.3d 936 (9th Cir. 2001) (defamation claim accrues upon publication under *California* law).

publication can be attributed to Defendants because each article indicates some type of outreach to their then-attorneys. "Clients are 'considered to have notice of all facts known to their lawyer-agent.'" *Garcia v. Citicorp Tr. Bank FSB*, No. 2:09-CV-00054-JCM-GWF, 2009 WL 3103793, at *1 (D. Nev. Sept. 23, 2009) (citing *Ringgold Corp. v. Worrall*, 880 F.2d 1138, 1141-42 (9th Cir.1989)). The Court agrees with this contention. The New York Times and Cosmopolitan articles both contain statements indicating that an attorney for the Defendants actually received a communication from that news source. The New York Times article contains a statement "sent through a lawyer who is speaking for the couple, Ken Swarts." (ECF No. 437-24 at 6.) The Cosmopolitan article states, that "when reached by Cosmopolitan, [the Buttons'] attorney declined to provide additional comment." (ECF No. 437-28 at 5.) The Court finds that Defendants' legal counsel had knowledge of the fact that these publications were planning to publish articles about their clients. This knowledge is attributed to Defendants, who either knew or should have known of the articles about them published by these sources. Additionally, Plaintiffs point out that Defendants' original counterclaim filed August 12, 2022 mentions that an article about this case had appeared in the New York Times. (ECF No. 67 at 6.) Claims based on statements in these articles are therefore waived as compulsory counterclaims.[5]

The record is less clear as to knowledge of the articles published by Pointe Magazine and Daily Mail. The Pointe Magazine article states that "[a] lawyer for the Buttons, who have denied the allegations, did not respond to requests for comment." (437-27 at 3.) The Daily Mail article quotes statements that attorneys Swartz and Randazza made to other outlets and stated that it had "reached out to both McCawley and Randazza for statements." (ECF No. 437-25 at 5-6.) These

---

[5] Plaintiffs also argue that claims related to the New York Times article are barred by the statute of limitations. Because the Court finds that these claims are waived as compulsory counterclaims, the Court need not reach this issue.

statements do not necessarily indicate that the Buttons or their attorneys *actually* received notice of pending articles. However, the Court finds that based on the evidence before it, Defendants and/or their attorneys should have known of these claims at the time they filed their original counterclaims. These articles were published in September and December of 2021, and Defendants brought their original counterclaims in August of 2022. Defendants were clearly aware at that time that numerous media outlets had published articles about them at the time of the filing—including articles published *after* these were published (such as the GMA and Boston Magazine articles, published in 2022, and brought in the original counterclaim) The counter-complaint even states, "[t]hus far, prominent articles about this Nevada federal case have appeared in, among other publications, the Boston Globe, the New York Times, the Washington Post, CNN, Business Insider, and People Magazine," indicating that Defendants and/or their counsel were well aware of numerous other publications discussing this litigation and the accusations against them. (ECF No. 67 at 6.) Based on this record, Defendants and/or their counsel at the very least should have known about the statements in Pointe Magazine and the Daily Mail. The Court therefore finds that Plaintiffs waived  their counterclaims based on statements in the New York Times, Cosmopolitan, Pointe Magazine, and Daily Mail articles. The Court grants summary judgment to Plaintiffs as to these claims.[6]

**D. Fair Reporting Privilege**

The Court next considers whether the remaining defamation claims are barred because the underlying statements are protected by fair reporting

---

[6] Plaintiffs also argue that Defendants' new counterclaims are barred because they were filed without leave of court. The Court addressed this argument at the motion to dismiss stage, stating, "[b]ecause the Court must liberally construe pro se parties' filings and the law regarding needing to seek leave of court in this situation is complicated, the Court will allow the counterclaims to proceed." (ECF No. 379 at 14.) The Court finds no reason to reconsider this argument at summary judgment.

privilege.

"[T]he fair reporting privilege shields a defendant from liability for publication of defamatory content contained within reports of official actions regarding issues of public concern so long as the publication is a fair, accurate, and impartial summary of the underlying occurrence." *Wynn v. Associated Press*, 475 P.3d 44, 52 (Nev. 2020); *see also Adelson v. Harris*, 402 P.3d 665, 667 (Nev. 2017) (holding that "although the fair reporting privilege is most commonly asserted by media defendants, it extends to any person who makes a republication of a judicial proceeding from material that is available to the general public"). In order to receive the benefit of the fair reporting privilege, (1) it must be "apparent either from specific attribution or from the overall context that the article is quoting, paraphrasing, or otherwise drawing upon official documents and proceedings;" and (2) the statement must constitute a "fair and accurate" description of the underlying proceeding. *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985). Nevada has adopted the *Dameron* test. *Adelson*, 402 P.3d at 668. The fair reporting privilege is "absolute" under Nevada law, meaning that it "precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff." *Adelson*, 402 P.3d at 668 (quoting *Circus Circus Hotels*, 657 P.2d at 101,104 (Nev. 1983). The Court will address each remaining statement in turn.

**1. Ms. Humphries' Statement on GMA**

In a Good Morning America ("GMA") segment, which aired on May 27, 2022, Ms. Humphries stated:

> [Taylor] suggested that we all watch a movie together. [The Buttons] thought we should all have one big group sleepover and bring the mattress out into the living room. I thought again that that was uncomfortable, so we just hung out we watched a movie and Dusty had fallen asleep. I was falling asleep and when I was falling asleep that was the first time that [Mitchell] violated me. And, you think that you're going to know to scream or to get up or to make a loud noise

1

or do anything to stop it from happening, but I just froze and my body just tightened and I just waited for it to be over.

2

(ECF Nos. 231 at 44; 437-29.)

3

The GMA interview begins with the narrator describing "[a] GMA exclusive, the bombshell federal lawsuit." (ECF No. 437-29.) The narrator then begins interviewing Ms. Humphries. (*Id.*) A few questions in, the narrator states "Humphries alleged in the suit that as time went on, the Buttons manipulated and brutalized her and that they also sexually assaulted and verbally abused her." (*Id.*) She then asks, "[a]t what point do you say that the direction turned sexual?" (*Id.*) Ms. Humphries responds with the alleged defamatory statement. (*Id.*) The narrator then again references the lawsuit, stating, "[t]he lawsuit also alleges the Buttons forced Sage to live with them full-time and she wasn't allowed to speak to her parents without their permission . . ." (*Id.*)

This statement draws on, references, and corresponds with allegations made in the complaint, making it a fair and accurate representation of the proceeding.[7] The statement closely follows a description of Ms. Humphries allegation in the lawsuit, and is bookended by another mention of the lawsuit. While these four sentences are not specifically attributed to the lawsuit—for example, Ms. Humphries does not preface it with, "according to my complaint,"— the context of the statement makes it clear that the statement is "otherwise drawing upon official documents and proceedings." *Dameron*, 779 F.2d at 739. The entire segment was also framed as a "bombshell federal lawsuit" report. Given this context, the Court finds that Ms. Humphries statement was fairly and accurately attributed to the underlying lawsuit and is protected by fair reporting privilege.

---

[7] The Third Amended Complaint states, "One evening, Taylor placed a mattress in the living room and insisted that Sage and the Buttons all lay on it and watch a movie, with Taylor laying in the middle. At some point, Dusty pretended to fall asleep. Taylor then rolled over and began to sexually assault Sage." (ECF No. 221 at 19.)

**2. Ms. Humphries' Statements to Boston Magazine**

The article published by Boston Magazine on August 2, 2022, contains the following statements:

> [A]ccording to the lawsuit, the pair had sex with Sage whenever they wanted, without her consent.
>
> Sage states she had grabbed someone's phone to message Taylor via Snapchat, who, along with Dusty, was in Australia. According to the lawsuit, Taylor responded that he wanted to throw Sage in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape her, and leave her to die.
>
> When they were all back in Boston, Sage said, the couple barged in on her while she was showering and told her she was now their girlfriend. It was not posed as a question.

(ECF Nos. 231 at 45; 437-30.)

The first two statements are preceded by the phrase, "[a]ccording to the lawsuit…" (ECF No. 437-30.) These statements are therefore specifically attributed to the underlying lawsuit. They also fairly describe allegations made in the complaint.[8] These two statements are accordingly protected by fair reporting privilege.

The last statement is not directly or through context attributed to the lawsuit. The article begins with a mention of the lawsuit and a description of the New York Times story that immediately followed it. (ECF No. 437-30.) However, the next portion of the article, in which this statement lies, appears to the reader to be based on interviews with Ms. Humphries; it states "[o]ver several months, I spent hours listening to Sage tell her story" and describes several other sources the author spoke to. (*Id.*) It is also not apparent from the context of the article

---

[8] The Third Amended Complaint states that "the Buttons began having sex with Sage whenever they pleased," "Taylor regularly shoved Sage to the ground or on the bed and violently penetrated her without her consent," and "[o]n one occasion, Taylor told Sage via Snapchat that he wanted to throw her in his van, tie her hands and feet, blindfold her, rent a warehouse, hang her from the ceiling, rape Sage, 'and leave [her] there to die.'" (ECF No. 221 at 20-21.)

that this statement is attributable to the underlying proceedings. This specific statement sits several pages into the interview section, in a paragraph that begins with and "[t]hen Sage told me . . ." (*Id.*) The article attributes the statement to Ms. Humphries herself, and not the lawsuit, stating halfway through "Sage said . . ." (*Id.*) Thus, while the article mentions the lawsuit, the average reader would not necessarily know whether Ms. Humphries' statement is "quoting, paraphrasing, or otherwise drawing upon official documents and proceedings," because it appears to be attributed to an interview, and is not made near any reference to the lawsuit. *Dameron*, 779 F.2d at 739; *see also Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 537 (7th Cir. 1982) (application if privilege to entire article not appropriate where government documents were only used to verify some statements); *Montgomery v. Risen*, 197 F. Supp. 3d 219, 266 n.41 (D.D.C. 2016), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017) (fair reporting privilege did not extend to passages of chapter where official reports were not referenced or discussed and chapter was not "premised entirely on summarizing or discussing an official report"). The statement also does not appear to reflect an allegation made in the complaint, meaning that it is not a "fair and accurate" description of the legal proceeding. This statement is not protected by fair reporting privilege. *See Prins v. Int'l Tel. & Tel. Corp.*, 757 F. Supp. 87, 93-94 (D.D.C. 1991) (statements in article about judicial proceeding which fell outside of the actual judicial record were not protected under *Dameron*).

The Court therefore finds that Ms. Humphries' statements on GMA and two of her statements made to Boston Magazine are protected by the fair reporting privilege. As this is an absolute privilege under Nevada law, a claim cannot be maintained. *Adelson*, 402 P.3d at 668. The Court therefore grants summary judgment to Plaintiffs as to Defendants' defamation claims based on these statements.

36

**E. Defamation**

The Court will now analyze the merits of Defendants' remaining defamation claim for the last statement made by Ms. Humphries to Boston Magazine.

To establish a prima facie case of defamation, a plaintiff must prove: (1) a false and defamatory statement by defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Wynn v. Smith*, 117 Nev. 6, 16 P.3d 424 (2001). Additionally, if the defamation plaintiff (here, Defendants) is a public figure, they must show that the statements were made with "actual malice." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, (1964); *Curtis Publishing Company v. Butts*, 388 U.S. 130, (1967). Plaintiffs argue that summary judgment should be granted as to Defendants' defamation claims because they are public figures and have failed to show actual malice.

**1. Public Figures**

General public figures are "those individuals who 'achieve such pervasive fame or notoriety that [they] become[] a public figure for all purposes and in all contexts.'" *Pegasus v. Reno Newspapers, Inc.*, 57 P.3d 82, 92 (Nev. 2002) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Public figures can include "artists, athletes, businesspeople, dilettantes, and anyone who is famous or infamous because of who he is or what he has done." *Cepeda v. Cowles Mags. & Broad., Inc.*, 392 F.2d 417, 419 (9th Cir. 1968). Whether defendants are public figures "is a question of law." *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1070 (C.D. Cal. 2002), *aff'd on other grounds*, 339 F.3d 1119 (9th Cir. 2003).

Plaintiffs argue that Defendants, by their own admissions in this and other judicial proceedings, are public figures. Plaintiffs point to cases in which courts have considered a party's own allegations in determining if they are a public figure: *Peterson v. Gannett Co. Inc.*, 2020 WL 1935520, at *6 (D. Ariz. Apr. 22,

2020) ("Pursuant to his own allegations, Plaintiff is a limited-purpose public figure."); *Resolute Forest Prod., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1017 (N.D. Cal. 2017) ("Resolute's own allegations about their world-wide reach and influence, as well as the public nature of its work in forestry and sustainability, show that the company is a limited public figure for purposes of its participation in the forestry industry.").[9]

In this litigation, Defendants stated that "Defendant Taylor Button was a world-renowned Ferrari builder and designer," "one of the world's most influential custom Ferrari builders," "with a large following both on social media and worldwide amassing millions of fans who idolized him and his work." (ECF No. 231 at 4, 26.) His "work has been featured in numerous publications." (*Id.* at 27.) "Defendant Dusty Button was arguably the most influential and well-respected name in the dance industry," and "became Red Bull's first ever (and only to date) ballet athlete, rendering global recognition in media and amassing an enormous following both on social media and worldwide." (*Id.* at 4.) She "has positively influenced hundreds of thousands of people nationally and internationally, including by performing and teaching in over 30 different countries and across the United States," and "has been published in media publications across the globe" (*Id.* at 25, 26.) "Together, Defendants were sponsored ambassadors [for] countless well-known companies." (*Id.* at 5.)

In other actions, Defendants have described themselves similarly. In one

---

[9] While Defendants' statements in other actions are not binding judicial admissions in this action, they are admissible and can be considered by the Court. "The Ninth Circuit has held that allegations in one case are not binding judicial admissions in a different case." *F.D.I.C. v. CoreLogic Valuation Servs., LLC*, No. SA CV 11-0704 DOC, 2011 WL 5554324, at *8 (C.D. Cal. Nov. 14, 2011) (citing *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir.1995) (holding that allegations from a complaint filed in one action were "admissible but not conclusive admissions" in a second action)); *see also Nuger v. Salke*, No. CV 14-08040-AB (JCX), 2015 WL 13655761, at *5 n.4 (C.D. Cal. Mar. 20, 2015). The Court will therefore consider these statements from other proceedings, but not as binding judicial admissions.

action, they alleged at the time of the events described, they each had half a million followers and subscribers on Instagram. (ECF No. 439-2 at 9-10.) Defendants also stated that their "names and likeness was their business and generated one hundred percent of their yearly revenue, and that and describe "their name brands, known as Dusty Button, Taylor Button, Mitch/Mitchell Button, Mitchell Taylor Button, "The Buttons", Button Built, Button Brand, Bravado by Dusty Button, Meisturwerk and Meisturwerk Machinen." (*Id.* at 9.) They stated in another action that Mr. Button has "been procured from global organizations for speaking engagements and commissions," and that Ms. Button "had over thirty fan pages created by other users." (*Id.* at 10, 31.)

Plaintiffs also point to media coverage of Ms. Button in particular, referencing articles in Ballet News, Dance Spirit, Boston Globe, Glamour, Dance Life, Pointe Magazine, Dance Magazine, Dance Informa, WBTW, and an Instagram post by Red Bull. (ECF Nos. 437-10 to 437-23.)  An article in Dance Life states "you have an amazing following on social media!" (ECF No. 437-24.) An article in Dance Forma stated of Ms. Button, "[s]he is a choreographer, dance fashion line designer, car enthusiast, dedicated wife and an inspiration to young dancers everywhere," and called her social media presence "magnanimous." (ECF No. 437-21.) Dance Informa listed her as one of "10 Ballet Dancers to Follow on Social Media." (ECF No. 437-22.)

The Court finds that based on the evidence in the record, including Defendants' own statements in this case and others, they are public figures.[10] Ninth Circuit case law supports this finding. In *Manzari v. Associated Newspapers Ltd.*, the Ninth Circuit found that a soft-core porn actress was "undoubtedly" a public figure, based on "news coverage related to her considerable success performing in and marketing online soft-core porn,"

---

[10] Because the Court finds that Defendants are general public figures, it does not reach the question of whether Defendants are limited-purpose public figures.

statements in the complaint that "Danni Ashe is considered 'the most downloaded woman on the Internet' and that her image has 'graced the cover of the Wall Street Journal,'" her presence in several adult films, and high website traffic. 830 F.3d 881, 888 (9th Cir. 2016). This was true even if "she is less of a household name than stars in other sectors of the entertainment industry." *Id*. The Ninth Circuit also noted that it had attributed public figure status with those with even less fame than Manzari. *Id*. For example, in *Leidholdt v. L.F.P. Inc*, the court had found that a woman was a public figure where she was "a founding member of the organization Women Against Pornography, has given public speeches against pornography, and has debated its proponents in the national media." 860 F.2d 890, 892 (9th Cir. 1988).

Similarly here, Defendants' own admissions and news articles in the record show that they were subject to significant media coverage. They also had a significant social media following, similar to high website traffic. Like the actress's fame within the softcore porn industry in *Manzari*, they describe Mr. Button "one of the world's most influential" custom Ferrari builders and "the most influential" name in the dance industry." (ECF No. 231 at 4, 26.) While not necessary to the Court's analysis, the Court also finds persuasive the opinion in a case filed by Defendants against attorney in this matter Sigrid McCawley in the Southern District of Florida. *Button v. McCawley*, No. 0:24-CV-60911, 2025 WL 50431 (S.D. Fla. Jan. 8, 2025). In that decision, Judge Leibowitz found that the Buttons were public figures, based on much of the same information as in the record here, "from the face of the complaint." *Id*. at *8-9.

### 2. Actual Malice

Actual malice has been defined as "knowledge that it [the statement] was false or with reckless disregard of whether it was false or not." *Pegasus v. Reno Newspapers, Inc*., 57 P.3d 82, 92 (2002) (citing *Sullivan*, 376 U.S. at 280.) "The question of actual malice goes to the jury only if there is sufficient evidence for

1  the jury, by clear and convincing evidence, to reasonably infer that the

2  publication was made with actual malice." *Id.* at 92.

3      The test for actual malice is a subjective one, focusing on what the

4  defamation defendant believed. *Pegasus.*, 57 P.3d 82, 92 (2002); *Wynn v. Bloom*,

5  No. 2:18-CV-609-JCM-NJK, 2020 WL 13201530, at *4 (D. Nev. Mar. 4, 2020),

6  *aff'd*, 852 F. App'x 262 (9th Cir. 2021). "The inquiry in 'actual malice' focuses

7  largely on the defendant's belief regarding truthfulness of the published material

8  rather than on the defendant's attitude toward the plaintiff." *Nevada Indep.*

9  *Broad. Corp. v. Allen*, 664 P.2d 337, 344 (1983).

10      Plaintiffs argue here that allegations or evidence of falsity of the statements

11  are not enough to show actual malice, because it is the speaker's beliefs about

12  the falsity of the statement that matter at the actual malice inquiry. (ECF No. 437

13  at 41) (citing *Allen v. Sunbelt Commc'ns Co.*, No. 2:07-CV-1409-JCM-PAL, 2008

14  WL 11452330, at *3 (D. Nev. Jan. 22, 2008) (evidence of actual falsity is not

15  sufficient to show that defamation defendants knew of falsity before publication).

16  Plaintiffs have each submitted a declaration attesting to their subjective belief

17  that their statements were true.[11] Plaintiffs argue that Defendants have no

18  evidence showing that Ms. Humphries or Jane Doe 1 did not subjectively believe

19  their statements to be true, and that they are thus entitled to summary judgment

20  because there is no evidence of actual malice.

21      The case law on which Plaintiffs rely generally addresses situations in

22  which a reporter is sued for publishing a statement from another source. *See e.g.*

23  *Allen*, 2008 WL 11452330, at *3 (news outlet sued for publishing photographs

24  _____

25  [11] Ms. Humphries and Jane Doe 1 have each submitted a declaration stating that,
   as to their allegedly defamatory statements: the statements are true, they

26  subjectively believe the statements to be true, and "[t]o the best of my knowledge
   and belief, I did not provide any information to [the publication] beyond

27  information that was already accessible in my complaint against Defendants."
   (ECF Nos. 437-4, 437-5.)

28

alleged to be false). This is different from the issue here, where the individuals being sued are the individuals who made the initial statement *to* a reporter. Several cases have addressed the issue of showing actual malice in this situation, where the only people who would be witnesses to the alleged events underlying the statements are the plaintiff and defendants. In *Chastain v. Hodgdon*, No. 16-2087, 2016 WL 5109944 (D. Kan. Sept. 20, 2016), a district court in Kansas addressed a defamation claim at the motion to dismiss stage based on a statement accusing the defendant of sexual assault. The court discussed the specific circumstances at issue here, where because plaintiff and defendant were the sole witnesses to the incident, their testimony about it goes to both falsity and actual malice:

> In an attempt to further clarify that difference, the court provides this hypothetical: Had plaintiff made a claim against a blog that republished defendant's Facebook post and stated that the blog writer must have known it was false because it never happened, defendant's argument would apply. There, plaintiff's claim that the events never happened does nothing to support that the blog writer knew the story was false when he wrote it, because the blog writer was not there. In this case, however, because defendant and plaintiff were the only two direct actors in events that either did or did not occur, plaintiff's claim of falsity supports both that the statement was false and that defendant necessarily knew it was false at the time she said it—because, according to him, it never occurred. Plaintiff's testimony, then, would be used for two purposes: (1) to show falsity, and (2) to show that defendant knew it was false, which is precisely the standard for actual malice.

*Id.* at *2. The court then found that the plaintiff's testimony that the allegations were false were sufficient to plead actual malice.

The court in *Todd v. Lovecruft* similarly addressed a defamation claim based on allegations of sexual misconduct where "[t]he only evidence supporting either parties' claims are their declarations attesting to conflicting versions of their encounter." No. 19-CV-01751-DMR, 2020 WL 60199, at *20 (N.D. Cal. Jan. 6, 2020). The court found that the conflicting testimony of plaintiff and defendant

42

meant that the defamation plaintiff could show a prima facie case of prevailing on his defamation claim under the anti-SLAPP standard. *Id.* "This is because logically, if [a defamation defendant] is lying, [they] would have to know that their version of events is false because they personally experienced the encounter." *Id.*

Both cases suggest that, in circumstances such as this, evidence of falsity—in the form of contradictory testimony as to allegations of abuse—can also be evidence of malice. While these cases addressed the issue under a motion to dismiss standard (or similar in the anti-SLAPP motion), the court in *Tallman v. Miller*, No. 2:23-CV-1592-HL, 2025 WL 444280 (D. Or. Feb. 10, 2025) (appeal docketed, No. 25-1382 (9th Cir. Mar. 5, 2025), relied on the reasoning in both *Chastain* and *Todd* using a motion for summary judgment standard. There, the defamation defendant had submitted evidence in the form of her declaration and a police report detailing her allegations against the defamation plaintiff. *Id.* at *2. In response, the plaintiff had submitted a declaration which denied all allegations. *Id.* The court found that, because it does not make credibility determinations or weigh evidence at summary judgment, a reasonable jury could believe either party. *Id.* Defendant had therefore presented sufficient evidence of actual malice because "[i]f a jury believes [plaintiff], then [defendant] would appear to have known that the events were false because she experienced them, and 'it is axiomatic that she wrote the narrative with actual malice, or actual knowledge that it was false.'" *Id.* (quoting *Chastain*, 202 F. Supp. 3d at 1222).

The same logic applies here. Ms. Humphries has submitted evidence, described in detail above, in support of her allegations of abuse, as well as a declaration as to her belief that her statements were true. Defendants have submitted declarations denying all allegations of abuse against all Plaintiffs, which includes Ms. Humphries. (ECF No. 471-14 at 4, 8.) As stated in *Tallman*, the court cannot make credibility determinations or weigh evidence on summary judgment; thus, a reasonable jury could believe either Plaintiffs or Defendants.

*See* 2025 WL 444280 at *2 (citing *Anderson*, 477 U.S. at 255). Like in *Tallman*, Defendants' denials of Plaintiffs' allegations are sufficient to create a factual issue as to actual malice. *See id.* The Court additionally notes that Defendants have presented other evidence which could tend to show that Ms. Humphries' allegations are untrue, such as evidence which contradicts her version of events or undercuts her credibility—as discussed *supra*, in section III.1.E.6 (finding that Defendants' evidence raised issues of fact and credibility as to allegations of sexual assault and abuse). This evidence also counsels against granting summary judgment on actual malice. The Court therefore denies Plaintiffs' motion for summary judgment as to Defendants' remaining counterclaims.

Plaintiffs also argued in their motion that if the Court finds factual issues as to actual malice, there are necessarily factual issues as to the "good faith" prong of the anti-SLAPP analysis under NRS 41.637(4). Because the Court denies summary judgment as to actual malice, this argument is moot.

## VI.    CONCLUSION

It is therefore ordered that Plaintiffs' motion for summary judgment (ECF No. 437) is GRANTED IN PART and DENIED IN PART in accordance with this order.

It is further ordered that Defendants' motion for summary judgment (ECF No. 452) is DENIED.

It is further ordered that Plaintiffs' motion to supplement (ECF No. 457) is GRANTED.

It is further ordered that Defendants motion for judicial notice (ECF No. 474) is DENIED AS MOOT.

It is further ordered that Defendants' motion to supplement (ECF No. 461) is GRANTED.

It is further ordered that Defendants' motion to supplement (ECF No. 514) is DENIED.

It is further ordered that Defendants' motion to strike (ECF No. 516) is DENIED.

Dated this 20th day of August 2025.

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE