Mitchell Taylor Button
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
Desmodynamica@gmail.com

Dusty Button
(*Pro se*)
101 Ocean Sands Ct.
Myrtle Beach, SC 29579
Worldofdusty@gmail.com

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

SAGE HUMPHRIES, GINA MENICHINO, ROSEMARIE DEANGELO, DANIELLE GUTIERREZ, JANE DOE 1 AND JANE DOE 2

PLAINTIFFS,

V.

MITCHELL TAYLOR BUTTON AND DUSTY BUTTON

DEFENDANTS

CASE: 2:21-CV-01412-ART-MDC

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO EXTEND TIME TO FILE THE JOINT PRETRIAL ORDER

Plaintiffs' motion is not a neutral scheduling request. It is an attempt to obtain a judicial finding of "bad faith" by presenting three different measurements as though they were the same thing, omitting communications that defeat Plaintiffs' narrative, and blaming Defendants for Plaintiffs' own transfer and review problems. ECF No. 617 at 2. Plaintiffs' accusation of a "bad-faith document dump" is not merely unsupported. It is contradicted by the evidence Plaintiffs themselves filed. Their exhibit confirms that the September 22 transmission added no new exhibits, removed unintended duplicates, corrected descriptions, and expressly superseded the earlier set. ECF No. 617-2 at 2–5. Yet Plaintiffs call it a "new set" and repeatedly collapse 2,017 Bates identifiers, approximately 764 grouped exhibits, and the far smaller number of files actually transmitted into one misleading figure. That is how Plaintiffs manufacture the false appearance that Defendants designated and re-served more than 2,000 separate trial exhibits. The motion similarly rewrites the extension discussions. Defendants never gave unconditional consent and then "revoked" it over stylistic language. Defendants consented to a neutral extension while refusing to sign Plaintiffs' contested factual advocacy as a joint statement. Id. at 2–4. Plaintiffs now use that refusal to accuse Defendants of obstructing the very extension Defendants proposed before Plaintiffs filed ECF No. 616. This is not a fair summary of the record. It is a litigation narrative constructed by deleting the conditions and explanations contained in the same emails Plaintiffs submitted. Defendants completed and transmitted their corrected materials and all remaining JPTO sections before the September 25 deadline. Plaintiffs may seek extra time for themselves, but they should not receive it through an order that rewards a materially misleading account or converts Defendants' compliance into misconduct.

## ARGUMENT

## I. The Supporting Exhibits Establish What Occurred

Defendants submit a narrow evidentiary record directed to the alleged transfer dispute. Exhibit B is the contemporaneous September 18 screenshot of the ShareFile request page Plaintiffs instructed Defendants to use. It expressly states: "Sharing folders is not available with this option. Please use individual files." Exhibit B therefore proves that Defendants could not upload their existing organized folder structure through the link Plaintiffs selected after Defendants already provided the Plaintiffs with the Google Drive folder and link, (the same process the parties have agreed to using for over five years). It also explains why Defendants repeatedly requested a folder-capable link rather than flattening tens of thousands of files into an unstructured mass. Exhibit A is the preserved February 2023 ShareFile notice and workspace record generated through BSF's own system. It shows that BSF previously shared a folder-capable workspace titled "Defendant Productions," containing organized production folders and large compressed productions, including "Buttons 8th production," listed at 35 GB. Exhibit A matters for two reasons. First, it confirms that BSF previously possessed and administered an organized repository of Defendants' productions. Second, it proves that ShareFile could preserve folder structure and accommodate substantial productions when BSF supplied the appropriate workspace permissions. The September 2026 file-request link was not equivalent: it prohibited folders and accepted only individual files. Exhibit C consists of the explanatory pages from Defendants' corrected and superseding exhibit list. It explains that BUTTON0001 through BUTTON2017 are Bates identifiers—not 2,017 discrete exhibits—and that consecutive identifiers bearing the same description constitute one grouped exhibit. The corrected list contains approximately 764 grouped exhibits. Exhibit C supplies the distinction Plaintiffs omit when they repeatedly characterize page-level Bates entries as more

than 2,000 exhibits or files. The accompanying Declaration authenticates Exhibits A through C and the operative directory inventory. It establishes when the screenshots were captured, that they fairly and accurately depict the interfaces shown, that the September 22 set added no new exhibits and removed unintended duplicates, and that the operative directory contained 247 substantive files, including the two Bates-stamped PDF compilations and separately provided native media. These exhibits allow the Court to resolve the transfer narrative from objective records rather than competing rhetoric. The contemporaneous emails are equally direct. On September 22, Defendants instructed Plaintiffs: "Disregard the prior exhibit list and remove the prior 'Final Trial Exhibits' materials from your active trial-review set. The attached list and corresponding replacement exhibit files are now the operative versions. Do not combine the prior and replacement versions as we have already narrowed the exhibit list." ECF No. 617-2 at 5. Defendants then explained that the 2,017 identifiers "do not represent 2,017 separate trial exhibits" and supplied the grouped count. Id. The description of an additional "new set" cannot be reconciled with those contemporaneous instructions.

## II. Plaintiffs' Own Evidence Refutes the Motion's Central Premises

Plaintiffs tell the Court that Defendants sent a "new set of exhibits" on September 22 and thereby forced Plaintiffs to restart review of all 2,017 entries. ECF No. 617 at 2. Their own attached correspondence expressly says the opposite: the transmission was corrected, deduplicated, and superseding; **no exhibits were new**; and the earlier version should be disregarded to prevent confusion. ECF No. 617-2 at 2–5. There is no ambiguity. Plaintiffs demanded corrected descriptions and a revised set, received exactly that, and then characterized the correction as a new production causing additional prejudice. That characterization cannot be reconciled with Plaintiffs' *own evidence*. Defendants stated this

repeatedly and without qualification. At 1:10 p.m. on September 22: “Defendants did not add or serve ‘new exhibits’ on September 22. The underlying materials had already been produced.” ECF No. 617-2 at 3. At 6:03 p.m.: “The September 22 transmission added no new exhibits.” Id. at 2. Plaintiffs attached both statements to their motion, yet their motion still characterizes the corrected set as new. That is not an inference dispute; it is a contradiction between Plaintiffs’ advocacy and the record they filed. Plaintiffs also repeatedly conflate Bates identifiers with exhibits and files. BUTTON0001 through BUTTON2017 are sequential Bates identifiers. They do not represent 2,017 discrete exhibits. The corrected list groups those identifiers into approximately 764 exhibits because many records span multiple Bates entries. A single therapy record, (provided by the Plaintiffs), transcript, police report, email chain, or other multi-page document may occupy dozens of consecutive entries while remaining one exhibit. ECF No. 617-2 at 4–5. Nor did the operative transfer contain more than 2,000 separate files. The operative directory contained 247 substantive files, including two principal Bates-stamped PDF compilations and separately produced audiovisual and image files. Plaintiffs’ assertion that the operative set “still contains more than 2,000 files” is therefore intentionally and factually wrong, not a matter of characterization. Plaintiffs remain free to argue that approximately 764 grouped exhibits should be narrowed. They are not entitled to secure that relief by repeatedly presenting page-level Bates numbers, grouped exhibits, and physical files as interchangeable. The distinction was explained to them before this motion was filed. Their continued use of the inflated “more than 2,000” figure, without candidly distinguishing what it measures, is materially misleading. It supplies both the supposed burden and the accusation of bad faith. Once the three measurements are stated honestly, the motion’s central narrative collapses.

## III. Defendants Completed Their Submissions Before the Court-Ordered Deadline

The governing deadline is September 25, 2026. ECF No. 610. At 1:26 a.m. on September 22, Defendants transmitted the corrected and superseding exhibit list and files, Attachment A, specific objections to Plaintiffs' third-party deposition designations, conditional counter-designations, specific objections to Plaintiffs' trial exhibits, and Defendants' remaining proposed JPTO sections. ECF No. 617-2 at 5. Defendants therefore completed the materials within their control more than three days before the Court-ordered deadline. Plaintiffs' inability to finish their review during that period may support a request for time for Plaintiffs, but it does not establish a missed deadline or misconduct by Defendants. The September 22 corrections did not disclose new evidence or enlarge the set. They reduced confusion, removed duplicates, and corrected descriptions in direct response to Plaintiffs' complaints. Id. at 2–5. Plaintiffs cannot demand corrections, receive them, and then weaponize the corrections as proof of an "eleventh-hour" bad-faith production. That is not a good-faith description of the sequence. It punishes compliance while concealing the decisive fact—contained in Plaintiffs' own exhibit—that the revised set included no new exhibits.

## IV. Plaintiffs Cannot Recast Their Transfer and Review Problems as Defendants' Bad Faith

The transfer record shows a contested technical process, not obstruction. Plaintiffs acknowledged that individual Google Drive files opened but stated that Google created zip packages when they attempted to download folders. ECF No. 617-2 at 6. Defendants repeatedly explained that, as pro se litigants with limited paid storage, completed batches had to be downloaded before the same space could be reused; requested identification of any

particular inaccessible file; and sought confirmation that completed folders had been saved. Plaintiffs did not provide a workable folder-preserving alternative. Their ShareFile request page expressly stated: “Sharing folders is not available with this option. Please use individual files.” Ex. B. That contemporaneous screenshot directly corroborates the precise limitation Defendants reported.

Plaintiffs’ own prior ShareFile configuration further exposes the problem with blaming Defendants. In February 2023, BSF sent Defendants access to a ShareFile workspace titled “Defendant Productions.” The preserved ShareFile record shows an organized folder environment containing production folders and large compressed productions, including a folder labeled “Buttons 8th production” listed at 35 GB. Ex. A. Thus, BSF had previously used a folder-capable ShareFile workspace for these parties and substantial productions. In September 2026, however, Plaintiffs supplied a materially more restrictive file-request link that prohibited folders and accepted only individual files. The resulting (alleged) inability to reproduce the existing folder structure was a limitation of Plaintiffs’ chosen link—not evidence that Defendants engaged in a document dump or refused to provide organized materials. The same history explains why Defendants first asked Plaintiffs to return or restore access to Defendants’ prior productions as Plaintiffs maintained them. On September 2—before the exhibit dispute—Defendants requested access to the complete set of materials previously produced to Plaintiffs, including the folders, subfolders, filenames, indexes, and upload or download records showing what Plaintiffs had received. ECF No. 616-2 at 22. Had Plaintiffs restored the folder-capable access BSF previously provided, Defendants could have compared the existing production, preserved its original organization and identifiers, and selected trial materials without paying to restore and retransmit hundreds of gigabytes

Plaintiffs had already received. Plaintiffs refused to provide that access, even though they provided it before. The sudden reluctance to accommodate creates suspicion of lost or deleted production. The September 2 request could not have been clearer: "Please provide access to the complete set of those materials as maintained by Plaintiffs/your office, including any folders, subfolders, file names, indexes, upload/download records, correspondence references, or other identifying information showing what Plaintiffs received from Defendants." ECF No. 616-2 at 22. That request predates Plaintiffs' claim that Defendants caused the alleged transfer crisis. Plaintiffs' failure to return or identify the organized production forced Defendants to reconstruct and retransmit a record BSF's own ShareFile history shows it had previously maintained and should still possess. The record does not establish whether Plaintiffs deleted the prior folders, lost access to them, archived them elsewhere, or simply declined to return them. It establishes something narrower and decisive: BSF previously maintained an organized "Defendant Productions" workspace, Defendants timely asked for access to the existing production record, Plaintiffs did not provide it, and Plaintiffs later blamed Defendants for the burdens of recreating and retransmitting the same materials through a link that prohibited folders. Whatever explains Plaintiffs' present inability or refusal to supply the previously available structure, its consequences cannot fairly be converted into Defendants' bad faith.That limitation is fatal to Plaintiffs' attempt to place exclusive responsibility on Defendants. Plaintiffs criticize the scale and organization of the production while directing Defendants to a portal that prohibited the organized folders from being uploaded at all. Flattening those folders into one mass of individual files would have destroyed the organization Plaintiffs claimed they needed and predictably invited another accusation of an

unstructured dump. Plaintiffs cannot create that dilemma, refuse to correct it, and then present the resulting delay as evidence of Defendants' bad faith.

The motion also omits the earlier correspondence explaining that one folder was accessed while its upload was still in progress, directing Plaintiffs to disregard that incomplete download, and identifying the completed replacement. ECF No. 616-2 at 7–11. The same correspondence explained that the evidence was not new discovery and described the BUTTON organization. Id. Those omissions are not minor. They remove the facts that explain both the incomplete folder and Defendants' efforts to correct it, leaving the Court with the false impression that Defendants knowingly served unusable materials. Plaintiffs' inability to retrieve, preserve, organize, or timely review evidence does not transform previously produced material into new evidence or Defendants' corrective transmission into bad faith. Defendants also repeatedly asked Plaintiffs to identify any allegedly inaccessible native file by filename, BUTTON number, error message, and the ESI provision allegedly violated. ECF No. 616-2 at 8–10. Plaintiffs instead continued making generalized assertions while admitting that individual files could be opened. ECF No. 617-2 at 6. A generalized transfer complaint cannot support a finding of bad faith where Defendants requested the information necessary to investigate any actual defect and Plaintiffs did not identify one with the requested specificity. To date, Plaintiffs have still not identified any corrupted file issue. Plaintiffs' admission is decisive: "We can open individual files for viewing, but cannot download the folders themselves." ECF No. 617-2 at 6. Thus, Plaintiffs did not claim that the operative evidence was universally corrupted or inaccessible. They identified a folder-download problem while simultaneously directing Defendants to a ShareFile request that expressly prohibited folders. Ex. B. Defendants, meanwhile, asked Plaintiffs to identify "the exact filename, BUTTON

number, error message, and specific ESI-protocol provision allegedly violated" for any remaining inaccessible media. ECF No. 616-2 at 8. Plaintiffs' own words demonstrate both the limited nature of their problem and Defendants' attempt to obtain the information necessary to correct any actual defect. The additional historical folders also were not random material appended to create burden. Defendants explained that the records had previously been produced and were preserved because Jane Doe 1 has not supplied a definite and consistent date, time, or location for the alleged encounter Defendants deny ever occurred. ECF No. 616-2 at 5, 7–9. Defendants' ability to use any particular historical record remains subject to the Court's evidentiary rulings, and the appropriate scope of trial designations is disputed in ECF No. 616. But Plaintiffs cannot omit the stated evidentiary purpose and portray the folders as an unexplained dump. Their breadth directly reflects the breadth of the unresolved timeframe Defendants have been required to defend against.

## V. Defendants Did Not Revoke Unconditional Consent

Plaintiffs state that Defendants agreed to an extension and later "revoked their consent" because Plaintiffs declined to include "extraneous arguments." ECF No. 617 at 3. Again, Plaintiffs' own evidence disproves the characterization. Defendants consented to a neutral extension before ECF No. 616 was filed, then repeatedly maintained that consent so long as a joint filing did not falsely present disputed facts as agreed facts. ECF No. 617-2 at 2–4; ECF No. 616-2 at 2, 5. Defendants proposed concise alternative language and explained that they would not sign a stipulation portraying 2,017 Bates entries as 2,017 exhibits or attributing the delay solely to Defendants. Id. Plaintiffs acknowledged the actual position on September 18: "We understand that Defendants consent to extending the JPTO deadline. But that is not the only relief Plaintiffs seek." ECF No. 616-2 at 2. Defendants repeated on

September 22: "Defendants consent to extending the JPTO deadline to October 9, 2026, but cannot agree to Plaintiffs' proposed stipulation because it materially mischaracterizes the record." ECF No. 617-2 at 3. Those statements establish continuing consent to the date and a substantive objection to disputed factual recitals. Describing that record as a revoked agreement is inaccurate. Refusing to sign Plaintiffs' disputed advocacy as a "joint" statement was not revoking consent; it was refusing to endorse statements Defendants maintain are false. Plaintiffs could seek an extension independently, as they ultimately did. Their contrary characterization is disproved by the emails they filed.

## VI. Plaintiffs Have Not Shown Good Cause for the Relief as Framed

Rule 16(b)(4) requires diligence and good cause. Plaintiffs possessed the initial Bates-stamped set and chart beginning September 16, identified concerns by September 17, and received the corrected, deduplicated operative set on September 22. ECF No. 617-2 at 2–6. Their own emails confirm that individual files opened. Id. at 6. The remaining dispute concerns how Plaintiffs chose or were able to download folders, how quickly they reviewed them, and whether approximately 764 grouped exhibits should be narrowed. None of those issues proves that Defendants served more than 2,000 exhibits or files, disclosed new evidence, missed the September 25 deadline, or acted in bad faith. Plaintiffs also cannot attribute the remaining time pressure entirely to Defendants while ignoring how Plaintiffs chose to use the available time. Rather than complete their objections and assemble the JPTO while preserving their right to challenge particular designations, Plaintiffs filed ECF No. 616 on September 18, circulated multiple competing stipulation drafts on September 22, and filed the present motion on September 23. During the same period, Defendants corrected the chart, removed unintended duplicates, completed the remaining JPTO sections, and transmitted the

operative materials before the deadline. The time Plaintiffs, (an entire firm), elected to devote to motion practice was Plaintiffs' litigation choice. It is not evidence that Defendants prevented Plaintiffs from working on the JPTO, and it should not be converted into a finding that Defendants caused the delay. Nothing prevented Plaintiffs from preparing objections concurrently, identifying any specific exhibit they could not open, or submitting objections subject to supplementation if the Court later ruled on ECF No. 616. Plaintiffs instead sought to halt the process, obtain a limitation order, and place responsibility for the resulting delay on Defendants. Plaintiffs chose motion practice over completing the JPTO and cannot blame Defendants for that choice. They have possessed and used this evidence for years. Any extension should be solely for Plaintiffs' benefit and should reject their false claims of delay, new evidence, a "document dump," or more than 2,000 exhibits, without prejudging ECF No. 616 or admissibility.

## CONCLUSION

Plaintiffs' own evidence disproves their account. Defendants served no new exhibits, corrected and narrowed the operative materials, and met the Court-ordered deadline despite Plaintiffs' restrictive portal and refusal to identify specific defects. The Court should deny the motion as framed or grant only a neutral extension for Plaintiffs' benefit, without attributing delay or bad faith to Defendants or affecting ECF No. 616 or admissibility.

Respectfully dated this 24th day of September, 2026



Mitchell Taylor Button and Dusty Button (pro se)

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing document was filed with LV_public_docketing@nvdcourts.gov on September 24th, 2026 and served on all parties via email.

Dated this 24th day of September, 2026,

Mitchell Taylor Button and Dusty Button (*Pro se*)